IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAWN GRAY,<br><br>                     *Plaintiff*<br><br>   v.<br><br><br>MAIN LINE HOSPITALS, INC.,<br><br>               *Defendant* | Case: 2:23-cv-00263-KNS |

---

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

---

Caren Litvin, Esq.
(Pa. Atty I.D. No. 41796)
150 N. Radnor Chester Road, Suite F-200
Radnor, PA  19087
CL@litvinlawoffice.com
(610) 977-2049 (office)
*Counsel for Defendant, Main Line Hospitals, Inc.*

Brendan Hennessy
(Pa. Attorney I.D. No. 91831)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
bhennessy@hennessylawfirm.com
(484) 875-3111 (office)
*Of Counsel to Litvin Law Office
for Defendant, Main Line Hospitals, Inc.*

Dated:  October 2, 2023

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................................ iii

I.     INTRODUCTION ............................................................................................................ 1

II.    SUMMARY JUDGMENT STANDARD ......................................................................... 3

III.   LEGAL ARGUMENT ...................................................................................................... 3

  A.    Gray cannot establish a religious failure-to-accommodate claim .................................. 4

    1.    Gray's objections to receiving the COVID-19 vaccine are not "religious" beliefs requiring accommodation under Title VII or the PHRA. .................................................... 5

    2.    Granting Plaintiff a religious exemption would have imposed an undue burden on MLH's efforts to protect patients and employees ........................................................... 13

  B.    Plaintiff has failed to establish a disparate treatment discrimination claim based on religion. ............................................................................................................................... 20

  C.    Plaintiff has failed to establish an age discrimination claim ........................................ 22

IV.   CONCLUSION ............................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Abels v. DISH Network Serv.*, LLC, 507 Fed.Appx. 179 (3d Cir.2012) ........................................ 23

*Abramson v. William Paterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001) .................. 4

*Africa v. Pennsylvania*, 662 F.2d 1025  (3d Cir. 1981) .............................................. 5, 6

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) .................................................... 3

*Atkinson v. LaFayette Coll*., 460 F.3d 447 (3d Cir. 2006).............................................. 4

*Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. CV 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022) ........................................................................... 5, 11, 17, 20

*Beickert et al. v. NYC Dept. of Education*, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236 (E.D.N.Y. Sept. 25, 2023)........................................................................ 9, 16

*Biden v. Missouri*, 142 S.Ct. 647 (2022)........................................................ 3, 15, 18

*Borrello v. Respironics California, LLC*, No. 23-CV-580-GPC-WVG, 2023 WL 5986135  (S.D. Cal. Sept. 14, 2023)................................................................... 12

*Brown v. Children's Hosp. of Philadelphia*, 794 F. App'x 226 (3d Cir. 2020)....................... 5, 10

*Brox v. Hole*, 590 F. Supp. 3d 359 (D. Mass. 2022)................................................. 11, 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 3

*Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377 (E.D. Pa. 2013) ................................... 22

*Detwiler v. Mid-Columbia Med. Ctr.*, No. 3:22-CV-01306-JR, 2022 WL 19977290  (D. Or. Dec. 20, 2022), report and recommendation adopted, No. 3:22-CV-01306-JR, 2023 WL 3687406 (D. Or. May 26, 2023) ........................................................................ 11

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768 (U.S. 2015)................................... 21

*E.E.O.C. v. Geo Group, Inc.*, 616 F.3d 265 (3d Cir. 2010) ........................................... 15

*Fallon v. Mercy Catholic Med. Ctr. Of Southeastern PA*, 877 F.3d 487  (3d Cir. 2017)..... 4, 5, 10

*Fasold v. Justice*, 409 F.3d 178 (3d Cir.2005)....................................................... 22

*Federoff v. Geisinger Clinic*, 571 F. Supp. 3d 376 (M.D. Pa. 2021)........................................ 5, 16

*Finkbeiner v. Geisinger Clinic*, 623 F.Supp.3d 458 (M.D.Pa. 2022) ........................................... 10

Fuentes v. Perskie, 32 F.3d 759  (3d Cir.1994) ...................................................................... 22

*Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir. 1976) ................................................ 3

*Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265 (3d Cir. 2005) ............................................... 3

*Groff v. DeJoy*, 600 U.S. 447 (2023) ................................................................................ 14, 15

*Kiel v. Mayo Clinic Health Sys. Se. Minnesota*, 2023 WL 5000255 (D.Minn.Aug. 4, 2023) ...... 11

*Makky v. Chertoff*, 541 F.3d 205 (3d Cir. 2008) .................................................................... 21

*Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47  (2d Cir. 1988) ......................................... 12

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792  (1973) ...................................................... 22

*Miller v. Port Authority of New York and New Jersey*, 788 Fed.Appx. 886  (3d Cir. 2019) .......... 9

*Pa. State Univ. v. Pa. Hum. Rels. Comm'n*, 95 Pa.Cmwlth. 388, 505 A.2d 1053 (Pa. 1986) ........ 4

*Passarella v. Aspirus, Inc.*, 2023 WL 2455681  (W.D. Wis. Mar. 10, 2023) .............................. 12

*Prewitt v. Walgreens Co.*, 2012 WL 4364660 (E.D. Pa. Sept. 25, 2012) .................................... 11

*Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129  (3d Cir.1986) ............................................. 15

*Smith v. City of Allentown*, 589 F.3d 684 (3d Cir.2009) ........................................................ 22

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) .................................................... 14

*Ulrich v. Lancaster Gen. Health*, No. CV 22-4945, 2023 WL 2939585 (E.D. Pa. Apr. 13, 2023)
............................................................................................................................. 10

*United States v. Seeger*, 380 U.S. 163 (1965) ..................................................................... 5, 9

*Webb v. City of Philadelphia*, 562 F.3d 256 (3d Cir. 2009) ...................................................... 5

*Wisconsin v. Yoder*, 406 U.S. 205  (1972) ........................................................................... 6

**Statutes**

Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§951 et seq. ..................................... 3, 4

Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §2000e-2(a) et seq. .................... passim

## <u>Rules</u>

Rule 56 of the Federal Rules of Civil Procedure ........................................................................ 1, 3

## I.      **INTRODUCTION**[1]

In March 2020, COVID-19 plunged the world into a global pandemic that has claimed the lives of over a million Americans to date.  Main Line Health (MLH) and other health care institutions were on the front lines of fighting the pandemic as sick patients flooded into the hospital in need of care.  COVID infection and death rates for health care workers with direct patient care were higher than for the general population.  With the rise of the Delta variant in 2021, MLH implemented a policy requiring employees to be vaccinated against COVID-19 in order to protect patients, employees, staff and their families. (SMF ¶41). The MLH COVID-19 Vaccination Policy allowed exemptions for valid medical conditions or sincerely held religious beliefs. Employees who did not receive the vaccine or an approved exemption were subject to termination. (SMF ¶44).

Plaintiff, Dawn Gray, was a nurse in the Emergency Department at Paoli Hospital.  (SMF ¶1) She submitted a request for a religious exemption from the COVID-19 vaccine focued on her decision not to pursue in vitro fertilization based on her stated religious beliefs, but did not tie those decisions to her opposition to the COVID-19 vaccine.  (SMF ¶¶54-57). She further stated that she was not opposed to all vaccines, and had received the flu vaccine which had been mandated by MLH for years.  (SMF ¶¶ 62-63). Gray objected to genetic components in the COVID vaccine, and her pastor submitted a statement on her behalf, asserting that Gray believed that the vaccine would alter ther genetic make up of her body.  (SMF ¶¶66, 76). The Religious Exemption Committee determined that COVID vaccines did not alter one's genetic makeup, and regardless

---

[1] Defendant's Proposed Statement of Undisputed Material Facts (SMF), which is filed contemporaneously with this Memorandum of Law in accordance with Fed.R.Civ.P. 56 and Section E(4) of the Court's Policies and Procedures, is referenced herein as "SMF" followed by the specific paragraph which contains the full factual statement and record evidence in support of such assertion.

of the accuratcy of Plaintiff's statements about genetics, her exemption request was focused on science, rather than explaining her religious opposition to the vaccine. (SMF ¶¶97-105) The Religious Exemption Committee concluded that Plaintiff failed to articulate a sincerely held religious belief that precluded COVID vaccination.   (SMF ¶¶92, 107) After the religious exemption committee denied her exemption request, Gray submitted an appeal, in which she added a new basis for her exemption request, contending that the COVID vaccines were tested on fetal cell lines which violate her religious opposition to abortion. (SMF ¶¶117-121). The appeals process did not consider new theories for objecting to the vaccine, but rather, was designed to ensure that the original committee had applied the standards for exemption requests equitably and consistently. (SMF ¶¶111-116) The Appeals Committee denied Gray's appeal as she relied predominantly on medical concerns and failed to explain how her religious beliefs precluded vaccination.  (SMF ¶¶137-141). Gray was a valued member of the Paoli Emergency Department and MLH did not want to lose her.  (SMF ¶142).   As Gray had exhausted her avenues for an exemption and declined to get the COVID vaccine, she was terminated in accordance with the COVID-19 Vaccination Policy.  (SMF ¶143-146).  She filed suit, claiming that her termination constituted religious discrimination and age discrimination.  (ECF Doc. No. 1).

Now that discovery is complete, Defendant moves for summary judgment as Plaintiff cannot satisfy the most basic elements of her claims.  Even viewing the evidence in the light most favorable to her, Gray cannot prevail in this lawsuit because her objections to receiving the COVID vaccine are not based on religious beliefs and are not entitled to accommodation.  To the contrary, Plaintiff's exemption request presented medical and scientific objections to the COVID-19 vaccines rather than religious concerns.  She further offers no support for her belief that MLH discriminated against her because of her age.

Finally, the Policy arose out of significant known safety concerns in the midst of a deadly pandemic, and Defendant should be granted judgment as a matter of law because allowing Gray to work unvaccinated in the Emergency Room, where she rendered bedside care to vulnerable patinents, would have amounted to an undue hardship given the undeniable safety interests involved. *See Biden v. Missouri*, 142 S.Ct. 647, 652 (2022)(upholding conclusion of the Secretary of Health and Human Services that a COVID-19 vaccine mandate was "necessary to promote and protect patient health and safety" in relation to providing services for Medicaid and Medicare patients).

## II.    **SUMMARY JUDGMENT STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*.  In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). This requirement upholds the purpose of summary judgment "to eliminate a trial in cases where it is unnecessary and would only cause delay and expense." *Goodman v. Mead Johnson & Co*., 534 F.2d 566, 573 (3d Cir. 1976).

## III.    **LEGAL ARGUMENT**

Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §2000e-2(a) *et seq*. and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§951 *et seq.* prohibit religious

discrimination in employment.[2]   Employees may assert two different theories of religious discrimination: failure to accommodate and disparate treatment. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 281 (3d Cir. 2001).  Plaintiff's five-count Complaint (ECF Doc. No. 1) purports to assert both failure to accommodate and disparate treatment theories of religious discrimination as well as an age discrimination claim:

- Plaintiff alleges that MLH failed to accommodate Plaintiff's request for a religious exemption to the COVID-19 vaccine mandate in violation of Title VII (Count One) and the PHRA (Count Three);

- Plaintiff further contends that MLH subjected Plaintiff to disparate treatment based on her religion in violation of Title VII (Count Two) and the PHRA (Count Four); and

- Plaintiff contends that MLH discriminated against her based on her age in violation of the PHRA (Count Five).

As detailed below, Plaintiff is unable to establish a prima facie case to maintain any of her claims.

### A.    Gray cannot establish a religious failure-to-accommodate claim

Gray contends that MLH engaged in religious discrimination by denying her request for an exemption from the COVID-19 vaccine mandate based on what she claims was a sincere religious objection.  To establish a prima facie failure-to-accommodate claim, Gray must establish that (1) she holds a religious belief that conflicts with a job requirement, (2) she informed MLH of the conflict, and (3) she was disciplined for failing to comply with the conflicting requirement. *Fallon v. Mercy Catholic Med. Ctr. Of Southeastern PA*, 877 F.3d 487, 490 (3d Cir. 2017).  If Gray makes such a showing, then the burden shifts to MLH, which can obtain judgment in its favor by demonstrating either (1) "it made a good-faith effort to reasonably accommodate the religious belief," or (2) "such an accommodation would work an undue hardship on the employer and its

---

[2] Plaintiff's claims under Title VII and the PHRA are coextensive and are thus considered under the same framework. *Atkinson v. LaFayette Coll*., 460 F.3d 447, 454 n. 6 (3d Cir. 2006); *Pa. State Univ. v. Pa. Hum. Rels. Comm'n*, 95 Pa.Cmwlth. 388, 505 A.2d 1053 (Pa. 1986).

business." *Aukamp-Corcoran v. Lancaster General Health*, No. 19-5734, 2022 WL 507479, at *3 (E.D. Pa. Feb. 18, 2022) *citing Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009).

As detailed below, Plaintiff cannot establish a failure to accommodate claim under Title VII because she cannot meet her burden of demonstrating that her objections to the vaccine were religious and, even if she could, MLH would have suffered an undue hardship by allowing unvaccinated nurses with direct patient contact such as Plaintiff to work in the midst of a pandemic.

        **1.**     **Gray's objections to receiving the COVID-19 vaccine are not "religious" beliefs requiring accommodation under Title VII or the PHRA.**

To establish a failure to accommodate claim under Title VII, it is not sufficient merely to hold a "sincere opposition to vaccination"; rather, the individual must show that the "opposition to vaccination is a religious belief." *Brown v. Children's Hosp. of Philadelphia*, 794 F. App'x 226, 227 (3d Cir. 2020), *citing, Fallon v. Mercy Catholic Med. Ctr.. supra*, 877 F.3d at 490.  In evaluating whether a belief can be termed "religious," as opposed to an "isolated moral teaching" or a philosophical belief, a judge must determine whether it "addresses fundamental and ultimate questions having to do with deep and imponderable matters," whether it is "comprehensive in nature," and whether it is accompanied by "certain formal and external signs." Id. at 481, *quoting Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981).

Assessing whether a person's beliefs are religious is often a difficult, but necessary, step in a Title VII suit.  *Federoff v. Geisinger Clinic*, 571 F. Supp. 3d 376, 387 (M.D. Pa. 2021). Although courts should not inquire into validity or plausibility of a belief, courts must  differentiate between views that are religious in nature from those views that are "essentially political, sociological, or philosophical." *Fallon v. Mercy Catholic Med. Ctr*., supra,  877 F.3d at 490 (*quoting United States v. Seeger*, 380 U.S. 163, 165 (1965)). Moreover, "the very concept of ordered liberty" precludes courts from granting a person "a blanket privilege 'to make his own

standards on matters of conduct in which society as a whole has important interest.' " *Africa v. Pennsylvania*, *supra*, 662 F.2d at 1031 (*quoting Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)).

Gray's Title VII claim fails because her articulated reasons for the requested exemption were not religious in nature; rather they were predicated on scientific claims.  The first question on MLH's COVID-19 Religious exemption form asked applicants to "provide a personal statement detailing the sincerely held beliefs that are religious in nature regarding your COVID-19 vaccination objection, explaining why you are requesting this exemption, the religious principles that guide your objections to COVID-19 vaccination and the religious basis that prohibits the COVID-19 vaccination."  In response, Gray stated that she and her husband tried "low tech" fertility options (which she did not identify), but decided against hormones, Artificial Insemination (AI) or In Vitro Fertilization (IVF):

> Even though I could apply for a medical exemption due to my allergy to PEG, I have chosen to apply for a religious exemption due to the personal conviction of my religious belief. I have a personal explanation as to why I religiously object to the current COVJD 19 vaccines The best example to explain my objection is when my husband and I tried to conceive children. After not conceiving for a couple of years, we pursued further fertility options. We went through the testing to determine if it was a structural or hormonal issue. We tried some "low tech" options to achieve a successful pregnancy resulting in several miscarriages. When the next fertility options were presented to us, we prayerfully considered them and concluded our faith and personal belief did not peacefully allow us to take further steps (hormones, AI, IVF, etc). Our belief was if we were to have children that God would allow it to happen through natural means. As Psalm 139:13-16 states "For you created my inmost being; you knit me together in my mother's womb. I praise you because I am fearfully and wonderfully made; your works are wonderful, I know that full well. My frame was not hidden from you when I was made in the secret place, when I was woven together in the depths of the earth. Your eyes saw my unformed body: all the days ordained for me were written in your book before one of them came to be" (NIV). I believe that life begins at conception and ends at natural death. It is this same belief system that guides my objections to getting the current COVlD 19 vaccination. I am not comfortable having genetic components that my body did not create injected into my body.

(SMF ¶ 56). Although she references the Bible, she fails to explain how her religious beliefs are incompatible with the COVID vaccine.  Nor does she explain how the COVID vaccine is similar to hormones, AI or IVF.  Gray's response to Question #1 suggests that she is against any medical interventions, but her response to Question #2 acknowledges that she never sought a religious exemption from the annual flu vaccine mandate. (SMF ¶¶62-62).

Gray's exemption request focuses on her struggles with fertility, which is heartbreaking but not related to the COVID vaccine.  Ultimately, Gray states "I am not comfortable having genetic components that my body did not create injected into my body."  (SMF ¶66). This statement, other than her reference to having an allergy, is her only referenced to the vaccine. She does not explain why she had a discomfort with genetic componants.  However, she  submitted a statement from her pastor which provides this explanation, referencing the "composition and performance" of COVID vaccines and Gray's concern that COVID vaccines would "alter the specific genetic makeup of her body:"

> Dawn Gray is a member of Cavalry Bible Church of Phoenixville, PA, and is regular in attending our church services. As explained to me, she is opposed to vaccinations in general. But her understanding of the composition and performance of the available COVID19 "vaccines" do not align with her personal convictions. Confident that God has determined the precise physiological makeup of each individual person, she believes that the functions of the present *COVID-19 "vaccines" would alter the specific genetic makeup of her body. As an RN, Dawn has considerably more knowledge of human anatomy than I.* Dawn's position on the COVID-19 "vaccines" is completely consistent with decisions she made decades ago regarding her refusal of recommended medical procedures. I am satisfied that her objection to a COVID-19 inoculation rests solidly upon sincerely held faith convictions.

(SMF ¶76). The Pastor's statement explains Gray's concern about having genetic components in her body.  She felt that the vaccines would alter her genetic makeup.  While Plaintiff has endeavored during litigation to recharacterize her position, Gray's original submission reflects her concern that the COVID vaccine would change the genetic composition of her body.  Whether or

not this is an accurate scientific belief (and it is submitted that it is not), it is, at its heart, a medical

belief rather than a "religious" belief.

Gray's exemption form further confirms that she had not received a religious exemption to

MLH's flu vaccine mandate and that she was only opposed to vaccines containing "genetic

components:"

> I am not comfortable having genetic components that my body did not create injected into my body. I am not opposed to vaccines. If there is a COVID 19 vaccination that comes out that does not use this process I would investigate and consider accepting it. I have done some initial research into the Novavax Covid 19 vaccine and if it is authorized, I would consider this alternative.

(SMF ¶66). Although Gray's September 2021 religious exemption request indicated that she

would consider the Novavax if it were authorized, after Novavax obtained emergency use

authorization in the summer of 2022 Gray now objects to receiving that vaccine.  (SMF ¶¶69-71).

Similarly, Plaintiff's 2021 religious exemption request states that she had received the flu vaccine

in prior years, but she testified during her deposition that she will not do so prospectively.  (SMF

¶71). According to Plaintiff, her body is pure and holy and God has made it, and she is not going

to inject something into her body in the absence of disease at this point going forward. (SMF ¶71).

Plaintiff's current anti-vaccination sentiments are not based on the composition of the vaccine.

In response to the question asking "how receiving the COVID-19 vaccination will

negatively affect your purpose in life or death,"  Gray responded:

> Throughout my life, I have held a consistent approach and a genuine conviction about medical invasion that seeks to alter how God created me. I believe my body is the temple of the Holy Spirit "Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own, you were bought at a price. Therefore honor God with your bodies" (I Corinthians 6: 19-20) and I strive to follow principles that are glorifying to God in acknowledgement of this. Getting this vaccine would negatively affect my conscience and soul, not allowing me to serve and honor the God I love.

(DSF ¶73). According to the members of the MLH Religious Exemption Committee and the Appeals Committee—which included doctors—Plaintiff's contention that the COVID-19 vaccine would alter her genetic structure was inaccurate science.   (DSF ¶¶98, 103). Moreover, the Committees members properly determined that whether Gray's beliefs were predicated on accurate science or false science, they were not religious.[3]  (DSF ¶¶ 97, 102, 104).

To be "religious," a belief need not necessarily contemplate an orthodox or traditional God; rather, it is sufficient if the belief "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *United States v. Seeger*, *supra*, 380 U.S. at 166.  An individual's contention that his or her beliefs have reached this level does not, however, automatically mean that the belief is religious. Moreover, "[t]he mere invocation of a biblical verse is insufficient to establish that she holds a religious belief against being vaccinated;" rather, to fall within Title VII protectins, the employee "must show that her espoused beliefs ... do in fact stem from religious convictions and have not merely been framed in terms of religious belief so as to gain the legal remedy desired."  *Beickert et al. v. NYC Dept. of Education*, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *3-4 (E.D.N.Y. Sept. 25, 2023) (granting 12(b)(6) motion to dismiss Title VII claim where "[plaintiff's] refusal to comply with the Vaccine Mandate actually is based on her concerns about the safety and efficiency of COVID-19 vaccines, which she attempts to categorize as religious convictions by invoking Deuteronomy" and therefore she fails to plausibly allege a bona fide religious belief).

---

[3] Plaintiff's Complaint contends that Defendant did not engage in an "interactive process."  Initially, there is no interactive process requirement stated in Title VII nor has the Third Circuit required that the ADA interactive process apply to Title VII cases.  *See Miller v. Port Authority of New York and New Jersey*, 788 Fed.Appx. 886, 890 fn 19 (3d Cir. 2019) ("[W]e have not yet imposed a ... duty [to engage in an interactive process] on employers for Title VII religious accommodation claims.").  Moreover, Defedants gave Plaintiff an opportunity to fully raise her concerns before the Vaccine Religious Exemption Committee and the Committee members understood her request. (cite)

Courts in the Third Circuit and across the country have dismissed Title VII claims of individuals whose opposition to vaccine mandates is labeled "religious," but present secular arguments.  In *Fallon v. Mercy Cath. Med. Ctr.*, *supra*, 877 F.3d at 492, a health care worker opposed the hospital's flu vaccine mandate, contending "one should not harm their [sic] own body and … the flu vaccine may do more harm than good." The Appeals Court determined that the "concern that the flu vaccine may do more harm than good—*is a medical belief, not a religious one*." *Id*. (emphasis added).  Accordingly, the court affirmed the 12(b)(6) dismissal of Fallon's Complaint because his secular objections to the vaccine requirement were not protected under Title VII.  Similarly, in *Brown v. Children's Hosp. of Philadelphia, supra,* 794 F. App'x at 227, the Third Circuit affirmed the dismissal of a Title VII Complaint by a CHOP employee  who opposed the flu vaccine because she scrupulously washed her hands and believed that the flu vaccine may do more harm than good, because it was predicated on "medical, not religious beliefs." *Id.*

The Eastern District and other federal courts in Pennsylvania have consistently dismissed objections to vaccines and testing mandates which are cloaked in "religious" terms but in essence present secular, medical or scientific claims.  *See, e.g., Ulrich v. Lancaster Gen. Health, No. CV 22-4945,* 2023 WL 2939585, at *5 (E.D. Pa. Apr. 13, 2023)(dismissing Title VII action of nurse opposing COVID testing which she argued "could bring potential harm, introduce harmful substances, cause adverse health effects or endanger [her] wellbeing," or cause her "anxiety," clearly state medical concerns which she attempts to "cloak with religious significance;") *Finkbeiner v. Geisinger Clinic*, 623 F.Supp.3d 458, 465 (M.D.Pa. 2022)(granting defendant's motion to dismiss Title VII failure-to-accommodate claim because plaintiff's objection to COVID-19 antigen testing was based on the contention that ethylene oxide is harmful, explaining that her "opposition stems from her medical beliefs" and therefore is not entitled to Title VII protections);

*Aukamp-Corcoran v. Lancaster Gen. Hosp., supra, 2022 WL 507479 at *5* (examining the progression of the plaintiff's objections to a flu vaccine and finding that her attempts to subsequently characterize "medical" objections as religious to be insincere and granting summary judgment for the employer accordingly); *Prewitt v. Walgreens Co*., 2012 WL 4364660 at *8, fn. 15 (E.D. Pa. Sept. 25, 2012)(employee's request to be exempt from administering flu vaccines, even though articulated as "religious," arose from a "personal preference and not a religious belief as intended by the statutes.")

Other courts across the country have similarly rejected objections to COVID vaccines and testing which are based on secular or medical claims because non-religious objections are not protected under Title VII. *See, e.g.,  Kiel v. Mayo Clinic Health Sys. Se. Minnesota*, 2023 WL 5000255 at *9 (D.Minn.Aug. 4, 2023) (dismissing Title VII claims of Mayo Clinic employee as statements about vaccine "altering" God-given body are medical safety judgments, not a religious belief); *Detwiler v. Mid-Columbia Med. Ctr*., No. 3:22-CV-01306-JR, 2022 WL 19977290, at *4 (D. Or. Dec. 20, 2022), *report and recommendation adopted*, No. 3:22-CV-01306-JR, 2023 WL 3687406 (D. Or. May 26, 2023)(Plaintiff's allegations – which center on her belief that COVID-19 antigen tests are carcinogenic – fail to establish sincere religious opposition under Title VII); *Brox v. Hole*, 590 F. Supp. 3d 359, 366 (D. Mass. 2022)("the record suggests that plaintiffs' opposition to receiving the COVID-19 vaccine" –that God has instilled them with adequate immune systems and a corresponding preference for natural remedies – is based primarily on "philosophical, medical, or scientific beliefs, or personal fears or anxieties rather than *bona fide* religious practices" and therefore  are not protected by state law modeled on Title VII.); *Bube v. Aspirus Hospital, Inc.*, 2023 WL 6037655, at *4 (W.D.Wis. 2023)(finding "objections about personal autonomy, as well as the safety and efficacy of the vaccine" not to be religious regardless

of how framed); *Passarella v. Aspirus, Inc.*, 2023 WL 2455681, at *2-7 (W.D. Wis. Mar. 10, 2023) (finding that exemption requests "predicated fundamentally on [ ] concerns with the safety of the vaccine and [plaintiffs'] right to bodily integrity"—even if based on the "belief that [plaintiff's] body is a temple" and "ratified by prayer"—are fundamentally "medical judgments ..., not matters of religious belief"). *See also Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51–52 (2d Cir. 1988)(rejecting parents' religious objection to the school's vaccination policy on the grounds that their cited belief in the body's ability to self-heal were scientific and/or secular, noting that Plaintiffs "may have strong convictions so far as their belief in a "genetic blueprint" is concerned" but "[m]erely because these decisions are important, and may be supported by strong conviction, does not render them religious."). *See also Brox v. Hole*, *supra*, 590 F. Supp. 3d at 366 (holding that plaintiffs' opposition to COVID vaccine have "no grounding in religious practice but are rather expressions of idiosyncratic personal belief" including "Jesus tells me that it is unwise to put the COVID vaccine into my body, his creation;" "I am afraid that it will kill me;" "Using genetically engineered envelopes such as mRNA that has shown ineffectiveness to work as intended to trick our bodies to fight somethings [sic] that we were made to defend goes against why God created us the way He did;" "I believe my God will guide me and protect me and [God] has told me not to get the vaccine at this time"); *Borrello v. Respironics California, LLC*, No. 23-CV-580-GPC-WVG, 2023 WL 5986135, at *12 (S.D. Cal. Sept. 14, 2023)(Plaintiff's refusal to comply with COVID-19 Vaccine Policy based on his "spiritual wellbeing, and right to remain the essence of the person [he] was born to be; to maintain [his] sacred genetic constitution inherited from [his] parents, and the right of respect by others to do no harm to [his] spiritual being," did not raise religious beliefs).

As she explained in her exemption request, Plaintiff and her husband made the decision to forego in vitro fertilization, artificial insemination and other fertility treatments based on their belief that "if we were able to have children God would allow it to happen through natural means." (DSF 56). Although Plaintiff's exemption request asserts that throughout her life she has held "a genuine conviction about medical invasion that seeks to alter how God created me," she did not seek a religious exemption from MLH's annual flu vaccine mandate. (DSF ¶ 62). Plaintiff has also received the Tdap (Tetanus, Dipptheria, Pertusis) vaccine. (DSF ¶ 63). As a nurse, she regularly administers medications, antibiotics, and vaccines to patients. (DSF ¶ 64). Although her exemption request stated that she switched assignments with co-workers to avoid caring for patients after an abortion or in administering Plan B medications, she did not request a religious accommodation from doing so. (DSF ¶ 72). She also switched assigments "when I felt I would be too emotional to care for those who might be experiencing a miscarriage due to my own miscarriages when I longed for a child so badly." (DSF ¶ 72).

As Plaintiff's exemption request was based on her non-religious concerns about the COVID vaccine, rather than sincerely held religious beliefs, it is not entitled to the religious protections of Title VII or the PHRA.

### 2.   Granting Plaintiff a religious exemption would have imposed an undue burden on MLH's efforts to protect patients and employees

Even if Plaintiff could establish that she held a sincere religious objection to the COVID vaccine, MLH would still be entitled to summary judgment. Title VII does not provide every employee requesting a religious accommodation with an absolute right to work unvaccinated. Rather, Title VII requires covered employers to accommodate their employees' sincerely held religious beliefs, ***unless doing so would impose "an undue hardship on the conduct of the employer's business."*** 42 U.S.C. §2000e(j)(emphasis added).

In *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 73-74 (1977), an airline worker contended his religious beliefs prevented him from working on the Sabbath, but exempting him from Saturday shifts violated the seniority system in the labor contract.  In addressing this conflict, the Supreme Court noted that Title VII's definition of "religion" only requires accommodation of religious observances, practices and beliefs that do not impose an "undue hardship on the conduct of the employer's business."  As Title VII itself "provides no guidance for determining the degree of accommodation required of an employer," the Court considered the specific circumstances of the airline industry in determining whether the requested accommodation would create an undue hardship.  *Id*. at 74-78.  The Court concluded that requiring TWA to bear more than a de minimis cost to give Hardison Saturdays off would constitute an undue burden.  *Id*. at 84.  The Court reasoned that "we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath."  *Id*. at 85.

In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court continued its effort to define the parameters of "undue hardship."  The Court clarified *Hardison*, by stating that "showing 'more than a de minimis cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." *Groff*, 600 U.S. at 468. According to the Court,  a religious accommodation presents an "undue hardship" when the "accommodation would result in ***substantial increased costs*** in relation to the conduct of its particular business." *Id*. at 470 (emphasis added). The *Groff* court acknowledged that "[h]aving clarified the Title VII undue hardship standard, we think it appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance." *Id.*

While the *Groff* decision was helpful in clarifying the standard for "undue hardship" it involved one postal worker whose religious objection to working Sundays "imposed on his

coworkers, disrupted the workplace and workflow, and diminished employee morale." *Groff v. DeJoy, supra*, 600 U.S. at 456. The *Groff* decision did not address the challenges to health care institutions in the midst of a deadly pandemic where the motivation for a mandatory vaccination policy was not inconvenience to co-workers, but rather, the health and safety of those co-workers and their families, as well as patients who enter hospitals assuming that their providers will "first, do no harm."  Nor did *Groff* entail multiple individuals seeking exemptions from the COVID vaccine-- some based on sincerely held religious beliefs and some based on medical or political theories—each of whom, if granted, increased the risk of COVID exposure in the hospital.

Although health and safety were not at issue in *Groff*, the Third Circuit has recognized that both "economic and non-economic costs can impose an undue hardship on employers…." *E.E.O.C. v. Geo Group, Inc*., 616 F.3d 265, 273 (3d Cir. 2010). According to the court, "[a] religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship…." *Id.* at 273.  Moreover, "[i]n deciding whether undue hardship exists, '[w]e focus on the specific context of each case, looking to both the fact as well as the magnitude of the alleged undue hardship.'" *Id*. at 273 (*citing Protos v. Volkswagen of Am., Inc*., 797 F.2d 129, 134 (3d Cir.1986)).  *Accord Groff, supra*, 600 U.S. at 470-71 (determining "undue hardship" is a context specific inquiry). Therefore, assessing whether granting an exemption to the COVID policy to an unvaccinated nurse with direct patient care requires a specific analysis of the facts as they existed at the time Plaintiff's exemption request was denied.

In *Biden v. Missouri*, *supra*, the Supreme Court recognized the significant safety issues and hardship COVID-19 posed to a health system business, noting that "COVID–19 is a highly contagious, dangerous, and … deadly disease." 142 S.Ct. at 652. Accordingly, the Court upheld

as a matter of law that mandatory COVID vaccination measures were "necessary to promote and protect patient health and safety:"

> COVID-19 is a highly contagious, dangerous, and—especially for Medicare and Medicaid patients—deadly disease. The Secretary of Health and Human Services determined that a COVID-19 vaccine mandate will substantially reduce the likelihood that healthcare workers will contract the virus and transmit it to their patients. He accordingly concluded that a vaccine mandate is necessary to promote and protect patient health and safety in the face of the ongoing pandemic… [E]nsuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm. It would be the very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick with COVID–19.

*Id.* (citations and internal quotations omitted.)

Even where plaintiffs have plausibly alleged bona fide religious opposition to COVID vaccines or testing, courts have dismissed religious opposition to COVID vaccines based on the undue hardship posed by the pandemic. In *Federoff v. Geisinger Clinic*, *supra*, 571 F. Supp. 3d 376, the Middle District denied injunctive relief to employees seeking to prevent Geisenger from implementing its COVID-19 vaccination policy. According to the Chief Judge Brann, although the plaintiffs invoked religious discrimination, "the vast majority of their case appears to reflect a toxic combination of motivated reasoning and misinformation—a cocktail that that promises to plague this country long after COVID-19 has abated." Id. at 379. The court determined that plaintiffs failed to meet their burden of establishing that their objections to vaccine and testing requirements were rooted in religion, rather than scientific or medical beliefs, and therefore it was not necessary to address Geisinger's contention that permitting their religious exemptions would impose an undue hardship. *Id*. at 388. Nevertheless, the court determined that "for the sake of completeness" that Geisinger carried its burden of demonstrating undue hardship. *Id*. *See also Beickert et al. v. NYC Dept. of Education, supra*, 2023 WL 6214236, at *5 (allowing special

16

education teacher to work unvaccinated would have presented "a risk to the vulnerable and still primarily unvaccinated student population" and other employees and therefore would have established an undue hardship warranting dismissal of plaintiff's claim); *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, 2023 WL 3467143, at *5 n.4, *6 n.7 (S.D.N.Y. May 15, 2023) (finding an "obvious hardship associated with the increased health and safety risk posed to other employees" by remaining at their worksite unvaccinated against COVID-19)

Similarly, in *Aukamp-Corcoran*, *supra,* 2022 WL 507479, at *6, this Court determined on the summary judgment record that it would constitute an undue hardship to accommodate a religious exemption to the flu vaccination. The court recognized initially that "an employer is not required to grant a proposed accommodation that would 'either cause or increase safety risks or the risk of legal liability for the employer.'" *Id.* (omitting citations). Citing the Defendant's expert report, Judge Schmehl found that granting of non-medical exemptions "significantly raises the danger that influenza will spread." *Id.* at *7. Further, the court noted that this concern was not ameliorated by the fact that other individuals were granted religious accommodations, noting "Every single additional unvaccinated employee to whom patients are exposed adds to the risk to those patients." *Id.* at *8.

The same analysis applies with respect to religious exemptions to COVID-19 vaccinations. Granting a religious exemption to Dawn Gray, who provided bedside care to Emergency Department patients, would have undermined MLH's efforts to protect its patients and staff in the midst of a deadly pandemic.  (SMF ¶ 2). Dr. Daniel Salmon is a Professor of Global Disease Epidemiology and Control, Department of International Health, and serves as the Director of the Institute for Vaccine Safety at Johns Hopkins.  (SMF ¶ 3 fn 2). Dr. Salmon has held positions in both government and academia, and is a global expert in vaccine hesitancy and vaccine-

preventable deaths.  (*Id.*) As Dr. Salmon states in his expert report, the COVID pandemic, which caused global deaths and severe illnesses, took a particular toll on both health care workers and the ability of health care institutions to care for their communities:

> COVID-19 had a tremendous impact on health care systems, patient access to care and quality of care.  (SMF ¶ 5).

> As COVID-19 spread across the country in waves, disproportionately impacting some communities and then moving on to others, health care systems struggled to keep up with patient demand. (SMF ¶ 6).

> Although health care capacity in the United States is generally designed to meet demand, often with rural health care facilities below community needs, the health care system was not well prepared for the surge on health care needs that resulted from COVID-19. (SMF ¶ 7).

> The impact of COVID-19 on health care facilities was further strained by COVID-19 illness and death among health care workers and worker burn out. (SMF ¶ 8).

> Health care staff were at risk of occupational acquired COVID-19 through exposure to infected patients and other health care staff. (SMF 10).

> The prevalence of SARS-CoV-2 infection among healthcare workers was 11% in 2020, noticeably higher than in the general population.  (SMF ¶ 11).

> In 2020, health care workers with direct patient care had four times this risk of contracting COVID-19 compared with health care workers without direct patient care. (SMF ¶ 12).

> More than 3,600 health care workers died of COVID-19 in the first year of the pandemic. (SMF ¶ 13).

Dr. Salmon's analysis comports with the Supreme Court's pronouncement in *Biden v. Missouri, supra,* as well as the experience of Main Line Health, which faced severe challenges while caring for patients and trying to keep its work force healthy.

Once COVID vaccines were available, they were prioritized for health care workers because (1) health care personnel were at increased risk of contracting and transmitting COVID-19 because of their occupation exposure to COVID-19 cases; (2) clinical workers were in regular

contact with persons at increased risk of serious complications and death from COVID-19, including persons who were immunocompromised, had other comorbidities, and/or were elderly; and (3) health care facilities were often at or beyond capacity caring for persons with COVID-19 as well as other healthcare needs.  (SMF ¶¶ 16-17). As essential personnel, reducing the risk of health care workers contracting COVID-19, resulting in missed time from work and potentially morbidity and mortality was a local, state and national priority in order to maintain health care capacity. (SMF ¶ 16)

Dr. Salmon's report confirms that vaccines proved both safe and highly effective.  During the Delta wave, full vaccination with COVID-19 vaccines was 80% effective in preventing COVID-19.  (SMF ¶ 19). Based on the demonstrated efficacy of the Moderna, Pfizer and J&J COVID-19 vaccines in preventing disease and reducing transmission to others (both by reducing the risk of infection and reducing the viral load if a breakthrough infection) unvaccinated persons were at increased risk of contracting COVID-19 and transmitting to others who could not be vaccinated because of medical contraindications, were too young to be vaccinated or for whom the vaccine was not effective (as well at persons who were unvaccinated because they did not have access to the vaccines or decided to forgo vaccination).  (SMF ¶ 20).

According to Dr. Salmon,  as of September 2021, mandatory COVID-19 vaccine policies were a critical protective action for health care institutions to protect patients and staff for the following reasons:

    a)      COVID-19 posed a substantial threat to patients and staff in health care institutions;

    b)      COVID-19 vaccines provided a high level of protection against contracting COVID-19 and reducing transmission of COVID-19; and

    c)      Mandatory vaccination policies for influenza vaccines in health care settings have been demonstrated to be necessary to achieve high levels of

vaccine coverage (voluntary policies even coupled with free access to vaccines and education did not achieve very high levels of vaccine coverage).

(SMF ¶ 23).  The undue hardship in a given case is not eliminated by the fact that MLH granted some religious based exemptions.  As Dr. Salmon added:  "a larger number of religious exemptions would result in a greater risk of COVID-19 disease transmission and outbreaks adversely impacting other health care staff, patients, and the capacity of the health care system to operate." (SMF ¶ 29). Thus, each additional exemption would give rise to a significant impact to safety.  *See Aukamp-Corcoran*, *supra, at* *8   ("Every single additional unvaccinated employee to whom patients are exposed adds to the risk to those patients.")

Although MLH wanted to retain its nursing staff and has ongoing staffing needs, it did not simply rubber-stamp COVID exemption requests and instead adopted a rigorous process in order to protect patients, staff, families and the community. The Religious Exemption and Appeals Committees only approved religious exemptions for those individuals who articulated sincerely held religious beliefs that precluded vaccination in order to protect their staff and patients. Defendant acted in good faith in carrying out the Policy.  Granting religious exemptions to all persons who requested them, including those without sincerely held religious practices or observances precluding vaccination, would have undermined the vaccine requirement leading to substantial disease, disability and death among health care staff and patients, particularly for nurses like Plaintiff who had direct patient contact. Accordingly, Defendant has established an undue hardship with respect to any Title VII claim based upon a failure to provide an accommodation.

**B.    Plaintiff has failed to establish a disparate treatment discrimination claim based on religion.**

Although the focus of Plaintiff's Complaint is the denial of her request for a religious exemption to the COVID vaccine, Count Two and Count Four of her Complaint attempt to assert

a separate disparate treatment religious discrimination claim.[4]   A plaintiff seeking to establish a prima facie case discrimination under a disparate treatment theory of religious discrimination must show that (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).   There is no dispute that Gray was a qualified nurse and that her termination was an adverse employment action.   But there is no record evidence to support her claim that she was subject to disparate treatment.

Gray's Complaint offers a panoply of "disparate treatment" claims, none of which can satisfy her burden of raising an inference of discrimination:

(1) She claims that MLH's COVID Policy treated medical and religious exemptions differently. (ECF 1, Complaint ¶¶65-66, 71).   Medical exemptions are subject to analysis under the Americans with Disabilities Act whereas religious exemptions are governed by a distinct statute- Title VII. Disparate treatment claims entail consideration of similarly situated employees who are treated differently, not distinct statutory frameworks which are inherently different.

(2) Gray alleges that non-religious individuals were not terminated under the Policy whereas employees who exercised their religious beliefs were termined.   (ECF 1, Complaint ¶¶67, 69).   Plaintiff has adduced no evidnce that she was more "religious" than individuals who were not terminated.   Indeed, someone who abides by strongly held religious beliefs on a daily basis woul have no need to seek a religious exemption if those religious beliefs or practices do not conflict with the COVID vaccine mandate.

---

[4] Based upon the current U.S. Supreme Court precedent, it is not clear that a failure-to-accommodate is separate from a disparate treatment claim. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 789 (U.S. 2015) (Thomas, J., dissenting) ("The Court today rightly puts to rest the notion that Title VII creates a freestanding religious-accommodation claim…".).   As the U.S. Supreme Court made clear in *Abercrombie & Fitch*, the salient question in a disparate treatment claim is one of motive. *See Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 773 (holding "[a]n employer who has actual knowledge of the need for an accommodation does not violate Title VII by refusing to hire an applicant if avoiding that accommodation is not his motive").   As discussed herein, there is no reasonable dispute that MLH was motivated by health and safety concerns during the pandemic, rather than particular religious practices or beliefs.   Namely, Defendant's motive in implementing and enforcing the Policy mandate had to do with protecting the safety of employees, patients and the community, not with Plaintiff's religion.   This motivation is expressed in the announcement of the Policy, the Policy language and in the record submitted.   Accordingly, the lack of discriminatory intent weighs in favor of granting Defendant's Motion for Summary Judgment.

There is no evidence or law to support Plaintiff's disparate treatment claims.  Accordingly, she cannot has produced no evidence to establish a prima facie claim for religious discrimination and Counts Two and Four of her Complaint must be dismissed.

**C.    Plaintiff has failed to establish an age discrimination claim**

Count Five of Plaintiff's Complaint also asserts that she was subject to age discrimination in violation of the PHRA.  PHRA claims are analyzed according to the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792  (1973). *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir.2009)(approving the "continued application of the *McDonnell Douglas* paradigm in age discrimination cases"); *Fasold v. Justice*, 409 F.3d 178, 183-84 (3d Cir.2005) (holding that ADEA and PHRA claims proceed under the *McDonnell Douglas* framework). First, Gray must establish a prima facie case of age discrimination by a preponderance of evidence by demonstrating that: (1) she is forty years of age or older; (2) the defendant took an adverse employment action against plaintiff; (3) plaintiff was qualified for the position at issue; and (4) she was replaced by an "employee who was sufficiently younger to support an inference of discriminatory animus." *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 385 (E.D. Pa. 2013).

If the plaintiff satisfies a prima face case, the burden shifts then to the defendant to "articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision." *Id.* at 691. If the defendant presents evidence of a nondiscriminatory reason, the burden shifts back to the plaintiff to show that "the employer's proffered justification for the adverse action is pretextual." *Smith*, 589 F.3d at 691. The plaintiff can prove pretext by submitting evidence that allows a fact-finder to either disbelieve the employer's justification, or to conclude discrimination was more likely than not a "but for" cause of the employment action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994).  "Regardless of the method, the plaintiff's evidence must

allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination was a 'but for' cause of the adverse employment action." *Abels v. DISH Network Serv., LLC*, 507 Fed.Appx. 179, 183 (3d Cir.2012).

Gray did not include an age discrimination claim in her original PHRC Complaint, but after she hired counsel she filed an Amended Complaint that included an age claim. (SMF ¶148). Gray's age discrimination claim is based on her contention that five staff nurses in the Emergency Department (who were not clinical coordinators like Gray) applied for a religious exemption and according to her, two of the requests submitted by the younger nurses were granted. (SMF ¶149). Plaintiff has not identified those individuals, identified the bases of their exemption requests and has adduced no further information to support her age discrimiantion claim.

Plaintiff has adduced no evidence that younger employees were treated more favorably in the exemption process. The denial of Plaintiff's exemption request was based on the Committee's good faith determination that she did not state a sincerely held religious belief that precluded vaccination. In fact, Plaintiff admitted that Defendant terminated her employment due to the violation of the mandatory vaccination Policy. (SMF ¶¶144, 146). Gray was a valued member of the Paoli Hospital Emergency Department, but all individuals who were not approved for exemptions and did not obtain the COVID vaccine by November 1, 2021 were terminated in accordance with the Policy. (SMF ¶¶ 142-146). Finally, Plaintiff has not demonstrated any pretext by MLH or that age was the "but for" cause of her termination. Accordingly, Plaintiff's age discrimination claim must be dismissed.

## IV.    <u>CONCLUSION</u>

This matter is ripe for summary judgment.   Plaintiff is unable to demonstrate a prima facie case under Title VII or the PHRA.   Defendant respectfully asks that the Court enter summary judgment in their favor and dismiss Plaintiff's Complaint in its entirety.

Respectfully submitted,

*/s/ Caren Litvin*
Caren Litvin, Esq.
(Pa. Atty I.D. No. 41796)
150 N. Radnor Chester Road, Suite F-200
Radnor, PA  19087
CL@litvinlawoffice.com
(610) 977-2049 (office)
*Counsel for Defendant*

Brendan Hennessy
(Pa. Attorney I.D. No. 91831)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
bhennessy@hennessylawfirm.com
(484) 875-3111 (office)
*Of Counsel to Litvin Law Office*
*for Defendant*

Dated:  October 2, 2023