**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DAWN GRAY**,

                          *Plaintiff*

   v.

**MAIN LINE HOSPITALS, INC.**,

                    *Defendant*

Case: 2:23-cv-00263-KNS

**DEFENDANT'S APPENDIX
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Description | Page |
|---------|-------------|------|
| A | Transcript of Dawn Gray's deposition | DA 3 |
| B | Expert Report of Dr. Daniel Salmon | DA 79 |
| C | MLH COVID-19 Vaccination Policy | DA 129 |
| D | Deposition transcript of Greg Papa, VP of Human Resources | DA 133 |
| E | Gray's Religious Exemption Form | DA 168 |
| F | Deposition transcript of  Reverend Casey Bien-Aime | DA 177 |
| G | Deposition transcript of Dr. Jennifer Burke | DA 201 |
| H | Deposition transcript of Pam Teufel, Senior VP of Human Resources | DA 220 |
| I | Deposition transcript of Dr. Barbara Wadsworth, Chief Operating Officer | DA 245 |
| J | Plaintiff's 9/27/21 email appealing denial of exemption request | DA 264 |

Respectfully submitted,

Caren Litvin, Esq.
(Pa. Atty I.D. No. 41796)
150 N. Radnor Chester Road, Suite F-200
Radnor, PA  19087
CL@litvinlawoffice.com
(610) 977-2049 (office)
*Counsel for Defendant*

Brendan Hennessy
(Pa. Attorney I.D. No. 91831)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
bhennessy@hennessylawfirm.com
(484) 875-3111 (office)
*Of Counsel to Litvin Law Office
for Defendant*

Dated:  October 2, 2023

# EXHIBIT A

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   DAWN GRAY,                  :
                    Plaintiff
5                               :   CIVIL ACTION
           v.
6                               :
                                    NO. 2-23-CV-00363-KNS
7   MAIN LINE HOSPITALS,    :
    INC.,
8              Defendants :

9

10

11

12

13

14        Deposition of DAWN GRAY, taken by

15   Defendants via videoconferencing on Wednesday,

16   July 12, 2023, beginning at 2:30 p.m. before

17   Lori A. Fausnaught, Registered Merit

18   Reporter/Certified Realtime Reporter.

19

20

21

22

23

24                   KARASCH & ASSOCIATES
25   NATIONALLY REGISTERED PROFESSIONAL REPORTERS
                     (800) 621-5689

```
 1   APPEARANCES VIA VIDEOCONFERENCE:

 2   DALLER LAW FIRM
     By: John A. Daller, Esquire
 3   8801 Lost Valley Drive
     Mars, PA  16046
 4   (724) 201-2050
     johndaller@daller-law.com
 5
         Attorneys for Plaintiff
 6

 7   HENNESSY LAW
     By:  Brendan D. Hennessy, Esquire
 8   101 Lindenwood Drive, Suite 225
     Malvern, PA  19335
 9   (484) 875-3111
     bhennessy@hennessylawfirm.com
10
         Attorneys for Defendants
11

12

     Also Present (not a participant):
13
     Caren Litvin, Esquire
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              INDEX TO WITNESSES

2                   DAWN GRAY

3    EXAMINATION                              PAGE:

4      By Attorney Hennessy                     5

5      By Attorney Daller                      --

6

7

8              INDEX TO EXHIBITS

9
     FOR DEFENDANTS                            PAGE:
10

11   Gray Exhibit No.  1                        47
     -curriculum vitae-
12
     Gray Exhibit No.  2                       104
13   -Employee Health Policy/Procedure Manual-

14   Gray Exhibit No.  3                       101
     -blank religious exemption form-
15
     Gray Exhibit No.  4                       115
16   -completed religious exemption form-

17   Gray Exhibit No.  5                       186
     -e-mails re: denial notice and appeal-
18
     Gray Exhibit No.  8                       193
19   -appeal denial e-mail-

20   Gray Exhibit No.  9                       194
     -HR/VP meeting e-mails-
21
     Gray Exhibit No. 10                       198
22   -HR follow-up e-mails-

23   Gray Exhibit No. 11                       209
     -letter to VP Legal/VP HR-
24
     Gray Exhibit No. 12                       214
25   -Slattery e-mails-
```

1                 INDEX TO EXHIBITS (Cont'd.)

2

3      FOR DEFENDANTS                        PAGE:

4      Gray Exhibit No. 14                   216
       -First Amended Complaint-

5      Gray Exhibit No. 15                   231
       -job search e-mails-

6

7      Gray Exhibit No. 17                   247
       -Suburban exemption e-mails-

8      Gray Exhibit No. 22                   248
       -letter to Prime Healthcare-

9

10     Gray Exhibit No. 23                   251
       -letter from Pastor Thompson-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 5

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing and certification and filing are hereby waived; and that all objections, except as to the form of the question, are waived until time of trial.

* * * * *

(Exhibits were marked electronically at time of production by Counsel.)

ATTORNEY HENNESSEY:  Okay.  You can go ahead and swear in the witness.

THE COURT REPORTER:  Ma'am, would you raise your right hand for me, please, and I will administer the oath.

DAWN GRAY,

called as a witness on behalf of the Defendants, having been duly sworn or affirmed according to law, testified as follows:

DIRECT EXAMINATION

BY ATTORNEY HENNESSEY:

Q.  Hi, ma'am.  My name is Brendan Hennessy.  I represent Main Line Hospitals, Inc. We're here in relation to your lawsuit against the Defendant, Main Line Hospitals, Inc.

Page 6

I don't think I got your name on the record.  I don't think it was stated yet.  Can you just state your full name for the record?

A.  Dawn Gray.

Q.  Okay.  Have you ever been known by any other name before marriage or do you have any other --

A.  Yes.  Dawn Friedly.

Q.  Okay.  Thank you.  Have you ever been deposed before, Ms. Gray?

A.  No.

Q.  Okay.  Do you have an understanding of what's involved in relation to this deposition?

A.  Yes.

Q.  What is your understanding?

A.  That we're going to review documents and ask questions relating to my case against Main Line Health, Inc.

Q.  Okay.  That's a pretty good rough understanding.  I'm going to -- this is my opportunity to ask you any questions about your lawsuit or any background questions whatsoever that may arise.

We may introduce some documents through the course of the deposition, and I may have -- I

Page 7

have a lot of questions which won't involve documents, as well.

I'm going to give you a few instructions before we get started just so that we're on the same page in relation to everything.

As I said, this is a question-and-answer session.  Make sure that you've heard my question before you start to answer.  There is a court reporter that's taking down everything that's being said.  So it's important that we don't interrupt each other, that you wait until I finish my question before you answer the question, and I'll try and do the same thing.  I have a habit of jumping in, as well.  So we'll try and be careful so that the court reporter can take down everything that's being said.

Do you understand that?

A.  Yes.

Q.  Okay.  And the same goes for gestures. A lot of witnesses like to nod their head or shake their head.  Make sure that you verbalize your responses, because it won't go on the record unless it's verbalized.  I'll try to remind you if it's not verbalized, but please try to make sure

Page 8

that you verbalize everything.

Do you understand that?

A.  I will do my best.

Q.  Okay.  Great.  I'm an attorney.  You know, I'm certainly human.  I do not always ask the clearest questions in the world.  You'd be surprised maybe.

But if you have any -- if you need clarification at any time, please let me know.  If my question is unclear to you, feel free to let me know and I'll try and rephrase the question.  If I think the question was appropriate, I will re-ask the question and give you another opportunity to digest it.

If you do answer the question, I'll assume that you understood the question 100 percent the way it was asked.

Do you understand that?

A.  Yes.

Q.  Okay.  And we're here, you're under oath to tell the truth and nothing but the truth and provide full -- and fully answer my questions that I ask.  Do you understand that?

A.  Yes.

Q.  Great.  Okay.  And if you need to

DA 7

Page 9

1   approximate, that's fine. We'll -- you know,
2   we'll -- just let me know if you're approximating.
3   We want to avoid guessing. If you don't have a
4   recollection, that's fine. You can just let us
5   know that you don't have a recollection.
6        I don't want you to guess. We're here
7   to obtain facts, not pure guesses, in relation to
8   the testimony. Do you understand that?
9        A. Yes.
10        ATTORNEY HENNESSEY: Okay. Before we
11   get started, John -- we've done this before -- but
12   I just want to make sure that you're agreeing that
13   this deposition is proceeding remotely and it's
14   being recorded by stenographic means, as it was
15   noticed. Is that agreed upon?
16        ATTORNEY DALLER: That's correct. And
17   we'll waive any objections until trial except for
18   to form. And deficiencies of notice, we'll waive
19   those, as well.
20        ATTORNEY HENNESSEY: Yes, okay.
21   BY ATTORNEY HENNESSEY:
22        Q. Ma'am, are you under the influence of
23   any drugs coming into today? Have you taken any
24   medications or anything of that nature?
25        A. Just some vitamins.

Page 10

1        Q. Okay. Great. And when is the last
2   time you had an alcoholic drink?
3        A. Years.
4        Q. Okay. So that's not an issue. I
5   just -- sometimes people drink the night before
6   depositions, and I want to make sure there is
7   nothing that would interfere with your testimony
8   today.
9        A. No.
10        Q. Okay. Is there any reason that you
11   think that the deposition should not proceed
12   today? Anything that would get in your way of
13   testifying fully and truthfully before we get
14   started?
15        A. Not that I'm aware of.
16        Q. Wonderful. You are represented by John
17   Daller, and he's here with you today.
18        How did you find Mr. Daller to
19   represent you?
20        A. Well, there's a story behind that. So
21   I was connected with him through a friend of a
22   friend who then reached out to me and just said
23   hey, I know somebody that was -- worked for Main
24   Line Health and they are in a similar situation,
25   would you like to be connected.

Page 11

1        And I said that's fine, you can give me
2   her name. Her name was Sara Slattery, M.D. And
3   she did. And Sara called me and we spoke. And at
4   the end of the conversation, she, you know -- she
5   just said hey, just so if, you know, you end up
6   needing an attorney or something, I do have
7   somebody.
8        And that is how I got John Daller's
9   name.
10        Q. And you said it was a friend of a
11   friend, and I think Sara Slattery was the friend
12   of a friend. Is that correct?
13        A. Yes, the friend of the second friend.
14   If you need me to clarify it, I can. I just --
15   there's details there. But you know, my husband
16   gives so many details that I tend not to
17   over-detail things. But I would gladly give you
18   the details if you'd like to know how it happened.
19        Q. I want details. That's why we're here
20   today.
21        A. All right. So, I play squash. I'm a
22   competitive squash player. And during -- you
23   know, we play every week. I play several times a
24   week with different players. One of the
25   players -- you know, I played competitively

Page 12

1   against one player. And COVID came and squash got
2   shut down. I hadn't played.
3        I started to play again but the rules
4   to play were very limited. You could only play
5   with certain people. You only could have four
6   people you could play with. You had to have the
7   same people.
8        Long-story-short, I had no contact with
9   this person. But the friend of a friend ran into
10   a person. So the person I play squash with, her
11   name is Molly.
12        Q. I was going to ask you. That's your
13   friend, Molly?
14        A. Yes. That is who I know from playing
15   squash.
16        Q. What is Molly's last name?
17        A. Pierce.
18        Q. You know, it may not be relevant, but I
19   just like to ask for full names. Go ahead.
20        A. Pierce.
21        Q. Pierce. All right. Go on.
22        A. So she was evidently at Marion, which
23   is a local squash club that I am not a member of,
24   and she ran into one of her friends who I know
25   just because she plays a little bit of squash.

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 13

1   But I don't know her well.  Her name is Ali, and I
2   would have to think very hard what her last name
3   is.  Maiden name was Oglesbee.  And I'm trying to
4   trick my brain.  I believe her last name now that
5   she is married might be Farrell.
6        So anyway, Molly ran into Ali at the
7   Marion Cricket Club, and I guess they were
8   talking.  This is all secondhand obviously.  And
9   Molly told Ali that I was not working anymore at
10  Paoli.  She had asked the question and said Dawn's
11  not working at Paoli.  And Ali said oh, my
12  goodness, she worked there for years or something
13  like that, is the story that Ali told me.
14        And she said oh, I know somebody else
15  that doesn't work.  And that was Sara.  So that is
16  how I got connected with Sara.
17     Q.   Okay.  Wonderful.  Had you talked to
18  Molly about your potential claims or anything like
19  that?
20     A.   I had never talked to Molly.  I didn't
21  even know Molly knew.
22     Q.   Okay.
23     A.   The squash world does have a network in
24  it, and I'm sure the squash world network was
25  working fine during COVID.

Page 14

1      Q.   When -- where do you usually play
2   squash; is it at Marion or somewhere else?
3      A.   No.  Oh, no.  That's a little above my
4   pay grade.  Sorry.  I play squash at Berlin Squash
5   and Fitness, where I'm a member at.
6      Q.   And they have -- I play racquetball but
7   nobody has courts anymore for racquetball.
8      A.   That is true.
9      Q.   So it's the same court.  Is that true?
10     A.   Racquetball?
11     Q.   Or is it -- it's a similar court as
12  squash.  Right?  Or am I wrong?
13     A.   It has four walls and you play it
14  inside.  Yes, the dimensions are similar.  Some
15  people do, if they can't find a squash court, play
16  squash on a racquetball court.
17     Q.   So they're different courts and they
18  are very different.  Okay.  I understand.
19     A.   Different racket, different ball.
20     Q.   Different racket, different ball,
21  different rules.  I always wondered.  Sorry.  I
22  never played squash, but I like racquetball.
23        Anyway, we'll get into the reasons
24  we're here.
25        Other than -- so Sara Slattery referred

Page 15

1   you to Mr. Daller.  Did you talk to Sara Slattery
2   about your case at all before you contacted Mr.
3   Daller?
4      A.   In terms of my specific case, the
5   specifics?  No.  Did I explain that I was -- I
6   worked at Paoli with Main Line -- you know, with
7   Main Line Health and that I was terminated and
8   that I had already filed a PHRC/EEOC claim in
9   early November, November 2nd.
10        So she did know that at that point.
11     Q.   Okay.  Have you talked to anyone else
12  that Mr. Daller has represented?  Do you know
13  anybody else he has represented?
14     A.   I would need to know names.  I do not.
15  I know that obviously Sara.  And Sara did make
16  mention that there were some other Main Line
17  Health employees that were referred or
18  considering, but I do not know who they are or
19  what their names are.
20     Q.   Okay.  All right.  I know a number of
21  former Main Line Health employees communicated
22  together via WhatsApp or Telegram.
23        Are you aware of that?
24     A.   No.  I was not on Telegram until August
25  of '22 when I needed to join for a job application

Page 16

1   that I was searching for a job.  And they did
2   their communication through Telegram.
3      Q.   That was the AFLDS, I guess, or what
4   was it, that organization?
5      A.   It would be the American Frontline
6   Nurses.
7      Q.   Frontline?
8      A.   AFLN.
9      Q.   AFLN.  American Frontline Nurses.
10  Okay.  Got it.  So you joined Telegram based upon
11  the American Frontline Nurses recommendation?
12     A.   I needed to join that in order to get
13  their communication and to go through the training
14  when I was pursuing and considering joining --
15  pursuing that job option, correct.
16        Then that started, like I said, August
17  of '22.  I had never been on Telegram.
18     Q.   Okay.  Did you follow the AFLN prior to
19  that?
20     A.   How do you -- can you clarify the word
21  follow?
22     Q.   Well, did you -- did you receive any
23  communication from them or follow them on any
24  social media?
25     A.   No.  No.

Page 17

Q. How did you become aware of that organization?

A. My cousin, I believe, saw -- she is on social media. She's a nurse in Ohio. And she just said hey, have you ever heard of this group. She actually, I think was looking at that group. And that's how I kind of -- I went to the website and I saw that they had posted that they were accepting applications and I applied.

Q. Accepting applications for nurses?

A. For their nurse advocacy program.

Q. Oh. And so you applied?

A. Yes.

Q. Do you know what the AFLN group stands for, what it advocates?

A. So they have had -- they are patient advocates. They are nurses that help patients. It has -- from my understanding it has gone through different both-side focuses. I guess it's both sides of what they do.

So since I have been in it, I have followed it a little bit more. I ended pursuing that job application because it just didn't quite align with what I was looking for.

Q. Okay.

Page 18

A. I didn't feel it represented me well.

Q. Okay. They were against the COVID-19 vaccination, if I recall in the literature I read. Is that accurate? The AFLN organization.

A. I do not recollect whether or not they stated that. I know that on some of the communications I have received or seen, that they do support and help people that have been vaccinated as well as unvaccinated.

So you know, I'm sure there is both prongs there.

Q. All right. We'll come back to some of that later on. You just brought it up, so I thought we would talk about it a little bit.

I wanted to ask you before we get into any further details what you've done to prepare for this deposition coming in here today.

A. Well, I spent a lot of time gathering all the documents that you requested and reviewing them. And I had also done some of that prior to when I filed with the PHRC and things.

And then Mr. Daller and I have had several conversations along the way. We've had an unemployment hearing. We have obviously talked through my refiling and things like that. And in

Page 19

terms of today, we met for two days last week to prepare for today.

Q. Where did you meet to prepare for today?

A. In his office, which is where I am now.

Q. Okay. In Pittsburgh?

A. Correct.

ATTORNEY DALLER: In Mars.

THE DEPONENT: Oh, boy.

ATTORNEY HENNESSEY: Not quite. It's in Mars, Pennsylvania.

BY ATTORNEY HENNESSEY:

Q. And you were there two days last week and you came there today. Did you drive out?

A. I drove out yesterday.

Q. Okay. And you mentioned documents that you reviewed. Are you talking about -- you said you gathered documents that was in relation to the documents I was seeking in discovery.

A. Yes.

Q. Do you remember any particular documents that you reviewed in advance of today?

A. I'm not sure what you're asking me. Can you clarify?

Q. Well, are there any particular

Page 20

documents that jump out in your recollection that you've reviewed in the past week to prepare for today's deposition?

A. There were a lot of documents. There are some that are clearly more dear to my heart than others and more that evoke more lasting impressions with me. But I wouldn't say I --

You know, I guess I'm really not understanding what you're asking.

I reviewed all the documents. Mr. Daller and I have gone through pretty much all of the interrogatories and the requests to produce. And we discussed, you know, e-mails. We discussed e-mails.

ATTORNEY DALLER: Object to the extent you're looking for anything that are specifics of attorney-client privilege.

BY ATTORNEY HENNESSEY:

Q. And just to clarify, I'm not. I'm not asking for any communications between you and your counsel. I have a right to ask you what you did to prepare for today. But I don't want to ask you about -- when Mr. Daller communicated to you anything, I don't want to hear it. You know, unless it becomes relevant somehow, I don't want

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 21

1  to hear it.
2        In terms of documents, I can be a
3  little more specific.  You reviewed the exemption
4  application that you submitted under the Main Line
5  Health COVID-19 Vaccination Policy.  Correct?
6        A.  Yes.
7        Q.  You've reviewed the responses, the
8  denial of the exemptions.  Correct?
9        A.  Yes.
10       Q.  And other correspondence and e-mails
11  that may have related to your exemption
12  application.  Would that be accurate?
13       A.  Yes.  E-mails that I sent and e-mails
14  about a meeting I had with Sara and Bern and about
15  follow-up e-mails with that and about the letter
16  that I sent as another attempt to clarify or to
17  make an accommodation for what I was denied.  Yes
18  we did speak.  We did review all of those.
19       Q.  Okay.  And I forgot to mention.  You
20  know, we could be here for a little while today.
21  If you need a break at any time, please let me
22  know.  You are on the stand.  Even though we're
23  not in a courtroom today, it is as if you were on
24  the stand testifying before the Court.
25       So if you do talk to your counsel, and

Page 22

1  you're entitled to talk to your counsel, it's not
2  a privileged communication during this process.
3  So I have the right to ask you anything about your
4  conversations.  You have to disclose any
5  conversations.  You have to disclose any
6  conversation you have with your counsel during a
7  break.
8        And I will ask you after we come back
9  from the break if there's -- if you've had any
10  conversations.  I will also ask you and give you
11  an opportunity to change any testimony that you
12  want to change after we take a break.
13       The other thing is if I'm in the middle
14  of asking you a question or a line of questions
15  and you want to take a break, I may ask you to
16  just wait until we finish my line of questions
17  before we take the break.
18       Do you understand that?
19       A.  Yes.
20       Q.  All right.  Let's talk a little bit
21  about your personal background before we get into
22  some of the allegations and facts relating to the
23  allegations.
24       Where is it that you grew up?  I
25  understand that you're now in Norristown.

Page 23

1        Is that correct?
2        A.  Yes.
3        Q.  Okay.  Where did you grow up?
4        A.  I grew up in Annandale, Virginia.
5        Q.  When did you move to the Pennsylvania
6  area?
7        A.  Um, I came back -- I went to Penn from
8  1983 to 1987.  Upon graduating from Penn, I went
9  to Boston and worked at the Boston VA, because I
10  had received a VA scholarship and I owed the VA
11  two years.
12       After about a year in Boston, give or
13  take, that's an approximation, I transferred to
14  the Philly VA.  So I want to say that was '88-'89.
15  And I have been in Pennsylvania since.
16       Q.  Okay.  So you went to elementary school
17  and high school in Virginia, I would assume.  Is
18  that correct?
19       A.  That is correct.
20       Q.  And where was it that you went to high
21  school?
22       A.  Annandale High School.
23       Q.  Annandale, is that a public high
24  school?
25       A.  It is.

Page 24

1        Q.  Did your family belong to a church when
2  you were growing up?
3        A.  We did.
4        Q.  What church was that?
5        A.  Church of Northern Virginia.
6        Q.  What's the denomination or
7  congregation?
8        A.  Nondenominational.
9        Q.  Now, I understand that you're a member
10  of Calvary Bible Church, at least at the time that
11  you submitted your application.  Are you still a
12  member of the Calvary Bible Church?
13       A.  So -- not every answer is as
14  straightforward as one wishes.  I still attend
15  church at the same building.  Our church went
16  through a period of searching for a pastor.  We
17  had an interim pastor.  We've been -- you know,
18  all of this was going on through COVID.  And then
19  another church was looking for a building.
20       So long-story-short, our two churches
21  merged and now the church is at the same location
22  as Calvary Bible Church.  And it is now called New
23  Story Church.  And for a little while there, we
24  had the another church's name, even though we went
25  to the same church, if that makes sense.

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 25

Q.  What was the other church's name?  Is that New Story or is it different one?

A.  No.  That is currently the name of the church.  It was Grace Valley Fellowship.

Q.  I thought I saw that.  When you say nondenominational, would you consider it kind of an Evangelical type of religion/church Christianity?  How would you describe your religious beliefs?

A.  I think the best way to describe my religious beliefs is that we use the Bible as a source of truth, and we circle back and we make decisions and follow the Lord according to the truth that is in the Bible.

Q.  When did you first develop your religious beliefs?  Was it when you were younger as a child or did it happen later in your life?

A.  I'm just going to clarify.  You cut out a little bit for me.  When did I --

Q.  When did you develop your religious belief?

A.  I gave my life to Jesus at the age of five at Vacation Bible School.

Q.  And consistently since that time you have been a member of a church and attend church?

Page 26

A.  Yes.  I -- when I went to college, I did not become a member of the church where I attended, but I did attend church throughout college.  I would have to think about when I was in Boston.

So when I was in college I attended Tenth Presbyterian Church.  James Montgomery Boice was the pastor at the time for the four years I was at Penn.

When I moved to Boston, I attended Park Street Church.  Couldn't tell you off the top of my head who that pastor was at the time.  And then came back to Philly when I was still single and living in the outskirts of the city and I still went to Tenth Pres.

And then I met my husband and I started attending with him for a shorter amount of time.  Again, I'm not going to approximate a time.  We attended the Green Tree Church of the Brethren.  And I do know that in 1998 we began attending Calvary Bible Church.

And I remember that date well because after we got married in 1995, we were living in the house I had bought that I had owned and we wanted to move out closer to where he worked.  And

Page 27

we actually went church shopping before we went house shopping because we wanted to find a place where we could worship, and then we kind of wanted to have our home near that because the church plays an important part in our lives.

Q.  Okay.  That's wonderful.  You answered a whole bunch of questions so I --

A.  I figured you were going to ask me anyway so --

Q.  I appreciate it.  I have some followups.  You talked about your husband.  That's Ron, your husband?

A.  Yes, Ron.  Yes.

Q.  And where did you meet your husband?

A.  So just to give you a little taste of me and my little sense of humor; I was raised in a very -- you know, a Christian home.  And my dad always said there's no such thing as a coincidence, there's only God incidences.  That's kind of how I live my life.  I live my life through the lens of how God has impacted my life.

When I worked at the Medical College of Pennsylvania, I did a stint in the ICU.  And one of the nurses there -- you are going to ask me her name.  Her name was Pam Kline.  It is now Pam

Page 28

Bateman.

Long-story-short, she said hey, you're single, do you want to meet a guy.  There's a guy in my small group.  And I said -- and here's the Valley Forge part.  I said well, I've just had three or so bad blind dates.  I really am not up for meeting a new -- another one.  But since he's -- goes to your church and he's in your small group, I will give it a try.

So I do know the date because it is a date we still celebrate to this day.  We met on March 26th, 1994 and did the Valley Forge Park loop, which is about five and a half miles, and we walked that loop.  I pretty much talked the whole five and a half miles.  But that's another story.

Q.  You know, I think that's wonderful.  You're still married today.  That's what, 25 -- well actually, almost -- how many years?

A.  We'll celebrate our 28th anniversary this coming Saturday, July 15th.

Q.  Okay.  Wonderful.  And you consider yourself to have a happy marriage?

A.  Oh, yes.  My smile will tell you that.

Q.  And do you consider yourself to have a happy life right now, as you sit here today?

Page 29

A. I am happy in the Lord. Life has been difficult.

Q. Well, tell me about that. You know, how do you feel about your life right now?

A. I feel that God still has a plan for my life. He is in charge. The event of November 1st and the events leading up to that were very difficult for me. It did cause me some struggles, which is okay, because you build faith when you intersect life's difficult moments.

And on the other side of it, I know I am stronger for it. I will not deny that I've had some dark days and some very difficult days.

I am very happy in my marriage. I'm very happy at my church and in my life. My job situation and the passion I've had for nursing my whole career is suffering right now.

Q. Your job. You're working at Suburban General. Is that correct?

A. Suburban Community Hospital.

Q. Okay. Suburban Community. Okay. Do you like your job now?

A. I love being clinical. I love the bedside nurse. The clientele, the type of patients we get is -- can be challenging. It is a

Page 30

very -- it can be a very unsafe environment physically to me.

I have -- I can probably count on one hand the number of times that I have been physically assaulted when I worked prior to Suburban, and I can count -- it would take me two hands to tell you how many times I have been physically assaulted since working at Suburban Community.

In addition to that, it is a union hospital. So professionally, it is challenging for me. There is a lack of striving to improve, challenge your thinking and do sometimes what is, what I would consider, high-quality care and -- it's different.

And I have found other ways to nourish that. It's just a difficult path right now that I'm trying to navigate through and figure out where I'm going to land.

Q. When you say physical assaults, you've -- you did -- you mentioned that you had some physical assaults even before moving to Suburban.

A. Yes. That's a well-known fact in the health profession, especially in the emergency

Page 31

room environment.

Q. Okay. And so there were some while you worked at -- was it Paoli?

A. I had one significant one at Paoli. I actually still have a mark of the bite from the patient that bit me on my arm. At Paoli, aside from the demented patient, maybe, you know, swinging or trying to pinch you and things like that, you know, I -- that, unfortunately, as a nurse we sometimes just consider that part of the job. A bite mark that I still have a scar from, I don't consider part of the job.

I did -- I have filed a police report since I have worked at Suburban Community because I was assaulted by a patient. And --

Q. Yeah. I did --

A. Go ahead.

Q. -- just want to ask you a little bit about these assaults. I know they may or may not be relevant.

You mentioned one at Paoli that you still have a scar in relation to. When did that happen?

A. Okay. I would need to look at the documents. I believe that in the request to

Page 32

produce I did submit that workman's claim follow-up that would have the date. It was pre-COVID. Pre-pandemic. Maybe 2018, 2019. I would need to refer to the documents. It would be under the -- you know, the requests to produce the medical things, whatever number that was.

And I did have to have a follow-up because I did have to take antibiotics because it was a human bite.

Q. And who treated you for that?

A. In the emergency room. Um...

Q. I mean -- when I say who, I mean not just the particular doctor but who was the medical provider that treated you for that?

A. I'm not sure I understand what the difference is there.

Q. Well, if you said in the emergency room, I'm going to assume that you got treated for that prior bite while at Paoli, at Paoli Hospital. That's what I'm saying. Who was the provider where you got treated?

A. So it was a PA. I know her first name was Jess. We had four Jesses. And I am drawing a blank on her last name. And I actually -- I cannot recollect off the top of my head who was

Deposition of Dawn Gray                                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 33

1  the attending that was working that day.
2          And then I did follow up, I believe,
3  with an MP for my workman's comp followup
4  appointment, and I do not remember her name.
5      Q.  The PA was at Paoli Hospital.  Right?
6      A.  Correct.
7      Q.  Okay.  Got you.  I just want to confirm
8  those details, like where you got treated.
9          You said that you've been assaulted a
10  number of times at Suburban Community Hospital.
11  Were there times where you got assaulted that you
12  needed to be treated in relation to that assault?
13      A.  Um, the incident that I filed the
14  police report in Norristown for, I did have a
15  bruise on my hand.  I did not formally sign in and
16  be registered for that case at that time.  For
17  that incident.  I shouldn't say at that time.  I
18  actually continued working my shift.
19      Q.  That was a bite, as well?
20      A.  No.  That was a -- it happened during
21  an altercation.  I was called to the room by a
22  housekeeper, that I needed to address a concern in
23  the room.  I approached the room and the patient
24  was strangling himself with a sheet.  I attempted
25  to -- I called out for help, and I attempted to

Page 34

1  remove it.
2          He got a little, in nurse's language, a
3  little wild and started throwing punches and I got
4  punched.
5      Q.  And did you see anybody in relation to
6  that, any medical provider in relation to getting
7  punched?
8      A.  Not formally.  I did -- obviously the
9  attending that was working on that shift -- no,
10  let me correct that.  Not the attending that was
11  working on that shift because he had to go home
12  because of what happened to him.
13          But the follow-up attending did just
14  say hey, I agree with you, I think it's a bruise.
15  So I did not sign in.
16      Q.  Any other times at Suburban Community
17  Hospital where you were assaulted that you needed
18  to seek medical treatment in relation to the
19  assault?
20      A.  I have not formally sought medical
21  treatment for any of the other assaults that have
22  occurred at Suburban, and I should do that more
23  consistently.
24      Q.  When you say formally, informally might
25  be if there's an attending on duty, you might ask

Page 35

1  the attending if they felt that you needed to do
2  any follow-up?
3      A.  Absolutely.  And that has happened.
4      Q.  Okay.  And that would be at Suburban
5  Community itself?
6      A.  Yes.  And if you would like, you can
7  just call it Suburban.
8      Q.  I will.  Yeah, you corrected me.  I
9  want to be accurate going forward.
10      A.  Well, it wasn't whatever you called it.
11  But that's what it is.  Suburban works for me.
12      Q.  Suburban.  I got you.
13          Who was your primary care doctor?
14      A.  My primary care doctor is William
15  Greer.
16      Q.  Where is William Greer out of?
17      A.  He's located -- his office is located
18  in Paoli.
19      Q.  Is he a part of a health system, do you
20  know?
21      A.  He has privileges at Main Line Health.
22      Q.  But he's an independent doctor, to your
23  knowledge?
24      A.  I'm going to have to say to my
25  knowledge.  I mean, I know he has privileges.  His

Page 36

1  current state, I don't know.  But at the time,
2  yes.
3      Q.  Where is it that you currently live?
4      A.  I live -- the actual address?
5      Q.  Yes.
6      A.  1318 Statesman Road, Norristown,
7  Pennsylvania.
8      Q.  When did you move there?
9      A.  Not too long ago.  March -- settlement
10  was March 24th, 2022.
11      Q.  Why did you move there?
12      A.  So once I knew that the situation at
13  Main Line was not going in a favorable direction
14  for me to retain my job, my husband -- even though
15  I was still very active at Main Line Health, my
16  husband -- we had just completed in January of '21
17  a rather large renovation project on our home that
18  caused us to remortgage our house to correct a
19  significant and repetitive flooding problem.
20          And my husband, in October or so,
21  September/October, said to me, I think God is kind
22  of -- the Holy Spirit, who, you know, we use as
23  discernment to direct us and guide us, is telling
24  me that I think that we may need to considering
25  selling our current home.

Deposition of Dawn Gray                                   Dawn Gray v. Main Line Hospitals, Inc.

Page 37

I was like -- it took a little while because, as I said, I have enough stress in my life right now. I have enough going on in my life right now.

But he felt very strongly that we needed to move forward because our funds would not remain if I was unable to secure another employment. We would pretty much not be able to meet our mortgage payments. So he said let's move.

So we put the house -- you know, that process takes time. We put the house on the market December 9th, and the house sold -- settlement was, I want to say, February 24th of '22. And then we spent a month kind of homeless with the majority of our belongings in a storage unit, and we rented a temporary apartment while we were searching for a new place to live that was not going to have a large mortgage.

Q. What does your husband do for a living?

A. He's a public school teacher. He teaches second grade at Radnor -- Wayne Elementary in Radnor Township.

Q. How long has he been doing that?

A. Oh, boy.

Page 38

Q. This might be where you estimate. That's fine. You don't have to give me an --

A. This may be -- can you repeat that?

Q. You can estimate how long. You don't have to tell me exactly if you can't remember.

A. I know that he's worked at Radnor at least 40 years.

Q. Okay. How much does he make a year?

A. Um, I believe -- I would say over a hundred. Around a hundred. Maybe, you know -- I always get confused with the gross and the net. And you know, they take out the health benefits and add that. So he's somewhere -- he's, by now, to that point.

Q. Okay. And he's been accruing a pension with PSERS for 38 years. Is that accurate?

A. That is accurate.

Q. And you sold the house in Wayne. Is that the Richards Road in Wayne?

A. 650 Richards Road.

Q. Okay. 650 Richards Road. How much did you sell that for?

A. Approximately, I'm going to say it was six. It might have been 604. It might have been an odd -- six is what sticks in my brain.

Page 39

Q. And what did you buy it for originally?

A. We bought it in 1998 for 316 or so, approximately.

Q. Okay. So there was a significant profit that you made in selling it at the time. Correct?

A. No. Because we had refinanced it to do the very large renovation project that we had to do that we were mitigating the flooding for.

Q. What was the amount of the mortgage that you had on it at the time of sale?

A. At the time of?

Q. At the time of sale.

A. The amount of our mortgage?

Q. Mm-hmm.

A. Probably 300, maybe 400. I mean, we had -- it was a rather large extensive renovation project.

Q. All right. So you're estimating 300 or 400,000. All that is public record.

A. I know that. That's why those numbers aren't in my head, as well. So I'm estimating. We had remortgaged pretty high back up there, yes.

Q. How much did you purchase the Statesman Road -- is it a townhouse that you purchased?

Page 40

A. It is a townhouse. I'm going to say 300. I don't think it was 310. I want to say it was 300.

Q. Are you happy at the Stateman -- Statesman Road house?

A. We have found a lot of peace there. We don't worry. I do not watch the radar and the weather forecast like I used to, because that used to cause -- my dog is much happier. I think she has had some PTSD from the storms as well and our stress. It is much better on that front and we are enjoying where we are living.

Q. And you didn't have any flooding during the recent storms that we have had?

A. Amen. We did not.

Q. Do you know if your Wayne house did? Did you drive by?

A. We did not drive by. They are doing some work with the Turnpike by our house. So the two streets in and out of our house, one of them is shut and you get stuck with the light. We tend not to drive by there. I did see it from the Turnpike view coming here of our house but that was just the backyard.

Q. Do you have an interest -- ownership

Page 41

1 interest in any other property?
2     A.  No.
3     Q.  And I was going to ask you if you have
4 any hobbies.  I know that you have a hobby.  You
5 play -- is it I mean, professional or competitive
6 squash or is it --
7     A.  I have competed on the Women's Squash
8 Professional Doubles Tour.
9     Q.  That's wonderful.  When have you
10 competed?
11     A.  When have I competed?
12     Q.  Yeah.
13     A.  I've probably competed -- oh, boy,
14 that's a great question.  Prior to 2020 I had
15 probably competed, wow, ten years maybe.
16     Q.  Okay.  For ten years?
17     A.  Quite a while.  I still compete as an
18 amateur.  I was fortunate -- you know, we are
19 allowed to do that in our sport.  So I still
20 compete in the national championships for my age
21 group and things like that.
22     Q.  Wonderful.
23     A.  And I do have other hobbies.  I just
24 don't always play squash.
25     Q.  What are some of your other hobbies

Page 42

1 that you have?
2     A.  I cross-stitch.  I quilt.  My husband
3 and I hike.  We are avid hikers.  Things like
4 that.
5     Q.  Great.  Do you vacation anywhere?
6     A.  We do.
7     Q.  Where do you vacation?
8     A.  So, we camp.  We try to camp a lot, at
9 least every other year.  And we do take other
10 trips.  We do have -- we did early on in our
11 marriage -- we do have a timeshare and we do -- it
12 was an every other.
13          So we would camp one year and then try
14 to go somewhere the other year.
15          In terms of other vacations, we were
16 given some advice by a distant cousin that also
17 did not have children.  They knew about our
18 fertility struggles.  And she said you need to do
19 yourself a favor and every five or ten years, you
20 need to take a trip that you would not be able to
21 take if you had children.
22          My husband has been very good about
23 doing that.  So in 2005, we took a 14-day trip to
24 Switzerland and hiked alp to alp with a tour
25 group.  Then we did a big trip to Hawaii for

Page 43

1 another two-week trip.  And we are headed for the
2 Colorado Rockies shortly for another trip.
3          So a lot of our trips are hiking
4 because we enjoy hiking.
5     Q.  When was the Hawaii trip?
6     A.  I knew you were going to ask that.  So
7 we did Switzerland in 2005.  I could look at my
8 phone and pull up a picture and tell you.
9          We have done quite a few national
10 parks, too.  So that's why I'm not sure exactly
11 when Hawaii was.  So it was either at a five-year
12 or a ten-year mark.
13     Q.  After the pandemic started?
14     A.  No.  We had actually been scheduled to
15 do the Rockies in 2020, and the trip was postponed
16 and delayed.  We were going to do that for our
17 25th wedding anniversary.  And now that things are
18 lifted up, that is happening this summer.  We are
19 spending --
20     Q.  That's great.  When --
21     A.  -- two weeks there.
22     Q.  -- do you leave?
23     A.  The 15th.
24     Q.  Wonderful.  Hope you enjoy that.
25          How do you get your news about what's

Page 44

1 going on in the world?  What are your news
2 sources?
3     A.  I do receive -- I do read the
4 Philadelphia Inquirer, digital edition.  But I
5 must be honest, I mainly go right to the sports.
6 I'm a bit of a sports nerd.  My husband laughs
7 that I'm the sports fanatic and he could care
8 less.  So he watches the commercials, and I watch
9 the sporting events.  So I do scan that.
10          And I do read the -- I have a
11 subscription to the Epoch Times.
12     Q.  So you're a Phillies fan, Sixers fan?
13 What sport do you follow the most?
14     A.  I am not a Sixers fan.  I am definitely
15 a Phillies fan.  My dad gives me much grief that I
16 have abandoned the 'dead skins', as we called them
17 growing up in my house; the Washington Redskins,
18 which I guess now I have to call the Commanders.
19          I root for the Phillies, the Eagles.  I
20 switched my loyalty to the Eagles.  I'm not really
21 a hockey fan.  But I'm a pretty sporty person.
22     Q.  I'll give you credit for the Eagles and
23 no longer being a Redskins fan.  That's --
24     A.  Well, I think there's a little piece of
25 me that does it so that when the Eagles and the

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 45

1  Redskins play, I can call my dad and we can banter
2  a bit.
3      Q.  As long as you're not a Steelers fan.
4  Right?
5      ATTORNEY DALLER:  Whoa.  Whoa.  I was
6  waiting for that.
7      THE DEPONENT:  Absolutely not.
8      ATTORNEY HENNESSEY:  Even though you're
9  in Pittsburgh.
10     ATTORNEY DALLER:  Mike Tomlin is a man
11 of God.  He works through the Man Up in Urban
12 Impact.  He does a lot for the community.
13     THE DEPONENT:  He is good.  But
14 remember I'm not in Pittsburgh.  I'm in Mars.
15     ATTORNEY HENNESSEY:  I got it.  I think
16 anywhere west of, what is it, Lancaster, there are
17 Steelers fans out there.
18     ATTORNEY DALLER:  That's right.
19     THE DEPONENT:  Okay, you two.
20     ATTORNEY HENNESSEY:  All right.  Let's
21 get back to what we're here for today.
22 BY ATTORNEY HENNESSEY:
23     Q.  We had started talking about your
24 religious beliefs.  And you had said the source of
25 your religious beliefs was the Bible primarily.

Page 46

1      Is that correct?
2      A.  Primarily I would say the source of my
3  religious beliefs is the Bible, the Holy Bible as
4  inspired by God.
5      Q.  Have you studied the Bible?
6      A.  Are you asking me if I formally studied
7  the Bible or do I do Bible studies?  I have not
8  taken any formal classes.  But --
9      Q.  Sure.
10     A.  -- I read the Bible every morning and
11 every evening.  I attend church.  I have been
12 members of -- do ladies' devotionals, small
13 groups, prayer groups.
14         Yes, I study the Bible.
15     Q.  What's the -- give me one of your
16 favorite stories of the Bible.  Can you tell me
17 the stories from the Bible?
18     A.  Well, I can tell you my favorite verse
19 is, "May the words of my mouth and the meditation
20 of my heart be acceptable unto you, oh, Lord, my
21 God and Redeemer."
22         Stories.  Hard for me not to find one.
23 I do go to -- I don't know if you've ever been to
24 Sight and Sound in Lancaster.  It's a theater.
25 You know, you name any of those stories, and

Page 47

1  they're pretty good.  And they do a darned good
2  job at representing God's story in those.
3      Favorite story.  Um, you know, that's a
4  good question.  I don't think anybody has ever
5  asked me that question.
6      Q.  If you can't think of one, that's fine.
7      A.  I can give you so many.  To say they're
8  my favorites; you know, whether you want Daniel in
9  the Lion's Den, whether you want Noah, whether you
10 want Samuel/Hannah, or whether you want
11 Ruth/Esther.  Jonah is a good one.
12     Q.  All right.  Well, maybe we'll come back
13 to some of them.  But that's fine.  In terms of --
14 let me just run through some of your educational
15 history.  And I will pull up -- if we get to it --
16 a copy of your resumé, if you need it to refer to.
17         (Whereupon, a six-page curriculum
18 vitae was produced for identification as Gray
19 Exhibit 1.)
20 BY ATTORNEY HENNESSEY:
21     Q.  You already testified a little bit
22 about where you were working, at least now and
23 where you worked before.  But why don't you
24 describe for -- and I think you've testified a
25 little bit regarding your educational history.

Page 48

1      Maybe just -- we'll start with a
2  summary of your educational history to the extent
3  that you didn't testify to it, and then we're
4  going to talk a little bit about your nursing
5  background.  Okay?
6      A.  Okay.  So education, obviously I went
7  to elementary school, high school in Annandale,
8  Virginia.  I attended the University of
9  Pennsylvania from 1993 to -- 1983 to 1987.  I then
10 paid back my time with the VA.
11         In about 2000 and -- I guess it would
12 be 2011, because I believe I got my master's
13 degree in nursing from Walden University, and I
14 believe that was 2013.  And that is my formal
15 education.
16         I obviously maintain my certifications
17 and things like that and pursue, you know,
18 furthering education as needed, whether it's for a
19 job requirement or just because that's the kind of
20 person I am.
21     Q.  Okay.  And I'm just going to put in
22 front of you --
23     A.  Oh good.  Was I right?
24     Q.  Yes -- your CV, I think it was.  We
25 have it premarked at Gray Exhibit 1.  You

Deposition of Dawn Gray                                Dawn Gray v. Main Line Hospitals, Inc.

Page 49

1 provided, I think, some of your background.  You
2 went to get a bachelor of science at the
3 University of Penn and master's of science at
4 Walden.  Correct?
5     A.  Correct.
6     Q.  And then you provided all your
7 licensures and certifications.  I understand all
8 the ones, unless there's an end date, they're
9 current; is that accurate, the registered nurse is
10 current and certified emergency nurse.
11        Is that correct?
12     A.  My RN, my CEN, my CCRN, my ACLS, my
13 PALS, my BLS.  I am now also -- oh, I just got my
14 NRP, which is my neonatal -- NPR, NRP -- neonatal
15 resuscitation patient, because at Suburban that's
16 required.
17     Q.  Okay.  And you provided this CV in
18 relation to the discovery requests.  Do you know
19 when you prepared this CV?  I can go to where the
20 last job was here.  It looks like it has Suburban
21 Community Hospital here.
22        Do you know when this one was prepared?
23     A.  This particular one?
24     Q.  Yes.
25     A.  I updated it when I put in the Suburban

Page 50

1 because that is my most recent experience, my most
2 recent job.  I may have -- there's other updates
3 in there.
4        I'm also published.  I have done that.
5 So I do update it for that, as well.  And
6 actually, I just found out three weeks ago that
7 another edition of one of the -- I think it's
8 actually -- I forget if it was the Fast Facts or
9 the Rapid Access Guide.  I would have to look.  I
10 just got a second edition on that.  I wrote
11 several chapters in that.  So I update that, as
12 well.
13        So those are the kind of things that
14 drive me back to it.  I know that the first time I
15 ever wrote this CV when I was at Walden because it
16 was one of the requirements for graduation.  So
17 since then, I've just kept the CV going.
18     Q.  So you have one CV that you regularly
19 update.  Is that accurate?
20     A.  Yes.  That would have been a much
21 easier way to say that.
22     Q.  Oh, that's fine.  And you said that you
23 have publications.  And you indicated that there
24 are probably more recent publications than the
25 last one here of 2018.  Is that correct?

Page 51

1     A.  Right.  I just -- there -- I believe we
2 had one in 20 -- I know that there is now one in
3 2022 and it's a second edition.  And like I said,
4 I just got the digital copy.  I have not received
5 the hard copy.  And I will update it with that.
6     Q.  So prior to 2022, the last one would
7 have been in 2018?
8     A.  Yeah.  I really think I missed one.
9 I'm pretty sure there was -- there's a
10 pediatric -- we did a pediatric one.  Can you
11 scroll down a little bit more?
12        Yep, it's not there.  So I need to add
13 that pediatric one.  We did the pediatric book in
14 2021.  I obviously should -- I would love to write
15 myself a note right now to tell myself to add
16 that.  I did not realize that was not in there.
17     Q.  Well, I'm glad I can be of help with
18 that.  So everything in here is accurate other
19 than, perhaps, it's missing some publications.
20        Is that correct?
21     A.  To the best of my knowledge, I would
22 say that's an accurate statement.
23     Q.  Okay.  And prior to working with Paoli
24 or Main Line Health, did you have any other
25 nursing jobs?  And I can go there, if you need me

Page 52

1 to refresh your recollection.  Maybe we will just
2 go with your recollection.
3        Where did you start your nursing
4 career?
5     A.  I started my nursing career up at the
6 Jamaica Plain Boston VA.  Like I said, I worked
7 there for maybe a year, not quite a year.  It was
8 difficult in that -- yeah, it was -- I needed to
9 change VAs.  I had a two-year commitment.
10        So then I transferred to the Philly VA.
11 I laugh every time, because I swore when I left
12 Penn after I graduated that I'd never come back to
13 Pennsylvania, and now I will probably die here.
14 But that's God's sense of humor in my life.
15        I went to the Philly VA and I finished
16 my two-year commitment.  I worked a little bit
17 there, a little bit beyond, not too much more,
18 than my two-year commitment.
19        And then I wanted to be a real -- I'm
20 putting quotes around the word real -- trauma
21 nurse.  So I applied for a job at the Medical
22 College of Pennsylvania, which I think changed its
23 name, I can't tell you how many times, when I
24 worked there, who owned it or whatever.
25        I worked there until they actually shut

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 53

1  down.  Before they closed their doors, I had
2  started working per diem at Paoli Hospital.  So
3  when Medical College of Pennsylvania closed, I had
4  an easy transition to Paoli.
5      I did remain part time for a while per
6  diem, actually per diem, because it was during
7  some of that that my husband and I were going
8  through infertility and trying to have children.
9      We got to a point of -- well, and then
10  I started picking up my part-time job, and I
11  pretty much worked the part-time job since then at
12  Paoli until November 1st, 2021.
13     Q.  Okay.  And I just have up on the
14  screen --
15     A.  Oh, I forget my ICU license.  Yes, I
16  did go spend a couple of years in the ICU, but
17  that was still at MCP.
18     Q.  So I think we have covered everything
19  up until starting at Paoli.  And you started in a
20  part-time position.  Is that accurate?
21     A.  No.  I started in a per diem position
22  because I was still working at MCP until it
23  closed.
24     Q.  All right.
25     A.  The little -- the little -- hangover is

Page 54

1  not the word.  Cross -- hangover is not the word I
2  want.  A little crossover between the two.
3      Q.  No.  I see that.  And it looks like
4  that's through 2000 to 2005 that you had a
5  crossover.
6      A.  There it is, crossover.  That's a
7  better word.
8      Q.  I think -- yeah.  Then you moved into
9  as a clinical leader, it looks like, in 2005 with
10  Paoli Hospital?
11     A.  Yes.
12     Q.  Did you continue to be per diem or did
13  you go part time or change the relationship at all
14  with --
15     A.  I had -- I had gone -- I would have to
16  really dig back.  When I took the coordinator
17  position, I officially was part time at that
18  point.  Had I gone part time before then, I am not
19  sure.  I think there was a period in there where I
20  kind of volunteered as their charge nurse because
21  their charge nurse had left.
22     And then they created this clinical
23  leader position, and I did go into that role as
24  part time.  And now that role is now a clinical
25  coordinator.  Same role, different name.

Page 55

1      Q.  Okay.  So you worked part time, I think
2  at -- pretty much at all times and on an hourly
3  basis, I guess that would translate into, rather
4  than a pure salary basis.  Is that accurate?
5      A.  Correct.  I have not -- correct.  All
6  my career has been that.
7      Q.  Okay.  And so the hours you worked
8  would also probably be adjusted depending on the
9  volume and how busy they were at Main Line Health
10  or Paoli Hospital.  Is that accurate?
11     A.  Can you clarify that question?  I'm not
12  sure.  I worked part time.  Were there shifts that
13  there -- were there days that I was able to pick
14  up extra shifts or I could sign up for extra
15  shifts or if they had holes or needs?  Yes.
16     But the position, I always remained
17  part time.  I was .5 towards the end at Paoli.
18  One of the --
19     Q.  When we --
20     A.  Go ahead.
21     Q.  When we talk about part time, how many
22  hours are we talking about for part time?
23     A.  That's what I was just about to get
24  into.
25     Q.  Okay.

Page 56

1      A.  So when we worked eight hours, I did --
2  the eight-hour position, I was two days one week
3  and three days the other week.  So that was a pure
4  part-time position.  I guess I would have been a
5  .5, is what they would have called it then.
6      And then the whole scenario within
7  healthcare kind of switched to 12 hours at some
8  point in my career.  And then when we went to
9  doing the 12 hours came, I job shared, pretty
10  much, the job.  I would do two 12s a week and my
11  colleague -- a colleague would do the three 12s a
12  week.
13     At the end of my time at Main Line, the
14  nurse that I -- Lauren, who I split the job with,
15  she had had a second child.  She wanted -- instead
16  of being a .9, she wanted to become a .75 and she
17  asked me if I would pick up an extra shift and be
18  a .75.
19     You know, my husband and I prayed about
20  it, considered it -- that's what we would do with
21  all of our decisions, we go to the Lord and we
22  decide as we seek His guidance.  And at that time
23  was when we were beginning to be thinking about
24  the construction project and all that.
25     So I did -- when I was terminated from

Karasch                                                          Page: 17 (53 - 56)

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 57

1  Main Line, I was working point -- technically I
2  guess you would call it a .75. I was working
3  three 12s one week and two 12s the other in a pay
4  period.
5      Q.   So three 12s, that's three 12-hour
6  shifts, and that would 36 hours; and two 12-hour
7  shifts would be 24 hours. So during the pay
8  period of two weeks, that would be 60. I'm
9  horrible at math, but I think I can add those two.
10     Is that right?
11     A.   That is correct.
12     Q.   So it would be around 60 hours per pay
13 period. If they were busy, and I assume during
14 the pandemic, Paoli Hospital was pretty busy,
15 would you volunteer for additional hours to help
16 out if there was a COVID surge, for example?
17     A.   I wouldn't -- I would not characterize
18 it as during the surge. Throughout nursing when
19 there's holes and needs, you know, you have the
20 opportunity to pick up extra. And I would do
21 that, depending on what was going on and things
22 like that.
23     I went through periods where I never
24 picked up extra, especially during some -- you
25 know, again, after I came back, of infertility and

Page 58

1  things like that, I did not pick up any extra.
2  That waxed and waned in my career.
3      I was not doing the 60 hours per week
4  for that long before I was terminated. So the
5  majority of my time at Main Line was -- would have
6  been called a .6.
7      Q.   So .6. -- you're saying .6 of, I guess,
8  40 hours a week is the standard. So .6 --
9      A.   Well, with 12 hours it would be 36.
10 Three 12s would be 36. That was considered full
11 time. So .6 would mean I would do two 12s a week
12 and that's considered .6.
13     Q.   Okay. I'm just -- the .6 was in
14 relation to what is what I was trying to get at.
15 But that's just what they refer to it as, .6?
16     A.   Part time.
17     Q.   Okay. Part time. Were you eligible
18 for benefits as a part-time employee?
19     A.   Yes.
20     Q.   How were you eligible for benefits as a
21 part-time employee?
22     A.   Main Line Health offers them
23 everywhere. Suburban offers them -- you pay more
24 into it if you opt to use their benefits as a
25 part-time employee. So I'm going to pay more in

Page 59

1  my paycheck or weekly or monthly, however they
2  take it out, if I'm part time versus full time.
3      Q.   Okay. So you would pay a little bit
4  more into your paycheck for health benefits, but
5  you were eligible for health benefits and you
6  received them while you worked at Paoli Hospital?
7      A.   I did not. I am under my husband's
8  benefits.
9      Q.   Okay. How long have you been under
10 your husband's benefits?
11     A.   Ever since I got married.
12     Q.   Did you receive any other benefits
13 while you worked at Paoli Hospital?
14     A.   They had a pension plan, because I was
15 there for 21 years that I was in, which obviously
16 stopped accruing or growing as of November 1st,
17 2021. They also had a 403(b) with a matching that
18 I did, too.
19     Q.   Does Suburban have a 403(b) matching?
20     A.   They have a 401(k) with its profit.
21 But it is -- if I remember right, Main Line
22 Health's is four percent. Suburban, I believe is
23 one.
24     Q.   So four percent is what the employer
25 would match in terms of --

Page 60

1      A.   Correct. Correct.
2      Q.   And do you recall how much in terms of
3  percentage that you put into the 403(b)?
4      A.   I believe I did ten percent of every
5  paycheck at Main Line.
6      Q.   Okay. And four percent would be
7  matched?
8      A.   Right.
9      Q.   And are you enrolled in Suburban's
10 401(k)?
11     A.   I am not at this time.
12     Q.   You would have the option to, though.
13 Correct?
14     A.   Yes. I have spoken with my financial
15 advisor. And we have been doing that. In fact,
16 we have another meeting in August.
17     We are just trying to do some
18 responsible things and do some planning. So that
19 is on the docket to discuss this year. We had met
20 with him in December of 2021, and then our next
21 meeting will be this August.
22     Q.   Okay. Does Suburban have a pension
23 plan?
24     A.   Excuse me?
25     Q.   Does Suburban have a pension plan or

Page 61

1 any sort of profit-sharing plan that you're aware
2 of?
3     A.  No.
4     Q.  Did you like working at Main Line
5 Health?
6     A.  I did.
7     Q.  What did you like about it?
8     A.  I liked the professionalism.  I liked
9 the opportunities, that you were able to seek your
10 own professional growth.  It was a very collegial
11 teamwork approach in the emergency room at Paoli.
12        It was -- I loved working at Main Line
13 Health.  I really planned on working until
14 retirement, if it meant Main Line Health.
15     Q.  What -- tell me about your last job,
16 what you did at -- we have it here in your CV.
17        But I want to ask you, I'm going to
18 turn to the top of your CV, and ask you based
19 on -- so you can tell me what you did from on a
20 day-to-day basis in your last job at Paoli
21 Hospital; what did you do?
22     A.  So we had two primary focuses.  I still
23 don't think that's the right word.  As
24 coordinator, you did your throughputs, your
25 quality improvement, your quality assurance.  You

Page 62

1 did education.  You did in-the-moment staff
2 leadership.  From redirecting -- some management.
3        We also had -- what I loved about the
4 job is, you know, a large portion or significant
5 portion of it was clinical.  So I was still at the
6 bedside.  I would do trauma alerts.  I would help
7 patients.  I would do what I needed to do.  I
8 interacted with patients and families and doctors
9 and would triage and do the roles that I -- that
10 is what I love to do.
11        It was a very good fit for me
12 professionally.  It was a challenge for me.  I
13 grew a lot in that role.  You know, kind of the
14 overall.
15        On the side, I did participate in a
16 clinical honor program which was another whole
17 area of growth for me.  And in my last year there,
18 I was actually mentoring to groups of nurses with
19 a clinic adjunct project because, you know, I
20 was -- I was very invested in that program.
21        I felt it was the best way to engage
22 nurses to start to think more clinically and use
23 critical thinking skills and not just do tasks.
24        And I was slated to take over the
25 clinical ladder lead team, at least in the

Page 63

1 emergency room, in December of '21.
2     Q.  What do you mean slated to?
3     A.  I was going to take over that position.
4 The nurse that had done it in the emergency room
5 didn't want to do it.  And we had started talking
6 about what I needed to know and how to work, you
7 know, working with the -- she didn't do a lot of
8 the project work.
9        She would just tell people -- she had
10 become the go-to person to come to if you needed
11 to know what needed to be in your binder and how
12 did you get this and how do you -- you know, the
13 clinical ladder was the series of views among the
14 teachers and you kind of did things within that.
15 I kind of did things like that.
16        I kind of ratcheted it up a notch in my
17 leadership role because I was so invested in the
18 growth of nurses.  My focus of my master's program
19 was nursing education.  So I loved teaching and
20 facilitating, and I loved watching others grow.
21 So I do a lot with that.
22     Q.  Would the position have been posted?
23     A.  No.  It's not a position -- well, let
24 me -- posted as a formal position?  No.  How it
25 was it goes out in the weekly 'Friday Facts'

Page 64

1 saying hey, we're looking for a new clinical
2 ladder team leader for the emergency room.  You
3 know, let the manager know if you're interested.
4        And I was interested.  And I was going
5 to be it as of December of '21.
6     Q.  Was there any sort of offer or
7 communication telling --
8     A.  In other words, the only -- I'm
9 guessing you're speaking financially?
10     Q.  No.  I'm -- we'll get to that.  But I
11 am speaking in terms of documentation showing that
12 you were going to be put in that position.  Was
13 there an offer of that?  Is there any written
14 communication that reflects that?
15     A.  I do not believe there was anything as
16 formal as an offer letter.  I do know that the
17 staff knew, whether it was from 'Friday Facts' or
18 word of mouth, because Julie was telling people
19 that Dawn was going to be the new team leader.
20        You know, that's something that I do
21 not believe that as something that you -- you
22 would go to monthly meetings with the clinical
23 ladder leadership team.
24        I had only attended one of those
25 meetings prior to my termination, because Julie

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 65

1  and I were trying to segue and she said you should
2  come to this meeting.  So I did.
3        But it wasn't -- you know, I never
4  received a formal offer letter, but I certainly
5  was on a roll.
6     Q.  Would there have been any change
7  financially if you had received that position?
8     A.  No.  But it would have checked one of
9  the difficult boxes to obtain your clinical ladder
10 five, which did come with a financial -- what
11 would you use?  Incentive.  Benefit.  You got the
12 3.50 extra an hour if I was a clinical ladder
13 five.  And I was a clinical ladder five.
14       But it would make that last -- the last
15 box, the last I guess, it's teachers, I guess I
16 would be with the S, that was always most
17 difficult to be able to get your -- to attain your
18 clinical ladder five, and it would've checked that
19 box for me.
20    Q.  Okay.  You're saying that otherwise,
21 you had met all of the requirements for clinical
22 ladder five, and that would have checked the last
23 box so that you could have received the clinical
24 ladder five?
25    A.  No.  Let me clarify that.  It was one

Page 66

1  of the options in that last box.  The other
2  options are -- some similar to you doing a Q/A
3  project or you're leading a Q/A project.  You are
4  doing research.  So you're in a research
5  fellowship.
6        Or one year I was -- before -- they
7  used to only go to a four.  Four used to be the
8  highest.  When I was a clinical ladder four, if
9  you were published, you can use that because it
10 obviously takes a lot of work and effort to be
11 published.
12       So, you know, attained either a four
13 when the four was the highest, or a five earlier.
14 But it -- it was just one of those boxes you could
15 check, I guess.  It makes it sound a little more
16 trite, but it was a lot of work.
17    Q.  Just to turn to what you said.  You
18 said you were involved in clinical, that you were
19 next to the bedside of patients and that was
20 something that you liked.
21       You were regularly in contact with
22 patients in doing your last position at Paoli
23 Hospital.  Is that correct?
24    A.  Yes.
25    Q.  And these were patients of -- well, I

Page 67

1  don't know want to classify anybody.  But patients
2  of all types; individuals who were young children,
3  babies potentially, different genders, age,
4  disability status.
5        Is that right?
6     A.  Yes.
7     Q.  So some of these individuals were, we'd
8  call them a vulnerable population set.  Do you
9  understand what I mean by that?
10    A.  Absolutely.
11    Q.  Do you think it would have been
12 important to have all the vaccinations recommended
13 by health authorities if you're providing bedside
14 service to vulnerable populations?
15    A.  So I'm just clarifying.  You're asking
16 me a personal opinion here?
17    Q.  Yeah.  I'm asking you for, you know,
18 your -- yes, your opinion.
19    A.  I -- we all wore the same PPE.  We all
20 followed the same procedures.  People that
21 received exemptions, whether it was medical or
22 religious, followed the same protocols with the
23 exception of weekly testing.  So I think that
24 exceptions were made, and exceptions could be made
25 safely.

Page 68

1     Q.  What vaccinations did you have?
2     A.  In terms --
3     Q.  I'll give you some examples.  I
4  understand you regularly got the flu vaccine.
5        Correct?
6     A.  Yes.
7     Q.  You had the Tdap vaccine, tetanus?
8     A.  I have had the Tdap.
9     Q.  How about the pneumonia vaccine, have
10 you received --
11    A.  No.
12    Q.  How about the shingles vaccine, have
13 you --
14    A.  No.
15    Q.  -- received that?  Have you been
16 recommended to receive any of those by a doctor or
17 medical provider?
18    A.  Um, I'm not -- to speak honestly, I'm
19 not one that goes to the doctor very often.  So
20 Dr. Greer, I will say that I do see Dr. Greer
21 regularly outside of the office.  He plays squash.
22 But I haven't seen him recently.
23       But I don't know.  I would not say -- I
24 don't know that we've ever had those
25 conversations.

Page 69

Q. Do you have any health conditions, any chronic health conditions?

A. Chronic health conditions? No. I do have some allergies that I have that I -- you know, it's between allergies with my latex and cross-allergies. I'm actually allergic to rubber and elastic with a cross-allergy to latex, and I do have some rosacea from that. Guess you could consider that a chronic condition.

Q. Any asthma?

A. No.

Q. Now, when you get the flu vaccine, that's not only for yourself but that's for who you are serving. Correct?

A. I think that there are different interpretations on that question. At the time and I -- as I said earlier, you know, say I used the Holy Spirit that's in me, that God gives me, and the temple of the Holy Spirit to navigate and make decisions.

And I had received the flu vaccine per further recommendation. Even though, as we all know, and it is well being published, that the efficacy of that is sometimes very low. So I'm -- you know, I'm going to not surely say that it

Page 70

necessarily protects others, per se.

As I would educate patients if they had it or they were getting it, I would say that it should likely have a lesser course of the flu, which is how we would teach that when somebody would come in and they would test positive for the flu and they were vaccinated.

I can tell you that in my journey since November of 2021, I have been having some serious prayer time and discussions about whether or not I will continue to receive the flu vaccine in the future.

I feel very strongly that my body is made and pure and holy and is a temple of the Holy Spirit. And I have come to realize through, you know, my walk and the Lord's discerning and things that I am not sure that I will been continuing with that medical intervention, as a healthy individual with an immune system that God has provided me with, that He ordained me with when He formed me.

Q. In terms of the -- and we'll come back to some of that. In terms of -- I want to go back to my original question, which was the reason for the flu vaccine. And I recognize that the

Page 71

efficacy goes up and down, you know, year to year and sometimes it can be quite low. The reason for it is to try to avoid infection of yourself -- and that's for yourself.

But as a health careworker, if you're infected with the flu, that infection can be spread. The flu is contagious. Right?

A. The flu is. But I will have to not try to be difficult here. But if I am sick and have a fever and not feeing well, I would not go to work. I would use my leave bank or PTO -- I forget what they called it right now off the top of my head -- at Main Line, and I would not be at work under those conditions. So I would not be exposing somebody to that.

Q. I understand that. But as a nurse, you recognize that viruses can be contagious before you show symptoms. Correct?

A. I do know that there is a pre-germinal period.

Q. But my question was -- and some viruses you can be asymptomatic and not know that you have the virus and spread it to others.

Is that correct?

A. There is -- again, you're speaking to a

Page 72

nurse who is published and has done research. There are meta-analyses and things on those that show different things, whether or not -- when you do not have symptoms whether or not.

So I do think that there is that possibility. I will -- I will agree with you on that. But we may have to agree to disagree on some of that -- that other point.

Q. And feel free to share any of that. If you disagree, my next question is almost always going to be what is the basis of your agreement.

So, for example, would you disagree that you could be --

A. Sorry. There's an ant crawling across the thing. Sorry. Okay. I got it.

Q. That's okay. Would you disagree that -- we'll start with the flu; that the flu virus, you can be asymptomatic and have the flu virus and be contagious.

Would you disagree with that?

A. I would have to look at the literature to be able to answer that honestly and completely off the top of my head right now.

Q. How about COVID-19? And when we talk about COVID-19 -- well, before we get into it, I

Deposition of Dawn Gray           Dawn Gray v. Main Line Hospitals, Inc.

Page 73

1 want to talk about in relation to COVID-19 is how
2 it existed in the Fall of 2021. Because, as with
3 all viruses, COVID-19 virus mutated.
4      So -- and the understanding in the Fall
5 of 2021 with regard to COVID-19 is that it had
6 asymptomatic transmission. Is that correct?
7      A. That was the belief system at that
8 time.
9      Q. Okay. And part of the reason for
10 recommending that healthcare workers like yourself
11 be vaccinated for COVID-19 would not only protect
12 the healthcare workers but also individuals who
13 were around them, or who you provided service to,
14 such as patients, vulnerable population.
15      Is that correct?
16      A. That was the belief at that time. I --
17 as we all know at that time in COVID, many of the
18 testings, things like that, were not known and
19 were not done. So the belief was there. Yes,
20 that was the belief and --
21      Q. Now, when we say the belief, we're
22 saying the accepted belief by the health
23 authorities at the time, such as the CDC.
24      Correct?
25      A. Um, I would have to -- you know, I

Page 74

1 would probably have to do a timestamp. Because
2 the CDC had very many changes on their website as
3 well as to what things were and what they did.
4      But yes, at the early part, you know, I
5 believe that that was the message that the CDC
6 delivered.
7      Q. Do you believe -- and this doesn't have
8 to be -- this is your personal belief, that's
9 fine, or if you have literature in relation to it.
10      COVID-19 in the Fall of 2021 was a
11 potentially fatal disease, particularly for a
12 vulnerable population such the elder and
13 individuals who were immunocompromised?
14      A. I do believe that even the flu is
15 potentially fatal for those populations as well as
16 is pneumonia, as is anything else.
17      As for what I was actually personally
18 experiencing between March of '20, and we can go
19 to the Fall of '21, I believe is where we're
20 speaking of right now, at the time, I think some
21 of what we were -- I was professionally seeing and
22 my personal was not matching of the narrative all
23 the time.
24      I'm not judging that. I'm not saying
25 whether it was right or wrong. But I'm just

Page 75

1 saying sometimes in informal discussions amongst
2 staff, you know, we had our moments of fear. We
3 had our moments of oh, no, when is our surge
4 coming; oh, what are we going to do; will we make
5 it; how is this going to go; to hey, we're really
6 doing okay. None of us are getting sick.
7      So you know, I think that there was
8 sometimes a reality check with what the -- what'd
9 you say, the CDC was -- how'd you say that, the
10 CDC was disseminating that information?
11      Q. Did you care for any patients who died
12 after having a COVID-19 infection?
13      A. After having the COVID-19 infection?
14      Q. Yes.
15      A. Um, I can tell you in the emergency
16 room, you know, we care for patients. Did I admit
17 patients with COVID-19 to the inpatient units?
18 Absolutely. Do I know who died or how -- or if
19 any of my patients died, I do not know that.
20      Because once they went to the floor or
21 whatever, we do not access the chart or whatever,
22 we would obviously in the Fall of '21 or even
23 before the Fall of '21, you know, in March, even
24 in '20, we were getting daily updates. So you
25 knew how many inpatients there were in the system

Page 76

1 and things like that.
2      But you know, do I know? I can't say
3 that. Nobody -- I did not, per se, was involved
4 in the coding in the emergency room where we
5 pronounced them dead with COVID-19, if that's what
6 you're asking me.
7      Q. During the same time period that we're
8 talking about, did Paoli Hospital treat a number
9 of patients for COVID-19?
10      A. Absolutely. I said that in the daily
11 things that came out, we'd have the number of
12 patients and how many at each hospital there was.
13 And you would see that that was their mission.
14      Q. Were there times where the COVID-19
15 infections created staffing issues in the
16 emergency room?
17      A. Just COVID-19?
18      Q. Well, either when we talk about -- I
19 used the word surge before. I understand that
20 people go to the emergency room for all sorts of
21 things.
22      My understanding is that hospitals
23 experienced a high volume of patients during that
24 same time that we're talking about, and part of
25 that was compounded by the COVID-19 pandemic that

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 77

1   we were experiencing at the time.
2       Are you disputing that?
3       A.  I'm not disputing that.  I just think
4   that in terms of surge, you know, if you could
5   define surge.  Did we have busy days?  Did we have
6   higher census days?  Yes.  Did our staff --
7       I mean, that's one of the other reasons
8   I really enjoyed working at Main Line Health,
9   because they saw needs and they would staff
10  appropriately.  And you know, our staffing numbers
11  would adjust just for volume.  If our volume
12  numbers were trending, you know, as a coordinator,
13  we had meetings about that, you know, and we would
14  up our staffing.
15      Oh, we saw ten percent more patients
16  the last six months, so we're going to add a nurse
17  between the hours of 11 to 7 for extra shift.
18  Main Line Health just -- they just -- they were --
19  I -- they were above the top on that.
20      So in terms of what we saw in the
21  emergency room, there in the very first few couple
22  weeks or so when people were just driving in and
23  we had the outside driving, we never really saw
24  the -- we always just kept saying when's the surge
25  coming, when's the surge coming, when's the surge

Page 78

1   coming.
2       We had our busy days.  Don't get me
3   wrong.  Was it always due to COVID?  No.  Were
4   there, you know, 40, 30 percent of the patients in
5   the ER there for COVID symptoms?  Absolutely.  I'm
6   not going to say that's not true.
7       But I'm not going to say that patients
8   were not being cared for or not being treated any
9   differently than probably like the emergency room
10  is today.  We had 28 beds, and we were up to
11  seeing, you know, 130, 140 a day.
12      Q.  You had 28 beds in Paoli and you
13  were -- were you seeing -- seeing doesn't mean
14  admitting.  That means that you were treating in
15  some respect up to that many patients per day?
16      A.  I'm sorry.  I didn't quite hear that.
17  You cut out a little bit on me.
18      Q.  So you said you had 28 beds, but you
19  were seeing over a hundred patients at times?
20      A.  Always.  Even pre-COVID we were.  Our
21  numbers were up there.  And we didn't just stick
22  to those 28 beds.  Any good ER nurse knows that
23  you use hallways and cubbies.  You had vertical
24  people.  You had people that pretty much -- people
25  would, even pre-COVID, they would have their whole

Page 79

1   emergency room visit in the waiting room and never
2   get back to a room.
3       Did we take mitigation things during
4   the COVID period where our waiting room was
5   divvied up into six-foot places, here's a place to
6   sit if you're waiting, here's a place to sit, you
7   know, things like that, visitors and like that?
8   Absolutely.
9       But you know, we kind of talked, it was
10  another day in the local emergency room and all
11  roads lead to Paoli.  I mean, we joked about that
12  all of time.
13      Q.  I understand.  And did you ever form a
14  belief at that time as to whether vaccines helped
15  prevent the spread of COVID-19?
16      A.  Did I form a belief during -- once they
17  came out in December of '20 to November of '21?
18      Q.  Yes.
19      A.  I do know that we had people in the
20  emergency room that were vaccinated.  Did I form a
21  belief did it work/did it not work?  I don't -- I
22  don't know.  To me, I just treated a patient with
23  (sic - for) the symptoms they presented with, and
24  I cared for them and I provided high-quality care.
25      That, to me, didn't change how I

Page 80

1   provided my care or how I treated my patients.  I
2   was surprised when we were seeing patients that
3   were vaccinated that were positive.  I'm not going
4   to deny that.
5       Q.  Did you research it?
6       A.  Um, in -- I guess I would probably need
7   to have a definition of research.  I used my
8   visual, what I saw and what I experienced.
9       I certainly did go to visit CDC
10  website, the CDC, and some of the other websites,
11  and I would look.  But there was not a lot of
12  information there, especially about when -- if
13  you're talking about the vaccine now, there was
14  not a lot of information there available about
15  studies and things like that to know how to reach
16  that decision.
17      Q.  Did you have an understanding of the
18  science behind the COVID vaccine?
19      A.  Did I have an understanding of the
20  science behind the COVID vaccine?
21      Q.  Yeah.  Behind how it worked, how it was
22  developed.  Did you have an --
23      A.  Absolutely.
24      Q.  -- understanding of --
25      A.  Absolutely.  I knew that it was a new

Page 81

1 technology, a new approach to a vaccine.  I was
2 well aware of, you know, the discussions and --
3 and concerns for those of faith with the aborted
4 fetal cells.  I --
5     Q.  Ma'am, when you say new approach, are
6 you referring to the RNA vaccines or the
7 Adenovirus-Vector vaccine?  What are you --
8     A.  Well, both --
9     Q.  -- referring to?
10     A.  Well, both of those use genetic
11 components in their vaccines.  All three of them
12 do.  The method of delivery, so obviously I know
13 enough about it.  Well, some of that knowledge,
14 did I have that knowledge then, do I have that
15 knowledge now?  I'm not going to be able to
16 delineate that for you probably as clearly as you
17 would like.
18     I was well aware because I had life
19 experiences that I needed to make decisions about
20 for my life and how what my religious views -- I
21 think I've said this before.  It's worth
22 reiterating.
23     My world view is a religious world
24 view.  And I take the situations and life's events
25 and things that are happening, and I look at them

Page 82

1 through the lens of God and His word.  So --
2     Q.  Well, I will ask you about it.  But I
3 will to ask you about the science first.  You
4 mentioned genetic components.  I -- you know, I
5 want to follow up on that.
6     What do you mean by that, they had
7 genetic components?  Were you concerned that the
8 genetic components would alter your genes or DNA?
9     A.  No.  I was concerned that I was -- for
10 me personally again?  We're talking about me
11 personally?
12     Q.  Sure.
13     A.  I was very well aware that I had life
14 experiences, whether it was through the situation
15 at Penn when I -- you know, it's hard.
16     I'm going to tell you, the situation at
17 Penn with the same nursing program, to my husband
18 and I taking birth control for a very short period
19 of time and then feeling very badly.  And we
20 stopped it because we felt like we were
21 interfering with what God's temple of the Holy
22 Spirit in the perfect person that He formed,
23 because he formed me and He knew me before He
24 formed me and that I would be interacting and
25 interfering with His perfect and holy body that I

Page 83

1 am, to infertility.
2     And to me, the infertility piece was
3 the biggest piece of the genetic components.
4     In my religious exemption, my sincerely
5 religious-held belief is that I am not going to
6 alter -- not alter.  But I am not going to
7 interfere, change, interact, do anything that
8 would put the perfect body, even though it isn't
9 perfect, that God made because I'm a temple for
10 Him.  And He speaks through me.  And He formed me.
11 And I'm not going to do that.
12     So my concern and my investigation or
13 searching, my studying was about the genetic
14 component, whether it was --
15     Q.  But isn't that true about almost all
16 medicines?  Medicines would alter, such as
17 antibiotics, and some of them have genetic
18 components.  And they alter how a patient responds
19 to an infection.  Correct?
20     A.  So, my body -- let me explain it maybe
21 this way better.  Let me explain it in terms of
22 the --
23     Q.  And we're going to explore the
24 religious entirely.
25     A.  Yes.

Page 84

1     Q.  I'm trying to explore kind of the
2 science side of it and get some sort of
3 understanding from you in relation to that.
4     But go ahead.
5     A.  So, I think part of the reason you're
6 having a little trouble with that is my view and
7 the way I view and interact in things is through a
8 religious lens.  So for me to separate the two is
9 not going to come out that way.  Right?  Because I
10 don't --
11     Q.  As a nurse treating patients you have
12 to separate the two, because you have to do what's
13 scientifically recommended.  Correct?
14     ATTORNEY DALLER:  Objection to form.
15 You're asking her about personal on one side and
16 treating patients on the other side.  We need to
17 either separate those out or make that a little
18 bit clearer as to what you're asking her at the
19 time.
20     ATTORNEY HENNESSEY:  I think the
21 question is clear enough.  And she started to
22 answer the question.  Go ahead.
23     THE DEPONENT:  Can you repeat the
24 question, please?
25     ATTORNEY HENNESSEY:  Yeah.

Page 85

BY ATTORNEY HENNESSEY:

Q. So you were talking about how you see and do everything through a religious lens. But you're a nurse in a hospital treating patients.

And when you treat patients, you're not treating patients based upon your religious views. You're treating patients based upon what the doctors recommend or what your nursing requirements would be. Correct?

A. I do follow the orders of the prescribing physician unless I have a religious exemption to performing them myself, yes.

Q. And when we're talking about medicine, I mean, as a nurse, you regularly administer medicine to patients. We can talk about whether you ever prescribed medication. But you regularly administer medication to patients. Correct?

A. I do.

Q. And you -- and that medication that you administer would change how they might naturally respond to an injection. Correct?

A. My interpretation with my nursing background is that I am administering a medication to improve, correct, cure, to provide an antibiotic, to provide an ointment for a wound, to

Page 86

provide wound care.

I'm not administering a medication that is going to change how their body is working. We hope when we prescribe an antibiotic that their body responds to it. Sometimes we have to change it to something else. But it is their body responding to the treatment we're giving. If that answers -- that's how I interpret that.

Q. And you administered vaccines in the course of your duties. Right?

A. The only vaccine I personally have administered that I am doing a little self-check here is the DT, Tdap, whatever is the vaccine. And I have given rabbies. I had to think about it. I knew there was another one that I have administered. I have administered rabbies vaccines.

Q. Do you know what the Tdap vaccine is composed of?

A. Off the top of my head? I mean, I know that it's diphtheria, tetanus and pertussis. But in terms of composed of specifically, no.

Q. You mentioned genetic materials. Do you know if genetic materials are in the Tdap vaccine?

Page 87

A. I do not.

Q. Do you know what the flu vaccine is composed of; what the basis is for the flu vaccine?

A. I have done a little bit more work on that because I had an allergic reaction to a flu vaccination. There was latex in it. So I am more familiar with the flu vaccine and, you know, its makeup or parts or however/whatever word you use to describe that. Yes, I am.

Q. What is the makeup of -- and I know there are different flu vaccines. There are some that --

A. Yes, there are. It's a protein subunit.

Q. And that protein comes from what? If you know. If you don't know or recall, that's --

A. I'm going to tell you I don't -- I don't recall.

ATTORNEY HENNESSEY: Okay. let's take a short break. It's now 11:16 a.m. and we've been here for a little under two hours. How about a five-minute break? Is that okay?

THE DEPONENT: Sure.

ATTORNEY DALLER: Make it ten?

Page 88

ATTORNEY HENNESSEY: All right. We'll make it ten. We'll come back. Again, you're on the stand. I will ask you if you've had any communications with counsel when we come back. All right? Thank you.

THE DEPONENT: Sure.

(Whereupon, a recess was taken from 11:16 to 11:28 a.m.)

BY ATTORNEY HENNESSEY:

Q. Before we get into the vaccination policy and your exemption, I just want to follow up on a couple of things that you had said.

Have you ever had surgery in the past?

A. I had my appendix out around 19 -- it was when I worked early -- early years at MCP. Maybe 1990-1991-ish. And then I had finger surgery just before the pandemic, a year or so, because I had a growth in my PIP joint of my right index finger.

Q. Any long-term issues from having the appendix out?

A. Not that I'm aware of.

Q. Finger surgery. Any -- did you have to wear like a cast or anything in relation to that?

A. I wore a gauze bandage, and I couldn't

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 89

1 play squash for a bit. And it was irritating.
2 It's fine now.
3    Q. Everything healed?
4       THE COURT REPORTER: Excuse me --
5 (Reporter briefly dropped from Zoom.)
6       THE COURT REPORTER: Counsel? Hello?
7       ATTORNEY HENNESSEY: Yes. Hello.
8       THE COURT REPORTER: I dropped from the
9 conference. Did you see my video drop and stop
10 questioning?
11      ATTORNEY HENNESSEY: No. I'm sorry I
12 didn't realize you weren't taking down what was
13 being said.
14      THE COURT REPORTER: I dropped off of
15 the video completely.
16      ATTORNEY HENNESSEY: Yeah. Sorry I
17 didn't see that.
18      THE COURT REPORTER: Let me read to you
19 the last two questions and answers so you'll know.
20      ATTORNEY HENNESSEY: That would be
21 great. Then we'll just circle back and cover.
22 Sorry about that.
23      THE COURT REPORTER: No, I'm sorry.
24      ATTORNEY HENNESSEY: No worries.
25

Page 90

1 BY ATTORNEY HENNESSEY:
2    Q. So again, just to confirm, as you
3 testified, other than the rabies vaccine and the
4 Tdap vaccines, you've not administered any other
5 vaccines to any individual. Is that correct?
6    A. That is the best of my recollection.
7    Q. Have there been times when you've been
8 asked to administer the vaccine that you -- a
9 vaccine that you've refused to administer?
10   A. No.
11   Q. And you started to testify before that
12 there are certain procedures that you don't take
13 part of. What are those procedures that you asked
14 not to take part of?
15   A. I think you called it a medical
16 intervention. I have not administered Plan B to a
17 patient.
18   Q. Other than plan B, are there any
19 procedures that you've been asked to administer,
20 be a part of that you've refused to for some
21 reason?
22   A. Not that I recollect, no.
23   Q. As a registered nurse, do you have a
24 problem with administering cutting-edge technology
25 to patients other than in relation to Plan B?

Page 91

1    A. I think that question is difficult to
2 answer because I don't know what cutting (edge)
3 technology may come and what it may involve. So
4 hesitate to say that I've given cutting edge.
5       I know that in my years of practice I
6 have not been involved in any situations where
7 I've been given anything that is -- you know, a
8 new antibiotic, sure. But nothing -- I don't
9 know. My definition of cutting edge might be
10 different than your definition of cutting edge.
11   Q. Do you have any problem -- you
12 mentioned genetic components before.
13      Do you have a problem administering to
14 others -- and we'll talk about yourself in a
15 little bit -- but to others medications or
16 vaccines that have genetic components in them?
17   A. Can you give me an example of what that
18 might be?
19   Q. Well, I think there are numerous
20 medications that have some form of genetic
21 components in them. I mentioned before
22 antibiotics. I believe some of the
23 over-the-counter medications have genetic
24 components in them.
25      Are there any that you've looked into

Page 92

1 that you would say I don't want to administer this
2 to a patient because it has genetic components, or
3 is that just something that you would restrict for
4 yourself?
5    A. So now that you said that, I have never
6 actually thought about that or looked into that.
7 So I will add that to my to-do list in the future.
8 But I have not run into that or, I guess to be
9 honest with you, considered that at this point.
10 So I will certainly do that.
11      But for me it is more what I would do
12 to me and to my body. But I will definitely take
13 prayerful consideration and use some discernment.
14 I'm sure there are going to be some more things
15 coming down the line that are going to need to
16 make me to reconsider some of those decisions.
17   Q. In relation to COVID-19 and the
18 vaccine, we started to talk a little bit about
19 that. And I think you kind of hedged a little bit
20 when I asked you whether you thought the vaccine
21 was helpful. Let me ask you a specific question.
22      Do you have any understanding -- and
23 we'll ask, you know, in relation to the Fall of
24 2021. Did you have any understanding as to
25 whether COVID-19, the vaccine, reduced severe

Page 93

1 hospitalization and death during that time period?
2     A.  I just don't know what you mean by --
3 did you say MOS?
4     Q.  No.  I said did the COVID-19 vaccine
5 reduce severe hospitalization and/or death during
6 the Fall of 2021?
7     A.  I have no idea.
8     Q.  Did you research that issue at all at
9 the time?
10    A.  No.
11    Q.  Have you since researched that issue at
12 all?
13    A.  I know that most recently, and I say
14 that within the last month, probably or so, give
15 or take approximate, I have probably seen some
16 pre-- similar to -- I've seen something come out
17 about whether or not that is a true statement or
18 not, I have not read them.  I have seen them in
19 the titles.  I have not gone there.
20    Q.  Okay.  And you testified previously
21 about you would use PPE.  Do you have an
22 understanding of whether masking prevented the
23 disease from being transferable or contagious?
24    A.  That's a hard question to ask.  Are we
25 talking about masking when you reuse the mask for

Page 94

1 three days and you send them to the recycler to
2 come back.  Never before in my career before COVID
3 had I wore the same mask all day long, the
4 efficacy of that.
5         Do I know whether or not it did?  I do
6 not know that.  I know that I was very happy when
7 I did not need to wear that mask.
8     Q.  Okay.  You didn't like wearing a mask?
9     A.  I'm sorry?
10    Q.  You didn't like wearing the mask, it
11 would be fair to say?
12    A.  I don't like wearing a mask and
13 covering my face.  It's -- you can see the
14 breakout on my face.  That is from the mask.  It's
15 hot.  It's sweaty.  But I did follow PPE when I
16 was required to follow PPE.  I did use my own
17 safety goggles, because I found that squash
18 glasses do not fog up like those safety goggles
19 they give you at work.  Even to this day, I still
20 pull out my squash safety glasses.
21    Q.  So you use the squash goggles rather
22 than -- okay.  That's your alteration to the PPE?
23    A.  And I didn't -- I do not wear the
24 regular face mask.  I do wear -- I think I
25 mentioned this.  I wear the ones with the ties.

Page 95

1 It's kind of irritating that you actually have to
2 tie, as opposed to the elastic because I will
3 break out from the elastic.
4     Q.  You learned at some point, and you can
5 tell me if this is not correct, that Main Line
6 Health as a health system decided to adopt a
7 vaccination policy, sometimes referred to as a
8 mandate.  When did you learn that?
9     A.  When the e-mail came out.  I know that
10 they had given previous e-mails about the -- you
11 know, they were going to consider it if it became
12 fully authorized.  Then they would, you know, go
13 there.  But they were -- you know, when they first
14 started talking about the vaccination, they said
15 as long as it was EUA that they were not going to
16 mandate the vaccine.
17        And then I believe it was, what, in
18 that August 10th e-mail that we were told that
19 despite the EUA status that they were going to
20 make it mandatory.
21    Q.  What was your understanding of the
22 motivation by Main Line Health to adopt the policy
23 and make it mandatory?
24    A.  My personal opinion was it's part of
25 what made them move a little bit quicker, was the

Page 96

1 fact that the CMS rule changed and it was going to
2 impact -- and it was mentioned in that e-mail
3 about -- and things about the impact financially.
4         So I do think that some of it
5 behind the decision-making process.
6     Q.  So when you say CMS, you're talking
7 about the Centers for Medicare and Medicaid
8 Services and the mandate that CMS came out with at
9 that time for health systems that received
10 Medicaid or Medicare funding, that they would
11 mandate that those systems have a mandatory
12 vaccinations COVID-19 vaccination.
13        Is that what you're referring to?
14    A.  Yes.
15    Q.  Do you believe that it was motivated at
16 all for the patient's safety or the community's
17 safety at the time?
18    A.  I think that that is what the CDC was
19 recommending.  I think that it was well known
20 before that that some health systems were adopting
21 a mandate and some were not.  And it seemed to
22 vary.
23        I can't speak to the motivation of
24 upper leadership at Main Line Health.  I can --
25 you know, again, I can only speak to what is in

Page 97

1  that e-mail. And what their motivation was, I
2  can't speak to that.
3      Q. And when you say what is in that
4  e-mail, you were referring to the e-mail that was
5  sent out by leadership?
6      A. I mean, yeah. I believe the first one
7  was October 10th. And you know, they did speak in
8  that e-mail about protection. You know, so I read
9  the e-mail. I fully understood the e-mail. So
10 that was communicated as well.
11          It was also, you know, communicated in
12 that e-mail about exemption. So you know, I read
13 the e-mail and was well aware of the next steps.
14     Q. Okay. And did you attend any of the --
15 I understand there were some town hall meetings,
16 any of the town halls in relation to the policy or
17 the vaccination mandate?
18     A. So I -- I do not recall that there were
19 any town halls specifically about that. The town
20 halls were more -- I did not attend very many.
21 Probably less than one hand's worth did I attend
22 during -- because they seemed -- they would seem
23 to be during my shift.
24         And if I was off from work, I did not
25 need to be living work. That has always been my

Page 98

1  MO. I work so I can live. I don't live to work.
2          I think the town halls were to keep the
3  staff up to date. It kind of morphed over the
4  time about different requirements. What do you do
5  if you have an infection. What we're doing here,
6  why we're doing that. I was not on any of the
7  town halls that spoke specifically to the policy
8  about the mandate or vaccines.
9      Q. And before you mentioned the e-mail in
10 relation to the COVID-19 vaccination policy; are
11 you referring to Jack Lynch's e-mail?
12     A. Yes. So the policy that I actually had
13 not seen prior to me being terminated, that I
14 believe is dated in July of '21, I was not aware
15 that policy was out there.
16         So I'm speaking about the letter from
17 Jack Lynch. I believe that was the letter that I
18 received.
19     Q. And you said that was October. Is that
20 accurate?
21     A. (Deponent shook head in the negative.)
22     Q. Okay.
23     A. No. I believe that first e-mail that
24 came out was August.
25     Q. August or July?

Page 99

1      A. August 10th, the COVID vaccine policy I
2  believe is dated in July.
3      Q. And when did you -- when did you first
4  review the vaccination policy?
5      A. The actual policy that stated COVID
6  vaccine policy?
7      Q. Sure.
8      A. About -- whenever Mr. Daller included
9  it in one of our exhibits within. I never saw
10 that policy when I was working at Main Line
11 Health, and then I would not have had access to
12 have it.
13     Q. Well, it was on Wellspring, the
14 intranet. Right? You could have accessed it, had
15 you gone back and --
16     A. I was not aware that there was a
17 policy. So we sometimes, especially in our
18 coordinator meetings, we talk about policies.
19 There was discussion about the August e-mail from
20 Jack Lynch. I do not recollect any discussions
21 about a formal COVID-19 vaccination policy.
22     Q. Did you go on Wellspring to look for
23 the exemption form, for example?
24     A. The funny thing is is I got -- we got
25 that e-mail I believe -- the reason I remember

Page 100

1  that date is I'm funny with numbers. I'm
2  horrible with names. Pretty good with numbers.
3          So I remember that I did reach out to,
4  um, Sarah Heilman in HR. I've known -- you know,
5  I've worked with Sarah. And I just said hey, in
6  this letter from Jack Lynch there's a reference to
7  exemption forms. I've called -- I was -- I've
8  called Occupation Health. They know nothing about
9  it.
10         She eventually -- I eventually found
11 out, I don't know exactly what day or if it was
12 later on the 10th, but they eventually got up.
13 And once they got up, they went up, I immediately
14 printed.
15     Q. Okay. So they -- you received a copy
16 of the -- of the form from Sarah, or she told you
17 where to get it from. Is that accurate?
18     A. For the exemption form?
19     Q. Yes.
20     A. Yes. I can't -- I know that I asked
21 Sarah where do I get it, and I do not recollect if
22 Sarah was the one that told me or if it was just a
23 name that I don't remember. But I do know that we
24 were eventually able to get it on Wellspring.
25     Q. Okay. So you got it on Wellspring.

Deposition of Dawn Gray                                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 101

And you're not denying that the policy was on
Wellspring.  It's just that you don't recall
accessing it on Wellspring.

A.  I have no -- I have no idea if the
policy was on Wellspring or not.

Q.  Oh.  All right.  This is -- I'm putting
in front of you something, and I'm going to go out
of order a little bit.  Because you mentioned the
form rather than the policy, we'll circle back to
the policy.

A.  Right.

(Whereupon, a six-page blank vaccine
religious exemption form was produced for
identification as Gray Exhibit 3.)

BY ATTORNEY HENNESSEY:

Q.  This has been marked as Gray Exhibit 3.
Is this a copy, and I can scroll through it if you
want, of the form that you accessed after your
communication with Sarah Heilman?

A.  Yes, at some point after my
communication.  I'm not -- I mean, I just want to
clarify that I'm not sure if Sarah was the one
that told me the form is on Wellspring.  But, yes
I did access that.  That is the blank form that I
accessed.

Page 102

Q.  Okay.  On this form it says here in
this first paragraph here, and I have it up on the
screen in front of us.  And it's -- the page it's
been Bates labeled at the bottom right-hand
corner, the MLH Gray 01904.  It says here Main
Line Health's policy on COVID-19 --

A.  Yep.

Q.  -- vaccine.  It references in that
first line there that professional medical staff
must comply with the MLH COVID-19 vaccination
policy.

Do you see that there?

A.  I do.  That is -- that's -- I will have
to punish myself for that one.  Never.  Never.  I
think I was already -- yeah, you're right.

Q.  So you don't -- but you don't recall
seeing that or making that decide -- or you don't
recall deciding to check the policy on Wellspring
at that time.  Correct?

A.  If I didn't see that, I didn't check
the policy.  I did not.

Q.  Okay.  And again, you're not denying
that the policy was available on Wellspring?

A.  Nope.

Q.  It's just that you didn't read it at

Page 103

the time.

A.  Correct.

Q.  Correct?

A.  Correct.

Q.  All right.  Now, you did have an
understanding of what the policy required.

Correct?

A.  I know that the dates were clear and
what the expectation was and that there would be a
medical -- an opportunity for a medical and
religious exemption and that you had to submit
forms by the dates that were listed.  And I did
understand that.

Q.  Okay.  The policy required that all
Main Line Health employees and medical staff
become fully vaccinated unless they have a medical
or religious exemption.  Correct?

A.  Correct.

Q.  And you had an understanding of what
was required in relation to obtaining a medical or
religious exemption in relation to the vaccination
policy.  Correct?

A.  I knew -- you know, I hesitate to say
that I knew it from the policy, because I never
looked at the policy.  But I knew the dates and I

Page 104

knew the expectations of what you needed to do in
order to apply for a religious exemption or a
medical exemption.  And if you did, what dates
certain things had to be done by.  And
November 1st was kind of the date.

And subsequent e-mails came out with
further clarification of those things as the dates
got closer.

Q.  All right.  You have testified that --
this is a document I'm putting in front of you
which has been premarked as Gray Exhibit 2.

(Whereupon, a three-page Employee
Health Policy and Procedure Manual was produced
for identification as Gray Exhibit 2.)

BY ATTORNEY HENNESSEY:

Q.  Your testimony is the first time you've
reviewed this document is in preparation of today
with Mr. Daller, or was it earlier with Mr.
Daller?

A.  No.  I saw it on one of the exhibits
when he -- when we filed our lawsuit.

Q.  Okay.  Do you mean when you filed --

A.  I never saw the policy.

Q.  Was it when you filed the lawsuit or
filed the Pennsylvania Human Relations Act -- or

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 105

Commission complaint, or do you recall?

A.  When I filed with the PHRC the first time, the date was November 2nd and Mr. Daller was not with me.  I did it with a representative named Saul Ravitch at that time.  And that was the first one.

And then I received the Main Line Health's response.  And it was at that one that I had -- I forget off the top of my head how many days to appeal that.  I then attained or in -- whatever -- retained -- that's the word I want -- retained Mr. Daller.

Q.  Okay.  Well, I just want to run through a couple of these things to make sure that you had an understanding of this is what you were required to do in order to either obtain the vaccination or an exemption.

And I've showed you the document which is under the subject of COVID-19 Vaccination Policy, Non-patient, and it states the policy purpose there, "To protect patients, employees, students, volunteers and members of the medical staff from COVID-19 infection through vaccination."

Do you see that?

Page 106

A.  I do.

Q.  And it identifies a procedure for new hires and medical staff appointees in order to obtain the exemption -- or obtain the vaccination.  I'm sorry.

And then beneath that it talks about current employees and medical staff, which I think is the relevant language.  It says under A of that that, "Main Line Health is requiring full vaccination for all MLH executives, directors, managers and medical staff by October 1st.  All other MLH employees will be required to be fully vaccinated by November 1st of 2021."

Do you see that there?

A.  Yes.

Q.  What would you have fallen under?  Would you have been a manager or other employee?

A.  I am the other MLH employee, according to my job code.

Q.  All right.  And you had an understanding that that was what the requirement was.  Right?

A.  Yes.  I believe I have answered that.  But yes.

Q.  Okay.  And you were required to provide

Page 107

proof of vaccination by September 15th, 2021.  And we'll get to the exemptions in just a moment.  And there are also deadlines there for October 1st and November 1st, whether you were a manager or other employee.

Do you see that there?

A.  I do.

Q.  And none of that is new, what I have referenced.  None of that is new to you.  Correct?

A.  No.  I understood it.  I understand it now.

Q.  All right.  Now, underneath it says, "Exemptions to vaccination may be granted for a valid medical condition or sincerely-held religious belief."

You were aware that you could get a vaccination (sic) for a valid medical condition or sincerely-held religious belief at the time.

Correct?

A.  Correct.

Q.  And in relation to -- under letter C it says, "A request for a religious exemption from the COVID-19 vaccination requirement will be evaluated by the MLH COVID-19 Vaccine Religious Exemption Committee."

Page 108

Do you see that there?

A.  Yes.

Q.  And that was your understanding at the time.  Correct?

A.  Yes.  I will clarify that the way the Zoom is and with the little all tools on the left, I can't completely read that document, but I am aware that's what that says.

I don't know if you can get rid of the X on the left with the all tools.  But some of those words are cut off.

But I do understand that that's what it says.

Q.  On my screen I moved it to the bottom.  I don't know if it moved to the bottom of your screen.  But you can adjust that and move that if you need to with your cursor.

A.  Hang on.  I'm going to get an assist.  Oh, that did it.  That's what I needed.  Now I'm good.  I just needed that little box on the left to go away.

Q.  That's a little better?

A.  Much better.

Q.  And it goes on to say that, "A religious exemption from the vaccination

Page 109

1  requirement will be only for sincerely-held
2  belief, precluding COVID-19 vaccination that is
3  religious in nature."
4        Do you see that there?
5        A.  Yes, sir.
6        Q.  "Personal beliefs and opinions will not
7  be sufficient to qualify for exemption from the
8  COVID-19 vaccination requirement.  A person
9  requesting a religious exemption must complete the
10  MLH religious exemption form."
11        That was your understanding at the
12  time.  Correct?
13        A.  Correct.
14        Q.  Okay.  Let me switch to the form
15  itself, because I believe a lot of this is also
16  restated in the form itself.  And this is
17  something that you did have access to and you did
18  review; at the time you had access to both, but
19  this is something that you reviewed at the time.
20        Correct?
21        A.  Correct.  Can you get rid of the little
22  X up there by all tools again for me?
23        Q.  Yes.  The exemption form asks here --
24  and I will go to the language and try and pull it
25  out for you.

Page 110

1        It says here that, "A religious
2  exemption from the vaccination requirement will be
3  approved only for a sincerely-held belief
4  precluding COVID-19 vaccination that is religious
5  in nature."
6        Do you see that?
7        A.  I do.
8        Q.  Okay.  And then it provides a process
9  to request an exemption.  "To request a religious
10  exemption from COVID-19 vaccination, this form
11  must be completed and returned by September 15th,
12  2021." -- Complete -- "Failure to completely and
13  accurately provide the information requested will
14  result in a denial of the religious exemption."
15        Do you see that there?
16        A.  Yes.
17        Q.  Question number one seeks a personal
18  statement detailing the sincerely-held belief
19  that's religious in nature.
20        Do you see that there?  It says,
21  "Please provide a personal statement detailing the
22  sincerely-held beliefs that are religious in
23  nature regarding your COVID-19 vaccination
24  objection, explaining why you are requesting this
25  exemption, the religious principles that guide

Page 111

1  your objections to COVID-19 vaccination and the
2  religious basis that prohibits the COVID-19
3  vaccination.
4        "Please attach additional documentation
5  supporting your sincerely-held religious beliefs,
6  if necessary."
7        Do you see that there?
8        A.  Yes, sir.
9        Q.  And there was no limitation in relation
10  to what you could provide at that time in terms of
11  the information that would detail the
12  sincerely-held religious belief.  Correct?
13        A.  Correct.
14        Q.  Then the form requests some additional
15  information, such as, "Did you receive a religious
16  exemption from MLH for the MLH mandatory annual
17  flu vaccination requirement?"
18        Do you see that there?
19        A.  Yes, sir.
20        Q.  And it talks about whether your
21  religious belief prevented you from receiving
22  other vaccines or just the COVID-19 vaccine.
23  You've received this, you have reviewed this form,
24  and at the time you made an effort to provide or
25  to comply with the requests on this form.

Page 112

1        Is that accurate?
2        A.  Yes.
3        Q.  And there was no limit at the time to
4  what you could submit.  Correct?
5        A.  There was no limit as to the time or
6  the amount?  Well, as to the time that you could
7  submit, yes.
8        Q.  How long -- you testified that at some
9  point in August you received or reviewed that
10  form.  Correct?
11        A.  Yes.  When it was available.
12        Q.  And how long did it take you to fill
13  out that form providing your religious exemption
14  request?
15        A.  Um, I -- I spent a lot of time in
16  prayer.  I am a -- as you well know, I'm a
17  mastered-prepared nurse.  I critically think.
18  I've done editing and authoring.  So I -- the way
19  I write is I write on a Word document and then I
20  amend and I change and I alter and I make sure
21  that I -- you know, I write and then I edit it and
22  then --and so I did that.
23        And then I believe I submitted my form,
24  I want to say it was September 11th, but I -- you
25  know, that's an approximate date.  But you know, I

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 113

1  did spend a lot of time in prayer.
2      I had already been doing some of that
3  in general in the anticipation that the day could
4  come that I knew I would need to fill out a
5  religious exemption form. I was not blindsided
6  that the day would come. And I continued that,
7  and I sought God's guidance on how I should do it
8  and then I fill it out.
9      Q. Did you fill it out yourself or did
10 anybody help you prepare the exemption form?
11     A. I filled it out. My husband did read
12 it and he did make a few grammatical changes,
13 which really made me mad because I think I'm
14 pretty good at that. But the thoughts and
15 beliefs, it was mine.
16     Q. Were the words yours, as well?
17     A. Um, I wrote it.
18     Q. Did you review any other  sample
19 exemption forms or anything of that nature on the
20 Internet or --
21     A. No.
22     Q. Okay. Other than your husband, did you
23 discuss the exemption form with anybody else
24 before you submitted it?
25     A. To my recollection, no. I am a -- I'm

Page 114

1  a private person.
2      Q. I want to kind of review your form with
3  you that you submitted. We're going to take a
4  look at -- you know, I'm assuming that you don't
5  have an independent recollection as to all of
6  language that you put on the form.
7      Is that accurate?
8      A. I don't have a photographic memory. I
9  am very familiar with what I put on that form and
10 what it says and what it represents of me. I have
11 read it and read it, and I felt that I was at that
12 point before I submitted it because I kept
13 reviewing it. That's the way I work. And since
14 then, I've obviously reviewed it many times.
15     Q. How many days did it take you to fill
16 out the form?
17     ATTORNEY DALLER: Object to form.
18 BY ATTORNEY HENNESSEY:
19     Q. And I don't think I asked before how
20 long it took you. I don't think I had a clear
21 answer. Did it take you a few hours? Did you
22 have the form for a few days? Do you recall how
23 --
24     A. Oh, I printed the form the first day
25 that it was available and I submitted it. So I

Page 115

1  was praying about it, reading the Bible, working
2  through it, just reading what I wrote, making sure
3  it accurately reflected what I was trying to
4  express. I cannot give you a time of hours or
5  days. It was -- it was a lot.
6      In fact, I do recollect thinking a
7  couple times boy, I'm glad I'm going to work today
8  so I don't have to think about this.
9      (Whereupon, an eight-page completed
10 vaccine religious exemption form was produced
11 for identification as Gray Exhibit 4.)
12 BY ATTORNEY HENNESSEY:
13     Q. I just kind of flipped down, what has
14 been premarked as Gray Exhibit 4, to the bottom
15 where there's a signature there.
16     And is that your signature? It looks
17 like your printed name, Dawn E. Gray, and then
18 your signature. Is that your signature?
19     A. It's me.
20     Q. And then the date on there, I'm not
21 sure about that date. It's either an 8 or 9/10 of
22 21.
23     A. It's a 9.
24     Q. It's a 9. Okay. So you submitted it
25 on September 10th of '21. Is that accurate?

Page 116

1      A. Not necessarily. I don't know
2  exactly. I would need to look at the records to
3  see what day I actually e-mailed it to the Vaccine
4  Exemption Committee.
5      Q. I understand. So you --
6      A. That is the date I signed it. Yes,
7  that is the date I signed it. And I did not make
8  any changes after I signed it.
9      Q. Okay. And it looks like your pastor
10 filled out a form. But that was -- the date on
11 that is 8/12 of '21. So you gave it to your
12 pastor at some point in August, and he filled out
13 that portion of it first -- or before you
14 submitted the whole thing. Is that accurate?
15     A. He was very prompt when I asked him. I
16 knew that it was not required to submit a pastor's
17 statement. It was optional. And I called him.
18 We spoke on the phone, you know, once I had the
19 form. And he said e-mail it to me and I will fill
20 it out. And he obviously returned it on
21 August 12th '21 to me.
22     Q. Did he talk to you at all before he
23 filled out his portion of it?
24     A. I -- yes. We spoke about -- when I
25 called and told him, we spoke about it, we talked

Page 117

about it, and I e-mailed him.

Q.  Did you talk to him about what your objections were before he filled out his portion of it?

A.  He knew.  Yes, he knew that I was objecting on the basis of the genetic components after my infertility process and religious beliefs related to that, to me, were parallel.  That was the example I used in exemption form.

For me, I worked with staff every day teaching them don't be task forces -- I mean task focused.  Use your critical thinking skills and apply.

And that is the approach I took with this exemption.  I applied the foundations and gave a personal example of how I applied them.  And the same religious beliefs applied in this situation to me.

Q.  Well, let's go through that in some detail.  I appreciate that.

Please provide -- question number one.  We want -- I'll go through each question and I'm going to ask you about some of your answers on each question.

Question number one asked for a

Page 118

personal statement detailing your sincerely-held beliefs that are religious in nature regarding your COVID-19 vaccination objection.  And we've already read through that.

Your answer is in handwriting here, but it's also printed.  As you said, you used the Word document.  It appears that if we go down to what's been Bates labeled MLH Gray 00439, at the top of that it appears to be a full answer to question number one.  Is that accurate?

A.  Yes.  I am a lefty.  I'm a nurse.  And my husband said maybe I should print that for them because they won't be able to read it.  It's kind of a running joke it in our house.  We write notes to each other, due to the shifts and things like that, I don't see him.

And yes, I actually printed and I typed it and I handwrote it.  Yes.

Q.  That's okay.  As you know, doctors are no better and I'm used to reading medical records.  But we'll make it easy for today and review the text version.  So I appreciate that.

So that was because your husband recommended it at you typed it up for them.  What we're looking at is the typed-up version, but it's

Page 119

the same as what was handwritten except that there's even more information here.  Correct?

A.  I'm not sure about your statement there is more information here.

Q.  Actually it's the same as -- the handwriting goes on to another page.  So identical to what you handwrote, to the best of your knowledge and recollection.  Correct?

A.  Yes.  I believe that the questions and answers match.  One is in handwritten form and one is in typed form.

Q.  In relation to question number one, you started there and said that, "Even though I could apply for a medical exemption due to my allergy to PEG, I have chosen to apply for a religious exemption due to the personal conviction of my religious beliefs."

Do you see that there?

A.  Yes.

Q.  What is PEG?

A.  Polyethylene glycol.

Q.  And is PEG in the vaccines for COVID-19 that were approved at that time?

A.  I was under that understanding, yes.

Q.  Okay.  And you were diagnosed at some

Page 120

point prior to that with a PEG allergy?

A.  Yes.  When I was diagnosed with my rubber, elastic, latex, rosacea.  It was secluded.  I'm also allergic to parabens and several fruits.  And I --

Q.  Who diagnosed -- I'm sorry.

A.  Go ahead.

Q.  I got feedback.  I'm sorry.  Who diagnosed you with that allergy?

A.  I have no -- it was a dermatologist.  I went through testing years ago.

Q.  Okay.

A.  Years ago.

Q.  So you could have -- to your understanding, you could have applied for a medical exemption to the vaccination requirement?

A.  I stated that right there.

Q.  But you decided not to.  Correct?

A.  Correct.

Q.  Why did you decide not to file for a medical exemption as well as a religious exemption?

A.  I chose to apply for a religious exemption because that was the strength in how strongly I felt about my belief system and still

Page 121

1  do to this day.
2      Q.   Did you believe at the time that you
3  would have been approved for a medical exemption
4  had you applied for a medical exemption?
5      A.   I can't speak to that.  I have no
6  knowledge of that.  I applied for a religious
7  exemption.
8      Q.   And then you go on to -- you mentioned
9  this a couple of times before.  But after that,
10 you go on to talk about when your husband and you
11 tried to conceive children.  And I understand that
12 was probably 20 years before this, in the late
13 '90s, early 2000s, based on what you said before.
14     A.   That is -- that's an accurate
15 approximation.  It was an eight-year process, at
16 least.
17     Q.   And you said there that you tried some
18 low-tech options, but there were miscarriages and
19 pregnancy was not successful at the time.
20         Is that accurate?
21     A.   It's what the document reads.
22     Q.   Okay.  And you decided not to -- to
23 carry on with additional options, which could have
24 involved hormone therapy, IVF, et cetera.
25         You would agree with me, would you not,

Page 122

1  that getting a vaccination for purposes of
2  minimizing the risk of the spread of a disease in
3  a medical facility is a completely different thing
4  from a fertility treatment decision?
5      A.   I would not.
6      Q.   Why not?  The fertility treatments
7  would have been solely for you and your husband's
8  benefit.  Correct?
9      A.   They were for the purpose of trying to
10 conceive children, yes.
11     Q.   Okay.  The COVID vaccine, that's not
12 only for your benefit but that's for the benefit
13 of the patient population and the community at
14 large.  Correct?
15     A.   It could be.
16     Q.   So the reasoning for the two are pretty
17 different.
18     A.   Not to me.  Not to the way I live my
19 life and I make decisions on what God has that is
20 best for me.  So you know, I have clearly had
21 plenty of time to rethink -- re --
22     Q.   Well --
23     A.   Critically think over what I wrote.
24         The fertility option was not the first
25 time that I had come into, with my own personal

Page 123

1  experience, with making a decision on what I was
2  going to do or inject or do with my own body.
3         This was just, to me, the most clear
4  example with how it paralleled with genetic
5  components.
6         And that is the basis of my religious
7  beliefs.
8      Q.   What I'm getting at is we're talking
9  about apples and oranges.  We're talking about a
10 vaccine that's being recommended by health
11 authorities at the time and healthcare workers are
12 being given priority for the vaccine.
13         Do you have an understanding of why
14 healthcare authorities gave healthcare workers
15 priority to get the vaccine?
16     A.   I believe there were two questions
17 there.  I'm not sure which question you want me to
18 answer first.
19     Q.   You can choose.
20     A.   So I'm going to have to disagree with
21 you about the apples and oranges.  Because for me,
22 it was not apples and oranges.  We're going to
23 have to agree to disagree there.
24         As for the medical personnel first, I
25 believe that that was the intent behind starting

Page 124

1  with healthcare personnel.  I do not have -- I
2  believe that was the intent.
3      Q.   And the intent was because medical care
4  personnel, like yourself, are on the frontlines of
5  dealing with the pandemic at the time.  There had
6  been a pandemic that was declared.  Correct?
7      A.   Yes.  And we were all wearing the
8  personal protective equipment.  And exemptions
9  were being given.  There was no delineation.  So
10 --
11     Q.   Well, the recommendation for the -- for
12 healthcare workers was to become vaccinated.
13 We'll talk about exemption.
14         But the recommendation was vaccination.
15 That was in order to ensure that the healthcare
16 facilities could continue to provide care for
17 patients.  Correct?
18     A.   I can say that I believe that that was
19 their intention, yes.
20     Q.   As a healthcare worker and somebody
21 whose been a nurse on the frontlines, you would
22 agree that there's a certain amount of sacrifice
23 that you need to undertake to -- in relation to
24 your personal interests to care for others.
25         Correct?

Deposition of Dawn Gray

Dawn Gray v. Main Line Hospitals, Inc.

Page 125

1   A.  There's a sacrifice to getting out of
2  bed every morning.  There's personal sacrifice
3  involved in how I live my life every day.
4       Yes, there's a personal sacrifice when
5  you are on the frontlines and when you are caring
6  for others and you are putting their needs before
7  yours.  And that did not stop for me at any point.
8   Q.  And sometimes that means getting
9  vaccines, though, correct, such as we talked
10  before about the flu vaccine, which at the time
11  you didn't have any objection to in terms of the
12  religious objections.
13   A.  I have stated that previously.  But I'm
14  going to be very clear that I know that that is
15  what you are saying and I'm not saying that's not
16  the belief.  For me, that was not an option.
17   Q.  You state here a couple of quotes from
18  the Bible.  One of them is Psalms, chapter 139:
19  13 to 16.  Why did you include that in relation to
20  your exemption?
21   A.  I included that because that's the
22  verse --
23   Q.  You can take a moment if you need to.
24   A.  I am.  Thank you.  I am.  That's the
25  verse that I held on to and prayed to and cried

Page 126

1  through miscarriages, attempts, testing and
2  everything.  That's the verse.  It's the verse
3  that I trust in my heart that God knew and still
4  knows His plan for me.  And it's perfect.  It is
5  perfect even though I still have pain.
6       Because that verse speaks to His wisdom
7  and His knowledge and His power.  He knows me.  He
8  knows me better than I know me.  And you know
9  what?  I'm never going to compromise that, even to
10  the pain of not having children.
11       That verse means so much to me.
12   Q.  Well, I am trying to break that apart.
13  And you know, if you need to take a short break,
14  we --
15   A.  No, I do not need to take a short break
16  because we will be doing this again.  It's a
17  difficult -- it's something that I still grieve
18  the loss of the children that I did not bear.
19       It is -- let's just work through this.
20  It's fine.  I will be okay.
21   Q.  Yeah.  And just to be clear, I'm not
22  asking you about that.  I understand that you
23  provided information about those difficulties.
24  And I'm sympathetic.  I have had family members
25  who have gone through the same thing.  I

Page 127

1  understand that.
2       What I'm asking you about is the
3  COVID-19 vaccination and how it relates to this
4  verse, which I'm familiar with, which talks about
5  the -- God's creation of people and how that
6  relates to the COVID-19 vaccine.
7       So I'm trying to -- you talked about
8  critical thinking before.  I'm trying to figure
9  out how a vague verse like this about creating a
10  human being translates to a medical procedure --
11  or not even procedure -- taking a vaccine for the
12  purpose of protecting yourself and others during a
13  pandemic.
14       And if you can answer that, that's what
15  I'm looking for.
16       ATTORNEY DALLER:  Brendan, I'm just
17  going to interject and object.  She is trying to.
18  And the core of the explanation is what you --
19       ATTORNEY HENNESSEY:  John.  Yeah, I'm
20  going to cut you off now because you are going to
21  testify.  I know what --
22       ATTORNEY DALLER:  Then we can go off
23  the record.
24       ATTORNEY HENNESSEY:  -- you're going to
25  do.  No, we're not going to go off the record.

Page 128

1       ATTORNEY DALLER:  We can go off the
2  record and you and I can have a discussion.
3       ATTORNEY HENNESSEY:  No, we're not
4  going off the record.  I'm not going to let you
5  testify for your client.  If you --
6       ATTORNEY DALLER:  Brendan, if you stop
7  --
8       ATTORNEY HENNESSEY:  If you want a
9  break, we can have one.  But we're not going to
10  have this discussion on or off the record.  We're
11  just not going to do it.
12       She is under oath.  I'm here.  She put
13  this in her exemption application.  This is an
14  allegation in her complaint and lawsuit that she
15  filed.  And I'm trying to get answers in relation
16  to how it relates.  It's a perfectly good
17  question.  And I'm not --
18       ATTORNEY DALLER:  And she has answered
19  your question.
20       ATTORNEY HENNESSEY:  She did not.
21       ATTORNEY DALLER:  She did not the way
22  you wanted it.  Okay.
23       ATTORNEY HENNESSEY:  No, she did not.
24  You interjected before she had a chance to answer
25  the question.

Karasch

Deposition of Dawn Gray                                          Dawn Gray v. Main Line Hospitals, Inc.

Page 129

1    ATTORNEY DALLER:  This is going back to
2  the --
3    ATTORNEY HENNESSEY:  I'm going to tell
4  you to stop now or I'm going to call the judge.
5    ATTORNEY DALLER:  Go ahead.
6    ATTORNEY HENNESSEY:  John, you
7  interjected before -- are you instructing your
8  witness not to answer the question that I have?
9    ATTORNEY DALLER:  No, I am not.  I am
10  asking for the courtesy to have a private
11  discussion with you.
12    ATTORNEY HENNESSEY:  Well, we can have
13  a private discussion off the record.  Have your
14  client leave the room, and you and I can have a
15  discussion.
16    ATTORNEY DALLER:  I'll leave the room.
17  I'll go outside if you want.
18    ATTORNEY HENNESSEY:  Okay.  Why don't
19  you do that?
20    ATTORNEY DALLER:  And she not be on
21  camera.
22    THE DEPONENT:  I can go outside, if
23  you'd rather.
24    ATTORNEY DALLER:  Your choice.
25    ATTORNEY HENNESSEY:  I don't care who

Page 130

1  leaves the room.  I just don't want to continue
2  with --
3    ATTORNEY DALLER:  What number should I
4  call you at, Brendan?
5    ATTORNEY HENNESSEY:  You can call me on
6  my cell, 610-92 --
7    ATTORNEY DALLER:  Is that your --
8    ATTORNEY HENNESSEY:  I want it on the
9  record.  If you don't mind if your client can
10  leave so that we can keep it on the record.  I
11  want this on the record, because I think this is
12  key testimony, and I think you're trying to
13  obstruct that what I'm doing here, which is ask
14  questions in --
15    ATTORNEY DALLER:  I am not.
16    ATTORNEY HENNESSEY:  -- relation to
17  what's in her exemption application.
18    ATTORNEY DALLER:  Absolutely not.
19  That's not what I'm trying to do.
20    Ms. Gray, can you step outside please?
21    (Whereupon, the deponent left room
22  and an off-the-record discussion was held.)
23    ATTORNEY DALLER:  We're going to leave
24  her computer on audio just because that is the one
25  that I've been speaking to.

Page 131

1    Okay, Brendan?
2    ATTORNEY HENNESSEY:  That's fine.
3    ATTORNEY DALLER:  Okay.  For some
4  reason -- there I am.  Okay.  Can you hear me,
5  Brendan?
6    ATTORNEY HENNESSEY:  I hear you.  I
7  hear you, John.
8    ATTORNEY DALLER:  Let me just close my
9  door as well.  She'll be going out the other way.
10    ATTORNEY HENNESSEY:  Okay.
11    ATTORNEY DALLER:  As you can tell, this
12  is a very emotional situation, and I'm not arguing
13  that you don't have the right to explore it.
14    I just want to make clear, since she
15  has explained it once and your subsequent question
16  then went to well, they're different.  And we can
17  sit here until next the week, and I can tell you
18  her testimony is going to be that they are not
19  different.  So to --
20    ATTORNEY HENNESSEY:  I understand.  I
21  understand that, John.
22    ATTORNEY DALLER:  Okay.
23    ATTORNEY HENNESSEY:  But I asked a
24  different question.  I asked her to explain it.
25  And you interrupted then and you were going to

Page 132

1  start with this explan -- that's why I stopped
2  you.  You are entitled to object to form.
3    But when you start with explaining on
4  the record in front of your client why they're the
5  same or why her previous testimony was accurate,
6  that's coaching the witness.  And I'm not going to
7  let that happen while I'm taking a deposition.
8    ATTORNEY DALLER:  Okay.  That -- if you
9  would have let me finish, you would have
10  understood that what I was saying was -- because
11  your question was how was this Psalm related to
12  COVID.
13    She told you the relationship is
14  because of what she experienced through the
15  miscarriages and infertility treatment.  That is
16  all I was going --
17    ATTORNEY HENNESSEY:  That makes no
18  sense whatsoever, John.  And I have a right to
19  follow up.
20    ATTORNEY DALLER:  You do.  I just --
21    ATTORNEY HENNESSEY:  It makes no sense.
22    ATTORNEY DALLER:  You --
23    ATTORNEY HENNESSEY:  It makes sense
24  maybe in your mind but not in my mind.  And I had
25  a right to follow up and ask for an explanation.

Deposition of Dawn Gray

Dawn Gray v. Main Line Hospitals, Inc.

Page 133

1    ATTORNEY DALLER:  You are correct.  I
2 just wanted to bring up that fact to you so that
3 you are aware.  That's it.
4    ATTORNEY HENNESSEY:  Okay.
5    ATTORNEY DALLER:  She's doing fine as
6 far as I'm concerned.  Okay.  I don't need to
7 protect her in any way, shape or form, if that's
8 what you think I was doing.  I'm just trying to
9 minimize the emotional trauma.
10    ATTORNEY HENNESSEY:  Well, that's why I
11 asked if she needed a break.  That's fine.  Take a
12 break.  We can take time to work through it.  I'm
13 fine with that.
14    ATTORNEY DALLER:  Okay.
15    ATTORNEY HENNESSEY:  I don't want
16 her -- I understand that.
17    ATTORNEY DALLER:  Okay.  So I think
18 we're on the same page.  As long as you don't
19 continue -- you know, you get your answer.  That's
20 fine.  Move on.
21    Keep going back to, you know, well, the
22 infertility has nothing to do with COVID, which is
23 a pure secular medical feign, doesn't respect her
24 religious rights the way Main Line did to begin
25 with, then we will be talking to the judge.  Okay?

Page 134

1    ATTORNEY HENNESSEY:  Let's her bring
2 them back in.  We'll have the court reporter read
3 what I just said.  I think that I laid it out
4 pretty well, asking her to explain how it relates
5 to COVID.  And you think she already answered
6 that.  I don't think she did.
7    And I -- you know, and she said she
8 didn't need a break.  So I want to bring her back
9 in.
10    ATTORNEY DALLER:  Okay.
11    ATTORNEY HENNESSEY:  I want to have the
12 court reporter read it to her.
13    ATTORNEY DALLER:  Okay.
14    ATTORNEY HENNESSEY:  And she has had a
15 moment, you know, now to kind of collect herself
16 and go to the bathroom.
17    ATTORNEY DALLER:  Mm-hmm.  I'll go get
18 her.  All right.  I'll be right back.
19    ATTORNEY HENNESSEY:  Thank you.
20    (Short pause.)
21    ATTORNEY DALLER:  She's back, Brendan.
22    ATTORNEY HENNESSEY:  Let's go back on
23 the record.  Well, we've been on the record.
24 We're back in.
25    And before we were interrupted I had a

Page 135

1 question for you.  I think you understood the
2 question.  I'm going to have the court reporter
3 read it back to you.  And I would like to hear
4 your explanation.  And I may have some follow-up
5 questions.
6    But bear in mind, if it becomes
7 emotional or any of the testimony does, feel free
8 to ask for a moment or a break, whatever that may
9 mean.  I am understanding of that.
10    So if the court reporter could read
11 back the -- my last question and we can go from
12 there, I would appreciate it.  Thank you.
13    (The record was read by the court
14 reporter, as requested.)
15    ATTORNEY HENNESSEY:  I will grant it
16 was a long question, but can you answer the
17 question?  I believe I laid it out for you there.
18    THE DEPONENT:  So, I will do my best to
19 try to figure out how you don't understand the
20 connection between this verse and how it applies
21 to my religious beliefs and the COVID vaccination.
22    The COVID vaccination is a genetic
23 component.  According to this verse, it says that
24 God has fearfully and wonderfully made me and He
25 knew me even before I was conceived, woven.  And

Page 136

1 for me, the vaccination required, just like it
2 would have for infertility, artificial
3 insemination, IVF, the hormone injections, the
4 things that you would have to go through, the
5 sperm and the egg outside of the body, which is
6 not natural to me, was not acceptable, according
7 to my strong belief on this.
8    I will give you some background that
9 before I got married the OB/GYN I attended, went
10 to, had the recommendation that you know, let's do
11 birth control.  You don't want to have your period
12 on your honeymoon.  Let's do that.
13    And at the time I followed the advice
14 of the doctor.  And we went on our honeymoon.  I
15 was on birth control.  And after about a month,
16 maybe two months, my husband came to me and I went
17 to him, and at the same time we said we can't do
18 this.  We are altering the natural parts of our
19 body that God has given us for conception and for
20 genetics and everything.  So we stopped birth
21 control.
22    Obviously we didn't need it.  We still
23 don't have any children.  And I laugh out of pain.
24    ATTORNEY HENNESSEY:  The --
25    THE DEPONENT:  The next thing that came

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 137

along was when I went to the next OB after I was married.  His recommendation was ahhh, you're healthy, you're going to be able to have kids.  Let's try Clomid.  I did one round.  I had a horrible cyst.  I had a horrible experience.

I had never, never felt so filthy in my life by altering what my body was, as given to me by my God.

ATTORNEY HENNESSEY:  Did you --

THE DEPONENT:  So when the infertility came up -- I'm trying to answer your question and it's a whole answer.

ATTORNEY HENNESSEY:  Go ahead.

THE DEPONENT:  When infertility came up, it was a no-brainer.  My husband and I always joke about hey, we need direction; should we buy the house here, should we buy the house here, where's the neon sign, we want clear answers from our Lord that we seek and honor.

When it came to infertility, it was a clear answer.  We were not going to take those steps that did not let -- and I say that in here.  I believe I say -- I'm looking for it.  That it would happen naturally if it was going to happen.

The same thing applies to my immune

Page 138

system.  I am not going to use a means to alter the immune system that God has given me.  And to me and my walk with my Lord, taking this vaccine did that.  Because it was making my -- and even the CDC changed its definition of what a vaccine was.  Clearly, it was different.

I'm not -- I don't -- I am not an expert in this.  I am not an expert in this at all.  But I can only stand on my belief system, the steps I have lived and the direction I have taken.

Obviously, beneath all of this was the whole abortion issue.  And that is -- well, because if you have gone through any of this and you know anybody that has gone through this, and especially when I went through this many years ago, they disposed of the egg and the sperm that formed and created a body.  Because to me, that is creating a new life.  And that was done in a Petri dish.  Not acceptable to me.

ATTORNEY HENNESSEY:  I'm -- you know, I am not --

THE DEPONENT:  So if abortion isn't acceptable to me, this is --

Page 139

BY ATTORNEY HENNESSEY:

Q.  We're going to cover some of these topics.  Now, I will ask you this.  You mentioned abortion.  You didn't mention abortion in this exemption application.

A.  Not on that question I did not, but it is certainly mentioned later.

Q.  It's not.

A.  In my appeal letter.

Q.  Okay.  It is not mentioned anywhere before the appeal.  And we'll get to that.  But I have a big -- you know, you said a lot.  I have a lot of follow-up questions in relation to what you said because I'm trying to make sense of it.

One of the things you said is that you did not want to do something that would alter your immune system.  You would agree with me that there are lots of things in this world that alter an immune response.  Correct?

A.  Alter is probably not the correct word.  I probably should not have used alter.  But interact with.  Change is probably better.  I mean, every time I'm exposed to something, I'm building my immune system through a natural process; every time I play in the dirt, every time

Page 140

I get a cold.  That is a natural process that happens.

Q.  You also testified earlier that you take supplements.  Supplements change how your immune system reacts to the world.  Correct?

A.  That is -- you know, I take them to improve my health and to be more healthy.  I do take supplements.  If you --

Q.  Have you ever taken --

A.  Your interpretation of that might be different than mine.

Q.  Have you ever taken antibiotics?

A.  Very, very, very rarely.

Q.  In relation to supplements, what supplements do you take?

A.  A multivitamin and a --

Q.  And you -- go ahead.

A.  I do take a vitamin C, and I do take a calcium pill, because I do not really eat cheese or milk or yogurt or anything like that.

Q.  Any probiotic?

A.  No.

Q.  Any prebiotic?

A.  No.

Q.  In relation to genetic components, you

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 141

1  mentioned that.  And at the bottom there it says,
2  "I'm not comfortable having genetic components
3  that my body did not create injected into my
4  body."
5       What genetic components would have been
6  injected in your body from one of the three COVID
7  vaccinations?
8       A.  MRNA is a genetic component.  It is a
9  part of DNA that is a genetic component.
10      Q.  Right.  But you would agree with me
11 that it does not affect your genes at all.
12      Correct?
13      A.  I don't know that.
14      Q.  Well, in order to affect your genes, it
15 would have to enter the nucleus.  Correct?
16      A.  I don't know that.
17      Q.  You don't know that or you don't
18 believe that?
19      A.  I don't know that this vaccine -- I
20 don't know if that is true about this, the
21 components of the -- the genetic components of
22 this.
23      Q.  Do you know whether the mR -- or RNA
24 can enter a person's nucleus?
25      A.  Are you asking me in relation to --

Page 142

1       Q.  Or cellular nucleus.
2       A.  -- to the vaccine or are you asking in
3  relation to the normal body processes.  Your mRNA
4  --
5       Q.  I'm asking you in relation to the
6  COVID-19 vaccines as they were developed at the
7  time.
8       A.  You're asking me if the COVID vaccine
9  mRNA interacted with my body?
10      Q.  Well, no, I didn't.  Because you know,
11 the reason -- well, tell me this.
12      Why did you object to it being --
13 having genetic components?
14      A.  Because my body did not create those
15 genetic components.  I am -- to quote Psalms 139,
16 "I am created in Him.  My frame was hidden.  I was
17 woven together."  To me, that speaks -- for me,
18 that is genetics.  To me, that is my
19 interpretation in what God has revealed to me in
20 my walk with Him.  That is what that means.
21      Q.  Do you eat vegetables?
22      A.  Yeah.
23      Q.  Do you eat corn?
24      A.  Yes.
25      Q.  Corn has foreign genes that you're

Page 143

1  putting in your body.  Correct?  Are you aware of
2  that?
3       A.  I guess not.  I consider fruit and
4  vegetables the bounty of God's creation, and it's
5  food to consume.
6       Q.  Do you know how they're grown today?
7       A.  I know -- I have not eaten corn since
8  my uncle did not grow the corn on his farm.
9       Q.  Do you eat broccoli?
10      A.  No.
11      Q.  Do you eat any other veg -- what other
12 vegetables do you eat?
13      A.  I'm not sure.  I'm not trying to be
14 difficult here, but I don't understand how my diet
15 relates to the genetic components of my body in
16 terms of a vaccination.  It's a completely
17 different -- for me, to use your words --
18      Q.  I'm trying --
19      A.  Can I finish?
20      Q.  Yeah, go ahead.
21      A.  We're talking apples and oranges here
22 for me.
23      Q.  I'm trying to explore that because lots
24 of things have genetic components; lots of
25 medicines, lots of the vegetables, lots of

Page 144

1  different things have genetic components.  So I'm
2  wondering what it is.
3       And you mentioned yourself that you may
4  be exposed to viruses in the world that have
5  genetic components obviously.
6       A.  I think I said that I'm exposed to
7  viruses in the world, and my immune system that
8  God created reacts to them and goes -- and
9  develops and goes from there.  That is what I --
10      Q.  Sure.  But there is nothing in this
11 verse that says that you can't take medicine, you
12 can't take things that would help prevent disease.
13      Correct?
14      A.  There's nothing in this earth that
15 prevents --
16      Q.  I said verse, not earth.  Nothing in
17 the Psalm --
18      A.  Oh.
19      Q.  -- 139 verse that says that you
20 shouldn't take medicine or things that may -- that
21 may affect how you react to diseases.
22      A.  So the other verse that I used in my
23 exemption -- and you know, from your
24 interpretation and I'm not going to judge your
25 interpretation, I did speak about my body being a

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 145

1 temple of the Holy Spirit and that He lives inside
2 of me and that I am to be worshipful.
3        So I did not put that in my question
4 one. But it was in my -- it is also in my basis
5 of the foundation of my beliefs. That's where I
6 was saying with the critical thinking. I have
7 foundational things in here that I did not put out
8 every single step.
9        And do I regret that today?
10 Absolutely.
11    Q.  Well, I saw that.
12    A.  Can I change that today?  No.  Do I --
13 does it change what I believe?  No.
14    Q.  Well, I saw the other verse that you
15 put in there, as well.  That was Corinthians
16 6:19-20.  Do you know what the context was for
17 that quote about the body being a temple?  Do you
18 know who it was who was talking there and what he
19 was saying?
20    A.  I do.  I can tell you that right now I
21 absolutely cannot recall it.  It's like I would
22 love to pull out my phone and look at it and I
23 could answer your question, because I have a
24 version of the Bible on my phone.  But I cannot
25 answer that question.

Page 146

1    Q.  Okay.  If we turn to it here, it
2 says -- this is the verse that you quoted, "Do you
3 not know that your bodies are temples of Holy
4 Spirit, who is in you, whom you have received from
5 God?  You are not your own.  You were bought at a
6 price.  Therefore, honor God with your bodies."
7        Do you know what the context was for
8 your statement?
9    A.  I believe you asked that, and I believe
10 I answered it.  I cannot recall right now.  I did
11 know it at the time.  I do not know it right now.
12 It's up there.  I will gladly look and answer your
13 question, if you would like.
14    Q.  I understand.  So my understanding is
15 Paul was speaking to the Corinthians at the time.
16 And the context was in relation to fornication,
17 specifically homosexual fornication.
18        Does that refresh your recollection?
19 Do you know -- does that ring a bell in your head
20 at all?
21    A.  I would need to read it to really
22 answer that, to be honest with that question.  And
23 I would need to read the chapter.
24    Q.  Do you have a belief that homosexuality
25 is wrong?

Page 147

1    A.  I believe that God created us male and
2 female.
3    Q.  In relation to -- I mean, speaking of
4 Bible quotes, and I was born and raised a
5 Christian; you know, my understanding is in
6 relation to Christians, it's not as important as
7 what we put into our bodies as what we put out.
8        Have you ever heard that before?
9    A.  That is a scripture verse.
10    Q.  Yeah.  In Matthew 15:11, Jesus said,
11 "It is not what goes into the mouths that defiles
12 a person but what comes out of the mouth."
13        Do you know what he's talking about
14 there?
15    A.  If -- I'm a little better with that one
16 because my level of whatever-you-want-to-call-it
17 is decreasing.  Is that one about the showbread or
18 is that one about the bread offered to sacrifices?
19        What is that?
20    Q.  Well, he goes on to talk about that --
21 you know, that the concern is what comes out of
22 the heart, which is -- I think the quote is evil
23 thoughts, murder, adultery, sexual immorality;
24 those are what defile a person.
25        It's not what we put into us that

Page 148

1 counts.  It's our intentions that are most
2 important.  Do you have an understanding of that?
3    A.  According to that verse, I absolutely
4 understand that.  And I do try to abide by that,
5 as well.  I'm not saying that is the only
6 verse in the Bible that I follow and it negates
7 every other verse or every other belief that I
8 have in my walk with my faith and my God.  I
9 don't.  I don't pick out single verses.  That's
10 not the way I do my walk.
11    Q.  I understand that.  I'm just -- I'm
12 questioning your -- how the interpretation of one
13 verse that the context was sexual fornication, how
14 that relates to a vaccine and something that you
15 put in your body.  And there are other verses that
16 speak to medication and what you put in your body,
17 not being --
18    A.  I don't think that verse -- I don't
19 think that verse that you just quoted says
20 medication.
21    Q.  Right.  It doesn't say medication.
22    A.  You're making --
23    Q.  Neither do any of these verses.  Right?
24    A.  I think you're making --
25    Q.  I mean, we're not --

Page 149

A.  I think you are making an inference.
And what I'm telling you is that I am making an
inference in mine.  And I don't understand how you
can make an inference in yours and I can't make an
inference in mine.  I just don't --

Q.  What did --

A.  I understand what you're saying --
please let me finish.

I understand what you're saying, and I
understand you don't understand how I get from
point A to point B.  I understand how I get from
point A to point B, and I live that life.

So I am not -- the Bible also says
judge not.  The Bible says for me not to judge me.
You're not supposed to judge me.  So I'm not going
to go there with that.

I'm telling you that this was the basis
of my sincerely-held religious beliefs.  And I
have lived my life with this religious belief, and
I have the examples to prove it.

Q.  Yeah.  I'm trying to break that apart.
I'm not trying to judge you.  I'm trying to
understand what you're talking about.  Because I
mean, there isn't any reference to medications,
vaccinations or even what you put in your body

Page 150

necessarily in relation to anything that you've
cited here.

And I'm trying to get a better
understanding of that.  And you've mentioned
genetic components, and I'm trying to figure out
why -- you know, what it is about the vaccines
that gave rise to an objection in relation to
genetic components.

And my understanding is other than your
knowledge of RNA being in the messenger RNA
vaccines, are you aware of any other genetic
components that might be in the vaccines?

A.  I don't know that we know all that.
But I know that what -- the information that's
available.

Q.  Okay.

A.  I know the information that is
available.  Can you just give me a second?  I had
a thought, and I just want to see if I can pull it
back before we speak again.

Q.  Sure.

A.  I understand that you don't understand
how this relates to my religious beliefs.  There
are many people, including some -- you know, we
had that unemployment hearing.  And other people,

Page 151

they have stated for record that I have a
sincerely-held religious belief.

When I met with Sarah and Bern, Sarah
clearly said I have a genuine, and she said I
understand where you're coming from.  Other people
do understand this connection of my mind and my
body with this vaccination.

I am not going to be able, as a human,
to make you understand that.  That's my God's job
not mine.

Q.  You know, I would ask -- I understand
that you want to testify; you want to tell me what
you want to tell me.  But what you're telling me
isn't answering the questions that I have.  I have
a limited amount of time.  I want you to respond
to my questions.  We'll talk about these other
things.

But I'm asking a question, and I want
you to limit your answer in relation to what
the -- you mentioned unemployment compensation.
You're saying that the board of review ultimately
approved of unemployment compensation, although
the referee at the hearing did deny that you had a
sincerely-held belief.  Right?

A.  Yeah.  And he --

Page 152

ATTORNEY DALLER:  Object to the form.

ATTORNEY HENNESSEY:  Isn't that
correct, Referee MacMaster did not feel that there
is a sincerely-held religious belief that
prevented you from getting a vaccine?

Correct?

THE DEPONENT:  It was not --

ATTORNEY DALLER:  Good job.  Misstates
the testimony in the transcript.

THE DEPONENT:  That is not the
interpretation.  In fact, the representative from
Main Line Health stipulated that I have a
sincerely-held religious belief.

BY ATTORNEY HENNESSEY:

Q.  That's not accurate.  I read the
transcript.  The representative of Main Line
Health, through the Unemployment Office, did not
stipulate to that.

All he stipulated to was that you
provided testimony.  That's all he stipulated to.

And I understand your attorney, you
know, argued that and kept arguing that, but
that's not what happened in the transcript.  I
have read the transcript.

And my question before was limited to

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 153

1  what the referee, Tiffany MacMaster, decided.  The
2  record reflects what it was.
3       But in relation to -- let's go back to
4  your objections, which you say here you're, "not
5  comfortable having genetic components that your
6  body did not create."
7       I'm asking you what those genetic
8  components are.  You mentioned RNA.  And I asked
9  the question of are there any other genetic
10  components that you researched that are in the
11  vaccines.  And I just -- you know, you decided not
12  to get a vaccine on this basis.  So I'm trying to
13  get clarity as to what you meant there.
14      A.  For me, the mRNA basis of a vaccine was
15  enough for me to have discernment, that it was not
16  aligned with my religious beliefs.  I can't give
17  you any more of an answer than that.
18      Q.  Are you aware that the mRNA is not DNA
19  and it would have to be essentially reverse
20  transcribed into DNA with an enzyme that would
21  allow that to happen in order for it to have any
22  sort of affect on genes or DNA?
23      Do you have any knowledge in relation
24  to that?
25      A.  I know that studies are -- I'm going to

Page 154

1  speak to the present time.  I know that studies
2  are being done.  To me, it was a religious
3  conviction at the time.  It still is.  There are
4  studies and things being done that are beginning
5  to -- I'm not going to get into that discussion
6  with you because it's not going to go where we
7  need to go, and it's not going to address your
8  question.
9       Q.  Okay.  Well, then --
10      A.  To me, the genetic component is enough
11  or the mRNA and the ability to revert -- to send a
12  message that my body did not create the message,
13  to send to create a protein that my body -- that
14  it was injected into me that my body did not
15  create, because that mRNA created that message.
16      That's my belief.
17      Q.  See, the message was in relation to the
18  immune system and the creation of B cells.  It had
19  no impact on your genetic makeup.  Or you
20  didn't -- did you understand that it would have an
21  impact on your genetic makeup at the time?
22      A.  I believe I spoke about genetic
23  components.  I believe I did not speak about
24  genetic makeup.  My belief was about the
25  components.  That's -- I cannot make that -- it is

Page 155

1  so crystal clear to me.  I just don't know another
2  way to make it more clear so that you can
3  understand it.
4       Q.  Well, it's not clear to me because what
5  you said was --
6       A.  Obviously.
7       Q.  -- any genes in the mRNA vaccines are
8  fragmented and already essentially destroyed by
9  the composition with other chemicals in the
10  vaccine, and those are essentially waste materials
11  that your body takes care of.  So it's not going
12  to have any impact.
13      And I'm trying to get an understanding
14  of what your understanding was at the time.
15      A.  So let me try this.  I remember during
16  this time I did go to the websites of Pfizer,
17  Moderna, and I cannot remember if I went to J & J.
18  I know I went to -- and they both said gene
19  therapy.
20      So then I went to the CDC and I looked
21  up the definition of gene therapy.  And there is
22  two parts to that definition; and they classify
23  this themselves, as gene therapy, Pfizer and
24  Moderna did, on their websites at the time.
25      I can't speak for what it is today.  I

Page 156

1  know it said gene therapy.  And gene therapy does
2  have that piece in it.  And I would need to pull
3  up the definition and the two parts to give it to
4  you.
5       But when I read that, it was a no -- as
6  I say in my words, it was a no-brainer from that
7  point forward.  I could not do that.
8       Now, whether or not it's argued that
9  it's gene therapy or not?  I don't know.  But at
10  the time I wrote this, that is what I found on
11  their websites and that is what I had discernment
12  against and that is why I wrote what I wrote.
13      Q.  What does gene therapy mean to you?
14      A.  Gene therapy, to me, means using genes
15  to interact and to get a response or do -- you
16  know, I would need to read you -- I just -- I do
17  not want to misstate myself and then have it come
18  back and say I don't understand what gene therapy
19  is.
20      Q.  Okay.  Let's move on.  In relation to
21  question number three, it states here, "Does your
22  religious belief identified in question number one
23  prevent you from receiving other vaccines or just
24  the COVID-19 vaccine?"
25      And you said, "Some but not all

Karasch                                                   Page: 42 (153 - 156)

Deposition of Dawn Gray        Dawn Gray v. Main Line Hospitals, Inc.

Page 157

1 vaccines." Correct?
2 A. Correct.  And I wrote genetic component
3 vaccines above it.
4 Q. Okay.  And you believe that the mRNA
5 vaccines had genetic components in them?
6 A. I do.
7 Q. How about --
8 A. I still do.
9 Q. How about the J & J vaccine?
10 A. I believe there was an adenovector.
11 Used a different method but it still had mRNA.
12 There was an mRNA methodology.  So to me, it was
13 the same.
14   It was not a protein subunit.  And I
15 did know that about the science.  And I did -- in
16 my next question, which I'm sure we're going to
17 get to, about the Novavax, I even mentioned that.
18 Q. Right.  I saw that.  You state --
19 A. At the time -- at the time I wrote
20 this, that was my belief.  My belief is now
21 different.  But we're talking about November 1st,
22 20 -- or September 10th, 2021.
23 Q. Well, let's talk about that.  You said
24 you had a belief in relation to Novavax.  You'd
25 done some initial research into the Novavax

Page 158

1 COVID-19 vaccine, and if it is authorized, you
2 would consider this alternative.
3   The Novavax vaccine was authorized a
4 year ago.  Correct?
5 A. Okay.  It might have received
6 emergency-use authorization last summer.
7 Q. Okay.  Did you get the Novavax vaccine?
8 A. I did not.
9 Q. Why not?
10 A. Because I have been working through
11 this journey after this, and I have been
12 reevaluating.  And I feel that that is not -- just
13 like I explained earlier about the flu vaccine, my
14 body is pure and holy.  And I am not there.
15   So between when I wrote this and the
16 emergency use authorization came out, I began to
17 start to feel that discernment.
18   And at this point, no.
19 Q. So is there anything particular about
20 the Novavax vaccine, other than it's a vaccine,
21 that causes you to object to the Novavax vaccine?
22 A. I think that it's the same as it will
23 be for my flu vaccine this year when I need to
24 submit my religious exemption.
25   In the absence -- you know, my body is

Page 159

1 pure and holy and God has made it.  And you know,
2 I'm not going to inject something into my body in
3 the absence of disease at this point forward or
4 from that point forward or, you know, during this
5 transition of where I'm landing.  It's just --
6 that's where I'm at.
7 Q. And that's your belief.  That's not
8 necessarily your religious organization's belief.
9  Correct?
10 A. My religious organization does not --
11 the constitution, and I believe I submitted that,
12 does not mention vaccines at all.  It does mention
13 abortion.
14 Q. Right.  And I --
15 A. And I knew that.  And that's one of the
16 reasons I had my pastor submit it, because he
17 knew, and we discussed that when I talked with him
18 about it.
19 Q. Did Calvary Bible Church at the time --
20 and we're talking about Calvary Bible Church,
21 because I understand that was the church that you
22 belonged to at the time.
23   They didn't prohibit COVID vaccines to
24 their parishioners and or that it was against the
25 religious rules to obtain a COVID vaccine.

Page 160

1   Is that correct?
2 A. My church -- my belief follows the
3 Bible.  And my church does not -- does not address
4 vaccines.  Did not address vaccines.
5 Q. They did.  I think I saw something
6 written where they said that they would not
7 consider it a sin to get the COVID-19 vaccine.
8   Did you believe --
9 A. I don't believe that that was Calvary
10 Bible Church.
11 Q. Is Calvary -- that goes -- CBC is short
12 for Calvary Bible Church.  Correct?
13 A. Correct.
14 Q. I believe that that's what they said,
15 that they did not consider it a sin.  In fact --
16 A. No.  I believe that you're not quoting
17 Calvary Bible Church and Harry Fletcher.  I
18 believe that you have moved into the merger
19 situation and the constitution of the new church.
20 That was not applicable in November 1st of '21.
21 Q. So the New Church that you belong to
22 has said that, that it's not a sin to get a
23 COVID-19 vaccination?
24 A. I would have to look at their
25 constitution.  Again, I do not believe that it is

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 161

mentioned. I believe that the way Ben Thompson
referred to that is that the church is not going
to take a stance on whether or not it is a sin to
take the COVID vaccination.

I believe that you are misinterpreting
and --

Q. Well, let me be clear. And I think
there's some testimony on this already.

But the CBC, or your religious
organization, does not require you to not get a
COVID-19 vaccine. Correct?

A. It seemed like that was a double
negative. The CBC at November 21st, 2021 did not
require me to get a vaccination.

Q. Right. There was no prohibition of CBC
members in relation to getting a vaccine?

A. It was never discussed at my church in
any sermon, group, meeting or anything like that.
It was never said from the pulpit.

Q. Many CBC members have gotten the
COVID-19 vaccine. You would agree with that.
Right?

A. I would guess. I know many people that
have gotten it. I do not ask people -- it is
not -- I don't know. I'm sure they have.

Page 162

Q. And you previously testified at the
unemployment compensation hearing, I think the
referee asked you this directly, did your
religion -- are vaccines prohibited as a part of
your religion. Do you recall --

A. And they are not.

Q. They are not. Okay. And you said as
to the body of the religion, no. Is that
accurate?

A. Correct. I just said that.

Q. Okay. Let's talk -- so my
understanding from what you have discussed that
this is an individual decision of your conscience.
Is that accurate?

A. It is not a decision of my conscience.
It is a decision based on my religious beliefs and
that I have used the Holy Spirit to help me
discern and to make decisions and to guide and
direct me. So for me it is a religious belief.

You are trying to tell me that it is
not. I am going to stress that it is my religious
belief because it is my religious belief.

Q. Let's go through what your pastor said
at the time. And this is after having - as you've
testified, you discussed this with him prior to

Page 163

him filling out a religious exemption, religious
origination statement form. And this is the
printed portion of it.

Is this, what I have in front of me,
is, and the Bates label on this is MLH Gray 00441;
is this a copy of what your pastor at the time
submitted as a part of your exemption application
request?

A. It appears to be that, yes.

Q. And it says there that you were a
member of the Calvary Bible Church of
Phoenixville. He goes on to say, "As explained to
me she is not opposed to vaccinations in general,
but her understanding of the composition and
performance of the COVID-19 vaccines do not align
with her personal conviction."

Do you see that?

A. I do.

Q. And that's correct so far. It's true
that --

A. That is -- that is what he wrote.

Q. Do you -- is there anything that you
disagree with what he wrote there?

A. I did not put words in his mouth. At
the time I was not opposed to vaccination in

Page 164

general. That is a true statement. How he worded
my understanding, I'm not going to speak to that.
Because that's his understanding. I don't know
what he heard. I don't know --

Yes, I see what he wrote. I can tell
that that is what he wrote. I will agree with
that.

Q. Did you talk to him? Do you recall
talking to him about the composition and
performance of the COVID-19 vaccines?

A. I do not recollect. It was a
conversation that might have been -- you know, it
was not a very -- it was not even a long
conversation. Define long. It was definitely
less than an hour. I do not recollect that.

Q. Okay. And he goes on to say --

A. I told him I was not going to -- I was
not going to change. Whatever he wrote was what I
was going to go with.

Q. Okay. And he completed that by saying,
"Confident that God has determined the precise
physiological makeup of each individual person,
she believes that the functions of the present
COVID-19 vaccine would alter the specific genetic
makeup of her body."

Karasch                           DA 46                    Page: 44 (161 - 164)

Page 165

1  Do you see that there?
2  A.  I do.
3  Q.  Do you know where he got that from?
4  A.  We talked -- I do remember.  I do have
5  a recollection we spoke about infertility.  He did
6  not realize what Ron and I had been through with
7  that.
8  Q.  Okay.  But my question was in relation
9  to what I just read.
10  A.  I cannot tell you where he got that
11  line, the determination of.  It is not a direct
12  quote of me.  He was not writing down what I said.
13  That is subject to his interpretation.
14  Q.  Okay.  So that was his interpretation
15  at the time following his discussion with you in
16  August of 2021, because that's when he filled it
17  out.  Correct?
18  A.  That is how he communicated his
19  interpretation, that is correct.
20  Q.  And nowhere in here -- and you've
21  mentioned fetal cells before.  Nowhere in this
22  exemption application did you mention fetal cells.
23  Is that correct?
24  A.  I would need -- I would need to review
25  the -- sorry.  You're going up and down so fast.

Page 166

1  Q.  Okay.
2  A.  I'm straining my eyes because -- if you
3  could find the section about the abortion that I
4  speak, I would need to verify that part.  There it
5  is.  Thank you.
6  Can you scroll up a little bit more
7  please -- or down?  Down, up, whatever.  I do
8  mention abortion.  I did not mention fetal cells.
9  Q.  Where do you mention abortion?  Oh.
10  With the Plan B.  I see that.
11  A.  Page four, question five.  I can read
12  it to you if you'd like.
13  Q.  Where you say, "Switched assignments
14  with colleagues to allow for them to care for
15  those after an abortion or for those patients who
16  are asking for Plan B."  I see that.
17  You didn't mention about fetal cells or
18  the cellular makeup of the COVID-19 vaccines in
19  relation to fetal cells.  Correct?
20  A.  In this, that is accurate.  I did in my
21  appeal e-mail.
22  Q.  Okay.  Did you learn about the fetal
23  cells after you submitted this initial
24  application?
25  A.  Absolutely not.  I knew it all along.

Page 167

1  Q.  So why didn't you put it in there?
2  A.  That's a great question.  I felt that
3  my argument and the strength of my belief system
4  was best communicated in the way that I
5  communicated it.  Because that, to me, was
6  stronger because of the processes that are
7  involved in infertility.  And it spoke more to
8  that.
9  And abortion and cells, not necessarily
10  aborted fetal cells.  But what you do and cells --
11  you know, the ovum and the sperm dying is, to me,
12  an abortion.  So to me, it was foundational.
13  Q.  When did you learn about the fetal cell
14  issue?
15  A.  I believe I knew pretty early on about
16  that.  I'm not going to be able to recollect the
17  exact time, but it was before I ever sat down to
18  write this exemption.
19  Q.  And when I'm talking about the fetal
20  cell issue, why don't you explain it in your own
21  words, what is it about the vaccines that would
22  involve fetal cells, to your knowledge?
23  A.  Sorry.  I missed the end of that.  Can
24  you repeat it?
25  ATTORNEY HENNESSEY:  Can the court

Page 168

1  reporter repeat it?
2  THE COURT REPORTER:  Sure.
3  (The record was read by the court
4  reporter, as requested.)
5  THE DEPONENT:  So I know it was used in
6  the development and the testing and the generation
7  of it and abortion.  That is a sin.  It's against
8  the Ten Commandments.  In my words, in order to
9  use that, you are, for lack of a better word right
10  now, propagating an evil indirectly and further --
11  much further down the line.
12  But I am not going to engage in that
13  willingly and knowingly.  So for me, it was not
14  the primary reason, but I was well aware that I
15  also had a religious objection to that, as well.
16  BY ATTORNEY HENNESSEY:
17  Q.  Let me ask you about that, because
18  you -- there are a number of things that I want to
19  break down.  What was involved in the development
20  of the COVID-19 vaccines?  When you say it, I want
21  you to define --
22  A.  Abortion, the use of aborted fetal
23  cells.
24  Q.  What did ---
25  A.  -- and the development and testing.

Deposition of Dawn Gray

Dawn Gray v. Main Line Hospitals, Inc.

Page 169

Q. Hold it. That they used fetal cell tissue in this development of the vaccine?

A. Aborted -- aborted fetal cell tissue.

Q. What tissue was that?

A. I said aborted fetal cell.

Q. Where did that tissue come from?

A. Where did the?

Q. Where did the tissue come from?

A. I don't know. I didn't -- you know, I didn't do a thorough investigation of that. It was not germane to my beliefs. I mean, it was there. And it is there. But I did not -- I don't know.

Q. Okay. Do you know what cell lines were used in the development of which vaccines?

A. I did at one point. I do not recollect it now.

Q. If I were to say the HEK 293 cell line, do you know what that is?

A. I -- I'm not sure.

Q. Okay. And I should say H-E-K 293. Okay. You don't know where that cell line came from?

A. I'm not -- I do not -- I do not. I'm not sure. I do not recollect.

Page 170

Q. Do you know what a cell line is?

A. I do have a sense of it. Do I know it in the scientific, down to the nitty-gritty? I do not.

Q. What is your sense of it?

A. My sense is whether they are using, whether it's the tissue or the cells or pieces of it in order to -- you know, it's done on a very microscopic level. They're using that in the ways they're using it. I'm not going to say they deliberately, because I'm not going to speak to something that I'm not well aware of and versed in right now.

Q. Okay. So if you researched it, you don't remember sitting here today.

Do you know whether or not you did any in-depth research into it at the time?

A. I know that I did some. I just -- I'm not -- I'm not -- I do not recollect what details. I do not.

Q. And that wasn't your primary concern from what you've articulated, and that's not what you put in the exemption form. The --

A. It was foundational to my concern because, you know, it's all about human life, and

Page 171

sanctity of human life for me is just precious.

Q. What do you mean by that? It was foundational to your concern, but you didn't put it in the initial exemption application? I'm trying to understand that.

A. Yeah, all kind of core beliefs. The Ten Commandments. Do not kill. You know, abortion. You know, all of those things are foundational. And they're in there. And I believe they're part of my belief system, so to say.

Q. Well, how --

A. I did not clearly -- I did not delineate or expand upon any of them in this religious exemption.

Q. Okay. And how would this be killing if you were to take a vaccine that --

A. I think I already -- I already spoke to that. That if it's used, it's evil. You know, I know it's evil. I know it has a basis. If I know that, I am not going to dishonor my God and my body and the sanctity of human life and continue to support. And that's not the best word, but that's the word that's coming to the top of my head right now.

Page 172

Q. In relation to the cell lines that were used, do you know if it came from an aborted fetus or a miscarriage?

A. I do not.

Q. Would that matter to you whether it was an elective abortion or spontaneous?

A. I would have to prayerfully consider that. I would have to have discernment and I would have to pray about that.

Q. Are you aware that many pro-life organizations have looked into this issue pretty closely?

A. No.

Q. Do you know what the Pontifical Academy for Life is?

A. Do I know what the Academy for Life is?

Q. The Pontifical Academy for Life, are you familiar with that --

A. I have never --

Q. -- organization?

A. I have never heard of it.

Q. Okay. It's a pro-life organization, and it took a very nuanced look at the use of these cell lines and whether it would be any sort of cooperation with evil and determined that it's

Page 173

1  so remote that it really is not an issue in
2  relation to taking a vaccine that would be
3  preventive potentially for saving human life in
4  the present day.
5      Did you read that anywhere?  Had
6  anybody looked at that and examined in it relation
7  to other values?
8      A.  I've never heard of what you're
9  speaking about.  So, if that's what they have
10  concluded, then that is their -- you know, I would
11  need to check their sources.  And if I wanted to,
12  I would want need to do, you know, a search and
13  all that about that.  I do not know what you're
14  referring to.
15      Q.  Well, when you make decisions, these
16  personal decisions, do you consider what's good
17  for others as well as what the common good is?
18      A.  I believe we have discussed earlier.
19  So I do not -- I look at my -- when I'm
20  talking about things that are going into me
21  personally and that are affecting me personally,
22  whether in this case it is a vaccination for me,
23  I'm going to not violate my religious belief and
24  my -- what I stand on for that.
25      And if that comes at the cost, I am

Page 174

1  willing to stand on that, that cost.
2      Q.  The cost of, you know, potentially
3  infecting others with COVID-19 when you're
4  supposed to be serving them as --
5      A.  No, that is not what I've spoke.
6      Q.  Well, I'm asking you.  What is the cost
7  then?
8      A.  The cost for me is that I was standing
9  on my beliefs and it cost me my job.
10      Q.  Okay.
11      A.  I have -- if you can -- if there's a
12  way you can show me or prove to me that I have
13  infected somebody with COVID --
14      Q.  Well, there's the risk is what I'm
15  talking about.
16      A.  I -- I can't speak to that.  I wore the
17  PPEs when required.  I followed the rules.  I
18  still, to this day, have not -- you know, even
19  when I've been around my other people that are not
20  vaccinated or vaccinated, they haven't said oh,
21  you gave me COVID.  So I can't speak to that.
22      Q.  Did you get COVID at all?
23      A.  I have got COVID.  I tested positive
24  during a weekly testing.
25      Q.  When did you test positive?

Page 175

1      A.  I believe -- I know it was August of
2  '22.  I do not believe -- I do not remember the
3  exact date.
4      Q.  All right.  Did you have symptoms when
5  you tested positive?
6      A.  The only -- I was surprised but not
7  surprised.  I was extremely tired.  I had woken up
8  and I'm like -- the day -- actually, the day
9  before I had woken up and I'm like wow.  And I got
10  up, walked the dog and I took a nap.  And I don't
11  do that.
12      So -- but I had no other symptoms other
13  than the fatigue, extreme.  I knew that fatigue
14  potentially was a symptom.  When I woke up the
15  next day or two days later when I went in for my
16  shift, I felt that I was on the other side of it
17  or I was not -- you know, I didn't have that.  And
18  I tested positive.
19      Q.  Did you take time off work in relation
20  to it?
21      A.  At that time the CDC recommendation was
22  that I took five days from the onset of -- I
23  believe.  It gets very confusing because it
24  changed so much.  I believe it was five days from
25  the onset of symptoms.  If I remember right, I got

Page 176

1  out -- I missed one day of work, the day I called.
2      Q.  Did your husband become infected with
3  COVID-19?
4      A.  At that -- no.
5      Q.  Had he ever been infected with
6  COVID-19?
7      A.  He thinks he got it before it was
8  COVID-19.  He thinks he had it the winter before.
9  But I don't know.
10      Q.  He never tested positive, as far as you
11  know?
12      A.  He has not tested positive.
13      Q.  Did -- and I shouldn't assume, but I
14  assume that he was the only one that you were
15  living with at the time?
16      A.  Just him and our dog.
17      Q.  All right.  Did anybody else in your
18  family get COVID-19 that you interact with?
19      A.  None of my family lives local.  So the
20  only time I see my family is if I make a trip to
21  Virginia to see my family.
22      ATTORNEY HENNESSEY:  Okay.  It is
23  1:23 p.m.  I am going to suggest that we take a
24  break.  It can be a short break or longer break.
25      I should ask the court reporter because

Page 177

1  she may want to get something to eat. We've been
2  going for a long period of time. I'm open to a
3  15, 20-minute break, if that's okay.
4          Does that sound okay, Lori?
5          THE COURT REPORTER: Yes, that's fine.
6          ATTORNEY HENNESSEY: Okay. John, are
7  you okay with that?
8          ATTORNEY DALLER: Yes. Do you have any
9  anticipated time?
10         ATTORNEY HENNESSEY: Uh, I -- you know
11  --
12         ATTORNEY DALLER: Or length of time or
13  whatever.
14         ATTORNEY HENNESSEY: I don't know. I
15  really don't. I don't think we'll be here all
16  afternoon, but I don't know for sure.
17         ATTORNEY DALLER: All right. Then a
18  15-minute break is fine.
19         ATTORNEY HENNESSEY: It's --
20         ATTORNEY DALLER: Or 20, whatever you
21  want. It's, what, 1:24 now.
22         ATTORNEY HENNESSEY: Yeah. We'll come
23  back at 1:45.
24         ATTORNEY DALLER: Perfect.
25         ATTORNEY HENNESSEY: All right. Sounds

Page 178

1  good. Thank you.
2          THE COURT REPORTER: Thank you.
3          ATTORNEY DALLER: Sounds good.
4          (Whereupon, a recess was taken from
5  1:24 to 1:45 p.m.)
6  BY ATTORNEY HENNESSEY:
7      Q. So we left off, and we were talking
8  about the -- your COVID-19 exemption application
9  and some of the research that you did.
10         Before I get into it, though, and we've
11  had a 20-minute break, is there anything that you
12  would like to change in relation to your prior
13  testimony?
14     A. No, there's nothing that I would like
15  to change. But as soon as we hung up, I dug out
16  the record of the 7/2 ruling from Tiffany
17  MacMasters. And in her statement she does say
18  there is no claim against sincere relig -- yeah,
19  and I'm not going to word it right because I can't
20  read it. But basically she stated about my
21  sincere religious belief.
22         So the testimony and in the transcript,
23  it's not there. But in her conclusion, there is a
24  statement that says that. So I did want to clear
25  up that, because that's where I was getting my

Page 179

1  interpretation.
2          I know that during the transcript there
3  were some other things that I knew that I had read
4  something about that. So, you know, I don't have
5  the paper out. I had put it away. That is how I
6  spent my break, after I went to the bathroom and
7  had a quick phone call with my husband.
8      Q. No. And what I was referring to was
9  that she said that your sincerely-held religious
10  belief, in her opinion, does not prevent you from
11  getting the vaccine, and she found that you had
12  violated the policy. I understand that the board
13  ultimately reversed that.
14         But that's what I was referring to, is
15  that she determined that you were not a vaccine
16  expert and that your objection to the vaccine did
17  not relate to any sincerely-held religious
18  beliefs. That's what I read. But we can pull it
19  up and look at it later, if we decide to.
20         Is there anything else that you would
21  like to clarify or change?
22     A. No.
23     Q. Okay. In terms of -- we were talking
24  about some of the research that you did at the
25  time that you made your exemption application.

Page 180

1          Do you recall anything specific that
2  you did at the time in terms of researching what
3  went into the vaccines and your objection to the
4  vaccines?
5      A. I -- maybe I did speak to that about
6  the gene therapy on the Pfizer and Moderna sites
7  and how that, for me, was where I was at. And I
8  believe I did mention that in my exemption, as
9  well. Or maybe that was in one of my appeals. It
10  might have been in my appeal letter that I put
11  that.
12         So you know, that is the research I
13  did. I spent more time in prayer reading the
14  Bible and seeking His will than I did going to
15  verify facts and documents and spend all my time
16  doing that.
17     Q. You said gene therapy and you saw that
18  on their sites. Do you recall anything more
19  specific, like what the -- the context was for
20  that, what it said?
21     A. Classification, gene therapy.
22     Q. That's it. So you don't recall reading
23  like what it meant or anything of that nature?
24     A. Not from there. I do remember going
25  and looking -- you know, I had experienced that

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 181

1  previously, which I mentioned I believe in my
2  appeal e-mail. I had once before run into some
3  gene therapy, and I was not willing to --
4        Sorry. My watch just went crazy. I
5  was not -- that is not -- that also violates my
6  religious beliefs.
7        Q.  Did you go onto J & J's site and see if
8  they said that -- if that site said the same thing
9  in relation to the J & J?
10       A.  I really -- I really am not -- I am not
11 recollecting what I did about J & J.
12       Q.  Okay. You don't recall.
13            Now, it is a different -- do you know
14 how long these vaccines were studied, like mRNA or
15 the J & J Adenovirus vaccine, how long it had been
16 studied? Was that a concern of yours at the time?
17       A.  I'm not sure when you're saying a
18 concern of mine. I think it was well known that
19 they had no long-term testing and things like
20 that. And it was a newer -- I don't know if the
21 word I heard was technology or whatever. A newer
22 method, a newer technology.
23            So obviously there is -- you know, it
24 was a -- you just didn't have all that data. So I
25 did know that. Again --

Page 182

1        Q.  Do you know how long --
2        A.  -- my -- again, it did not apply to my
3  religious belief.
4        Q.  Do you know how long J & J had been
5  researching its technology or method?
6        A.  I did at one time because I had a
7  neighbor that worked for J & J and she said
8  something, but I have absolutely no idea what it
9  was.
10       Q.  I mean, if it was studied from, you
11 know, the 1990s onward, would that ring a bell?
12       A.  Not ringing a bell.
13       Q.  Okay. Or that it had been approved in
14 relation to Ebola. Does that ring a bell?
15       A.  I remember things about Ebola, but I do
16 not remember anything about J & J and a vaccine
17 for Ebola at that time.
18       Q.  Okay. And you don't remember, you
19 know, what went into the vaccine or doing any
20 research into the J & J vaccine, sitting here
21 today?
22       A.  I don't -- I don't recollect.
23       Q.  And your recollection of your research
24 into the mRNA vaccine is that you went on the
25 websites of Pfizer, Moderna, and there was a

Page 183

1  reference to gene therapy on their websites.
2        But you don't have a specific
3  recollection of anything else beyond that?
4        A.  I read -- I read their websites about
5  it. I just don't remember the details. I do
6  remember the gene therapy piece because it
7  resonated a chord with me. I definitely read it.
8  I just don't remember.
9        Q.  And you don't remember exactly what
10 that meant by gene therapy other than what you
11 testified to? I think you already provided some
12 testimony in relation to that.
13       A.  I did. And you know, like I said, I
14 looked it up. I am just not able to recall that
15 right now, the exact specifics and details.
16       Q.  Okay. And do you recall researching
17 whether the vaccines were effective or not at the
18 time?
19       A.  I think that we did speak to this
20 already. And if I remember right, I think, you
21 know, we were all trying to figure it out. I
22 think I spoke to the fact that we did have people
23 in the emergency room with COVID that had the
24 vaccine.
25            And I don't -- I was not watching the

Page 184

1  news during these times. I kind of stopped
2  watching the news in May of 2020.
3        Q.  Yeah. I know you spoke to your
4  anecdotal experience. I'm asking whether you
5  looked at the science, the research, the health
6  authorities, the CDC, the State, what they said
7  about it, or the actual clinical studies, what was
8  reported in terms of the effectiveness of the
9  vaccine.
10       A.  Well, I know -- at the time I know that
11 they were 95 percent. You know, I remember that
12 wording of things. I do know -- obviously since
13 then, Freedom of Information and more things about
14 the studies have come out and things. And I have
15 read them.
16            So, you know, it muddied the waters
17 here. But I know what they were saying and I
18 know -- I know that.
19       Q.  When you say 95 percent, that was the
20 95 percent to prevent severe hospitalization or
21 death. Do you recall that that's --
22       A.  I'm not going to recollect the details
23 of that, no. That was a number you heard a lot.
24       Q.  Okay. All right. And you don't recall
25 what it was in relation to, either prevent

Page 185

1  infections or severe hospitalizations or death.
2      All right.
3      A.  No.
4      Q.  And you've mentioned that you've done
5  some further research since that time.  What do
6  you recall of that further research that you've
7  done?
8      A.  I just read some of the actual
9  documents from the Freedom of Information about
10 the actual studies that were done by Pfizer and
11 things.  And I have not read them in detail, but I
12 have read some of them.  And you know, just seeing
13 what their numbers said and the dropout numbers
14 and things like that.
15     You know, I've looked into that a
16 little bit at this point now, more recently.
17     Q.  Why did you do that?
18     A.  Because I was curious.  In my clinical
19 practice, right now we are -- when we were seeing
20 some cases a couple months ago, the only cases
21 that we were seeing were people that were
22 vaccinated.  I just was curious whether they were
23 boosted twice, three, four, whatever the deal was.
24     When that Freedom of Information Act
25 information was released, I reviewed it just to

Page 186

1  see what the initial studies showed.  That's what
2  I did.  That's my research brain going into
3  action.
4      Q.  You don't recall any other details of
5  that at this time, of that more recent research?
6      A.  Specifically, no.  Not off --
7      Q.  Yes.
8      A.  -- the top of my head.  I just know
9  that I have read some and looked into it.
10     Q.  Okay.  At some point you received --
11 strike that.  Hold up.  I just want to pull up and
12 show you a couple of documents.
13     A.  Let me know when you have it.  I'm
14 looking away.
15     Q.  You don't have to look away.
16     A.  It drives my eyes batty so tell me when
17 you're ready.
18     Q.  I understand.  I understand.
19     (Whereupon, a three-page e-mail
20 thread re: denial notice and exemption appeal
21 was produced for identification as Gray Exhibit
22 5.)
23 BY ATTORNEY HENNESSEY:
24     Q.  I'm showing you a document which has
25 been premarked as Gray Exhibit 5.  Well, why don't

Page 187

1  you describe what that document says for the
2  record, what that document is, if you recognize
3  it.
4      A.  I do recognize it.  So when I received
5  the e-mail about the denial of my religious
6  exemption, it said I had five days to appeal it.
7  And my conclusion --
8      Q.  Go ahead.
9      A.  I'm sorry.  It was just moving again.
10     Q.  I'll stop.  Go ahead.
11     A.  Thank you.  My conclusion was that if
12 it was an appeal, it was another chance to explain
13 and further explain what they didn't -- you know,
14 it led itself to believe that an appeal committee
15 would take into consideration additional
16 information.  So I attached what I felt was
17 additional information to this.
18     And then I actually also did that -- my
19 supervisor had said are you writing anything.  I
20 said yes, I am.  So you know, and he said that's
21 good.  And that's kind of, you know, what I did.
22 And he wanted to know when I submitted my appeal
23 so him and Sarah were aware of when I submitted my
24 appeal.
25     Q.  And I should start with the bottom of

Page 188

1  the page.  It says that what I have at the bottom
2  of Gray Exhibit 5 dated September 23rd, 2021, that
3  was the initial denial of your religious exemption
4  request by the COVID-19 Religious Exemption
5  Committee.
6      Are you aware of what the committee
7  considered in terms of reviewing your request for
8  an exemption?
9      A.  You mean if they followed guidelines or
10 rules or anything?
11     Q.  Well, do you know what was discussed by
12 the committee members?
13     A.  Oh, absolutely not.  That was all kept
14 under lock and -- you know, you couldn't even --
15 it was nope, you can't know.  You don't know.
16 You're not going to know.  You'll get a decision.
17     Q.  Okay.  So you don't know what the -- do
18 you know who the committee members were in
19 relation to your vaccine request?
20     A.  At this point, no.
21     Q.  Okay.  And you don't know what they
22 discussed at the time or, you know, if they had a
23 meeting or what they discussed at that meeting.
24     Correct?
25     A.  Correct.  But in the discovery

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 189

documents, I now see their two-page paper with very informal guidelines.

Q. So you've seen some informal guidelines. But you don't know what specific facts were discussed at the time?

A. In discovery those documents were not --

Q. And you don't know whether there were documents or whether it was a verbal meeting, do you?

A. I do not.

Q. You've said -- this is your appeal, which the decision was made on September 23rd of 2021 and your appeal was within five days of that, on September 27th of 2021.

Do you believe that you provided everything that you would want to provide for the committee in relation to your exemption form and your appeal?

And when I say to the committee, there are two different committees; there's the Religious Exemption Committee and then the Appeal Committee.

Did you feel like you provided -- you had a chance to submit everything that you wanted

Page 190

to submit?

A. I don't know because I -- we didn't know anything. It was a shot in the dark. I know a colleague -- I heard a colleague somewhere along the line say that they didn't -- they just put an appeal in and didn't put anything. So there was absolutely no -- anything.

So I just felt like I should write something, because I felt like an appeal meant I had -- it was a chance for me -- I thought that they would be more, as their branding is at that time, be human, and I thought that there would be a little more human interaction or something. But it was just a form letter.

So I just kind of tried to explain a little bit more of the foundations, even though it was not my intent to go over every single thing. And I'm sure I left out a lot that I could have addressed.

It was -- like I said, it was more of a shot in the dark and I wanted just to have a voice. And I'm not sure they read it.

Q. Do you know -- okay. So you don't know what the Appeal Committee considered or whether they considered it freshly or if they reviewed it

Page 191

for any sort of error by the original reviewing committee?

A. I don't -- I don't know if they even read my e-mail.

Q. In terms of the -- after that -- let me just see here.

Following that, you received a denial by the committee. Before I -- you sent a copy of your exemption form to Sarah Heilman and, it looks like, William Belmonte.

Why did you send a copy to them?

A. You mean when I first submitted my --

Q. Yeah.

A. I just felt like they should have it. It was my immediate supervisor and it was my HR representative at Paoli.

Q. Did you --

A. In my thoroughness, I just figured these are two people I'm going to include on this. You know, there was a thought in my mind if they say they didn't get it or something happened or whatever, somebody else would speak to the fact that I submitted it on 12:06 on September 11th, 2021.

Q. And so that was prophylactic, so to

Page 192

speak, that just in case somebody had --

A. And I was perfectly fine with them reading my religious exemption. Nobody else read my religious exemption but me. Hopefully, they read it.

Q. Did you have any understanding in whether they were involved in the decision-making process at any time?

A. It was very clear that they were not in the COVID Vaccine Exemption Committee. It was like a secret society, is the way it was kind of referred to if you asked the question. That's the sense I got from it. That's my interpretation.

Q. Do you know why it was considered by a separate committee and not by individuals who you may have known and interacted with on a daily basis?

A. I'm sure that they were trying to seem what they thought would be -- you know, that was the process. I'm not going to -- I'm not going to criticize their process. That's the way they wanted to do it, and you weren't ever supposed to know who was on your committee that reviewed your exemption.

We see from discovery, I can find that

Karasch                                                   Page: 51 (189 - 192)

Page 193

1  out now.  But I did not know at the time.
2       (Whereupon, a one-page appeal denial
3  e-mail was produced for identification as Gray
4  Exhibit 8.)
5  BY ATTORNEY HENNESSEY:
6       Q.  I've put in front of you an exhibit
7  which has been premarked as Gray Exhibit 8.
8       Do you recognize this document?
9       A.  That was when my appeal was denied.
10      Q.  Okay. did you have any understanding at
11 the time whether the appeal was -- the denial of
12 the appeal was the end of the process, or was
13 there any indication ever given to you that --
14 (breaking up...)
15      ATTORNEY DALLER:  Brendan, you're
16 breaking up.  Your question is not understandable.
17      THE DEPONENT:  Yeah, you're breaking
18 up.  I couldn't hear any of that.
19      ATTORNEY HENNESSEY:  Okay.  I can
20 rephrase that.
21      THE DEPONENT:  You're breaking up.
22      ATTORNEY HENNESSEY:  Okay.  Hang on one
23 moment.   (pause in proceedings.)
24 BY ATTORNEY HENNESSEY:
25      Q.  All right.  Can you hear me a little

Page 194

1  bit better now?
2       A.  I can hear you right now, yes.
3       Q.  Okay.  I may have to be careful when I
4  share documents to take it down because I
5  understand that that can interfere with the
6  connection.
7       In terms of the -- were you ever told
8  that there was any additional process beyond the
9  policy which allowed for the submission of a form,
10 decision by the initial Religious Exemption
11 Committee and then an Appeals Committee; does
12 anybody indicate at any time that there was
13 anything beyond that?
14      A.  I did -- in my documents that I
15 produced, I did have an e-mail that says, you
16 know, per Bill's -- I think it said Bill's
17 recommendation that I reach out to you and meet
18 with Sarah and Bern.
19      So on his recommendation I did that.
20 We scheduled a meeting.  And I believe I sent that
21 e-mail on October 8th, and I believe that we had
22 the meeting on the 12th.
23      (Whereupon, a four-page e-mail thread
24 was produced for identification as Gray Number
25 9.)

Page 195

1  BY ATTORNEY HENNESSEY:
2       Q.  Is this a copy of that e-mail that I
3  have in front of you?  It's marked as Gray Exhibit
4  9 at the top of it.
5       A.  Yes.
6       Q.  Now, the way this was produced to me in
7  discovery is it had a policy attached to it.  Was
8  that attachment in the original e-mail?
9       A.  No.  I took that to the meeting with
10 Bern and Sarah.
11      Q.  Okay.  So that wasn't attached to the
12 actual e-mail at any time?
13      A.  No.  There is no attachment on that
14 e-mail.
15      Q.  Okay.  And you said that you had a
16 meeting with -- when you say Bern, I assume you're
17 referring to Bernadette Weis?
18      A.  Yep, that's Bern.  And Sarah.
19      Q.  And Sarah Heilman.  Yes, I understand.
20 Tell me about what happened at that meeting.
21      A.  So, we met and I just said to them I'm
22 coming to you to see -- two -- I said I was coming
23 for a couple of reasons.  The first was that
24 according to that policy that I had in my hand, it
25 said that, you know, if I felt that I was being

Page 196

1  discriminated against that I should meet with HR
2  and communicate that and see if there's an
3  accommodation that could be made.
4       And I also met -- the other part of the
5  meeting with them was to discuss through if there
6  could be any accommodations to be made.  And you
7  know, we talked about my thought process and
8  religious beliefs and things from there -- I mean,
9  that's what we did.  We discussed that.  And we
10 had some back and forth.
11      And at the end of the meeting Sarah
12 just said you know, Dawn, I feel like we should
13 see if there is anything else where we can address
14 this further with, you know, somebody else or
15 higher men or something like that.  I don't
16 remember the exact words.  And I said okay, I
17 would really appreciate that.  And I said when
18 will I hear.  She said you should know by the end
19 of the day or tomorrow.  And then I did -- I
20 thanked her for that.  She thought that my belief
21 was genuine.
22      And then I met with.  I received a
23 phone call with Bern.  We did a little bit of
24 telephone tag.  I think she called me and I wasn't
25 home.  I called her back.  And then she called me

Page 197

back. And she just called and said that all
decisions are final. Have a good day.

Q. Now, didn't they make it clear to you
at the meeting that they were not the ones that
made the decision on this issue, correct,
Bernadette and Sarah?

A. They did.

Q. And Sarah said that she would review it
with somebody else at another time. Was that in
--

A. I'm not sure what the question -- I'm
not sure what the question is.

Q. You testified that Sarah told you that
she would review it with somebody else and get
back to you?

A. Sarah said that she felt like that I
had -- that my belief was genuine and that she
wanted to see if there was any other consideration
that could be made. I believe -- I can't -- I
don't want to misspeak her. I don't want to
misspeak Bern in the meeting.

But that was my take-home from that
meeting. And that's when I said when will I hear.
And she said she was going to take it to see if
there was another administrative or something

Page 198

pathway. And that's when she said you'll hear
either later today or tomorrow.

Q. Did Sarah ever tell you that she had
reviewed your exemption application form?

A. I don't recall.

Q. Okay. You had some follow-up e-mails
with Sarah after that. Correct?

A. Yes.

Q. Do you recall what they were about,
sitting here?

A. I thanked her for her kindness and
consideration. And I believe a lot of them were
about paychecks, what's the process, how's it
going to work on November 1st. I like to be
prepared. Paycheck time. Is there a difference
between resigning and being terminated.

I think -- you know, there was a couple
back and forths there between Sarah and I.

Q. See if this -- sorry. That's not it.
We'll see if this -- give me a moment.

(Whereupon, a four-page e-mail thread
with HR was produced for identification as Gray
Exhibit 10.)

BY ATTORNEY HENNESSEY:

Q. I have a document which has been marked

Page 199

Gray Exhibit 10 in front of you. And there
appears to be an exchange -- and I'll stop
scrolling for a minute -- of e-mails between you
and Sarah.

These are over a period of time that
stretches from -- we'll start at the top,
October 14th, I believe, and I think it goes all
the way to October 22nd.

Do you see those documents?

A. I was not looking at it when you were
scan -- scrolling through them. Could you get rid
of the X for me again, please, on the left?

Q. Yep.

A. Okay.

Q. You had asked there on October 14th, "I
do have another question. Can you explain to me
any difference between being terminated and
resigning with regard to my basic time and
pension?" Do you see that there?

A. I do.

Q. Why did you ask that question?

A. Because I knew that I was not going to
get the vaccine before November 1st and I knew
that once I was terminated, I would not have
access and I wanted to have my questions answered.

Page 200

Q. Okay.

A. Question.

Q. Was there a discussion about
potentially resigning at some point?

A. With whom?

Q. With Sarah.

A. No.

Q. With anybody else?

A. My husband and I maybe, probably.
That's probably why I asked. I'm trying to
recollect. It seemed like it was a question I
needed to ask. I had a lot of basic time. I had
21 years in a pension.

Q. Okay.

A. And to me, you make financial
decisions, and I needed to have some answers. I
didn't know. I didn't know the answers to those
questions and I needed to know.

Q. On October 19th you had an e-mail here
where you said, "Maybe the rumor mill" -- I think
you meant to say "is flowing. But I would be
remiss to not reach out once again. I hear on the
street that people have been denied two times,
continue to submit until they are acknowledged and
have different results. Can you tell me if I

Deposition of Dawn Gray                                      Dawn Gray v. Main Line Hospitals, Inc.

Page 201

1  should continue to resubmit?"
2        Where did you hear that from, that
3  people who had been denied two times continued to
4  submit and have different results?
5    A.  The rumor mill.  Just different
6  conversations and comments that were made.  I do
7  not recollect who they were.  It was just hey --
8  comments were being made.  There was talk out
9  there.
10        I did not, on the units, during my --
11  once I knew, I did not tell the staff.  The staff,
12  some of them may have guessed.  But I did not tell
13  the staff anything or speak to it until my last
14  safety huddle on my last shift.
15    Q.  And did Sarah -- do you recall how she
16  responded?  I mean, we can go to that, as to what
17  there would be additional --
18    A.  You have the e-mail there.
19    Q.  Okay.  Right.  It says here that those
20  employees -- she does not know of any decision
21  after the appeal process was final that was
22  changed.  Correct?
23    A.  That is what she states.
24    Q.  And she didn't give you any indication
25  that there might be a -- different outcome.

Page 202

1        Correct?
2    A.  In this e-mail?  No.
3    Q.  And so she also said here that, "I'm
4  always open to provide a listening ear and also
5  answer any questions you might have.  If you do
6  come to a final decision to leave, it will be a
7  sad day if that happens."
8        It seems to me like she was kind of
9  rooting for you, in a way.  Is that accurate?
10    A.  I would think that.  I was pleasantly
11  surprised in the discovery documents to see that
12  when she forwarded my termination papers that she
13  said please process, this is a sad one for me.
14  That meant a lot.
15    Q.  And your interactions with Sarah
16  Heilman and Bernadette Weis as well as
17  Mr. Belmonte, they appeared to be genuinely
18  concerned for you.
19        They didn't appear to be discriminatory
20  or anything of that nature.  Correct?
21    A.  I would need you to explain that
22  further.  I don't know what you're asking me.
23    Q.  Well, do you think that anybody you
24  interacted with had any sort of negative animus
25  towards you?

Page 203

1    A.  Can you describe negative animus?
2    Q.  Well, had they, you know, expressed to
3  you that -- and I'm talking about the individuals
4  that you had interactions with such as I'd
5  mentioned, Bernadette Weis, Sarah Heilman, I
6  believe your supervisor, that they expressed
7  direct animus towards you, like that they
8  expressed negativity towards you?
9    A.  In relation to what?
10    Q.  Your religious beliefs, your vaccine
11  exemption request, anything of that nature.
12    A.  No.  Sarah and Bill were absolutely
13  supportive.  I would say that at times my
14  relationship with Bern was torturous.  Did she
15  ever say anything?  No.
16        I do very vividly remember -- and I did
17  include this in an e-mail to Rays Koshy of PHRC
18  that we turned over in discovery, that my last
19  shift, there was a -- what was a very
20  uncomfortable moment for me with her.
21        But I'm not going to say that she --
22  she never said a word.  Nothing spoken.
23        I do see Sarah's statement that you
24  didn't read in that e-mail, which says, "I do
25  appreciate that you have been respectful and

Page 204

1  professional throughout this very difficult
2  situation, and it breaks my heart that you are
3  continuing to be so troubled by this situation."
4        That was very nice of her.
5    Q.  Okay.  So you didn't feel as if Sarah
6  was trying to push you out or anything of that
7  nature.  Correct?
8    A.  No.  I think Sarah really wanted me to
9  stay.
10    Q.  Okay.  In terms of -- it appears that
11  you -- well, let me -- let's talk about that.  You
12  said you had an uncomfortable interaction with
13  Bernadette.  Tell me about that.
14    A.  It was uncomfortable for me.  So as I
15  said, my relationship with Bernadette was
16  torturous at times.  For the most part, you know,
17  I strive to get along with everybody and show
18  God's love.  But you know, as with everybody, we
19  have moments.
20        And on my last -- you know, I'd never
21  had a lot of interaction with Bern when she was
22  president -- vice-president of patient services.
23  She would come down on the unit.  She would talk
24  to other staff.  Never really sought me out.  If I
25  was in a group, we would -- you know, I'd be

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 205

there. She never really made eye contact with me.

Now, there was a specific computer on the unit on pod A that the coordinators would tend to stand at because it was kind of where we did our job. We did our throughput. We looked in the waiting room. We looked at rooms. We took ambulance calls. We moved. But that was kind of, for me, where I went back to.

On my last day on November 1st, she just came up and I turned and all of the sudden she was just standing behind me. I had never had that. I kind of just kept doing my job, because I did perform my duties to the best of my ability until the last minute. And I finally turned to her, which felt like a lifetime but probably was only about 30 seconds, and I said can I help you with something. And she made a comment like no, no, no, I'm looking at the unit. Never, never in my years as a coordinator has that ever happened.

And then she proceeded, and I said yep, this is it, this is the day, like I do. She continued to stand for another period of time, enough that I then addressed her and said is there something I can help you with. She said no, and I walked away.

Page 206

In my e-mail to Rays Koshy, I actually said I'm going to assume goodwill and maybe she was trying to say thank you. I try to think the best.

Q. Okay.

A. It was a very unnerving experience for me.

Q. That was the uncomfortable interaction and that was your last day. So that's what you are referring to in relation to the uncomfortable interaction.

A. Right.

Q. You said you had kind of a torturous relationship with her. What was torturous about your relationship with her prior to --

A. Just our communication wasn't always the best. Some of our discussions. You know, she's very fair in my evaluations. You know, my evals speak for themselves. I was a dedicated employee. I performed at a high level.

It was just always -- it was just kind of a feeling. Some other staff sometimes would be like yeah, she doesn't like you. Yep, you guys do not get along. And I'd be like you know I get along with everybody.

Page 207

But those were just people's opinions and I did not put a lot of weight into them. But there was obviously something that other people also picked up on. So you know, one of those people was a coordinator for a time and was in the coordinator meetings when Bernadette was our manager. So she did see interactions and discussions. So you know, I'm pretty sure that's where she got her conclusions. But I -- they're her opinions. I can't speak to --

Q. Okay. In terms of kind of referring back to your communications with Sarah and you had asked if there was anything else that you could do, and she said that, you know, the process was final.

I understand that you did continue to try to seek an exemption. Is that accurate?

A. I sent one more letter, because from what I was led to believe in my meeting with Bern and Sarah was that it was just -- you know, there were evidently -- what we were told. Never saw this in writing.

But we were told that there were multiple groups of four that reviewed all of these exemptions. And for the appeal process, at that

Page 208

meeting with Sarah and Bern, they said you know, another group of four will see that and review it, read your exemption and see if they come to the same conclusion.

And when I read the e-mail -- I'm not going to say I read the policy, because I honestly don't think I ever did.

But when I read the e-mail on the appeal process, and it stated that it would go to the director of, you know, this and that. That was not what I was led to believe in my meeting with Sarah and Bern, which is why I did send that final letter.

It was, maybe in hindsight, a misunderstanding on my part. And because it was very secretive, I don't -- you know, you just didn't who was what. And I was led to believe that it was just a completely similar group, different group of four. And it did not, to me, meet the listing of what was in that document. So I sent it to those people.

ATTORNEY HENNESSEY: Did the court reporter get all that? I know there was a little bit of interference on my end. Did you get that?

THE COURT REPORTER: Yes, I did.

Page 209

1    ATTORNEY HENNESSEY:  Okay.
2    (Whereupon, a three-page letter to VP
3 Legal and VP HR was produced for identification
4 as Gray Exhibit 11.)
5 BY ATTORNEY HENNESSEY:
6    Q.  I'm going to show you another document
7 that's been marked as Gray Exhibit 11, which you
8 sent to Sarah.  And you asked her to send it to
9 the persons it was addressed to, which included
10 the senior vice-president of human resources and
11 senior vice-president of legal affairs, general
12 counsel.
13    Do you see that there?
14    A.  I do.
15    Q.  And she said, I think ultimately, that
16 she would do so.  I mean, down on this page.  I
17 hate to scroll so much for you.
18    But in terms of this letter, I just
19 have a couple of questions on it.  You state in
20 there, in your third paragraph that, "MLH is
21 bullying and trying to coerce me to change my
22 religious beliefs by asking me to still consider
23 being vaccinated."
24    Who were you referring to there?
25    A.  Well, we got e-mails that spoke to you

Page 210

1 can to speak to an ambassador.  If you haven't
2 gotten it, you can speak to this person.  You can
3 speak to that person.  I felt that it just was, at
4 that point, to me, it felt like they were beating
5 my dead horse.
6    I felt like I had already been --
7 that's how I felt.  It's a description of my
8 feeling.  And they just -- they said in those
9 e-mails if you would still consider being
10 vaccinated.  You know, they wanted to make sure
11 you knew the policy.  They wanted to make sure you
12 knew the consequences.
13    I felt that my religious belief was a
14 true, sincerely-held religious belief and I have
15 lived my whole life and have actions based on
16 that.  And I just felt that my voice was not being
17 heard and that we were not following some of the
18 core principles that Main Line has stood for.
19    Q.  Has anybody specifically --
20    A.  Delineated there.
21    Q.  You said that was kind of your sense of
22 it.  But was there anybody, any specific person
23 like Sarah or, you know, anybody who kept asking
24 you to get vaccinated that you're referring to, or
25 is that just based upon your receipt of

Page 211

1 communications in general, as you said?
2    A.  Yeah, you hear comments on the unit.  I
3 mean, you don't live in a bubble.  You know, and
4 walking around the unit there was a lot of talk
5 about things.  And you know, staff -- being staff,
6 as they are, you know, I just don't understand why
7 anybody just wouldn't get this.  This is
8 ridiculous.  Just get the darn thing and be done
9 with it.
10    You know, there was constant comments
11 like that.
12    Q.  Any comments by anybody, any
13 supervisor, manager in relation to you?  I
14 understand that there may have been comments like
15 that out there.
16    But was there anything that -- any
17 specific comments by specific people to you in or
18 in relation to you?
19    A.  I'm thinking.  Not that I'm
20 recollecting at this time.  I did -- maybe it was
21 just all the e-mails.  Maybe it was just the
22 constant in your face.  It was in every single
23 daily review.  It was in every single -- you know,
24 it was a lot.  The manager had to meet with me.
25 It was a lot.

Page 212

1    Q.  Okay.
2    A.  So I cannot recollect at this time if
3 there was.
4    Q.  Now, ultimately you had been told that
5 if you declined to get the COVID-19 vaccination
6 and didn't receive an exemption, and you did not,
7 that you would be terminated.
8    And I understand that you were
9 terminated on November 1st of 2021 as a result of
10 the COVID-19 Vaccination Policy.
11    Is that accurate?
12    A.  Yes.
13    Q.  Did you keep your pastor up-to-date in
14 relation to what was happening and the potential
15 termination?
16    A.  I believe that I've included -- I
17 included those e-mails.  Some of these e-mails my
18 husband wrote because I was at work.  So you know,
19 you have that, what I communicated with Pastor
20 Harry.  He did -- his interim time was over.  So
21 he kind of left.
22    Q.  Do you recall telling him that you had
23 decided to file a lawsuit at some point?
24    A.  Probably.  I would imagine I did.  He
25 would, every Sunday after church that I was there,

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 213

come up and pray with me and we would talk.

Q. When was it that you first decided to file a lawsuit?

A. That I was going to file a case with the EEOC and the PHRC?

Q. Sure. That's clear. Yes.

A. I knew when my appeal was denied that there was a very strong likelihood that I would be terminated. So I started making many phone calls, because it takes an extended period of time to get through.

And so in, I believe it was in the last week of October. That's my recollection. It's an approximate. I believe I finally got through and I made an appointment to speak with a PHRC representative on November 2nd. So I knew early. I knew that I was going to go to --

Q. So you had arranged that meeting before your last day, with the PH --

A. I had, knowing that I could cancel it if there was a reprieve or God chose to intervene.

Q. There were, I understand, a number of individuals who were interacting about the exemption process and trying to obtain an exemption, many of whom met in-person in different

Page 214

locations.

Did you interact with any of those individuals? And we've talked about your meeting with Sara Slattery, you know, Cathy Lasure.

A. Don't know her.

Q. Don't know her. Were there any individuals that you interacted with other than Sara Slattery about a potential lawsuit or your experience with the COVID vaccine exemption process?

A. No. As I said, I'm a private person. And I considered it a God incident that I even was able to even hook up indirectly with Sara to get Mr. Daller as a resource for me. No, I did not.

Q. In relation to that hookup you referenced with Sara Slattery, I recall, and you can tell me if I'm wrong, that Sara Slattery gave you John Daller's information and suggested that you tell him that you have 14 days.

Do you know what that was a reference to, the 14 days?

A. Yes. That was -- I had 14 days to appeal the Main Line Health, whatever they denied the response. I was on a timeframe. That's when she sent in an e-mail Mr. Daller's information to

Page 215

me, which I included.

Q. So this was in reference to unemployment compensation? I'm trying to -- let me see if I have that.

A. No, it's not with unemployment compensation, because I was granted unemployment compensation on December 1st. I was awarded unemployment. So it was not about unemployment compensation.

I believe it was on something to do with the PHRC. Because Rays Koshy had sent me an e-mail saying something about you have 14 days to appeal this decision or something, this something. I don't remember. I would need to look at the documents to know what.

But I knew that I had timeframe that I needed to work within. I had a deadline.

Q. All right. I'm just going to show you that document quickly. Hang on one moment. Let me make sure I have it up in the right place.

(Whereupon, three pages of Slattery e-mails were produced for identification, to be post-marked as Gray Exhibit 12.)

BY ATTORNEY HENNESSEY:

Q. I'm showing you a document which -- it

Page 216

doesn't look like it's premarked. I have it -- we will call it Gray Exhibit 12. And it's got a Bates -- well, it doesn't have a Bates on it for some reason. It was produced by your counsel in Response to Request to Produce Number 28?

Does this reflect the e-mail that we were just talking about?

A. Yes.

Q. And it says, "Explain that you have 14 days. Talk with him first."

A. Yes.

Q. Okay. All right. So that's what we were referring to. And you're not exactly sure what the 14 days meant?

A. I know that I had the 14-day deadline with something with Rays Koshy, which obviously was PHRC related. And that's why -- you know, and I went from there.

(Whereupon, a ten-page First Amended Complaint was produced for identification as Gray Exhibit 14.)

BY ATTORNEY HENNESSEY:

Q. And it does appear, based upon this -- I have put in front of you what has been premarked as Gray Exhibit 14. This appears to be an amended

Page 217

1  complaint --
2      A.  Yes.
3      Q.  -- which was filed on your behalf, it
4  looks like probably about 14 days later.  Well,
5  within that time period, February 28th of 2022.
6      And this was filed after you hired
7  Mr. Daller?
8      A.  Correct.  He's on that document.
9      Q.  Okay.  There is an allegation in here
10  which was not raised previously to this time in
11  relation to age discrimination.
12      Tell me what is your age discrimination
13  claim based upon?
14      A.  So I know in the emergency department,
15  that five people applied for an exemption.  The
16  one applied for a medical exemption.  She was
17  denied.  She appealed it.  She was denied.  And
18  then she applied for a religious exemption.  It
19  was granted.  She was 20, maybe 30.
20      I know that there was another nurse
21  that applied for a religious exemption.  She was
22  also young.  So a Corey and then a Carrie.  Then
23  the two others that got a religious exemption, I
24  was the only one in the ER that did not get a
25  religious exemption.  The other person that did

Page 218

1  not get an exemption in the ER did a medical, and
2  she was denied as well.
3      Q.  Who were the two others that did get an
4  exemption in the ER?
5      A.  Corey, Carrie, Julie and Andrea
6  Gazillo.
7      Q.  What were their ages?
8      A.  I don't know their specific ages.  I
9  don't have their birthdays.  I don't wish them
10  happy birthday.  I do Julie Grimm.  I know her
11  birthday is November 9th, but I know she's younger
12  than me because I know that we had a birthday
13  party for her when she turned 30 and I was not 30.
14  So...
15      Q.  Were any of them over 40, in your
16  estimate?
17      A.  I'm -- I'm horrible with that, with
18  guessing ages.  At this time could Julie have
19  been, or Andrea?  I suppose those two could.
20  Corey and Carrie, absolutely not.
21      Q.  It's not your testimony -- I mean, you
22  testified that you were terminated under the COVID
23  Vaccination Policy.  It's not your testimony that
24  somebody selected you because of your age, not to
25  approve your exemption application?  Or is it?

Page 219

1      I'm trying to understand that.  I mean,
2  you testified that even a couple of people who
3  were younger were granted exemptions.  You're not
4  sure of the other two in your department, what
5  their ages were.  They could have been over 40.
6      But you're not saying that you, Dawn
7  Gray, were selected as someone not to give an
8  exemption to because of your age, are you?
9      A.  I don't know that.  I don't know.  You
10  know, I don't know.
11      Q.  Okay.  You don't know one way or the
12  other if --
13      A.  I sought counsel and I moved forward
14  from there.
15      Q.  Those other individuals, you said that
16  they were in the ER department.  What did they do
17  in the ER department?
18      A.  They were all nurse -- staff nurses.
19      Q.  All right.  Would you consider yourself
20  a staff nurse in the ER?
21      A.  I was a clinical coordinator.
22      Q.  None of them were clinical
23  coordinators.  Right?
24      A.  Correct.
25      Q.  Do you have any other facts or any

Page 220

1  facts really that would support you were
2  discriminated against based upon your age?
3      A.  I know that it was, again, rumor mill
4  talked about.  Other people were much more open
5  and new trends that were at different facilities
6  and things like that.  The suggestion was out
7  there.  Do I know facts?  Absolutely not.
8      Q.  I'm asking about -- I'm asking about
9  facts, not the rumor mill.  So if -- if you have
10  any facts to support that it was because of your
11  age, that's what I'd be interested in.  Anybody
12  you know, you feel discriminated against you
13  because of your age?
14      A.  I do not have any statements.
15      Q.  Okay.  Now, you say statements.
16  Statements or any other facts; other than what
17  we've talked about, there's nothing to support
18  that age was a factor?
19      A.  According to my knowledge, that is a
20  true statement.
21      Q.  Are you currently working?
22      A.  I am.  Suburban.
23      Q.  And when did you get the job at
24  Suburban?
25      A.  I believe I applied for the job -- I

Page 221

1  was just looking at this, so the dates will be a
2  little fresher. I believe I applied 12/5/21. I
3  believe I had a phone interview very quickly after
4  that. It was the holiday time. I was moving.
5  Packing.
6          I believe I started submitting
7  documents, getting my FBI clearances, those
8  things, over Christmas, New Years. Suburban is,
9  I'm going to say unique. I don't know if it's
10 unique. But they do -- crime does not allow
11 external e-mails to enter their servers, even in
12 the case of job applications.
13         So there was definitely some phone
14 calls of hey, I sent my -- I sent this and that
15 and they said we didn't get it. And they said
16 what's your e-mail. You know, we went back and
17 forth.
18         So they don't accept things from like
19 G-mail. So there was some weird delays in there
20 of that. So the dates are a little confusing.
21 They're not fresh in my mind.
22         But I do know that I was obviously
23 offered the job. I signed it. I want to say I
24 did that end of December, maybe the beginning of
25 January. I don't know. But then it was time for

Page 222

1  me to start working.
2      Q.  It seemed like that happened pretty
3  quickly. Did you start looking for a job?
4      A.  Well, when you are in the unemployment
5  process, you have requirements that you need to
6  meet. I knew that there was an income concern for
7  us.
8          You know, I did not know the house sold
9  at that point still. I don't think we knew that
10 it was officially sold until, you know, the closer
11 to the beginning of 2022, end of December of '21,
12 beginning of '22.
13         So you know, I was looking. I was
14 scrambling. When I first started looking, I only
15 looked for a comparable job because I liked the
16 combination of a little leadership and clinical.
17 I did. There just did not seem to be a lot out
18 there.
19         I did put out -- you know, a couple of
20 weeks. I believe I did more. I had my three a
21 week. I had to be either interviewing, networking
22 or searching and putting in applications. I think
23 I had to do three a week. So I was doing that in
24 addition to, you know, packing, moving.
25         And then I also was selected into this

Page 223

1  unemployment RESEA program, which had other
2  requirements that I had to fill out, that I was
3  one of those supposedly random people. I don't
4  know how they picked it, but I got to do that,
5  too. So I had other work that I had to do.
6      Q.  Tell me about that. You have said so
7  many things that I have all these follow-up
8  questions.
9      A.  It was a program. I received notice
10 that I was enrolled in it. And I had to meet with
11 a representative of the program. Those e-mails
12 are in the discovery. His name is Michael. I had
13 to meet with him, and then I had to sign up for
14 seminars to help me find a job.
15     Q.  So it was an additional layer of
16 service by the unemployment department, I
17 understand, in helping individuals who are
18 selected find another job?
19     A.  That was the intent, yes.
20     Q.  Did it help you at all?
21     A.  Negative. It was a waste of my time
22 because they wanted me to take a class on Outlook
23 e-mail.
24     Q.  Yeah. I mean, you did find another job
25 pretty quickly. It seemed like you provided

Page 224

1  applications that you sent ahead of time in with
2  your discovery.
3          Were there other places that you had
4  interviewed beyond Suburban?
5      A.  Sure.
6      Q.  Where else did you have interviews, to
7  your recollection?
8      A.  So off the top of my head, I had one
9  with a Dan. I had one with a Tracy. I believe
10 Tracy was DaVita.
11     Q.  I'm talking about institutions. You
12 said and Tracy. Where are their --
13     A.  Tracy, I believe, was DaVita.
14     Q.  DaVita. Okay.
15     A.  I believe that I applied -- I applied
16 to Tower Pottstown. I applied to Prime
17 Roxborough. Interviews.
18     Q.  And Tower would have been, I think,
19 Phoenixville or was it different --
20     A.  No. I actually never heard back from
21 anybody at Phoenixville. Tower was Pottstown.
22     Q.  Pottstown. Okay. So you did interview
23 at Pottstown?
24     A.  And I never heard back from him after
25 the interview. He was supposed to get back to me

Page 225

1  and he never did.
2       I did have an interview with a
3  correctional facility. I had several. I had
4  several interviews.
5       Q.  Okay.  You had several -- did you get
6  any other job offers?
7       A.  DaVita was probably the one that was
8  most willing.  I had -- their application was also
9  I had to take a two-hour test even to apply.
10 That's crazy.  I'm like holy moly.  They gave me
11 quite a bit of information.
12      I think I might have had more than one
13 call with Tracy, I think actually.  And I believe
14 they said they would consider hiring me, and I did
15 decline that.
16      Q.  And that would have been -- do you know
17 what the pay would have been at DaVita?
18      A.  It was a salary and I want to say it
19 was 70ish.  70 maybe.  70,000 a year.  It was 70
20 to 80 I might have written on my scratch notes,
21 something like that.  It was less.  It was five
22 days a week.  It was all remote.
23      It -- you know, I didn't feel like it
24 was worth me to change my whole lifestyle and
25 priorities with my husband, and now I had to go to

Page 226

1  five days a week for less pay.  And I was already
2  moving forward with Suburban in the temporary
3  position.  I told her if this falls through or
4  something else, I'll re-contact you.
5       Q.  How many days a week did you want to
6  work?
7       A.  I wanted to remain part time.
8       Q.  Okay.  So that would be two to three
9  days a week?
10      A.  Yes.
11      Q.  And you limited yourself to just
12 looking for part time, two to three days a week
13 essentially.  I mean, you got these offers which
14 is more --
15      A.  Well, I applied to jobs because I
16 learned early in the process that you applied and
17 there were some times where you spoke to people.
18      So when I applied for the Suburban job,
19 it was listed as full time.  It actually was
20 listed as full time.  And money -- and I don't
21 remember if it was full-time nights.  But I -- you
22 know, I applied.
23      And when they called me, I said let's
24 talk.  I said I'm not doing night shift, what do
25 you have.  I rotated night shift for 18 years, and

Page 227

1  night shift and Dawn do not get along.  She vomits
2  every night from 2:00 to 4:00  So that was really
3  not an option.  Theirs was a full time.  And I
4  said do you have a part time.  Suburban did.
5       I found that's not uncommon, as I've
6  learned since.  I've got a little bit of standing
7  or whatever.  Sometimes they actually -- some
8  people use that.  I've heard from somebody else
9  that they use that as a screening method to narrow
10 down the applicants.
11      ATTORNEY HENNESSEY:  Okay.  You know, I
12 just -- I probably drank too much coffee at the
13 last break.  So we're just going to take a
14 five-minute break, if that's okay?
15      THE DEPONENT:  Five minutes is fine.
16      ATTORNEY HENNESSEY:  It's 2:52 p.m.
17 Let's just say at 3:00, to make it even.  I'll
18 come right back.  Okay?
19      THE DEPONENT:  Okay.
20      ATTORNEY DALLER:  Sounds good.
21      ATTORNEY HENNESSEY:  Thank you.
22      (Whereupon, a recess was taken from
23 2:53 to 3:04 p.m.)
24 BY ATTORNEY HENNESSEY:
25      Q.  All right.  Let's get back to this.  I

Page 228

1  don't think I have that much to go through.  I
2  mean, there's one area that could take a little
3  while.
4       We have already talked about some of
5  the offers you received.  You would have had an
6  offer from DaVita.  You had an offer from
7  Suburban.  And that meant ultimately you
8  negotiated part time.
9       And the part time with Suburban, is
10 that similar to the 60 hours a pay period, as you
11 had at Paoli?
12      A.  So when I took the Suburban job, for
13 the first 12 weeks it was a temp job.  So for the
14 first 12 weeks I got 90 bucks an hour.  Then at
15 the end of the 12 weeks, they were doing an
16 overhaul and changing things and whatever.  So the
17 temporary program that used to continue for, you
18 could do it up to three or four times, went away.
19 And I did take a part-time staff position.  Like I
20 said, it's union.  So there was no --
21      I did negotiate a little bit for myself
22 because they wanted me to start lower on the union
23 scale, and I said absolutely not.  I have over 30
24 years experience.  I am masters prepared.
25      So they put me at the second to the

Page 229

top, which is like 51-something.  The next time
came that the union allowed for people to be
bumped up, I was immediately bumped up to the 52
bucks an hour.

Q.  Is that what you're getting paid now,
52 an hour?

A.  Fifty-two-odd-something, yep.

Q.  All right.  Fifty-two and change an
hour.  Previously it was -- and it was just the
temporary program partly to recruit nurses, I
guess, the $90 an hour.  Then that went away.

A.  Yeah.  They were -- they needed staff.
Yeah.  That's a recurring problem for them.

Q.  Yeah.  I understand.  That's true for
clinical nursing; there's a staffing shortage
throughout.  Correct?  Or there has been in the
past couple years.  Is that correct, from your
experience?

A.  We never had a problem at Main Line's
emergency room.  People wanted to work there.

Q.  Okay.

A.  Suburban is always probably going to
have some problems due to the type of clientele
and the issues that they have there.  But yeah.
We have travelers there constantly.

Page 230

Q.  How many hours did you negotiate to
work at Suburban after you did the part time --
and maybe split it up between that temporary
period and then that part-time period that you
negotiated?

A.  I've done .6 at Suburban.

Q.  .6.  So .6 throughout?

A.  Correct.

Q.  Any other offers besides Suburban and
DaVita?  I think we talked about maybe having the
AFLDS.

A.  American Frontline Nurses.  A-F-L-N?

Q.  Maybe it's AFLN, yeah.

A.  There's a difference between the two.
AFLN, I did take -- they had a training thing.
It's more of a self-employed entrepreneur kind of
position.  If you wanted to do that, they had
different levels that you can be involved at.

And I very quickly opted out of any of
those positions to do that.  So even though I went
through the training and things, I'm, you know,
kind of what they call it, a -- I don't know what
they call it.

I do get some of their e-mails.  I can
attend their weekly meeting, if I want; which it's

Page 231

not weekly anymore.  It's like every other month
or something.  But I don't -- I don't earn any
money through them at all.

Q.  I just want to ask you about that,
because there were some documents produced, I just
want to review quickly with you, from AFLN.  I
don't have these premarked.  And you know, I don't
know that we need to use them as a formal exhibit.

But I'll represent that these were
produced from your counsel as a part of the
discovery, and you might recognize these documents
that you turned over.

You know, actually I can pull up and
show you ones that I have premarked.  Hang on one
moment.  This has been premarked as -- or it's
been saved as 16.  We'll call it Gray 16.  I
believe it has the same documents in there.  No,
it does not.  Maybe it's 15.  Hang on.

We're looking at what was saved, and
I'll produce it, as Exhibit 15.

(Whereupon, 47 pages of job search
and e-mails related thereto were produced for
identification, to be post-marked as Gray
Exhibit 15.)

Page 232

BY ATTORNEY HENNESSEY:

Q.  It looks like there's an application
for AFLDS.  So I've been getting that wrong.  You
said they're two different organizations.

What is AFLDS?

A.  American Frontline Doc -- it's for
doctor.  AFLDS.  American Frontline -- drawing a
blank.

Q.  That's okay.  This looks like something
that you uploaded.  It says here, application for
AFLDS, 12/17/2021, uploaded to application file.
No response.

So you received no response to them --
from them?

A.  This was a -- an opportunity I saw.  I
had looked at the American Frontline Doctor's
site.  I don't recall it now.  I don't know what
it's called now.  Anyway, I looked at it.  And
they sent out on one of their notices that they
were considering opening some urgent care and
things in different states, and if you were
interested to put in an application.  And I was
putting in an application.

So I checked a box for unemployment to
put in an application and I never heard from them.

Page 233

Q. And that was kind of a patriot organization?

A. Yes.

Q. Okay. And it was an organization that you were following at the time?

A. I mean, I had -- yes, I had some familiarity with them. My brother -- well, I shouldn't say my brother. We had -- we knew of them.

Q. Okay. And you say here, "My life was turned upside down in November when I was fired from my 21-year-job as clinical coordinator."

And then ultimately you say, "because my religious exemption was denied."

Then you go on to say, "Working with like-minded individuals on a care team would provide inspiration and motivation for me to continue serving in a profession I am passionate about.

"I have followed AFLDS since the early in the pandemic and would be honored to serve alongside fellow patriots who desire to return patient-centered care to the medical profession."

Do you see that there?

A. I do.

Page 234

Q. So you did follow them from early in the pandemic.

A. I did. I would get -- if they would put out an e-mail, I would get that. I did not follow them because I don't do social media and I don't do any of that. But that's what I'm -- for me, that's what following means.

So you know, here you can click to receive e-mails from different people if you got an e-mail, and I did do that.

I do believe that healthcare is broken, and I do think that we have lost the focus of patient-centered care in healthcare.

So that's a true statement. I still feel that today. I still think healthcare is broken.

Q. Are you aware that that organization has been investigated by -- well, the state of California, for example, for promoting non-scientific -- (connection unclear) -- its information campaigns, such as promoting ivermectin or hydroxychloroquine.

Are you aware of that?

A. I'm not aware of everything you said in that statement. And you cut out a little.

Page 235

Q. Did I go out there?

A. You put a lot of stuff in that statement. I know nothing about California that you're speaking of. I have -- I do know of ivermectin/hydroxychloroquine. We used it directly from AFLDS. Oh, I mistyped it there. AFLDS.

I'm not going to recollect that. But you know, there is obviously, to this day, still some talk. Ivermectin is on the CDC website as an accepted treatment. It's still listed there.

Q. What's your view of ivermectin?

A. I think that the approach that I saw and heard, which was treat late, went against every principle I learned in my nursing career, which was you catch things early. You don't wait. You don't wait until a patient is blue and hypoxic. You intervene earlier.

What that means in terms of medical COVID, I don't have the medical expertise. It's not in my scope of practice. But I think in that way, that's my kind of referral to that healthcare is broken. I think that that approach, waiting until somebody was at that state to address something just still feels wrong to me.

Page 236

Q. So you think using ivermectin as a preventative measure would be an inappropriate method of trying to avoid a severe infection of COVID-19?

A. I didn't say that. That's beyond my scope of practice.

Q. Well, I'm inferring because you -- it was kind of a vague statement.

My question was how you felt about ivermectin. Did you -- have you had -- well, tell me.

Just because you didn't say that; you didn't say that what I said was wrong, did you feel that ivermectin could be an appropriate choice by a patient in relation to treating for COVID-19?

A. I think that many different avenues for early treatment should have been looked at. I'm not saying that ivermectin was the cure. That's beyond my scope.

But I do know that the underlying feeling was that we are not going to treat early. I know for a fact in my emergency room, the very pandemic, we, meaning the doctors -- I never did -- but they prescribed hydroxychloroquine. We

Page 237

1  gave some in our emergency department.  And then
2  we never did again.
3        Don't remember the dates.  Don't
4  remember the details.  But then, like I said,
5  that's not my scope of practice.  But then we did
6  nothing early prevention at all.
7        And where I work now, we do some
8  Paxlovid™.  I always say that wrong.  We do do
9  some Paxlovid™ when indicated for higher-risk
10 people a little bit earlier than I believe we did
11 earlier in the pandemic.  So there is a little
12 turn towards a little more early treatment.
13       But that's what -- when I refer to
14 patient-centered care and things like that, I was
15 referring to that.  I was not referring to
16 specifically to ivermectin.  I was just speaking,
17 you know, late treatment versus early treatment.
18    Q.  Would you take ivermectin?
19    A.  I would look into it.  I would have to
20 investigate it and consider it and look into it.
21 I have not had the need.
22    Q.  You said preventative.  So you didn't
23 take ivermectin or hydroxychloroquine or anything
24 of that nature at any time?
25    A.  As a -- no.

Page 238

1     Q.  And you would look at --
2     A.  I do -- I should say, though, that I do
3  have a face cream that I use for my rosacea that
4  the copay went from $35.00 to $780.00.  I did a
5  little research on that, and I think it has some
6  derivative, I think, of ivermectin.
7        So I just -- I did in that sense.  But
8  it wasn't for COVID.  I used it well before COVID,
9  and am not paying the copay to get it renewed.
10 Not worth it.
11    Q.  Okay.  Did you -- you know, going back
12 to the AFLDS.  That's a political organization,
13 correct, to your knowledge?
14    A.  Um, the position I applied for was a
15 clinical position.  What this is in reference to
16 was a clinical position.  So that was my intent.
17 I'm not going to -- I don't -- that is not why I
18 applied.  That's not why I applied for that.
19       I applied because they were looking to
20 start some early treat -- some urgent care
21 treatment options in states.  And they didn't even
22 identify which states.  They just were opening it
23 up and I applied.
24    Q.  Just to go back.  You mentioned the
25 face cream.  I wanted to follow-up quickly.

Page 239

1        When was the last time that you used
2  that face cream?
3     A.  I ran out of my prescription before
4  COVID.  I was a little delinquent in getting it.
5  So it's probably now been -- what is it?  '23.
6  Probably 2019.
7     Q.  Okay.  2019.  Who prescribed it for
8  you?
9     A.  A dermatologist.
10    Q.  Do you use anything different now?
11    A.  No.  I told my husband that he married
12 me and we've been married long enough, and he
13 loves me and he can look at my face when it
14 reacts.
15    Q.  That's the allergic reaction to the --
16    A.  Yeah.  It comes and goes.  If I eat red
17 tomatoes, if I eat red sauce, if I'm in the sun
18 too much.  I already had an allergy to parabens
19 from the dermatologist many years ago.
20       So I never use any face creams or
21 anything with any parabens.  So I get to pay a lot
22 of money for suntan lotion.  But yeah.
23    Q.  And ivermectin, do you know whether
24 that was tested using fetal cells?
25    A.  I have no idea.

Page 240

1     Q.  You don't?
2     A.  No.
3     Q.  Okay.  In terms of the AFLDS, are you
4  aware that --
5        And I'm going to take this down,
6  because again, the bandwidth may be an issue.
7        Are you aware that they promoted
8  ivermectin and spread information, negative
9  information about COVID-19 vaccines?
10    A.  I believe you asked that and I believe
11 I said no.  So I don't -- you know, like I said, I
12 only -- e-mails and things like -- you know, when
13 they come.
14       And I saw this e-mail about this
15 opportunity for the urgent care possibly, and
16 that's why I applied.
17    Q.  Were you aware -- who is the founder of
18 AFLDS; do you know?
19    A.  I probably know from the e-mails that I
20 get every once in a while.  I do not recollect
21 right now.
22    Q.  Would it be -- (connection became
23 unclear.)
24    A.  What's that?
25    Q.  I have Simone Gold.  Do you recognize

Page 241

1 that name?

2   A.  I have heard that name.

3   Q.  Okay.  And Simone Gold was ultimately
4 convicted for involvement in January 6th.  Were
5 you aware of that?  In the
6 January 6th insurrection.

7   A.  If you say it's true, it's true.

8   Q.  Do you know if the American Frontline
9 Nurses were at all related to AFLDS?

10   A.  I do not.

11   Q.  You said you signed up for Telegram in
12 relation to the American Frontline Nurses.  Do you
13 receive information from them to this day through
14 Telegram?

15   A.  Like I said, I get access if I want to
16 join their meeting when they have it.  Which, like
17 I said, it was more frequently back then.  I have
18 not attended a meeting since probably say -- when
19 was that?  August?  I probably have never attended
20 a meeting since the first time.  Well, I attended
21 one when I was first thinking of doing it.

22   Q.  And you know, I wasn't clear.  I'm
23 sorry.  You may have said this.

24       Were you given a firm offer from AFLN,
25 from American Frontline Nurses?  Have you done any

Page 242

1 work for pay for them?

2   A.  I have done no work for pay from them.
3 It's -- my understanding, when I was looking into
4 it at the time, it's tiered.  You start at one
5 tier, and then once you get whatever, you can go
6 to the second tier.

7       And I believe it's a third or fourth
8 tier that you can start kind of being an
9 entrepreneur and have your own -- be self-employed
10 if you want to have consults and stuff.

11       But I never -- I never even did that.
12 I never went beyond.

13   Q.  Have you received compensation from any
14 other organizations since your termination from
15 Main Line Health other than Suburban Community?

16   A.  Yes.  Now that you say that.  I also
17 have done -- I believe it was in December of '21.
18 I had previously been on an emergency nurse
19 association triage work group.  That was a
20 non-paid.

21       There was just a bunch of us from
22 around the country, because they were looking to
23 acquire the ESI handbook.  And all of these
24 details you probably don't need to know.

25       Long-story-short, one of those people

Page 243

1 knew that I had an expertise in triage.  I'm
2 published in triage.  And they asked if I would
3 review some modules for them.  So I did some work
4 for them.  Over two periods, I believe I got a
5 $200.00 honorarium at one point.  And I think I
6 got a $300.00 honorarium at that point.  And
7 that's it.

8   Q.  That's an additional $500 of income
9 that you've received?

10   A.  Yeah.

11   Q.  You said that Suburban Community does
12 have a 401(k) program which you would be eligible
13 to participate in, but you have not participated
14 in it to date.  Correct?

15   A.  Right.  I'm meeting with my financial
16 advisor in August, and we are going to re-look at
17 those numbers.  With the mortgage changes and
18 things like that and other -- you know, some
19 things, we just -- at that point we decided to
20 wait.

21       And we'll see if I really -- was hoping
22 that another job would come along by now that
23 would be a little more suited or whatever.

24       But I still have done a little bit of
25 work.  I did apply for a coordinator job, I

Page 244

1 believe at the end of January.  I think I found
2 out and included in -- I think I found out in May
3 that they had hired somebody.  I don't know.

4   Q.  You're anticipating my questions again.
5 I was going to ask you if you have continued to
6 look for other jobs since Suburban.  So the answer
7 is yes?

8   A.  Yes.  Not nearly as required by
9 unemployment.

10   Q.  So unemployment requires that you look
11 for, I think it was the three applications per
12 week.  Is that -- does that ring a bell?

13   A.  Right.  And you could substitute an
14 interview for one -- you know, their rules.  You
15 could substitute an interview for one or whatever.
16 And you had to do searches and things like that.

17       I have done a couple.  I've really --
18 nothing really, like I said, I got that one back
19 that I actually thought hey, this might work for
20 me.  Obviously it didn't, six months later, five
21 months later.

22       I have had some networking things that
23 I thought might come through and they have not.
24 So you know, I'm looking.

25   Q.  I mean, we read that message that you

Deposition of Dawn Gray                                Dawn Gray v. Main Line Hospitals, Inc.

Page 245

1  sent to AFLDS and it may have been appropriate for
2  them.
3         But are you telling other organizations
4  that you were fired from your job from Main Line
5  Health because you did not get a COVID-19
6  vaccination exemption?
7     A.  I do recollect with some of the earlier
8  interviews and things that I would ask if they had
9  a vaccine exemption opportunity.  Because for me,
10 if they didn't, it was null and void for me.
11        So you know, I was open that I would
12 need a religious exemption for a vaccine for
13 COVID-19.
14        So did I say I was terminated?  No, per
15 se.  If they asked me why I left, I would say that
16 my religious exemption was denied.  You know, if
17 they asked me specifically, I would tell them.
18    Q.  That's not --
19    A.  But that doesn't happen very often.
20    Q.  That's not something you would
21 typically lead with other than maybe the AFL --
22 (connection unclear.)
23    A.  I'm sorry?  I did not hear that.
24    Q.  I said that's not something that you
25 would typically lead with in terms of reaching

Page 246

1  out, other than with AFLDS and I think AFLN.
2        You led with hey, I was terminated
3  because of the religious exemption.
4     A.  No.
5     Q.  But other employers you wouldn't lead
6  with that necessarily?
7     A.  Oh, no.  Because the other employers
8  were an on-line submission.  You know, I had
9  opportunities to speak if one -- if they raised
10 it.  It was more in an interview.  On those there
11 wasn't one.  It was all by paper.
12    Q.  With regard to Suburban Community, did
13 they have a vaccine exemption process?
14    A.  Yes.
15    Q.  Did you go through that vaccine
16 exemption process?
17    A.  Yes.
18    Q.  Did you get approved for an exemption?
19    A.  Yes.
20    Q.  Did you request help from your current
21 religious organization in relation to that?
22    A.  Ask for help in what way?
23    Q.  Well, did you ask for them to submit a
24 letter or anything on your behalf?
25    A.  My boss did ask me for a letter from a

Page 247

1  pastor at my church.  It ended up -- and I did
2  give it to him, but it was not -- it ended up not
3  being needed.  And I said what did you do with it,
4  and he said I just got rid of it.  He did have one
5  but it was not necessary.
6     Q.  Did they have a -- what was their
7  process for the -- for exemption requests?
8     A.  For Suburban?
9     Q.  Yes, for Suburban.
10    A.  I submitted an open letter stating my
11 beliefs.  There was no form.  And I gave it to my
12 boss.
13    Q.  Did you provide a copy of that letter
14 in the discovery responses here?
15    A.  I did.
16    Q.  I have a number of e-mails which I
17 noted that you have produced.  This has been saved
18 as Gray Exhibit 17.
19        (Whereupon, a three page e-mail re:
20 Suburban exemption was produced for identification
21 as Gray Exhibit No. 17.)
22 BY ATTORNEY HENNESSEY:
23    Q.  It says here that this is -- this
24 appears to be an e-mail from your husband to the
25 church.  The RDG, is that your husband's e-mail

Page 248

1  address?
2     A.  Yep.
3     Q.  And it talks about the exemption
4  process with regard to Suburban.  And it says here
5  that Suburban said during the interview that it
6  was not a big deal, in relation to the exemption.
7        Is that accurate?
8     A.  It ended up being not a big deal at
9  all.  They ended up not leaving -- the
10 communication at Suburban is poor, confusing,
11 constantly changing.  And like I said, you told me
12 I needed it.  I needed it ASAP.  I gave it to
13 them.  Then when I followed up with them, they
14 said they didn't need it, I didn't do anything
15 with it.  I didn't give it to anybody.
16        In hindsight, what I ended up doing was
17 I signed a form that said I was requesting a
18 religious exemption.  I hit the X over religious
19 exemption.  I signed it and I dated it.  They had
20 my letter, but they needed nothing else.
21    Q.  Now, is Suburban owned by Prime
22 Healthcare?
23    A.  Yes.
24        (Whereupon, a one-page letter to
25 Prime Healthcare was produced for identification

Page 249

as Gray Exhibit 22.)

BY ATTORNEY HENNESSEY:

Q.   And this document here which is saved as exhibit -- or Gray Exhibit 22, is this what you're referring to as the letter that you sent to them that they accepted and that was that?

A.   When you stop scrolling, I'll look at it.

Q.   Okay.

A.   You're killing me.  I get seasick if I stand on land and look at water.  And you're giving me the boat ride of my life today.

Q.   I'm not doing it on purpose, I swear.

A.   Yes, that is the letter that I gave to my boss.  A hand-printed copy.

Q.   Okay.

A.   There was nowhere to upload it.  There was nowhere to -- yeah.

Q.   I'm just going to show you another document.  Hang on one moment.  There it is.

Let me go back to these e-mails which I referenced as Gray Exhibit 17.  It says here from -- it says, "Sincerely, Ron and Dawn Gray.  Attached is a letter Dawn's attorney wrote for Paul to consider signing as well as Dawn's

Page 250

letter."

What is that a reference to?

A.   Hmmm.  That's a great question.  My husband wrote that.  I don't know.

Q.   Okay.  I mean, if you had this e-mail, do you think you would have the attachment to this e-mail?

A.   You have the letter.

Q.   Right.  I don't know that I do.

A.   That's what you just showed.

Q.   Oh, okay.  So that was the letter that was attached.  That was provided by, it says your attorney.

A.   Well, I did.  Since I had retained Mr. Daller at that point, he did review it and we did -- we did work on -- I don't want to say we worked on it together.  But he did review the letter before he sent it.

So I think that is probably what my husband is speaking about.  It was one letter, and it's the letter you saw.

Q.   All right.

A.   And this is, you know, after the merger and, you know, this is after all that.  So -- and then that's the letter from -- well --

Page 251

Q.   All right.  It says that Pastor Harry was involved in the first process and provided counsel up to this point.

Was there any reason that you decided not to use the same pastor for this exemption request?

A.   A) he was not my pastor anymore.  He moved.  He took another interim job, another pastor position.  That's kind of what he did at the stage of his career.  And I don't know where he went.

Q.   The new letter that you received from -- it appears that Ben Thompson responded and provided a letter dated March 29th, 2022.  It's been saved as Gray Exhibit 23.

(Whereupon, a one-page letter from Pastor Thompson was produced for identification as Gray Exhibit 23.)

BY ATTORNEY HENNESSEY:

Q.   Do you see that letter?

A.   I do.

Q.   That's a relatively simple, straightforward letter that doesn't go into any level of details.  Is that correct?

A.   It states what it states.

Page 252

Q.   Okay.  Did you have any involvement in crafting that letter with Pastor Ben or did your husband?

A.   No.

Q.   Did your attorney?

A.   No.  Unless he did and I didn't know it.  Not to my knowledge I guess is the correct answer there.

Q.   And you're saying that it wasn't even an issue at that point because they didn't even really look at the letter?

A.   I mean, I don't -- you took it down.  I don't remember the date of that letter.  I don't remember the date of the e-mail.  The ironic thing is is that I don't think I had to sign -- it was months later that I actually had to do that X and sign my name.  Months later.

Q.   Did you apply for an exemption anywhere else that you applied for a job?

A.   I never got far enough along in the process.  There were some places that when I asked them, they said they didn't have a vaccine requirement.  That was the jail.

The correctional facility did not require at all.  And there was another -- there

Page 253

1 was another one I applied for. I found out it was
2 like over an hour from my house or something, and
3 I didn't even go there.
4    Q.   Okay. Any other offers that we didn't
5 talk about?
6    A.   None that came -- you know, once I had
7 Suburban, you know, there were some e-mails sent
8 and things like that. But no, I did not pursue
9 anything else once I knew that the temporary
10 position was open and that I was accepted. It was
11 just a matter of paperwork and clearances.
12         Their communication. Yeah, I smile and
13 I laugh. I was supposed to -- I didn't start the
14 day I was supposed to actually start. Anyway,
15 it's just Suburban.
16         It's not Main Line Health, period.
17    Q.   Do you have any other interviews coming
18 up --
19    A.   No.
20    Q.   -- or scheduled for any other job?
21    A.   Excuse me. No.
22    Q.   And you're --
23    A.   Not at this time.
24    Q.   And you're continuing to look to this
25 day?

Page 254

1    A.   I have not looked recently. I've been
2 busy with documents and things for this. So I
3 have not recently looked.
4         My husband is a school teacher. He is
5 off from last day of school until after Labor Day.
6 So our summers are filled with other things. So I
7 have been doing that when I'm not working on this.
8    Q.   And just to clarify again. I want to
9 circle back to this, because you mentioned the
10 move from Wayne to Norristown. And that seemed to
11 be a stressful time for you.
12         That -- you listed your house. When
13 was that that you listed the Wayne house for sale?
14    A.   I believe we put it on the market
15 December, earlier in December. Maybe the 7th,
16 9th, 5th, something like that.
17    Q.   Okay. December 7th.
18    A.   Something like that.
19    Q.   All right. And you moved to
20 Norristown. That was really only about ten
21 minutes away from where you lived in Wayne,
22 correct, maybe 15 depending on traffic?
23    A.   Yes. My husband -- my husband is still
24 working where he was working. We liked our
25 church. We liked our network. We liked our gym

Page 255

1 where we worked out. You know things, that -- you
2 know, we did not really want to move out of the
3 area. That was not even a consideration for us.
4         We opted to downsize. It was a hot
5 market. It was very difficult. It was very, very
6 difficult to find something. And God opened some
7 pretty cool doors on that, too.
8    Q.   Okay. All right. So that was more
9 financial consideration, that wasn't necessarily
10 to move right near where you're working at
11 Suburban or was it?
12    A.   Oh, no. My husband laughs at that.
13 One of the houses we put a bid on it that we
14 didn't get was even closer. He's like you can
15 walk to work. I'm like no, I can't. I'm on my
16 feet for 13 hours a day. I'm not walking to work.
17         (Laughter.)
18    Q.   I understand. All right. There were
19 some -- I want to go through some of your
20 interrogatory answers that were produced to me. I
21 know we had -- you may have -- well, strike that.
22         I'm going to put a document in front of
23 you. We don't have to attach it as an exhibit
24 because I think it can be agreed what this
25 document is. It's -- it's entitled Plaintiff's

Page 256

1 Response to Defendants' First Set of
2 Interrogatories addressed to Plaintiff.
3         Do you see that document?
4    A.   Yes.
5    Q.   I'm just going to scroll down to see if
6 you signed. At the end here, it has a
7 verification. It says, "I, Dawn Gray, hereby
8 verify that pursuant to the Federal Rules of Civil
9 Procedure, under penalty of perjury, that the
10 foregoing Plaintiff's response to the Defendants'
11 First Set of Interrogatories directed to Plaintiff
12 is true and correct."
13         Is that your signature there?
14    A.   Yes.
15    Q.   You responded --  you assisted, I
16 guess, your attorney in response to these
17 requests. Would that be accurate? And we'll look
18 at the first one. I have the first one up and it
19 asks for --
20         Before I ask that, I just want to get a
21 yes on my prior question.
22         Did you help provide the information
23 responsive to these requests?
24    A.   Oh. Yes.
25    Q.   All right. And the first request asks

Page 257

1 for you to identify all individuals who you know
2 of or believe to have knowledge of any of the
3 facts alleged in the complaint or to your claims
4 with respect to each person identified; describe
5 in detail the factual knowledge that each person
6 has.
7        You've provided a list here without
8 really -- I mean, you then put facts known by
9 these people, but you didn't connect the person to
10 the facts known by the individual.
11       And so we'll do that now, to make sure
12 I have that information.
13      So the first person you identified is
14 Ronald Gray. What information does he have that's
15 related to your complaint or the claims that you
16 have?
17    A.  He knows. He knows. I live with the
18 man. So he's read --
19    Q.  Let me --
20    A.  He's read things. He knows the steps
21 I've taken. He's reviewed --
22    Q.  Well, that's what I want to discern.
23 Does he have -- go ahead.
24    A.  Yes, he has.
25    Q.  Does he have personal knowledge or does

Page 258

1 he have knowledge through you?
2    A.  Okay. I'd need an explanation of what
3 the difference is.
4    Q.  Knowledge through you would be that
5 you're providing him the information. And
6 personal knowledge would be -- he attended a phone
7 call where you had with a specific person or
8 overheard what was said by the other side.
9        So it could be that he has personal
10 knowledge in relation to -- well, he reviewed your
11 vaccine exemption form, which you've already
12 testified to, that he reviewed that.
13    A.  Yes.
14    Q.  So I understand that he has knowledge
15 in relation to reviewing that and making some
16 grammatical changes to that.
17       But is there anything else that he
18 would have personal knowledge to?
19    A.  So he has read, like the PHRC filing.
20 You know, he's read things when I've gotten them
21 in paper, whatever, or form.
22       In terms of conversations about details
23 of those things, no, I -- you know, except for
24 talking to me? No. Is that what you're asking
25 me? I'm not sure.

Page 259

1    Q.  Yeah. That's all I'm asking you.
2    A.  There you go. There you go. That's
3 good for Ronald.
4    Q.  That's good enough.
5        Donald Friedly and Janet Friedly, I
6 guess that's your mom and dad?
7    A.  Yep, father and mother.
8    Q.  And what do they have as any personal
9 knowledge about?
10    A.  They have not read any -- they have not
11 read my exemption. They have not read any of the
12 filings. But obviously we have discussed it, and
13 they have been my prayer warriors. So I said I
14 need prayer.
15       They know I'm here today and I can
16 guarantee you that my dad -- he was a preacher in
17 his second career or his third career, I think it
18 might have been. So I can guarantee they are
19 praying. That's their knowledge. They do not
20 know any details. They have not seen any
21 documents.
22    Q.  Douglas Friedly and Felicia Friedly,
23 what is the extent of their knowledge?
24    A.  That's my brother and his wife. I'm
25 sorry I did not put that in there. That's my

Page 260

1 brother and his wife.
2        He's the same. Has not read any of my
3 things. We talk about it. You know, obviously I
4 went home for Christmas. I had Christmas off for
5 the first time in I don't know how many years of
6 my career.
7        So we did spend the holidays together
8 in November and December of '21. Obviously I was
9 still very shaken up. Things they know, they know
10 that I'm pursuing this, of course. I know him and
11 his wife are praying today.
12    Q.  And you put there that he's a
13 government employee. He works at the Pentagon.
14    A.  Yes.
15    Q.  What does he do at the Pentagon?
16    A.  His comment about that is that if I
17 told you, I would have to shoot you. I'm serious.
18 He works for the Department of Defense at a very,
19 very, very high level.
20    Q.  Daniel Friedly and Lori Friedly, what's
21 the extent of their knowledge?
22    A.  Same. My brother and my sister-in-law.
23 They're aware of the process. They have read no
24 documents. He texted me this morning and told me
25 he was praying. And he is. I'm sure Lori is,

Page 261

too.

Q.  So you have two brothers.  Any other siblings?

A.  Nope.  I'm the baby.

Q.  They're older brothers.  Okay.

Harry Fletcher.  He filled out the religious organization form, and we have talked about his involvement and some of the e-mails that were exchanged with him.

Is there anything else that he's aware of that we haven't discussed?

A.  No.  In fact, I'm not in contact with him anymore.  Like I said, I'm not even sure where he's at right now.  But you know, we'd pray -- like I said, we'd pray on Sundays in the parking lot or in the sanctuary or whatever while he was the interim pastor at our church.

Q.  Ben Thompson.  We just talked about him and we reviewed a letter that he wrote.

Anything else that he was involved in other than helping with the exemption request at Suburban?

A.  Nope.  Except for the -- you know, every once in a while we pray after a church service or before a church service.  And he knows

Page 262

I'm here today but does not know any details.

Q.  Kyle Davis and Michelle Davis, who are they?

A.  Make this a little bit easier.  Maybe, maybe not.  Kyle and Michelle Davis and William Malenke and Kim Malenke, they were members of my most recent small group at our church.  So we would meet.  We stopped for a little bit at the beginning of the pandemic.

When the churches merged, we have not re-started up a small group.  So you know, as a small group, we were going through some of the things.  There were prayer requests.  They never read a document.  Just prayer, prayer support.  I have not -- yeah, I don't think Kim and Bill know that I'm here today.  Michelle does.  Michelle is praying.

Again, just church relations and no details.  Never read any of my documents.

Q.  Have you talked to them about your case?

A.  In terms of the process I'm going through?

Q.  Sure.

A.  Michelle knows more because after

Page 263

November of '21, she -- we did meet every so often.  I would say not weekly.  Maybe every other week.  And we'd walk and talk about her kids and just things, and then we would end with prayer time.

She'd say where are you at, what can I pray for specifically.  I'd say okay, I'm waiting to hear back from this or whatever.  But again, never saw any documents.  The other is just the group, small group community and prayer.

Q.  So the small prayer group and --

A.  Small group with prayer, yes.

Q.  So you aren't going to be calling them to testify.  I think it's fair to say they don't have personal knowledge or anything of that nature?

A.  They have personal knowledge of my religious beliefs and the convictions and the things that I have gone through with my walk.  So to say I'm not going to call them, I don't know.

Q.  Okay.  So you haven't made that determination at this point?

A.  That's true.

Q.  Amy Jenkins.  Who is Amy Jenkins?

A.  So Amy is a member of our church, who

Page 264

on Sunday, she's -- we have this joke in our church.  It's a big church.  She sits on the other side.  We call it the dark side of the church.

She just came over one Sunday in November and just said God told me I need to come over and pray with you and give you a hug.  And we have continued to do that on Sundays in church.  She prays.

She does know that I'm not working at Main Line Health anymore and that I'm at Suburban and that I have filed this.  She has not read any of my documents.

Q.  Are you going to call her as a witness?

A.  I don't know.

Q.  I mean, if you were going to call somebody as a witness, I kind of would like to know.

A.  I don't think that Amy would be -- Amy, Chrissy or Jen would be somebody in that category.

Q.  Chrissy, Jen, tell me about them.

A.  They are church members.  Chrissy does not attend our church now but she did.  Hooked up with her at a funeral afterwards.  She came up to asked how's Paoli.  So I directly told her that I didn't work at Paoli anymore.

Page 265

She said oh, I went through that with Penn. She works at the Penn Museum in Philly. She just said she would keep me in prayer.

Q. Was that Chrissy or Jen? I missed that.

A. That's Chrissy.

Q. Chrissy. Okay. And Jen?

A. Jen, I quilt with. We quilt about -- lately -- we used to do it all the time. Lately it's been maybe once a year, twice a year. We did get together for lunch over her birthday in March.

So she asked for an update for prayers. She knows I'm not at Main Line. She knows -- I don't think she knows I'm here today, but she knows I'm going through the process.

Q. Julie Grimm, how about her? What does she have knowledge in relation to?

A. She knows -- she still works at Paoli's emergency room. She worked alongside me. She -- I did think about it long and hard, if she actually read my religious exemption. And I don't recollect that she did. She definitely has not read any documents.

We had lunch once after I got terminated, just to hey, how are you doing, let's

Page 266

do lunch. We were -- you know, we were close friends. We would pray together at work if there was a spiritual need. And when we were on, sometimes we would team up and do it together if a family, after a traumatic situation, was asking for prayer, and if the chaplain wasn't there, we would do that. You know, things like that. She's a fellow Christian.

And she knows -- she doesn't know I'm here today or anything, but she definitely worked alongside of me at Paoli.

Q. Did she have any personal knowledge of any of the events that we have discussed or you have put in your complaint?

A. In terms of -- she knows I was terminated. She knows my -- she knows I applied for a religious exemption. She knows about my fertility and Plan B and those kinds of things. So, she has knowledge of my religious beliefs very solidly.

So yeah, I guess if you're asking me would she be a potential witness, I would say she could be.

Q. Other than that, there isn't anything specific that you can think of that she would

Page 267

testify to?

A. I -- she doesn't know any of my documents. She knows that I'm working at Suburban, because when we got together for lunch she wanted to know what our volume was like and our patients and things like that. So yeah, she knows some of that.

But she's never read any of my documents or my complaints or anything like that. She knows, obviously, that I filed. But not that I can think of.

Q. We already talked about Sara Slattery. Is there anything that we missed on Sara Slattery in terms of, I understand that you connected with her through -- I forget the name, Molly and someone --

A. Molly and Ali.

Q. Molly and Ali, yeah.

A. Molly and Ali. No, I never met her. I keep thinking one of these days if I -- I have not played at Marion in a long time. Maybe one of these days, I'll run into her. But I won't know her to run into her. So...

Q. Is it Marion Squash? What's the -- what's the Marion Country Club name?

Page 268

A. Marion Cricket Club.

Q. Cricket Club. Okay. So she's a member of Marion Cricket Club?

A. I believe, yes, that was the connection between Ali and her. I know Sara does not play squash. So I don't know if it's paddle tennis or -- well, I don't know what it is.

Q. So Marion Cricket Club has squash facilities there?

A. Oh, yes.

Q. Nice ones, I guess?

A. Of course. Better than Berlin.

Q. Andrew Snyder. Who is Andrew Snyder?

A. Andrew Snyder is -- he's part of -- he was somebody who was in my group, that COVID group. Remember, I said we had to have a group after we started playing squash again, after we opened up after the initial COVID.

So he's aware that I'm not working at Main Line anymore. He's been on the court when I've kind of got rid of some of my stress and frustration on the court. He's like you're hitting the ball really hard today, Dawn. I'm like yes, I am, next step in the process. I have made comments like that. He would be like okay,

Deposition of Dawn Gray                                      Dawn Gray v. Main Line Hospitals, Inc.

Page 269

1  then you're my partner today and I'm not competing
2  against you, something like that.
3        Again, you know, he has some indirect
4  knowledge. But again, he hasn't read anything or
5  anything like that. And no, I would not consider
6  calling him.
7     Q.  Amy Milanek?
8     A.  Amy Milanek. Like Milan, like the
9  country, city or whatever. Amy is my -- when I
10 competed on the professional squash doubles tour,
11 when I do, I play with her. She is my doubles
12 partner.
13       So you know, we have traveled together.
14 Broken a lot of bread together. Been in some good
15 moments and bad moments. She is also another one
16 that obviously we would play -- she was in my
17 group, the COVID group, as we called it.
18       She has not read anything. She is more
19 than familiar with my religious beliefs. You
20 know, if we decided that we wanted somebody to
21 speak from a non-church or something like that and
22 knows my beliefs and how firm my beliefs are and
23 how much I hold them dear, you know, I'm not going
24 to rule her out.
25    Q.  Are there any other persons that you

Page 270

1  didn't list other than, you know, people we've
2  talked about through the deposition today that
3  have information that may be relevant to your
4  case?
5     A.  I don't think so. I mean, indirectly.
6  You know, now that I'm playing squash again more
7  and we're not stuck to those same people and stuff
8  like that. People will say hey, are you still
9  working at Paoli. You know, casual conversations
10 that they hadn't heard it through that.
11       You know, I'm sure there's people that
12 every once in a while, I do -- somebody will text
13 me and say hey, how busy is Paoli today, my kid
14 just fell. I'm like I don't know, I'm not there.
15       So there was a lot of those, that I
16 would call, nonspecific things. But no, I
17 wouldn't have any documentation. I wouldn't even
18 know the names, the dates, the times or anything
19 like that. So no.
20    Q.  No one else that you would call as a
21 witness other than the people that we've talked
22 about today that you're aware of, at least sitting
23 here today?
24    A.  At this time. That would be a correct
25 statement.

Page 271

1     Q.  Okay. I think we have clarified that
2  you -- you sent your Facebook social media to me.
3  It doesn't appear -- you weren't very active on
4  Facebook. Would that be accurate?
5     A.  Did you notice I don't have any
6  friends?
7     Q.  Well, I didn't notice that. I just
8  noticed that you only had the one entry on
9  Facebook.
10    A.  The only reason I ever even got on
11 social media -- the whole time I worked at Main
12 Line I was never on social media. And the
13 pandemic changed that.
14       There is a particular person that led
15 some group fitness classes and she started up some
16 on-line. And that's the Instagram and that's the
17 Facebook. The Core Max Fitness. I would do her
18 workouts. I still do. The Core Max does not
19 happen anymore. She still does Instagram live
20 workouts on that, and I do -- when I'm able to, I
21 do them. They're good.
22    Q.  I saw that. The only other person I
23 saw you watched a video was, it was like Dr. Z on
24 or Z Dog. Do you recall watching that video?
25    A.  No.

Page 272

1     Q.  No. Not really? You don't recall
2  following a Dr. Z?
3     A.  No. If I did, I probably did it by
4  accident. I have an awful time with that because
5  I don't know Facebook. I probably did. If I did
6  it, I probably did it by accident.
7     Q.  It was a good video.
8     A.  It was? No. I can't help you there.
9     Q.  All right. You don't recall.
10    A.  Maybe I should go back and look at it.
11    Q.  Yeah, I would recommend it. I don't
12 know if you would like it, but I did.
13       In the interrogatory in relation to
14 interrogatory number five, I think you already
15 provided all of the applications.
16       Oh. The thing that I wanted to circle
17 back to was the benefit options for Suburban. I
18 don't know if I saw anything with relation to like
19 401(k) options.
20       So if you do have something that
21 provides the benefits for Suburban in relation to
22 your current position, I received the benefits
23 related to the temporary position or the offer in
24 relation to the temporary position.
25       But I didn't see anything about

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 273

benefits in relation to your current position. If you do have --

A. I can tell you I got nothing further because I was hired as a temporary. I was actually considered an employee. So when I rolled over into the non-temporary staff job, nothing really changed, except for I had to resubmit that I was waiving my medical, dental and vision. It's the same. There was no difference. I was considered -- it's weird. So I didn't get anything else.

Q. Okay. Well, if you get something regarding the 401(k), I know you're meeting with your financial advisor, if you get something in relation to that, if you can turn it over to your counsel so he could turn it over to us, I would appreciate that.

And we have talked here about -- and this is the remuneration that you've received?

A. Oh, yeah, there's my thing. I now earn 52.42.

Q. That's it. It doesn't have the $500 there, but I did see it on your tax record.

A. Yeah, I kind of forgot about that. It was one of those honorariums. For the hours in

Page 274

it, it was a drop in the bucket. But yes.

Q. As long as you put it on your tax record, you're --

A. It's there.

Q. I saw it and I can confirm.

In relation to your healthcare providers, you testified as to who your primary care doctor is.

You know, I've got to say that you did during this deposition express some emotion in relation to your attempts to have children. And I wanted to ask you if you treated with anybody in relation to that; a psychologist, a therapist or anybody, because I couldn't help but notice that there was some emotion that you expressed in relation to that.

Did you have any treatment in relation to that?

A. My church.

Q. Just your church?

A. My pastor.

Q. Okay. Have you talked to your doctor in regards to any emotional --

A. I haven't seen -- no. Nurses and doctors don't make good patients. I think you

Page 275

should know that by now.

I did see Dr. Greer when I did my finger because he had to give me my clearance.

Q. Do you have any objection to us getting your medical records from Dr. Greer?

A. I don't think. No. I mean, I think he saw me once for what ended up being hand, foot and mouth. Yeah. No, if you would like to, you may.

Q. Who did you see before Dr. Greer as your primary care?

A. You're going back a-ways.

Q. So it's been Dr. Greer for about how long?

A. Probably almost the whole time I was at Main Line, 20 years.

Q. Okay.

A. And I think before that.

Q. You mentioned a dermatologist at some point. Who is your dermatologist?

A. I knew you were going to ask me that. I can see her. I know where the office is. I've been trying to -- I even looked in my phone to see if I can find her name. I need to ask my friend Amy; my friend that I play squash with will know her name. I can't pull it.

Page 276

Q. Yeah. That's fine. You can provide that information to your attorney and I would ask that he turn that over.

THE DEPONENT: John, you'll have to remind me.

ATTORNEY DALLER: Brendan, can you send a list?

THE DEPONENT: Because I'm not going to remember that.

ATTORNEY HENNESSEY: Yeah, I'll send the list.

ATTORNEY DALLER: Okay.

BY ATTORNEY HENNESSEY:

Q. You know, you provided some details, information in relation to what you're seeking in terms of damages, and I reviewed that in your interrogatories. And you also had a separate sheet.

This asked you with respect to damages sought in your complaint, provide in detail the types and amounts of all damages you are seeking. I reviewed this.

And it does talk about backpay. And I came up with a different calculation. We can get into that at some point later. You provided your

Case 2:23-cv-00263-KNS  Document 21-3  Filed 10/02/23  Page 75 of 265

Deposition of Dawn Gray                                    Dawn Gray v. Main Line Hospitals, Inc.

Page 277

1  tax information.  You mentioned pension loss and
2  pay and in relation to retraining costs.
3       I am curious what you meant by
4  retraining costs, because it seems like you had
5  quite a bit of training and certification.
6       So is there any retraining costs that
7  I'm missing that you make reference to?
8     A.  It could be my clearances.  Main Line
9  paid for those.  They don't.  Main Line reimbursed
10  you for your certification.  Suburban doesn't.
11    Q.  Okay.  So you --
12    A.  I'm not -- I'm not recollecting that at
13  this time.
14    Q.  Now, did you withdraw from your
15  retirement accounts at all?
16    A.  I rolled over the one from Main Line.
17    Q.  Okay.  So you rolled it over.  You
18  didn't incur any early penalty for the rollover.
19     Correct?
20    A.  Correct.
21    Q.  And then the selling your house.  From
22  my rough estimation, you made a nice little
23  profit, even though you had a higher mortgage in
24  relation to that house and in relation to that
25  transaction.

Page 278

1       It's fair to say that a lot of things
2  go into the decision to move and sell a house.
3       Would you agree with that?
4     A.  I mean, you aren't giving me any
5  specifics.  But there's a lot.  In terms of making
6  a lot of money, I can tell you that, you know, we
7  had just done a major renovation project.  And we
8  were not planning on moving.
9       So I'm not sure -- you know, there is
10  some of the -- the cost of that project, we did
11  remortgage.  We did have other costs that we did
12  not remortgage that we paid out of pocket and
13  things like that, for that.  So yeah, I -- I --
14    Q.  But it's not like you moved, like you
15  said, to be closer to your new work or anything
16  like that.  That was a financial decision that you
17  made.  And as far as I can tell, you even sold at
18  the right time in terms of those e-mails, that you
19  received for the house.
20       And even if you did remortgage it,
21  you're talking about buying in at a certain amount
22  and doubling your money by the time you sell.
23       So you are asking for closing costs in
24  connection with that?
25    A.  Yeah.  We had extensive damage from

Page 279

1  flooding that we also had paid, that we had bills.
2  I know you think we made all this money from the
3  sale of the house.  We did not.  And we were not
4  planning on selling it at the time we did, because
5  we were planning on living there to sort of start
6  help recoup some of that and enjoy all of the work
7  and effort we had put in and money we had put in.
8       So the closing costs are in there and
9  things like that because of the process that we
10  were forced to do after being terminated.
11    Q.  Who did you retain to sell your house?
12    A.  We used a real estate agent.  And those
13  documents were all submitted.
14    Q.  When did you contact your real estate
15  agent about selling?
16    A.  I believe I spoke to that earlier.  I
17  want to say that my husband kind of -- if I
18  remember, October-ish.
19    Q.  So this was before your termination.
20  Correct?
21    A.  No.  But I knew that my religious
22  exemption was denied and that there was a possib
23  -- you know, the house did not go on the market
24  until I was terminated.
25    Q.  But you didn't know if you were going

Page 280

1  to get another job quickly.  I mean, there were a
2  lot of unknowns at that point.  Right?
3     A.  There absolutely are -- were.
4     Q.  Sure.  You know, there isn't any claim
5  here for emotional distress damages.  I just want
6  to confirm that you're not asking for any sort of
7  emotional distress in relation to what happened.
8       Right?
9     A.  Not at this time.
10    Q.  Other than your dermatologist, who you
11  can't remember at this time and the --
12    A.  It's really buggin' me.  Sorry.
13    Q.  That's okay.  Are you going to sometime
14  later ask for emotional distress?  I just didn't
15  want to -- there is no claim for emotional
16  distress as far as I saw.  Correct?
17    A.  You cut out a little bit.  But no, we
18  have not at this time.
19    Q.  You have not made a claim for emotional
20  distress?
21    A.  Correct.
22    Q.  All right.  In terms of the other
23  providers that you've -- are there any other
24  providers other than your primary care doctor and
25  your dermatologist that you've treated with?

Page 281

1   A.  My dentist.
2   Q.  Okay.
3   A.  And I have an eye doctor.
4   Q.  Who's your dentist?
5   A.  Michael Sophocles.
6   Q.  Sophocles.  Okay.
7       And who is your eye doctor?
8   A.  Richard Bennett.
9       ATTORNEY HENNESSEY:  It's 4:12 p.m.  I
10  just want to take ten minutes, review my notes.  I
11  think I can come back and hopefully we can get out
12  of here by 4:30, if all goes according to plan.
13      But I want to take a moment.  I know
14  that there are a number of areas that I had marked
15  in my notes to circle back on.  So I want to take
16  a look at that.
17      So let's take a break for ten minutes,
18  and we'll go back on the record around 4:23.
19      Okay?
20      THE DEPONENT:  All right.
21      ATTORNEY DALLER:  Yep.
22      ATTORNEY HENNESSEY:  Thank you.
23      (Whereupon, a recess was taken from
24  4:13 to 4:23 p.m.)
25

Page 282

1   BY ATTORNEY HENNESSEY:
2   Q.  You know, again, I don't have very
3   much.  So I think we're just about done.  There
4   was something that you mentioned before in
5   relation to -- and I think I clarified this, but I
6   just want to check again.
7       In talking with Sarah Heilman and
8   Bernadette Wise --
9       ATTORNEY HENNESSEY:  And I don't know
10  if you'll have any questions how to spell any of
11  those names.  If you need it Lori, I can provide
12  it.
13  BY ATTORNEY HENNESSEY:
14  Q.  Neither Sarah nor Bernadette ever gave
15  you any indication to believe that they were
16  responsible for deciding whether your exemption
17  should be granted or not.
18      Is that an accurate statement?
19  A.  Right.  There was a Vaccine Exemption
20  Committee and then the Vaccine Exemption Appeal
21  Committee, according to the form.
22  Q.  Okay.  So that was correct.  They never
23  gave you any indication to believe that they were
24  responsible for reviewing your exemption
25  application or contributing to whether it should

Page 283

1   be granted.  Correct?
2   A.  Correct.  Sarah just said what she said
3   at the meeting that I've already explained
4   previously.
5   Q.  Okay.  All right.  And you understand
6   that they weren't involved in those -- in that
7   decision making.  Right?
8   A.  Right.
9   Q.  All right.  Before we let -- I let you
10  go, we've talked a lot.  It's now 4:26 p.m.  I
11  like to ask of witnesses, because this is my
12  opportunity to gather relevant information that
13  may be material to your claims that you've
14  brought.
15      And we've talked a lot about
16  conversations and areas, events that occurred in
17  relation to your claim, your complaint while we're
18  together.
19      Is there any other information,
20  admission -- (connection unclear.)
21  A.  You're breaking up.
22  Q.  Okay.  Can you hear me?
23  A.  Yes.
24      ATTORNEY HENNESSEY:  You got all the
25  stuff before that when I started, right, Lori?

Page 284

1       THE COURT REPORTER:  Let me read to you
2   right before you broke up, just to be certain.
3       ATTORNEY HENNESSEY:  Yes, great.
4       (Whereupon, the record was read by
5   the court reporter, as requested.)
6   BY ATTORNEY HENNESSEY:
7   Q.  My question is, is there anything else
8   important that you think that we've missed in our
9   day together today?
10  A.  Not at this time.
11      ATTORNEY HENNESSEY:  With that said, I
12  want to thank you for coming to, or attending via
13  Zoom, the deposition.  I wish you luck moving
14  forward.
15      That's all the questions that I have.
16  Thank you.
17      THE DEPONENT:  Thank you.
18      ATTORNEY DALLER:  Thank you.
19      (Attorney Daller disconnected.)
20      ATTORNEY HENNESSEY:  Thank you, Lori.
21      THE COURT REPORTER:  You bet.  Thank
22  you.  If you could send me the exhibits at your
23  convenience.
24      ATTORNEY HENNESSEY:  I sure will.
25      THE COURT REPORTER:  Have a great

Deposition of Dawn Gray                                          Dawn Gray v. Main Line Hospitals, Inc.

Page 285

1  evening.  I'll see you soon.
2        ATTORNEY HENNESSEY:  Yes, you will.
3        THE COURT REPORTER:  Take care.  Bye.
4        ATTORNEY HENNESSEY:  Bye.
5        (Whereupon, the deposition concluded
6  at 4:33 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 286

1
2        C E R T I F I C A T E
3
4        I, Lori A. Fausnaught,
5  Registered Professional Reporter, Registered
6  Merit Reporter and Certified Realtime Reporter,
7  do hereby certify that the proceedings,
8  evidence, and objections noted are contained
9  fully and accurately in the notes taken by me of
10  the preceding statement, and that this copy is a
11  correct transcript of the same.
12
13        s/Lori A. Fausnaught, RPR, RMR, CRR
14        Lori A. Fausnaught, RPR, RMR, CRR
15
16
17
18
19        The foregoing certification
20  does not apply to any reproduction of the same
21  by any means, unless under the direct control
22  and/or supervision of the certifying reporter.
23
24
25

# EXHIBIT B

## Expert Report of Daniel Salmon, Ph.D., MPH

Professional Experience

Dr. Salmon is a Professor of Global Disease Epidemiology and Control, Department of International Health, Johns Hopkins University Bloomberg School of Public Health.  He also has a joint appointment in the Department of Health, Behavior and Society.  Dr. Salmon serves as the Director of the Institute for Vaccine Safety at Johns Hopkins.

Dr. Salmon is broadly trained in vaccinology, with an emphasis in epidemiology, behavioral epidemiology, and health policy.  Dr. Salmon received a Bachelor of Arts (BA) in Political Science with a minor in Psychology from Rutgers University in 1991.  He received a Master of Public Health (MPH) from Emory University Rollins School of Public Health in 1996.  Dr. Salmon received a Doctor of Philosophy (PhD) from Johns Hopkins University Bloomberg School of Public Health in 2003.

Dr. Salmon has held positions in government and academia.  Dr. Salmon has worked for the Centers for Disease Control and Prevention as a contractor and later as a Policy Analyst. In these positions, he used surveillance systems to conduct studies of measles and pertussis and coordinated Federal efforts around vaccine safety, immunization information systems, and development of new vaccines such as for tuberculosis.  Dr. Salmon also served as the Director of Vaccine Safety, National Vaccine Program Office, Department of Health and Human Services.  In this capacity, Dr. Salmon was responsible for coordinating and overseeing the nation's vaccine safety system including vaccine safety activities in the Department of Health and Human Services (National Institute of Health, Food and Drug Administration, Centers for Disease Control and Prevention, and Health Resources and Services Administration) other Federal Departments (Defense, Veterans Affairs, State), and non-federal partners including academia, industry, professional medical and public health associations, states and localities, and the public.  Dr. Salmon led a Secretary's initiative in vaccine safety, oversaw the 2009 H1N1 vaccine safety program, and served as the Designated Federal Official for the National Vaccine Advisory Committee (NVAC) Vaccine Safety Working Group and the Advisory Commission on Childhood Vaccines (ACCV).  Among other accomplishments, Dr. Salmon created the Post-Licensure Rapid Immunization Safety Monitoring (PRISM) Network to conduct active vaccine safety surveillance for the 2009 H1N1 immunization program.  PRISM became an ongoing surveillance system for the Food and Drug Administration as a part of the Sentinel program.

Dr. Salmon has conducted a broad range of research in academia including research grants funded by the National Institutes of Health, Centers for Disease Control and Prevention, state health departments, the World Health Organization, Gavi, the Vaccine Alliance, the Robert Wood Johnson Foundation, and private industry including Walgreens, Pfizer, Merck and Crucell.  Dr. Salmon has also served as a grant reviewer for the National Institutes for Health, Centers for Disease Control and Prevention, Food and Drug Administration, National Science Foundation, the Gates Foundation, as well as numerous other country federal health authorities.  Dr. Salmon has taught and continues to teach a class in vaccine policy for two decades and also currently teaches a class in public health practice at Johns Hopkins University Bloomberg School of Public Health.  Dr. Salmon has mentored numerous students and scientists, many of which now hold leadership positions in academia, government, and international organizations.

Dr. Salmon's research and practice work has included a broad range of studies examining the individual and community risks of vaccine refusal, the impact of laws and policies in increasing vaccination coverage and controlling vaccine preventable diseases, the reasons why patients and parents refuse vaccines, and the role of health care providers in impacting patient and parent vaccine decision-making. Dr. Salmon is widely considered a national and global expert in these areas. Dr. Salmon is a member of the Lancet Commission on Vaccine Hesitancy and served on a National Vaccine Advisory Committee Working Group on vaccine hesitancy.

Dr. Salmon has published more than 100 papers in top medical and public health journals including the New England Journal of Medicine, the Lancet, the Journal of the American Medical Association, Health Affairs, and Pediatrics. Dr. Salmon regularly serves as a peer reviewer for these and other high impact journals. He has been invited to give presentations at the National Foundation for Infectious Diseases, Federal advisory committees, and international meetings. Dr. Salmon has served as an expert witness for a variety of legal cases. Dr. Salmon's current curriculum vitae is attached (Appendix 1).

Dr. Salmon has been retained by Main Line Health.  Dr. Salmon has reviewed the following materials provided by Main Line Health:

1)  Main Line Health COVID-19 vaccination policy;
2)  Religious Exemption form;
3)  Medical Exemption form; and
4)  Pregnancy Deferral Form (added in September 2021.

The client has not impacted the content of this report. All opinions herein are that of Dr. Salmon. Dr. Salmon has been compensated at a rate of $450 per hour for time spent preparing this report.

Dr. Salmon was requested by the Defendant to provide opinions on the following issues:

**1. Covid threat to patients and employees in September 2021**
a. In September 2021, was COVID-19 a potentially fatal disease, particularly for vulnerable populations?
b. How did asymptomatic transmission impact the spread of COVID-19 in health care facilities?
c. Was exposure to COVID-19 in health care setting an occupational hazard for employees?
d. What was the impact of COVID-19 on health care system, patient access to care and care quality?
e. Why were health care personnel high priority group (#1a) when vaccines had limited availability?

**2. Safety and Efficacy of COVID-19 Vaccines**
a. What was the efficacy of vaccines available in September 2021?
b. In September 2021 were unvaccinated persons at an increased risk of contracting COVID and transmitting it to others who could not be vaccinated because of medical contraindications, were too young to be vaccinated or for whom the vaccine was not effective?

2

DA 80

c. In September 2021, did the science indicate that "natural immunity" was as effective as vaccination?

**3. Justification for mandatory Covid vaccine policy by health care institutions**
a. September 2021, did Covid-19 pose a direct threat to patients and staff in health care facilities?
b. In September 2021, were mandatory COVID-19 vaccine policies a critical protective action for health care institutions to protect patients and staff?
c. Did anticipation of the upcoming flu season justify rollout of mandatory COVID-19 vaccine policy in September 2021?
d.Did mandatory COVID-19 vaccine policies pose risk that health care workers would choose to leave job rather than get vaccinated?
e.How did mandatory COVID-19 vaccine policies impact vaccine hesitancy?

**4. Impact of medical and religious exemption requests on health care institutions**
a. What were the clinical contraindications to receiving the COVID vaccine?
b. How did non-medical vaccine exemption requests impact the efficacy of vaccine requirements and patient safety?
c. Did exemptions seriously undermine the efficacy of a vaccination requirement?
d. Did health care institutions have a responsibility to patients and staff to establish and implement a process for evaluating exemption requests rather than simply rubber-stamping requests?
e. **How did exemptions impact the operations of the health care institutions**?
f.How effective were alternative infection control strategies (masking, testing, social distancing) in health care institutions?

**5. Anti-vaccine movement's impact on mandatory vaccine policies**
a. Was there an anti-vax movement that impacted COVID-19 vaccine hesitancy in September 2021?
b. What is the impact of the anti-vaccine movement on mandatory vaccine policies?

**6. Stem cells: Some individuals who challenged mandatory COVID vaccine policies raised religious objections based on stem cell use in testing/development of vaccines**
a. Which stem cell lines were used in testing the COVID-19 vaccines available in September 2021?
b. Other medicines for which stem cells were used in testing

Dr. Salmon's professional judgement in these areas is based upon review of current scientific evidence and federal advisory repots (referenced accordingly).  However, at the request of counsel, data sources were limited to those available as of September 2021.

**Covid threat to patients and employees as of September 2021**

**As of September 2021, was COVID-19 a potentially fatal disease, particularly for vulnerable populations?**

DA 81

As of September 2021, about 40 million cases of COVID-19 had been reported[1], about 2.9 million hospitalizations,[2] and about 675,000 deaths[3]. This month marked an unfortunate milestone, when the number of COVID-19 deaths had surpassed the number of deaths from the 1918 H1N1 influenza pandemic.[4]  Hospitalizations and deaths were disproportionately impacting the elderly and those with chronic medical conditions such as diabetes, heart conditions and obesity.[5]  However, even some young and healthy individuals were experiencing serious disease, hospitalization and death.  Vulnerable racial/ethnic populations (Black, Hispanic and Native American) were also disproportionately impacted by COVID-19.[6]  Delta (B.1.617.2) was the predominant variant in September 2021.  COVID-19 was appearing in waves and varied substantially by locality, state and region, as often is the case with infectious disease.

**How did asymptomatic transmission impact the spread of COVID-19 in health care facilities?**

Asymptomatic transmission of COVID-19 in health care facilities was a major problem through September 2021.  Many health care facilities were regularly testing staff.  However, such tests were imperfect and testing frequency limits the value of testing in detecting asymptomatic infections.  At this point, it was well accepted in the scientific community that asymptomatic persons were transmitting COVID-19.[7]

**Was exposure to COVID-19 in health care setting an occupational hazard for employees?**

Health care staff were at risk of occupational acquired COVID-19 through exposure to infected patients and other health care staff.  The Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention (CDC) consequently prioritized health care workers for vaccination.[8] More than 3,600 health care workers died of COVID-19 in the first year of the pandemic.[9]  The prevalence of SARS-CoV-2 infection among healthcare workers was 11%

---

[1]  Statista.  Number of cumulative cases of COVID-19 in the United States from January 20, 2020 to November 11, 2022, by week.  https://www.statista.com/statistics/1103185/cumulative-coronavirus-covid19-cases-number-us-by-day/ accessed 3/22/2023

[2] American Hospital Association.  COVID-19 Snapshot Challenges Confronting America's Hospitals and Health Systems (September 9, 2021).  https://www.aha.org/system/files/media/file/2021/09/snapshot-9-9-21.pdf  accessed 3/22/2023

[3]  CNN.  The latest on the Covid-19 pandemic in the US. https://www.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-09-20-21/index.html accessed 3/22/2023

[4]  Centers for Disease Control and Prevention.  1918 Pandemic (H1N1 virus). https://www.cdc.gov/flu/pandemic-resources/1918-pandemic-h1n1.html  access 3/22/2023

[5] Centers for Disease Control and Prevention.  People with Certain Medial Conditions. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html  accessed 3/22/2023

[6] Don Bambino Geno Tai, Irene G. Sia, Chyke A. Doubeni, Mark L. Wieland.  Disproportionate Impact of COVID-19 on Racial and Ethnic Minority Groups in the United States: a 2021 Update.  J Racial Ethn Health Disparities. 2022; 9(6): 2334–2339.

[7] Michael Johansson, Talia quandelacy, Sarah Kada et al.  SARS-CoV-2 Transmission From People Without COVID-19 Symptoms. JAMA Netw Open. 2021;4(1):e2035057.

[8] Bell BP, Romero JR , Lee GM. Scientific and ethical principles underlying recommendations from the advisory committee on immunization practices for COVID-19 vaccination implementation. *JAMA*. 2020; 324: 2025-2026

[9]  KHN.  12 Months of Trauma: More Than 3,600 US Health Workers Died in Covid's First Year. https://khn.org/news/article/us-health-workers-deaths-covid-lost-on-the-frontline/  accessed 3/25/23

in 2020, noticeably higher than in the general population.[10]  Also in 2020, health care workers with direct patient care had 4 times this risk of contracting COVID-19 compared with health care workers without direct patient care.[11]  In a large health care system of about 30,000 employees between June 1 to December 31, 2020, 2,357 employees were involved in occupational COVID-19 exposures; 1,128 (48%) were exposed to patients and 1,229 (52%) to other employees.[12]

COVID-19 had a tremendous impact on health care systems, patient access to care and quality of care.  As COVID-19 spread across the country in waves, disproportionately impacting some communities and then moving on to others, health care systems struggled to keep up with patient demand.  Health care capacity in the United States is generally designed to meet demand, often with rural health care facilities below community needs.  As a consequence, the health care system was not well prepared for the surge on health care needs that resulted from COVID-19.  The impact of COVID-19 on health care facilities was further strained by COVID-19 illness and death among health care workers and worker burn out.  Health care systems attempted to respond by establishing surge capacity, including portable morgues in hospitals for COVID-19 deaths.  Additionally, health care providers and facilities delayed routine and non-emergency procedures to free up capacity to address heath care needs related to COVID-19.  The consequence was reduced access to care for patients and, in some cases, reductions in quality of care with increases in many diseases which were not diagnosed during routine care visits.  For example, there were substantial drops in immunization coverage among children as routine visits were either virtual (not allowing for vaccination) or missed altogether.  A study from Michigan indicated that among children aged 5 months, up-to-date vaccination status for all recommended vaccines declined from approximately two thirds of children during 2016–2019 to fewer than half in May 2020.[13]  The long-term impact of rationing health care as a result of the COVID-19 pandemic will take many years to fully characterize.

**Why were health care personnel a high priority group (#1a) when vaccines had limited availability?**

The Advisory Committee on Immunization Practices (ACIP) and the Centers for Disease Control and Prevention (CDC) determined that health care personnel were the first priority for COVID-19 vaccine when it was available:

**Phase 1a.** Health care personnel (HCP) are being considered for phase 1a, which includes the first available doses and an extremely constrained supply. HCP are defined as all paid and unpaid persons serving in health care settings who have the potential for direct or indirect exposure to patients or infectious materials, comprising an estimated 20 million people. Examples include hospital, long-term care and assisted living, home health care, and

---

[10] Sergio Alejandro Gómez-Ochoa et al.  COVID-19 in Healthcare Workers: A Living Systematic Review and Meta-analysis of Prevalence, Risk Factors, Clinical Characteristics, and Outcomes.  Am J Epidemiol. 2020 Sep 1.

[11] Jonne Sikkens, David Buis, Edgar Peters et al.  Serologic Surveillance and Phylogenetic Analysis of SARS-CoV-2 Infection Among Hospital Health Care Workers. JAMA Netw Open. 2021;4(7):e2118554.

[12] Jessica Ibiebele, Christina Silkaitis, Gina Dolgin et al. Occupational COVID-19 exposures and secondary cases among healthcare personnel. Am J Infect Control. 2021 Oct; 49(10): 1334–1336.

[13] Centers for Disease Control and Prevention.  Decline in Child Vaccination Coverage During the COVID-19 Pandemic — Michigan Care Improvement Registry, May 2016–May 2020. MMWR. May 22, 2020 / 69(20);630–631.

DA 83

outpatient facility staff, as well as pharmacies and emergency medical services. HCP are essential for the ongoing COVID-19 response and are at high risk for exposure to SARS-CoV-2.[14]

Health care personnel were the first priority for initial availability of COVID-19 vaccines for several reasons:

1) Health care personnel were at increased risk of contracting and transmitting COVID-19 because of their occupation exposure to COVID-19 cases;

2) Health care personnel were in regular contact with persons at increased risk of serious complications and death from COVID-19, including persons who were immunocompromised, had other comorbidities, and/or were elderly;

3) Health care facilities were often at or beyond capacity caring for persons with COVID-19 as well as other healthcare needs.  As essential personnel, reducing the risk of health care personnel for contracting COVID-19 resulting in missed time from work and potentially morbidity and mortality was a local, state and national priority in order to maintain health care capacity; and

4) Given the sacrifice health care personnel were making to care for COVID-19 infected persons in addition to persons requiring other health care needs, it was equitable for health care personnel to receive all means available to protect themselves from COVID-19.

**Safety and Efficacy of COVID-19 Vaccines**

**What was the efficacy of vaccines available as of September 2021?**

The most accurate estimates of the efficacy of COVID-19 vaccines as of September 2021 were based on the information available from the phase 3 clinical trials that were consider by the Food and Drug Administration (FDA) and its Vaccines and Related Biological Product Advisory Committee (VRBPAC) which were made available to the public.  At the time, there were three vaccines available through Emergency Use Authorization.

The Moderna COVID-19 vaccine (mRNA-1273) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).  The Phase 3 randomized, double-blinded and placebo-controlled trial of mRNA-1273 included approximately 30,400 participants. The primary efficacy endpoint was the reduction of incidence of COVID-19 among participants without evidence of SARS-CoV-2 infection before the first dose of vaccine. Efficacy in preventing confirmed COVID-19 occurring at least 14 days after the second dose of vaccine was 94.5.0% (95% CI 86.5%, 97.8%).  Subgroup analyses showed similar efficacy across age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[15]

---

[14] Bell BP, Romero JR , Lee GM. Scientific and ethical principles underlying recommendations from the advisory committee on immunization practices for COVID-19 vaccination implementation. *JAMA.* 2020; 324: 2025-2026
[15] Vaccines and Related Biological Products Advisory Committee Meeting. December 17, 2020. FDA Briefing Document. Moderna COVID-19 Vaccine. https://www.fda.gov/media/144434/download  Accessed 03/26/23

DA 84

The Pfizer and BioNTech COVID-19 vaccine (BNT162b2) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The Phase 3 randomized, double-blinded and placebo-controlled trial of BNT162b2 included approximately 44,000 participants. The primary efficacy endpoint was incidence of COVID-19 among participants without evidence of SARS-CoV-2 infection before or during the 2-dose vaccination regimen.  Efficacy in preventing confirmed COVID-19 occurring at least 7 days after the second dose of vaccine was 95.0%.  Subgroup analyses showed similar efficacy across age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[16]

Janssen Biotech COVID-19 vaccine (Ad26.COV2.S) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The Phase 3 randomized, double-blind and placebo-controlled trial of Ad26.COV2.S included approximately 40,000 participants. Vaccine efficacy against central laboratory-confirmed moderate to severe/critical COVID-19 was 66.9% (95% CI 59.0, 73.4) when considering cases occurring at least 14 days after the single-dose vaccination. Subgroup analyses showed similar efficacy across age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[17]

Using real world data among frontline workers between December 14, 2020–August 14, 2021 (Delta Wave), full vaccination with COVID-19 vaccines was 80% effective in preventing COVID-19.[18]

**As of September 2021, were unvaccinated persons at an increased risk of contracting COVID and transmitting it to others who could not be vaccinated because of medical contraindications, were too young to be vaccinated or for whom the vaccine was not effective?**

Based on the demonstrated efficacy of the Moderna, Pfizer and J&J COVID-19 vaccines in preventing disease[15,16,17] and reducing transmission to others (both by reducing the risk of infection and reducing the viral load if a breakthrough infection)[19,20], unvaccinated persons were at increased risk of contracting COVID-19 and transmitting to others who could not be vaccinated because of medical contraindications, were too young to be vaccinated or for whom the vaccine was not

---

[16] Vaccines and Related Biological Products Advisory Committee Meeting. December 10, 2020.  FDA Briefing Document. Pfizer-BioNTech COVID-19 Vaccine. https://www.fda.gov/media/144245/download  Accessed 03/26/23.
[17] Vaccines and Related Biological Products Advisory Committee Meeting February 26, 2021 FDA Briefing Document: Janssen Ad26.COV2.S Vaccine for the Prevention of COVID-19. https://www.fda.gov/media/146217/download. Accessed 03/26/23
[18] Centers for Disease Control and Prevention.  Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance — Eight U.S. Locations, December 2020–August 2021.  MMWR. August 27, 2021 / 70(34);1167-1169.
[19] David W Eyre, Donald Taylor, Mark Purver, David Chapman, Tom Fowler, Koen B Pouwels, A Sarah Walker, Tim EA Peto The impact of SARS-CoV-2 vaccination on Alpha & Delta variant transmission. https://doi.org/10.1101/2021.09.28.21264260
[20] Marc Shamier, Alma Tostmann Susanne Bogers et al. Virological characteristics of SARS-CoV-2 vaccine breakthrough infections in health care workers. Medriv.  Aug 21, 2021. https://www.medrxiv.org/content/10.1101/2021.08.20.21262158v1

effective (as well at  persons who were unvaccinated because they did not have access to the vaccines or decided to forgo vaccination).

### As of September 2021, did the science indicate that "natural immunity" was as effective as vaccination?

Several studies were available at that time that indicated an immune response to COVID-19 that lasted for at least a short time,[21, 22,23] reduces the risk of reinfection, [24] and infections provided some level of protection among Rhesus monkeys.[25]  However, good correlates of protection were not available.  A correlate of protection is an "empirically defined, quantifiable immune parameters that determine the attainment of protection against a given pathogen".[26]  In other words, it was not known what sort or how strong an immune response was necessary to protect from COVID-19, including but not limited to new variants that might emerge.  So, it was measured that natural infection resulted in an immune response which lasted at least for months, it was not known if that immune response protected from COVID-19.  Additionally, while there was some indication that infection reduces the risk of reinfection, there was not a good measure of how much it reduced reinfection nor for how long.  A CDC study available in August of 2021 indicated that among previously infected persons, reinfection was about twice as high if not being fully vaccinated, leading CDC to recommend "To reduce their likelihood for future infection, all eligible persons should be offered COVID-19 vaccine, even those with previous SARS-CoV-2 infection."[27]  Natural immunity also comes as the potential for morbidity and mortality from COVID-19.  Monitoring of healthy individuals for more than 35 years had shown that reinfection with the same seasonal coronavirus occurred frequently[28] and protection from seasonal coronavirus infections are short lived.[29]

### Justification for mandatory Covid vaccine policy by health care institutions

### As of September 2021, did Covid-19 pose a direct threat to patients and staff in health care facilities?

---

[21] Staines HM, Kirwan DE, Clark DJ, et al. IgG seroconversion and pathophysiology in severe acute respiratory syndrome coronavirus 2 infection. Emerg Infect Dis. 2021 Jan;27.

[22] Wajnberg A, Amanat F, Firpo A, et al. Robust neutralizing antibodies to SARS-CoV-2 infection persist for months. Science. 2020 Dec;370(6521):1227-1230.

[23] Dan JM, Mateus J, Kato Y, et al. Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection. Science. 2021 Feb 5;371(6529):eabf4063.

[24] Gallais F, Gantner P, Bruel T, et al. Anti-SARS-CoV-2 Antibodies Persist for up to 13 Months and Reduce Risk of Reinfection. medRxiv. 2021.

[25] Bao L, Deng W, Gao H, et al. Lack of Reinfection in Rhesus Macaques Infected with SARS-CoV-2. bioRxiv. 2020.

[26] Altmann DM, Douek DC, Boyton RJ. What policy makers need to know about COVID-19 protective immunity. The Lancet. 2020 May;395(10236):1527–1529.

[27] Centers for Disease Control and Prevention.  Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination — Kentucky, May–June 2021.  MMWR. August 13, 2021 / 70(32);1081-1083.

[28] Om E, Byrne P, Walsh KA, et al. Immune response following infection with SARS-CoV-2 and other coronaviruses: A rapid review. Rev Med Virol. 2021 Mar;31(2):e2162.

[29] Edridge AWD, Kaczorowska J, Hoste ACR, et al. Seasonal coronavirus protective immunity is short-lasting. Nat Med. 2020 Nov;26(11):1691–1693.

DA 86

As of September 2021, COVID-19 posed a direct threat to patients and staff in health care facilities.  Health care facilities around the country and the world were being overwhelmed by COVID-19.  As previously described, health care staff were disproportionately impacted by COVID-19.  Additionally, patients in health care facilities were at substantial risk of exposure and infection with COVID-19 despite precautionary measures that were taken to reduce the risk of transmission in health care settings.  Often, patients in health care settings were at increased risk of severe COVID-19 because of underlying health conditions and age.

**As of September 2021, were mandatory COVID-19 vaccine policies a critical protective action for health care institutions to protect patients and staff?**

As of September 2021, mandatory COVID-19 vaccine policies were a critical protective action for health care institutions to protect patients and staff for the following reasons:

1. COVID-19 posed a substantial threat to patients and staff in health care institutions (previously described);
2. COVID-19 vaccines provided a high level of protection against contracting COVID-19 and reducing transmission of COVID-19 (previously described); and
3. Mandatory vaccination policies for influenza vaccines in health care settings have been demonstrated to be necessary to achieve high levels of vaccine coverage (voluntary policies even coupled with free access to vaccines and education did not achieve very high levels of vaccine coverage).

**Did anticipation of the upcoming flu season justify rollout of mandatory COVID- 19 vaccine policy in as of September 2021?**

In 2020 we wrote a commentary in the Journal of the American Medical Association (JAMA) warning of the potential dangers of COVID-19 and influenza: The Dual Epidemics of COVID-19 and Influenza - Vaccine Acceptance, Coverage, and Mandates.[30]  Both **influenza and COVID-19** are unpredictable viruses with the potential to mutate, cause similar symptoms, strain the health care system, are often transmitted in a health care setting (particularly to high risk patients), and are preventable by vaccination.  As we stated in this article:

The health system, and wider society, must prepare for the likelihood of co-epidemics of COVID-19 and influenza… The nation's goal should be to attain high influenza vaccine coverage, including near-universal coverage among health care personnel and other high-risk groups for COVID-19… The CDC prioritizes high-risk groups and their contacts/caregivers for influenza vaccinations. Health care personnel are exposed to pathogens that can be transmitted to and from patients, even if staff are not directly involved in patient care. In 2018-2019, vaccine coverage among health care personnel reached 81.1%, similar to previous seasons (77.3%-79.0%).[6] Given the heightened importance of health care worker

---

[30] Lawrence Gostin and Daniel A Salmon.  The Dual Epidemics of COVID-19 and InfluenzaVaccine Acceptance, Coverage, and Mandates  JAMA. 2020;324(4):335-336.

9

and patient safety during the co-epidemics of COVID-19 and influenza, higher vaccine coverage should be a national priority… Given the high risks, health workers would gain high priority for COVID-19 vaccination. Strong incentives should be in place, including laws requiring health facilities to routinely offer both influenza and COIVID-19 vaccines.

Fortunately, 2020-21 was a mild influenza season in the United States and globally most likely because of social distancing, masks and other control measures for COVID-19.  However, many of these measures were being relaxed in 2021 and there were widespread concerns that 2021-22 would be a particularly bad influenza season.  Additionally, a mild 2019-20 influenza season meant that more people would be susceptible to influenza in the 2020-21 influenza season as influenza in the previous season can sometimes provide protection in the current year (depending on the strains of influenza that are circulating).

Mandatory influenza vaccine policies are very important for healthcare institutions and directly relate to mandatory COVID-19 vaccine policies.  Exposure to influenza in health care settings is an occupational hazard.  Asymptomatic and health care workers who come to work ill (including the day before symptoms become apparent and the person is infectious) can transmit influenza to patients.  Likewise, patients may be asymptomatic and transmitting influenza, including to unvaccinated healthcare workers and other patients.  There are a broad range of strategies to reduce the risk of influenza among health care workers and protect patients who come into contact with such personnel.  Strategies to reduce the risk of influenza in healthcare institutions include offering education and free, on-site vaccination, implementation of hand and respiratory hygiene and cough etiquette, screening and isolation of healthcare workers and patients with acute respiratory infections, and other prevention measures.[31]

Influenza vaccination is the most effective strategy to protect healthcare workers from contracting influenza and transmitting it to their patients.  Vaccination of healthcare workers has been shown to be very effective, with minimal adverse effects, and shown to reduce patient mortality. [32] Despite considerable efforts at the Federal level and among states, with strong support from medical associations, influenza vaccination coverage among healthcare workers remains suboptimal.

Many healthcare institutions require influenza vaccination among their workers to protect their employees and the patients they care for.  The Society for Healthcare Epidemiology of America (SHEA) strongly endorses mandatory vaccination of healthcare workers to protect against influenza, as can be seen in their most recent policy position on this topic:

> SHEA views influenza vaccination of HCP as a *core patient and HCP safety practice* with which noncompliance should not be tolerated. It is the professional and ethical responsibility of HCP and the institutions within which they work to prevent the spread of infectious pathogens to their patients through evidence-based infection prevention practices, including influenza vaccination. *Therefore, for the safety of both patients and*

---

[31] CDC. Prevention Strategies for Seasonal Influenza in Healthcare Settings. [cited 2011 17 November]; Available from: http://www.cdc.gov/flu/professionals/infectioncontrol/healthcaresettings.htm. accessed 04/02/23.

[32] Burls A, Jordan R, Barton P et al.  Vaccinating healthcare workers against influenza to protect the vulnerable – is it. A good use of healthcare resources?  A systematic review of the evidence and an economic evaluation.  Vaccine. 2006. May 8;  24(19): 4212-21.

DA 88

*HCP, SHEA endorses a policy in which annual influenza vaccination is a condition of both initial and continued HCP employment and/or professional privileges.* [33]

Many professional medical and public health associations also support mandatory influenza vaccination of healthcare workers, including the American Academy of Family Physicians, the American Academy of Pediatrics, the American College of Physicians, the American Hospital Association, the American Medical Directors Association, the American Nurses Association, the American Public Health Association, the Association for Professionals in Infection Control and Epidemiology, the Infectious Disease Society of America, the National Association of County and City Health Officials, National Patient Safety Foundation, and others.[34]

This experience with influenza vaccine mandates in health care settings is directly applicable to COVID-19 mandates in health care settings.  As with influenza, COVID-19 exposure in health care settings is an occupational hazard.  Asymptomatic and health care workers who come to work ill (including the day before symptoms become apparent and the person is infectious) can transmit COVID-19 to patients.  Likewise, patients may be asymptomatic and transmitting COVID-19, including to unvaccinated healthcare workers and other patients.  Voluntary programs for COVID-19 vaccine even coupled with access and education, as is the case with influenza, were unlikely to adequately in reaching very high levels of vaccine coverage necessary for protecting health care workers and patients.  For example, we conducted a survey in late 2020 before the vaccines were available at SUNY Upstate Medical University in Syracuse, NY, the only academic medical center in Central New York and the region's largest employer with 9,565 employees.[35]  We found that 57.5% of individuals expressed intent to receive COVID-19 vaccine, including 80.4% of physicians and scientists. Nearly half or more of nurses, Master's level clinicians, allied health professionals, and ancillary service personnel were not sure whether the vaccine will work and protect them from COVID-19; slightly lower but similar levels of uncertainty were expressed by the same groups about vaccine safety, and nearly a third of each group was unsure whether they would take a vaccine for COVID-19 if offered for free.  The attitudes and concerns of nurses were very similar to those of the general public at the time.  We conducted a follow-up survey in this health care system between 21 February and 19 March 2021 and found that 87.7% of respondents had already received a COVID-19 vaccine or planned to get vaccinated.[36] Physicians and scientists showed the highest acceptance rate (97.3%), whereas staff in ancillary services showed the lowest acceptance rate (79.9%).  These levels of COVID-19 vaccine coverage are too low, leading New

---

[33] Revised SHEA position paper: influenza vaccination of healthcare personnel.  Infection Control and Hospital Epidemiology. Oct 2010. 31(10); 987-995.

[34] See https://www.immunize.org/honor-roll/influenza-mandates/ for list of these organizations that have policy positions supporting mandatory influenza vaccination for healthcare workers, including links to these policy statements.  Accessed 04/02/20.

[35] Jana Shaw, Telisa Steward, Kathryn Anderson, Samantha Hanley, Stephen Thomas, Daniel Salmon, Christopher Morley.  Assessment of U.S. health care personnel (HCP) attitudes towards COVID-19 vaccination in a large university health care system.  Clin Infect Dis. 2021 Jan 25.

[36] Jana Shaw, Samantha Hanley, Telisa Steward, Daniel Salmon, Christin Ortiz, Paula Trief, Elizabeth Reddy, Christopher Morley, Stephen Thomas, Kathryn Anderson.  Healthcare Personnel (HCP) Attitudes About Coronavirus Disease 2019 (COVID-19) Vaccination After Emergency Use Authorization.  Clin Infect Dis. 2022 Aug 24;75(1):e814-e821.

York to require vaccination of healthcare workers in September of 2021 and experiencing a 10% increase in vaccine coverage within a week.[37]

Many health care systems were finding voluntary programs for COVID-19 vaccination in health care settings to be insufficient and were thus turning to mandatory programs.  According to the COVID States Project, as of July, 2021, 27% of healthcare workers were unvaccinated and 15% were vaccine resistant, leading the authors to conclude that "absent mandates, most of the currently unvaccinated health care workers will remain unvaccinated, potentially fueling outbreaks in health care facilities."[38]  A joint statement by nearly 88 major medical organizations and associations called for mandatory vaccination of healthcare workers, including the American Hospital Association, the American Medical Association, the American College of Physicians, the American Academy of Family Physicians, and the American Public Health Association (see below).[38,39]  In August, 2021, the Department of Veterans Affairs announced that all employees and staff at VA facilities had to be vaccinated for COVID-19.[40]  On September 9, 2021, President Biden announced a requirement for all health care workers working in a settings that receive Medicare or Medicaid reimbursement to receive COVID-19 vaccines.[41]

---

[37] Forbes.  Covid-19 Vaccine Mandates Are Working—Here's The Proof https://www.forbes.com/sites/tommybeer/2021/10/04/covid-19-vaccine-mandates-are-working-heres-the-proof/?sh=8555e4b23058  accessed 03/30/23

[38] Lazer David, et al. The COVID States Project #62: COVID-19 vaccine attitudes among healthcare workers. The COVID States Project. Aug 18, 2021

[39] Joint Statement in Support of COVID-19 Vaccine Mandates for All Workers in Health and Long-Term Care. https://assets.acponline.org/acp_policy/statements/joint_statement_covid_vaccine_mandate_2021.pdf  accessed 03/30/23

[40]  US Department of Veteran Affairs.  VA mandates COVID-19 vaccines among its medical employees including VHA facilities staff. https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5696  accessed 03/30/23

[41]  The White House.  Remarks by President Biden on Fighting the COVID-19 Pandemic https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/  accessed 03/30/23

### Joint Statement in Support of COVID-19 Vaccine Mandates for All Workers in Health and Long-Term Care

Due to the recent COVID-19 surge and the availability of safe and effective vaccines, our health care organizations and societies advocate that all health care and long-term care employers require their workers to receive the COVID-19 vaccine. This is the logical fulfillment of the ethical commitment of all health care workers to put patients as well as residents of long-term care facilities first and take all steps necessary to ensure their health and well-being.

Because of highly contagious variants, including the Delta variant, and significant numbers of unvaccinated people, COVID-19 cases, hospitalizations and deaths are once again rising throughout the United States.[1] Vaccination is the primary way to put the pandemic behind us and avoid the return of stringent public health measures.

Unfortunately, many health care and long-term care personnel remain unvaccinated. As we move towards full FDA approval of the currently available vaccines, all health care workers should get vaccinated for their own health, and to protect their colleagues, families, residents of long-term care facilities and patients. This is especially necessary to protect those who are vulnerable, including unvaccinated children and the immunocompromised. Indeed, this is why many health care and long-term care organizations already require vaccinations for influenza, hepatitis B, and pertussis.

*We call for all health care and long-term care employers to require their employees to be vaccinated against COVID-19.*

We stand with the growing number of experts and institutions that support the requirement for universal vaccination of health workers.[2,3] While we recognize some workers cannot be vaccinated because of identified medical reasons and should be exempted from a mandate, they constitute a small minority of all workers. Employers should consider any applicable state laws on a case-by-case basis.

Existing COVID-19 vaccine mandates have proven effective.[4,5] Simultaneously, we recognize the historical mistrust of health care institutions, including among many in our own health care workforce. We must continue to address workers' concerns, engage with marginalized populations, and work with trusted messengers to improve vaccine acceptance.

As the health care community leads the way in requiring vaccines for our employees, we hope all other employers across the country will follow our lead and implement effective policies to encourage vaccination. The health and safety of U.S. workers, families, communities, and the nation depends on it.

**SIGNATORIES** (Listed Alphabetically)

Academy of Managed Care Pharmacy (AMCP)
American Academy of Ambulatory Care Nursing (AAACN)
American Academy of Allergy, Asthma & Immunology (AAAAI)
American Academy of Child and Adolescent Psychiatry (AACAP)
American Academy of Emergency Medicine (AAEM)
American Academy of Family Physicians (AAFP)
American Academy of Nursing (AAN)
American Academy of Ophthalmology (AAO)
American Academy of PAs (AAPA)
American Academy of Pediatrics (AAP)
American Association for Respiratory Care (AARC)
American Association of Clinical Endocrinology (AACE)
American Association of Colleges of Pharmacy (AACP)
American Association of Neuroscience Nurses (AANN)
American College of Allergy, Asthma and Immunology (ACAAI)
American College of Clinical Engineering (ACCE)
American College of Clinical Pharmacy (ACCP)
American College of Emergency Physicians (ACEP)
American College of Gastroenterology (ACG)
American College of Medical Genetics and Genomics (ACMG)
American College of Medical Toxicology (ACMT)
American College of Mohs Surgery (ACMS)
American College of Osteopathic Family Physicians (ACOFP)
American College of Physicians (ACP)
American College of Preventive Medicine (ACPM)
American College of Surgeons (ACS)

American Epilepsy Society (AES)
American Geriatrics Society (AGS)
American Medical Association (AMA)
American Medical Women's Association (AMWA)
American Nurses Association (ANA)
American Occupational Therapy Association (AOTA)
American Osteopathic Association (AOA)
American Pharmacists Association (APhA)
American Psychiatric Association (APA)
American Psychological Association (APA)
American Public Health Association (APHA)
American Society for Clinical Pathology (ASCP)
American Society for Radiation Oncology (ASTRO)
American Society for Transplantation and Cellular Therapy (ASTCT)
American Society of Health-System Pharmacists (ASHP)
American Society of Hematology (ASH)
American Society of Nephrology (ASN)
American Thoracic Society (ATS)
Association for Clinical Oncology (ASCO)
Association for Professionals in Infection Control and Epidemiology (APIC)
Association of Academic Health Centers (AAHC)
Association of American Medical Colleges (AAMC)
Association of Pediatric Hematology/Oncology Nurses (APHON)
Association of Rehabilitation Nurses (ARN)
Connecticut Nurses Association (CNA)
Council of Medical Specialty Societies (CMSS)
Delaware Nurses Association (DNA)
Emergency Medicine Residents' Association (EMRA)
Hematology/Oncology Pharmacy Association (HOPA)
HIV Medicine Association
Illinois Pharmacists Association (IPhA)
Infectious Diseases Society of America (IDSA)

LeadingAge
Medical Society of Virginia (MSV)
Missouri State Medical Association (MSMA)
National Association of Indian Nurses of America (NAINA)
National Association of Pediatric Nurse Practitioners (NAPNAP)
National Council of Asian Pacific Islander Physicians (NCAPIP)
National Council of State Boards of Nursing (NCSBN)
National Hispanic Medical Association (NHMA)
National League for Nursing (NLN)
National Medical Association (NMA)
National Pharmaceutical Association (NPhA)
New Hampshire Nurses Association (NHNA)
New Mexico Medical Society (NMMS)
Nurses Who Vaccinate (NWV)
Organization for Associate Degree Nursing (OADN)
Pediatric Infectious Diseases Society (PIDS)
Philippine Nurses Association of America, Inc (PNAA)
Society of Gynecologic Oncology (SGO)
Society for Healthcare Epidemiology of America (SHEA)
Society of Hospital Medicine (SHM)
Society for Immunotherapy of Cancer (SITC)
Society of Infectious Diseases Pharmacists (SIDP)
Society of Interventional Radiology (SIR)
Society of Nuclear Medicine & Molecular Imaging (SNMMI)
South Carolina Nurses Association (SCNA)
Texas Nurses Association (TNA)
The John A. Hartford Foundation
Transcultural Nursing Society (TCNS)
Virgin Islands State Nurses Association (VISNA)
Wound, Ostomy, and Continence Nurses Society (WOCN)

1. Centers for Disease Control and Prevention. Covid Data Tracker Weekly Review. July 16, 2021. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html [Accessed 22 July 2021].
2. Weber, D., Al-Tawfiq, J., Babcock, H., Bryant, K., Drees, M., Elshaboury, R., et al. (2021). Multisociety Statement on COVID-19 Vaccination as a Condition of Employment for Healthcare Personnel. Infection Control & Hospital Epidemiology, 1-46. doi:10.1017/ice.2021.322
3. American Hospital Association. AHA Policy Statement on Mandatory COVID-19 Vaccination of Health Care Personnel. July 21, 2021. https://www.aha.org/public-comments/2021-07-21-aha-policy-statement-mandatory-covid-19-vaccination-health-care
4. Bacon J. 'Condition of employment': Hospitals in DC, across the nation follow Houston Methodist in requiring vaccination for workers. *USA Today*. Available from: https://www.aha.org/public-comments/2021-07-21-aha-policy-statement-mandatory-covid-19-vaccination-health-care [Accessed 22 July 2021].
5. Paulin E. More Nursing Homes Are Requiring Staff COVID-19 Vaccinations. *AARP*. Available from: https://www.aarp.org/caregiving/health/info-2021/nursing-homes-covid-vaccine-mandate.html [Accessed 22 July 2021].

*This version of the statement was provided by Dr. Emanuel on 29 July 2021 and is reproduced with his permission.*

**Did mandatory COVID-19 vaccine policies pose risk that health care workers would choose to leave job rather than get vaccinated?**

There was the potential that some health care workers would choose to leave their job rather than get vaccinated. Undoubtedly, some health care workers did leave their job when COVID-19 vaccines were required. Some of this risk of health care workers leaving their jobs because of COVID-19 mandates could be mitigated by making vaccine readily available free of charge and through vaccine education. New York state's COVID-19 vaccine mandate resulted in about 34,000 health workers losing jobs or being placed on leave, reflecting a reduction of 3.5% of the workforce.[42] A COVID-19 mandate for health care workers in Colorado resulted in 1.8% of health care workers leaving or losing their jobs because of a COVID-19 mandate.[43]

**How did mandatory COVID-19 vaccine policies impact vaccine hesitancy?**

Mandatory COVID-19 policies likely had a mixed impact on vaccine hesitancy. For those who strongly held views against vaccination, mandatory policies likely further solidified those beliefs. The vast majority of people in favor of vaccination would likely be vaccinated absent such policies, particularly as COVID-19 vaccines were free and readily available. For those in the middle, often referred to as "fence sitters", mandatory COVID-19 vaccines would likely push some towards the decision to vaccinate. Additionally, mandatory COVID-19 vaccine policies also create a social norm to vaccinate, having a broader indirect impact on vaccine acceptance.

**What was the impact of medical and religious exemption requests on health care institutions?**

**What were the clinical contraindications to receiving the COVID vaccine?**

There are two contraindications for COVID-19 vaccines: 1) History of a severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine; or 2) History of a known diagnosed allergy to a component of the COVID-19 vaccine.[44]

**How did non-medical vaccine exemption requests impact the efficacy of vaccine requirements and patient safety?**

Unvaccinated persons (those with non-medical exemptions) are at increased risk of contracting disease and transmitting disease to others who cannot be vaccinated (because of medical contraindications), are too young to be vaccinated, or who are vaccinated but the vaccine did not work for them (no vaccine is 100% effective). The impact of non-medical exemptions has been extensively studied among children for pertussis and measles, through the epidemiological

---

[42] lohud. Remarks by President Biden on Fighting the COVID-19 Pandemic. https://www.lohud.com/story/news/coronavirus/2021/10/14/how-many-health-workers-lost-jobs-due-ny-vaccine-mandate/8449413002/ accessed 03/30/23

[43] The Colorado Sun. Did Colorado's COVID vaccine mandate for health care workers hurt hospital staffing? It's complicated. https://coloradosun.com/2021/11/17/health-care-worker-vaccination-mandate-staffing/ accessed 03/30/23

[44] Centers for Disease Control and Prevention. https://www.cdc.gov/vaccines/covid-19/clinical-considerations/interim-considerations-us.html#covid-vaccines accessed 03/30/23

DA 92

principles apply to influenza vaccine and non-medical exemptions among healthcare workers. Children who have non-medical exemptions are 22-35 times more likely to contract measles and 6 times more likely to contract pertussis than vaccinated children.[45,46]  In addition to this individual risk, exempt persons also increase the risk to others.  Studies we have conducted demonstrate that communities with higher rates of non-medical exemptions are at increased risk of pertussis outbreaks.[45,46,47] We also found that states that had easier non-medical exemptions processes for granting exemptions had higher rates of non-medical exemptions and higher rates of pertussis.[48,49] Measles also highlights the community risks of vaccine refusal.[50]  Measles has been eliminated in the United States because of sustained high coverage of a very safe and effective vaccine. However, there are communities in the United States with high rates of vaccine refusal and measles is still circulating in many parts of the world.  As a result, measles is introduced into these communities with high rates of vaccine refusal – clustered socially or geographically – resulting in outbreaks of measles.[51]

An outbreak originating in Disneyland in 2015 caught the most national attention though there have been similar outbreaks in the Somali community in Minnesota and orthodox Jewish community in New York.  As a result, the United States almost lost its "elimination status" in 2009, the same year that the World Health Organization declared vaccine hesitancy a top 10 global health threat.  Several states (California, New York, Maine and Washington) have consequently eliminated their non-medical exemptions (Washington only eliminated non-medical exemptions for the MMR vaccine).  There was recently a case of paralytic polio in the same orthodox Jewish community in New York which had the measles outbreak.  This single case of polio indicates there are likely thousands of cases of asymptomatic polio in the community given the often asymptomatic nature of polio.  Sewage samples testing positive for polio support this.

These studies have been focused on children because every state has laws requiring vaccination for school entry.  These studies have focused on measles and pertussis because the epidemiology of the diseases makes them well suited for such studies.  However, the findings from these studies are very generalizable to non-medical exemptions to COVID-19 vaccine requirements for healthcare workers given the nature of infectious diseases and the impact of unvaccinated persons with non-medical exemptions.  In fact, the impact of non-medical exemptions for COVID-19 vaccine among

---

[45] Salmon DA, Haber M, Gangarosa EJ, Phillips L, Smith N, Chen RT. Health consequences of religious and philosophical exemptions from immunization laws: individual and societal risks of measles. JAMA. 1999 July 7; 282(1): 47-53.

[46] Feikin DR, Lezotte DC, Hamman RF, Salmon DA**,** Chen RT, Hoffman RE. Individual and community risks of measles and pertussis associated with personal exemptions to immunizations. JAMA. 2000 Dec. 27; 284(24): 3145-3150.

[47] Atwell JE, Van Otterloo J, Zipprich J, Winter K, Harriman K, Salmon DA, Halsey NA, Omer SB.  Nonmedical vaccine exemptions and pertussis in California, 2010.  Pediatrics. 2013 Oct;132(4):624-30.

[48] Rota JS, Salmon DA, Rodewald LE, Chen RT, Hibbs BF, Gangarosa EJ. Processes for obtaining nonmedical exemptions to state immunization laws. AJPH. April 2000; 91: 645-8.

[49] Omer SB, Pan WK, Halsey NA, Stokely S, Moulton LH, Navar AM, Salmon DA. Nonmedical Exemptions to School Immunization Requirements: Secular Trends and Association of State Policies with Pertussis Incidence. JAMA. 2006 Oct 11; 296(14):1757-63.

[50] Salmon DA, Dudley MZ*, Glanz JM, Omer SB. Vaccine hesitancy: Causes, consequences, and a call to action. Co-Published. Vaccine & Am J Prev Med. 2015 Nov 23; Suppl 4:D66-71.

[51] Phadke VK. Bednarczyk RA, Salmon DA, Omer SB. Association between Vaccine Refusal and Vaccine Preventable Diseases in the United States: A Focus on Measles and Pertussis.  JAMA.  2016 Mar; 315(11): 1149-58.

DA 93

healthcare workers would be much higher than in the case with childhood vaccine because healthcare workers regularly come into contact with patients that are at high risk COVID-19 complications and death.

**How did exemptions impact the operations of the health care institutions?**

Exemptions to vaccine mandates had a substantial impact on the operations of the health care institutions. Health care institutions had to grant medical exemptions based upon valid medial contraindications (previously discussed). Health care institutions which granted religious exemptions needed to develop a process by which religious exemption requests would be submitted and criteria for granting or denying requests. As discussed, it has been shown that exemptions that are easily granted are associated with higher rates of exemptions and disease in the context of childhood vaccine requirements. Allowing all exemption requests to be granted would have likely resulted in a large number of exemptions, and, as previously described, a larger number of religious exemptions would result in a greater risk of COVID-19 disease transmission and outbreaks adversely impacting other health care staff, patients, and the capacity of the health care system to operate. One can reasonably conclude that such additional exemptions would be geographically clustered, increasing their impact, given COVID-19 vaccine hesitancy has been shown to geographically cluster and health care workers tend to live in the communities in which they work.

**Did health care institutions have a responsibility to patients and staff to establish and implement a process for evaluating exemption requests rather than simply rubber-stamping requests?**

Health care institutions had a responsibility to limit religious exemptions to those with sincerely held beliefs that precluded vaccination in order to protect their staff and patients. As previously described, individuals who are granted exemptions to immunization requirements are at increased risk of contracting and transmitting vaccine preventable diseases. The greater the number of religious exemptions the higher the risk of COVID-19 infections and transmission. Medical exemptions, based upon valid medical contraindications, are necessary and rare. Religious exemptions represent an effort to accommodate the religious views of those impacted by mandatory policies. However, granting too many exemptions can undermine the impact of the mandatory policy and lead to disease outbreaks. It is for this reason that several states have recently eliminated non-medical exemptions to school immunization requirements. Ensuring that sincerely held religious beliefs that prevent vaccination are granted exemptions but restricting exemptions to those with sincerely held religious beliefs limits the adverse impact of exemptions on outbreaks of disease while preserving this exemption option for those who with the sincerely held religious beliefs.

**Do exemptions from a mandatory vaccination policy undermine an organization's ability to inhibit the spread of a serious communicable disease?**

Exemptions from mandatory vaccination policy have the potential to undermine an organization's ability to inhibit the spread of a serious communication disease. Whether or not this potential is realized and the extent to which exemptions undermine the control of vaccine preventable

16

diseases depends on the frequency of exemptions and the extent to which they are geographically clustered.

**How effective were alternative infection control strategies (masking, testing, social distancing) in health care institutions?**

In addition to vaccination, alternative infection control strategies such as masking, testing and social distancing had an impact in health care institutions. However, each of these strategies had limitations and the most effective policy to control COVID-19 in health care settings was a compressive approach where strategies were combined or layered.

The use of masks in health care settings to prevent COVID-19 vaccine was based on what was known regarding mask wearing in health care settings to control influenza. Wearing a mask has a clear benefit in reducing the acquisition and transmission of influenza. Two studies have shown that surgical masks are similar to some types of respirators in protecting healthcare workers from acquiring influenza.[52,53] However, wearing a surgical mask when treating patients in lieu of mandatory vaccination is problematic for many reasons. First and foremost, surgical masks do not work as well as vaccination which is why the Centers for Disease Control and Prevention (CDC) considers influenza vaccination the first and best way to prevent influenza. Additionally, implementing a surgical mask policy in lieu of vaccination is problematic. A study of health care workers at 12 hospitals found that the SARS-CoV-2 test positivity rate among health care workers decreased from 14.7% to 11.5% during a 3-week period after implementation of universal masking.[54] Such a program requires oversight to ensure compliance. Doing so would be very difficult, particularly if only for employees who have forgone vaccination. The healthcare institution would need to know who has a non-medical exemption and then develop a program that would target them to make sure they consistently wear the mask. This would be a difficult and expensive program to implement and poor compliance would further enhance the risk of influenza acquisition and transmission.

Regular testing for COVID-19 allows for the identification of persons who have active disease. However, there are limitations to this approach. First, available COVID-19 tests are imperfect with the potential for both false positives and false negatives. Additionally, by September of 2021, it had been well established that people could transmit COVID-19 before becoming symptomatic and among asymptomatic cases. As a consequence, even daily COVID-19 testing would not identify people as soon as they became infectious. In the time between when a person first became infectious and when the test was taken there was risk that the person would infect others.

Social distancing also had the potential to reduce transmission of COVID-19 in health care settings. Most health care facilities attempted to isolate COVID-19 cases. However, staff often

---

[52] Johnson DF, Druce JD, Birch C, Grayson ML. A quantitative assessment of the efficacy of surgical and N95 masks to filter influenza virus in patients with acute influenza infection. Clin Infect Dis 2009;49(2):275–277.

[53] Aiello AE, Murray GF, Perez V, et al. Mask use, hand hygiene, and seasonal influenza-like illness among young adults: a randomized intervention trial. J Infect Dis;201(4):491–498.

[54] Wang  X, Ferro  EG, Zhou  G,  et al.  Association between universal masking in a health care system and SARS-CoV-2 positivity among health care workers.  *JAMA*. 2020;324(7):703.

needed to work with both COVID-19 and other patients, allowing opportunities for transmission. Additionally, staff and patients may be asymptomatically transmitting COVID-19.  Reducing the density of the population (distance between persons or less people permitted in a defined space) could also reduce COVID-19 transmission.  However, this is very difficult to operationalize in a health care setting. Health care workers who work from home some of the time, even with limited interactions with patients and coworkers, can still contract and transmit of COVID-19 when in the health care setting.

Each of these approaches – vaccination, masks, testing, social distancing – all have the potential to reduce disease transmission but are all imperfect by themselves.  While the vaccines were shown to have very high efficacy, they are imperfect and some people who are vaccinated will still contract and transmit disease.  Similarly, but to a lesser extent, each of these other strategies have an impact.  However, they are also imperfect.  The most effective approach to reducing transmission of COVID-19 in a health care setting is to require all these approaches, thus layering protection.

**Anti-vaccine movement's impact on mandatory vaccine policies**

**Was there an anti-vax movement that impacted COVID-19 vaccine hesitancy in 2021?**

Anti-vaccine groups have existed as long as we have had vaccines, dating back to the Smallpox vaccine created by Edward Jenner in the late 18th century.  Over time, the issues have evolved through many of the central arguments have remained the same.  In the 1970's and 1980's, the antivaccine movement in the United States and many developed countries were focused on the whole cell pertussis vaccine.  Japan, the UK and Sweden experiences substantial drops in vaccination coverage and resurgence of pertussis.  In the 1990's, concerns raised that the MMR vaccine caused autism were championed by anti-vaccine groups and led to a major resurgence of measles across Europe with introductions of measles into the United States.  In 2019, just before the COVID-19 pandemic, the World Health Organization declared vaccine hesitancy a top 10 global threat.  While the issues have evolved, the underlying arguments of the anti-vaccine movement have been remarkably stable over time, as described by Wolfe and Sharpe[55]:

> *19th century*—Typical membership:
> 1. Those who feel smallpox vaccination is ineffective
> 2. Persons who believed their relatives had suffered injury or death due to vaccination
> 3. Persons opposed to compulsory vaccination as an infringement of basic human rights
> 4. Proponents of alternative medical practice and theory, especially homoeopaths. Herbalists, chiropractors, and hydropaths
>
> *20th century*—Typical membership:
> 1. Those who feel that some or all vaccinations are ineffective or unsafe
> 2. Persons who believe their relatives had suffered injury or death due to vaccination
> 3. Persons opposed to compulsory vaccination as an infringement of basic human rights

---

[55] Robert Wolfe and Lisa Sharp, Anti-vaccinationists past and present.  BMJ. 2002 Aug 24; 325(7361): 430–432.

18

4. Proponents of alternative medical practice and theory, such as homoeopathy, herbal therapy, and chiropractic

The anti-vaccine movement was extremely well positioned (and funded) when the COVID-19 pandemic struck.  Anti-vaccine groups were able to build relationships with and expand their influence by persons and groups who perceived the public health and government response to COVID-19 was infringing on their personal freedoms.  Mask wearing quickly became controversial as some people objected to being told to wear a mask. Social distancing and the closing of some business were even more controversial.  There were clear political divides in the United States COVID-19 response, with political affiliation becoming one of the best predictors of COVID-19 vaccination.[56]

As described in a Lancet Commission report (in which I am a co-author)[57]:

> Over the past two decades, anti-vaccine activism in the USA has evolved from a fringe subculture into an increasingly well organised, networked movement with important repercussions for public health. The COVID-19 pandemic has exacerbated this evolution and magnified the reach of vaccine misinformation. Anti-vaccine activists, who for many years spoke primarily to niche communities hesitant about childhood vaccinations, have used traditional and social media to amplify vaccine-related mistruths about COVID-19 vaccines while also targeting historically marginalised racial and ethnic communities. These efforts contributed to COVID-19 vaccine hesitancy and expanded the movement, with early indications suggesting that this hesitancy could now also be increasing hesitancy that existed pre-pandemic towards other vaccines.

Thus, Anti-vaccine groups were able to capitalize on the controversies around COVID-19 and COVID-19 control strategies including but limited to vaccination. There is no question that anti-vaccine groups had an impact on COVID-19 vaccine hesitancy.

**What is the impact of the anti-vaccine movement on mandatory vaccine policies?**

There has been a very strong and concerted effort by the anti-vaccine movement to loosen state laws requiring vaccination of school children, particularly over the past decade.  The reasons behind this are multifactorial.  First and foremost, anti-vaccine groups have become fairly sophisticated in how they present themselves and frame their arguments.  They have learned over the past few decades that they are not perceived well – by the media, politicians or much of the public – if they present themselves as being against vaccines.  Thus, they tend to present

---

[56] Matthew Z Dudley, Benjamin Schwartz, Janesse Brewer, Lilly Kan, Roger Bernier, Jennifer E Gerber, Haley Budigan Ni, Tina M Proveaux, Rajiv N Rimal, Daniel A Salmon.  COVID-19 Vaccination Status, Attitudes, and Values among US Adults in September 2021. J Clin Med. 2022 Jun 28;11(13):3734.

[57] Richard M Carpiano, Timothy Callaghan, Renee DiResta, Noel T Brewer, Chelsea Clinton, Alison P Galvani, Rekha Lakshmanan, Wendy E Parmet, Saad B Omer, Alison M Buttenheim, Regina M Benjamin, Arthur Caplan, Jad A Elharake, Lisa C Flowers, Yvonne A Maldonado, Michelle M Mello, Douglas J Opel, Daniel A Salmon, Jason L Schwartz, Joshua M Sharfstein, Peter J Hotez.  Confronting the evolution and expansion of anti-vaccine activism in the USA in the COVID-19 era. Lancet. 2023 Mar 18;401(10380):967-970.

19

themselves as being advocates for informed choice and the safety of vaccines. This is a very effective approach to open doors and influence policy, discourse and the thinking and decisions of the public. Central to this argument of informed choice is the ability of persons to claim non-medical exemptions. Additionally, because all school immunization requirements are state rather than federal laws this allows anti-vaccine groups to focus their efforts on individual states where they are more likely to sway local legislators and manipulate public opinion than they could achieve at the federal level. In many states, anti-vaccine groups have established state chapters or organizations who find state legislators who are sympathetic to their views and willing to propose legislation expanding non-medical exemptions. Anti-vaccine groups have rallied opposition to mandatory COVID-19 vaccine policies.

**Stem cells: Some individuals who challenged mandatory COVID vaccine policies raised religious objections based on stem cell use in testing/development of vaccines**

**Which stem cell lines were used in testing the COVID-19 vaccines available in 2021?**

Some COVID-19 vaccines used cells, either in development or in manufacturing, originally isolated from fetal tissues derived from an aborted fetus. The fetal cell lines being used to test or manufacture the COVID-19 vaccines are from two sources[58]:

- HEK-293: A kidney cell line that was isolated from a fetus in 1973
- PER.C6: A retinal cell line that was isolated from a fetus in 1985

In neither of these cases was an abortion done for the purposes of harvesting a fetal cell line. These cell lines are used in a in vaccine and other drug development as well as manufacturing of some drugs and vaccines because they have been extremely well characterized over many decades, providing advantages over other cell lines where less in known about them.[59]

Fetal cell lines were used in the early in the development of mRNA vaccine technology.

The Pfizer and Moderna mRNA COVID-19 vaccines produced do not use any fetal cell cultures to manufacture the vaccine.

The Johnson & Johnson COVID-19 vaccine uses fetal cell cultures (PER.C6) to manufacture the vaccine.[60]

**Other medicines for which stem cells were used in testing**

---

[58] Richard K. Zimmerman. Helping patients with ethical concerns about COVID-19 vaccines in light of fetal cell lines used in some COVID vaccines. Vaccine. 2021 Jul 13; 39(31): 4242–4244. Published online 2021 Jun 15. doi: 10.1016/j.vaccine.2021.06.027

[59] John Grabenstein. What the World's religions teach, applied to vaccines and immune globulins. Vaccine. Volume 31, Issue 16, 12 April 2013, Pages 2011-2023.

[60] Janssen. https://www.janssenscience.com/products/janssen-covid-19-vaccine/medical-content/janssen-covid-19-vaccine-janssen-covid-19-vaccine-no-presence-of-fetal-tissue-or-human-cells accessed 04/04/23

HEK293 cells are one of the most widely used cell lines in research because they are easy to manipulate and are immortal (can be grown and replicated indefinitely).  The following commonly used drugs (not comprehensive) have been tested, developed or manufactured using fetal cell lines.[61]

Common over the counter drugs tested on HEK-293 cells or derivative cell lines.

1. Tylenol / Acetaminophen
2. Advil / Motrin / Ibuprofen
3. Aspirin / Acetylsalicylic Acid (ASA)
4. Aleve / Naproxen
5. Pseudoephedrine / Sudafed / / SudoGest, Suphedrine
6. Diphenhydramine / Benadryl
7. Loratadine / Claritin
8. Dextromethorphan / Delsym / Robafen Cough / Robitussin
9. Guaifenesin / Mucinex
10. Tums / Calcium Carbonate
11. Maalox / Aluminum Hydroxide and Magnesium Hydroxide
12. Docusate / Colace / Ex-Lax Stool Softener
13. Senna Glycoside / Sennoside / Senna / Ex-Lax / Senokot
14. Pepto-Bismol / Bismuth Subsalicylate
15. Phenylephrine / Preparation H / Vazculep / Suphedrine PE
16. Mepyramine / Pyrilamine
17. Lidocaine / Lidoderm / Recticare

Common prescription drugs tested on HEK-293 cells or derivative cell lines.

1. Levothyroxine / Synthroid / Tirosint / Levoxyl
2. Atorvastatin / Lipitor
3. Amlodipine / Norvasc
4. Metoprolol / Toprol XL / Lopressor
5. Omeprazole / Prilosec OTC / Zegerid OTC / OmePPi
6. Losartan / Cozaar
7. Albuterol / Salbutamol / ProAir / Ventolin
8. Enbrel / Etanercept
9. Azithromycin / Zithromax
10. Hydroxychloroquine / Plaquenil
11. Remdesivir / Veklury
12. Dapagliflozin / Farxiga / Ipragliflozin / Suglat / Enavogliflozin / Jardiance
13. Ivermectin / Stromectol
14. Metformin / Glucophage / Riomet / Glumetza

---

[61] Commonwealth Journal.  April 4, 2023. https://www.somerset-kentucky.com/opinion/letters_to_the_editor/there-are-no-aborted-fetal-cells-in-vaccines/article_14809887-84f7-58a4-bb4c-76bc29724d8a.html  accessed 04/04/23

**When was Novavax available in the United States?**

The U.S. Food and Drug Administration issued an emergency use authorization (EUA) for the Novavax COVID-19 Vaccine on July 13, 2022.[62]

**Did the manufactures of Novavax use human fetal derived cell lines or tissue in its development, manufacture or production?**

The Novovax COVID-19 vaccine did not use human fetal cells lines or tissue in its development, manufacturing or production.[63]

Summary

In September 2021, COVID-19 was a substantial threat to staff and patients in health care institutions.  Health care staff were disproportionately impacted by COVID-19 and patients in health care settings were at increased risk of serious disease and death because of underlying health conditions and/or age.  Consequently, health care personnel were the first priority for vaccination by the ACIP and CDC when vaccine supplies were limited.  There were three vaccines approved for use at the time, and they had been shown to be very safe and effective at preventing diseases, reducing transmission of disease, and serious consequences from COVID-19 including death.  Consequently, unvaccinated persons in health care settings were at greater risk of COVID-19 themselves, and also posed risk to others they came into contact with.  While many health care workers had already been infected at this time, natural immunity was poorly understood and not a substitute for vaccination. Mandatory COVID-19 vaccine policies were necessary in health care settings given the need for extremely high vaccine coverage necessary in health care settings and inadequate vaccine coverage that could be accomplished through education and access to free vaccine.  The small number of persons with valid medical contraindications to vaccination must be given medical exemptions to mandatory policies.  Health care institutions often also allowed religious exemptions for persons with sincerely held religious beliefs against vaccination. However, these health care institutions needed to limit exemptions to those persons with sincerely held religious beliefs that precluded vaccination in order to protect their staff and patients.  Easily granting religious exemptions to all persons who requested them, including those without sincerely held religious beliefs precluding vaccination, would have undermined the vaccine requirement leading to substantial disease, disability and death among health care staff and patients.

---

[62] FDA News Release: Coronavirus (COVID-19) Update: FDA Authorizes Emergency Use of Novavax COVID-19 Vaccine, Adjuvanted.  https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-emergency-use-novavax-covid-19-vaccine-adjuvanted  accessed 04/01/22
[63] Los Angeles County Department of Public Health.  COVID-19 VACCINES AND FETAL CELL LINES.  http://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf  Accessed 04/01/23

DA 100

REVISED APRIL 4, 2023

## CURRICULUM VITAE

## Daniel Salmon

*Home*
540 Walters Mill Rd
Forrest Hill, MD 21050

*Business*
615 N. Wolfe Street, W5035
Baltimore, MD 21205
Tel: (443) 803-7754
E-mail: dsalmon1@jhu.edu

Global Disease Epidemiology and Control
Department of International Health
Department of Health, Behavior & Society
Institute for Vaccine Safety
The Johns Hopkins University
Bloomberg School of Public Health

## Education and Training

2003     PhD, Health Policy and Management, Johns Hopkins University Bloomberg School of Public Health, Baltimore, MD
Dissertation:  School Implementation of Immunization Requirements: Are School Policies or Personnel Associated with the Likelihood of a Child Claiming an Exemptions or School-Based Outbreaks of Measles or Pertussis?

1996     MPH, Health Policy and Management, Emory University Rollins School of Public Health, Atlanta, GA
Thesis: Health Consequences of Religious and Philosophical Exemptions from Immunization Laws: Individual and Societal Risk of Measles

1991     BA, Political Science with Minor in Psychology, Rutgers University, New Brunswick, NJ

## Professional Experience

2018 -     Director, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health

2017 -     Professor, Global Disease Epidemiology and Control, Department of International Health, The Johns Hopkins University, Bloomberg School of Public Health

2017 -     Professor, Health, Behavior and Society (joint appointment), The Johns Hopkins University, Bloomberg School of Public Health

2018 - 2021     Director of PhD Program, Global Disease Epidemiology and Control, Department of International Health, The Johns Hopkins University, Bloomberg School of Public Health

| 2012 - 2018 | Deputy Director, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health |
|---|---|
| 2012 - 2017 | Associate Professor, Global Disease Epidemiology and Control, Department of International Health, The Johns Hopkins University, Bloomberg School of Public Health |
| 2013 - 2017 | Associate Professor, Health, Behavior and Society (joint appointment), The Johns Hopkins University, Bloomberg School of Public Health |
| 2007 - 2012 | Director of Vaccine Safety (GS 15 – Step 10), National Vaccine Program Office, Office of the Assistant Secretary for Health, Department of Health and Human Services |
| 2007 - 2012 | Adjunct Associate Professor, Global Disease Epidemiology and Control, Department of International Health, The Johns Hopkins University, Bloomberg School of Public Health |
| 2005 - 2007 | Associate Professor, Department of Epidemiology and Health Policy Research, University of Florida, College of Medicine |
| 2003 - 2005 | Assistant Scientist, Division of Disease Prevention and Control, Department of International Health, Associate Director for Policy and Behavioral Research, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health |
| 2001 - 2003 | Research Associate, Division of Disease Prevention and Control, Department of International Health, Associate Director for Policy and Behavioral Research, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health |
| 1999 - 2001 | Consultant, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health |
| 2000 | Consultant, Merck Vaccine Division, Merck and Co, Inc. |
| 1997 - 1999 | Policy Analyst, National Vaccine Program Office, Centers for Disease Control and Prevention |
| 1995 -1997 | Contractor, National Immunization Program, Centers for Disease Control and Prevention |
| 1994 - 1995 | HIV Prevention Community Coordinator, Health Visions, Inc. |
| 1994 | Consultant, Health Visions, Inc. |

1990 - 1992    Residential Aide/Counselor, Alternatives, Inc.

## Professional Activities
*Society Membership*
American Public Health Association, Member (1995-1999)
Infectious Disease Society of America, Member (2005-2007)

*Advisory Panels*
Parents of Kids with Infectious Diseases (PKIDS), Board Member (2007- )
Brighton Collaboration, Board Member, Vaccine Hesitancy Working Group Co-Chair (2012- )
Janssen Vaccine Policy Board Member (2021- )
Merck Vaccine Policy Board Member (2007)
39th National Immunization Conference External Planning Committee (2004)

## Editorial Activities
*Peer Reviewer (selected)*
American Journal of Preventive Medicine
American Journal of Public Health
Archives of Pediatric and Adolescent Medicine
Biosecurity and Bioterrorism
BMC Family Practice
BMC Public Health
Expert Reviews of Vaccines
Health Affairs
Health Education Research
Indian Journal of Medical Science
Journal of Comparative Family Studies
Journal of Health Communication
Journal of the American Medical Association
Journal of the National Medical Association
Journal of Urban Health
New England Journal of Medicine
Pediatrics Pediatric Infectious Disease Journal
Pediatrics International
Public Health Reports
The Lancet
The Lancet, Infectious Diseases
Vaccine
Vaccines

*Editorial Board*
Vaccine, Associate Editor (2021- present)
Vaccines (2012-2013)

*Guest Editor*
Pediatrics Supplement: Vaccine Safety Throughout the Product Life Cycle (2011)
Vaccines Supplement: Confidence in Vaccines (2013)

## Review of Proposals (selected)

National Institutes of Health, Dissemination & Implementation in Heath Study Section (DIHR). Special Emphasis Panels for National Institutes of Health, Centers for Disease Control and Prevention, Food and Drug Administration (Chair), National Science Foundation, and Canadian Institutes of Health Research.

## Honors and Awards

- Haddon Fellow, Johns Hopkins University Bloomberg School of Public Health (1999-2001)
- Achievement Award – Dedication to Students, Johns Hopkins Bloomberg School of Public Health (2005)
- Development of the Federal Immunization Safety Task Force, Assistant Secretary for Health (2008)
- Federal Monitoring of H1N1 Vaccine Safety, Assistant Secretary for Health (2010)
- Patient Education Working Group Co-Chair, Assistant Secretary for Health (2012)
- Outstanding recent graduate (within past 10 years), Johns Hopkins Bloomberg School of Public Health (2013)
- Delta Omega Society (2014)

## Publications (* indicated student/advisee/mentee)

### JOURNAL ARTICLES (PEER REVIEWED)

1. Dudley MZ, Gerber JE, Budigan Ni H, Blunt M, Holroyd TA, Carleton BC, Poland GA, **Salmon DA.** Vaccinomics: A scoping review. Vaccine. 2023 Mar 31;41(14):2357-2367.
2. Schwartz B, Brewer J, Budigan H, Bernier R, Dudley MZ, Kan L, Proveaux TM, Roberts R, Tafoya N, Hamlin MD, Moore L, Hughes M, Turner B, Al-Dahir S, Velasco E, Privor-Dumm L, Veloz W, White JA, Dubois S, Ooton J, Kipp BJ, Show TJ, Salu K, Chavez B, Montes MDP, Najera R, King T, **Salmon DA**. Factors Affecting SARS-CoV-2 Vaccination Intent and Decision Making Among African American, Native American, and Hispanic Participants in a Qualitative Study. Public Health Rep. 2023 Mar 27:333549231160871.
3. Carpiano RM, Callaghan T, DiResta R, Brewer NT, Clinton C, Galvani AP, Lakshmanan R, Parmet WE, Omer SB, Buttenheim AM, Benjamin RM, Caplan A, Elharake JA, Flowers LC, Maldonado YA, Mello MM, Opel DJ, **Salmon DA**, Schwartz JL, Sharfstein JM, Hotez PJ. Confronting the evolution and expansion of anti-vaccine activism in the USA in the COVID-19 era. Lancet. 2023 Mar 18;401(10380):967-970.
4. Kitano T, Thompson DA, Engineer L, Dudley M, **Salmon DA**. Risk and benefit of mRNA COVID-19 vaccines for Omicron variant by age, sex and presence of comorbidity: a quality-adjusted life years analysis. Am J Epidemiol. 2023 Mar 14:kwad058.
5. **Salmon DA**, Plotkin S, Navar AM. Vaccine Decision-making in a Time of Conflicting Recommendations: A Call to Go Beyond Politics. Pediatr Infect Dis J. 2023 Feb 22:e003892.

6.  Dudley MZ, Schuh HB, Shaw J, Rimal RN, Harvey SA, Balgobin KR, Zapf AJ, **Salmon DA**. COVID-19 vaccination among different types of US Healthcare Personnel. Vaccine. 2023 Feb 17;41(8):1471-1479.

7.  Dudley MZ, Barnett EE, Paulenich A, Omer SB, Schuh H, Proveaux TM, Buttenheim AM, Klein NP, Delamater P, McFadden SM, Patel KM, **Salmon DA**. Characterization of parental intention to vaccinate elementary school aged children in the state of California. Vaccine. 2023 Jan 16;41(3):630-635.

8.  Budigan Ni H, de Broucker G, Patenaude BN, Dudley MZ, Hampton LM, **Salmon DA**. Economic impact of vaccine safety incident in Ukraine: The economic case for safety system investment. Vaccine. 2023 Jan 4;41(1):219-225.

9.  Opel DJ, Brewer NT, Buttenheim AM, Callaghan T, Carpiano RM, Clinton C, Elharake JA, Flowers LC, Galvani AP, Hotez PJ, Schwartz JL, Benjamin RM, Caplan A, DiResta R, Lakshmanan R, Maldonado YA, Mello MM, Parmet WE, **Salmon DA**, Sharfstein JM, Omer SB. The legacy of the COVID-19 pandemic for childhood vaccination in the USA. Lancet. 2023 Jan 7;401(10370):75-78.

10. **Salmon DA**, Schuh HB, Sargent RH, Konja A, Harvey SA, Laurie S, Mai BS, Weakland LF, Lavery JV, Orenstein WA, Breiman RF. Impact of vaccine pause due to Thrombosis with thrombocytopenia syndrome (TTS) following vaccination with the Ad26.COV2.S vaccine manufactured by Janssen/Johnson & Johnson on vaccine hesitancy and acceptance among the unvaccinated population. PLoS One. 2022 Oct 11;17(10):e0274443.

11. Mello MM, Opel DJ, Benjamin RM, Callaghan T, DiResta R, Elharake JA, Flowers LC, Galvani AP, **Salmon DA**, Schwartz JL, Brewer NT, Buttenheim AM, Carpiano RM, Clinton C, Hotez PJ, Lakshmanan R, Maldonado YA, Omer SB, Sharfstein JM, Caplan A. Effectiveness of vaccination mandates in improving uptake of COVID-19 vaccines in the USA. Lancet. 2022 Aug 13;400(10351):535-538.

12. Omer SB, O'Leary ST, Bednarczyk RA, Ellingson MK, Spina CI, Dudley MZ, Chamberlain AT, Limaye RJ, Brewer SE, Frew PM, Malik FA, Orenstein W, Halsey N, Ault K, **Salmon DA**. Multi-tiered intervention to increase maternal immunization coverage: A randomized, controlled trial. Vaccine. 2022 Aug 12;40(34):4955-4963.

13. Sargent RH, Laurie S, Weakland LF, Lavery JV, **Salmon DA**, Orenstein WA, Breiman RF. Use of Random Domain Intercept Technology to Track COVID-19 Vaccination Rates in Real Time Across the United States: Survey Study. J Med Internet Res. 2022 Jul 1;24(7):e37920.

14. Dudley MZ, Schwartz B, Brewer J, Kan L, Bernier R, Gerber JE, Ni HB, Proveaux TM, Rimal RN, **Salmon DA**. COVID-19 Vaccination Status, Attitudes, and Values among US Adults in September 2021. J Clin Med. 2022 Jun 28;11(13):3734.

15. Sargent RH, Laurie S, Moncada L, Weakland LF, Lavery JV, **Salmon DA,** Orenstein WA, Breiman RF. Masks, money, and mandates: A national survey on efforts to increase COVID-19 vaccination intentions in the United States. PLoS One. 2022 Apr 21;17(4):e0267154.

16. Brewer NT, Buttenheim AM, Clinton CV, Mello MM, Benjamin RM, Callaghan T, Caplan A, Carpiano RM, DiResta R, Elharake JA, Flowers LC, Galvani AP, Hotez PJ, Lakshmanan R, Maldonado YA, Omer SB, **Salmon DA,** Schwartz JL, Sharfstein JM, Opel DJ. Incentives for COVID-19 vaccination. Lancet Reg Health Am. 2022 Apr;8:100205.

17.   Trent MJ, **Salmon DA**, MacIntyre CR. Predictors of pneumococcal vaccination among Australian adults at high risk of pneumococcal disease. Vaccine. 2022 Feb 16;40(8):1152-1161.

18.   Patel KM, McFadden SM, Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon DA**, Omer SB, Buttenheim AM. Evaluation of Trends in Homeschooling Rates After Elimination of Nonmedical Exemptions to Childhood Immunizations in California, 2012-2020. JAMA Netw Open. 2022 Feb 1;5(2):e2146467.

19.   **Salmon DA**, Black S, Didierlaurent AM, Moulton LH. Commentary on "Common vaccines and the risk of dementia: a population-based cohort study": Science can be messy but eventually leads to truths. J Infect Dis. 2022 Dec 21:jiac487.

20.   Dudley MZ, Omer SB, O'Leary ST, Limaye RJ, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Chamberlain AT, Malik F, Frew PM, Church-Balin C, Riley LE, Ault KA, Orenstein WA, Halsey NA, **Salmon DA**. MomsTalkShots, tailored educational app, improves vaccine attitudes: a randomized controlled trial. BMC Public Health. 2022 Nov 21;22(1):2134.

21.   Trent M, Seale H, Chughtai AA, **Salmon D**, MacIntyre CR. Trust in government, intention to vaccinate and COVID-19 vaccine hesitancy: A comparative survey of five large cities in the United States, United Kingdom, and Australia.  Vaccine. 2022 Apr 14;40(17):2498-2505.

22.   Brewer NT, Buttenheim AM, Clinton CV, Mello MM, Benjamin RM, Callaghan T, Caplan A, Carpiano RM, DiResta R, Elharake JA, Flowers LC, Galvani AP, Hotez PJ, Lakshmanan R, Maldonado YA, Omer SB, **Salmon DA**, Schwartz JL, Sharfstein JM, Opel DJ. Incentives for COVID-19 vaccination. Lancet Reg Health Am. 2022 Apr;8.

23.   Patel KM, McFadden SM, Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon DA**, Omer SB, Buttenheim AM. Evaluation of Trends in Homeschooling Rates After Elimination of Nonmedical Exemptions to Childhood Immunizations in California, 2012-2020. JAMA Netw Open. 2022 Feb 1;5(2).

24.   Trent MJ, **Salmon DA**, MacIntyre CR. Predictors of pneumococcal vaccination among Australian adults at high risk of pneumococcal disease. Vaccine. 2022 Feb 16;40(8):1152-1161.

25.   **Salmon DA**, Elharake JA, Brewer NT, Carpiano RM, DiResta R, Maldonado YA, Sgaier SK, Omer SB Vaccine Verification in the COVID-19 World. Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. Lancet Reg Health Am. 2022 Feb;6.

26.   Omer SB, Benjamin RM, Brewer NT, Buttenheim AM, Callaghan T, Caplan A, Carpiano RM, Clinton C, DiResta R, Elharake JA, Flowers LC, Galvani AP, Lakshmanan R, Maldonado YA, McFadden SM, Mello MM, Opel DJ, Reiss DR, **Salmon DA**, Schwartz JL, Sharfstein JM, Hotez PJ. Promoting COVID-19 vaccine acceptance: recommendations from the Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. 2021 Dec 11;398(10317):2186-2192.

27.   Sharfstein JM, Callaghan T, Carpiano RM, Sgaier SK, Brewer NT, Galvani AP, Lakshmanan R, McFadden SM, Reiss DR, **Salmon DA**, Hotez PJ. Uncoupling vaccination from politics: a call to action. Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. Lancet. 2021 Oct 2;398(10307):1211-1212.

28.   **Salmon D**, Opel DJ, Dudley MZ, Brewer J, Breiman R. Reflections On Governance, Communication, And Equity: Challenges And Opportunities In COVID-19 Vaccination.

Health Aff (Millwood). 2021 Mar;40(3):419-425. doi: 10.1377/hlthaff.2020.02254. Epub 2021 Feb 4.

29. Shaw J, Hanley S, Stewart T, **Salmon DA**, Ortiz C, Trief PM, Asiago Reddy E, Morley CP, Thomas SJ, Anderson KB. Health Care Personnel (HCP) attitudes about COVID-19 vaccination after emergency use authorization.  Clin Infect Dis. 2021 Sep 1.

30. Dudley MZ, Bernier R, Brewer J, **Salmon DA.** Walking the Tightrope: Reevaluating science communication in the era of COVID-19 vaccines. Vaccine. 2021 Sep 15;39(39):5453-5455.

31. Wu Q, Dudley MZ, Chen X, Bai X, Dong K, Zhuang T, Salmon D, Yu H. Evaluation of the safety profile of COVID-19 vaccines: a rapid review. BMC Med. 2021 Jul 28;19(1):173.

32. **Salmon DA**, Lambert PH, Nohynek HM, Gee J, Parashar UD, Tate JE, Wilder-Smith A, Hartigan-Go KY, Smith PG, Zuber PLF. Novel vaccine safety issues and areas that would benefit from further research. BMJ Glob Health. 2021 May;6(Suppl 2):e003814.

33. Gerber JE*, Brewer J, Limaye RJ, Sutherland A, Blunt M, Holroyd TA*, Geller G, Carleton B, Kahn J, **Salmon DA.** Vaccinomics: a cross-sectional survey of public values. Hum Vaccin Immunother. 2021 Jun 21:1-17.

34. Holroyd TA*, Limaye RJ, Gerber JE*, Rimal RN, Musci RJ, Brewer J, Sutherland A, Blunt M, Geller G, **Salmon DA.** Development of a Scale to Measure Trust in Public Health Authorities: Prevalence of Trust and Association with Vaccination.  J Health Commun. 2021 May 16:1-9.

35. Limaye RJ, Opel DJ, Dempsey A, Ellingson M, Spina C, Omer SB, Dudley MZ, **Salmon DA**, Leary SO. Communicating with Vaccine-Hesitant Parents: A Narrative Review. Acad Pediatr. 2021 May-Jun;21(4S):S24-S29.

36. **Salmon DA**, Dudley MZ, Brewer J, Kan L, Gerber JE, Budigan H*, Proveaux TM, Bernier R, Rimal R, Schwartz B. COVID-19 vaccination attitudes, values and intentions among United States adults prior to emergency use authorization. Vaccine. 2021 Mar 24:S0264-410X(21)00315-7..

37. Gerber JE*, Brewer J, Limaye RJ, Sutherland A, Geller G, Spina CI, **Salmon DA.** Ethical and policy implications of vaccinomics in the United States: community members' perspectives. Hum Vaccin Immunother. 2021 Feb 24:1-12.

38. Trent MJ*, **Salmon DA**, MacIntyre CR. Using the health belief model to identify barriers to seasonal influenza vaccination among Australian adults in 2019. Influenza Other Respir Viruses. 2021 Feb 15.

39. Dudley MZ, Limaye RJ, **Salmon DA**, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Malik F, Frew PM, Chamberlain AT. Racial/Ethnic Disparities in Maternal Vaccine Knowledge, Attitudes, and Intentions. Public Health Rep. 2021 Jan 28.

40. Holroyd TA*, Howa AC, Proveaux TM, Delamater PL, Klein NP, Buttenheim AM, Limaye RJ, Omer SB, **Salmon DA**. School-level perceptions and enforcement of the elimination of nonmedical exemptions to vaccination in California. Hum Vaccin Immunother. 2021 Jan 25:1-8.

41. Shaw J, Stewart T, Anderson KB, Hanley S, Thomas SJ, **Salmon DA**, Morley C. Assessment of U.S. health care personnel (HCP) attitudes towards COVID-19 vaccination in a large university health care system. Clin Infect Dis. 2021 Jan 25. :

42.  Dudley MZ, Taitel MS, Smith-Ray R, Singh T, Limaye RJ, **Salmon DA**. Effect of educational and financial incentive-based interventions on immunization attitudes, beliefs, intentions and receipt among close contacts of pregnant women. Vaccine. 2021 Feb 5;39(6):961-967.

43.  Holroyd TA*, Howa AC, Delamater PL, Klein NP, Buttenheim AM, Limaye RJ, Proveaux TM, Omer SB, **Salmon DA**. Parental vaccine attitudes, beliefs, and practices: initial evidence in California after a vaccine policy change. Hum Vaccin Immunother. 2020 Nov 24:1-6.

44.  Spina CI, Brewer SE, Ellingson MK, Chamberlain AT, Limaye RJ, Orenstein WA, **Salmon DA**, Omer SB, O'Leary ST. Adapting Center for Disease Control and Prevention's immunization quality improvement program to improve maternal vaccination uptake in obstetrics. Vaccine. 2020 Nov 25;38(50):7963-7969.

45.  Kochhar S, **Salmon DA**. Planning for COVID-19 vaccines safety surveillance. Vaccine. 2020 Sep 11;38(40):6194-6198.

46.  Dudley MZ, Limaye RJ, **Salmon DA**, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Malik F, Frew PM, Chamberlain AT. Latent Class Analysis of Maternal Vaccine Attitudes and Beliefs. Health Educ Behav. 2020 Oct;47(5):765-781.

47.  Bleser WK, **Salmon DA**, Miranda PY. A hidden vulnerable population: Young children up-to-date on vaccine series recommendations except influenza vaccines. PLoS One. 2020 Jun 18;15(6):e0234466.

48.  Limaye RJ, Malik F, Frew PM, Randall LA, Ellingson MK, O'Leary ST, Bednarczyk RA, Oloko O, **Salmon DA**, Omer SB. Patient Decision Making Related to Maternal and Childhood Vaccines: Exploring the Role of Trust in Providers Through a Relational Theory of Power Approach. Health Educ Behav. 2020 Jun;47(3):449-456.

49.  Dudley MZ, Halsey NA, Omer SB, Orenstein WA, O'Leary ST, Limaye RJ, **Salmon DA**. The state of vaccine safety science: systematic reviews of the evidence. Lancet Infect Dis. 2020 May;20(5):e80-e89.

50.  Dudley MZ*, Limaye RJ, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Chamberlain AT, Bednarczyk RA, Malik F, Frew PM, Salmon DA. Factors associated with referring close contacts to an app with individually-tailored vaccine information. Vaccine. 2020 Mar 17;38(13):2827-2832.

51.  Holroyd TA*, Oloko OK, **Salmon DA**, Omer SB, Limaye RJ. Communicating Recommendations in Public Health Emergencies: The Role of Public Health Authorities. Health Secur. 2020 Jan/Feb;18(1):21-28.

52.  Dudley MZ*, Limaye RJ, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Chamberlain AT, Bednarczyk RA, Malik F, Frew PM, **Salmon DA**.  Characterizing the vaccine knowledge, attitudes, beliefs, and intentions of pregnant women in Georgia and Colorado.  Hum Vaccin Immunother. 2020 Feb 20:1-9.

53.  Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon D**, Omer SB, Buttenheim AM. Homeschooling parents in California: Attitudes, beliefs and behaviors associated with child's vaccination status.  Vaccine. 2020 Feb 18;38(8):1899-1905.

54.  Gostin LO, Hodge JG Jr, Bloom BR, El-Mohandes A, Fielding J, Hotez P, Kurth A, Larson HJ, Orenstein WA, Rabin K, Ratzan SC, **Salmon D**.  The public health crisis of underimmunisation: a global plan of action.  Lancet Infect Dis. 2020 Jan;20(1):e11-e16.

55.  Delamater PL, Buttenheim AM, Klein NP, Mohanty S, **Salmon DA**, Omer SB. Assessment of Exemptions from Vaccination in California, 2015 to 2027. Ann Intern Med. 2019 Nov 5.

56. **Salmon DA**, Limaye RJ, Dudley MZ*, Oloko OK, Church-Balin C, Ellingson MK, Spina CI, Brewer SE, Orenstein WA, Halsey NA, Chamberlain AT, Bednarczyk RA, Malik FA, Frew PM, O'Leary ST, Omer SB.  MomsTalkShots: An individually tailored educational application for maternal and infant vaccines.  Vaccine. 2019 Oct 8;37(43):6478-6485.

57. Pingali SC, Delamater PL, Buttenheim AM, **Salmon DA**, Klein NP, Omer SB.  Associations of Statewide Legislative and Administrative Interventions with Vaccination Status Among Kindergartners in California.  JAMA. 2019 Jul 2;322(1):49-56.

58. Ratzan SC, Bloom BR, El-Mohandes A, Fielding J, Gostin LO, Hodge JG, Hotez P, Kurth A, Larson HJ, Nurse J, Omer SB, Orenstein WA, **Salmon D**, Rabin K.  The Salzburg Statement on Vaccination Acceptance.  J Health Commun. 2019;24(5):581-583.

59. Delamater PL, Pingali SC, Buttenheim AM, **Salmon DA**, Klein NP, Omer SB. Elimination of Nonmedical Immunization Exemptions in California and School-Entry Vaccine Status. Pediatrics. 2019 Jun;143(6).

60. Chamberlain AT, Limaye RJ, O'Leary ST, Frew PM, Brewer SE, Spina CI, Ellingson MK, Dudley MZ*, Orenstein WA, Donnelly MA, Riley LE, Ault KA, **Salmon DA**, Omer SB. Development and acceptability of a video-based vaccine promotion tutorial for obstetric care providers. Vaccine. 2019 May 1;37(19):2532-2536.

61. Herman R, McNutt LA, Mehta M, **Salmon DA**, Bednarczyk RA, Shaw J.  Vaccination perspectives among adolescents and their desired role in the decision-making process. Hum Vaccin Immunother. 2019 Feb 8

62. McDonald P*, Limaye RJ, Omer SB, Buttenheim AM, Mohanty S, Klein NP, **Salmon DA**. Exploring California's new law eliminating personal belief exemptions to childhood vaccines and vaccine decision-making among homeschooling mothers in California. Vaccine. 2019 Jan 29;37(5):742-750.

63. Ellingson MK, Dudley MZ*, Limaye RJ, **Salmon DA**, O'Leary ST, Omer SB.  Enhancing uptake of influenza maternal vaccine.  Expert Rev Vaccines. 2019 Feb;18(2):191-204.

64. Bleser WK*, Miranda PY, **Salmon DA**.  Child Influenza Vaccination and Adult Work Loss: Reduced Sick Leave Use Only in Adults With Paid Sick Leave. Am J Prev Med. 2019 Feb;56(2):251-261.

65. Mohanty S, Buttenheim AM, Joyce CM, Howa AC, **Salmon D**, Omer SB.  Californian's Senate Bill 277: Local health jurisdictions' experience with the elimination of nonmedical vaccine exemptions.  Am J Public Health. 2018 Nov 29:e1-e6.

66. Mohanty S, Buttenheim AM, Joyce CM, Howa AC, **Salmon D**, Omer SB. Experiences With Medical Exemptions After a Change in Vaccine Exemption Policy in California. Pediatrics. 2018 Nov;142(5).

67. Kasting ML, Christy SM, Sutton SK, Lake P, Malo TL, Roetzheim RG, Schechtman T, Zimet GD, Walkosz BJ, **Salmon D**, Kahn JA, Giuliano AR, Vadaparampil ST. Florida physicians' reported use of AFIX-based strategies for human papillomavirus vaccination. Prev Med. 2018 Nov;116:143-149.

68. Jones M, Buttenheim AM, **Salmon D**, Omer SB.  Mandatory health care provider counseling of parents led to a decline in vaccine exemptions in California.  Health Aff (Millwood). 2018 Sep;37(9):1494-1502.

69. Bednarczyk RA, Chamberlain A, Mathewson K, **Salmon DA**, Omer SB.  Practice-, Provider-, and Patient-level interventions to improve preventive care: Development of the P3 Model. Prev Med Rep. 2018 Jun 18;11:131-138.

70. Buttenheim AM, Jones M, Mckown C, **Salmon D**, Omer SB. Conditional admission, religious exemption type, and nonmedical vaccine exemption in California before and after a state policy change.  Vaccine. 2018 May 16. Epub ahead of print.

71. Omer SB, Allen K, Chang DH, Guterman LB, Bednarczyk RA, Jordan A, Buttenheim A, Jones M, Hannan C, deHart MP, **Salmon DA**.  Exemptions from mandatory immunization after legally mandated parental counseling.  Pediatrics. 2018 Jan;141(1).

72. Frew PM, Randall LA, Malik F, Limaye RJ, Wilson A, O'Leary ST, **Salmon D**, Donnelly M, Ault K, Dudley MZ*, Fenimore VL, Omer SB.  Clinician perspectives on strategies to improve patient maternal immunization acceptability in obstetrics and gynecology practice settings.  Hum Vaccin Immunother. 2018 Jan 9:1-10.

73. Omer SB, Porter RM, Allen K, **Salmon DA**, Bednarczyk RA. Trends in Kindergarten Rates of Vaccine Exemption and State-Level Policy, 2011-2016.  Open Forum Infect Dis. 2017 Nov 15;5(2).

74. Bednarczy RA, Frew PM, **Salmon DA**, Whitney E, Omer SB.  ReadyVax: A new mobile vaccine information app. Hum Vaccin Immunother. 2017 May 4;13(5):1149-1154.

75. Vadaparampil ST, Malo TL, Sutton SK, Ali KN, Kahn JA, Casler A, **Salmon D**, Walkosz B, Roetzheim RG, Zimet GD, Giuliano AR.  Missing the target for routine Human Papillomavirus vaccination: consistent and strong physician recommendations are lacking for 11 to 12-year old males.  Cancer Epidemiol Biomarkers Prev. 2016 Oct;25(10):1435-46.

76. Lee C, Whetten K, Omer S, Pan W, **Salmon D**. Hurdles to herd immunity: distrust of government and vaccine refusal in the U.S., 2002-2003.  Vaccine. 2016 Jul 25; 34(34):2972-8.

77. Phadke VK. Bednarczyk RA, **Salmon DA**, Omer SB. Association between Vaccine Refusal and Vaccine Preventable Diseases in the United States: A Focus on Measles and Pertussis.  JAMA.  2016 Mar; 315(11): 1149-58.

78. Halsey NA, Talaat KR, Greenbaum A, Mensah E, Dudley* MZ, Proveaux T, **Salmon DA**.  The safety of influenza vaccines in children: An Institute for Vaccine Safety white paper.  Vaccine. 2015 Dec 30;33 Suppl 5:F1-67.

79. **Salmon DA**, Dudley MZ*, Glanz JM, Omer SB. Vaccine hesitancy: Causes, consequences, and a call to action. Co-Published.  Vaccine & Am J Prev Med. 2015 Nov 23; Suppl 4:D66-71.

80. Buttenheim AM, Sethuraman K, Omer SB, Hanlon AL, Levy MZ, **Salmon D**. MMR vaccination status of children exempted from school-entry immunization mandates.  Vaccine. 2015 Nov 17;33(46):6250-6.

81. Geller G, Dvoskin R, Thio CL, Duggal P, Lewis MH, Bailey TC, Sutherland A, **Salmon DA**, Kahn JP.  Genomics and infectious disease: a call to identify the ethical, legal and societal implications for public health and clinical practice.  Genome Medicine 2014 Nov 18; 6:(11): 106.

82. Vadaparampil ST, Malo TL, Kahn JA, **Salmon DA**, Lee JH, Quinn GP, Roetzheim RG, Bruder KL, Proveaux TM, Zhao X, Halsey NA, Giuliano AR. Physicians' human papillomavirus vaccine recommendations, 2009 and 2011.  Am J Prev Med. 2014 Jan; 46(1):80-4.

83. Siddiqui M, **Salmon DA**, Omer SB.  Epidemiology of vaccine hesitancy in the United States. Hum Vaccin Immunother. 2013 Nov 18;9(12).

Case 2:23-cv-00263-KNS   Document 21-3   Filed 10/02/23   Page 111 of 265

Page 11

84. Atwell JE, Van Otterloo J, Zipprich J, Winter K, Harriman K, **Salmon DA**, Halsey NA, Omer SB.  Nonmedical vaccine exemptions and pertussis in California, 2010.  Pediatrics. 2013 Oct;132(4):624-30.

85. **Salmon DA**, Vellozzi C, Chen RT, Halsey NA. Did the influenza A (H1N1) 2009 monovalent inactivated vaccines increase the risk for Guillain-Barré syndrome?  Expert Rev Clin Immunol. 2013 Sep;9(9):795-7.

86. Mergler MJ*, Omer SB, Pan WK, Navar-Boggan AM*, Orenstein W, Marcuse EK, Taylor J, Dehart MP, Carter TC, Damico A, Halsey N, **Salmon DA**. Association of vaccine-related attitudes and beliefs between parents and health care providers.  Vaccine. 2013 Jul 26.

87. Sadaf A, Richards JL, Glanz J, **Salmon DA**, Omer SB. A systematic review of interventions for reducing parental vaccine refusal and vaccine hesitancy. Vaccine. 2013 Jul 13.

88. Dodd CN, Romio SA, Black S et al. International collaboration to assess the risk of Guillain-Barré Syndrome following Influenza A (H1N1) 2009 monovalent vaccines. Vaccine. 2013 June 13.

89. Richards JL, Wagenaar BH, Van Otterloo J, Gondalia R, Atwell JE*, Kleinbaum DG, **Salmon DA**, Omer SB.  Nonmedical exemptions to immunization requirements in California: a 16-year longitudinal analysis of trends and associated community factors. Vaccine. 2013 May 10.

90. **Salmon DA**, Proschan M, Forshee R, Gargiullo P, Bleser W*, Burwen DR, Cunningham F, Garman P, Greene SK, Lee GM, Vellozzi C, Yih WK, Gellin B, Lurie N, and the H1N1 GBS Meta-Analysis Working Group.  A Meta-Analysis of the Association between Guillain-Barré Syndrome and Influenza A (H1N1) 2009 Monovalent Inactivated Vaccines in the United States. The Lancet.  2013 Apr 27; 2819876): 1461-8.

91. **Salmon DA**, Yih WK, Lee GM, Rosofsky R, Brown J, Vannice K*, Tokars J, Roddy J, Brand W, Ball R, Gellin B, Lurie N, Platt R, Lieu TA, and the PRISM Program H1N1 Project Collaborators.  Success of program linking data sources to monitor H1N1 vaccine safety points to potential for even broader safety surveillance. Health Aff (Millwood). 2012 Nov; 31(11):2518-27.

92. Bruder KL, Downes KL, Malo TL, Giuliano AR, **Salmon DA**, Vadaparampil ST. Physicians' intentions to change pap smear frequency following human papillomavirus vaccination. J Pediatr Adolesc Gynecol. 2012 Dec;25(6):384-9.

93. Jones AM, Omer SB, Bednarczyk RA, Halsey NA, Moulton LH, **Salmon DA**.  Parents' source of vaccine information and impact on vaccine attitudes, beliefs, and nonmedical exemptions.  Adv Prev Med. Epub 2012 Oct 2.

94. Yih KW, Lee GM, Lieu TA, Ball R, Kulldorff M, Rett M, Wahl PM, Walraven CNM, Platt R, **Salmon DA**.  Pandemic 2009 H1N1 Vaccine Safety Surveillance by the Post-Licensure Rapid Immunization Safety Monitoring (PRISM) System in 2009-2010.  Am J Epidemiol. 2012 Jun 1;175(11):1120-8.

95. Vadaparampil ST, Kahn JA, **Salmon D**, Lee JH, Quinn GP, Roetzheim R, Bruder K, Malo TL, Proveaux T, Zhao X, Halsey N, Giuliano AR.  Missed clinical opportunities: provider recommendations for HPV vaccination for 11-12 year old girls are limited. Vaccine. 2011 Nov 3;29(47):8634-41.

96. **Salmon DA**, Pavia A, Gellin B.  From Sugar Cubes to Injections: Vaccine Safety throughout the Product Lifecycle.  Introduction from Guest Editors.  Pediatrics. 2011 May;127 Suppl 1:S1-4.

97. **Salmon DA**, Akhtar A, Mergler MJ*, Vannice KS*, Izurieta H, Ball R, Lee GM, Vellozzi C, Garman P, Cunningham F, Gellin B, Koh H, Lurie N, and the H1N1 Working Group of the Federal Immunization Safety Task Force. Immunization Safety Monitoring Systems for the 2009 H1N1 Monovalent Influenza Vaccination Program. Pediatrics. 2011 May;127 Suppl 1:S78-86.

98. Hussain H*, Omer SB, Manganello JA, Kromm EE, Carter T*, Kan L, Stokley S, Halsey NA, **Salmon DA**. Immunization Safety in United States Print Media, 1995-2005. Pediatrics. 2011 May;127 Suppl 1:S100-6.

99. Vannice KS*, **Salmon DA**, Omer SB, Kissner J, Edwards KM, Sparks R, Dekker CL, Klein NP, Gust DA. Attitudes and Beliefs of Parents with Concern about Vaccines: Impact of Timing of Immunization Information. Pediatrics. 2011 May;127 Suppl 1:S120-6.

100. Shen AK, Spinner JR, **Salmon DA**, Gellin BG.  Strengthening the U.S. Vaccine and Immunization Enterprise: The Role of the National Vaccine Advisory Committee.  Public Health Reports. Jan-Feb 2011. 126: 4-8.

101. Smith PJ, Humiston SG, Parnell TS, Vanice KS*, **Salmon DA**. The association between intentional delay of vaccine administration and timely childhood vaccination coverage. Public Health Reports. 2010;25(4).

102. Esteves-Jaramillo A, Omer SB, Gonzalez-Diaz E, **Salmon DA**, Hixson B, Navarro F, Kawa-Karasik S, Frew P, Morfin-Otero R, Rodriguez-Noriega E, Ramirez Y, Rosas A, Acosta E, Varela-Badillo V, Del Rio C. Acceptance of a vaccine against novel influenza A (H1N1) virus among health care workers in two major cities in Mexico.  Arch Med Res. 2009 Nov;40(8):705-11.

103. Black S, Siegrist, MA, Halsey NA, MacDonald N, Law B, Miller E, Andrews N, Stowe J, **Salmon DA**, Vannice K*, Izurieta HS, Akhtar A, Gold M, Oselka G, Zuber P, Pfeifer D, Vellozzi C.  Importance of background rates of disease in assessment of vaccine safety during mass immunisation with pandemic H1N1 influenza vaccines. The Lancet. 2009 Oct 31.

104. **Salmon DA**, Smith PJ, Pan WK, Navar AM*, Omer SB, Halsey NA.  Disparities in preschool immunization coverage associated with maternal age.  Hum Vaccin. 2009 Aug;5(8):557-61. 2009 Aug 14.

105. Glanz JM, McClure DL, Magid DJ, Daley MF, France EK, **Salmon DA**, Hambidge SJ. Parental refusal of pertussis vaccination is associated with an increased risk of pertussis infection in children.  Pediatrics. 2009 Jun;123(6):1446-51.

106. Omer SB*, **Salmon DA**, Orenstein WA, deHart MP, Halsey N.  Vaccine refusal, mandatory immunization, and the risks of vaccine-preventable diseases.  N Engl J Med. 2009 May 7;360(19):1981-8.

107. Gust DA, Kennedy A, Weber D, Evans G, Kong Y, **Salmon D**.  Parents questioning immunization: evaluation of an intervention.  Am J Health Behav. 2009 May-Jun;33(3):287-98.

108. **Salmon DA**, Sotir MJ, Pan WK, Berg JL, Omer SB*, Stokley S, Hopfensperger DJ, Davis JP, Halsey NA.  Parental vaccine refusal in Wisconsin: a case-control study. WMJ. 2009 Feb;108(1):17-23.

109. Omer SB*, Enger KS, Moulton LH, Halsey NA, Stokley S, **Salmon DA**.  Geographic clustering of nonmedical exemptions to school immunization requirements and associations with geographical clustering of pertussis.  Am J Epidemiol. 2008 Oct 15.

110. Malm H, May T, Francis LP, Omer SB, **Salmon DA**, Hood R. Ethics, pandemics, and the duty to treat.  Am J Bioth. 2008 Aug; 8: 4-19.

111. **Salmon DA**, Pan WK, Omer SB, Navar AM*, Orenstein W, Marcuse EK, Taylor J, deHart MP, Stokley S, Carter T*, Halsey NA.  Vaccine knowledge and practices of primary care providers of exempt vs. vaccinated children.  Hum Vaccin. 2008 Jul-Aug. 4(4): 286-91.

112. Giuliano AR, **Salmon D**. The case for a gender-neutral (universal) human papillomavirus vaccination policy in the United States: Point. Cancer Epidemiol Biomarkers Prev. 2008 Apr;17(4):805-8.

113. Vernick JS, Rutkow L, **Salmon DA**.  Availability of litigation as a public health tool for firearm injury prevention: comparison of guns, vaccines, and motor vehicles.  AJPH. 2007 Nov; 97(11): 1991-7.

114. Navar AM*, Halsey NA, Carter TC*, Montgomery MP, **Salmon DA**.  Prenatal immunization education: the pediatric prenatal visit and routine obstetric care.  AJPM. 2007 Sep: 33(3): 211-3.

115. Shuster JJ, Jones LS, **Salmon DA**.  Fixed vs random effects meta-analysis in rare event studies: the rosiglitazone link with myocardial infraction and cardiac death. Stat Med. 2007 Oct 30; 26(24): 4375-85.

116. Irving SA*, **Salmon DA**, Curbow BA. Vaccine risk communication interventions in the United States, 1996-2006: a review.  Current Ped Reviews. 2007 Aug 3; 3: 238-247.

117. Thompson JW, Tyson S. Card-Higginson P, Jacobs RF, Wheeler JG, Simpson P, Bost JE, Ryan KW, **Salmon DA**.  Impact of addition of philosophical exemptions on childhood immunization rates.  AJPM. 2007 Mar; 32(3): 194-201.

118. Omer SB*, Pan WK, Halsey NA, Stokely S, Moulton LH, Navar AM*, **Salmon DA.** Nonmedical Exemptions to School Immunization Requirements: Secular Trends and Association of State Policies with Pertussis Incidence. JAMA. 2006 Oct 11; 296(14):1757-63.

119. **Salmon DA**, Omer SB*.  Individual Freedoms versus Collective Responsibility: Immunization Decision-Making in the Face of Occasionally Competing Values. Emerging Themes in Epidemiology. 2006 Sep 27; 3:13-15.

120. Linkins RW, **Salmon DA**, Omer SB*, Pan WKY, Stokley S, Halsey NA.  Support for immunization registries among parents of vaccinated and unvaccinated school-aged children. BMC Public Health. 2006 Sep 22; 6:236-243.

121. **Salmon DA**, Smith PJ, Navar AM*, Pan WKY, Omer SB*, Singleton JA, Halsey NA. Measuring immunization coverage among pre-school children: past, present and future opportunities. Epidemiologic Reviews.  2006; 28:27-40.

122. **Salmon DA**, Teret SP, MacIntyre CR, Salisbury D, Halsey NA.  Compulsory Vaccination and Conscientious or Philosophical Exemptions: Past, Present and Future.  The Lancet. 2006 Feb 4; 367(9508):436-42.

123. **Salmon DA**, Moulton LH, Omer SB*, DeHart P, Stokley S, Halsey NA.  Factors Associated with Refusal of Childhood Vaccines: A Case-Control Study.  Arch Pediatr Adolesc Med. 2005 May; 159(5):470-6.

124. **Salmon DA**, Sapsin J, Jacobs J, Thompson J, Teret S, Halsey NA.  Public Health and the Politics of School Immunization Requirements.  AJPH. 2005 May; 95(5):778-83.

125. **Salmon DA**, Omer SB*, Moulton L, Stokley S, DeHart P, Lett S, Norman B, Teret S, Halsey N. Exemptions to School Immunization Requirements: The Role of School-Level Requirements, Policies and Procedures. AJPH. March 2005; 95(3); 436-440.

126. **Salmon DA**, Moulton L, Omer SB*, Chace L, Klassen, Talebian P, Halsey N. The Knowledge Attitudes and Beliefs of School Personnel and Associations with Non-Medical Exemptions. Pediatrics. 2004 June 6; 113(6): 552-559.

127. **Salmon DA**, Moulton LM, Halsey NA.  Enhancing Public Confidence in Vaccines through Independent Oversight of Post-Licensure Vaccine Safety.  AJPH.  2004 June; 94(6); 947-950.

128. **Salmon DA**, Siegel AW. Religious and philosophical exemptions from vaccination requirements and lessons learned from conscientious objectors from conscription.  Public Health Reports.  2001 July-August; 116: 289-295.

129. Feikin DR, Lezotte DC, Hamman RF, **Salmon DA,** Chen RT, Hoffman RE. Individual and community risks of measles and pertussis associated with personal exemptions to immunizations. JAMA. 2000 Dec. 27; 284(24): 3145-3150.

130. Rota JS*, **Salmon DA**, Rodewald LE, Chen RT, Hibbs BF, Gangarosa EJ. Processes for obtaining nonmedical exemptions to state immunization laws. AJPH. April 2000; 91: 645-8.

131. **Salmon DA**, Haber M, Gangarosa EJ, Phillips L, Smith N, Chen RT. Health consequences of religious and philosophical exemptions from immunization laws: individual and societal risks of measles. JAMA. 1999 July 7; 282(1): 47-53.

*COMMENTARIES*

1. Gostin LO, Shaw J, **Salmon DA.** Mandatory SARS-CoV-2 Vaccinations in K-12 Schools, Colleges/Universities, and Businesses. JAMA. 2021 Jun 7. *Invited*

2. Gostin LO, **Salmon DA**, Larson HJ. Mandating COVID-19 Vaccines. JAMA. 2021 Feb 9;325(6):532-533. doi: 10.1001/jama.2020.26553. PMID: 33372955. *Invited*

3. Opel DJ, **Salmon DA**, Marcuse EK. Building Trust to Achieve Confidence in COVID-19 Vaccines. JAMA Netw Open. 2020 Oct 1;3(10):e2025672. doi: *Invited*

4. **Salmon DA**, Dudley MZ, Carleton BC. Guillain-Barré Syndrome Following Influenza Vaccines Affords Opportunity to Improve Vaccine Confidence. J Infect Dis. 2021 Feb 13;223(3):355-358. doi: 10.1093/infdis/jiaa544. PMID: 33137189. *Invited*

5. **Salmon DA**, Dudley MZ. It is time to get serious about vaccine confidence. Lancet. 2020 Sep 26;396(10255):870-871. doi: 10.1016/S0140-6736(20)31603-2. Epub 2020 Sep 10. PMID: 32919522. *Invited*

6. Gostin LO, **Salmon DA**. The Dual Epidemics of COVID-19 and Influenza: Vaccine Acceptance, Coverage, and Mandates. JAMA. 2020 Jul 28;324(4):335-336. doi: 10.1001/jama.2020.10802. PMID: 32525519. *Invited*

7. **Salmon DA**, MacIntyre CR, Omer SB. Making mandatory vaccination truly compulsory: well intentioned but ill conceived. Lancet Infect Dis. 2015 Aug;15(8):872-3.

8. Halsey NA, **Salmon DA**. Measles at Disneyland, a problem for all ages.  Ann Intern Med. 2015 May 5;162(9):655-6.  *Invited*

9. Atwell JE*, **Salmon DA**.  Pertussis resurgence and vaccine uptake: implications for reducing vaccine hesitancy.  Pediatrics. 2014 Sep; 134(3): 602-4. *Invited*

10. **Salmon DA**, Halsey. Guillain-Barré Syndrome and vaccination.  Clin Infect Dis. 2013 Jul; 57(2):205-7.  *Invited*

11. **Salmon DA**, Halsey NA.  Keeping the M in medical exemptions: protecting our most vulnerable children.  J Infect Dis. 2012 Oct 1; 206(7): 987-8.
12. MacIntyre CR, Kelly H, Jolley D, Butzkueven H, **Salmon D**, Halsey N, Moulton LH Recombinant hepatitis B vaccine and the risk of multiple sclerosis: a prospective study. Neurology. 2005 Apr 12;64(7):1317.

*BOOKS*

The Clinician's Vaccine Safety Resource Guide: Optimizing the Prevention of Vaccine-Preventable Diseases Across the Lifespan.  Mathew Z. Dudley.  **Daniel A Salmon**, Neal A. Halsey, alter A. Orenstein, Rupali J. Limaye, Sean T. O'Leary, Saad B. Omer. Springer Publishing, 2018.

*GOVERNMENT AND ADVISORY COMMITTEE REPORTS*

1. White Paper on the United States Vaccine Safety System.  National Vaccine Advisory Committee (NVAC), 2012.  Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the working group, holding closed and public meetings to gather scientific and programmatic information and incorporation of stakeholder views, and oversaw drafting of final report.
2. H1N1 Vaccine Safety Risk Assessment Working Group (VSRAWG).  National Vaccine Advisory Committee (NVAC).  Interim reports (12/2009, 1/2010, 2/2010, 3/2010, 4/2010, 6/2010) and final report (1/2012). Role: Served as the Designated Federal Official with responsibilities including determining the charge and membership of the VSRAWG, coordinating bi-monthly conference calls with the Federal Immunization Safety Task Force and the VSRAWG reviewing all H1N1 safety data, facilitated discussions of safety issues among the VSRAWG, drafting all reports.
3. Recommendations on 2009 H1N1 Influenza Vaccine Safety Monitoring.  National Vaccine Advisory Committee (NVAC). 7/2009. Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the Working Group, holding meetings with Working Group and HHS leadership, and drafting final report.
4. Federal Plans to Monitor Immunization Safety for Pandemic 2009 H1N1 Influenza Vaccination Program.  Department of Health and Human Services, 2009.  Role:  Primary author with the Federal Immunization Safety Task Force.
5. Recommendations on the Centers for Disease Control and Prevention Immunization Safety Office Draft 5-Year Scientific Agenda. National Vaccine Advisory Committee (NVAC), 2009.  Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the working group, holding closed and public meetings to gather scientific and programmatic information and incorporation of stakeholder views, and oversaw drafting final report.
6. A Comprehensive Review of Federal Vaccine Safety Programs and Pubic Health Activities.  Department of Health and Human Services, 2008.  Role:  Primary author with the Federal Immunization Safety Task Force.

7.     Vaccine Safety Action Plan (Implementation Plan for the Task Force Report on Safer Childhood Vaccines).  Department of Health and Human Services, 1999.  Role:  Primary author with the many HHS agencies (NIH, FDA, CDC, HRSA).

## Practice Activities

Dr. Salmon's public health practice has been carried out while he held positions in the Federal government and academia and has resulted in 15 peer reviewed publications, 7 Federal and advisory committee reports, dozens of testimony to Federal advisory committees and state legislators, regular consultation with policy-makers, and more than 50 interviews with national media outlets.  This practice work has been funded by state and Federal government agencies, has been integrated into Dr. Salmon's teaching, and has resulted in several awards for outstanding services by the Assistant Secretary for Health.   Dr. Salmon's leadership has impacted policy and public health practice nationally.  Dr. Salmon has assisted in the development of model state laws for school immunization requirements, based upon public health scholarship, and evaluated the impact of the application of this model.  Dr. Salmon was a major contributor to realigning vaccine safety activities within the Centers for Disease Control and Prevention in order to provide greater public confidence in vaccine safety, surveillance and response activities.

While serving as the Director of Vaccine Safety at the National Vaccine Program Office, Dr. Salmon led an inter-agency and inter-departmental Secretarial task force, The Federal Immunization Safety Task Force, responsible for ensuring the coordination and strategic planning of Federal vaccine safety activities.  Under his leadership, this Task Force wrote a Secretarial report to enhance our vaccine safety systems and the safety chapter of the National Vaccine Plan.  Dr. Salmon led the development of the National Vaccine Advisory Committee (NVAC) Vaccine Safety Working Group, issuing reports to the Assistant Secretary for Health to improve the national vaccine safety system and focus vaccine safety research activities.  This Working Group was cited by RAND on how to effectively utilize the National Vaccine Advisory Committee.  The Department of Health and Human Services has been able to garner and focus vaccine safety programmatic and research activities through these internal government and advisory committee reports.

The 2009-10 H1N1 vaccine program brought unusual challenges and opportunities for vaccine safety and Dr. Salmon's work.  The last national effort to quickly vaccinate the country to prevent a novel swine flu pandemic in 1976 resulted in a public health and political failure as the vaccine caused Guillain-Barré syndrome (GBS) and the pandemic never materialized as anticipated.  The New York Times referred to this as the Swine Flu Fiasco as the Director of the Centers for Disease Control and Prevention and the Surgeon General were dismissed as President Ford faced public criticism.  A new administration and the public remembered this experience as the 2009-10 H1N1 vaccine program was launched with considerable skepticism.  Dr. Salmon seized these challenges and was able to capitalize on them to ensure the safety monitoring was robust and credible and build long lasting infrastructure.

Dr. Salmon oversaw the largest and most comprehensive vaccine safety monitoring program (2009-10 H1N1 vaccine program) ever in the US or internationally.  Dr. Salmon worked with seven agencies in the Department of Health and Human Services, as well as the Departments of

Defense and Veterans Affairs, to enhance active safety monitoring programs.  Dr. Salmon developed a novel vaccine safety surveillance system, the Post Licensure Rapid Immunization Safety Monitoring (PRISM) Network that is now a part of permanent infrastructure at the Food and Drug Administration and has served as a model for drug and product safety monitoring.  Dr. Salmon led the Federal Immunization Safety Task Force to develop a safety-monitoring plan for H1N1 that was shared with stakeholders and the public and once the program was launched.  To enhance public and stakeholder engagement and improve public confidence, Dr. Salmon developed the H1N1 Vaccine Safety Risk Assessment Working Group of the National Vaccine Advisory Committee that provided independent oversight of all 2009-10 H1N1 vaccine data across the government every two weeks and provided publically deliberated reports on a monthly basis throughout the vaccine program. Dr. Salmon's work in this area was cited by an Institute of Medicine report reviewing the National Vaccine Plan and Federal vaccine activities as an area in vaccines with exemplary leadership and coordination.  Many aspects of this 2009-10 H1N1 vaccine program that were instituted under his leadership continue today.

*TESTIMONY*
Dr. Salmon has made dozens of presentations to the National Vaccine Advisory Committee (NVAC), Advisory Commission on Childhood Vaccines (ACCV), the Advisory Committee on Immunization Practices (ACIP), and the National Biodefense Science Board (NBSB). He has also provided testimony for the Maryland and Florida Legislators.

*PRESENTATIONS TO POLICY-MAKERS*
Dr. Salmon has provided dozens of briefings for 3 CDC Directors, 3 Secretary's, two Deputy Secretary's, and 5 Assistant Secretary's for Health, U.S Department of Health and Human Services.

*CONSULTATIONS WITH POLICY-MAKERS AND OTHER STAKEHOLDERS*
Served as the Federal Ex-Officio for the Advisory Commission on Childhood Vaccines (ACCV; 2007-2012) which provides advice to the Secretary, HHS, regarding the Vaccine Injury Compensation Program (HRSA).  Developed working groups (as the Designated Federal Official) of the National Vaccine Advisory Committee (NVAC) that provides policy advice to the Director of the National Vaccine Program/Assistant Secretary for Health to optimize the prevention of disease through vaccination and the prevention of vaccine adverse events. Through Dr. Salmon's leadership, the NVAC produced the following reports: 1) Review and prioritization of CDC Immunization Safety Office research agenda; 2) Recommendations for improving the Nations vaccine safety system; 3) Recommendations for improvements to H1N1 safety monitoring programs; and 4) Independent ongoing review of all H1N1 safety data. Through these Federal Advisory Committee efforts, Dr. Salmon worked closely with a very broad range of stakeholders including state and local health departments, Federal agencies (NIH, FDA, CDC, HRSA, IHS) and departments (HHS, DoD, VA, USAID), vaccine manufacturers, professional associations, academia, and advocacy organizations.  Dr. Salmon has held many local, regional and national meetings to engage these stakeholders in vaccine policy and practice, issuing meeting reports, and impacting the policy and practice recommendation of the aforementioned advisory committee reports.

*RESEARCH FINDING DISSEMINATION THROUGH MEDIA APPEARANCES*
Dr. Salmon has made many media appearances and contributed to stories for CNN, Reuters News, The Associated Press, The New York Times, The Wall Street Journal, The Washington Post, The LA Times, and many other city, state and national media outlets.

*SOFTWARE DEVELOPMENT*
Developing and evaluating immunization App to increase maternal and infant vaccination uptake.

*PRACTICE POSITIONS (OUTSIDE ACADEMIA)*
Director of Vaccine Safety, National Vaccine Program Office, Office of the Assistant Secretary for Health, US Department of Health and Human Services (2007-2012): Coordinated, evaluated and provided leadership for federal vaccine safety programs.

- Developed a Secretarial Task Force (Federal Immunization Safety Task Force) issuing a report to the Secretary to enhance safety systems and providing ongoing coordination and leadership of Federal vaccine safety activities.
- Coordinated Federal H1N1 vaccine safety monitoring across multiple HHS Agencies and Departments, including development of federal strategic planning, addressing emerging issues, and development of innovative initiatives.
- Developed a novel active surveillance system (Post Licensure Rapid Immunization Safety Monitoring (PRISM)) for H1N1 vaccination program, capturing vaccine histories from 8 state immunization registries linked with health records for about 35 million persons through 5 large health insurance companies. This program is now a permanent part of vaccine safety monitoring by the FDA.
- Conducted a meta-analysis combining GBS data across multiple safety monitoring systems and worked with Vaccine Injury Compensation Program (HRSA) to determine if GBS should be a compensatable injury.
- Guest Edited supplement for Pediatrics to improve understanding of vaccine safety systems and science and enable effective communications by pediatricians when discussing vaccine safety with parents.

**CURRICULUM VITAE**

## Daniel Salmon
## Part II

# Teaching

*MASTERS ADVISEES*
Ann Marie Navar, 2005
Jana Goins, 2005
Bernadette Cambell, 2005
Brian Rosen, 2013
Kevin Wright, 2013
Benjamin Williams, 2013
Mathew Dudley, 2013
Bansari Patel, 2013
Oladeji Oloko, 2014
Hannah Steinberg, 2014
Moar Sherbini, 2014
Aderemi Sanusi, 2016 (anticipated)
Caroline Picher, 2016 (anticipated)

*DOCTORAL ADVISEES*
Dustin Gibson, PhD, 2014
Matt Dudley, PhD, 2019
Andrea Carcelen, PhD, 2020
Jennifer Gerber, PhD, 2020
Taylor Halroyd, PhD, 2020

*PRELIMINARY ORAL PARTICIPATION*
Saad Omer, 2004
Dustin Gibson, 2012
Paul Messino, 2014 (alternate)
Cristina Garcia, 2015 (alternate)
Karen Chang, 2015 (alternate)
Talia Quandelacy, 2016 (alternate)
Elizabeth Chmielewski, 2016

*FINAL ORAL PARTICIPATION*
Saad Omer, 2006: "Societal Risk of Pertussis in the United States:  Role of State Policies and Spatial Clustering of Childhood Vaccine Refusers"
Ann Marie Navar, 2009: "Impact of Immunization in the Neonatal Intensive Care Unit"
Zunera Gilani (alternate), 2012: "Population Immunity to Measles and Rubella Virus in Rural Zambia"
Noor Rakshani, DRPH, 2013: "Individual and Contextual Level Factors Influencing Initiation, Completion and Up to Date Vaccination in Routine Immunization Program"

Jennifer Kreslake (chair), 2014: "Determinants of Risk Behaviors in the Containment of Highly Pathogenic Avian Influenza and Implications for Risk Communication"
Dustin Gibson, 2014: "The Readiness, Need for, and Effect of mHealth Interventions to Improve Immunization Timeliness and Coverage in Rural Western Kenya"
Brittany Kmush, 2016: "Determinants of Immunologic Persistence of Hepatitis E Virus Antibodies." (alternate)

*MSPH/POST-MPH INTERNSHIPS HIRED AND SUPERVISED (CURRENT POSITION, NUMBER OF CO-AUTHORED PAPERS)*
Ann Marie Navar, 2006 (Cardiology Resident, Duke University; 5 papers)
Terrel Carter, 2007 (American Academy of Pediatrics, Global Immunization Staff; 4 papers)
Stephanie Irving, 2007 (Kaiser Permanente Center for Health Research; 1 paper)
Kirsten Vannice, 2008-10 (World Health Organization; 6 papers)
Michelle Mergler, 2009-10 (Johns Hopkins Doctoral Student; 2 papers)
Will Bleser, 2010 (Penn State Doctoral Student; 1 paper)

## Classroom Instruction
*PRIMARY INSTRUCTOR*

| | |
|---|---|
| 2003 - | Vaccine Policy Issues (223.687.01).  This 3-credit course examines current national and international policy issues in vaccine research, development, manufacturing, supply, and utilization. Topics include development of orphan vaccines, ensuring an adequate supply of safe and effective vaccines, vaccine injury compensation, and disease eradication. Emphasizes the identification of important vaccine policy issues and the development and evaluation of policies to address these issues. Presents the roles, responsibilities, and policy positions of key immunization stakeholders via guest lectures by a wide array of experts who have worked for important vaccine groups (i.e., FDA, GAVI, Vaccine Industry, US Vaccine Injury Compensation Program, Consumer Group). 35-45 students masters and doctoral students from across the School of Public Health and Preventive Medicine Residents.  Consistently received high student course evaluations. |
| 2018 - | The Practice of Public Health Through Vaccine Case Studies: Problem Solving Seminar (223.630.81).  Vaccines are among the most effective medical and public health interventions. This class for DrPH students presents historic vaccine case studies highlighting challenges in emerging science, program design and evaluation, management, policy and communication. The seminar examines decision-making surrounded by scientific uncertainty, controversy and competing public health priorities and explores the challenges of developing policy and practice decisions within the constraints of emerging and uncertain science. Students are challenged to make policy decisions and develop programmatic and communication strategies in real world settings. |
| 2012 - 2013 | Vaccine Policy Issues (223.687.98).  Johns Hopkins Fall Institute, Barcelona, Spain. |

C*O*-I*NSTRUCTOR*

2004-05    Public Health Practice (305.607.01).  This 4 credit course focused on the areas of knowledge and skills necessary to the administration of health agencies. The course covered topics such as administrative structure, intergovernmental relations, legislation, politics, and the public budgetary process with reference to health departments on the federal, state, and local levels. The course also reviewed public sector issues for which health agencies are responsible, including AIDS, health promotion strategies, primary care, and immunization programs. Developed and taught class on-site and online.

## Research Grant Participation
C*URRENT*

**SARS-CoV2 Vaccines Information Equity and Demand Creation Project (COVIED)**
Sponsor: Centers for Disease Control and Prevention
Role: Multiple Principal Investigator (mPIs Robert Breiman and Walter Orenstein) (25% effort)
Dates: 02/01/2021-09/31/201
Project: This project implements systematic approach to provide interpretable, context- and culture-specific accurate and trusted information about the vaccines that will be offered, and to package and deliver this information to susceptible populations at risk for COVID and demonstrating vaccine hesitancy as a means to substantively reduce the disproportionate impact of COVID illness and death associated with this pandemic.

**Understanding Diverse Communities and Supporting Equitable and Informed COVID-19 Vaccination Decision-Making**
Sponsor: Robert Wood Johnson Foundation
Role: Principal Investigator (20% effort)
Dates: 11/1/2020-9/1/2021
Project: Collaborating with NACCH, ASTHO, AIM and NIHB to better understand how people are approaching decision-making regarding COVID-19 vaccination and what additional information they need to make an informed decision for themselves, their family, and their community.

**Public and Health Care Provider knowledge, attitudes, beliefs, intentions, and behaviors regarding COVID-19 disease and SARS-CoV-2 vaccines: the mediating role of trust in health care providers and public health authorities**
Sponsor: Merck
Role: Principal Investigator (15% effort)
Dates: 01/01/2021-07/30/2022
Project: The primary objective of this study is to evaluate the immediate impact of outbreaks of COVID-19 disease and response measures on uptake of recommended vaccines, including but not limited to SARS-CoV-2 vaccines (when such vaccines are recommended), with a focus on trust in health care providers and public health authorities, and their vaccine knowledge, attitudes and beliefs.

**Health Care Provider Training to Increase Vaccine Uptake and Reduce Vaccine Hesitancy**

Sponsor: Merck
Role: Principal Investigator (15% effort)
Dates: 01/01/2021-07/30/2022
Project: The primary objective of this project is to develop, disseminate and evaluate a Continuing Medical Education (CME) training module and an electronically available Point-of-Care Information Technology (POC-IT) guide for health care providers (HCPs) to improve vaccine informed decision-making, vaccine acceptance, and control of vaccine preventable disease (VPD).

**TweenVax: A comprehensive practice-, provider-, and parent/patient-level intervention to improve adolescent HPV vaccination**
Sponsoring Agency: National Cancer Institute, National Institutes of Health
Role: Co-Investigator (5% effort)
Dates: 09/01/2019 – 06/30/2024
Project: The aim of the project is to develop and refine the practice-, provider-, and patient/parent-level intervention that will be tested in primary care pediatric and family practice offices for adolescents aged 9-14.

**Valuation of Vaccine Safety**
Sponsor: GAVI
Role: Principal Investigator (20% effort)
Dates:  07/15/2020 – 07/31/2021
Project: This project quantifies the health and economic costs associated with the vaccine safety disaster that occurred in the Ukraine in 2008 where there was a decline in vaccine public confidence triggered by mishandled death following a measles vaccine campaign, leading to a large measles outbreak including exportation to other countries.

**Impact of Eliminating Non-Medical Exemptions in California**
*Sponsoring Agency:* National Institute of Allergy and Infectious Diseases, National Institutes of Health
*Role:* Co-Investigator (20% effort)
*Dates:* 2016-2021
*Project:* California is the first state in decades to abolish non-medical exemptions to school immunization requirements.  This study examines the implementation and impact of this change by assessing the burdens on health care providers, health departments, schools and parents and the rates of medical exemptions and home schooling.

**Ethical, Legal and Social Issues (ELSI) for Precision Medicine and Infectious Disease: Centers for Excellence in ELSI Research (CEER)**
*Sponsoring Agency:* National Human Genome Research Institute, National Institutes of Health
*Role:* Co-Investigator, Lead Vaccinomics (15% effort)
*Dates:* 2016-2020
*Project:* Anticipate and examine the ethical, legal, social, historical and policy issues confronting the incorporation of genomics in the prevention, outbreak control, and treatment of a range of infectious diseases, and plan for the responsible translation of genomic advances into practice.

**A Comprehensive Pre-natal Intervention to Increase Vaccine Coverage**
*Sponsoring Agency:* National Institutes of Health: Dissemination and Implementation Research in Health (R01)
*Role:* Multiple Principal Investigator (with Saad Omer, Emory University) (35% effort)
*Dates:* 2015-2020
*Project:* Develop and evaluate a comprehensive intervention at the patient, provider and practice levels to increase maternal and childhood vaccine uptake.

**The Vaccine Safety Communication E-Library**
Sponsor: WHO
Role: Principal Investigator (5% effort)
Dates: 02/01/2019 – 04/30/2019
Project: The objective is to work with the WHO vaccine safety office to develop the e-library by assisting with growing the content and enhancing the organization and searchability of the VSN e-library and the development of a plan of action to increase participation of members and new members.

**Development and Writing of the Global Vaccine Safety Blueprint 2.0**
Role: Principal Investigator (15% effort)
Dates: 07/16/2019 – 04/30/2020
Project: The objective of this project is to work with the Global Vaccine Safety Initiative team to develop and write the Global Vaccine Safety Blueprint 2.0.

**Programmatic Impact of Multi-dose Vaccines**
*Sponsoring Agency*: Bill and Melinda Gates Institute through the Johns Snow Institute
*Role:* Co-Investigator (10% effort)
*Dates:* 2016-2018
*Project:* To equip global and country level decision makers with the evidence, guidance, and tools needed to assess when, where, and how the selection of vaccine presentation affects timely, equitable, and safe vaccination coverage.

**Case Studies of the Impact of Meningitis Epidemics on Local Health Departments and College Health Facilities**
*Sponsoring Agency:* Pfizer
*Role*: Principal Investigator (25% effort)
*Dates:* 2015-2016
*Project:* Evaluate the non-medical costs associated with Meningitis outbreaks in university settings.

COMPLETED
**Capitalizing on Recent Changes to School Immunization Requirements to Improve the Publics Health**
*Sponsoring Agency:* Robert Wood Johnson Foundation Public Health Law Program
*Role:* Hopkins Principal Investigator (10% effort)
*Dates:* 2014-2016

*Project:* Evaluate the implementation and impact of recent changes made to state school immunization requirements and develop model school immunization law.

**Evaluation of Parents Claiming Exemptions to School Entry Immunization Requirements**
*Sponsoring Agency:* Centers for Disease Control and Prevention
*Role:* Principal Investigator (20% effort)
*Dates:* 2004-2006
*Project:* Examined the secular trends and geographical clustering of immunization exemptions and associations with pertussis, reasons why parents refuse vaccines, and conducted a content analysis of vaccine safety newspaper stories.

**Mentored Patient-Oriented Research Career Development Award (K23).  Decision Making of Parents to Vaccinate Their Children**
*Sponsoring Agency:* National Institutes of Health
*Role:* Principal Investigator (75% effort)
*Dates:* 2004-2007
*Project:* Explored the role of health care providers in influencing parental vaccination decisions.

**Policy and Ethical Consultation on Pandemic Planning and Public Health Emergencies**
*Sponsoring Agency:* Florida Department of Health
*Role:* Principal Investigator (10% effort)
*Dates:* 2005-2006
*Project:* Explored ethical issues regarding responding to an influenza pandemic and developed a training module for public health workers to understand ethical issues surrounding vaccination during a pandemic.

**Implementation of Mandatory Immunization Requirements**
*Sponsoring Agency:* Centers for Disease Control and Prevention
*Role:* Co-Principal Investigator (with Neal Halsey) (75% effort)
*Dates:* 2001-2003
*Project:* Assessed the role of school personnel and school policies in implementing immunization requirements.  Explored the reasons why some parents claim exemptions to school immunization requirements.

**The Role of School Personnel and Policies in Implementing Immunization Requirements**
*Sponsoring Agency:* Washington State Department of Health
*Role:* Principal Investigator (10% effort)
*Dates:* 2001-2004
*Project:* Explored the role of school personnel and school policies in implementing immunization requirements in Washington State.

## Academic Service
2003 - 2005   Admissions Committee for MSPH Program, Disease Prevention and Control, Department of International Health, Johns Hopkins Bloomberg School of Public Health

| 2005 - 2007 | Epidemiology Program Director, Interdisciplinary Program (IDP), University of Florida, College of Medicine |
| 2012 - | Admissions Committee for PhD Program, Global Disease Epidemiology and Control, Department of International Health, Johns Hopkins Bloomberg School of Public Health |
| 2014 - | Honors and Awards Committee, Department of International Health, Johns Hopkins Bloomberg School of Public Health |
| 2015 - | Public Health Practice Committee, Johns Hopkins Bloomberg School of Health |

## Advisory Committee Presentations (selected)

National Vaccine Advisory Committee, Vaccine Confidence Working Group (2020- ).

National Vaccine Advisory Committee, Adolescent Vaccine Working Group.  History and Impact of School Immunization Requirements: Implications for Adolescent Vaccination.  (2006)

National Vaccine Advisory Committee, Subcommittee on Vaccine Safety.  Enhancing Public Confidence in Vaccines through Independent Oversight of Post-Licensure Vaccine Safety (2004).

National Vaccine Advisory Committee Working Group on Implementing Vaccine Recommendations, presentation to the Committee and expert witness for panel discussion (2002).

National Vaccine Advisory Committee Working Group on Philosophical Exemptions, presentation to the Committee (1998).

## Personal Statement

Dr. Salmon's primary research and practice interest is optimizing the prevention of childhood infectious diseases through the use of vaccines. He is broadly trained in vaccinology, with an emphasis in epidemiology, behavioral epidemiology, and health policy. Dr. Salmon's focus has been on determining the individual and community risks of vaccine refusal, understanding factors that impact vaccine acceptance, evaluating and improving state laws providing exemptions to school immunization requirements, developing systems and science in vaccine safety, and effective vaccine risk communication. Dr. Salmon has considerable experience developing surveillance systems, using surveillance data for epidemiological studies, and measuring immunization coverage through a variety of approaches. Dr. Salmon has worked with state and federal public health agencies to strengthen immunization programs and pandemic planning.

Controversies have always existed around vaccines. However, increasingly parents are worried about the safety of vaccines and the rates of parents refusing vaccines have been increasing. Dr. Salmon's led the first study quantifying the individual and community risks of measles associated with vaccine refusal. He and others have replicated these studies examining the risk of vaccine refusers for pertussis, *Haemophilus influenzae* type b, varicella, and pneumococcal. Dr. Salmon's studies in this area have demonstrated that local clustering of refusal is associated with measles and pertussis, explaining why we see sporadic measles outbreaks despite very high vaccine coverage nationally. Dr. Salmon's work quantifying the individual and community risks of disease resulting from vaccine refusal has directly impacted national and state policy in this area.

Having quantified the magnitude of the problem of vaccine refusal, Dr. Salmon conducted a broad range of studies examining factors that contribute to vaccine acceptance and refusal. He conducted studies comparing parents who refused vaccines for their children compared to parents of fully vaccinated children. He then linked these parents to their health care providers to understand the impact of health care providers on parental vaccine decision-making. Dr. Salmon conducted studies exploring the impact of school-level personnel and policies on vaccine refusal and the impact of the media's focus on vaccine safety.

Dr. Salmon's investigations of parents who refuse vaccines for their children have included parents who claim exemptions to school immunization requirements because they are actively deciding to refuse vaccines altogether rather than delay vaccines. Dr. Salmon has investigated compulsory vaccination in the US compared to other developed countries. He has explored how school laws are implemented and enforced at the state and local level and how this impacts the rates of exemptions. He developed an evidence-based model state exemption law that has been implemented in various forms in many states to strengthen their state exemption laws. He has evaluated the impact of these applications of this model and is in the process of revising this model law with a broad range of stakeholders. Dr. Salmon's work in this area has largely shaped the debate we see in many states making exemption laws more stringent and offers a policy approach to limiting exemptions while preserving parental autonomy.

Concerns about the safety of vaccines are the primary (but not the only) reason that parents are increasingly refusing vaccines. Dr. Salmon has focused on developing the science base for

vaccine safety. He served as the Director for Vaccine Safety, National Vaccine Program Office, HHS, where he was responsible for coordinating and leading our national vaccine safety efforts including, but not limited to, the 2009 H1N1 vaccine program. In this capacity, Dr. Salmon improved our vaccine safety systems. During the H1N1 vaccine program he oversaw the largest, most comprehensive vaccine safety monitoring program ever in the US and the world. Dr. Salmon developed a new active surveillance system (Post-licensure Rapid Immunization Safety Monitoring (PRISM) Network) that is now a permanent part of our vaccine safety monitoring program. He created independent vaccine safety assessment to improve trust and confidence. The success of these efforts was highlighted by the IOM when reviewing the National Vaccine Plan. Dr. Salmon has also conducted safety studies, such as the most comprehensive evaluation of GBS post-influenza vaccine since 1976. Dr. Salmon is currently a board member of the Brighton Collaboration, an international network of vaccine safety investigators, and co-chairs their vaccine confidence working group.

While improving safety systems and science is essential to addressing parental safety concerns, it is necessary to effectively communicate the risks and benefits of vaccines to the scientific community, healthcare providers, the media and the public. To work toward this objective, Dr. Salmon has conducted vaccine risk perception and communication studies, developed communication strategies for the Department of Health and Human Services and its Agencies, and developed resources for healthcare providers. Dr. Salmon is currently focused on developing and evaluating interventions at the patient, provider and practice levels to improve maternal and infant vaccine acceptance. Dr. Salmon was the guest editor to a supplement in Pediatrics that assisted pediatricians in working with vaccine hesitant parents by reviewing the complex vaccine safety system in the US, reviewing factors that impact vaccine hesitancy, and assisting pediatricians with how to communicate with parents. Dr. Salmon is widely considered a national and international expert in vaccine safety and factors impacting vaccine acceptance.

## Keywords
Vaccine, Immunization, Infectious Diseases, Epidemiology, Health Policy, Public Health Practice

# EXHIBIT C

| Main Line Health, Inc. and Main Line Health, Inc. Subsidiaries | | |
|---|---|---|
| Working Together to Serve the Community | | |
| This policy applicable to: | All Subsidiaries  All Hospitals  All Acute Care Hospitals | BMRH          MLHC  Mirmont Treatment Center |

<div align="center">

**EMPLOYEE HEALTH POLICY AND PROCEDURE MANUAL**

</div>

**Subject:**
**COVID-19 Vaccination Policy, Non-patient**

**Policy Purpose:**
To protect patients, employees, students, volunteers, and members of the Medical Staff from COVID-19 infection through vaccination.

**Policy Statement:**

All Main Line Health (MLH) employees and appointees to the Main Line Hospitals and Bryn Mawr Rehabilitation Hospital Medical and SHP Staffs ("Medical Staff") must comply with the COVID-19 New Hire Vaccination Policy as outlined below.

**Performed by:**
MLH Occupational Health Services, Physicians, Registered Nurses, LPNs, Physician Assistants, and Medical Assistants under a Physician's direction.

**Procedure**
**New Hires and Medical Staff Appointees:**
  A.  COVID-19 vaccination will be offered/required by MLH Occupational Health to on-boarding employees and Medical Staff as of September 1, 2021.
  B.  The following will need to be met to be medically cleared to begin employment or practice at an MLH facility:
    1.  Proof of two prior documented Pfizer or Moderna COVID-19 vaccines or one documented Johnson & Johnson COVID-19 vaccine.
    2.  Proof of one prior documented Pfizer or Moderna COVID-19 vaccine #1 at an outside event, with a scheduled time for vaccine #2 within 45-days.
    3.  Documented COVID-19 vaccine #1 at MLH Occupational Health Services at the time of the on-boarding evaluation or MLH vaccine site, with a scheduled plan for vaccine #2 within 45-days.
    4.  An approved religious or medical exemption.  Forms are available through Occupational Health. Services.
**Current Employees and Medical Staff:**
  A.  Main Line Health is requiring full vaccination for all MLH executives, directors, managers and Medical Staff by October 1, 2021.  All other MLH employees will be required to be fully vaccinated by November 1, 2021.
  B.  Employees and Medical Staff who have been vaccinated outside of Main Line Health are required to provide proof of vaccination by September 15, 2021.
  C.  Employees will not be permitted to work after the established deadlines of October 1 and November 1, 2021 and will be given 2-weeks to initiate the vaccination process before termination of employment occurs.

MLH-Gray 01896

**Record Keeping / Vaccine Administration**

A. Occupational Health Services will maintain records of COVID-19 vaccinations for employees. The Medical Staff Office will maintain records of COVID-19 vaccination for Medical Staff.

B. In the event of a COVID-19 vaccination shortage, MLH will evaluate the shortage and vaccination requirements and priorities for the entire health system. Occupational Health, Infection Prevention, Human Resources, Pharmacy, and Administration will conduct the evaluation with other departments as needed when vaccine shortages occur. COVID-19 vaccine will be offered to healthcare providers based on job function and risk of exposure to COVID-19. Priority will be given to those who provide direct hands-on patient care with prolonged face-to-face contact with patients and/or have the highest risk of exposure to patients with COVID-19.

**Exemptions:**

A. Exemption to vaccination may be granted for a valid medical condition or sincerely held religious belief.

B. New Hires, current Employees and Medical Staff requesting a medical exemption from the MLH COVID-19 vaccination requirement must provide proof such as a letter from their physician and complete the attached form (Appendix A). Requests made for temporary medical exemptions shall provide an exemption expiration date and may be renewed if necessary. Requests for a medical exemption will be evaluated by the COVID-19 Vaccine Exemption Review Committee. If a medical exemption is granted, the requesting individual will be notified in writing by Occupational Health Services within 2 weeks. If the request is granted for a permanent medical condition, another exemption does not need to be requested if COVID booster vaccines are recommended by the CDC.

C. A request for a religious exemption from the COVID-19 vaccination requirement will be evaluated by the MLH COVID-19 Vaccine Religious Exemption Committee. A religious exemption from the vaccination requirement will be approved only for a sincerely held belief precluding COVID-19 vaccination that is religious in nature. Personal beliefs or opinions will not be sufficient to qualify for exemption from the COVID-19 vaccination requirement. A person requesting a religious exemption must complete the MLH Religious Exemption Form (Appendix B). Individuals requesting a religious exemption will be required to describe the sincerely held religious belief preventing them from receiving the COVID-19 vaccination. Additional information will be requested to support an individual's request for an exemption based upon a sincerely held religious belief, including but not limited to their prior vaccination history. Individuals whose beliefs are derived from an organized religion may submit documentation from individuals including leaders from that organization to support their request. Requests for exemptions and any supporting documentation will be submitted to MLH Human Resources or the MLH or Bryn Mawr Rehabilitation Hospital Medical Staff Credentials Committee, as applicable. The requesting person will be notified in writing by Human Resources or the MLH or Bryn Mawr Rehabilitation Hospital Medical Staff MEC within 2 weeks if the exemption has been granted or denied. An employee may appeal a denial within 5 days from the receipt of the decision, in writing to the MLH Senior Vice President, Human Resources and the MLH Senior Vice President, Legal Affairs / General Counsel. Medical Staff may appeal a denial in writing to the applicable Medical Staff MEC. This appeal will be reviewed, and the employee or appointee will be notified of the final decision within 2 weeks.

D. If an exemption is granted, efforts will be made to reasonably accommodate the employee or Medical Staff while maintaining a safe work environment for patients, staff, and others. Weekly testing will be required for those granted a medical or religious exemption. Reasonable accommodations may include reassignment and additional infection prevention and control measures, among other things. While MLH will seek to identify reasonable accommodations for anyone who is granted a religious exemption, it is

MLH-Gray 01897

possible that there may not be a reasonable accommodation that will allow every person with such an exemption to continue to work onsite while unvaccinated.

E.  Requests for medical and religious exemptions must be made by September 15, 2021.  Appointees to the Medical Staff who request exemptions may not begin practice until the exemption is approved.

E.  Employees and Medical Staff may be subject to MLH Performance Management up to and including termination and/or administrative suspension of clinical privileges and referral to the Medical Executive Committee of Main Line Hospitals or Bryn Mawr Rehabilitation Hospital for appropriate action, as applicable, if any information provided in support of their exemption  request is false.


References:

**https://www.cdc.gov/coronavirus/2019-ncov/vaccines/index.html**
Origination Date: 7/15/2021
Key Contact: System Medical Director, Employee Health and Safety, System Director, Infection Prevention
Approved: Covid-19 Steering Committee

MLH-Gray 01898

# EXHIBIT D

1

— — — — —

1             IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                 — — — — —

3
DAWN GRAY,                  )  Civil Action
4                           )  No.
            Plaintiff,      )  2:23-cv-00263-KNS
5                           )
    vs.                     )
6                           )
MAIN LINE HOSPITALS, INC.,  )
7                           )
            Defendant.      )
8                           )
                            )
9

10

11

12                 — — — — —

13        VIDEOTAPED ZOOM DEPOSITION OF GREG PAPA

14            Thursday, August 24, 2023
                   — — — — —
15

16

17

18

19

20

21

22

23                 — — — — —

24   *ELECTRONIC DISTRIBUTION, FORWARDING OR REPRODUCTION OF*
       *THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION*
25              *FROM THE CERTIFYING AGENCY*
                   — — — — —

                    EXLER REPORTING
                    412-221-4007

**2**

1           VIDEOTAPED ZOOM DEPOSITION OF GREG PAPA,
2    a witness herein, called by the Plaintiff for
3    examination, taken pursuant to the Federal Rules of
4    Civil Procedure, by and before Margaret J. Exler, a
5    Registered Professional Reporter and Notary Public in
6    and for the Commonwealth of Pennsylvania, held remotely
7    with all participants appearing via Zoom, on Thursday,
8    August 24, 2023, at 2:29 p.m.
9                     – – – – –
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    EXLER REPORTING
                    412-221-4007

**3**

1    APPEARANCES:        – – – – –
2    For the Plaintiff:

3        **JOHN A. DALLER, ESQUIRE**
         Daller Law Firm
4        P.O. Box 162
         510 Pittsburgh Street
5        Mars, PA  16046
         724-201-2050
6        johndaller@daller-law.com

7    For the Defendant:

8        **BRENDAN D. HENNESSY, ESQUIRE**
         Hennessy Law
9        101 Lindenwood Drive, Suite 225
         Malvern, PA  19355
10       484-875-3111
         bhennessy@hennessylawfirm.com
11
12   Also Present:

13       **PATRICK O'MALLEY, ESQUIRE**
         Litigation Advantage, LLC
14       4411 Gibsonia Road, Suite 5
         Gibsonia, PA  15044
15       412-486-3325
         pomalley@litadvantage.com
16
     Dawn Gray, Plaintiff
17
18
19
20
21
22
23
24
25

                    EXLER REPORTING
                    412-221-4007

**4**

1                     – – – – –
                    I N D E X
                      – – – – –
2

3           WITNESS:  GREG PAPA
4
5    E X A M I N A T I O N:              PAGE
6
7      BY MR. DALLER                       6
8      BY MR. HENNESSY                   122
9      BY MR. DALLER                     127
10
11
12   E X H I B I T S:                   PAGE
13
14   NO. 1 - MLH GRAY BATES 01920-0192122
15   NO. 2 - COVID-19 VACCINE RELIGIOUS47
16   EXEMPTION FORM
17
18
19
20
21
22
23
24
25

                    EXLER REPORTING
                    412-221-4007

**5**

1                     – – – – –
                    P R O C E E D I N G S
2                     – – – – –
3           THE VIDEOGRAPHER:  Good afternoon.  My
4    name is Pat O'Malley and I am a legal videographer with
5    Litigation Advantage.
6           Today's date is August 24th, 2023, and the
7    time is approximately 2:29 p.m.  We are taking the
8    videotaped deposition of Greg Papa in the matter of Dawn
9    Gray, Plaintiff, versus Main Line Hospitals, Inc.,
10   Defendants.
11          This case is filed in the United States
12   District Court for the Eastern District of Pennsylvania,
13   Number 2:23-cv-00263-KNS.
14          Our court reporter today is Megan Exler from
15   Exler Reporting.
16          Will counsel please identify yourselves,
17   beginning with the noticing attorney, state whom you
18   represent, and our court reporter will then swear in our
19   witness?
20          MR. DALLER:  John Daller representing
21   Plaintiff, Dawn Gray.
22          MR. HENNESSY:  This is Brendan Hennessy
23   representing Defendant, Main Line Hospitals, Inc.
24                    – – – – –
25

                    EXLER REPORTING
                    412-221-4007

---

**6**

Greg Papa - by Mr. Daller

– – – – –

1            GREG PAPA,
2  a witness herein, having been first duly sworn, was
3  examined and testified as follows:
4            EXAMINATION
5  BY MR. DALLER:
6    Q.  All right.  Good morning -- or good afternoon
7  again --
8    **A.**  **Good afternoon.**
9    Q.  -- Mr. Papa.  So as you know, I'm going to ask
10 you a series of questions today.  You know, the purpose
11 is to -- for me to learn what your testimony would be at
12 trial.
13       Because we have a court reporter taking down
14 what we say and things that are being recorded, it is
15 important that we let each other finish, you know,
16 speaking so we don't speak over each other.
17       Agree?
18   **A.**  **Yes.**
19   Q.  Okay.  And if I do it by accident, I apologize
20 in advance, and please just tell me, "Hey.  I wasn't
21 finished."
22       Okay?
23   **A.**  **I will.**
24   Q.  All right.  If you don't understand my
25 question, please ask me to clarify it.  Otherwise, I'll

---

**7**

Greg Papa - by Mr. Daller

– – – – –

1  anticipate that you're asked -- answering it the way I
2  meant it to be asked.
3        Okay?
4    **A.**  **Okay.**
5    Q.  All right.  And, again, because Megan is
6  taking things down, we have to verbalize our responses
7  rather than just nodding what we might do in normal
8  conversation.
9        Okay?
10   **A.**  **Okay.**
11   Q.  All right.  And are you taking any type of
12 prescription or nonprescription medications that could
13 impair your ability to understand my questions
14 completely or answer them completely?
15   **A.**  **No.**
16   Q.  Okay.  And -- now, I understand you have a
17 hard stop today?  A time constraint?
18   **A.**  **I do.  One second.**
19   Q.  I think -- you know --
20   **A.**  **I don't.  I don't.**
21   Q.  You don't, okay.
22   **A.**  **No.**
23   Q.  Well, I mean, if you do need to take a break,
24 please let me know.  You know, I would anticipate we're
25 only going to be here a couple of hours, though.

---

**8**

Greg Papa - by Mr. Daller

– – – – –

1        Okay?
2    **A.**  **Okay.**
3    Q.  Now, I have deposed you in other cases for
4  Main Line regarding COVID.  I'm aware of those.
5        Have you been deposed in any other COVID
6  discrimination cases?
7    **A.**  **Yes.**
8    Q.  Okay.  Which cases were those?
9    **A.**  **I can't remember their specific names.  I've**
10 **been deposed.**
11   Q.  Uh-huh.
12   **A.**  **I believe two times:  Once with you and once**
13 **with another --**
14   Q.  Okay.
15   **A.**  **-- for another employee.**
16   Q.  Okay.  And you've been at Main Line for how
17 long now?
18   **A.**  **Since 2006.**
19   Q.  Okay.  And your current role is what?
20   **A.**  **Vice president of human resources.**
21   Q.  Okay.  And do you personally know Mrs. Gray?
22   **A.**  **I do not.**
23   Q.  Okay.  Have you -- did you meet her at any
24 time during the course of her application for a
25 religious exemption?

---

**9**

Greg Papa - by Mr. Daller

– – – – –

1    **A.**  **I did not.**
2    Q.  Okay.  And have you done any training since we
3  -- in terms of COVID, how to view a religious exemption
4  request that deals with COVID?
5        Any specific training --
6    **A.**  **No.**
7    Q.  -- in that regard?  No, okay.
8        Have you done any specific training in
9  evaluating a religious exemption request, in general,
10 regardless of the reason for it?
11   **A.**  **No.**
12   Q.  No, okay.  And you have not done any specific
13 training as to any of the medical aspects of COVID,
14 correct?
15   **A.**  **Correct.**
16   Q.  Okay.  And now, as vice president of human
17 resources, you're a human resource professional,
18 correct?
19   **A.**  **Correct.**
20   Q.  Okay.  And do you know Sarah Heilman?
21   **A.**  **I do.**
22   Q.  Okay.  Who is she?
23   **A.**  **Sarah is the director of human resources for**
24 **Paoli Hospital.**
25   Q.  Okay.  So in that role, would she have been,

10

Greg Papa - by Mr. Daller

– – – – –

1  for want of a better term, the human resource partner
2  for Mrs. Gray?
3      **A.**   **Yes.**
4      **Q.**   Okay.  All right.  And have you ever spoke to
5  Ms. Heilman about Mrs. Gray's religious exemption
6  request?
7      **A.**   **No.**
8      **Q.**   No, okay.  Have you ever spoken to her about
9  her termination at all?
10     **A.**   **I spoke to Sarah in regards to the**
11  **unemployment.**
12     **Q.**   In regards to Mrs. Gray's unemployment claim?
13     **A.**   **Correct.**
14     **Q.**   Okay.  And what did that conversation entail?
15     **A.**   **That Sarah would attend the unemployment**
16  **hearing.  I didn't go over specifics with Sarah, but we**
17  **had a conversation which I remember -- which I don't**
18  **really remember the entire conversation, but just that**
19  **she was going to be present at the unemployment hearing.**
20  **I believe she was.**
21     **Q.**   Okay.  And did you discuss the substance of
22  any of her testimony with her?
23     **A.**   **I did not.**
24     **Q.**   You did not, okay.
25           And are you aware of what her testimony would

EXLER REPORTING
412-221-4007

11

Greg Papa - by Mr. Daller

– – – – –

1  have been during that hearing?
2      **A.**   **No.**
3      **Q.**   Okay.  Did she ever express to you that in her
4  belief, as a human resource professional, that
5  Mrs. Gray's exemption request should have been granted?
6      **A.**   **No.**
7      **Q.**   Okay.  And can you refresh my memory?  What
8  was your role in the creation of the COVID-19
9  vaccination policy?
10     **A.**   **So I worked with legal, and I also worked with**
11  **employee health to craft the policy.**
12     **Q.**   Okay.
13     **A.**   **Infection prevention.  Employee health.  It**
14  **was interdisciplinary.**
15     **Q.**   Okay.  So I'm assuming from the legal
16  perspective, it was the members of the two committees.
17  Mr. Mendicino, who was on the original or initial
18  Request Evaluation Committee, and then Mr. Corbett, who
19  is a member of the Appeal Committee; is that correct?
20     **A.**   **I don't know if Brian Corbett was involved in**
21  **the policy creation.  I know Tom Mendicino was.  I**
22  **worked with Tom.  I don't know if Tom had brought in**
23  **corporate to review the policy.  I don't know that.**
24     **Q.**   Okay.  And in terms of -- you said infectious
25  disease or --

EXLER REPORTING
412-221-4007

12

Greg Papa - by Mr. Daller

– – – – –

1      **A.**   **Infection prevention.**
2      **Q.**   Okay.
3      **A.**   **But I don't --**
4      **Q.**   Would that have been including Dr. Brett
5  Gilbert?
6      **A.**   **At the time, yes.**
7      **Q.**   Okay.  And then was Dr. Stallkamp involved in
8  the creation of the policy?
9      **A.**   **Yes.**
10     **Q.**   Okay.
11     **A.**   **And then Dr. Bindu Kumar.**
12     **Q.**   Okay.
13     **A.**   **She was the employee health physician.**
14     **Q.**   Okay.  All right.  And Dr. Kumar was also on
15  the -- was the chair of the Medical Exemption Committee,
16  correct?
17     **A.**   **That's correct.**
18     **Q.**   Okay.  All right.  And are you aware if
19  Dr. Kumar ever spoke to any individuals who originally
20  were denied their exemption by her committee?
21     **A.**   **Can you rephrase the question?**
22     **Q.**   Sure.  Are you aware --
23     **A.**   **Or repeat it.**
24     **Q.**   -- of whether Dr. Kumar ever had any
25  discussions with any individuals requesting a medical

EXLER REPORTING
412-221-4007

13

Greg Papa - by Mr. Daller

– – – – –

1  exemption?
2      **A.**   **I don't know specifics.  I don't know the**
3  **specific individuals, but I do -- I was aware that she**
4  **spoke to individuals about their -- their health history**
5  **and some of their concerns.  I don't know if that was**
6  **every time.  I don't know if there was follow-up.**
7           **She did provide other guidance to them during**
8  **the process, but I'm not sure if that was with every**
9  **individual.**
10     **Q.**   Okay.  And are you aware if, following those
11  conversations, any individual's exemption requests were
12  granted?
13     **A.**   **I do not know that answer.**
14     **Q.**   Do you know if she ever spoke to anybody who
15  had requested a religious exemption, as well?
16     **A.**   **No.**
17     **Q.**   You're not aware?
18     **A.**   **Not -- no, she did not speak to them.  That**
19  **was not part of our process, that Dr. Kumar would speak**
20  **to someone.**
21           **If they had a medical and religious, she would**
22  **speak to them about the medical and never spoke to them**
23  **about the religious exemption.**
24     **Q.**   Okay.  All right.  Now, in terms of creation
25  of the policy, would you agree that Dr. Stallkamp and

EXLER REPORTING
412-221-4007

14

Greg Papa - by Mr. Daller

– – – – –

1   Dr. Gilbert were kind of the medical experts who -- and
2   Dr. Kumar who guided the development of the policy?
3                MR. HENNESSY:  Object to form, but if you
4   can answer, go ahead.
5                THE WITNESS:  I -- the thing I would say
6   that they were part of developing the policy.  I don't
7   know to which extent they -- they used best practice in
8   the medical community or from other -- other sources,
9   other institutions that had a similar process.
10               Legal was involved.  Human resources was
11  involved.  So it was very interdisciplinary, and I can't
12  say for sure that they were the main --
13               THE REPORTER:  I can't hear you.  I cannot
14  hear the witness.
15               MR. DALLER:  Oh.  Go ahead.
16               THE WITNESS:  Can everyone else hear me?
17               THE REPORTER:  Can you hear me?
18               MR. DALLER:  I can hear you, Megan, and I
19  can hear Mr. Papa.
20               THE REPORTER:  I'm not hearing anything.
21               MR. DALLER:  Are you hearing me?
22               THE WITNESS:  We can't hear you now.
23               MR. DALLER:  Patrick, why don't we go off
24  the record while we try and fix this?
25               THE VIDEOGRAPHER:  Sure.  Off the record

15

Greg Papa - by Mr. Daller

– – – – –

1   at 2:40 p.m.
2                (Whereupon, a brief recess took place due
3   to connection issues.)
4                MR. DALLER:  Yeah.  Let's go back on the
5   record.
6                THE VIDEOGRAPHER:  Back on the record at
7   2:44 p.m.
8   BY MR. DALLER:
9        Q.   All right.  So, Mr. Papa, before we had the
10  technical issue, I had asked you whether or not the
11  medical expertise, if you will, that was brought to the
12  committee was provided by Dr. Stallkamp, Dr. Gilbert and
13  Dr. Kumar?
14       A.   **And I believe that the medical advice was a**
15  **combination of those individuals, also best practice,**
16  **and through literature search, and then with legal's**
17  **involvement.**
18            **Other -- there were other clinical people on**
19  **that, infection prevention practitioners, myself.  So I**
20  **don't know if they were the main proponents, but**
21  **certainly were involved in the creation of that policy.**
22       Q.   Okay.  Who were the other medical experts that
23  you're speaking of now?
24       A.   **There were infection prevention nurses on the**
25  **review of that policy, as well.**

16

Greg Papa - by Mr. Daller

– – – – –

1        Q.   Okay.  Were they primarily there in a
2   supporting role, or did they report -- you know, like
3   give information of those best practices and what people
4   were doing?
5        A.   **I'm not sure.**
6        Q.   Okay.
7        A.   **Yeah.**
8        Q.   All right.  Do you know what some of the
9   external sources were that the doctors considered or
10  that they spoke about to the committee?
11       A.   **The only thing I could comment on is best**
12  **practice in the community.  So other hospitals, what**
13  **policies they were using, if we wanted to review and**
14  **read those policies.**
15            **I can't tell specifics, but I know there was**
16  **some best practice from other health care institutions**
17  **brought into the creation of our policy.**
18       Q.   Okay.  And would you say that Main Line Health
19  sort of followed what the other local health care
20  systems were doing, in general?
21               MR. HENNESSY:  Objection.
22               THE WITNESS:  A combination.
23  BY MR. DALLER:
24       Q.   A combination?
25       A.   **Sure.**

17

Greg Papa - by Mr. Daller

– – – – –

1        Q.   All right.  But can you give me an example of
2   something that they did not follow?
3        A.   **I could not.**
4        Q.   Okay.  All right.  Now, in terms of deciding
5   the religious exemptions, there was a committee,
6   correct, that reviewed them?
7        A.   **Correct.**
8        Q.   Okay.  And did every member of that committee
9   review every request, or did it depend on who was
10  available to make a meeting or any other factors?
11       A.   **For the most part, we had representation of**
12  **each specialty, so for the most part that there was a**
13  **representative there, but we did not require that, but**
14  **-- but, generally speaking, we had representation from**
15  **all of the disciplines.**
16       Q.   Okay.  Do you recall if all of the disciplines
17  were represented when Mrs. Gray's application was
18  reviewed?
19       A.   **I believe they were, but I'm not a hundred**
20  **percent sure.**
21       Q.   Okay.  Is there any way of knowing?
22       A.   **Sure.**
23       Q.   Okay.  How would you say we should find that
24  out?
25       A.   **You would -- we could just check the Zoom call**

18

Greg Papa - by Mr. Daller

– – – – –

1  or the Teams call dial-ins, who dialed into that
2  specific Teams call.
3     Q.   Okay.  All right.  And did you keep any
4  written notes from the meeting?
5     A.   I didn't keep any written notes.  We had a log
6  where I wrote a brief -- excuse me -- explanation of the
7  denial or the acceptance.
8     Q.   Okay.  And was that log on your computer then?
9     A.   It was on the Teams chattel, yes.
10    Q.   Okay.  So like a share drive?
11    A.   Yes.
12    Q.   Okay.  Was there any recording of sort of the
13  substance of the discussion around a given application?
14    A.   No.
15    Q.   No.  So there would be no record if -- well,
16  strike that.
17         You did not take a vote, correct, on whether
18  to approve or deny a request?
19    A.   We gave everyone a chance to answer if they
20  wanted to approve it or not.
21    Q.   Okay.  And in terms of Mrs. Gray's
22  application, do you recall, when you went around and did
23  that the first time, what the results of that poll was?
24    A.   I don't know the first time, but we never --
25  we never had a situation in which we had to take a

EXLER REPORTING
412-221-4007

19

Greg Papa - by Mr. Daller

– – – – –

1  consensus and the consensus won, but I mean -- not a
2  consensus.  We didn't have to take a vote and the
3  majority won.
4         We -- we had great discussion and we always
5  had everyone after we gave the final determination
6  entering it onto that --
7     Q.   Okay.  So you were --
8     A.   -- share drive.
9     Q.   I'm sorry.  Were you finished?
10    A.   Entering it -- entering that onto the share
11  drive.
12    Q.   The consensus determination is what got
13  entered, correct?
14    A.   No, not the termination.  To approve or deny
15  the --
16    Q.   Okay.
17    A.   -- the request.
18    Q.   Okay.  So if you -- and you don't recall
19  whether or not you had consensus the first time when you
20  spoke about Mrs. Gray's request, correct?
21    A.   We had a conversation about each one, so it
22  wasn't -- there was never a need to go around the room.
23         If someone wasn't speaking, we may have asked
24  them "your thoughts on that," but we pretty much had --
25  everyone was discussing each individual request.

EXLER REPORTING
412-221-4007

20

Greg Papa - by Mr. Daller

– – – – –

1     Q.   Uh-huh.
2     A.   I recall on a few times where I had to say,
3  "Your thoughts on this."  Very rarely, but I had to -- I
4  didn't say, you know, "We'd like to know your vote or
5  your thoughts on this," and then we -- if we were all
6  good with the decision, and we did not move on until we
7  were -- we were all in favor of the acceptance or the
8  denial.
9     Q.   Okay.  So, in other words, then, there could
10  be situations where somebody originally was against it,
11  but because of continued discussion, they just went
12  along with the group then and concluded yes?
13         Since -- you know, to vote one way or the
14  other, go along with the consensus, in other words,
15  because that's the direction that the group was going
16  in?
17    A.   I wouldn't characterize it --
18         MR. HENNESSY:  I just want to assert an
19  objection to the form.
20         Go ahead.
21         THE WITNESS:  I wouldn't characterize it
22  as that.  That the committee discussed the form and
23  asked questions.  It was more questioning to either the
24  chaplain or to the HR policy or to the physician.  It
25  was more answering and asking questions rather than "I

EXLER REPORTING
412-221-4007

21

Greg Papa - by Mr. Daller

– – – – –

1  don't think it should have been this way," or, "I think
2  it should be this way and we're going to convince you.
3  If not, we're not going to get -- we're not going to
4  leave this meeting until we have" -- in every one that
5  I've done, we asked appropriate questions or question,
6  any questions of the different disciplines, and people
7  felt comfortable with the decisions that came out of
8  those meetings.
9  BY MR. DALLER:
10    Q.   Okay.  And do you recall any specific
11  questions that were raised during the review of
12  Mrs. Gray's request?
13    A.   No.
14    Q.   Okay.  Now, I think earlier you said that not
15  everybody might be at every meeting.
16         Is that correct?
17    A.   Correct.
18    Q.   Okay.  What steps were taken to make sure that
19  there was consistency and no subjectivity going from,
20  say, one week to the next?
21    A.   So Tom Mendicino and I developed some
22  guidelines that we went over with the group initially
23  and we reviewed those with the group, and the group --
24  they were our guiding principles to making decisions.
25    Q.   Okay.

EXLER REPORTING
412-221-4007

22

Greg Papa - by Mr. Daller

_ _ _ _ _

1    MR. DALLER:  And if you can pull up the
2 exhibit marked Bates 1248, the criteria?
3    THE VIDEOGRAPHER:  (Indicating.)
4 BY MR. DALLER:
5    Q.   Is this the criteria that you were
6 referencing?
7    **A.   Yes.**
8    Q.   Okay.  And if I understood correctly, you and
9 Mr. Mendicino created this, correct?
10    **A.   Correct.**
11    Q.   Okay.  Was this distributed then to the
12 members of the group for those discussions?
13    **A.   I'm not sure if it was distributed or we**
14 **reviewed this.  I -- I believe it was distributed via**
15 **e-mail.  I'm not a hundred percent sure.**
16    Q.   Uh-huh.  Okay.
17    MR. HENNESSY:  I just want to note for the
18 record that Bates label on this is MLH Gray 01920.
19    MR. DALLER:  Okay.
20    MR. HENNESSY:  You didn't stamp it with an
21 exhibit or anything.  I just want to make sure it's
22 clear for the record what document it is.
23    MR. DALLER:  Yeah.  They'll make this
24 Exhibit 1.
25    (Whereupon, Pap Deposition Exhibit No. 1

EXLER REPORTING
412-221-4007

23

Greg Papa - by Mr. Daller

_ _ _ _ _

1 was identified for the record.)
2 BY MR. DALLER:
3    Q.   So you referred to these as, I think, guiding
4 principles, if I remember correctly; is that right?
5    **A.   Correct.**
6    Q.   Okay.  And how was -- was the group instructed
7 on how to use these?
8    **A.   In reviewing the form.  When reviewing the**
9 **form, this is what -- this is what would -- could**
10 **potentially constitute a denial, and then, you know,**
11 **what constituted an acceptance.**
12    Q.   Okay.  Was there a -- like, if they could
13 categorize the religious exemption request as fitting
14 into one of those statements that are listed under
15 Denial, that would be sufficient then to provide a
16 denial?
17    MR. HENNESSY:  I'm going to object to
18 form.  And also, I mean, there's been some testimony on
19 this document.  If the witness wants to read the
20 document to refresh his recollection, I want to give him
21 an opportunity to do so.
22    But go ahead if you're comfortable answering
23 the question.
24    THE WITNESS:  Can you repeat the question?
25 BY MR. DALLER:

EXLER REPORTING
412-221-4007

24

Greg Papa - by Mr. Daller

_ _ _ _ _

1    Q.   Sure.  So when people -- the members of the
2 committee reviewed a religious exemption request -- and
3 they used these guiding principles in this document,
4 right?
5    **A.   Uh-huh.**
6    Q.   Was the presence of one of those criteria
7 sufficient to deny the application then?
8    **A.   Again, these were guiding principles, so we**
9 **relied on this document as well as the discussion and**
10 **the questions from each individual member of the**
11 **committee to make a decision, and if we reviewed the**
12 **form and we felt it -- after the questions and after the**
13 **person with the information had, you know, sufficiently**
14 **answered the question, we would look to see if it fit**
15 **here.**
16    **But, again, these were guiding principles, and**
17 **all of the different factors we took into consideration.**
18    Q.   Okay.  All right.  And you testified that you
19 were a member of the committee that considered
20 Mrs. Gray's, correct?
21    **A.   Right.**
22    Q.   Okay.  Now, when you were on that committee --
23 well, you don't have any specific medical training,
24 correct?
25    **A.   No.**

EXLER REPORTING
412-221-4007

25

Greg Papa - by Mr. Daller

_ _ _ _ _

1    Q.   Okay.  So if there was a discussion of a
2 medical issue that was raised in an application, maybe a
3 statement that was made, okay, by the applicant, would
4 you rely upon the medical expert's opinion regarding
5 that statement in informing your decision as to whether
6 the exemption should be approved or denied?
7    MR. HENNESSY:  Objection to form.
8    Go ahead.
9    THE WITNESS:  I asked -- me personally
10 and, I believe, other members of the committee, if we
11 did not understand something that was medical in nature,
12 that we would ask the question.
13    We didn't rely solely on them to -- if they
14 said something, we asked them for -- we asked them for
15 clarification.  If they gave the answer, we weighed it
16 against these guiding principles, against what the
17 individual employee wrote on the form to make our
18 decisions.
19    So we used them as -- as an expert to make the
20 decision, but they weren't -- if the medical
21 professional said this or gave an example of something,
22 we did not automatically accept that without discussion
23 and review of the form, review of the process.
24 BY MR. DALLER:
25    Q.   Okay.  So if the medical expert would say that

EXLER REPORTING
412-221-4007

26

Greg Papa - by Mr. Daller

- - - - -

1  there was something in an application that was incorrect
2  medicine or bad science or something like that, how
3  would that -- what would happen during those discussions
4  then?
5      A.   **We would ask clarifying questions, follow-up**
6  **questions, and if we felt that the answer was -- you**
7  **know, if we -- we answered -- asked questions until we**
8  **were satisfied or until we understood the answer, and**
9  **then made some decisions.**
10     Q.   Okay.  Do you recall any time when the
11 committee that you participated in approved a religious
12 exemption request when the medical expert who was there
13 said that this was bad science or bad medicine?
14     A.   **Can you repeat that question?**
15     Q.   Sure.  Do you have any recollection of any of
16 the times when you were at a committee meeting where the
17 medical expert would say, "This is bad science," or,
18 "incorrect medicine," something to that effect, and the
19 committee would still approve the exemption request?
20     A.   **I can't remember any of that.  No.  I don't**
21 **remember that conversation or that type of conversation**
22 **having occurred.**
23          **I think members of the committee would read**
24 **the form and say, "This sounds like it's scientific in**
25 **nature," or, "This sounds like it's medical in nature,"**

EXLER REPORTING
412-221-4007

27

Greg Papa - by Mr. Daller

- - - - -

1  **and maybe the medical professional would explain it.**
2  **Maybe they didn't feel they had to explain it.**
3          **So they were more types of the conversations**
4  **that we had.**
5      Q.   Okay.  Can someone have a sincerely-held
6  religious belief that warrants an exemption, warrants a
7  religious exemption and speak about medical conditions
8  or situations within their application?
9          MR. HENNESSY:  I'm going to object to
10 form, but go ahead.
11         THE WITNESS:  We considered the entire
12 body of the form.  The consistency of the person's
13 responses.  So in some cases, yes, that could have
14 definitely caused us to deny a religious exemption based
15 on that inconsistency.
16 BY MR. DALLER:
17     Q.   What would the inconsistency be?
18     A.   **That it was not religious in nature.  That it**
19 **was medical or scientific.**
20     Q.   Okay.  Do you believe that religious beliefs
21 can impact your medical decisions?
22         MR. HENNESSY:  Objection to form.
23         THE WITNESS:  Re- -- yes, I do.  That's
24 why we had this process.
25 BY MR. DALLER:

EXLER REPORTING
412-221-4007

28

Greg Papa - by Mr. Daller

- - - - -

1      Q.   So the mere fact that they talked about
2  something medical would not lead to a denial of their
3  religious exemption; is that correct?
4      A.   **No.  I think we weighed everything.  We -- we**
5  **looked at the form, the way it was written.**
6          **So, again, we asked questions.  We -- we**
7  **approached every individual request and looked at these**
8  **guiding principles, asked questions, had discussion and**
9  **dialogue amongst the committee.**
10     Q.   Okay.  So understanding that the criteria that
11 we're looking at here kind of were the guiding
12 principles, right, for the group, what were your guiding
13 principles, if you will, or the factors that you
14 considered in reviewing a religious exemption?
15         MR. HENNESSY:  Objection to form, but go
16 ahead.
17         THE WITNESS:  I reviewed the guiding
18 principles against the form.  I looked for consistency,
19 and I looked that there was a connection to the COVID-19
20 vaccine.
21 BY MR. DALLER:
22     Q.   Okay.  So in addition to the principles, you
23 looked for consistency and the connection of what?
24 Their belief to the vaccine?
25         What was the connection to the vaccine that

EXLER REPORTING
412-221-4007

29

Greg Papa - by Mr. Daller

- - - - -

1  you were looking for?
2      A.   **That it was religious in nature.**
3      Q.   Okay.  And so help me to understand
4  consistency.
5          What -- what factors did you consider to
6  determine whether something was consistent?
7      A.   **The timing of the -- the religious belief.**
8  **Timing of the religious belief, and taking vaccines, not**
9  **taking vaccines.  Taking certain vaccines, not taking**
10 **others.  They would be some examples that come to mind.**
11     Q.   Okay.  So by timing, I'm -- would another word
12 for that be long-standing?
13         In other words, how long-standing the belief
14 was?
15         MR. HENNESSY:  Objection.  Form.
16         THE WITNESS:  I mean, long-standing is
17 part of the consistency and timing, sure, it was.
18 BY MR. DALLER:
19     Q.   Okay.
20     A.   **You know, long-standing was one of the -- one**
21 **of the criteria or guiding principles we looked at, but**
22 **certainly you could look at, you know, consistency and**
23 **to "Is it religious in nature?"  And then the timing of**
24 **it when -- you know, going back to the word**
25 **long-standing would be.**

EXLER REPORTING
412-221-4007

30

Greg Papa - by Mr. Daller

– – – – –

1    Was it did this belief just happen, or was it
2  some long-standing belief?
3    Q.    Okay.  All right.  And in terms of -- you said
4  taking other vaccines, correct?
5    A.    Correct.
6    Q.    Okay.  Can you explain how that would impact
7  your decision?
8    A.    There were some individuals who took the flu
9  vaccine and made statements that they do not inject
10  anything into their bodies.  Their bodies are a temple.
11  So that's something to consider.
12    That's an example that comes to mind.
13    Q.    Okay.  So are you saying that those, then, are
14  mutually exclusive?
15    MR. HENNESSY:  Objection to form.
16    THE WITNESS:  Repeat that.  Can you
17  restate that?
18  BY MR. DALLER:
19    Q.    Yeah.  Sure.  Is that mutually exclusive then
20  if you take the flu vaccine and you say that "I cannot
21  inject anything into my body"?
22    A.    No.  It's something that we would consider.
23  So I don't think each one was boilerplate, but it's
24  certainly something to consider when looking at
25  consistency.

EXLER REPORTING
412-221-4007

31

Greg Papa - by Mr. Daller

– – – – –

1    Q.    Is the flu vaccine and the COVID vaccine, are
2  they different?
3    A.    They're vaccines, and there's some
4  differences, sure.
5    Q.    Okay.  Do you know what those differences are?
6    A.    I know, just in doing this, that the flu does
7  have animal products tested in terms of eggs and the
8  COVID vaccine does not.
9    Q.    Okay.
10    A.    So there are some differences, but they're
11  still injected into the body.
12    Q.    Okay.  And once they get injected into the
13  body, they interact with the body in the same way?
14    A.    Oh.  I don't know.
15    Q.    Okay.  So would that not be an important piece
16  of information to determine why someone may be able to
17  take one vaccine and not the other?
18    MR. HENNESSY:  Objection to form, but go
19  ahead.
20    THE WITNESS:  In terms -- we're looking at
21  the religious exemption of each of the requests.
22  BY MR. DALLER:
23    Q.    Uh-huh.
24    A.    So...
25    Q.    I understand.

EXLER REPORTING
412-221-4007

32

Greg Papa - by Mr. Daller

– – – – –

1    A.    Yeah.
2    Q.    So if there is a religious foundation for why
3  take one vaccine but not the other, is that something
4  that you would believe is inconsistent if they made that
5  statement?
6    A.    We would review religious reason for each
7  vaccine, and flu and COVID are the two that we make
8  mandatory.
9    So we would look at their religious reason for
10  requesting exemption separately:  one for COVID, one for
11  flu.
12    Q.    Okay.  So that somebody who takes the flu
13  vaccine, they might still be able to take or still may
14  not be able to take the COVID vaccine; is that correct?
15    MR. HENNESSY:  Objection to form.
16    THE WITNESS:  Correct.  Someone may take
17  the COVID vaccine and not take the flu or vice versa.
18  Sure.  Or both.
19  BY MR. DALLER:
20    Q.    Okay.  And that could be for religious
21  reasons, correct?
22    A.    Sure.  That's what we're looking at.
23    Q.    Okay.  And that religious reason could be
24  based in the different interactions that each of those
25  vaccines have with the body, correct?

EXLER REPORTING
412-221-4007

33

Greg Papa - by Mr. Daller

– – – – –

1    A.    I don't -- I don't know if it's the
2  interactions with the body rather than your -- your
3  religious belief, so I don't know what -- how it reacts
4  with the body in terms of how it affects your religious
5  belief.
6    Q.    Do you think that's an important piece of
7  information to have, though, and understand if one is
8  viewing a religious exemption request?
9    A.    Have what?
10    Q.    Understand the difference of the interaction
11  so you can understand the belief?
12    A.    The -- we are looking at -- when we're making
13  the religious exemption for COVID, we are looking at
14  your religious belief and what -- and not taking the
15  COVID vaccine, what -- what that has on your religious
16  belief.  How that affects your religious belief by
17  taking the COVID vaccine.  That's what we were looking
18  for.
19    Q.    So you were looking to see how the medical
20  impacted their religious belief, correct?
21    A.    No.
22    MR. HENNESSY:  Objection to form.
23  BY MR. DALLER:
24    Q.    Maybe I didn't understand your answer then, so
25  if you could restate it.

EXLER REPORTING
412-221-4007

34

Greg Papa - by Mr. Daller

– – – – –

1    A.    Can you restate the question?
2    Q.    Well, I had asked how you make that
3  determination, and if I understood you correctly, you
4  said you looked at how taking the vaccine or not taking
5  the vaccine influences your religious belief.
6        Is that correct?
7    A.    We look at not how taking the vaccine is
8  against or it causes a -- is against your religious
9  belief.  That how the vaccine -- how taking the vaccine
10  affects your religious belief.  How that would alter
11  your religious belief.
12    Q.    By alter the religious belief, do you mean
13  impact the religious belief?
14    A.    Sure.  Yes, impact your religious belief.
15    Q.    Okay.  Now, you don't anticipate or you don't
16  have an opinion as to the -- how the vaccine works, its
17  safety, its efficacy.  Anything like that, anything to
18  do with medicine or science as it relates to the
19  vaccine; is that correct?
20    A.    No.
21    Q.    Okay.
22    A.    I do have -- our -- I meant no, that I do have
23  a knowledge of that.
24        We are giving the vaccine to our employees,
25  and it was safe for the communities.  It was safe for

EXLER REPORTING
412-221-4007

35

Greg Papa - by Mr. Daller

– – – – –

1  our employees.
2    Q.    Okay.
3    A.    That's my belief.
4    Q.    And what are you basing -- I'm sorry.  Go
5  ahead.
6    A.    No.  That's my belief.
7    Q.    Okay.  So your belief is that it was safe and
8  effective?
9    A.    Correct.
10    Q.    Okay.  And what do you base your personal --
11  that opinion on?
12    A.    I believe on the research that our health
13  system comple- -- and the research for the vaccine.
14    Q.    Okay.  So you're basing your belief on
15  information that you were given, correct?
16    A.    And research that I've done.
17    Q.    Okay.  Tell me what research you've done.
18    A.    In reading the policy, creating the policy,
19  talking to our medical professionals, being on
20  committees.
21    Q.    I mean, that's not really research, is it?  I
22  mean, you're hearing information that you were given?
23    A.    That's my definition of research.  It's a
24  broad definition.  I would consider that research.
25    Q.    Have you ever --

EXLER REPORTING
412-221-4007

36

Greg Papa - by Mr. Daller

– – – – –

1    A.    Clinical -- I didn't do a clinical trial, but
2  I did my research on the vaccine that we were giving at
3  Main Line Health.
4    Q.    Okay.  Have you read any medical literature
5  about COVID, you, yourself?
6    A.    Yes.
7    Q.    Okay.  Can you tell me what you've read?
8    A.    I've read information on COVID that was
9  provided by our health system.
10    Q.    Has your health system done any independent
11  research to determine the safety or efficacy of the
12  COVID vaccine?
13    A.    Yes.
14    Q.    They have?
15    A.    Yes.
16    Q.    What research has Main Line Health done itself
17  to determine safety and efficacy of the vaccine?
18    A.    I don't know specifics.  Our pharmacy did
19  research, ordering the medication, and that's one piece.
20  How to safely administer.  How to safely store.
21        So they've done the research on the COVID
22  vaccine.
23    Q.    Have they -- now, that's research in terms of
24  using a vaccine.  I mean, any hospital is going to do
25  that for any product or device that they use.

EXLER REPORTING
412-221-4007

37

Greg Papa - by Mr. Daller

– – – – –

1        What I'm asking specifically is did Main Line
2  Health, to your knowledge, perform any research itself
3  in terms of the safety and efficacy of the vaccine?
4    A.    Yes.
5    Q.    Do you know where that research is published?
6    A.    I don't.
7    Q.    Is it published?
8    A.    I don't know.
9    Q.    Okay.  In the alternative, do you believe that
10  Main Line Health relied upon research that was published
11  -- that was performed and subsequently published by
12  others in order to inform its decisionmaking process
13  around the COVID vaccine?
14    A.    I'm sure that was a piece of it.
15    Q.    You believe that's a piece of it?
16    A.    Yes.
17    Q.    Okay.  And do you have any knowledge of what
18  it was that the medical experts at Main Line Health
19  reviewed in order to make their determinations?
20    A.    Our lead infection prevention physician did
21  research.  He's an infection preventionist, and he did
22  research on the COVID-19 vaccine.  I don't know
23  specifically what -- how he went about his research, but
24  certainly did research around the efficacy,
25  administration of the vaccine, how to safely handle it.

EXLER REPORTING
412-221-4007

GREG PAPA

---

38

Greg Papa - by Mr. Daller

– – – – –

**So there was research done.**
1
2    Q.    So your recommendations on whether a religious
3  exemption request should be approved was based upon your
4  knowledge of whether a religious exemption request
5  demonstrated a sincerely-held religious belief?
6          MR. HENNESSY:  Objection.  Form.
7          THE WITNESS:  My reasons for accepting and
8  denying were based off of these guiding principles that
9  you have in front of me, the dialogue between our
10  interdisciplinary committee, the questions that were
11  raised, and the forms that were provided by the
12  employee.
13  BY MR. DALLER:
14    Q.    Okay.  And you used your knowledge, then, to
15  evaluate the things you just mentioned, correct?
16    A.    **Yes.**
17    Q.    Okay.  Did you use your personal beliefs in
18  evaluating them?
19          MR. HENNESSY:  Objection to form.
20          THE WITNESS:  I did not.
21  BY MR. DALLER:
22    Q.    You did not, okay.
23          Now, did anybody tell the committee looking at
24  Mrs. Gray's exemption request how or what the
25  determination should be of the group?

EXLER REPORTING
412-221-4007

---

39

Greg Papa - by Mr. Daller

– – – – –

1    A.    **No.**
2    Q.    And I think you testified that you did not
3  have any discussion with Mrs. Gray before she submitted
4  her request, correct?
5    A.    **Correct.**
6    Q.    Did you have any discussion with her after she
7  submitted her request?
8    A.    **I don't believe so.**
9    Q.    Okay.  To your recollection, did you have any
10  questions about her religious exemption request --
11    A.    **No.**
12    Q.    -- in terms of what she stated, what something
13  meant, anything like that?
14    A.    **No.**
15    Q.    And did Mrs. Gray have any poor performance
16  evaluations that you're aware of?
17    A.    **I'm not aware of.**
18    Q.    Okay.  Would you -- in your position, would you
19  anticipate being made aware of them if there was
20  anything?
21    A.    **That was not part of this process, so, no.**
22    Q.    Well, I'm not talking about this process.  I'm
23  talking about your role as vice president of HR?
24    A.    **No.**
25    Q.    No.  And are you religious?

EXLER REPORTING
412-221-4007

---

40

Greg Papa - by Mr. Daller

– – – – –

1    A.    **Yes.**
2    Q.    Okay.  What religion?
3    A.    **Catholic.**
4    Q.    Catholic, okay.  And did Catholic beliefs
5  influence your decision at all?
6    A.    **They did not.**
7    Q.    Nothing the Pope said influenced your
8  decision?
9    A.    **No.**
10    Q.    Okay.  Can you be Catholic and not follow
11  things that the Pope says?
12    A.    **I don't think so.  I don't practice**
13  **Catholicism any more.  I think if you're going to be**
14  **Catholic, you have to follow what the Pope says, so**
15  **that's my personal belief, if you're asking me about the**
16  **Catholicism, not about this process.**
17    Q.    Okay.  About Catholicism.  I'm trying to
18  understand the religious framework that you brought to
19  these evaluations.
20          So you believe that if you're Catholic, you
21  have to follow what the Pope says?
22    A.    **I mean, I -- I don't believe you have -- you**
23  **can be Catholic and you can celebrate Catholicism how**
24  **you want, but I think a portion of that is following the**
25  **Pope.  I don't know -- I'm sure you could be Catholic**

EXLER REPORTING
412-221-4007

---

41

Greg Papa - by Mr. Daller

– – – – –

1  **and follow some of it, but I think for the most part, if**
2  **you're Catholic, you're following what the Pope says,**
3  **but I realize there's variations of every religion.  I**
4  **respect that.**
5    Q.    Do you believe that, like, when the Pope
6  speaks to edicts that he puts out -- right -- do you
7  believe that they are infallible?
8    A.    **I don't personally believe that.**
9    Q.    Okay.  So, then, is it correct that you
10  believe the Pope could say something and you could
11  disagree with it and still be Catholic?
12          MR. HENNESSY:  I'm going to object to
13  form.
14          THE WITNESS:  I mean, I don't know how --
15  I personally -- I can only answer what I think.  I -- I
16  think of -- I don't believe in that, that he's
17  infallible.
18  BY MR. DALLER:
19    Q.    You don't believe that he's infallible?
20    A.    **Yes.**
21    Q.    Okay.  So as a Catholic, if the Pope says,
22  "You should take the vaccine," as a Catholic, you can
23  still make a decision based upon your religious
24  conscious that's described in the catechism, correct?
25          MR. HENNESSY:  Objection to form.

EXLER REPORTING
412-221-4007

---

42

Greg Papa - by Mr. Daller

− − − − −

1    THE WITNESS:  I mean, I think you could do
2  -- you could be religious and say you're a Catholic and
3  not -- I think it's with you.  Between you and that
4  higher power, whatever that higher power is, and, again,
5  you listen to people on earth for some guidance, but at
6  the end of the day, I feel it's between you and that
7  higher power, whatever that higher power looks like, and
8  I respect that.
9  BY MR. DALLER:
10    Q.    Okay.  So if somebody has a -- that
11  relationship with a higher power, as you call it, and
12  makes their decisions based upon those beliefs, you
13  believe that's consistent with being religious, correct?
14    MR. HENNESSY:  Objection.  Form.
15    THE WITNESS:  Yeah, I don't know.  I don't
16  know in every instance.  I'm not going to state that.
17  I wouldn't feel comfortable commenting on that.
18  BY MR. DALLER:
19    Q.    But in general terms?  I mean, obviously,
20  there's always specifics.
21    MR. HENNESSY:  Objection.  Form.
22    THE WITNESS:  No.  I still -- I still
23  don't know the circumstances around your example.
24    So I just believe it's a conversation where
25  it's a feeling or whatever it is between you and your --

EXLER REPORTING
412-221-4007

44

Greg Papa - by Mr. Daller

− − − − −

1  come up with a decision.
2    Q.    Okay.  Based upon the writings that they
3  submitted, correct?
4    A.    **Based upon the form and the policy.**
5    Q.    And would you agree that some people write
6  better than others?
7    A.    **Yes.**
8    Q.    Would you agree that some people, because of
9  their level of training, may write significantly better
10  than others?
11    A.    **Sure.**
12    Q.    Would you agree that interpretation of a
13  writing is also dependent upon the reader's knowledge,
14  correct?
15    A.    **All --**
16    MR. HENNESSY:  Hey, John -- and I'm going
17  to -- John, is there a reason we need to have this --
18  the Exhibit 1 up still?  You can --
19    MR. DALLER:  Oh, no.  We can take it down.
20    MR. HENNESSY:  Okay.  All right.  I think
21  that's a little bit confusing.  Thanks.
22    MR. DALLER:  Okay.
23    THE VIDEOGRAPHER:  (Indicating.)
24    MR. DALLER:  So --
25    MR. HENNESSY:  And I may have interrupted.

EXLER REPORTING
412-221-4007

43

Greg Papa - by Mr. Daller

− − − − −

1  your beliefs.
2  BY MR. DALLER:
3    Q.    Okay.  And is Main Line Health a spiritual
4  interpreter?
5    A.    **No.**
6    Q.    So did the committee insert themselves into
7  these exemption requests to interpret what an individual
8  may have been saying?
9    A.    **As a spirit -- you asked the question of a**
10  **spiritual interpreter?  This committee was not**
11  **interpreting someone's -- was not meant to be a**
12  **spiritual interpreter.**
13    **And I don't even know how you're using the**
14  **definition spiritual interpreter, so if you could**
15  **explain that, that would be helpful.**
16    Q.    So a spiritual interpreter is one who looks at
17  a belief and then interprets what that belief means to
18  the person.
19    A.    **We did not do that.  We were looking at in**
20  **terms of the COVID-19 vaccine.**
21    Q.    So you interpreted how their belief would keep
22  them from taking the COVID-19 vaccine?
23    A.    **We used -- and, again, I'll go back to our**
24  **process.  We used these guidelines.  We used what the**
25  **employee stated.  We used an interdisciplinary team to**

EXLER REPORTING
412-221-4007

45

Greg Papa - by Mr. Daller

− − − − −

1  I was going to object to form.
2    MR. DALLER:  That's all right.  I'll just
3  clarify it with Mr. Papa.
4  BY MR. DALLER:
5    Q.    We had said that some people write better than
6  others.
7    You agreed to that?
8    A.    **Yes.**
9    Q.    Some people write significantly better than
10  others.
11    You agreed with that?
12    A.    **Yes.**
13    Q.    Okay.  And I think where we left off was would
14  you agree that a reader's interpretation of a writing is
15  also dependent upon their knowledge, correct?
16    A.    **Are we talking about writing in general or**
17  **this process?**
18    Q.    Writing in general.
19    A.    **Sure.**
20    Q.    Okay.
21    A.    **I agree.**
22    Q.    Okay.  And if someone reads something that
23  they don't have the knowledge base for, they may not
24  understand it, correct?
25    MR. HENNESSY:  Object to form.

EXLER REPORTING
412-221-4007

46

Greg Papa - by Mr. Daller

– – – – –

BY MR. DALLER:
1 BY MR. DALLER:
2     **Q.**   Correct?
3     **A.**   **Correct.**
4     **Q.**   Okay. All right. And I think you said that
5 you did not have any conversation with Mrs. Gray about
6 her religious exemption request, correct?
7     **A.**   **Correct.**
8     **Q.**   And, to your knowledge, neither did anybody on
9 the committee, correct?
10     **A.**   **Correct.**
11     **Q.**   Okay. But you did read her request, correct?
12     **A.**   **I did, correct.**
13     **Q.**   And to your recollection, before we look at
14 it, was there anything in it that you did not
15 understand?
16     **A.**   **No.**
17     **Q.**   Okay. And can you define Christianity for me,
18 please?
19         MR. HENNESSY: Objection to form.
20         THE WITNESS: It's a belief in God. A
21 belief in the *New Testament*, the *Old Testament*. That's
22 about as far as I could go.
23         MR. DALLER: Okay. And why don't we go
24 ahead and pull up the religious exemption request? And
25 we're going to move around the document a little bit.

EXLER REPORTING
412-221-4007

---

47

Greg Papa - by Mr. Daller

– – – – –

1         THE VIDEOGRAPHER: (Indicating.)
2         (Whereupon, Papa Deposition Exhibit No. 2
3 was displayed on the screen.)
4 BY MR. DALLER:
5     **Q.**   Just for orientation, do you recognize this as
6 her exemption request, correct?
7     **A.**   **Yes.**
8         THE WITNESS: Can you blow it up?
9         MR. DALLER: Yeah. He'll blow up.
10         THE VIDEOGRAPHER: (Indicating.)
11         THE WITNESS: Okay. There we go. Thanks.
12 It's better.
13 BY MR. DALLER:
14     **Q.**   All right. And she handwrote this, as we can
15 see, correct?
16     **A.**   **Right.**
17     **Q.**   Okay. And she provided a typed transcript of
18 the answers that she provided to specific questions and
19 she also provided a typed transcript of her pastor's
20 statement.
21       Okay?
22     **A.**   **Okay.**
23     **Q.**   For ease of viewing, we will concentrate on
24 the typed transcripts.
25       Do you need any amount of time to review the

EXLER REPORTING
412-221-4007

---

48

Greg Papa - by Mr. Daller

– – – – –

1 handwritten ones to familiarize yourself with the
2 questions, and then also do what you want to convince
3 yourself that the typed page is what she handwrote?
4     **A.**   **No.**
5     **Q.**   No, okay. All right. So let's -- since we
6 have the thing up, let's just briefly go through.
7         MR. DALLER: Start on Page 2, and if you
8 can blow up the questions just so we can read the
9 questions and -- okay. Because she refers on her typed
10 portion to it.
11         THE VIDEOGRAPHER: (Indicating.)
12 BY MR. DALLER:
13     **Q.**   So "Question 1: Please provide a personal
14 statement detailing the sincerely-held beliefs that are
15 religious in nature regarding your COVID-19 vaccination
16 objection, explaining why you are requesting this
17 religious exemption, the principles that guide your
18 objections, and the basis that prohibits vaccination."
19       Okay?
20     **A.**   **Okay.**
21     **Q.**   You agree that's the question, okay.
22       And then Question 3 is, "Does the religious
23 belief identified in Question 1 prevent you from
24 receiving other vaccines or just the COVID vaccine?"
25       And you see that Mrs. Gray did write something

EXLER REPORTING
412-221-4007

---

49

Greg Papa - by Mr. Daller

– – – – –

1 in, but the only thing that appears on this page -- and
2 I don't believe it's in the narrative part -- is that
3 she will take "some but not all vaccines," correct?
4     **A.**   **Correct.**
5     **Q.**   Okay. And she specifies genetic-component
6 vaccines, correct?
7     **A.**   **Correct.**
8     **Q.**   Okay. In your consideration of her exemption
9 request, is the words "genetic-component vaccines," did
10 that cause any concern to you in making the
11 determination, or did it inform, in any way, the
12 determination of denying her religious exemption
13 request?
14     **A.**   **We looked at the whole form, so whether**
15 **genetic-component vaccines were written there, we -- we**
16 **took a look at the whole form, so, no.**
17     **Q.**   Okay. So in and of itself, those three words
18 did not negate the sincerity of her belief in your view?
19     **A.**   **I'm not sure of that. I want to see more and**
20 **see how -- how she answered the rest of the questions**
21 **before I would make any decision.**
22     **Q.**   Okay. And then on Page 4, Question 5, I think
23 she had some additional information?
24     **A.**   **Yep. Yes.**
25     **Q.**   And Question 5 is "Have you ever been approved

EXLER REPORTING
412-221-4007

---

50

Greg Papa - by Mr. Daller

_ _ _ _ _

1  for any other type of religious accommodation during
2  your employment?"  She did indicate no on that.
3      And then let's look at Question 6 because she
4  didn't write anything in specifically there.
5      She states that "it derives from an organized
6  religion?"  She says, "Yes," and she stated nondenominal
7  [sic] Christianity, correct, or she is a
8  nondenominational Christian?
9  **A.  Correct.**
10  Q.  Okay.  And did that, in and of itself, cause
11  any concern that it was not a specific denomination of
12  Christianity?
13  **A.  No.**
14  Q.  Okay.  And then Question -- or then the next
15  line is "When did you first practice this religion?"
16  She notes, "1970," correct?
17  **A.  Yes.**
18  Q.  Okay.  And then she indicates that she belongs
19  to an organization or a church, and she was with that
20  church since 1998, correct?
21  **A.  Correct.**
22  Q.  Okay.  Would you say that that's -- those are
23  pretty consistent beliefs?  I mean, long-standing being
24  a member of this faith community?
25  **A.  I mean, I don't know what her specific beliefs**

EXLER REPORTING
412-221-4007

---

51

Greg Papa - by Mr. Daller

_ _ _ _ _

1  **are, but she's established herself as a part of this**
2  **church since 1970.**
3  Q.  Okay.  And do you recall if she referenced any
4  *Bible* verses or anything like that in her request?
5  **A.  I believe there were *Bible* verses.**
6  Q.  Okay.  Do you recall whether or not you
7  verified them, went to read them in context or anything?
8  **A.  We -- we read the entire form that every**
9  **employee filled out, and if we had questions, we -- we**
10  **asked Casey or someone else who would know.**
11  Q.  Okay.  And did you rely on whatever they said
12  in terms of their interpretation of the verse?
13  **A.  I mean, it was a piece of the decisionmaking.**
14  Q.  So did you rely on the chaplains to interpret
15  what the scriptures meant that somebody used?
16      MR. HENNESSY:  Objection.  Form.
17      THE WITNESS:  At times.
18  BY MR. DALLER:
19  Q.  And if that interpretation conflicted with the
20  individual's interpretation who presented -- who wrote
21  it, okay, did you seek to clarify that at all?
22  **A.  I can't remember if there were any conflicts**
23  **in *Bible* verses.**
24  Q.  So -- well, I mean, you just said that you
25  relied upon the chaplain to interpret what the person

EXLER REPORTING
412-221-4007

---

52

Greg Papa - by Mr. Daller

_ _ _ _ _

1  was saying, correct?  Or what the scripture verse was
2  saying, correct?
3  **A.  No.  We didn't ask the chaplain to interpret**
4  **what the person was saying.**
5  Q.  You asked them to interpret what the scripture
6  verse meant, correct?
7  **A.  If we had a question about the scripture or if**
8  **we didn't understand, we had asked for the chaplain to**
9  **clarify the verse and how it relates to the COVID-19**
10  **vaccine, and not -- or either requesting on the**
11  **exemption or getting the vaccine.**
12  Q.  So that interpretation by the chaplain is
13  their subjective determination, correct?
14  **A.  We didn't use it to determine the acceptance.**
15  **We used it to determine the clarification of a *Bible***
16  **verse.**
17  Q.  Right.  But you said that you used the belief
18  that they were presenting and how it prevented them from
19  getting the vaccine, correct?
20      MR. HENNESSY:  Objection to form.
21      THE WITNESS:  Can you restate the
22  question?
23  BY MR. DALLER:
24  Q.  Sure.
25  **A.  Thanks.**

EXLER REPORTING
412-221-4007

---

53

Greg Papa - by Mr. Daller

_ _ _ _ _

1  Q.  You said that one of the factors that you
2  considered was how the belief prevented them from
3  getting the vaccine; is that correct?
4  **A.  Correct.**
5  Q.  Okay.  And if there was a question about that,
6  you asked the chaplain, correct?
7      MR. HENNESSY:  Objection.  Form.
8      THE WITNESS:  We asked the chaplain to
9  clarify *Bible* verses that people submitted.
10  BY MR. DALLER:
11  Q.  Okay.  And in so doing, they gave you what
12  they believed the individual's belief was, correct?
13      MR. HENNESSY:  Objection.  Form.
14      THE WITNESS:  No.
15  BY MR. DALLER:
16  Q.  No.  What was the --
17  **A.  They --**
18  Q.  -- purpose of them clarifying?  What did they
19  clarify?
20  **A.  They clarified what was meant by that *Bible***
21  **verse or any significance -- what was the -- you know,**
22  **what was the context maybe of that *Bible* verse.**
23  Q.  Okay.
24  **A.  It's a verse --**
25  Q.  They interpreted the scripture that they were

EXLER REPORTING
412-221-4007

GREG PAPA

---

**54**

Greg Papa - by Mr. Daller

– – – – –

1  asked to review, correct?

2              MR. HENNESSY:  Objection to form.

3  BY MR. DALLER:

4      Q.    You can answer.

5      A.    **At times they were clarifying what -- they**

6  **were answering the question, so I don't know if it was**

7  **interpreting.  At times could have been interpreting**

8  **this for someone, but they were more questions regarding**

9  **the** *Bible* **verse and either what it meant, either -- you**

10  **know, what came before or what came after that one**

11  **sentence in the** *Bible,* **and how it relates to COVID.**

12          **So there was many factors in -- in why we**

13  **asked the chaplain to review the** *Bible* **quotes.**

14      Q.    Okay.  Is there anything in the *Bible* at all

15  that speaks to COVID?

16      A.    **Specifically to COVID- --**

17      Q.    Yes.

18      A.    **-- -19?**

19      Q.    Yes.

20      A.    **I don't know.**

21      Q.    So you reviewed all of these exemptions.

22          In those reviews, did you see anything that

23  specifically related to COVID?

24      A.    **I'm not sure related to disease, but I'm not**

25  **sure it's specifically related to COVID.  I would**

EXLER REPORTING

412-221-4007

---

**55**

Greg Papa - by Mr. Daller

– – – – –

1  **imagine that there's nothing related to COVID in the**

2  *Bible.*

3      Q.    Okay.

4      A.    **COVID-19.**

5      Q.    All right.  I would agree with you on that,

6  that there's nothing specific about COVID in the *Bible.*

7          But if I heard you correctly, you did say that

8  the *Bible* speaks to disease, correct?

9      A.    **I said it could speak to disease.  I'm not**

10  **sure.  I am not a** *Bible* **expert, and I'm sure it does**

11  **talk about disease and plagues.**

12      Q.    Okay.  And is COVID a disease?

13      A.    **Yes.**

14      Q.    Okay.  So someone who is a believer in the

15  *Bible* could interpret a reference to disease as being a

16  reference to COVID, correct?

17      A.    **They could make that connection, yes.**

18      Q.    Okay.  And is their connection any more wrong

19  or right than the chaplain's connection?

20          MR. HENNESSY:  Objection.

21          THE WITNESS:  I don't know.

22  BY MR. DALLER:

23      Q.    You don't know, okay.

24          Would you give deference to the chaplain

25  because, I mean, they're educated in this?

EXLER REPORTING

412-221-4007

---

**56**

Greg Papa - by Mr. Daller

– – – – –

1          MR. HENNESSY:  Objection.

2          THE WITNESS:  I don't know.

3          We used the chaplain to clarify things when we

4  needed them.  We -- we didn't rely solely on the medical

5  professional, the chaplain, HR person.  It was a

6  collective interdisciplinary team making a decision.

7          MR. DALLER:  All right.  Let's look at the

8  typed page, Page 2, Question 1, please.

9          THE VIDEOGRAPHER:  (Indicating.)

10          MR. DALLER:  And if we can blow up Page 2,

11  Question 1?

12          THE VIDEOGRAPHER:  (Indicating.)

13  BY MR. DALLER:

14      Q.    And then if you could just take moment to read

15  that, Mr. Papa.

16          MR. DALLER:  If you can move it over a

17  little bit so the pictures don't obscure it.

18          THE VIDEOGRAPHER:  (Indicating.)

19  BY MR. DALLER:

20      Q.    All right.  Why don't you take a minute to

21  read that and let me know when you're finished?

22      A.    **(The witness reviews the document on the**

23  **screen.)**

24          **Okay.**

25      Q.    Okay.  After reading it, has that recollected

EXLER REPORTING

412-221-4007

---

**57**

Greg Papa - by Mr. Daller

– – – – –

1  your knowledge or memory of the time when you reviewed

2  her exemption request at all?

3      A.    **Yes.**

4      Q.    Okay.  Can you tell me what it recollected for

5  you?

6      A.    **That it's dealing with fertility.  It's**

7  **dealing with -- it's -- for me, this is more medical and**

8  **science in nature.**

9      Q.    Okay.  And it's medical and science because

10  she -- for what reasons?  Because she talks about

11  fertility?

12          MR. HENNESSY:  Objection to form.

13          THE WITNESS:  It talks about the medical

14  exemption for the allergy.  It talks about fertility,

15  and it's not -- it's not stating about the COVID-19

16  vaccine.  It's not making that connection.

17  BY MR. DALLER:

18      Q.    Okay.

19      A.    **The COVID-19 vaccine.  It's more talking about**

20  **medical and scientific issues.**

21      Q.    Okay.  We're going to go through those in some

22  detail.

23          You mentioned about the medical exemption.

24          Can we agree that we can kind of ignore that

25  because she's not stating that she's applying for

EXLER REPORTING

412-221-4007

---

58

Greg Papa - by Mr. Daller

_ _ _ _ _

1  medical exemption?  She actually says, "even though I
2  could, I'm not"?
3      A.  Sure.
4      Q.  Okay.  All right.  And would you agree that if
5  somebody has a religious exemption, that they -- or a
6  religious reason not to take the COVID vaccine, would
7  that not be the appropriate exemption to request even if
8  they could get a medical exemption?
9          MR. HENNESSY:  Objection.  Form.
10         THE WITNESS:  I don't know "Even if --
11  even though I could apply."  I mean, anyone could apply
12  for any medical exemption.  I don't know if it would be
13  accepted or not.  That's not my decision.
14  BY MR. DALLER:
15     Q.  Right.  But --
16     A.  And I don't even know what --
17     Q.  Go ahead.
18     A.  I don't know what PEG means.
19     Q.  Okay.  And after that introductory phrase, she
20  states, "I have chosen to apply for a religious
21  exemption due to the personal conviction of my religious
22  belief," correct?
23     A.  That's what's stated there, yes.
24     Q.  Okay.  And would you agree that for somebody
25  who has strong religious convictions, it doesn't matter

EXLER REPORTING
412-221-4007

59

Greg Papa - by Mr. Daller

_ _ _ _ _

1  what a medical situation would be because religious is
2  dominant over medical concerns?
3          MR. HENNESSY:  Objection.
4  BY MR. DALLER:
5      Q.  Would you agree with that?
6      A.  I would not agree with that.
7      Q.  Okay.  Would you agree there's God's law?
8      A.  I don't understand your question.
9      Q.  Does God have laws for people?
10     A.  Some people may believe they do -- he does or
11  she does.
12     Q.  Do you believe that God provides laws or
13  rules?
14     A.  Do I personally believe God provides laws or
15  rules?
16     Q.  Yes.
17     A.  Not related to her religious exemption?
18     Q.  Correct.
19     A.  No.
20     Q.  Okay.  So you do not believe that God has
21  outlined or ordained laws for his followers to abide by?
22     A.  No.
23     Q.  Okay.  Do you believe in the Ten Commandments?
24     A.  I believe in certain aspects of following
25  those -- those principles, sure.  I believe they're good

EXLER REPORTING
412-221-4007

60

Greg Papa - by Mr. Daller

_ _ _ _ _

1  things to live by.
2      Q.  Okay.
3      A.  But I -- you're asking me personally.  I
4  believe that people believe that God has laws for them
5  and I respect that.  And I believe that they believe
6  that God has laws for them, so I respect that.
7          You asked me if I believed that God has laws.
8  I do not believe God has laws for me.
9      Q.  Okay.
10     A.  I just wanted to clarify that.
11     Q.  Okay.  Does your belief of God not having laws
12  for you influence your decision here at all?
13     A.  No.
14     Q.  And just like God has laws, okay, man
15  has laws, correct?
16     A.  Yes.
17     Q.  Okay.
18     A.  There are many different Gods that people
19  believe in, so these laws are different for many people,
20  and they're interpreted different by many different
21  religions.
22     Q.  Okay.  And is one religion more wrong or more
23  correct?
24     A.  I don't think so.
25     Q.  And religious beliefs are held by the

EXLER REPORTING
412-221-4007

61

Greg Papa - by Mr. Daller

_ _ _ _ _

1  individual, correct?
2      A.  I don't know.  Certain individuals don't, so I
3  don't know how -- I don't feel comfortable answering
4  that for other people.
5      Q.  Okay.  Let me rephrase that.
6          Catholics have their beliefs, correct?
7      A.  Correct.
8      Q.  Okay.
9      A.  In general.
10     Q.  In general.  And people of the Jewish faith
11  have their beliefs, correct?
12     A.  In general.
13     Q.  Okay.
14     A.  There's many kinds of Judaism.
15     Q.  Okay.  And people of the Muslim faith have
16  their beliefs, taking into account any denominations,
17  correct?
18     A.  Sure.
19     Q.  And members of the Christian faith, there's
20  different denominations.  They all have their own
21  beliefs, but they have their beliefs, correct?
22     A.  Sure.
23     Q.  Okay.  And I think you testified that not
24  anybody's belief is any more wrong or right than the
25  other, correct?

EXLER REPORTING
412-221-4007

## 62

Greg Papa - by Mr. Daller

_ _ _ _ _

1    A.   I believe as it affects society, sure.  That
2  if someone believes in something that would harm
3  someone, I don't -- I don't know all forms of religion,
4  but if a religion was harming someone or harming our
5  communities or harming a child or an individual, yeah.
6  I would not support that.
7    Q.   You would not support that, okay.
8         Can you give me an example of that?
9    A.   No.
10    Q.   Okay.  If there's a conflict between God's law
11  and man's law, which one should prevail, in your
12  opinion?
13    A.   I don't know.
14         MR. HENNESSY:  Object to form.
15  BY MR. DALLER:
16    Q.   I'm sorry?
17         MR. HENNESSY:  I'm going to object to
18  form.
19         THE WITNESS:  I don't know.
20  BY MR. DALLER:
21    Q.   You don't know, okay.
22    A.   I don't.
23    Q.   If there's a conflict between God's law and
24  man's law in a religious exemption request, which one
25  should prevail?

EXLER REPORTING
412-221-4007

## 63

Greg Papa - by Mr. Daller

_ _ _ _ _

1         MR. HENNESSY:  I'm going to object to
2  form.
3         If you can -- if you understand the question,
4  go ahead.
5         THE WITNESS:  I don't understand the
6  question.
7  BY MR. DALLER:
8    Q.   If one has a belief that God's law tells them
9  how they should live and what they should do, okay, and
10  that conflicts with something in man's law, is that
11  individual obligated to follow one or the other?
12    A.   I would have to know what that something is.
13  I still don't understand your question.
14    Q.   Okay.  You're familiar with Sharia Law?
15    A.   No.
16    Q.   No, okay.  You're familiar with the Ten
17  Commandments, correct, you said?
18    A.   A basic knowledge of them.
19    Q.   Uh-huh.  And are you familiar with the one
20  "Thou shall not use the Lord God's name in vain"?
21    A.   Yes.
22    Q.   What does that mean?
23    A.   You should not use the lord's name in vain,
24  whoever that Lord is.  I'm not sure.
25    Q.   Okay.  And what does "in vain" mean?  What's

EXLER REPORTING
412-221-4007

## 64

Greg Papa - by Mr. Daller

_ _ _ _ _

1  your interpretation of that?
2    A.   In -- for evil purposes, I guess.
3    Q.   Okay.
4    A.   I don't really know what is the intent around
5  that.
6    Q.   Okay.
7    A.   I'm not going to guess.
8    Q.   And when you drive, okay, ever get cut off by
9  somebody?
10    A.   Yes.
11    Q.   Okay.  And what do you say?
12    A.   I don't react.
13    Q.   You don't react, okay.
14         If someone were to curse in that situation,
15  okay, is there a law against that?
16    A.   Which kind of law?
17    Q.   Man's law.  Like, if somebody cuts you off and
18  the cop happens to be in your car and you spout off a
19  few expletives at the guy, can the cop give you a
20  ticket?
21    A.   Oh, I don't know.
22    Q.   You don't know they could give you a ticket
23  for that?
24    A.   I don't know.
25    Q.   Okay.  If I would submit to you that they

EXLER REPORTING
412-221-4007

## 65

Greg Papa - by Mr. Daller

_ _ _ _ _

1  cannot give you a ticket for that, all right, would you
2  accept that?
3    A.   No.
4    Q.   You would not accept that?
5    A.   No.
6    Q.   Okay.  Why wouldn't you accept that?
7         MR. HENNESSY:  Objection.  Form.
8         THE WITNESS:  Because I don't know --
9         MR. HENNESSY:  Sorry.
10         THE WITNESS:  If you would -- it's your
11  word against a cop's word.  You just asked me, "Can he
12  give you a ticket?"  And you're going to tell me no?  I
13  don't know.
14  BY MR. DALLER:
15    Q.   Okay.  Well, let's assume he doesn't give you
16  a ticket.  Okay?  Did you do something wrong?
17    A.   I didn't -- I didn't shout -- you asked me
18  what do I do in that situation.  I said nothing.  I
19  remain calm.
20    Q.   We've moved on from that.  And I said if
21  someone did shout several expletives, and we've
22  established that the cop did not give you a ticket.
23    A.   Okay.
24    Q.   Now, given God's law, what we talked about,
25  and man's law, did that individual do something wrong?

EXLER REPORTING
412-221-4007

66

Greg Papa - by Mr. Daller

_ _ _ _ _

1    A.    I don't know.
2    Q.    You don't know, okay.
3          So you have no opinion as to whether God's law
4    should prevail over man's law; is that correct?
5    A.    **No.**
6    Q.    Okay.
7    A.    **That's incorrect.  That's incorrect.  I don't**
8    **know whether God's law, man's law in a car shouting an**
9    **expletive when someone cuts you off, I don't know that**
10   **answer to that question.**
11         **I don't know who's driving the car.  I don't**
12   **know what the context is, so I don't feel comfortable**
13   **answering it.**
14         **I do know if I was driving the car, I would**
15   **remain calm.**
16   Q.    Okay.  Let's go back to Mrs. Gray's religious
17   exemption request, and she goes on then to say, "The
18   best example to explain my objection is when my husband
19   and I tried to conceive children."
20         Do you see that?
21   A.    **Yes.**
22   Q.    Okay.
23   A.    **Yep.**
24   Q.    And is your view of that statement that it's
25   solely medical?

67

Greg Papa - by Mr. Daller

_ _ _ _ _

1    A.    **It could be many factors, but it does not**
2    **relate to the COVID-19 vaccine.**
3    Q.    Okay.  And in your mind, there's no way that
4    this could be an example of how they're connected.
5          Is that your testimony?
6    A.    **I don't see the connection in this statement:**
7    **"The best example to explain my objection is when my**
8    **husband and I tried to conceive children."**
9          **I don't see that connection to the COVID**
10   **vaccine.**
11   Q.    Okay.  You don't see a connection because
12   there's not enough information in that sentence, or you
13   do not believe that there can be a connection even if
14   there's an explanation?  Which of those two?
15   A.    **I mean I could --**
16         MR. HENNESSEY:  Objection.  Form.
17         Go ahead.
18         THE WITNESS:  I could read the rest of the
19   statement to get a better -- yes.  That's just one
20   sentence.
21   BY MR. DALLER:
22   Q.    Okay.  All right.
23   A.    **Yeah.**
24   Q.    So she goes on to say then that after not
25   conceiving for a couple years, they pursued further

68

Greg Papa - by Mr. Daller

_ _ _ _ _

1    fertility options, correct?
2    A.    **Correct.**
3    Q.    And then she goes on to describe them.  Went
4    through testing to determine if it was structural or
5    hormonal; is that correct?
6    A.    **Correct.**
7    Q.    Okay.  And then she tried some low-tech
8    options and those led to some miscarriages, and then
9    when the next options were presented, they "prayerfully
10   considered them and concluded that their faith and
11   belief did not allow them to take those steps."
12         And she identifies those steps as hormones,
13   artificial insemination, and in vitro fertilization; is
14   that correct?
15   A.    **That's correct how you've read it.**
16   Q.    Okay.  All right.  And then she states what
17   her belief was:  "That our belief was if we were to have
18   children, God would allow it to happen from natural
19   means," correct?
20   A.    **Correct.**
21   Q.    Okay.  What does -- is this a medical
22   statement, or is this a religious statement?
23         MR. HENNESSEY:  I'm going to object to
24   form.
25         THE WITNESS:  I don't know.  It sounds

69

Greg Papa - by Mr. Daller

_ _ _ _ _

1    like it could be both.
2    BY MR. DALLER:
3    Q.    Okay.  Well, when it says, "God would allow it
4    through natural means," all right, I mean, does that
5    influence your opinion at all?
6    A.    **I think it's both.  I think it's religious and**
7    **I think it's scientific in nature, natural means.**
8    Q.    Okay.  Who created nature?
9    A.    **I don't know.**
10   Q.    Okay.  For a Christian, who created nature?
11   A.    **For Christians, I guess they believe God.**
12   Q.    Uh-huh.  Okay.  So if something happens
13   naturally, is that not the way God intended it to
14   happen?
15   A.    **I guess you can make that connection, sure.**
16   Q.    Okay.  And Mrs. Gray is a Christian, correct?
17   A.    **Yes.**
18   Q.    Okay.
19   A.    **At the time of this, yes.  She stated that.**
20   Q.    Okay.  And you didn't doubt that she's a
21   Christian, correct?
22   A.    **No.**
23   Q.    Okay.
24   A.    **Not at all.**
25   Q.    Okay.  So if she's a Christian, then it would

GREG PAPA

---

70

Greg Papa - by Mr. Daller

\- - - - -

1  be pretty clear that if she believes that God created
2  things, she says, then, "God would allow it to happen
3  through natural means," His means, correct?
4          MR. HENNESSY:  Objection to form.
5  BY MR. DALLER:
6      Q.    That's what she said, right?  That God would
7  allow it to happen through natural means, correct?
8      A.    **Through natural means.  Not His means.**
9      Q.    Well, we agreed that for a Christian, God
10  created nature, correct?
11      A.    **Is God -- are you -- in your example is God a**
12  **man?**
13      Q.    In my example it doesn't matter if God is a
14  man or a woman.
15          Is God a man?
16      A.    **I don't know.**
17      Q.    Is he a woman?
18      A.    **I don't know.**
19      Q.    Does the *Bible* say what he is?
20      A.    **I don't know.**
21      Q.    Does the *Bible* speak to the image of God?
22      A.    **I don't know.**
23      Q.    Okay.
24          MR. DALLER:  Let's go on to Psalm 139.
25  BY MR. DALLER:

EXLER REPORTING
412-221-4007

---

71

Greg Papa - by Mr. Daller

\- - - - -

1      Q.    And go ahead and read the quote from the
2  *Bible*.
3      A.    **Me?**
4      Q.    Yeah.  You don't have to read it out loud.  I
5  just want to make sure that --
6      A.    **Oh, okay.**
7      Q.    I'm sorry.  Yeah.
8      Q.    Okay.
9          **(The witness reviews the document on the**
10  **screen.)**
11      Q.    Let me know when you're done.
12      A.    **All right.**
13      Q.    Okay.  Does this *Bible* verse help you
14  understand or does it -- well, first, does it speak to
15  the belief about God would allow conception to happen
16  naturally, in your opinion?
17          MR. HENNESSY:  Objection to form.
18          THE WITNESS:  I mean, it's saying that the
19  purpose of this is that God would let it happen
20  naturally.  I think that's why it's written here.
21  BY MR. DALLER:
22      Q.    Okay.  And you don't doubt that, correct?
23      A.    **I don't doubt?**
24      Q.    That interpretation of what you just said.
25      A.    **No.  I mean, it's written here for the**

EXLER REPORTING
412-221-4007

---

72

Greg Papa - by Mr. Daller

\- - - - -

1  purposes of explaining that.  Sure.  I agree.
2      Q.    Okay.  And do you believe that that is a valid
3  belief?
4      A.    **I believe it's a valid belief, sure.**
5      Q.    Okay.  All right.  And so it supports that God
6  would allow it to happen naturally, correct?
7      A.    **The person who wrote this believes that God**
8  **would allow it to happen naturally, exactly.**
9      Q.    Okay.  And is artificial insemination natural?
10      A.    **I don't know.  It's an interpretation.  Some**
11  **people interpret that differently, that God made the**
12  **hands that create the person who made that artificial,**
13  **you know, form to inject in your body.**
14          **I have many friends who are very Christian and**
15  **believe that that's not artificial.  Different views.**
16      Q.    What about in vitro fertilization?
17      A.    **The same thing.  The same concept.**
18      Q.    Okay.  And what about the use of hormones?
19      A.    **The same thing.**
20      Q.    Would you agree that all three of those
21  require something to be done to the body?
22      A.    **Lots of things require things to be done to**
23  **the body.  So, yeah, I would say those things -- those**
24  **three things have some- -- something to do with the**
25  **body.  Sure.**

EXLER REPORTING
412-221-4007

---

73

Greg Papa - by Mr. Daller

\- - - - -

1      Q.    All right.  And they're used for somebody who
2  cannot get pregnant naturally, correct?
3      A.    **You're -- again, naturally, if naturally is a**
4  **definition to people.  What's naturally to some person**
5  **may not be naturally to another.**
6      Q.    Does it matter what anybody else thinks other
7  than Mrs. Gray here?
8      A.    **No.**
9      Q.    No.
10      A.    **But you're asking me in general, I thought.**
11      Q.    So in this specific case now, I think we
12  agreed or you stated that the *Bible* verse from Psalm 139
13  supports her statement that God would allow it to happen
14  naturally, correct?
15      A.    **Yes.  I answered that.**
16      Q.    Okay.  And we agreed that hormones, artificial
17  insemination and in vitro fertilization are things that
18  are done to the body, correct?
19      A.    **Correct.**
20      Q.    Okay.  And for someone who believes that God
21  will allow it to happen through natural means, would the
22  application of these external treatments be allowing
23  something to happen naturally?
24      A.    **I don't know.  That's where I said some**
25  **people's definition of naturally is different.**

EXLER REPORTING
412-221-4007

---

---

74

Greg Papa - by Mr. Daller

— — — — —

1   Q.   Okay.
2   A.   **Some people believe that because -- that the**
3   **product is out there, God made the product.  God made**
4   **the person who is -- who created it, so it's natural to**
5   **that person.**
6   Q.   Okay.  But this is Mrs. Gray's exemption
7   request, correct?
8   A.   **I already said Mrs. Gray's exemption request**
9   **she believes that, so, yes, I agree.**
10   Q.   All right.  And then she goes on after the
11   *Bible* verse that she believes that "life begins at
12   conception and ends at natural death," correct?
13   A.   **Correct.**
14   Q.   Okay.  And then she says, "It's the same
15   belief that guides my objections to getting the COVID-19
16   vaccine."  Okay?
17   And then she says, "I am not comfortable
18   having genetic components that my body did not create
19   injected into my body."
20   Do you see that?
21   A.   **Yeah.**
22   Q.   Okay.  And do you see any connection between
23   having genetic components injected and the
24   administration of exogenous or not from the body
25   hormones, artificial insemination or in vitro

EXLER REPORTING
412-221-4007

---

75

Greg Papa - by Mr. Daller

— — — — —

1   fertilization?
2   Do you see any connection there?
3   A.   **No.**
4   Q.   No.  Do the COVID vaccines have genetic
5   components in them?
6   A.   **I believe they do.**
7   Q.   Okay.  Were those genetic components made in
8   Mrs. Gray's body?
9   A.   **I don't know.**
10   Q.   You don't know if the vaccine that's taken off
11   the shelf contains any genetic material from Mrs. Gray?
12   A.   **I don't know.**
13   Q.   You don't know, okay.
14   So how can you interpret what this statement
15   is saying if you don't know the answer to that?
16   MR. HENNESSY:  Objection to form.
17   THE WITNESS:  She believed, according to
18   this, that her conception should be held -- should be
19   natural.
20   BY MR. DALLER:
21   Q.   Okay.
22   A.   **And she believes that she was "objecting to**
23   **the genetic components that my body did not create**
24   **injected into my body," so she was not comfortable with**
25   **that.**

EXLER REPORTING
412-221-4007

---

76

Greg Papa - by Mr. Daller

— — — — —

1   Q.   And you don't understand the spiritual
2   connection between those two?
3   A.   **Well, I do think Mrs. Gray has a spiritual**
4   **connection between those two.**
5   Q.   Okay.
6   A.   **Sure.**
7   Q.   She does, okay.  So then why did you say that
8   she didn't make a statement why she can't take the
9   vaccine?
10   A.   **Because --**
11   MR. HENNESSY:  I -- go ahead.
12   THE WITNESS:  Because this is just one
13   piece of the -- we're asking for one piece of the
14   questions.  This is the first question, so, okay.  She
15   established that.
16   BY MR. DALLER:
17   Q.   Okay.  All right.
18   A.   **Yeah.**
19   MR. DALLER:  Let's go on to Page 2,
20   Question 3 then.
21   THE VIDEOGRAPHER:  (Indicating.)
22   BY MR. DALLER:
23   Q.   And before we leave, did you have any issues
24   with her use of the terminology "genetic components"?
25   A.   **I did.  In subsequent portions of the form,**

EXLER REPORTING
412-221-4007

---

77

Greg Papa - by Mr. Daller

— — — — —

1   yes, I did.
2   Q.   Okay.  When we get to those sections, please
3   point out --
4   A.   **I will.**
5   Q.   Okay.  Thank you.  All right.  And why don't
6   you take a minute to read Page 2, Question 3 here?
7   A.   **(The witness reviews the document on the**
8   **screen.)**
9   Q.   And then just let me know when you finished.
10   A.   **I'm finished.**
11   Q.   Okay.  So she kind of reiterates again, "I'm
12   not comfortable having genetic components that my body
13   did not create injected into my body."
14   Then say says, "I'm not opposed to vaccines,"
15   correct?
16   A.   **Correct.**
17   Q.   And she says, in fact, that if a vaccine came
18   out that did not use this process, the genetic
19   components, she would consider it, correct?
20   A.   **Correct.**
21   Q.   Okay.  And at the time, she said that, "I
22   would, you know, consider the Novavax vaccine," correct?
23   A.   **Correct.**
24   Q.   Okay.  What was the difference between the
25   vaccines that were available at the time and the

EXLER REPORTING
412-221-4007

---

Greg Papa - by Mr. Daller

— — — — —

1   Novavax?
2       A.   I'm not sure.  I'm not sure of that.
3       Q.   Okay.
4       A.   I can't remember.
5       Q.   All right.  What -- what recollection do you
6   have of the impact of this statement on your decision,
7   if any?
8       A.   I mean, I can appreciate she was giving an
9   alternative, but, again, it was medical -- it was
10  scientific in nature.
11      Q.   The alternative was scientific in nature?
12      A.   Yes.
13      Q.   Okay.  Because of the difference of what?  One
14  was genetic and one was not?  Is that the reason?
15      A.   I think she -- she's offering another
16  alternative.  That's what I'm reading here, that she's
17  offering another alternative to the vaccine.
18      Q.   Okay.  But you have no knowledge of the
19  medical difference between those two vaccines, correct?
20      A.   Not at the moment.  No, I don't.
21      Q.   Okay.  Did you at the time, do you believe?
22      A.   I'm not sure.
23      Q.   Okay.  Would you agree that if the medical
24  differences between those two, right, the
25  genetic-component vaccines and the Novavax vaccine,

EXLER REPORTING
412-221-4007

Greg Papa - by Mr. Daller

— — — — —

1   aligned with the beliefs that she expressed in answer to
2   Question 1, that this statement would have religious
3   meaning then?
4            MR. HENNESSY:  Objection.  Form.
5   BY MR. DALLER:
6       Q.   You can answer.
7       A.   I don't -- I don't understand your question.
8       Q.   All right.  If the Novavax vaccine relied on a
9   natural process in the body for it to work, okay, then
10  would that be consistent with the beliefs that Mrs. Gray
11  expressed in Question 1?
12      A.   Well, she said she would consider.
13      Q.   Okay.  After she did further research into it,
14  right?  And Novavax was not available at the time she
15  was terminated.
16           So -- so what did you take out of this other
17  than it was a medical description?
18      A.   Well, I can appreciate she was offering --
19  what I took out of it was I could appreciate she was
20  offering an alternative, but at the time it was not
21  available.
22      Q.   Okay.  And did you contemplate at all whether
23  this statement was consistent with the beliefs as she
24  expressed them in Question 1?
25      A.   I mean, her -- her beliefs are consistent,

EXLER REPORTING
412-221-4007

Greg Papa - by Mr. Daller

— — — — —

1   yes.
2       Q.   Okay.  So there's nothing in Question 3 then
3   that -- at this point, we've gone through 1 and 3 --
4   that have raised a doubt in your mind?  Because you did
5   say you would point out to me when we get to that point,
6   correct?
7       A.   On the -- on the genetic makeup, yeah.
8       Q.   Okay.  All right.  All right.
9            MR. DALLER:  So now let's go to Page 4,
10  Question 5.
11           THE VIDEOGRAPHER:  (Indicating.)
12  BY MR. DALLER:
13      Q.   And that is about whether, you know, she's
14  applied previously for a religious exemption, to
15  recollect your knowledge about what Question 5 is, and
16  go ahead.  Take a minute to review it, and let me know
17  when you're finished.
18      A.   Uh-huh.
19           (The witness reviews the document on the
20  screen.)
21           I'm finished.
22      Q.   Okay.  All right.  Does this paragraph cause
23  any recollection to you about your decisionmaking
24  process regarding her vaccination exemption request?
25      A.   No.

EXLER REPORTING
412-221-4007

Greg Papa - by Mr. Daller

— — — — —

1            I think it's nice that her colleagues were
2   able to accommodate her.  We have policies in place to
3   accommodate staff for such things as not participating
4   in abortions, and I think it's -- it's nice that she has
5   demonstrated the collegiality of her colleagues, but,
6   again, this doesn't have anything -- again, this
7   question doesn't demonstrate why she cannot take the
8   COVID-19 vaccine.
9       Q.   What type of answer would have been
10  appropriate in this question that -- Main Line Health
11  actually posed this question, right, in their form?
12      A.   Yeah.
13      Q.   Is that correct?
14      A.   I would have to see Question --
15      Q.   You want to see the question?
16      A.   -- 5.  Sure.
17      Q.   Sure.
18           MR. DALLER:  If we can go to the form, and
19  I believe it is on --
20           MR. HENNESSY:  It's right up there.
21           MR. DALLER:  Page 4.
22           MR. HENNESSY:  They have it.
23           THE WITNESS:  Yeah.  I think -- yeah.  Go
24  ahead.  I just saw it.
25           THE VIDEOGRAPHER:  (Scrolling.)

EXLER REPORTING
412-221-4007

82

Greg Papa - by Mr. Daller

– – – – –

1          MR. DALLER:  No.  Keep going.  It's the
2  other direction.
3          THE VIDEOGRAPHER:  (Scrolling.)
4          MR. DALLER:  Okay.  There you go.
5  Question 5.
6          THE VIDEOGRAPHER:  (Indicating.)
7          THE WITNESS:  Uh-huh.
8          We have religious exemptions for individuals
9  who opt out of abortions.
10  BY MR. DALLER:
11     Q.   Uh-huh.
12     **A.    And so if that was, you know, the main focus**
13  **of a religious exemption, that we may have looked at**
14  **this question in more detail.**
15     Q.   Okay.  But whether or not -- you said --
16     **A.    But she said no.  She answered no.  I'm sorry.**
17  **Go ahead.**
18     Q.   No.  Go ahead.
19     **A.    She answered no to the question.**
20     Q.   That she did not apply for any, correct?
21     **A.    Correct.**
22     Q.   Okay.
23     **A.    So if she would have answered yes, we would**
24  **have reviewed the religious accommodation, but since she**
25  **answered no, and you asked me that, you know, how does**

EXLER REPORTING
412-221-4007

83

Greg Papa - by Mr. Daller

– – – – –

1  **that pertain?  I said, you know, I think it's great that**
2  **her colleagues were able to switch, but there was no**
3  **religious accommodation.**
4          **So -- and you asked me what the right answer**
5  **would be if she would have checked yes.  We would have**
6  **looked at that other accommodation.**
7          THE WITNESS:  Can we take a bathroom
8  break?  I just need, like, five minutes.
9          MR. DALLER:  That's fine.
10          THE WITNESS:  Okay.
11          MR. DALLER:  Yeah.  Go ahead.  Let's go
12  off the record.
13          THE VIDEOGRAPHER:  Off the record at 5:25
14  p.m. -- or excuse me -- 4:25 p.m.
15          (Whereupon, a brief recess took place.)
16          THE VIDEOGRAPHER:  Back on the record.
17  The time is 4:31 p.m.
18          MR. DALLER:  Okay.  Megan, can you just
19  repeat the last question, please?
20          THE WITNESS:  I'm sorry.  I left my
21  glasses out in the -- I'll be right back.
22          MR. DALLER:  Sure.  Okay.
23          THE REPORTER:  Sure.
24          (Whereupon, the requested portion of the
25  record was read back.)

EXLER REPORTING
412-221-4007

84

Greg Papa - by Mr. Daller

– – – – –

1          MR. DALLER:  Okay.  All right.  Are you
2  ready, Mr. Papa?
3          THE WITNESS:  I'm ready.
4  BY MR. DALLER:
5     Q.   Okay.  All right.  So we were just talking
6  about Page 4, Question 5 that deals with the fact that
7  Mrs. Gray did not request any other religious exemption
8  request, and, you know, you explained how you would have
9  considered that, had she done that.
10          Was there anything in this paragraph -- and we
11  can go back to the typed one just so it's easier to read
12  -- that was concerning to you that she stated or
13  anything like that?
14     **A.    No.**
15     Q.   No, okay.
16          MR. DALLER:  And so let's go on then to
17  Question 7.
18          THE VIDEOGRAPHER:  (Indicating.)
19  BY MR. DALLER:
20     Q.   And Question 7, "Please state how receiving
21  the vaccine will negatively affect your purpose in life
22  or death."  Okay?
23          And why don't you take a minute to read what
24  her response was to that?
25     **A.    (The witness reviews the document on the**

EXLER REPORTING
412-221-4007

85

Greg Papa - by Mr. Daller

– – – – –

1  **screen.)**
2     Q.   Let me know when you're done.
3     **A.    I'm done.**
4     Q.   Okay.  All right.  So she -- this is asking
5  her about the negative impact this could have on life
6  and death for her, correct, from your recollection of
7  the question?
8     **A.    Yes.**
9     Q.   Okay.  And she states that --
10     **A.    Could we go back to the Question 7?**
11     A.   Sure.  Sure.
12     **A.    Thank you.**
13          THE VIDEOGRAPHER:  (Indicating.)
14          THE WITNESS:  Okay.  Thank you.
15  BY MR. DALLER:
16     Q.   So she starts by saying that "throughout her
17  life, she's had a consistent approach," correct?
18     **A.    Yes.**
19     Q.   Okay.  And when you reviewed her request --
20  you said that you reviewed the entirety of the
21  application, correct?
22     **A.    Right.**
23     Q.   Okay.  And Question 1 is part of the
24  application, correct?
25     **A.    Correct.**

EXLER REPORTING
412-221-4007

86

Greg Papa - by Mr. Daller

_ _ _ _ _

1   Q.   Okay.  And she's kind of referring now to her
2   entire life how she's had a consistent approach and a
3   conviction about medical invasion that seeks to alter
4   how God made her, correct?
5          MR. HENNESSY:  I'm going to object to
6   form.
7   BY MR. DALLER:
8   Q.   Okay.
9   A.   **I think what she's --**
10         MR. HENNESSY:  There are some other
11  words --
12         THE WITNESS:  Sorry.  Go ahead.
13         MR. HENNESSY:  No.  I'm just objecting to
14  form.  Mr. Daller inserted some other words.  He read
15  half the sentence, inserted words.  I'm just objecting
16  to form.
17  BY MR. DALLER:
18  Q.   Do you agree that the sentence that she wrote
19  there states that she's had a consistent approach and a
20  genuine conviction about medical invasion that seeks to
21  alter how God created her, correct?
22  A.   **She wrote that, yes.**
23       **But in looking at the form, the flu shot is**
24  **medical invasion.  There's other things that -- you**
25  **know, other vaccines, other medical interventions that**

87

Greg Papa - by Mr. Daller

_ _ _ _ _

1   **could be invasive in nature, and it's just not -- I**
2   **agree that the COVID-19 shot or vaccine is an invasion**
3   **as she states, but there are other things also such as**
4   **the flu that are also invasive --**
5   Q.   Okay.
6   A.   **-- to the body.**
7   Q.   Okay.  So your interpretation of invasion is
8   merely the introduction of anything from the outside,
9   correct?
10         MR. HENNESSY:  Objection.  Form.
11         THE WITNESS:  As it's stated here,
12  Mrs. Gray didn't explain that, so as I read that here,
13  yes.
14  BY MR. DALLER:
15  Q.   Okay.  But you did read Question 1, correct?
16  A.   **I did, yes.**
17  Q.   Okay.  And in other parts of the application,
18  Mrs. Gray stated that she would take some vaccines,
19  correct?
20  A.   **Correct.**
21  Q.   Okay.  In Question 1, she specifically spoke
22  about types of treatments from the outside or invasive,
23  as it's referred to here, that would be not acceptable,
24  correct?
25  A.   **Yes.**

88

Greg Papa - by Mr. Daller

_ _ _ _ _

1   Q.   Okay.  And do you have any knowledge, as you
2   sit here today, about the differences in what that
3   medical invasion could be?
4   A.   **I don't know.**
5       **The way Question 7 is written is "God created**
6   **-- God created me and my body is a temple," and, you**
7   **know, "a strong conviction against medical invasion,"**
8   **and I'm saying that there are other things that were in**
9   **this application that are medically invasive, including**
10  **the COVID-19, including flu shot, or including other --**
11  **and she did write low-tech options.**
12       **I don't know what low-tech options she used in**
13  **that -- or what she was talking about.**
14  Q.   Okay.  Did you ask her?
15  A.   **We asked her in the question -- questionnaire**
16  **in the policy to be very specific, so we did ask her.**
17  Q.   All right.  But when you read this and had a
18  question, you did not go back and ask her, "Help us
19  understand the concept of medical invasion that you're
20  speaking about"?
21  A.   **The committee, again, did not have a question,**
22  **and we did not go back and ask for further**
23  **clarification.**
24       **We -- we felt that, you know, the form and the**
25  **policy provided us with the information that we needed**

89

Greg Papa - by Mr. Daller

_ _ _ _ _

1   to make the decision.
2   Q.   Okay.  All right.  And are you aware that some
3   vaccines are proteins that create an immune response?
4   A.   **I'm not a vaccine expert, but I believe there**
5   **are some -- some vaccines, sure.  Yes.**
6   Q.   Okay.  And a vaccine like that relies upon the
7   body to respond to it, correct?  The way the body would
8   respond to an infection, correct?
9   A.   **I mean, the body responds to interventions,**
10  **medications.  The body responds to Tylenol.  The body**
11  **responds to all kind of things.**
12  Q.   Okay.  And the body has a natural way of doing
13  that, correct?
14  A.   **I guess.  I mean, I'm not a medical expert, so**
15  **I don't know how the body reacts to certain -- to talk**
16  **about this with me is -- I'm not really sure of the --**
17  **I'm not really sure first what specific -- with the**
18  **specifics you're talking about, so I don't feel**
19  **comfortable answering that, in general.**
20  Q.   Okay.  But you did -- you were a member of the
21  committee that had a consensus opinion about Mrs. Gray's
22  belief, correct?
23  A.   **Correct.**
24  Q.   Okay.  So if you don't understand the medicine
25  behind it, if you don't -- if you don't understand the

90

Greg Papa - by Mr. Daller

– – – – –

1 medicine that she's explaining, the difference in there,
2 right, as to how it impacts her belief, how can you make
3 a determination on her belief?
4         MR. HENNESSY:  Object to form.
5         If you understand it -- there are a couple
6 negatives there, but go ahead.
7         THE WITNESS:  We reviewed all sections of
8 the form.  We asked questions and -- and we relied on
9 the interdisciplinary team when we had questions or when
10 there was comments to make that decision.
11 BY MR. DALLER:
12     Q.    Okay.  Let me ask you this:  Do you think that
13 Mrs. Gray's exemption request was complex in any way?
14     A.    **No.**
15     Q.    No.  Do you believe that she was using an
16 analogy of invasion?
17     A.    **Where?**
18     Q.    Well, throughout the totality of the exemption
19 request.
20         What do you think she meant by the term --
21     A.    **You know, I think she objected to genetic**
22 **components.  I think that was -- I think that was -- for**
23 **me reading this, and I think that was a concern of hers,**
24 **but then it was further explained in other documents**
25 **that we're probably going to review here that it altered**

EXLER REPORTING
412-221-4007

---

91

Greg Papa - by Mr. Daller

– – – – –

1 her genetic makeup.
2     Q.    Okay.  Did they --
3     A.    **And we did not feel that, as a committee, that**
4 **the COVID-19 vaccine altered anybody's genetic makeup.**
5 **So that -- that felt like that was the**
6 **connection.  We found -- we did see the connection, and**
7 **it was it was medical in nature and it was false science**
8 **or science in nature.  Regardless whether someone believes it**
9 **was false or not, that was -- it was -- it was medical**
10 **and scientific in nature.**
11 **We believed, as a committee, it was false**
12 **science.  That the COVID vaccine does not alter the**
13 **genetic makeup.**
14     Q.    Okay.
15     A.    **And, therefore, it's not religious in nature.**
16     Q.    Okay.  Did you just have that recollection?
17 Because, I mean, that kind of came up out of the clear
18 blue.
19     A.    **I don't understand your question.**
20     Q.    Well, I mean, we're almost at the end of her,
21 you know, thing and we hadn't gotten to -- I'm assuming
22 you're referring to the pastor's report?
23     A.    **You said we would get to it, and we've -- I**
24 **was just referring to that.  That was --**
25     Q.    Okay.

EXLER REPORTING
412-221-4007

---

92

Greg Papa - by Mr. Daller

– – – – –

1     A.    **Yeah.**
2     Q.    Okay.
3     A.    **When you said we'd get to it and talk about**
4 **it, but I thought it was -- the questions you were**
5 **asking me were relative to that, so I brought it up, but**
6 **I did -- I explained -- it didn't come out of nowhere.**
7 **I told you that's how I --**
8     Q.    Okay.
9     A.    **-- you know, felt.**
10     Q.    All right.  So a couple of questions on the
11 things you just said.
12         The pastor's statement, did Mrs. Gray write
13 that?
14     A.    **I would have to see it.  I don't believe she**
15 **did.  It was the pastor's statement.**
16     Q.    Okay.
17     A.    **I believe that she -- that he wrote it or he**
18 **or she.  I don't know.**
19     Q.    And does the pastor, to your knowledge,
20 have any science background?
21     A.    **I don't know.**
22     Q.    Okay.  So it could be that the pastor, that
23 was his interpretation of what Mrs. Gray stated,
24 correct?
25     A.    **Well, Mrs. Gray provided it as a --**

EXLER REPORTING
412-221-4007

---

93

Greg Papa - by Mr. Daller

– – – – –

1     Q.    Mrs. Gray provided what?
2     A.    **The pastor's statement, so I -- if she didn't**
3 **support that or agree with it, I would have not included**
4 **that.**
5     Q.    Okay.  So let's wait until we get to the
6 pastor's statement.  It will be easier.
7         So we were talking about vaccines and how the
8 immune system reacts to a protein in a vaccine or it can
9 react if you've not been vaccinated, to an infection.
10         Is that kind of your understanding of how the
11 immune system works?
12     A.    **Overall.**
13     Q.    Okay.  And do you have any understanding of
14 how the genetic-component COVID vaccines work in the
15 body?
16     A.    **I know that they do not alter your genetic**
17 **makeup.**
18     Q.    Okay.  Do they interact with your genetic
19 system?
20     A.    **I would imagine any- -- anything you put in**
21 **your body interacts with your system, but it doesn't**
22 **alter your genetic system, though.**
23     Q.    Okay.  But you don't understand the
24 interaction between a COVID genetic-component vaccine
25 and the immune system compared to a regular vaccine,

EXLER REPORTING
412-221-4007

---

94

Greg Papa - by Mr. Daller

– – – – –

1  correct?
2          MR. HENNESSY:  Objection to form.
3          THE WITNESS:  I don't know.  When you say,
4  "regular vaccine," they're vaccines to me.
5  BY MR. DALLER:
6      Q.   Okay.  So you don't differentiate between the
7  COVID vaccine and any other vaccine, correct?
8      A.   **I mean, we do when we're -- when employees are**
9  **requesting religious exemptions, what it's made of, what**
10 **it's tested on.  That kind of thing.  Sure.**
11     Q.   And in terms of how it works in the body, you
12 don't make any distinction?
13     A.   **Well, we do.  It -- we made the distinction**
14 **that it does not alter the genetic makeup of your body.**
15     Q.   Okay.  Do other vaccines?
16     A.   **I don't know.  I don't believe so.**
17     Q.   So you said that other members of the
18 committee, the, quote, "medical expert," said that this
19 was bad science or bad medicine.  Is that --
20     A.   **False science.**
21     Q.   False science, okay.  And was that medical
22 expert Dr. Burke?
23     A.   **Yes.**
24     Q.   Okay.  And did she say why it was bad science?
25     A.   **That the COVID-19 does not alter the genetic**

EXLER REPORTING
412-221-4007

---

95

Greg Papa - by Mr. Daller

– – – – –

1  makeup of your body.
2      Q.   Okay.  And if Dr. Burke gave you incorrect
3  information, right, or her opinion was wrong, would that
4  have changed your opinion?
5      A.   **Her opinion was wrong about what?**
6      Q.   About false medicine, false science.
7      A.   **I mean, I would have to know the context of**
8  **that.**
9      Q.   Well, if there's evidence that's introduced
10 that there was medical support for the statements and
11 the concepts that Mrs. Gray expressed that would allow
12 someone to -- with her religious beliefs -- to determine
13 that she cannot take the COVID vaccine?
14     A.   **But then -- no.  My answer is no, because the**
15 **request then is not religious.  It's medical or science**
16 **in nature.**
17          **You could use the word "false science" or you**
18 **could use the word "science," but it's not religious.**
19 **It becomes, to me, scientific.**
20     Q.   Okay.
21     A.   **You can say it's false or not.**
22     Q.   Okay.  But you're using the fact that it's
23 false science to say it's not a sincerely-held religious
24 belief?
25     A.   **No.  I used the term -- we used the term**

EXLER REPORTING
412-221-4007

---

96

Greg Papa - by Mr. Daller

– – – – –

1  **"false science" to say that it was scientific in nature.**
2  **We used false science because we believed it was false,**
3  **but removing the word "false" and it's scientific, and**
4  **it's not religious.**
5      Q.   Okay.  So one's religious beliefs cannot
6  consider any science facts; is that your statement?
7          MR. HENNESSY:  Objection to form.
8          THE WITNESS:  No.  I mean, we had the
9  criteria.  We asked questions of the committee.  We
10 clarified questions.  We looked at the form.  They were
11 all factors that were played into the -- that were
12 centered around making the final decision.
13 BY MR. DALLER:
14     Q.   Okay.  Can a scientific fact be inconsistent
15 with a religious belief?
16     A.   **I suppose it could be.**
17     Q.   Okay.  Can a scientific fact impact or be --
18 can the interpretation of a scientific fact be impacted
19 by a religious belief?
20     A.   **In any situation, sure, of course.**
21     Q.   Okay.
22     A.   **Absolutely.  Anyone can interpret anything how**
23 **they want, so I would say yes to that question.**
24 **Anyone's interpretation.**
25     Q.   And would you agree that if the COVID vaccines

EXLER REPORTING
412-221-4007

---

97

Greg Papa - by Mr. Daller

– – – – –

1  work differently than other vaccines, that a religious
2  belief could see those vaccines differently?
3          MR. HENNESSY:  Objection.  Form.
4          THE WITNESS:  In this situation, we --
5  we're looking at the religious belief, not the
6  scientific belief.
7  BY MR. DALLER:
8      Q.   Okay.  Somebody has a religious belief,
9  though, I think we talked about earlier, can that --
10 that religious belief can impact how they view the
11 world, correct?
12     A.   **Sure.**
13     Q.   Okay.  And if the religious belief causes them
14 to see two different scientific facts differently, is
15 that not their religious belief?
16     A.   **But it's scientific in nature, and we were**
17 **looking -- we were focused on a religious exemption**
18 **during this process.**
19     Q.   Okay.
20     A.   **And -- and altering the genetic makeup,**
21 **introducing that into a religious exemption is**
22 **scientific.**
23          **We said it was false science.  Someone may say**
24 **it's not false, but we said it was false science and,**
25 **therefore, not religious.**

EXLER REPORTING
412-221-4007

---

98

Greg Papa - by Mr. Daller

– – – – –

1    Q.    Okay.  Are you familiar with Moses parting the
2  Red Sea in the *Bible*?
3    **A.    The story of Moses parting the Red Sea in the**
4  ***Bible*, am I familiar with that?**
5    Q.    Yes.
6    **A.    Yes.**
7    Q.    Okay.  And do you believe that that happened?
8    **A.    No.**
9    Q.    You don't believe that happened?
10   **A.    No.**
11   Q.    If someone were to believe that that happened,
12 okay, what -- and you had an opportunity to say, "Well,
13 why do you believe that?"  Okay?
14   **A.    Are you asking me this question?**
15   Q.    Yeah.  You have the opportunity to ask
16 somebody, "Why do you believe that Moses parted the
17 sea?"  Okay?
18         Help me to understand how that happened.
19 Okay?
20         Do you have any ideas on what type of answer
21 you could get?
22   **A.    I don't want to know why Moses -- why someone**
23 **believed that Moses -- how he parted the Red Sea.  If**
24 **that's -- you're asking me a personal question about the**
25 **Red Sea and Moses parting it.  I don't really -- I'm not**

EXLER REPORTING
412-221-4007

99

Greg Papa - by Mr. Daller

– – – – –

1  inquisitive --
2    Q.    Okay.
3    **A.    -- to that.**
4    Q.    All right.  So if they were to say, "Well,
5  he's God and he did it," would you believe them?
6    **A.    No.**
7    Q.    Okay.  It's in the *Bible*, correct?
8    **A.    I guess.**
9    Q.    Okay.  Do you believe that the *Bible* is the
10 inherent word of God?
11   **A.    I don't believe that.  There's many religions.**
12 **I think that -- you know, all religions have a -- have a**
13 **book of truth or some guidelines that they follow.**
14 **I'm not saying that the *Bible* is any different**
15 **than the Koran or anything other -- other teachers to**
16 **people -- teachings that people believe.**
17 **I think -- I respect them for it.  I don't --**
18 **you're asking me personally.  I don't have a comment on**
19 **that.**
20   Q.    Okay.  And --
21   **A.    But I respect it totally.**
22   Q.    Okay.  Christians do follow the *Bible*,
23 correct?
24   **A.    Yes.  Most of them.**
25   Q.    Okay.  So would a Christian who says, "Well,

EXLER REPORTING
412-221-4007

100

Greg Papa - by Mr. Daller

– – – – –

1  he's God, so he parted the sea," would that be a
2  reasonable explanation to you?
3    **A.    I don't understand your question.**
4    Q.    If someone said to you --
5    **A.    Okay.**
6    Q.    -- "Moses parted the sea because God
7  intervened.  He did it.  He caused it."
8    **A.    Okay.**
9    Q.    Would that be an acceptable belief statement
10 to you?
11   **A.    I would want to know how and what it looked**
12 **like.**
13   Q.    Okay.  Suppose a person then goes on and gives
14 you a scientific explanation about tides and shifting of
15 the moon and things like that and says, "That's how God
16 did it, but God did it."  Does.
17         -- in your opinion, does that detract from the
18 sincerity of his belief?
19   **A.    No.  Not at all.**
20   Q.    But he used science, did he not?
21   **A.    I don't know if he considered that science.  I**
22 **don't know.**
23   Q.    Do you consider tides -- you know, variations
24 of tides based upon the moon and gravitational pulls, do
25 you consider that science?

EXLER REPORTING
412-221-4007

101

Greg Papa - by Mr. Daller

– – – – –

1    **A.    I do.**
2    Q.    Okay.  So if the person were to say to you
3  that those things are how it happened, "but I believe
4  that God caused it," is that belief not valid as a
5  religious belief?
6    **A.    Did God part the sea, or did Moses part the**
7  **sea?**
8         **You started off with asking me about Moses,**
9  **but then I feel like you switched your example.  So I'm**
10 **confused, and I'm not trying to be difficult.  I just**
11 **want...**
12   Q.    Okay.  Can we agree that God worked on earth
13 through Moses in this situation?
14   **A.    I don't agree with that.**
15   Q.    You don't agree.  So you think that Moses did
16 it himself?
17   **A.    I don't think Moses did it himself either.**
18   Q.    Okay.  You think God did it or --
19   **A.    I don't think anyone parted the sea.  Maybe**
20 **tidal forces or gravitational pull or -- maybe that had**
21 **something to do with it, but -- and I don't know.  I**
22 **don't know what was -- I'm not a *Bible* expert.**
23   Q.    Okay.
24   **A.    Yeah.**
25   Q.    But you determined what Mrs. Gray said in her

EXLER REPORTING
412-221-4007

---

**102**

Greg Papa - by Mr. Daller

_ _ _ _ _

1  religious exemption request as not being a
2  sincerely-held religious belief that prevented her from
3  getting the COVID vaccine, correct?
4      A.    **In the examples that I used it was that**
5  **Mrs. Gray wrote, she stated that genetic components and**
6  **had -- and had that throughout the religious exemption**
7  **request, and then stated -- further explained that they**
8  **would alter -- she had -- whether it was the pastor or**
9  **her, had prepared and presented documentation on her**
10 **behalf that said your genetic makeup would be altered,**
11 **and so we felt that was scientific in nature and not**
12 **religious.**
13     Q.    Okay.
14              MR. DALLER:  Let's pull up the pastor's
15 statement.
16              THE VIDEOGRAPHER:  (Indicating.)
17              MR. DALLER:  Let's go to the typed
18 version, if we can.
19              THE VIDEOGRAPHER:  (Indicating.)
20              MR. DALLER:  There we go.
21 BY MR. DALLER:
22     Q.    **Why don't you take minute to read through**
23 **that.  Okay?**
24     A.    **Okay.**
25              **(The witness reviews the document on the**

EXLER REPORTING
412-221-4007

---

**103**

Greg Papa - by Mr. Daller

_ _ _ _ _

1  **screen.)**
2      Q.    Just let me know when you're done.
3      A.    **Okay.**
4              **(The witness continues to review the document**
5  **on the screen.)**
6              **Okay.  Go ahead.**
7      Q.    Okay.  So this is the statement that Reverend
8  Fletcher provided, and if we look at the fourth line
9  down, "Confident that God has determined the precise
10 physiological makeup of each individual person."
11     Do you see that?
12     A.    **I do.**
13     Q.    Okay.  What's physiology?
14     A.    **Your makeup.  Your body matter.  Your**
15 **composition.**
16     Q.    Okay.  So your understanding of physiology is
17 that it's like the structure of her body?
18     A.    **Yeah.**
19     Q.    Okay.  What's anatomy?
20     A.    **Parts of your body.**
21     Q.    And parts are structure, correct?
22     A.    **Uh-huh.**
23     Q.    Okay.
24     A.    **Yes.**
25     Q.    All right.  So if you don't understand the

EXLER REPORTING
412-221-4007

---

**104**

Greg Papa - by Mr. Daller

_ _ _ _ _

1  difference between anatomy and physiology, then do you
2  think that would impede your ability to understand what
3  Mrs. Gray wrote?
4      A.    **No.**
5      Q.    You don't, okay.
6     So if you believe that physiology is structure
7  and makeup, that does not impact your ability to
8  understand her statement?
9      A.    **I mean, the anatomy and physiology of your**
10 **body is the makeup of your body.  It's -- the parts of**
11 **your body is your anatomy, and the -- I guess how they**
12 **move, the physiology, or how they're incorporated into**
13 **your body.**
14     Q.    So if you continue to read what she says or
15 what the pastor said, that "Confident that God has
16 termed the precise physiological makeup of each
17 individual person," correct?
18     A.    **Yes.**
19     Q.    Okay.  She believes that the functions of the
20 present COVID-19 would alter the genetic makeup of her
21 body, correct?
22     A.    **Correct.**
23     Q.    Okay.
24              MR. HENNESSY:  Objection to form.
25 BY MR. DALLER:

EXLER REPORTING
412-221-4007

---

**105**

Greg Papa - by Mr. Daller

_ _ _ _ _

1      Q.    Is physiology not function?
2              MR. HENNESSY:  Objection to form.
3              THE WITNESS:  We looked at this, that the
4  genetic makeup of the body would not be altered or --
5  and so we classified -- we say it's false science.  Not
6  religious in nature.
7  BY MR. DALLER:
8      Q.    Okay.  And then, in fact, the pastor then goes
9  on to say, "Well, Ms. Gray has more knowledge of anatomy
10 than I do," correct?
11     A.    **He does.**
12     Q.    Okay.  Did Ms. Gray herself, in anything that
13 she wrote, state that the genetic makeup of her body
14 would change?
15     A.    **The pastor said she believed and she presented**
16 **this.**
17     Q.    And that's your interpretation of what he
18 wrote, correct?
19              MR. HENNESSY:  Objection to form.
20              THE WITNESS:  No.  It's what he wrote.
21 BY MR. DALLER:
22     Q.    Uh-huh, okay.
23     A.    **He wrote, "She believed that the function of**
24 **the present COVID-19 vaccines would alter the specific**
25 **genetic makeup of her body."**

EXLER REPORTING
412-221-4007

---

106

Greg Papa - by Mr. Daller

– – – – –

1    Q.    Okay.  And what is genetic makeup?
2    A.    **The genes that make up your body.**
3    Q.    Okay.
4    A.    **The -- I mean, I'm not a medical expert, so,**
5    **yeah.  That's it.**
6    Q.    Do those genes have functions?
7    A.    **Sure.**
8    Q.    Okay.  If the vaccine changes the function of
9    those genes, is that statement true?
10   A.    **We're not looking at -- it's scientific in**
11   **nature.  Not medical -- not religious.  This is medical,**
12   **scientific information, and when you're reviewing a**
13   **religious request, this -- this presents as science.**
14   Q.    All right.  Did Mrs. Gray --
15   A.    **Someone can say it's false.  Someone can say**
16   **it's not false, but it's scientific in nature and,**
17   **therefore, not religious.**
18   Q.    Okay.  Did Mrs. Gray say that God made her?
19   A.    **I would have to go back and look at her**
20   **request, but I assume she did.  I don't know if she**
21   **wrote that specifically.**
22   Q.    And if something changes how she functions the
23   way God made her, did she talk about that at all in her
24   religious exemption request?
25        MR. HENNESSY:  Objection to form.

EXLER REPORTING
412-221-4007

107

Greg Papa - by Mr. Daller

– – – – –

1        THE WITNESS:  The COVID-19 will not alter
2    that genetic makeup of her body.
3    BY MR. DALLER:
4    Q.    Would it alter the function of the body?
5        MR. HENNESSY:  Objection to form.
6        John, I think you're turning this passage
7    around, but, again, he's answered the question.
8    BY MR. DALLER:
9    Q.    Do the vaccines changes function?
10       MR. HENNESSY:  Objection to form.
11   BY MR. DALLER:
12   Q.    You can answer.
13   A.    **The vaccines stop the spread of COVID-19 in**
14   **our communities.  They cause overcrowding of our**
15   **hospitals, and they worked.**
16   Q.    Okay.  So your viewing her religious exemption
17   request based on your interpretation of the efficacy
18   because they, quote, "work in the community" now?
19       Is that what you're saying?
20   A.    **No.  I'm saying that the vaccine does not**
21   **alter the genetic makeup of her body.**
22   Q.    Okay.  Does it --
23   A.    **And that's a scientific statement and it's not**
24   **religious in nature.**
25   Q.    Okay.

EXLER REPORTING
412-221-4007

108

Greg Papa - by Mr. Daller

– – – – –

1    A.    **And that's what this committee was looking at.**
2    Q.    Okay.  Does it change natural function of the
3    body?
4    A.    **I don't know.**
5    Q.    You don't know.  So you don't know whether it
6    -- that statement is religious or not because you don't
7    know if the vaccine itself changes function of the body?
8    A.    **No, I don't -- natural function you used.**
9    **It's certainly changing something in the body.  You said**
10   **natural function.**
11   Q.    Okay.
12   A.    **It's -- and I answered that by saying it's**
13   **stopping the spread of COVID-19 in our community.**
14   Q.    It has nothing to do with natural function.
15   Let's go back to the question --
16       MR. HENNESSY:  I'm going to object.  This
17   is getting argumentative.
18       If you have questions -- this is discovery.
19   If you have questions that involve discovery information
20   or testimony, you can ask them, but you're starting to
21   go far afield.
22       I'm hearing you restate passages from her
23   religious exemption form and change around the
24   phraseology.
25       Mr. Daller, you're going beyond what the

EXLER REPORTING
412-221-4007

109

Greg Papa - by Mr. Daller

– – – – –

1    purpose of a deposition is, and I want to put my
2    objection to it on the record.
3        MR. DALLER:  Okay.  We're going to go back
4    to Question 1 because I'll put on the record that I'm
5    getting circular answers.  Okay?
6        MR. HENNESSY:  You're getting -- you're
7    getting answers to your questions, and your questions --
8    you're becoming argumentative.  You're making statements
9    on the record which are argumentative.
10       You're not asking a question that you would be
11   allowed to under the Federal Rules of Procedure, and I'm
12   objecting to it, and I'm putting it on the record.
13       This is your warning.  If it keeps up, then
14   we'll -- we'll take next steps.
15       MR. DALLER:  All right.
16   BY MR. DALLER:
17   Q.    So back to Question 1.  You agree that
18   hormones, artificial insemination and in vitro
19   fertilization were things that she did not see as
20   natural, correct?
21   A.    **Ms. Gray did not see them as natural.**
22   Q.    Okay.
23   A.    **Other people could see them as natural.**
24   Q.    Okay.  Does it matter what other people think
25   to Mrs. Gray's religious belief?

EXLER REPORTING
412-221-4007

Greg Papa - by Mr. Daller

– – – – –

1   A.   No.
2   Q.   Okay.  And if the COVID vaccines had an
3   unnatural way of working, analogous to, for example,
4   hormones, artificial insemination and in vitro
5   fertilization, not on a scientific basis, but on the
6   spiritual basis of how they interact with the body, do
7   you see the connection then?
8            MR. HENNESSY:  Objection.  Form.
9   BY MR. DALLER:
10   Q.   Do you believe there's a connection?
11   A.   I don't understand your question.  Can you
12   answer -- can you ask it in a different way?
13   Q.   Sure.  So we agreed that hormones and
14   artificial insemination, in vitro fertilization are
15   things that are treatments that will cause the body to
16   respond in a way that Mrs. Gray does not feel is a
17   natural way, correct?
18   A.   Correct.
19   Q.   Okay.  And that natural way of the body
20   responding is the way God made her, correct?
21   A.   According to Mrs. Gray, yes, that's correct.
22   Q.   Okay.  So if the COVID vaccines, that have
23   genetic components, would cause Mrs. Gray's body to
24   respond in an unnatural way to the way God made her,
25   could there be a connection between her use of the

EXLER REPORTING
412-221-4007

Greg Papa - by Mr. Daller

– – – – –

1   hormones, artificial insemination and in vitro
2   fertilization to explain why she cannot take a genetic
3   component-based vaccine?
4            MR. HENNESSY:  Objection.
5   BY MR. DALLER:
6   Q.   You can answer.
7   A.   Her body can be altered by any other vaccine,
8   so I don't -- I understand she's making that connection
9   here, but taking any form of medical intervention can
10   have that effect, but I don't see how that relates to
11   the COVID-19 vaccine.
12            And it's further explained that the COVID-19
13   is altering your genetic makeup is scientific.  We can
14   -- we don't even have to debate whether it's false
15   science.  It's just science.  It's scientific and not
16   religious.
17   BY MR. DALLER:
18   Q.   Well, hormones, in vitro fertilization and
19   artificial insemination are scientific, too, correct?
20   A.   Correct.  And, again, they don't -- they're
21   not demonstrating the connections to the COVID-19
22   vaccine.
23   Q.   Now, Mrs. Gray appealed her religious
24   exemption request, correct?
25   A.   She did.

EXLER REPORTING
412-221-4007

Greg Papa - by Mr. Daller

– – – – –

1   Q.   Okay.
2   A.   Yes.
3   Q.   And were you at that meeting?
4   A.   I was.
5   Q.   Was it in person?
6   A.   It was.
7   Q.   Okay.  What was your participation in that
8   meeting?
9   A.   I had answered questions and just kind of -- I
10   think I was pulling up the request on the computer for
11   them.
12            I was not a vote or a participant.  If they
13   had other -- if they had questions, I -- I answered
14   them.
15            MR. HENNESSY:  Are we done with this
16   exhibit?  You know, this is what's in front of the
17   witness while he's testifying.
18            MR. DALLER:  Yeah.  Yeah.  We can take
19   that off.  That's fine.
20            THE VIDEOGRAPHER:  (Indicating.)
21   BY MR. DALLER:
22   Q.   What -- do you recall what their questions
23   were?
24   A.   I don't.  Some of them they didn't have
25   questions.  I don't know specific with Mrs. Gray.

EXLER REPORTING
412-221-4007

Greg Papa - by Mr. Daller

– – – – –

1   Q.   And you informed them of what happened at this
2   original meeting?
3   A.   No.  Only when asked.  They read the
4   statements.  I didn't present each one, if that's what
5   you're asking.
6   Q.   Did you bring your notes?
7   A.   I didn't have notes.  The only thing we had
8   was that -- that summary sheet with the name, yes, no,
9   and reasoning.
10   Q.   Okay.
11   A.   I'm not sure if that was there.  We would have
12   to look.
13   Q.   How would you know if it was there?
14   A.   It would have been on the Teams site, and I'm
15   not sure if I provided that.  I think -- I don't think
16   that was there.  I think that just the forms were
17   available, and the ones that we had yes/no.
18   Q.   Okay.
19   A.   I mean, the ones that we had were appealing on
20   those.
21   Q.   And where was that form kept, I mean, in
22   general, usually?
23   A.   Which form are you referring to?
24   Q.   That spreadsheet that you're referring to now.
25   A.   The spreadsheet was on the Teams site that we

EXLER REPORTING
412-221-4007

114

Greg Papa - by Mr. Daller

_ _ _ _ _

1   used to review each request.
2       Q.    So it was on the site, but you don't know if
3   they used it?  Is that --
4       A.    No, I don't.  I don't remember.
5       Q.    And you don't recall --
6       A.    I didn't present each one.  So they were going
7   through them, and I only answered questions when asked.
8       Q.    Okay.  What type of questions would they have?
9       A.    You know, nothing comes to mind directly.  I
10  can't recall specific questions.  I don't want to
11  speculate, you know, what types of things that they had
12  asked.
13            Nothing's coming to mind.
14      Q.    What's the role of a human resource
15  professional with regards to an employee?
16      A.    We handle their -- everything from their
17  onboarding -- the recruitment process to onboarding
18  them, to orientation, providing them with the correct
19  benefits and compensation, making sure their
20  compensation and benefits are aligned with the market so
21  that we can retain them.
22            And then we look at the employee experience
23  while they're here, so ensuring that, you know, their
24  needs are met.  They have the tools and equipment to do
25  their job.  They receive proper communication.  They --

EXLER REPORTING
412-221-4007

115

Greg Papa - by Mr. Daller

_ _ _ _ _

1   they're able to answer ques-- -- we're able to answer
2   questions when they have benefit issues.
3            We provide FMLA leave of absence.  We provide
4   leadership and employees with employer relations and
5   guidance, making sure we're not violating any local,
6   state, federal rules consistent with that.
7            So, you know, just providing the superior
8   employee experience to our staff and leaders.
9       Q.    So what human resource professional assured
10  that Mrs. Gray's rights were not being violated, that
11  she wasn't being discriminated against here?
12      A.    We worked with legal on -- so the HR
13  department -- specifically to this COVID-19 and to the
14  termination, we worked with legal.  We do that a lot
15  with employee relations.
16            We handled this similar as employee relations,
17  you know, employee relations case or -- you know, all of
18  the COVID exemption requests that were denied, who we,
19  at the end of the day, had to terminate.
20      Q.    And if -- now, you said that Ms. Heilman was
21  Mrs. Gray's, like, human resource partner or connection,
22  if you will, correct?
23      A.    Right.
24      Q.    And if she thought that Mrs. Gray's rights
25  were being violated or that she was being discriminated

EXLER REPORTING
412-221-4007

116

Greg Papa - by Mr. Daller

_ _ _ _ _

1   against here --
2       A.    Sure.
3       Q.    -- what would the process have been?
4       A.    Sarah Heilman could have went to myself or
5   legal, Pam Teufel, my boss, and explained her concerns.
6   We also have an HR person for HR who she could express
7   that to, but she did not.
8       Q.    She did not, okay.
9             And she did not in writing?
10      A.    She did not in writing or verbally express
11  that -- is your question that Sarah Heilman did not
12  express -- wanted to express?
13            I don't understand your question.
14      Q.    Did she express in any type of communicative
15  form that she had concerns about the decision regarding
16  Mrs. Gray's religious exemption determination?
17      A.    She did not, not in writing or verbally to me
18  or -- that I know of.
19            I'm her direct supervisor.
20      Q.    Uh-huh.  Okay.  Now, in -- you know, we talked
21  about the religious exemption guidelines that you used,
22  correct?
23            Did you use anything from the EEOC in terms of
24  guidelines on how these should be processed?
25      A.    We used the religious exemption guidelines as

EXLER REPORTING
412-221-4007

117

Greg Papa - by Mr. Daller

_ _ _ _ _

1   to look at -- to terminate the religious exemption
2   request along with the committee, along with the
3   questions and answers and what the person wrote on the
4   form, and then relied on legal to -- in terms of
5   determinations, and felt comfortable moving forward with
6   terminations.
7       Q.    So you did rely on the EEOC guidelines?
8       A.    Yes.  Yes.
9       Q.    And did you rely on the EEOC's guideline that
10  you should generally assume that a religious exemption
11  request is sincere?
12            MR. HENNESSY:  Objection to form.
13  BY MR. DALLER:
14      Q.    You can answer.
15      A.    Yeah.
16      Q.    You did?
17      A.    Yes.
18      Q.    And once a religious exemption request is
19  deemed to express a sincerely-held religious belief,
20  what's the next step in that process then?
21      A.    That we would accept the religious exemption,
22  so we -- we asked employees to fill out this form
23  according to our policy.  We created the policy.
24  Employees filled out the form.  They requested the
25  religious exemption request.

EXLER REPORTING
412-221-4007

GREG PAPA

118

Greg Papa - by Mr. Daller

– – – – –

1  If they were approved, we let them know that
2  their religious exemption request was approved.
3  Q.  Okay.  So you believed that Ms. Gray had a
4  sincerely-held religious belief?
5  MR. HENNESSY:  Objection to form.
6  BY MR. DALLER:
7  Q.  You can answer.
8  A.  Her -- Mrs. Gray's religious belief was denied
9  because it was scientific in nature.
10  Q.  Are you saying that she did not have a
11  sincerely-held religious belief?
12  A.  For not taking the COVID vaccine, yes.
13  Q.  So does the EEOC --
14  A.  That's a part of it.  Part of the decision.
15  Q.  So if we can -- all right.  So the EEOC --
16  MR. HENNESSY:  John, I don't mean to
17  interrupt, but if you're going to take a break at any
18  time -- are you almost wrapped up because --
19  MR. DALLER:  Yeah.  I think we can be done
20  probably by 5:30.
21  MR. HENNESSY:  Okay.  All right.
22  MR. DALLER:  Okay?
23  BY MR. DALLER:
24  Q.  You said that the EEOC states that you
25  generally assume that a religious exemption request is

EXLER REPORTING
412-221-4007

119

Greg Papa - by Mr. Daller

– – – – –

1  sincere, correct?
2  A.  That they have to establish it's sincerely
3  held, yes.
4  Q.  Okay.  And does the EEOC say what should
5  happen -- if you question either the nature or the
6  sincerity of the belief, what you should do?
7  A.  I don't know.
8  Q.  You don't know, okay.
9  Does the EEOC talk about undertaking a limited
10  factual inquiry?
11  A.  I would assume -- I would assume so.
12  Tom Mendicino, our attorney, was part of that
13  discussion.
14  Q.  And that limited factual inquiry is also
15  called an interactive process, correct?
16  MR. HENNESSY:  Objection to form.
17  THE WITNESS:  Yes.
18  BY MR. DALLER:
19  Q.  Okay.
20  A.  We've established that we had an interactive
21  process.
22  Q.  Who established that?
23  A.  Main Line Health.
24  Q.  Main Line Health unilaterally, okay.
25  And on what basis did you decide that Main

EXLER REPORTING
412-221-4007

120

Greg Papa - by Mr. Daller

– – – – –

1  Line Health had an interactive process?
2  A.  We developed a policy form and a process to
3  review these requests, and a process to dispute the
4  request.
5  Q.  Okay.  And all the interactive process
6  requires is a process.  Is that your testimony?
7  MR. HENNESSY:  Objection to form.
8  BY MR. DALLER:
9  Q.  You can answer.
10  A.  We had -- we had a process where the employee
11  got to state their reasons for the request in a
12  document.  That they got to provide us with information,
13  and they got to tell us, you know, why they believed
14  that they should receive a religious exemption.
15  So, yes, it was interactive.
16  Q.  You ask the question, they gave you an answer
17  and that's the interactive nature of your process; is
18  that correct?
19  MR. HENNESSY:  Objection to form.
20  BY MR. DALLER:
21  Q.  You can answer.
22  A.  And they -- they explained their answers.
23  They answered -- they were given the opportunity to
24  answer yes/no, and they explained their answers in the
25  form.  They also had an appeal process as part of the --

EXLER REPORTING
412-221-4007

121

Greg Papa - by Mr. Daller

– – – – –

1  our policy.
2  Q.  Okay.  And if the applicant submitted
3  additional information to that appeal committee, was
4  that considered?
5  A.  It was not.
6  Q.  It was not?
7  A.  No.
8  Q.  Okay.  So where's the appeal?
9  A.  The appeal process was that the employee was
10  able to have a second review of the -- of their request
11  by a senior committee, and we did overturn -- and they
12  did overturn quite a few.
13  Q.  Oh, they did?
14  A.  They did.
15  Q.  Okay.  Do you have any numbers to what they
16  overturned?
17  A.  I don't.
18  Q.  Do you know the basis of those overturns?
19  A.  Not all of them.
20  Q.  Okay.  Any of them?
21  A.  I don't know them off the top of my head right
22  now.
23  Q.  Okay.  Okay.
24  MR. DALLER:  That's all I have.  All
25  right.  Thank you very much.

EXLER REPORTING
412-221-4007

122

Greg Papa - by Mr. Hennessy

_ _ _ _ _

1    THE WITNESS:  All right.  Thanks.
2    MR. HENNESSY:  I have a few clarifying
3  questions.

_ _ _ _ _

4

5    EXAMINATION
6  BY MR. HENNESSY:
7    Q.    Mr. Papa, there's some testimony that confused
8  me, and I think the language can be a little bit
9  confusing.  I want to be a little bit more precise.
10    There was testimony about how the vaccine may
11  have -- or there was an issue of whether it altered
12  beliefs or I think Mr. Daller used the term "impacted
13  beliefs."  I want to clarify.
14    The issue was whether the articulated
15  objection to getting the COVID-19 vaccine was a
16  sincerely-held practice or observance which was
17  religious in nature; is that correct?
18    A.    **Me? Yes.**
19    Q.    Yeah.  Okay.  And the committee met together
20  to decide the issues of sincerity and whether it was
21  religious in nature based upon legal guidance using
22  various factors, I think many of which you articulated,
23  correct?
24    A.    **Correct.**
25    Q.    And those factors included timing,

123

Greg Papa - by Mr. Hennessy

_ _ _ _ _

1  inconsistencies, whether there were non-religious
2  reasons for the request to abstain; is that accurate?
3    A.    **Yes.**
4    Q.    And during this deposition today, Mr. Daller
5  showed you the exemption form in piecemeal and asked you
6  questions about specific pieces of the exemption form,
7  correct?
8    A.    **Yes.  Correct.**
9    Q.    And I don't believe he gave you an opportunity
10  to review the entire application before you discussed
11  those pieces.
12    I also want to clarify.  We never -- we have
13  not, since the start of this deposition, had any
14  interaction other than me sitting here, correct?
15    A.    **Correct.**
16    Q.    I have not talked to you during breaks or
17  anything of that nature, correct?
18    A.    **Not at all.**
19    Q.    Okay.
20    A.    **I went to the bathroom.**
21    Q.    I understand.  So you didn't talk to anybody
22  outside of Mr. Daller asking you questions during this
23  deposition, correct?
24    A.    **Correct.**
25    Q.    And we have Ms. Gray here who's present during

124

Greg Papa - by Mr. Hennessy

_ _ _ _ _

1  the deposition which started on a Thursday, August 24th,
2  at 2:30 p.m.  It's now about 5:30 p.m.
3    He showed you the pieces of the exemption
4  form, and you answered questions, and you didn't really
5  have a full opportunity to review the entire application
6  before answering those questions, correct?
7    A.    **Correct.**
8    Q.    Okay.  But when you met as a committee, did
9  you have an opportunity at that time to review the
10  entire application before discussing it as a committee?
11    A.    **Yes.**
12    Q.    Okay.
13    A.    **The process was they were -- it was the**
14  **expectation --**
15    Q.    Go ahead.
16    A.    **It was the expectation you reviewed the form.**
17    Q.    And you would review the form ahead of time?
18    A.    **Yes.**
19    Q.    Okay.  The -- and you would discuss it, and if
20  you had questions at that time, you had -- there was
21  medical representation there and HR, and you would
22  discuss it together and make a decision based upon the
23  factors that we discussed, some of the guiding
24  principles that you discussed, as well.
25    Is that an accurate summary of what happened?

125

Greg Papa - by Mr. Hennessy

_ _ _ _ _

1    A.    **Yes, very.**
2    Q.    Okay.  And during the deposition today,
3  Mr. Daller put up a copy of the religious exemption form
4  that Ms. Gray filled out.
5    MR. HENNESSY:  I'd ask if that could be
6  put back up.  I think it was marked as Exhibit 2,
7  although I don't know if it was referred to as an
8  exhibit.
9    He talked to you about Question Number 1.  If
10  you could put that up and put up the typed response to
11  Question Number 1.
12    THE VIDEOGRAPHER:  (Indicating.)
13    MR. HENNESSY:  Okay.  And if you could,
14  yeah, just highlight that response, I'd appreciate it.
15    THE VIDEOGRAPHER:  (Indicating.)
16    MR. HENNESSY:  Great.
17  BY MR. HENNESSY:
18    Q.    There was some testimony about this question,
19  and this was Ms. Gray's articulation of her religious
20  reasons for objecting to the practice or observance of
21  getting the COVID-19 vaccine.
22    Where in here did she talk about why she
23  wanted to avoid getting the COVID-19 vaccination?
24    A.    **I don't see that.**
25    Q.    Well, does she talk about -- I think you

GREG PAPA

---

126

Greg Papa - by Mr. Hennessy

– – – – –

1  mentioned at the end the genetic component.
2         Was that a reference to you -- would you have
3  considered that as a reference to, perhaps, the COVID-19
4  vaccine?
5     **A.   Yes.**
6     **Q.**   Okay.  So she says here in the last sentence,
7  "I am not comfortable having genetic components that my
8  body did not create injected into my body."
9         Is that what she said about the COVID-19
10  vaccine?
11     **A.   Correct.**
12     **Q.**   And would you or the committee have known at
13  that point whether to approve or deny this application
14  based on this statement alone, or would you have
15  reviewed the rest of the application before you reached
16  a decision?
17     **A.   We reviewed the rest of the application before**
18  **-- and I said that today.  I think I was clear with**
19  **that.  That this -- we needed to see the entire form**
20  **because it had different components and different**
21  **questions, and it was fair to the employees for us to**
22  **read it all.**
23     **Q.**   And you would have wanted to know why she had
24  an objection to genetic components, correct?
25     **A.   Correct.**

EXLER REPORTING
412-221-4007

---

128

Greg Papa - by Mr. Daller

– – – – –

1  religious exemption request based upon their
2  sincerely-held religious belief cannot state any medical
3  fact, whether it's true or not?
4         MR. HENNESSY:  Mr. Daller, you asked that
5  exact question before.  I mean, we're not here to go
6  back and continue to ask questions that you asked before
7  and try to get a different answer.
8         MR. DALLER:  It's an easy yes/no and we
9  move on.
10         THE WITNESS:  I believe it's -- it's
11  medical in nature.  It's medical and scientific in
12  nature when you start to introduce science and medical
13  -- and medical information into the request.
14  BY MR. DALLER:
15     **Q.**   Okay.  And Mr. Hennessy asked if you had
16  reviewed the application, correct, just now?
17     **A.   Reviewed the --**
18     **Q.**   Mr. Hennessy asked if you reviewed the entire
19  submission for Mrs. Gray today, correct?
20     **A.   I thought he asked me if I reviewed parts of**
21  **it when you showed me parts of it, so I reviewed parts**
22  **of it with you today.  I read -- reviewed the entire**
23  **submission when we convened the committee.**
24     **Q.**   Okay.  And did you review the application in
25  preparation for your deposition today?

EXLER REPORTING
412-221-4007

---

127

Greg Papa - by Mr. Daller

– – – – –

1     **Q.**   And did the submission provide the answer to
2  that question?
3     **A.   It did.  By the pastor when it said it altered**
4  **the genetic makeup of her body.**
5     **Q.**   Okay.  And now having reviewed the
6  application, would you agree that her reference to
7  genetic components does not appear to be religious or
8  spiritual in nature?
9     **A.   That's what we determined.  Yes.**
10     **Q.**   Okay.
11         MR. HENNESSY:  That's all the questions I
12  have.  Thank you.
13         MR. DALLER:  All right.  Just a couple of
14  follow-ups.
15         – – – – –
16                 EXAMINATION
17  BY MR. DALLER:
18     **Q.**   Is a medical statement and a religious
19  exemption request mutually exclusive?
20         MR. HENNESSY:  I think that was already
21  covered.  I mean, you know, objection to form.
22         MR. DALLER:  Well, again -- so I want to
23  clarify it again.
24  BY MR. DALLER:
25     **Q.**   Are you saying that a person who has a

EXLER REPORTING
412-221-4007

---

129

Greg Papa - by Mr. Daller

– – – – –

1     **A.   I did, yes.**
2     **Q.**   Okay.  And when did you do that?
3     **A.   I did that today.**
4     **Q.**   Today, okay.
5         And as I was asking you the questions, you did
6  not ask for any further time to review anything in
7  particular, correct?
8     **A.   In terms of the -- what you were showing me, I**
9  **answered -- I answered what was in front of me.**
10     **Q.**   Okay.  Do you feel that you needed more time
11  to review anything before you answered my questions?
12     **A.   I don't.**
13     **Q.**   Okay.  And you didn't ask that either,
14  correct, to, you know --
15     **A.   No.  No.**
16     **Q.**   Okay.
17     **A.   But he -- but Mr. Hennessy asked me if I**
18  **reviewed the entire document which I didn't, but to**
19  **answer your questions, I felt like I answered them or**
20  **else I would have stopped and asked for a clarifying**
21  **question.**
22     **Q.**   Okay.  Thank you.  All right.
23         And the last sentence of that Question 1 that
24  Mr. Hennessy asked about, "I am not comfortable having
25  genetic components that my body did not create injected

EXLER REPORTING
412-221-4007

---

GREG PAPA

130

Greg Papa - by Mr. Daller

– – – – –

1    into my body." Okay?

2         Does that state anything about changing the

3    structure of her genetic system?

4    **A.    No, but that's why we had -- that's why it was**

5    **important to review the entire piece submitted because**

6    **it explained that with the pastor's note and it said**

7    **Ms. Gray believed, and so that was, we felt -- I felt**

8    **was very important to making the decision.**

9    Q.    The pastor's note says he bel- -- she believed

10   it changes function, correct?

11   **A.    I believe -- no.  He said altered the genetic**

12   **makeup.**

13        MR. DALLER:  Can we pull up the statement

14   again, please, by the pastor?

15        THE VIDEOGRAPHER:  (Indicating.)

16        MR. DALLER:  Okay.

17   BY MR. DALLER:

18   Q.    So she believes that "the functions of the

19   present COVID-19 alter genetic makeup," correct?

20   **A.    The genetic makeup of the body.**

21   Q.    "Functions of the present vaccine," so she's

22   talking about "function" in that sentence, correct?

23        MR. HENNESSY:  Objection to form.

24        THE WITNESS:  I don't know what you mean.

25   BY MR. DALLER:

EXLER REPORTING
412-221-4007

---

132

Greg Papa - by Mr. Daller

– – – – –

1    Q.    The last statement, "I am satisfied that her

2    objection to a COVID-19 inoculation rests solidly upon

3    sincerely-held faith convictions," do you believe that?

4    **A.    I believe that -- I believe that her pastor**

5    **and her believe that.**

6    Q.    Okay.

7    **A.    Sure.  She wrote it.**

8         MR. DALLER:  All right.  That's all I got.

9         THE WITNESS:  Thank you.

10        MR. DALLER:  Anything in follow-up,

11   Brendan?

12        MR. HENNESSY:  No.  Thank you.

13        MR. DALLER:  All right.  All right,

14   everybody.  Have a good day.

15        THE WITNESS:  Thanks.  You too.

16        THE VIDEOGRAPHER:  This concludes the

17   videotaped deposition via Zoom of Greg Papa.  Off the

18   record at 5:41 p.m.

19        – – – – –

20        (Signature waived.)

21        (Whereupon, the above-entitled matter was

22   concluded at 5:41 p.m.)

23        – – – – –

24

25

EXLER REPORTING
412-221-4007

---

131

Greg Papa - by Mr. Daller

– – – – –

1    Q.    Okay.  And the last paragraph there, that

2    "it's completely consistent with the decisions she's

3    made decades ago regarding her refusal of recommended

4    medical procedures," correct?

5    **A.    It's written there.**

6    Q.    And it's the pastor's statement, correct?

7    **A.    That's the pastor's statement.**

8    Q.    Okay.  Do you believe that statement?

9         MR. HENNESSY:  Objection to form.

10   BY MR. DALLER:

11   Q.    You can answer.

12   **A.    I believe that she submitted this on this.**

13   **I'm believing her.  Dawn Gray submitted this, so I am**

14   **believing her.**

15   Q.    Okay.  So --

16   **A.    Just like I believed that she believed that**

17   **the COVID-19 vaccines would alter the specific genetic**

18   **makeup of her body.  I believe that, too.**

19   Q.    And you believed that her objection rests

20   solidly upon her sincerely-held faith convictions?

21        MR. HENNESSY:  Objection.

22   BY MR. DALLER:

23   Q.    Do you believe that statement?

24   **A.    Say that again.  Ask that differently.  I'm**

25   **not sure what you mean by that.**

EXLER REPORTING
412-221-4007

---

133

1    COMMONWEALTH OF PENNSYLVANIA    )

2    COUNTY OF ALLEGHENY              )

3

4         I, Margaret J. Exler, a notary public in
     and for the Commonwealth of Pennsylvania, do hereby

5    certify that the witness, GREG PAPA, was by me first
     duly sworn to testify the truth, the whole truth, and

6    nothing but the truth; that the foregoing videotaped
     Zoom deposition was taken at the time stated herein; and

7    that the said videotaped Zoom deposition was recorded
     stenographically by me and then reduced to typewriting

8    under my direction, and constitutes a true record of the
     testimony given by said witness, all to the best of my

9    skill and ability.

10        I further certify that the reading and
     signing of said videotaped Zoom deposition were waived

11   by counsel for the respective parties and by the
     witness.

12        I further certify that I am not a
     relative, or employee of either counsel, and that I am

13   in no way interested, directly or indirectly, in this
     action.

14        IN WITNESS WHEREOF, I have hereunto set

15   my hand and affixed my seal of office this 20th day of
     September, 2023.

16

17

18   _____
     Margaret J. Exler, RPR, Notary Public

19

20   Commonwealth of Pennsylvania - Notary Seal
21   MARGARET J. EXLER, Notary Public
     Allegheny County
22   My Commission Expires February 15, 2025
23   Commission Number 1047211
24

25

EXLER REPORTING
412-221-4007

# EXHIBIT E

# COVID-19 VACCINE RELIGIOUS EXEMPTION FORM



**Main Line Health®**
Well ahead.®

TO BE COMPLETED BY EMPLOYEE/MEDICAL STAFF MEMBER/SHP. PLEASE COMPLETE ALL OF THE FOLLOWING INFORMATION:

| | |
|---|---|
| Name: Dawn Gray | Date of Birth: 1/21/65 |
| Email address: GrayD@mlhs.org | Phone/Pager No.: |
| Department and Entity [If MLH Employee]: ED Paoli | MLH Employee Number: 11308 |
| Manager Name [If MLH Employee]: Bill Belmore | Job Title: Clinical coordinator |
| Department: [If Medical Staff Member or SHP] | Department Chair: [If Medical Staff Member or SHP] |

**Initial next to each of the statements below:**

| | |
|---|---|
| DSG | I am requesting an exemption from the COVID-19 vaccination requirement due to my sincerely held religious beliefs. |
| DSG | I understand that if my religious exemption is approved, I will be required to comply and will comply with Main Line Health (MLH) assigned COVID-19 testing requirements and other required preventive guidance. I understand this will include masking at all times while on campus at any MLH facility. |
| DSG | I understand that in the event of a surge in COVID-19 infections, as determined by Main Line Health, I may be reassigned or furloughed and will comply with all restrictions imposed by MLH and accept responsibility for communication with my managers and the Employee Exposure Line (EEL) as appropriate to comply with health and safety requirements for unvaccinated individuals. |
| DSG | Should I, or my cohabitants, experience symptoms or contract COVID-19, I will **immediately** contact the EEL to report it and will comply with all recommended guidance. |
| DSV | I acknowledge that I have read the MLH COVID-19 Vaccination Policy and the CDC COVID-19 Vaccine Information: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html?s_cid=10536:%2Bvaccine%20%2Bfor%20%2Bcovid:sem.b:p:RG:GM:gen:PTN:FY21 and agree to comply with all MLH COVID-19 Vaccination Policies and Procedures, except for those policies and procedures to which this application for an exemption may apply. |

## Main Line Health's Policy on COVID-19 Vaccine

As of October 1, 2021, all MLH Managers, Directors, Executives, members of the Main Line Hospitals and Bryn Mawr Rehabilitation Hospital Medical Staff (MLH Medical Staff), and MLH Medical Staff Specified Health Professionals Medical Staff must comply with the MLH COVID-19 Vaccination Policy. As of November 1, 2021, all MLH employees and contracted clinical personnel* must comply with the MLH COVID-19 Vaccination Policy. COVID-19 vaccination has been proven to be highly effective at preventing COVID-19 infection, severe disease,

Update: 8/5/2021           Reference:  MLH Staff Covid-19 Vaccination Policy           pg. 1

MLH-Gray 00300

hospitalization, and death. MLH and the Centers for Disease Control and Prevention (CDC) recommend all adults receive COVID-19 vaccine.

## Religious Exemption Request

MLH recognizes that individuals may have personal beliefs and opinions regarding COVID-19 vaccination. However, personal beliefs or opinions will not be sufficient to qualify for exemptions from the MLH COVID-19 vaccination requirement.  A religious exemption from the vaccination requirement will be approved only for a sincerely held belief precluding COVID-19 vaccination that is religious in nature.  If a religious exemption is granted, efforts will be made to reasonably accommodate the employee while maintaining a safe work environment for patients, staff, and others.  Reasonable accommodations may include reassignment and additional infection prevention measures.  While MLH will review each request and look to identify reasonable accommodations for anyone who is granted a religious exemption, it is possible that there may not be a reasonable accommodation that will allow every person with such an exemption to continue to work while unvaccinated.

## Process to Request an Exemption

To request a religious exemption from COVID-19 vaccination, this form must be completed and returned by September 15, 2021. Failure to completely and accurately provide the information requested will result in the denial of the religious exemption.

1) In the space below, please provide a personal statement detailing the sincerely held beliefs that are religious in nature regarding your COVID-19 vaccination objection, explaining why you are requesting this religious exemption, the religious principle(s) that guide your objections to COVID-19 vaccination, and the religious basis that prohibits the COVID-19 vaccination.  Please attach additional documentation supporting your sincerely held religious beliefs, if necessary. Even though I could apply for a medical exemption due to my allergy to PEG. I have chosen to apply for a religious exemption due to the personal conviction of my religious belief. I have a personal explanation as to why I religiously object to the current Covid 19 vaccines. The best example to explain my objection is when my husband and I tried to conceive children. After not conceiving for — see No page

2) Did you receive a religious exemption from MLH for the MLH Mandatory Annual Flu Vaccination requirement? ___Yes  X  No

   If yes, is the religious belief that prevented you from receiving the MLH Mandatory Flu Vaccination the same as the religious belief that is currently preventing you from receiving the COVID-19 vaccination? ___ Yes  _____No

3) Does the religious belief identified in Question #1 prevent you from receiving other vaccines or just the COVID-19 vaccine?     genetic component vaccines

   _____ All other Vaccines   ✗  Some but not all vaccines  _____ Only the COVID-19 Vaccines

   (a) If your religious belief prevents you from receiving only the COVID-19 vaccines, please explain why. (For example, if there is something about the way that the currently approved COVID-19 vaccines are manufactured that prevents you from receiving it, please identify what that is.)

   I am not comfortable having genetic components that my body did not create injected into my body. I am not opposed to vaccines. If there is a Covid 19 vaccine that comes out that does not use this process I would investigate and consider accepting it. I have done some initial research into the Novavax Covid 19 vaccine and if it is authorized, I would consider this alternative

4) If you have received a religious exemption for any other vaccine requirements in the past, please provide additional details, including for which vaccine(s) you received a religious exemption, when you were granted the religious exemption, the religious belief underlying the prior exemption request, and whether you were employed by MLH at the time.

MLH-Gray 00301

DA 169

a couple of years, we pursued further fertility options. We went through the testing to determine if it was structural or hormonal issue. We tried some "low tech" options to achieve a successful pregnancy resulting in several miscarriages. When the next fertility options were presented to us, we prayerfully considered them and concluded our faith and personal belief did not peacefully allow us to take further steps (hormones, AI, IVF, etc). Our belief was it we were to have children that God would allow it to happen through natural means.

As Psalm 139:13-16 stated, "For you created my inmost being, you knit me together in my mother's womb I praise you because I am fearfully and wonderfully made; your works are wonderful, I know that full well. My frame was not hidden from you when I was made in the secret place, when I was woven together in the depths of the earth. Your eyes saw my unformed body; all the days ordained for me were written in your book before one of them came to be" (NIV). I believe that life begins at conception and ends at natural death. It is this same belief that guides my objections to getting the current COVID-19 vaccination. I am not comfortable having genetic components that my body did not create injected into my body.

MLH-Gray 00302

5)  Have you ever been approved for any other type of religious accommodation during your employment with MLH?

_____Yes  ☒ No

If yes, please describe the accommodation that was approved, when this occurred and whether the accommodation is still in effect. Even though I have not officially requested a religious exemption on the basis on my beliefs, I have relied upon the graciousness of my colleagues to support patient decision making when it conflicts with my personal religious belief. I have "switched" assignments with colleagues to allow them to care for those after an abortion or for those patients who are asking for Plan B. I have also switched assignments when I felt I would be too emotional to care for those who might be experiencing a miscarriage due to my own miscarriages when I longed for a child so badly.

6)  Does the sincerely held religious belief that prevents you from receiving COVID-19 vaccination derive from an organized religion?

⊄  Yes  _____No

If yes, please answer the following questions:

- What is the name of the religion:  Non-Denominational Christian
- When did you first begin to practice this religion: 1970
- Do you belong to an organization or group affiliated with this religion (i.e. church, mosque, synagogue etc.)?

⊄  Yes  _____No

If Yes, indicate when you first affiliated with this organization or group: current church 1898

You may use the attached Request for Religious Exemption from COVID-19 Vaccine Religious Organization Statement Form from a leader of your religious organization to submit in support of your request for a religious exemption.

7)  Please state how receiving the Covid-19 vaccination will negatively affect your purpose in life or death?  Throughout my life, I have held a consistent approach and a genuine conviction about medical invasion that seeks to alter how God created me. I believe my body is the temple of the Holy Spirit "Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own; you were bought at a price. Therefore honor God with your bodies" (I Corinthians 6:19-20, NIV) and I strive to follow principles that are glorifying to God in acknowledgment of this. Getting the vaccine would negatively affect my conscience and soul, not allowing me to serve and honor the God I love.

I certify that the information I have provided in connection with this request is accurate and complete. I understand this exemption may be revoked and I may be subject to MLH performance management up to and including termination and/or to administrative suspension of my clinical privileges and referral to the Medical Executive Committee of the Main Line Hospitals or Bryn Mawr Rehabilitation Hospital Medical Staff for appropriate action, as applicable, if any of the information I provide in support of this exemption request is false.

Printed Name: Dawn E Gray

Employee, SHP or Medical Staff Member Signature: Dawn E Gray

Date: 9/10/21

MLH-Gray 00303

DA 171

**Page 2 Question 1**

Even though I could apply for a medical exemption due to my allergy to PEG, I have chosen to apply for a religious exemption due to the personal conviction of my religious belief.  I have a personal explanation as to why I religiously object to the current COVID 19 vaccines The best example to explain my objection is when my husband and I tried to conceive children.  After not conceiving for a couple of years, we pursued further fertility options.  We went through the testing to determine if it was a structural or hormonal issue.  We tried some "low tech" options to achieve a successful pregnancy resulting in several miscarriages.  When the next fertility options were presented to us, we prayerfully considered them and concluded our faith and personal belief did not peacefully allow us to take further steps (hormones, AI, IVF, etc).  Our belief was if we were to have children that God would allow it to happen through natural means.  As Psalm 139:13-16 states "For you created my inmost being; you knit me together in my mother's womb. I praise you because I am fearfully and wonderfully made; your works are wonderful, I know that full well.  My frame was not hidden from you when I was made in the secret place, when I was woven together in the depths of the earth.  Your eyes saw my unformed body: all the days ordained for me were written in your book before one of them came to be" (NIV).  I believe that life begins at conception and ends at natural death.  It is this same belief system that guides my objections to getting the current COVID 19 vaccination.  I am not comfortable having genetic components that my body did not create injected into my body.

**Page 2 Question 3**

I am not comfortable having genetic components that my body did not create injected into my body.  I am not opposed to vaccines.  If there is a COVID 19 vaccination that comes out that does not use this process I would investigate and consider accepting it. I have done some initial research into the Novavax Covid 19 vaccine and if it is authorized, I would consider this alternative.

**Page 4 Question 5**

Even though I have not officially requested a religious exemption on the basis of my beliefs I have relied upon the graciousness of my colleagues to support patient decision making when it conflicts with my personal religious belief.  I have "switched" assignments with colleagues to allow for them to care for those after an abortion or for those patients who are asking for Plan B.  I have also switched assignments when I felt I would be too emotional to care for those who might be experiencing a miscarriage due to my own miscarriages when I longed for a child so badly.

**Page 4 Question 7**

Throughout my life, I have held a consistent approach and a genuine conviction about medical invasion that seeks to alter how God created me.  I believe my body is the temple of the Holy Spirit "Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you  have received from God? You are not your own, you were bought at a price.  Therefore honor God with your bodies" (I Corinthians 6: 19-20) and I strive to follow principles that are glorifying to God in acknowledgement of this.  Getting this vaccine would negatively affect my conscience and soul, not allowing me to serve and honor the God I love.

MLH-Gray 00304



**Main Line Health®**

Well ahead.

## Request for Religious Exemption from COVID-19 Vaccine
## Religious Organization Statement Form

Name of Observant: _Dawn Gray_

Name of Religious Organization: _Calvary Bible Church_

Religious Organization Address and Email: _110 Valley Park, Rd. Phoenxville, PA 19___
_phoenixvillechurch.com_

Name of Religious Leaders and Title: _Rev Harry Fletcher, Pastor_

**For Religious Leader:**

In the space below, please provide a written and signed statement supporting the basis of the observant's faith/beliefs which are contrary to the practice of vaccination or use of the COVID-19 vaccination.

_Dawn Gray is a member of Calvary Bible Church of Phoenxville, PA_
_and is regular in attending our church services. As explained to me,_
_she is not opposed to vaccinations in general. But her understanding of_
_the composition and performance of the available COVID19 "vaccines"_
_do not align with her personal convictions. Confident that God_
_has determined the precise physiological make up of each_
_individual person, she believes that the functions of the present_
_COVID19 "vaccines" would alter the specific genetic make up of_
_her body. As an RN, Dawn has considerably more knowledge_
_of human anatomy than I.   Dawn's position on the COVID19_
_"vaccines" is completely consistent with decisions she made_
_decades ago regarding her refusal of recommended medical procedures._
_I am satisfied that her objection to a COVID19 innoculation rests solidly upon_

I certify that my statement above is true and accurate and that the above-named observant is a member of my religious organization in good standing and holds a sincere religious belief that is against the receipt of the COVID-19 vaccination.   _sincerely held faith convictions_

Printed name: _Harry Fletcher_

Signature: _Harry Fletcher_

Date: _8/12/21_



**Main Line Health®**

Well ahead.

## Request for Religious Exemption from COVID-19 Vaccine
## Religious Organization Statement Form

Name of Observant: _Dawn Gray_

Name of Religious Organization: _Calvary Bible Church_

Religious Organization Address and Email: _110 Valley Park Rd. Phoenixville, PA 19460_
_phoenixvillechurch.com_

Name of Religious Leaders and Title: _Rev. Harry Fletcher, Pastor_

For Religious Leader:

In the space below, please provide a written and signed statement supporting the basis of the observant's faith/beliefs which are contrary to the practice of vaccination or use of the COVID-19 vaccination.

Dawn Gray is a member of Calvary Bible Church of Phoenixville, PA, and is regular in attending our church services. As explained to me, she is not opposed to vaccinations in general. But her understanding of the composition and performance of the available COVID19 "vaccines" do not align with her personal convictions. Confident that God has determined the precise physiological make up of each individual person, she believes that the functions of the present COVID19 "vaccines" would alter the specific genetic make up of her body. As an RN, Dawn has considerably more knowledge of human anatomy than I.

Dawn's position on the COVID19 "vaccines" is completely consistent with decisions she made decades ago regarding her refusal of recommended medical procedures. I am satisfied that her objection to a COVID 19 inoculation rests solidly upon sincerely held faith convictions.

I certify that my statement above is true and accurate and that the above-named observant is a member of my religious organization in good standing and holds a sincere religious belief that is against the receipt of the COVID-19 vaccination.

Printed name: _Harry Fletcher_

Signature: _Harry Fletcher_

Date: _8/12/21_

☐ By checking this box and typing my name above, I understand and agree that I am submitting this document electronically and that it is the legal equivalent of having placed my handwritten signature on the submitted document.

Once this form is completed, please email to: <u>MLHCovidDocuments@mlhs.org</u>.  If you have any questions or concern, please reach out to your HR lead.

MLH-Gray 00307

# EXHIBIT F

1

— — — — —

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                   — — — — —

3
DAWN GRAY,                    )   Civil Action No.
4                             )   2:23-cv-00263-KNS
            Plaintiff,        )
5                             )
         vs.                  )
6                             )
MAIN LINE HOSPITALS,          )
7   INC.,                     )
                              )
8            Defendant.       )

9

10

11

                    — — — — —
12
    VIDEOTAPED ZOOM DEPOSITION OF REV. CASEY BIEN-AMIE
13
             Wednesday, August 16, 2023
14                  — — — — —

15

16

17

18

19

20

21

22

23                  — — — — —

24   *ELECTRONIC DISTRIBUTION, FORWARDING OR REPRODUCTION OF*
     *THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION*
25              *FROM THE CERTIFYING AGENCY*
                    — — — — —

                  EXLER REPORTING
                  412-221-4007

REV. CASEY BIEN-AMIE

**2**

1      VIDEOTAPED ZOOM DEPOSITION OF REV. CASEY BIEN-AMIE,

2   a witness herein, called by the Plaintiff for

3   examination, taken pursuant to the Federal Rules of

4   Civil Procedure, by and before Pamela J. Rose, a

5   Registered Professional Reporter and a Notary Public in

6   and for the Commonwealth of Pennsylvania, held remotely

7   with all participants appearing via Zoom, on Wednesday,

8   August 16, 2023, at 1:59 p.m.

9                     — — — — —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**4**

1                    I N D E X

2                   — — — — —

3

4      WITNESS:  REV. CASEY BIEN-AMIE

5   E X A M I N A T I O N:              PAGE:

6

7      BY MR. DALLER                    6

8   E X H I B I T S:

9

10     (WHEREUPON, NO EXHIBITS WERE MARKED FOR
       IDENTIFICATION.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**3**

1   APPEARANCES:           — — — — —
2   For the Plaintiff:

3   **JOHN A. DALLER, ESQUIRE**
    Daller Law Firm
4   P.O. Box 162
    510 Pittsburgh Street
5   Mars, PA  16046
    724-201-2050
6   johndaller@daller-law.com

7   For the Defendant:

8   **BRENDAN HENNESSY, ESQUIRE**
    Hennessy Law
9   101 Lindenwood Drive, Suite 225
    Malvern, PA  19355
10  484-875-3111
    bhennessy@hennessylawfirm.com

11
    Also Present:
12
    **AIMEE KUMER, ESQUIRE**, Associate General Counsel
13  Main Line Health

14  **PATRICK O'MALLEY, VIDEOGRAPHER**
    Litigation Advantage, LLC
15  4411 Gibsonia Road, Suite 5
    Gibsonia, PA  15044
16  412-486-3325
    pomalley@litadvantage.com

17
    Dawn Gray, Plaintiff
18

19
20
21
22
23
24
25

**5**

1                   — — — — —
                P R O C E E D I N G S
2                   — — — — —

3      THE VIDEOGRAPHER:  Good afternoon.  My

4   name is Pat O'Malley, and I'm a legal videographer for

5   Litigation Advantage.

6      Today's date is August 16, 2023, and the time

7   is approximately 1:59 p.m.

8      We are taking the videotaped deposition of

9   Casey Bien-Amie in the matter or Dawn Gray, Plaintiff,

10  versus Main Line Hospitals, Inc., Defendant.

11     This case is filed in the United States

12  District Court for the Eastern District of Pennsylvania,

13  No. 2:23-cv-00263-KNS.

14     Our court reporter today is Pamela Rose from

15  Exler Reporting.

16     Will counsel please identify yourselves,

17  beginning with the noticing attorney, state whom you

18  represent, and our court reporter will then swear in our

19  witness?

20     MR. DALLER:  John Daller representing

21  Dawn Gray.

22     MR. HENNESSY:  This is Brendan Hennessy.

23  I represent the Defendants Main Line Health, Inc., and

24  Main Line Hospitals, Inc.

25                  — — — — —

– – – – –
REV. CASEY BIEN-AMIE,

1  a witness herein, having been first duly sworn, was
2  examined and testified as follows:
3  
4                          EXAMINATION
5  BY MR. DALLER:
6      Q.    Good afternoon again, Reverend.  Just a couple
7  of preliminary matters to, you know, go over.  I know
8  we've done one of your depositions previously, so I
9  think you'll understand some of the questions.  I'll try
10  and go through it.
11          I believe you have a hard stop at 4 p.m.; is
12  that correct?
13      **A.    Yes.**
14      Q.    Oh, okay.  Well, we'll certainly try and
15  accommodate that, and I think we'll be successful.
16          So I'm going to ask you a series of questions
17  today.  It's important that we don't talk over each
18  other.  I know that with the technology, that's apt to
19  happen because, you know, I see -- I don't hear anything
20  and the mouth stops moving and I think that, you know,
21  you've finished.
22          So if I do that to you, I apologize in
23  advance.  Please just let me know.  Okay?
24      **A.    I understand.**
25      Q.    And it's also important that we verbalize our

– – – – –

1  answers, right, because Ms. Rose can't write down a head
2  nod or something like that, even though I know I do that
3  all the time.
4          And then if I ask a question and you don't
5  understand it, please ask me to clarify it because,
6  otherwise, I'll assume that you answered it the way I
7  intended it to come out.
8          Okay?
9      **A.    I understand.**
10     Q.    You're not taking any type of prescription
11  medications today or nonprescription meds that would
12  impair your ability to answer questions fully and
13  completely; correct?
14     **A.    I am not taking any medicines.**
15     Q.    Okay, great.
16          MR. DALLER:  And, Brendan, you'll reserve
17  any objections, other than form and privilege, for trial
18  or...
19          MR. HENNESSY:  Yes, that's correct.
20          MR. DALLER:  Okay.
21  BY MR. DALLER:
22     Q.    And if you do need a break, even though,
23  hopefully, we'll be here less than two hours, you know,
24  certainly let me know.  This is not a marathon race.
25          Now, are you still working at Main Line Health

– – – – –

1  as director of pastoral care?
2      **A.    I am a spiritual care coordinator at Lankenau**
3  **Medical Center.**
4      Q.    Okay.  So you don't have any role over the
5  entire health system's spiritual care practice; correct?
6      **A.    We do not have a director.**
7      Q.    Oh, okay.  And do you still participate in
8  the -- I believe it was the CPE program?
9      **A.    I support it, yes.**
10     Q.    You support that, okay.  All right.
11          And since we've last spoken, have you done any
12  other continuing education around COVID, particularly as
13  it relates to discrimination in the religious arena?
14     **A.    I don't believe so.**
15     Q.    No?  Okay.
16          Now, you were disclosed as being a member of
17  the group that considered Ms. Gray's COVID-19 exemption
18  request; is that correct?
19     **A.    Yes.**
20     Q.    Okay.  And do you have any particular
21  recollections of reviewing that application?
22     **A.    Some.**
23     Q.    Some?  Okay.  All right.
24          Well, why don't you tell me what you recall
25  before we get into the application; you know, the papers

– – – – –

1  that she had submitted.
2      **A.    I recall her sharing personal stories of her**
3  **life, a little bit of life review, and I recall -- I'm**
4  **sorry for the pause.  I think that's most of what I**
5  **recalled.**
6      Q.    Mm-hmm, okay.
7      **A.    Yeah.**
8      Q.    All right.  And, to your recollection, when
9  the committee reviewed her application, what was your
10  opinion or decision or, you know, what did you express
11  to the group that you thought should be done?
12     **A.    Could you rephrase the question?**
13     Q.    Sure.
14          So you met with the group; correct?
15     **A.    Yes.**
16     Q.    Okay.  While you were meeting, I'm sure you
17  had discussions with those groups, that group; correct?
18     **A.    Yes.**
19     Q.    Okay.  What did you express as your opinions,
20  thoughts on her application to the group?
21     **A.    From what I recall -- I wouldn't be able to**
22  **remember what I said, you know, verbatim -- but that I**
23  **recall that much of what was stated was medical in**
24  **nature, and we did not have a clear understanding of the**
25  **religious objection to the vaccine.**

_ _ _ _ _

1    Q.   Okay.  Was it primarily the connection between
2 what she had said and her request for the religious
3 exemption, or was it more the medical things that she
4 said and you didn't even understand that part?
5         MR. HENNESSY:  I'm going to object to
6 form.
7         If you understand the question, you can answer
8 it.
9         THE WITNESS:  I don't have a more or less
10 knowledge of that.
11 BY MR. DALLER:
12    Q.   Okay.  And was your opinion that she was
13 expressing more of a medical situation your opinion, or
14 was it something that you were told by, perhaps, a
15 doctor that was on the committee?
16        MR. HENNESSY:  Object to form.
17        You can answer.
18        THE WITNESS:  The -- I can only assess the
19 statements that were given to me of the expertise to
20 understand the medical background.
21 BY MR. DALLER:
22    Q.   Okay.  All right.  And were you given any
23 medical background from, you know, other people who were
24 in attendance with you that day?
25    A.   **I wouldn't be able to recall specifics, but I**

_ _ _ _ _

1 **would have turned to Dr. Jen Burke as our representative**
2 **from more of the medical side.**
3    Q.   Okay.  And do you remember anything that
4 Dr. Jennifer Burke had said that day regarding the
5 application?
6    A.   **Not in specifics, no.**
7    Q.   Okay.  Anything in generalities?
8    A.   **I don't know if it was specifically to this**
9 **case.  She explained the vaccine process to us on a**
10 **number of occasions.**
11   Q.   Okay.  All right.  To your recollection, did
12 she ever say that whatever Mrs. Gray had presented was
13 bad science?
14   A.   **I don't recall her saying that.**
15   Q.   Okay.  Do you believe that anything that she
16 stated in her application was incorrect science or
17 incorrect medicine?
18   A.   **It's my understanding that it is -- it was**
19 **inaccurate to how vaccines interact with the body.**
20   Q.   Okay.  Can you tell me a little bit more about
21 that understanding?
22   A.   **I understand that the preface for vaccines to**
23 **interact with spiking an immune response do not change**
24 **the DNA of the individual that receives said vaccine.**
25   Q.   Okay.  And is that a general statement for all

_ _ _ _ _

1 vaccines?  Only if it's within your knowledge.
2    A.   **I know only of the vaccines that I've engaged**
3 **with.**
4    Q.   Okay.  All right.
5         And, now, I recall from our previous
6 discussions that you have an interest in social justice
7 and diversity; is that correct?
8    A.   **I do, yeah.**
9    Q.   Okay.  And does your -- did your interest
10 in diversity influence your decisionmaking during these
11 committee meetings at all?
12   A.   **Could you rephrase the question?**
13   Q.   Sure.  Did your -- you have an interest in
14 diversity; correct?
15   A.   **Yes.**
16   Q.   Okay.  And there were certain goals of
17 diversity?
18   A.   **I mean, by its very nature, right, it's**
19 inclusive and diverse; would you agree?
20   A.   **Yes.**
21   Q.   Okay.  Did those goals or descriptions, that
22 description of diversity, influence how you look at any
23 of the exemption requests?
24   A.   **I can't think of specific ways in which**
25 **DREI -- or diversity, respect, equity and inclusion --**

_ _ _ _ _

1 **impacted, but the concepts of DREI, I think, are a**
2 **component of my practice.**
3    Q.   Okay.
4    A.   **But nothing specific.**
5    Q.   Can you explain in generalities, then, how it
6 may have impacted your decisionmaking?
7    A.   **My understanding is that I tried to lead with**
8 **an openness, interest, boundary setting, and equity,**
9 **which we ensure the processes that we have in place are**
10 **as equitable as possible for as many individuals as we**
11 **can.**
12   Q.   Okay.
13   A.   **That's the best of my knowledge at this**
14 **moment.**
15   Q.   Okay.  And just to, hopefully, avoid the need
16 for a whole lot of questions, you're not going to offer
17 any testimony as to anything to do with the medicine of
18 the vaccine and how that influenced your decision?
19        Let me rephrase that.
20        You're not going to offer any testimony as to
21 the specificity of any medical opinion that influenced
22 your decision; correct?
23        MR. HENNESSY:  I'm going to state an
24 objection.  I don't think you can ask the witness what
25 they're definitely going to testify to when you haven't

－ － － － －

1  heard the question on the cross-examination.
2          MR. DALLER:  Okay.
3          MR. HENNESSY:  So I don't -- I think it
4  needs to be reformed, the question.
5          MR. DALLER:  All right.
6  BY MR. DALLER:
7      Q.    The question is are you going to offer any
8  testimony at trial regarding the medicine of the
9  vaccine?
10          MR. HENNESSY:  I'm still going to state an
11  objection to form.
12          If the witness can answer, go ahead.
13          THE WITNESS:  I don't have any medical
14  expertise.
15  BY MR. DALLER:
16      Q.    Okay.  All right.
17          And prior to that day when, you know, the
18  committee met, am I correct in understanding what you
19  said before that Dr. Burke reviewed sort of the criteria
20  or guidelines of the religious exemption requests
21  regarding how to view them?
22          Is that what you said earlier or...
23      A.    **I don't believe so, no.**
24      Q.    Okay.  Did she review any criteria or
25  guidelines in general in terms of how to consider a

－ － － － －

1  request?
2      A.    **No.**
3      Q.    No?  Okay.
4          Did anybody else do that that day?
5      A.    **I'm sorry?  Could you --**
6      Q.    Sure.  Did anybody else, the day of the
7  evaluation of Mrs. Gray's request, did they review,
8  anybody review with you how to consider the requests you
9  were going to look at that day in terms of any criteria,
10  guidelines I think you alluded to, you know, to make
11  sure that they were done equitably?
12          Did anybody review that type of information
13  with you that day?
14      A.    **As I recall, almost -- I couldn't say with 100**
15  **percent certainty, but most of our meetings we reviewed**
16  **the basics of the EEOC guidelines.**
17      Q.    Okay.
18      A.    **Yes.**
19      Q.    Okay.  All right.  But you don't recall who
20  did that with you that day?
21      A.    **No, I do not.**
22      Q.    Okay.  All right.  Were you given any formal
23  or informal document at all?  You know, a check sheet or
24  a list of criteria to look at?
25      A.    **I was not given a document of criteria, no.**

－ － － － －

1      Q.    Okay.  Were you ever given a document or
2  criteria even beforehand, like maybe at the beginning
3  when you started reviewing these, in general?
4      A.    **Not -- no.**
5      Q.    No?  Okay.
6          So earlier you had said that your recollection
7  was, regarding Mrs. Gray's request, that it talked about
8  a lot of medical things; correct?
9      A.    **Yes.**
10      Q.    Okay.  And other than talking about the
11  medical things, were there other reasons why you felt it
12  did not express a sincerely-held religious belief?
13      A.    **I wouldn't feel comfortable going just based**
14  **on recollection.**
15      Q.    Okay.  All right.  And just to be sure, nobody
16  told you that day that what she said was, quote, "bad
17  science" or "not medically true" or similar words like
18  that?
19          MR. HENNESSY:  Objection to form.
20          THE WITNESS:  Would you rephrase for me?
21  BY MR. DALLER:
22      Q.    Sure.  Did anybody tell you that day that the
23  statements that she made reflected inaccurate facts?
24      A.    **I don't recall anybody saying that.**
25      Q.    Okay.  And is it your opinion that the

－ － － － －

1  totality of what she presented did not create a link of
2  why she could not take the vaccine?
3      A.    **Not from a religious perspective, no.**
4      Q.    Okay.  So assuming that she had justification
5  to the medical side, your opinion would be that she
6  still fell short of explaining the link to why she could
7  not take the vaccine; is that correct?
8          MR. HENNESSY:  Object to form.
9  BY MR. DALLER:
10      Q.    You can answer.
11      A.    **If you wouldn't mind just -- could I ask for a**
12  **rephrase?**
13      Q.    Sure.
14          So you said that she made some statements
15  about medical things, right, why she couldn't -- why she
16  believed she couldn't take the vaccine?
17      A.    **Yes.**
18      Q.    Okay.  And then you also said that she did not
19  make a religious argument about those things, how it
20  connected to why she could not take the vaccine; is that
21  correct?
22      A.    **Yes.  We did not see stated a link between her**
23  **religious beliefs and objections to the COVID-19**
24  **vaccine.**
25      Q.    Okay.  Had she made that link, then would you

– – – – –

1  have supported her exemption request, despite what she
2  talked about in the medicine part?
3         MR. HENNESSY:  Objection.
4  BY MR. DALLER:
5     Q.    You can answer if you can.  I mean, otherwise,
6  when we get to the, you know, actual exemption form,
7  we'll go through it in a little bit more detail.
8         Again, I just want to know if you have any
9  recollection here, as we sit, as to whether or not you
10  think, okay, this was sort of the reason that her
11  request was denied and if something was different, then,
12  "Oh, yeah, that would have made a difference to us."
13        That's what I'm trying to get at.
14    A.    I wouldn't be able to assess that with a
15  hypothetical.
16    Q.    Okay.
17    A.    I think it would depend what was stated.
18    Q.    Okay.  All right.
19        And did you have any discussion yourself with
20  Mrs. Gray, say, prior to the submission of her request
21  regarding her request?
22    A.    I did not.
23    Q.    Okay.  Did you have any discussion with her
24  after the submission of her request?
25    A.    I did not.

EXLER REPORTING
412-221-4007

– – – – –

1     Q.    Okay.  And you're not aware if anybody else
2  did; correct?
3     A.    I am not aware of that.
4     Q.    Okay.  And did you review Ms. Gray's request
5  prior to the meeting, if you recall?
6     A.    I believe I did.  It's hard to recall exactly,
7  but I tried to review all of them prior to.
8     Q.    Okay.  So the ones that you were able to
9  review prior to the meeting, do you have any
10  recollection as to how long you might, you know, have
11  reviewed them?
12    A.    It depends on the length of the document.  I
13  would generally read it at least once or twice.
14    Q.    Okay.  Is there anything particular you recall
15  about Mrs. Gray's document in terms of how long you
16  looked at it?
17    A.    I don't recall.
18    Q.    Okay.  Did you do any research into anything
19  she said?
20    A.    No.  I don't think so.
21    Q.    Okay.  Did you verify, like look at any
22  Internet searches to see whether or not anything
23  supported her request or contradicted it, anything like
24  that?
25    A.    I don't recall doing that.

EXLER REPORTING
412-221-4007

– – – – –

1     Q.    All right.  Did you review any of the
2  scriptural references?
3     A.    I read through them.  I didn't do any formal
4  exegesis but...
5     Q.    Okay.  All right.
6         Do you recall what specific criteria or
7  guidelines that Mrs. Gray's request did not satisfy?
8     A.    Would you rephrase that for me?
9     Q.    Sure, yeah.  We talked about that there has
10  been criteria and guidelines, whether or not you saw
11  them, you know, or had them there that day.
12        You know, you said that people -- somebody
13  always at the beginning of the meeting talked about
14  general guidelines and how you reviewed these requests;
15  correct?
16    A.    Yes.
17    Q.    Okay.  Do you recall, again, before we go into
18  the document, what specific deficiencies were in
19  Ms. Gray's request that led you to deny it?
20    A.    I think it's better to look at it as the full
21  document.
22    Q.    Okay.
23    A.    The concept was always around a comprehensive,
24  consistent, long-held belief.
25    Q.    Okay.

EXLER REPORTING
412-221-4007

– – – – –

1     A.    There's nuances to how each of those are
2  connected to each other.
3     Q.    Okay.  And do you recall who else was present
4  with you during the consideration of her request?
5     A.    I can't recall specifically who was there.  I
6  do feel that Jen Burke was there, but I don't remember
7  specifically.
8     Q.    Okay.  And were there notes that were taken
9  during the consideration of these?
10    A.    Not by me, no.
11    Q.    Not by you?  Okay.  Are you aware if anybody
12  else did?
13    A.    I do not know.  I don't think so.  I don't
14  know of any.
15    Q.    Okay.  Were these meetings in person?
16    A.    No.  They were Zoom or Teams.
17    Q.    Okay.  And did you have any discussions prior
18  to the meeting with any committee members about
19  Mrs. Gray's request?
20    A.    I don't recall any, no.
21    Q.    Okay.  Did you have any discussions with
22  anybody who might not have been on the committee?
23    A.    Oh.  No.
24    Q.    No?  And do you believe that you understood
25  everything that she put in her request?

EXLER REPORTING
412-221-4007

– – – – –
1    A.    Yeah.  I believe I understood what was
2  articulated.
3    Q.    Okay.  All right.
4          MR. DALLER:  Patrick, if we can pull up
5  the exemption request by Ms. Gray.
6          THE VIDEOGRAPHER:  (Indicating.)
7  BY MR. DALLER:
8    Q.    And I know -- do you recognize this as
9  Ms. Gray's request, Reverend?
10    A.    Yes.
11    Q.    Okay.  Now, I know that her answers are
12  handwritten.  I also know that within this document
13  there's, I believe, two typewritten pages that
14  transcribed what was handwritten.  Okay?
15          Do you need to take a minute to look at the
16  document as it was provided by Main Line Health to
17  refresh yourself on any of the content of the questions
18  at all?
19    A.    Oh, no.
20    Q.    No?  Okay.  All right.  That'll help.
21          MR. DALLER:  If we can just go to Question
22  6 then on the document, because that was not
23  particularly or specifically addressed in the
24  transcribed portion, and if you can blow that up,
25  Patrick, I'd appreciate it.

1          THE VIDEOGRAPHER:  (Indicating.)
2  BY MR. DALLER:
3    Q.    So Question 6 dealt with whether the
4  sincerely-held belief that Mrs. Gray was claiming that
5  prevents her from taking the vaccine.  I have a couple
6  of questions about it.  Right?
7          One:  "Does it derive from an organized
8  religion?"  She responded, "Yes."  She named the
9  organized religion.
10          And then she also said when she started
11  practicing, it was in 1970.  She belongs to an
12  organization in the current church that she goes to.  It
13  looks like she joined in 1998.
14          Is that a fair representation of what she
15  wrote?
16    A.    Yes.
17    Q.    Okay.  And as you, you know, looked at this,
18  did you have any questions or concerns with those
19  particular statements?
20          I know earlier I think you had mentioned
21  longstanding.  Do you believe that she has longstanding
22  beliefs?
23    A.    Her practice of Christianity does appear to be
24  longstanding.
25    Q.    Okay.  And did you have any issue with her

1  characterization of nondenominational Christianity?
2    A.    No.
3    Q.    What's your understanding of nondenominational
4  Christianity?
5    A.    It's incredibly varied, depending on the
6  practice.
7    Q.    Mm-hmm.
8    A.    Most don't have a -- the leadership structure
9  varies, depending on the nondenominational church.  Some
10  can have, you know, bishops and leadership in that realm
11  and be connected across multiple churches.
12          Others are standalone churches with the
13  leadership only within their congregation.
14    Q.    Mm-hmm.
15    A.    And so the variety is great and it's -- you
16  know, the quality of that tradition is varied.  So it
17  would take -- you would have to look at each church to
18  understand their practice in theology.
19    Q.    Okay.  So that's a very secular kind of
20  approach, is it not?
21    A.    In what way?
22    Q.    Well, if you're talking about organizational
23  structure of an entity here in this world; correct?
24    A.    Oh, I'm talking about ecclesiology on how the
25  church is set up.

– – – – –
1    Q.    Okay.  All right.  From the standpoint of a
2  spirituality or a spiritual realm, what would you -- how
3  would you characterize nondenominational Christianity?
4    A.    That varies greatly, as well.  The particular
5  practices, sacraments, ordinances within each
6  nondenominational church can vary depending on that
7  church's belief and how they were founded.
8          Some nondenominational churches branch off of
9  another denomination, often within Protestantism, so
10  they may retain some of the practices of the tradition
11  that they broke off from.  Others form organically from,
12  like, a home church kind of movement.
13          So the religious practice can vary greatly.
14  The foundations of Christianity tend to remain the same.
15    Q.    Okay.
16    A.    But the practice and quality of the tradition
17  varies.
18    Q.    Okay.  And that probably lends a lot of
19  subjectivity then to a consideration of Christianity;
20  no?
21          MR. HENNESSY:  Object to form.
22          THE WITNESS:  Would you rephrase the
23  question?
24  BY MR. DALLER:
25    Q.    Sure.  That variability, okay, you described,

– – – – –

1  would you agree that that leads to a subjectivity of an
2  evaluation then of a particular group of
3  nondenominational Christians?
4          MR. HENNESSY:  Objection to form.
5          If you understand it, go ahead.
6          THE WITNESS:  I think there's nuance in
7  every -- whether someone is nondenominational or a part
8  of a more organized -- not that -- nondenominational
9  churches are also organized, but within any nomination,
10  there is a nuance to how they believe, and so it would
11  lend itself to look at the individual.
12  BY MR. DALLER:
13      Q.   Okay.  Did that potential for variability
14  subjectivity factor into your decision at all in regards
15  to Mrs. Gray's case?
16      A.   **No.**
17      Q.   No?  Okay.  So you did not doubt that she
18  followed a religion, regardless of how that was going to
19  be defined?
20          She did follow a religion; correct?
21      A.   **Yes.  Yes.**
22      Q.   All right.
23          MR. DALLER:  Let's go to the typewritten
24  page then that has Page 2, Question 1 on top of it.
25          THE VIDEOGRAPHER:  (Indicating.)

– – – – –

1          MR. DALLER:  All right.  And if we can
2  sort of blow up that first paragraph.
3          THE VIDEOGRAPHER:  (Indicating.)
4          MR. DALLER:  Okay.
5  BY MR. DALLER:
6      Q.   So Question 1, you said that you recall the,
7  you know, document.  I'll just kind of paraphrase it.
8          Basically, Question 1 was a prompt for the
9  individual to describe or detail the nature of the
10  objection.
11          Do you recall that?
12      A.   **Yes.**
13      Q.   Okay.  All right.  So I'd like to just kind of
14  go through what you said to see what your thoughts were
15  about it.
16          I mean, in the first sentence she, you know,
17  states that she could have applied for a medical
18  exemption, but she's chosen to apply for a religious
19  exemption because of her personal conviction; correct?
20      A.   **It states that, yeah.**
21      Q.   Okay.  And was the fact that she decided to
22  apply for a religious exemption rather than a medical
23  exemption, did that factor into your decision at all in
24  any way?
25      A.   **Not to me, no.**

– – – – –

1      Q.   Okay.  Do you think that it might have
2  factored into anybody else's decision?
3      A.   **I wouldn't be able to speak to that.**
4      Q.   Okay.  Would you -- do you believe that this
5  is like a factual determination, you know, as to her
6  motivation for applying for the exemption?
7      A.   **Would you rephrase that question?**
8      Q.   Sure.
9          If you had to characterize that statement,
10  would you say that your opinion of it was a fact that
11  was true, or did you think that this was more subjective
12  on her part, that statement?
13          MR. HENNESSY:  Objection to form.
14          If you understand it...
15          THE WITNESS:  I believe that that was her
16  experience.
17  BY MR. DALLER:
18      Q.   Okay.
19      A.   **That she believed that she could apply for a**
20  **medical exemption.  She didn't give a -- I don't know**
21  **anything about PEG and would not be able to speak to**
22  **that.**
23      Q.   Okay.  And then the next sentence where, "I
24  have a personal explanation" as to why she religiously
25  objects, do you see that?

– – – – –

1      A.   **I do.**
2      Q.   Okay.  And do you accept that as a statement
3  of her telling you how religion has impacted her
4  personally and she's going to explain that?
5          Is that how you interpreted that sentence?
6      A.   **Yes.**
7      Q.   Okay.  All right.  And then she goes into it
8  with -- she leads with what she says is her best
9  example; correct?
10      A.   **Yes.**
11      Q.   Okay.  And is the fact that the example has to
12  do with conception, is that problematic, you know?
13          Is this one of those things that you thought
14  of as, oh, this is a medical thing?
15      A.   **No.**
16      Q.   Okay.  Anything else that you wanted to add
17  there?
18      A.   **No.**
19      Q.   Okay.  And is conception of children spiritual
20  at all?
21      A.   **I think it can be.**
22      Q.   Okay.  In Christianity, is it?
23      A.   **Yes.**
24      Q.   Okay.  In fact, Jesus speaks about children in
25  the Bible several times; correct?

1   A.   Yeah.
2   Q.   Okay.
3        And so then in the next sentence, Ms. Gray
4   talks about the misfortune of not being able to conceive
5   for a couple of years; correct?
6   A.   Yeah.
7   Q.   Okay.  And then they decided to pursue
8   fertility options; correct?
9   A.   Yeah.
10  Q.   Okay.  Was this a medical statement, in your
11  mind?
12  A.   **More a historical, life-review engagement.**
13  Q.   Okay.  And then in the next sentence, she
14  actually goes on to say, "...to determine whether there
15  was a structural or a hormonal issue"; correct?
16  A.   **Yes.**
17  Q.   Okay.  And would you agree that that sentence,
18  in and of itself, is probably a medical statement;
19  correct?
20  A.   **Yes.**
21  Q.   Okay.  And then she goes on to describe sort
22  of what they did in order to conceive; right?  And she
23  refers to low-tech options to achieve a successful
24  pregnancy; right?
25       And, unfortunately, it sounds like that was

1   not successful; correct?
2   A.   **Yes.**
3   Q.   Okay.  And did you have an understanding of
4   what "low-tech options" are?
5   A.   **I am familiar with them.**
6   Q.   Okay.  Can you name a couple?
7   A.   **Many involve, you know, monitoring the best**
8   **times of fertility, temperature checks, ensuring that**
9   **sperm count is high, minimizing any reasons why a sperm**
10  **count would be low, things of that nature.**
11  Q.   Okay.  And from the methods that you describe,
12  I think you would agree that those are sort of secular
13  things, if you will, worldly things; right?  Checking a
14  temperature, checking a calendar, things like that;
15  right?
16  A.   **They're biological.**
17  Q.   Okay.  I think that's a good way of saying it.
18  And they're biological in the sense of it's observations
19  of the biology; correct?
20  A.   **I wouldn't be able to speak to how they came**
21  **about but...**
22  Q.   Well, I mean, if one takes a temperature,
23  right, the temperature is what the temperature is?
24       The act of taking the temperature doesn't
25  change the temperature, does it?

1   A.   **No.**
2   Q.   Okay.  All right.  And then she says that,
3   "When the next options were presented" -- do you see
4   that part?
5   A.   **I see that, yes.**
6   Q.   Okay.  "That they prayerfully considered them
7   and concluded that their faith would not allow them to
8   take those further steps"; correct?
9   A.   **Yes.**
10  Q.   Okay.  And she, in parentheses, then, she kind
11  of lists what some of those are; correct?
12  A.   **Yes.**
13  Q.   Okay.  And she lists hormones, AI -- which I'm
14  assuming is artificial insemination -- and then IVF,
15  which is in vitro fertilization; correct?
16  A.   **Yes.**
17  Q.   Okay.  Are those things different than, like,
18  taking a temperature?
19  A.   **Yes.**
20  Q.   Okay.  In what way would you say they're
21  different?
22  A.   **Well, they're three very different examples.**
23  Q.   Okay.
24  A.   **But, yeah, I would say that taking a**
25  **temperature is taking in data, while these are more**

1   **interactive.**
2   Q.   Okay.  Manipulations, perhaps?
3   A.   **Possibly, depending on --**
4   Q.   Okay.  All right.  And then in the next
5   sentence she says that, "Our belief was if we were to
6   have children, God would allow it to happen through
7   natural means."
8        Do you see that?
9   A.   **I do.**
10  Q.   Okay.  At this point as you -- you know, we've
11  reviewed this part -- do you have an opinion on the
12  medical statements and their interaction with her
13  spiritual belief?
14  A.   **Related to conception, yes.**
15  Q.   Okay.  And what is that understanding?
16  A.   **That through their belief in God, that they**
17  **identify that natural means be without using external**
18  **factors to support conception or carrying a pregnancy to**
19  **term.**
20  Q.   Okay.  And are -- you believe in the Bible;
21  correct?
22  A.   **I do.**
23  Q.   Okay.  And I think I may have asked you this
24  before, but is the Bible the immutable word of God?
25  A.   **Yes.**

– – – – –
1    Q.   Okay.  Is the Bible situationally dependent as
2   to one's beliefs in it?
3    A.   **Would you rephrase the question?**
4    Q.   Sure.  So if you believe that the Bible says
5   that you shall not do something -- correct?
6    A.   **I believe it does have statements of "you**
7   **shall not," yes.**
8    Q.   Okay.  All right.  Are you allowed to pick and
9   choose when or whether you do or do not apply that
10  prohibition?
11          MR. HENNESSY:  Objection to form.
12          THE WITNESS:  I would also be curious.
13  Are you asking about my personal belief or belief of
14  Christianity, in general?
15  BY MR. DALLER:
16   Q.   Well, I mean, I think -- where I'm going with
17  this is Christianity, in general, okay, as -- is that
18  a -- you know, a denominational difference in
19  Christianity; that there are absolutes in the Bible?
20  And then if it's the individual because -- just let me
21  leave it at that for now.
22          Do you believe that the Bible gives absolutes
23  to some Christians, at least?
24          MR. HENNESSY:  Objection to form.
25  BY MR. DALLER:

– – – – –
1    Q.   You can answer.
2    A.   **I would need more understanding of your**
3   **question.  I'm sorry.**
4    Q.   Okay.  When you reviewed Ms. Gray's request,
5   did you -- if I recall correctly, you said or believe
6   that her exemption request did not warrant an approval;
7   correct?
8    A.   **Correct.**
9    Q.   Okay.  Was that based on your knowledge?
10   A.   **Not solely my knowledge, no.**
11   Q.   Okay.  Was it based, at least in part, upon
12  your beliefs?
13   A.   **In part, yes.**
14   Q.   Okay.  And one's beliefs are subjective;
15  correct?
16          MR. HENNESSY:  Objection.
17  BY MR. DALLER:
18   Q.   You can answer.
19          MR. HENNESSY:  I don't know that anybody
20  can answer that question.
21          THE WITNESS:  I think I would need a
22  better understanding of what you mean by "belief."
23          Are you talking about my religious beliefs or
24  my understanding of the guidelines from the EEOC?
25  BY MR. DALLER:

– – – – –
1    Q.   Well, I mean, I asked about knowledge.  I
2   would think guidelines of the EEOC, they are what they
3   are; right?  We can look them up, but that's fact.
4   That's knowledge.
5          When I'm talking about "belief," I'm asking
6   about your religious beliefs, you, as a person, your
7   understanding of things, of life.
8          Did those beliefs play a role in your
9   determination of what Mrs. Gray's request said?
10   A.   **No.**
11   Q.   It did not?  Okay.
12   A.   **It did not, no.**
13   Q.   It had no role in it?
14   A.   **No, it did not.**
15   Q.   Okay.  Now, going back to what she had said,
16  you know, previously -- she talked about the low-tech
17  options and then she talked about sort of the
18  manipulative things, as I think we agreed -- we can call
19  them hormones, artificial insemination, in vitro
20  fertilization -- and that if it was going to happen, God
21  would allow it to happen; correct?
22          That's what she said?
23   A.   **Yes.**
24   Q.   Okay.  And looking at that, did you accept
25  that as -- or did you consider that as a medical thing

– – – – –
1   or a spiritual thing?
2    A.   **She used both.**
3    Q.   Okay.  And does the fact that she used both
4   lead to a preclusive decision as to the sincerity of her
5   belief?
6    A.   **No.**
7    Q.   Okay.  And do you see any link formed, not to
8   the COVID vaccine at this point, but to her choice of
9   interventions that are possible for her to accept and
10  her religious belief?
11          Do you see a connection in that respect?
12   A.   **I'm sorry.  Could you rephrase that?**
13  **Regarding what?**
14   Q.   Sure.  So she's made several statements about,
15  you know, the low-tech options.  You know, we can try
16  them.  The higher tech, the manipulations, we can't;
17  correct?
18   A.   **Mm-hmm.**
19   Q.   And it's because of "our belief that if we
20  were to have children, God would allow it to happen"?
21          Do you see the connection between those two
22  parts?
23   A.   **Yeah.**
24   Q.   Okay.  And do you think that that was a strong
25  belief for her?

1           MR. HENNESSY:  Objection.
2  BY MR. DALLER:
3      Q.    You can answer.
4      A.    **It came out in this application, so it's**
5  **clearly a major component of her story.**
6      Q.    Okay.  And I believe you testified earlier
7  that there are sort of some absolutes in the Bible in
8  terms of what you shall or shall not do; correct?
9      A.    **There are statements of such in the Bible.**
10     Q.    Okay.  And there's probably other statements
11  that, depending upon what an individual believes, okay,
12  the depth of their belief, their relationship to their
13  God and to Jesus, depending upon that relationship, some
14  other things in the Bible could be absolutes to them;
15  correct?
16          MR. HENNESSY:  Objection to form.
17  BY MR. DALLER:
18     Q.    You can answer.
19     A.    **Yeah.  Would you mind -- I just lost track of**
20  **what the question was.**
21     Q.    Sure.  Do you believe that, based upon an
22  individual's understanding of what they're reading in
23  the Bible, okay, that they may have absolute beliefs
24  developed as part of their religious fabric, based upon
25  what they're reading?

1  of that statement, it really is an admonition, in a way,
2  in terms of manipulating what God has made; correct?
3          MR. HENNESSY:  Objection to form.
4          THE WITNESS:  Yeah, would you please say
5  that question again?
6  BY MR. DALLER:
7      Q.    Sure.  Building off of that, it's almost an
8  admonition, if you will, in terms of interpretation of
9  interfering with what God has created?
10     A.    **I'm sure there could be an interpretation like**
11  **that.**
12     Q.    Okay.  Did you know if that was Mrs. Gray's
13  interpretation?
14     A.    **I don't know.**
15     Q.    Okay.  And you didn't know if that's the
16  interpretation of the spiritual leaders that she follows
17  here on earth, do you?
18     A.    **Not from her pastor's statement, no.**
19     Q.    Okay.  And then she says, in fact, that, this
20  belief system is what guides her objections to getting
21  the vaccine; correct?
22     A.    **That is her statement in the paragraph.**
23     Q.    Okay.  And then she states that she's not
24  comfortable having genetic components that her body did
25  not create injected into her body; is that correct?

1           MR. HENNESSY:  Objection to form.
2  BY MR. DALLER:
3      Q.    You can answer.
4      A.    **Yeah.  I believe that people have a varying**
5  **degree of boundaries and rules that they follow in their**
6  **understanding of their religious tradition.**
7      Q.    Okay.  All right.  And, in fact, in the next
8  several lines, Ms. Gray quotes something from Psalm 139;
9  correct?
10     A.    **Yes.**
11     Q.    Okay.  And take a minute to read that.
12     A.    **Sure.**
13          (The witness is reviewing the document.)
14          I've read it.
15     Q.    Okay.  And what's your understanding of this
16  verse in terms of Mrs. Gray's utilization of it as you
17  read her application?
18     A.    **You know, it's a scripture that relates to**
19  **God's intimate connection with parents and the child**
20  **wanting to be born.**
21     Q.    Mm-hmm.
22     A.    **Yeah.  It's actually a scripture that we use**
23  **very often caring for people who have come through**
24  **losses of babies.**
25     Q.    Okay.  In fact, you know, sort of building off

1      A.    **She does state that, yes.**
2      Q.    Okay.  Is that statement inaccurate?
3      A.    **Taken into context of the entire application,**
4  **it does raise a flag of inconsistency, as she does**
5  **partake in other vaccines.**
6      Q.    Okay.  Would that inconsistency be dependent
7  upon the vaccine in general or the other vaccines'
8  natures, if you will?
9      A.    **There can be a variety, but we don't have**
10  **enough information in this question.  We would have to**
11  **take the whole application in a cohesive nature.**
12     Q.    Uh-huh, okay.  And is the fact that she took
13  the flu vaccine, if she did, a problem?
14     A.    **Well, we don't have enough information here**
15  **tying what component of intervention medically where her**
16  **boundaries are and how they relate to her religious**
17  **beliefs.**
18     Q.    Okay.  So you think you need more information?
19     A.    **From this question, yes.**
20     Q.    Okay.
21     A.    **You'd have to move on to the ongoing questions**
22  **in the application.**
23     Q.    Okay.  You believe that the answers are
24  somewhere else within the application?
25     A.    **We offer multiple questions.  We offer**

– – – – –
1  multiple opportunities for people to share the different
2  aspects of their beliefs.  It is thought that if it's
3  not explained in one question, it will be explained in
4  another.
5        Q.    Okay.  And she -- if you need to look at it,
6  we can -- but for the sake of time, for Question 2, the
7  question was, "Did you receive a religious exemption
8  from MLH or the MLH mandatory annual vaccine
9  requirement?"  And she stated, "No."  And I don't
10 believe there's any other additional text to go with
11 that.
12       Do you need to see that or...
13       A.    I don't need to see that, no.
14       Q.    Okay.  Would that piece of information -- does
15 that alter your or enhance, in your opinion, your
16 response regarding the comfortableness with "genetic
17 components that my body did not create" and your
18 statements about vaccine?
19       A.    It still is not enough information.
20       Q.    Okay.
21       A.    There's not enough of a link here.
22       Q.    Mm-hmm, okay.
23             Now, if somebody did take the flu vaccine,
24 okay, the day before and they didn't want the COVID
25 vaccine, is that something -- how would you, if you have

1  any knowledge of, you know, the committee in general,
2  how would they consider that?
3        A.    I think that would be dependent on what the
4  reasoning is for the exemption for the COVID-19 vaccine.
5        Q.    Okay.  So if they said that there was a
6  similarity from the medical perspective and that
7  similarity may not be true, then you would say, "Well,
8  that's not really a correct reason"; correct?
9        A.    I don't feel like I understand the question
10 well enough.
11       Q.    Sure.  You said it depends on why they said
12 they can't take the vaccine; correct?
13       A.    Yes.
14       Q.    Okay.  Can you explain to me what you mean by
15 that then?
16       A.    If somebody said that their religious belief
17 was so that they can't take any vaccine and they took
18 the flu vaccine the day before submitting the COVID-19
19 vaccine application, that would raise some red flags
20 about it being a long-held belief.
21       Q.    Okay.  Did Ms. Gray do that?
22       A.    Not to my knowledge.
23       Q.    Okay.  In fact, she stated that, in Question
24 2, that she never applied for an exemption from the flu
25 vaccine; correct?

– – – – –
1        A.    Correct.
2        Q.    Okay.  And then we'll get into Question 3, I
3  think, next here.
4              In response to the question she said she
5  cannot take -- she can take some but not all vaccines?
6        A.    Yes.
7        Q.    Okay.  All right.
8              MR. DALLER:  Let's blow up Page 2,
9  Question 3.
10             THE VIDEOGRAPHER:  (Indicating.)
11 BY MR. DALLER:
12       Q.    And in there she -- go ahead.  Take a minute
13 to review that.
14       A.    (The witness is reviewing the document.)
15       A.    Let me know when you're done.
16       A.    I'm done.
17       Q.    Okay.  She starts off by saying that she's
18 "not comfortable having genetic components that my body
19 did not create" injected into her body; is that correct?
20       A.    That is what she states.
21       Q.    Okay.  Is that inconsistent with the flu
22 vaccine?
23       A.    They are made differently, to my
24 understanding, but I wouldn't be able to testify to the
25 ways that the vaccines are created.

– – – – –
1        Q.    Okay.  So your testimony -- and I just want to
2  differentiate making them to kind of what they are when
3  you get them out of a bottle.  Okay?
4              So your testimony is that in making them,
5  they're not genetic in nature?  Is that your
6  understanding?
7              MR. HENNESSY:  Object to form.
8              THE WITNESS:  Yeah.  I just can't testify
9  to what is in a vaccine.
10 BY MR. DALLER:
11       Q.    Okay.
12       A.    I mean, that's not my expertise.
13       Q.    Okay.  And what about the difference of them
14 in terms of what each is?
15             To make it simple, you have a Dodge car in one
16 hand; you have a Ford in the other.  They're different.
17 Okay?
18       A.    Mm-hmm.
19       Q.    Do you, yourself, have any understanding as to
20 whether the flu vaccine is different than the COVID
21 vaccine itself?
22       A.    I do understand that that there are some
23 differences.
24       Q.    Okay.  And what's your understanding about
25 whether those differences can lead to different results

---

- - - - -

1 in terms of somebody's willingness to take the vaccine?
2  A.  **Would you restate that question for me?**
3  Q.  Sure.  You stated that there are some
4 differences; correct?
5  A.  **Yes.**
6  Q.  Okay.  And the people, when they look at those
7 differences, may make a different decision as to whether
8 or not they'll take one vaccine versus the other;
9 correct?
10  A.  **Yes.**
11  Q.  Okay.  Do you have an opinion as to those
12 actions and their applicability to a sincerely-held
13 religious belief that "I cannot take the vaccine," the
14 COVID vaccine?
15       MR. HENNESSY:  I'm going to object to
16 form.
17       But if the witness can answer, go ahead.
18       THE WITNESS:  I'm sorry.  I didn't fully
19 understand the last part of that question.
20 BY MR. DALLER:
21  Q.  Do you believe that somebody who takes the flu
22 vaccine would have a legitimate reason not to take the
23 COVID-19 vaccine?
24  A.  **Yes.**
25  Q.  You do?  Okay.  All right.

---

- - - - -

1       MR. DALLER:  And, Patrick, if we can just
2 pull up -- it's a file, e-mails of August 10th and 11th,
3 that file.  Keep this one handy.  I just want to jump
4 over to another one for a minute.
5       THE VIDEOGRAPHER:  (Indicating.)
6       MR. DALLER:  All right.  And if you go to
7 the next page of that, I believe it's a three-page
8 document.
9       THE VIDEOGRAPHER:  (Indicating.)
10       MR. DALLER:  There you go.
11 BY MR. DALLER:
12  Q.  So just for orientation, Reverend, this is an
13 e-mail that was sent to all employees at Main Line
14 Health.  It looks like maybe Riddle, your medical staff,
15 and whatever CWR is, and it was sent by a Kathleen Allan
16 on behalf of Jack Lynch?
17  A.  **Mm-hmm.**
18  Q.  And if you go down to the next to the last
19 paragraph on the page that starts as, "Just as we
20 allow..."
21  A.  **Mm-hmm.**
22  Q.  Okay.  And the second sentence there that
23 talks about, "If you are exempt from flu vaccination,
24 this does not mean that you are exempt from COVID-19
25 vaccination"; correct?

---

- - - - -

1  A.  **Correct.**
2  Q.  Okay.  And I think -- would you agree that
3 this statement kind of reinforces what we were just
4 talking about, that one doesn't necessarily correlate to
5 the other?
6       MR. HENNESSY:  Objection to form.
7       THE WITNESS:  I think it's a reminder that
8 people would have to apply separately.
9 BY MR. DALLER:
10  Q.  Mm-hmm.
11  A.  **And I think it's a dangerous step if they**
12 **don't know that they should reapply.  They could have**
13 **easily just assumed otherwise.**
14  Q.  Okay.  I think you can -- I mean, if you are
15 going to be exempt automatically because you're exempted
16 from the flu vaccine, then this sentence has no purpose;
17 correct?
18       MR. HENNESSY:  Objection.
19       THE WITNESS:  I'm sorry.  Would you say
20 the beginning of that question again?
21 BY MR. DALLER:
22  Q.  Sure.  If the organization was going to say,
23 "If you're exempt from the flu vaccine, you are going to
24 be exempt from the COVID vaccine," if that was the
25 organization's position, then this sentence would have

---

- - - - -

1 no purpose in this document; correct?
2  A.  **I would assume they would write the sentence**
3 **to the effect of what you said; that if you are exempt**
4 **for flu, then you don't need to submit an application.**
5  Q.  Okay.  But they chose to say, "If you are
6 exempt from the flu, it doesn't mean you're exempt from
7 COVID"?
8  A.  **Right.  Reminding staff to send a new**
9 **application in.**
10  Q.  Okay.  And, therefore, if you are not exempt
11 from the flu, right, would you read this to then mean
12 that you should apply for -- you know, that you can
13 apply for a COVID exemption?
14  A.  **I'm sorry.  There were too many negatives for**
15 **me.**
16  Q.  Yeah.  Unfortunately, that's the direction
17 we're going in here.
18       If something is true, then something is true.
19 Okay?
20  A.  **Mm-hmm.**
21  Q.  If something is not true, then what's on the
22 other side of the "then" is also not true; right?
23       I'm just trying to see if you -- you know, if
24 that's your interpretation of this statement.  If you
25 don't have any other interpretation of it, that's fine.

---

– – – – –

1  **A.   Yeah.  My interpretation of this statement is**
2  **that this is a new process and any religious exemption**
3  **that would be requested would have to have its own**
4  **application.**
5  Q.   Okay.  All right.  So by conclusion then, you
6  could be exempt from one and not the other?
7  **A.   Correct.**
8  Q.   Okay.  All right.
9       MR. DALLER:  Let's go back to Page 2,
10 Question 3, and if we can just blow that up.
11      THE VIDEOGRAPHER:  (Indicating.)
12 BY MR. DALLER:
13 Q.   Take a minute to review that.
14 **A.   Mm-hmm.**
15      **(The witness reviews the document.)**
16 Q.   Whenever you're ready, just let me know.
17 **A.   I'm ready.**
18 Q.   Okay.  So Ms. Gray states that she's not
19 comfortable -- correct?
20 **A.   Mm-hmm, yep.**
21 Q.   -- having genetic components that her body did
22 not create injected into her body.
23      Do you see that?
24 **A.   I do.**
25 Q.   Okay.  What was the nature of the content of

– – – – –

1  the COVID vaccines?  Do you know?
2       I mean, were they DNA?  Were they Messenger
3  RNA?
4  **A.   I understood that they were Messenger RNA.**
5  Q.   Okay.  And is Messenger RNA a genetic
6  component?
7  **A.   It is a -- yeah, it is a part of a cell.**
8  **There's a lot more complexity to it than I would be able**
9  **to explain.**
10 Q.   Okay.  But Messenger RNA, you have Messenger
11 RNA that's yours; correct?
12 **A.   Indeed, I do.**
13 Q.   Okay.  And do you know what happens to
14 Messenger RNA?
15 **A.   In general?**
16 Q.   Yeah.  I mean, you know, we can go back to,
17 like --
18 **A.   Eighth grade biology?**
19 Q.   I'm sorry?
20 **A.   Eighth grade biology?**
21 Q.   Yeah.  Is that when they teach it now?
22 **A.   That's where I learned it.**
23 Q.   Okay.
24 **A.   It's a communication source within the cell.**
25 Q.   Okay.  All right.  And it communicates about

– – – – –

1  what?
2  **A.   All sorts of things.**
3  Q.   I mean, in general, not -- you know, specific:
4  It's going to make this protein or that.
5       I mean, what does it communicate in the cell?
6       MR. HENNESSY:  Objection.  Again, this
7  witness is not a medical expert.
8       MR. DALLER:  I'm not saying she is.  I'm
9  trying to understand her understanding of what is
10 written in here, and since the statement of genetic
11 components was made, then I need to explore what her
12 understanding of that is.
13      Now, if you're willing to stipulate that any
14 decision was made based solely upon what she was told by
15 a medical person of, you know, what this statement
16 means, then that's fine.
17      MR. HENNESSY:  I'm not stipulating to
18 anything.  It's just your question was, you know, what
19 does Messenger RNA communicate within a cell, and I
20 thought she answered the question pretty well -- that it
21 communicates is the first thing -- and it seems like
22 you're trying to get to a specific thing.
23      So if you have something in mind, go ahead and
24 ask it, but this is -- that's my objection.
25      MR. DALLER:  Okay.  All right.

– – – – –

1  BY MR. DALLER:
2  Q.   Would you agree with the statement that
3  Messenger RNA is part of the genetic system in a body?
4       MR. HENNESSY:  Objection to form.
5       Go ahead.
6       THE WITNESS:  I would have to understand
7  how the terms are being used in this case.
8  BY MR. DALLER:
9  Q.   Would you defer to a medical person then in
10 terms of -- you know, if they said that Messenger RNA is
11 not part of the genetic system, if you were told that,
12 would you say, "Okay, it's not"?
13 **A.   I, you know, would hold that intention with**
14 **the readings that I would do if I was in that situation.**
15 Q.   Okay.  Now, did you believe, at the time when
16 you evaluated Ms. Gray's request, that statement
17 that if you are vaccinated, if you received a vaccine,
18 you're having a genetic component injected into your
19 body, did you believe that to be inaccurate?
20 **A.   Did you say "inaccurate"?**
21 Q.   Inaccurate, correct.
22 **A.   I don't know.  I don't know.  I don't know if**
23 **I can answer that.**
24 Q.   Because you don't recall?
25 **A.   I don't recall.**

_ _ _ _ _

1    Q.    Okay.  As you sit here today, do you believe
2    that having the vaccine would result in a genetic
3    component being injected into your body?
4        A.    **I would have to understand how somebody is**
5    **deciding genetic components.**
6        Q.    Okay.  So is it fair to say that if you
7    required that definition now, you probably would have
8    required that definition back then?
9        A.    **Yes.**
10       Q.    Okay.  And is it fair to say that you relied
11   upon -- I believe you said the medical person on the
12   committee today that you reviewed Mrs. Gray's exemption
13   request was Dr. Burke?
14       A.    **For medical information?**
15       Q.    Yes.
16       A.    **Yes.**
17       Q.    Was Dr. Marchant present at all?  Do you know?
18       A.    **I don't recall.**
19       Q.    Okay.  And, in fact, you know, sort of in
20   followup to Question 3 that asks, "Does it impact all of
21   them" -- all vaccines, right? -- Mrs. Gray actually
22   stated that if there was a vaccine that did not, you
23   know, use a genetic component, she would consider it.
24       Is that not what she said?
25       A.    **She did say that.**

_ _ _ _ _

1    Q.    Okay.  All right.  In terms of Question 4
2    where she talks about -- I believe the question was,
3    "Have you ever applied for a religious exemption
4    before."  Okay?  And she wrote what she has, Page 4,
5    Question 5, you know, whether she's been approved for
6    any other --
7        A.    **Mm-hmm.**
8        Q.    Okay.  And Question 4 talks about other
9    vaccines, in general, and, you know, I think it was kind
10   of a -- I don't even see a place for an answer for
11   Question 4 in terms of yes/no.  If you didn't answer it,
12   then it was assumed that you never got a vaccine
13   exemption.
14       But Question 5 is for any religious
15   accommodation, in general.  Okay?  And she writes
16   that --
17            MR. DALLER:  If you can blow that up,
18   Patrick.
19            THE VIDEOGRAPHER:  (Indicating.)
20   BY MR. DALLER:
21       Q.    So she hasn't officially requested it, but
22   because of patient decisionmaking, you know, how -- she
23   works in the emergency room, as you're aware; correct?
24       A.    **Yeah.**
25       Q.    So you can't really -- emergency rooms, you

_ _ _ _ _

1    never know what's going to happen.  So you can't always
2    predict or plan for something.
3        Would you agree with that?
4        A.    **I agree.**
5        Q.    Okay.  So, yeah, that's right.  I mean, you
6    support the American Constitution; correct?
7        A.    **I do.**
8        Q.    Yeah.  So when somebody comes in, there might
9    be circumstances where, because of her religious
10   beliefs, she cannot participate in the care of an
11   individual; correct?
12            MR. HENNESSY:  Objection to form.
13            THE WITNESS:  Yes.
14   BY MR. DALLER:
15       Q.    I think you answered.  I just didn't hear it.
16       A.    **Because of her religious beliefs.**
17       Q.    Correct.
18       A.    **She could not participate in the care of**
19   **certain patients.**
20       Q.    Correct.
21       A.    **Is what she indicated here.**
22       Q.    Okay.  And you would agree that that's
23   certainly a possibility for people who have religious
24   beliefs; correct?
25       A.    **Yes.**

1    Q.    Okay.  And, in fact, I think she gave a couple
2    of examples; right?
3        The first is somebody -- or the second one --
4    comes in for Plan B; correct?
5        A.    **That is one of the examples she gives.**
6        Q.    Okay.  Or somebody who required an abortion;
7    correct?
8        A.    **That's what she states, yes.**
9        Q.    And then -- and she relies on her colleagues
10   for that; correct?
11       A.    **Yes.**
12       Q.    Okay.  And then she says that she's actually
13   also switched assignments when she believes that she
14   might be too emotional to care for an individual;
15   correct?
16       A.    **Yes.**
17       Q.    Okay.  Is that statement to you a problem in
18   terms of the religious nature of why she does this?
19       A.    **Sorry.  What is the question?**
20       Q.    Sure.  Is that statement about switching
21   assignments because she's too emotional, okay, is that a
22   problem in terms of being an explanation of a religious
23   belief as opposed to just a personal preference?
24       A.    **No.  Just additional information.**
25       Q.    Okay.  All right.  Because, in fact, I think

– – – – –

1  if you look at the sentence before, it talks about
2  abortion or Plan B; right?
3         Those are proactive care situations, correct,
4  where a person comes in and says, "I think I might be
5  pregnant. I either, A, want an abortion, or B" -- you
6  know, "The conception is relatively recent. Therefore,
7  I want to take the Plan B medicine?"
8         That's a proactive thing; correct?
9         MR. HENNESSY: Objection to form.
10        THE WITNESS: I probably wouldn't qualify
11  it as proactive. You can be proactive for some things
12  but sort of reactive to others.
13  BY MR. DALLER:
14    Q.    In terms of a required action, if somebody
15  wants an abortion or they want to take Plan B, right,
16  they need something at that point; correct?
17        They either need a surgical procedure or they
18  need a medication to be administered to them; correct?
19    A.    Yes.
20    Q.    Okay. In terms of somebody who's having a
21  miscarriage already, okay, which is where she refers to
22  the emotionality of the circumstance, okay, somebody who
23  presents to the emergency room already, that's not
24  really seeking care to have a miscarriage; correct?
25    A.    **It's sort of complicated in the case of**

– – – – –

1  **miscarriages. There are some treatments that sometimes**
2  **need to happen to ensure that someone doesn't end up**
3  **infected or further harmed.**
4    Q.    Correct. But in terms of if somebody is
5  having a miscarriage, okay, somebody doesn't come into
6  the emergency room and say, "I want to have a
7  miscarriage"; correct?
8    A.    **No. Most would not use that language.**
9    Q.    Okay. So my point is is that there is a
10  difference between the patients that are described in
11  having an abortion or wanting an abortion or those who
12  want Plan B as one group and the other group being those
13  patients who are, unfortunately, suffering a
14  miscarriage; correct?
15        You would say that they're different?
16    A.    **There's a lot of complexity in all of these**
17  **cases.**
18    Q.    Okay. I mean, there's certainly emotional
19  complexities, but I think just from a pure medical
20  perspective, would you agree that those are probably two
21  different patient categories?
22    A.    **There are a lot of very emotional individuals**
23  **who are torn about abortion or Plan B. There are many**
24  **reasons why they have come to that place.**
25    Q.    Okay.

– – – – –

1    A.    **So I would say that I've seen people have**
2  **miscarriages and feel a sense of relief; I've seen**
3  **individuals go through abortion and have grief that**
4  **lasts deep into their elderly years.**
5    Q.    Okay.
6         MR. DALLER: Let's move on to Page 4,
7  Question 7.
8         THE VIDEOGRAPHER: (Indicating.)
9  BY MR. DALLER:
10    Q.    And this question of the prompt is how taking
11  the COVID vaccine negatively affects your purpose in
12  life or death?
13    A.    **Mm-hmm.**
14    Q.    And Ms. Gray says that throughout her life,
15  she's had "a consistent approach and genuine conviction
16  about medical invasion that seeks to alter how God
17  created me." Okay?
18        Do you see any relationship -- or what's your
19  understanding of the relationship between what she
20  expressed regarding hormonal therapy, artificial
21  insemination, and in vitro fertilization and the COVID
22  vaccine?
23        Do you see any connection?
24    A.    **I would have to work with what she states, and**
25  **she hasn't stated that clearly. I would not want to**

– – – – –

1  **make an assumption.**
2    Q.    Okay. So did she not state that she could not
3  take hormones, artificial insemination, and in vitro
4  fertilization?
5    A.    **She did state that, yeah.**
6    Q.    Okay. And did she not relate that to a
7  scriptural reason why she couldn't do it, about being
8  fearfully and wonderfully made and how God had ordained
9  everything for her in her life if she was going to have
10  children versus if she was not?
11        Is that not what she stated in the first
12  paragraph?
13    A.    **She did state her beliefs around conception.**
14    Q.    Okay.
15    A.    **And birth.**
16    Q.    Okay. You believe that that belief is limited
17  to conception issues?
18    A.    **That's where we have the most detail about the**
19  **connection between the practice and the religious**
20  **background.**
21    Q.    Okay. And then when she's prompted for,
22  "Explain how this affects my purpose in life and death,"
23  essentially, right, she goes on to say that she has had
24  a consistent approach about medical invasion; correct?
25    A.    **She does state that, yes.**

---

Rev. Casey Bien-Amie - by Mr. Daller                    62

－ － － － －

1    Q.    "That seeks to alter how God created me";
2  correct?
3    A.    **She does say that, yes.**
4    Q.    Okay.  If God created her not to have
5  children, would in vitro fertilization, hormones, and
6  artificial insemination go against God's design for her?
7          MR. HENNESSY:  Objection to form.
8  BY MR. DALLER:
9    Q.    You can answer.
10   A.    **That could be her interpretation of that.**
11   Q.    Okay.  So whose spiritual belief is at issue
12 in a religious exemption?
13   A.    **We're just looking at what the individual**
14 **tells us.  All we have is to look at the document they**
15 **give us or that of their religious leader.**
16   Q.    Okay.  And she told you that; no?
17         MR. HENNESSY:  Objection to form.
18 BY MR. DALLER:
19   Q.    You said that she told you that she can't take
20 hormones, AI, or IVF because of her interpretation of
21 Psalm 139 and how this is a conviction about medical
22 invasion.
23         The totality of her document says that;
24 correct?
25         MR. HENNESSY:  Objection to form.

EXLER REPORTING
412-221-4007

---

Rev. Casey Bien-Amie - by Mr. Daller                    63

－ － － － －

1          THE WITNESS:  Her statement in Question
2  one speaks to the connection between her religious
3  beliefs and her practices around conception.
4  BY MR. DALLER:
5    Q.    Okay.
6    A.    **But we don't have the specifics here about**
7  **what medical invasion means to her because she does take**
8  **other vaccines and does engage in other medical**
9  **interventions.  So I would need the tie here.**
10   Q.    So in Question 4 -- oh, I'm sorry -- Page 2,
11 Question 3 she says, "I'm not comfortable having genetic
12 components that my body did not create injected into
13 me."  Okay?
14         we've said that the COVID vaccines have a
15 genetic component.  I mean, they're Messenger RNA, okay,
16 and it's injected into her; correct?
17   A.    **Yes.**
18   Q.    Okay.  And, you know, I mean, she acknowledges
19 she's not opposed to vaccines; correct?
20   A.    **She does acknowledge that, yeah.**
21   Q.    Mm-hmm, okay.  But a vaccine, in her belief
22 system, changes God's creation of her in some way.  That
23 is what she's opposed to; correct?
24         MR. HENNESSY:  Objection.
25 BY MR. DALLER:

EXLER REPORTING
412-221-4007

---

Rev. Casey Bien-Amie - by Mr. Daller                    64

－ － － － －

1    Q.    You can answer.
2    A.    **We don't really have that information here.**
3  **So bringing the whole thing into one document, we have**
4  **that she has objection to genetic material, as she says,**
5  **but we don't actually have a statement about why, what**
6  **about genetic material she is opposed to, and we don't**
7  **really get that until the pastor's statement, which is a**
8  **fear of it altering her own DNA.**
9    Q.    Well, now, if somebody said at the time that
10 the COVID vaccine alters DNA, would you have accepted
11 that statement?
12   A.    **That seems sort of out of context.  It's hard**
13 **to --**
14   Q.    Well, you're the one who brought it up.  So, I
15 mean, that's why I'm asking.
16   A.    **I would have to take it in context, even in my**
17 **own example.**
18   Q.    In fact, that's actually one of the supposed
19 falsehoods that were promulgated about the vaccine, that
20 it alters someone's DNA; correct?
21   A.    **Yeah.**
22   Q.    Yeah.  So as you read the totality of
23 Ms. Gray's exemption request, is she saying that it
24 alters her DNA?
25   A.    **She doesn't give us very much to work with**

EXLER REPORTING
412-221-4007

---

Rev. Casey Bien-Amie - by Mr. Daller                    65

－ － － － －

1  here.
2    Q.    Well, she also describes not taking, what I
3  think we agreed upon, was manipulative treatments to her
4  genetic system; right:  hormones, AI, and artificial --
5  in vitro fertilization.
6          Those treatments manipulate the body, correct,
7  to do something that the body wasn't doing?  It wasn't
8  getting pregnant now, was it?
9    A.    **Those are three different treatments, and they**
10 **treat different components of the body, and so...**
11   Q.    Well, what's the purpose of those treatments?
12   A.    **When used in the context that she's talking**
13 **about, yes, they are used to get pregnant.**
14   Q.    Correct.
15   A.    **It doesn't -- some have components that**
16 **change -- that impact the body, but artificial**
17 **insemination, for example, I don't -- other than**
18 **assisting with the physicality of getting the pieces**
19 **together often doesn't -- it depends on the situation.**
20 **But these are three different modalities to**
21 **assist with getting pregnant.**
22   Q.    Okay.  Let me ask you this:  If Ms. Gray said
23 that, "I cannot participate in the care of transgenders
24 because of the hormonal manipulation and that that
25 violates my sincerely-held beliefs," how would you view

EXLER REPORTING
412-221-4007

---

– – – – –

1  that exemption request?

2       MR. HENNESSY:  Object to form.

3       THE WITNESS:  I would need more

4  information for the situation.  So...

5  BY MR. DALLER:

6       Q.    What information do you think you need?

7       **A.    So in this hypothetical, she would be a nurse**

8  **in an emergency department and would want the ability to**

9  **reject anybody who is transgender from receiving**

10 **lifesaving medical intervention?**

11      Q.    No.  She would be saying, "I cannot

12 participate in the administration of these agents to an

13 individual because it impacts my sincerely-held

14 religious beliefs."

15      **A.    So in this case, it would be an inpatient who**

16 **is getting some other treatment?  Because she's not**

17 **working for a facility that engages in supporting**

18 **transgender people because that would be an**

19 **inappropriate job, I imagine.**

20      Q.    Mm-hmm.

21      **A.    So a patient receiving medical care for**

22 **something else also needs their hormone injections**

23 **during her shift?**

24      Q.    Okay.

25      **A.    Is that the situation that we're --**

– – – – –

1       Q.    Let's look at that situation.

2       If she said, "I cannot administer that

3  injection," would that be a problem?

4       **A.    You know, I don't know.  I'm not a lawyer, so**

5  **I don't know what the law is regarding that.**

6       **I think it would also have to do with would**

7  **this harm the patient, or is it something that is a**

8  **reasonable switch.**

9       Q.    Okay.

10      **A.    Or, you know, just that she received support**

11 **from her colleagues to not care for patients who had**

12 **abortions.**

13      Q.    Okay.  All right.  Or the Plan B?  You'd put

14 it kind of on that level; correct?

15      **A.    I would need more information about it, but at**

16 **first glance, that seems consistent.**

17      Q.    All right.  And continuing on, "consistent

18 approach and genuine conviction about medical invasion,"

19 do you agree that hormonal therapy and artificial

20 insemination and in vitro fertilization are invasive to

21 the body?

22      **A.    I guess it depends on the individual.  Some**

23 **find it to be more invasive than others.**

24      Q.    It is a manipulation, however; correct?

25      **A.    Much of medicine is some form of manipulation.**

– – – – –

1       Q.    And you see how her beliefs, in terms of the

2  application to life and death, is that it alters how God

3  made her; correct?

4       **A.    In...?  Which are we talking about right now?**

5       Q.    Page 4, Question 7, first line.

6       **A.    We're talking about the vaccine?**

7       Q.    Well, I mean, she wrote -- everything she

8  wrote about was prompted by why don't you want to take

9  the vaccine.

10      So, you know, I'm trying to understand why she

11 did -- why you didn't believe that she made the link

12 from her beliefs to why she can't take the vaccine.

13      That's what I'm trying to understand here.

14      **A.    There are many ways in which medicine**

15 **manipulates the body, whether we're taking Tylenol or**

16 **getting, you know, a Whipple.**

17      **You know, like, there's many different ways in**

18 **which we are treated.**

19      Q.    Mm-hmm.

20      **A.    We don't have the statement about what -- that**

21 **if it is a fear that these will change the DNA, that's**

22 **not true about the vaccine, as far as I know.**

23      Q.    Correct.  Correct.  And did she make that

24 statement?

25      **A.    She does not directly but then submits her**

– – – – –

1  **pastor's letter, which I believe is more direct in that**

2  **statement.**

3       Q.    Okay.  Well, we'll get to that in a minute.

4       And then she talks about her "body is a temple

5  of the Holy Spirit"; correct?

6       **A.    Yes.**

7       Q.    And that she is to honor God by -- with her

8  body, caring for her body; correct?

9       **A.    Yes.**

10      Q.    Because her body is made -- I believe she said

11 it earlier -- in the image of God; correct?

12      MR. HENNESSY:  I'm going to object to

13 form.

14      THE WITNESS:  I believe it says that.

15 BY MR. DALLER:

16      Q.    Okay.  All right.

17      MR. DALLER:  Let's take a look at the

18 pastor's statement, which is the typewritten Page 5.

19      THE VIDEOGRAPHER:  (Indicating.)

20 BY MR. DALLER:

21      Q.    If you want to take a minute to review this,

22 my first question is going to be do you acknowledge that

23 this is Pastor Fletcher's statement that would have

24 accompanied her application?

25      **A.    Yes.  I had it in a handwritten form, but,**

- - - - -
1  yes.
2      Q.    Oh.  Okay.  At least you can see it in the
3  form which is, I think, a lot more easy to read.
4      A.    I appreciate that.
5      Q.    Okay.  And now earlier you had referenced
6  this, that it seemed to clarify some thought for you or
7  belief for your understanding for you.
8           Can you describe what you're referring to?
9      A.    It's near the end of the first paragraph.
10     Q.    Mm-hmm.
11     A.    "Confident that God has determined the precise
12  physiological makeup of each individual.  She believes
13  that the functions of the present COVID-19 vaccines
14  would alter the genetic makeup of her body."
15     Q.    Okay.  So the pastor wrote that; correct?
16     A.    Yes.
17     Q.    Okay.  And are parts of what the pastor wrote
18  contained within Ms. Gray's statement, or is the
19  entirety of what he wrote contained within her
20  statement?
21     A.    Well, what do you mean by that question?
22     Q.    Okay.  Well, "Confident that God has
23  determined precise physiological makeup of each
24  individual person," is that something that we can fairly
25  interpret to be present in Ms. Gray's narratives?

- - - - -
1           MR. HENNESSY:  Objection to form.
2           THE WITNESS:  It is a similar language.
3  BY MR. DALLER:
4      Q.    She uses similar language, okay.
5           And then she believes that the "...functions
6  of the present COVID vaccine..." correct?
7      A.    Mm-hmm.
8      Q.    Okay.  And he used the word "functions";
9  correct?
10     A.    He uses the word "functions," yes.
11     Q.    Okay.  Did Ms. Gray, either directly or
12  indirectly, use "functions" in her --
13     A.    I would have to look back up at the full
14  document.
15     Q.    Mm-hmm.  So on Page 2, Question 1, she says,
16  "We went through the testing to determine if there was a
17  structural or hormonal issue"; correct?
18     A.    In Question 1?  Yes.
19     Q.    Yes.  Okay.  All right.  And structure is
20  makeup, if you will; right?  Anatomy?
21           I mean, a structure does not, in and of
22  itself, give function?  I mean, function can result from
23  it but...
24           Have you ever taken anatomy and physiology?
25     A.    I did, yeah.

- - - - -
1      Q.    Okay.  What was anatomy?
2      A.    The parts of the body.
3      Q.    Okay.  And then what's physiology?
4      A.    How they chemically work together.
5      Q.    Okay.  So he says that, you know, "...she
6  believes that the function..."; correct?
7      A.    She states that -- he states that, yes.
8      Q.    Okay.  And would you agree with her statement,
9  "...to determine whether it was structural or
10  hormonal..."?
11           Is hormonal functional?
12     A.    Would you restate that question?
13     Q.    Sure.  So hormones have a structure to them,
14  correct, a chemical structure?
15     A.    True, yes.
16     Q.    All right.  All right.  But Mrs. Gray
17  distinguishes between structure and hormonal issue,
18  correct, in her narrative?
19     A.    Yes.
20     Q.    And she also talks about "...medical
21  invasion that seeks to alter..." how God made her;
22  correct?
23     A.    I would have to double-check that, too, but
24  you're reading it.
25     Q.    Okay.  All right.  So in that perspective, an

- - - - -
1  invasion or an entry into the body of something from
2  outside, okay, do you believe that alteration is a
3  functional alteration that she's referring to, or you
4  don't know?
5      A.    I don't know if I fully understand the
6  question.
7      Q.    Sure.  Do you want to see the statement?
8  Would that help if we pull it up?
9      A.    Are you talking about the first question?
10     Q.    Page 4, Question 7, the answer to that.  I
11  think Patrick's going to get us there.
12     A.    Yep.
13     Q.    All right.
14           THE VIDEOGRAPHER:  (Indicating.)
15  BY MR. DALLER:
16     Q.    So do you see where she talks about
17  "...medical invasion that seeks to alter..."?
18     A.    Mm-hmm.
19     Q.    Correct?  Okay.
20           And earlier we had talked about hormones,
21  artificial insemination, and in vitro fertilization
22  being manipulations, if you will, of function; correct?
23     A.    Yes.
24     Q.    Okay.  So Ms. Gray, in her statement of her
25  religious beliefs as she's trying to explain this,

- - - - -
1 differentiates between structure issues, which, you
2 know, they looked at, and functional issues; right?
3          MR. HENNESSY:  Objection.
4          THE WITNESS:  I think they said structural
5 and hormonal.
6 BY MR. DALLER:
7     Q.    Right.  And we, I think, agree that these
8 hormones were manipulating the body?
9          So a hormone manipulates function; correct?
10          MR. HENNESSY:  Objection.
11 BY MR. DALLER:
12     Q.    What does a hormone do to a person who wants
13 to change their gender?
14          Does it manipulate this body?
15     A.    **Well, even if you don't want to change your**
16 **gender, your hormones are functioning in your body.**
17     Q.    Correct.  So if you have more or less of one,
18 that's gonna manipulate your body; correct?
19     A.    **I don't know if I consider my estrogen**
20 **manipulating me.**
21     Q.    Okay.  It can change you; correct?
22     A.    **In some ways, yes.**
23     Q.    Okay.  But it doesn't change your structure,
24 really, does it?
25     A.    **Well, it does.  Like that's the whole thing of**

- - - - -
1 **puberty.**
2     Q.    Okay.  And in terms of as you undergo puberty,
3 okay, there is a sequence of events that occur; correct?
4     A.    **Yes.**
5     Q.    Okay.  And those events that were going to
6 occur at puberty were determined at birth; correct?
7          MR. HENNESSY:  Objection.
8          THE WITNESS:  Yeah.  I don't --
9          MR. HENNESSY:  You know, John, as much as
10 you want to talk about how puberty -- you know, I just
11 want to remind you what I said at the beginning.  We're
12 looking at a 4:00 stop.
13          Are you on track for that?
14          MR. DALLER:  Yeah.  I think so.  I mean, I
15 think that, you know, this is very important because the
16 crux of Mrs. Gray's exemption request is the
17 interpretation of how her life experiences, going back
18 20-plus years, okay, influenced her decision, and that
19 that's the importance of it.
20          MR. HENNESSY:  I'm glad you think so
21 because I don't think so.  I think --
22          MR. DALLER:  All right.  Well...
23          MR. HENNESSY:  You put what you think; I
24 put what I think.  She hasn't said any of that.
25          MR. DALLER:  All right.

- - - - -
1 BY MR. DALLER:
2     Q.    So going back to the pastor's statement, that
3 that sentence we were looking at, "would alter the
4 specific genetic makeup of her body," did she say that
5 in her narrative?
6     A.    **She used the word "alter."**
7     Q.    Alter what?
8     A.    **I would have to look back at the -- I think it**
9 **was in Question 7.**
10     Q.    In Question... Okay.  Yeah, you're right.
11 It's Page 4, Question 7, and it states, "I have held a
12 consistent approach and genuine conviction about medical
13 invasion that seeks to alter how God made me."
14          Do you see that?
15     A.    **Wait.  It's not up here, but I recall that.**
16     Q.    Okay.  All right.  So your interpretation of
17 that statement is that she meant how -- that it would
18 change her specific genetic makeup; correct?
19     A.    **We don't have any other information about what**
20 **the alteration would be.  She accepts other vaccines.**
21     Q.    Uh-huh.
22     A.    **Which --**
23     Q.    Which is okay, we agree; correct?
24     A.    **Which also transforms how the body functions**
25 **and helps build an immune response.**

- - - - -
1          **And so if her objection to the COVID-19**
2 **vaccine is not about building an immune response, the**
3 **only information we have is that she is concerned that**
4 **it will change the genetic makeup of her body.**
5     Q.    Okay.  The flu vaccines, are you familiar with
6 what they inject into the body?
7     A.    **Specifically?  No.**
8     Q.    Okay.  Would you agree if I told you that it
9 was a protein?
10          MR. HENNESSY:  I think she answered the
11 question.
12          THE WITNESS:  Everything would be -- this
13 is old things that I remember.
14 BY MR. DALLER:
15     Q.    Okay.  So it's fair to say then that you do
16 not know, as you sit here today, the difference between
17 the flu vaccine and the COVID vaccine in terms of the
18 responses that they produce; correct?
19     A.    **I have read up on it before, but at this**
20 **moment I would not be able to articulate it fully to**
21 **you.**
22     Q.    Okay.  Do you plan on reading up on it some
23 more and articulating it at trial, then, to explain your
24 understanding?
25     A.    **I don't think that's my place.**

_ _ _ _ _

1    Q.    Okay.  All right.  So it seems that based
2  upon -- and was Pastor Fletcher's statement even needed?
3    A.    **What's needed is what is submitted by the**
4  **individual.  It's completely individual-based, whatever**
5  **they think is important to include.**
6          **If they include it, then we see it as**
7  **important because they included it.**
8    Q.    Then what about the next paragraph that
9  he writes that, "Dawn's position on the, quote,
10  'vaccine' -- I notice he uses quotes for vaccine -- "is
11  completely consistent with decisions she made decades
12  ago."
13          Okay?
14    A.    **Mm-hmm.**
15    Q.    Does that contradict your interpretation of
16  what she said regarding specific genetic makeup, as you
17  interpreted her statement?
18    A.    **He just doesn't give us enough information**
19  **about what he's referring to here.**
20    Q.    Okay.
21    A.    **I'm sure there's more stories.  They have a**
22  **long relationship of pastor and congregant.**
23    Q.    Okay.  And he's satisfied, and you said he had
24  a long relationship with her; correct?
25    A.    **If her statement is correct about how long**

_ _ _ _ _

1  **she's been a member of that church.  I don't know how**
2  **long he's been pastor.**
3    Q.    Okay.  And you had no reason to doubt that;
4  correct?
5    A.    **To doubt their pastor-congregant relationship?**
6    Q.    Mm-hmm.
7    A.    **She submitted his letter, so...**
8    Q.    All right.  So his opinion is that her
9  decision, her objection to the COVID vaccine, solidly
10  rests upon her sincerely-held faith convictions.
11          Do you see that?
12    A.    **Yes, I see that.**
13    Q.    Okay.  Do you have any reason to disagree with
14  that statement?
15    A.    **It just doesn't give me any information about**
16  **the connection.**
17    Q.    Okay.  All right.  So then if I can sort of
18  summarize what we learned from this, it was your
19  subjective interpretation of what he meant in the words
20  "would alter the specific genetic makeup of her body,"
21  that is what led you to believe that she was saying that
22  her DNA would be changed?
23          Is that a fair summary?
24          MR. HENNESSY:  I'm going to object to the
25  form.  I think her testimony stands for itself and

_ _ _ _ _

1  doesn't need to be summarized but...
2          MR. DALLER:  I'm asking her, too, because
3  we've covered a lot of different ground and, I mean, it
4  seems to be boiling down to this specific issue.
5          THE WITNESS:  I wouldn't make it just one
6  line.  I think it's the whole application taken as a
7  whole and the lack of connection that we have from her
8  religious belief to her practice of abstaining from this
9  particular vaccine.
10  BY MR. DALLER:
11    Q.    Okay.  Why don't we just go off the record for
12  a couple of minutes.  We'll be back in, say, three
13  minutes.  Let me just check my notes, and then I think
14  we can wrap up.  Okay?
15    A.    **Okay.**
16          MR. HENNESSY:  Okay.
17          THE VIDEOGRAPHER:  Going off the record at
18  3:50 p.m.
19          (Whereupon, a short recess was taken.)
20          THE VIDEOGRAPHER:  Back on the record at
21  3:55 p.m.
22  BY MR. DALLER:
23    Q.    So, Reverend, is it your testimony that there
24  was not sufficient objective information that was
25  provided by Ms. Gray, in your opinion, in this case?

_ _ _ _ _

1    A.    **I probably wouldn't phrase it that way.**
2    Q.    Okay.  How would you phrase it?
3    A.    **We did not have a clear link between the**
4  **religious beliefs and the practice of a need to abstain**
5  **from the COVID-19.**
6    Q.    Okay.  And that was in your interpretation of
7  her presentation or her exemption request; is that
8  correct?
9          MR. HENNESSY:  Objection to form.
10  BY MR. DALLER:
11    Q.    You can answer.
12    A.    **As a team, we read through and tried to make**
13  **those links.  So it's not based solely on my opinion.**
14    Q.    Okay.
15    A.    **It was looking at the guidelines of the EEOC**
16  **and trying to find a clear and consistent connection**
17  **based on the religious beliefs she did state and how it**
18  **would impact her, how it would impact the COVID-19**
19  **vaccine.**
20    Q.    Okay.  And it's your testimony that the team
21  did not see that connection; correct?
22    A.    **Yes.**
23    Q.    Okay.  And you testified that you were relying
24  upon what the EEOC kind of said that it should contain;
25  correct?

---

_ _ _ _ _

1      MR. HENNESSY:  Objection.
2  BY MR. DALLER:
3      Q.  You can answer.
4      A.  **We utilized the understanding of a consistent,**
5  **comprehensive long-held belief.**
6      Q.  Okay.  And did anybody speak to Mrs. Gray
7  about what she meant?
8      A.  **No.  Not to my knowledge.**
9      Q.  Not to your knowledge, okay.
10         So you, yourself, did not do a factual inquiry
11  into what she meant; correct?
12     A.  **A verbal or additional --**
13     Q.  Either a verbal or a written followup to her;
14  correct?
15     A.  **We only looked at what we received from her**
16  **application.**
17     Q.  Okay.  And, to your knowledge, nobody else
18  requested clarification that was a member of your team;
19  correct?
20     A.  **No.  I do not believe so.**
21     Q.  Okay.  So, really, a decision came down to
22  what you and the other members of the team thought she
23  meant with what she wrote to you; correct?
24     A.  **What she articulated.**
25     Q.  Okay.  And your interpretation of that

---

_ _ _ _ _

1  articulation; correct?
2      MR. HENNESSY:  Objection.
3  BY MR. DALLER:
4      Q.  And you can answer.
5         MR. HENNESSY:  I think she did, for the
6  record.
7         THE WITNESS:  It's what -- yeah, I don't
8  know if I have anything else that I can add.
9  BY MR. DALLER:
10     Q.  All right.  And you would agree that people
11  who read the same documents could have different
12  interpretations; correct?
13     A.  **Depending on the document, yes.**
14     Q.  Well, people have different interpretations of
15  the Bible; correct?
16     A.  **That is true.**
17     Q.  People have different interpretations of the
18  Constitution; correct?
19     A.  **That is true.**
20     Q.  Okay.  And those are somewhat subjective;
21  correct?
22     A.  **Depending on the lens in which you're looking**
23  **at them, yes.**
24     Q.  Okay.  And if somebody was to review
25  Mrs. Gray's exemption request through a different

---

1  religious lens than hers, would you believe that they
2  could come to a different conclusion?
3      A.  **I'm sorry.  If they had a different religious**
4  **tradition than she has?**
5      Q.  Mm-hmm, correct.
6      A.  **They would have a different interpretation --**
7      Q.  Mm-hmm.
8      A.  **-- than we have?**
9      Q.  Well, a different interpretation of what she
10  wrote and what your committee and group came up with?
11     A.  **It's possible.**
12     Q.  Mm-hmm, okay.  And would that be particularly
13  true if an individual had experiences with COVID that
14  might have impacted them?
15     A.  **In what way?**
16     Q.  Suppose they saw a lot of people dying from
17  COVID.
18     A.  **Wasn't that most people?**
19     Q.  I'm sorry?
20     A.  **Wasn't that most people, like, for our area?**
21     Q.  So people who saw a lot of people dying from
22  COVID would have sort of a predisposition, if you will,
23  to evaluate a COVID exemption request in a different
24  way; correct?
25         MR. HENNESSY:  Objection.

---

_ _ _ _ _

1  BY MR. DALLER:
2      Q.  You can answer.
3      A.  **I think people's -- the impact of the pandemic**
4  **has had varying impacts on people.  So I don't know if**
5  **there's a direct correlation.**
6      Q.  Okay.  But there's some correlation; correct?
7      A.  **There could be, but there's definitely**
8  **different impacts from the pandemic.**
9      Q.  Okay.  All right.
10         MR. DALLER:  Brendan, do you have
11  anything?
12         MR. HENNESSY:  Nope.
13         MR. DALLER:  All right.  That's all I
14  have.
15         Thank you very much, Reverend.  I appreciate
16  your time.
17         THE WITNESS:  No problem.  Thank you.
18         MR. DALLER:  You have a great day.
19         THE WITNESS:  You too.
20         THE VIDEOGRAPHER:  This concludes the
21  videotaped deposition via Zoom of Casey Bien-Amie.  Off
22  the record at 4 p.m.
23         (Signature waived.)
24         (Whereupon, the above-entitled matter was
25  concluded at 4:00 p.m.)

---

```
 1   COMMONWEALTH OF PENNSYLVANIA     )

 2   COUNTY OF WESTMORELAND           )

 3
              I, Pamela J. Rose, a notary public in and
 4   for the Commonwealth of Pennsylvania, do hereby certify
     that the witness, REV. CASEY BIEN-AMIE, was by me first
 5   duly sworn to testify the truth, the whole truth, and
     nothing but the truth; that the foregoing videotaped
 6   Zoom deposition was taken at the time stated herein; and
     that the said videotaped Zoom deposition was recorded
 7   stenographically by me and then reduced to typewriting
     under my direction, and constitutes a true record of the
 8   testimony given by said witness, all to the best of my
     skill and ability.
 9
              I further certify that the inspection,
10   reading and signing of said videotaped Zoom deposition
     were waived by counsel for the respective parties.
11
              I further certify that I am not a
12   relative, or employee of either counsel, and that I am
     in no way interested, directly or indirectly, in this
13   action.

14            IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office this 13th day of
15   September, 2023.

16

17            Pamela J. Rose
     _____
18            Pamela J. Rose, RPR, Notary Public

19
              COMMONWEALTH OF PENNSYLVANIA
20                   NOTARIAL SEAL
                Pamela J. Rose, Notary Public
21                 Westmoreland County
            My commission expires September 25, 2024
22              Commission Number 114070
23
24
25
                   EXLER REPORTING
                    412-221-4007
```

# EXHIBIT G

1

— — — — —

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                    — — — — —

3
DAWN GRAY,                    )  Civil Action
4                             )  No.
          Plaintiff,          )  2:23-cv-00263-KNS
5                             )
     vs.                      )
6                             )
MAIN LINE HOSPITALS, INC.,    )
7                             )
          Defendant.          )
8                             )
                              )
9

10

11                   — — — — —

12   VIDEOTAPED ZOOM DEPOSITION OF JENNIFER BURKE, D.O.

13            Friday, August 18, 2023
                     — — — — —
14

15

16

17

18

19

20

21

22

23                   — — — — —

24   ELECTRONIC DISTRIBUTION, FORWARDING OR REPRODUCTION OF
      THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION
25             FROM THE CERTIFYING AGENCY
                     — — — — —

EXLER REPORTING
412-221-4007

2

1    VIDEOTAPED ZOOM DEPOSITION OF JENNIFER BURKE, D.O.,
2   a witness herein, called by the Plaintiff for
3   examination, taken pursuant to the Federal Rules of
4   Civil Procedure, by and before Margaret J. Exler, a
5   Registered Professional Reporter and Notary Public in
6   and for the Commonwealth of Pennsylvania, held remotely
7   with all participants appearing via Zoom, on Friday,
8   August 18, 2023, at 8:32 a.m.
9                    _ _ _ _ _
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXLER REPORTING
412-221-4007

---

3

1   APPEARANCES:
2   For the Plaintiff:
3       **JOHN A. DALLER, ESQUIRE**
        Daller Law Firm
4       P.O. Box 162
        510 Pittsburgh Street
5       Mars, PA 16046
        724-201-2050
6       johndaller@daller-law.com

7   For the Defendant:

8       **BRENDAN HENNESSY, ESQUIRE**
        Hennessy Law Firm
9       101 Lindenwood Drive, Suite 225
        Malvern, PA  19355
10      484-875-3111
        bhennessy@hennessylawfirm.com

11  Also Present:

12      **KAREN BEGLEY, VIDEOGRAPHER**
        Litigation Advantage, LLC
13      4411 Gibsonia Road, Suite 5
        Gibsonia, PA  15044
14      412-486-3325
        kbegley@litadvantage.com

15
16  Dawn Gray, Plaintiff
17
18
19
20
21
22
23
24
25

EXLER REPORTING
412-221-4007

---

4

1                    _ _ _ _ _
                   I N D E X
2                    _ _ _ _ _

3       WITNESS:  JENNIFER BURKE, D.O.
4
5   E X A M I N A T I O N:              PAGE
6
7    BY MR. DALLER                        6
8
9
10  E X H I B I T S:                 PAGE
11
12   NO. 1 - FREQUENTLY ASKED QUESTIONS  25
13
14  (WHEREUPON, EXHIBIT NO. 1 WAS RETAINED BY COUNSEL.)
15
16
17
18
19
20
21
22
23
24
25

EXLER REPORTING
412-221-4007

---

5

1                    _ _ _ _ _
                  P R O C E E D I N G S
2                    _ _ _ _ _
3           THE VIDEOGRAPHER:  All right.  Good
4   morning.  My name is Karen Begley, and I am a legal
5   videographer for Litigation Advantage.
6           Today's date is August 18th, 2023, and the
7   time is approximately 8:32 a.m.
8           We are taking the videotaped deposition via
9   Zoom of Jennifer Burke, D.O., member of Main Line Health
10  Religious Exemption Committee, in the case of Dawn Gray
11  versus Main Line Hospitals, Inc.
12          This case is filed in the United States
13  District Court for the Eastern District of Pennsylvania,
14  Number 2:23-cv-00263-KNS.
15          Our court reporter today is Megan Exler from
16  Exler Reporting.
17          Will counsel please identify yourselves,
18  beginning with the noticing attorney, state whom you
19  represent, and our court reporter will then swear in our
20  witness.
21          MR. DALLER:  John Daller representing
22  Plaintiff, Dawn Gray.
23          MR. HENNESSY:  I'm Brendan Hennessy
24  representing Defendant, Main Line Hospitals, Inc.
25                   _ _ _ _ _

EXLER REPORTING
412-221-4007

6

Jennifer Burke, D.O. - by Mr. Daller

– – – – –
1            JENNIFER BURKE, D.O.,
2  a witness herein, having been first duly sworn, was
3  examined and testified as follows:
4               EXAMINATION
5  BY MR. DALLER:
6     Q.   All right.  Good morning, Dr. Burke.  How are
7  you today?
8     **A.   I'm fine.  How are you?**
9     Q.   Very well.  Thank you.  Just a couple of
10  housekeeping things:  I'm going to be asking you some,
11  you know, questions today to see what your understanding
12  of some of the issues are, you know, in this case and
13  how you might testify at trial.
14         Because of the technology, a couple of things
15  can happen:  Number one is we can talk over each other
16  because we're not in the same room.  There's a time lag.
17  I think you've stopped talking.  You think I've stopped
18  talking.  If that happens, please feel free to just tell
19  me, you know, "I wasn't finished" or something along
20  those lines.
21         Agree?
22     **A.   Agree.**
23     Q.   Okay.  The second is that Megan is recording
24  everything and transcribing it, so it's important that
25  we use words and not nods and, you know, sounds.  Okay?

7

Jennifer Burke, D.O. - by Mr. Daller

– – – – –
1  Which we all do in normal conversation.
2         Agree?
3     **A.   Understood.**
4     Q.   Okay.  And if I ask a question and you do not
5  understand the question, please ask me to clarify it
6  because, otherwise, I will assume that you're answering
7  it the way I intended it to be asked.
8         Okay?
9     **A.   Okay.**
10     Q.   All right.  And if you, certainly, need a
11  question clarified, please feel free to ask me to do so.
12     **A.   I will.**
13     Q.   All right.  Now, are you taking any type of
14  prescription or nonprescription medications today that
15  could impair your ability to understand my questions and
16  answer completely and truthfully?
17     **A.   I'm not.**
18     Q.   Okay.  And when did you have an alcoholic
19  drink last?
20     **A.   Beginning of May.**
21     Q.   Okay.  If you need a break, let me know.  I
22  would just ask that, you know, you finish answering the
23  question that's pending beforehand.
24         I don't anticipate us being here, you know,
25  for more than about an hour, hour half and a half,

8

Jennifer Burke, D.O. - by Mr. Daller

– – – – –
1  though.  Okay?
2     **A.   Okay.**
3     Q.   All right.  Have you ever been deposed before?
4     **A.   I have.**
5     Q.   You have.  Have any of those cases been in
6  regards to determination of a religious exemption
7  request?
8     **A.   Yes.**
9     Q.   Okay.  Can you tell me the names of the case?
10     **A.   My God.  They just went out of my head.**
11  **Rachel, and the first one was -- shoot.**
12         THE WITNESS:  I told you yesterday,
13  Brendan.
14         MR. HENNESSY:  You can only testify to
15  what you can remember.
16         THE WITNESS:  Sorry.
17         Rachel, and the other one I don't remember her
18  name right now.
19  BY MR. DALLER:
20     Q.   Okay.  Did they deal with COVID?
21     **A.   Yes.**
22     Q.   Okay.  And your involvement was also as a
23  member of the Religious Exemption --
24     **A.   Yes.**
25     Q.   -- Committee?  Okay.  All right.

9

Jennifer Burke, D.O. - by Mr. Daller

– – – – –
1         And where do you work?
2     **A.   I work at Riddle Hospital.**
3     Q.   Okay.
4     **A.   In Maryland.**
5     Q.   Okay.  And what do you do there?
6     **A.   I'm a palliative physician.**
7     Q.   Okay.  And how long have you been there?
8     **A.   I've been at Riddle since 2015 full-time.**
9     Q.   Okay.  And what did you do prior to that?
10     **A.   I was a hospital- -- I was an ICU hospitalist**
11  **at Paoli until 2009 until I became a full-time**
12  **palliative doctor at Riddle.**
13     Q.   Okay.  And did you know Mrs. Gray prior to her
14  submission of a religious exemption request?
15     **A.   I do not believe so.**
16     Q.   Okay.  And have you done any specific training
17  in determining whether or not a religious exemption
18  request should be granted or shouldn't it?
19         You know, in other words, the criteria that
20  one might use?
21     **A.   Not specific training.**
22     Q.   Okay.  What nonspecific training might have
23  you done?
24     **A.   I have a master's in bioethics.**
25     Q.   Okay.

10

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    A.    Or a master's -- I have a master's certificate
2  in bioethics.
3    Q.    Okay.  All right.  And -- now, did you have
4  any role at all in the development or creation of Main
5  Line Health's COVID-19 vaccine policy?
6    A.    No.
7    Q.    No, okay.  So your role in it was solely to
8  the extent of participating on the Exemption Request
9  Committee; is that correct?
10   A.    Correct.
11   Q.    Okay.  And did you personally care for
12 patients with COVID?
13   A.    I did.
14   Q.    Okay.  Can you tell me about that experience?
15   A.    It was a long time and we saw a lot of
16 patients that were very sick and a lot of them died.
17   Q.    Okay.  Did that influence your beliefs about
18 whether somebody should or should not take the vaccine?
19   A.    Not at all.
20   Q.    It did not, okay.
21        So do you have any medical opinion as to
22 whether they should or should not take the vaccine?
23   A.    I believe that vaccinating yourself will
24 protect yourself, your family and patients.
25   Q.    And did you -- when you considered people's

EXLER REPORTING
412-221-4007

11

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1  religious exemption requests, can you tell me what
2  process you went through yourself, what things you
3  thought of in terms of whether or not a religious
4  exemption request should be granted?
5    A.    We looked at exactly what the patient -- what
6  the person said and we looked at what we believe to be
7  the rules which were, you know, it had to be a
8  long-standing, deeply-held religious belief.
9    Q.    Okay.  So you looked at what they said?
10   A.    Correct.
11   Q.    And did you -- let's think just for a moment
12 specifically about Ms. Gray's in terms of your
13 recollection of it.  Okay?
14        We will go through her actual exemption
15 request later, but right now I'm trying to understand
16 what is that you believe you recall, that type of thing.
17 Understood?
18   A.    From the meeting or --
19   Q.    Just kind of in general about her request.
20        So did you under- -- do you believe you
21 understood everything that she had wrote?
22   A.    I would have to look at it again.
23   Q.    Okay.  All right.  And is long-standing a
24 requirement for a belief?
25   A.    Absolutely.

EXLER REPORTING
412-221-4007

12

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    Q.    It is, okay.  And are you familiar with the
2  tenets of nondenominational Christianity?
3    A.    No more familiar than I am with any other
4  religion I do not practice.
5    Q.    Okay.  And you would agree, then, that a
6  religion can have beliefs unto itself, correct?
7    A.    Specifically, sure.
8    Q.    Okay.  And you would believe that those
9  beliefs are no more or less valid just because somebody
10 else has a different belief, correct?
11        MR. HENNESSY:  I'm going to object to the
12 form.  I'm not sure I understand it, but the witness can
13 answer.
14        THE WITNESS:  Could you -- could you
15 repeat -- could you clarify the question?
16 BY MR. DALLER:
17   Q.    Sure.  The fact that you may have different
18 beliefs than somebody else's beliefs in their religion,
19 that does not invalidate their beliefs, does it?
20   A.    It does not.
21   Q.    Okay.  And are you familiar with the concept
22 of salvation?
23   A.    I am.
24   Q.    Can you describe to me what your concept of
25 salvation is?

EXLER REPORTING
412-221-4007

13

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    A.    My concept is that Jesus died for me and I am
2  saved.
3    Q.    Okay.  And you broke off at the end.
4        Did you say and because of that you are saved?
5    A.    I said "and I am saved," yes.
6    Q.    Okay.  And when does that salvation occur?
7    A.    When I die.
8    Q.    I mean, certainly that's the fruits of the
9  salvation.
10        In terms of when -- when are you entitled or
11 when have you earned that salvation?
12   A.    When I accept Jesus as my Savior.
13   Q.    Okay.  So at that moment you are saved,
14 correct?
15   A.    I am, yes.
16   Q.    Okay.  And that's not -- there's no waiting
17 period, correct?
18   A.    Correct.
19   Q.    Okay.  All right.  And did you rely on any
20 non-Main Line consultants for your evaluation of
21 religious exemption requests?
22   A.    In the committee?
23   Q.    You personally.
24   A.    No.
25   Q.    Did the committee?

EXLER REPORTING
412-221-4007

JENNIFER BURKE, D.O.

14

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    A.    No.  I don't believe so.
2    Q.    And you would -- when you considered a
3    religious exemption request, did you evaluate any
4    medical statements that were made within that request?
5    A.    We did, yes.
6    Q.    Okay.  And when Mrs. Gray's request was
7    evaluated, were you the only medical person that was
8    present, to your recollection?
9    A.    I don't recall.
10   Q.    Okay.  Did you opine as to the medical aspects
11   of what she was saying?
12   A.    I don't recall.
13   Q.    You don't recall, okay.  And would you agree
14   that different medical experts can have different
15   opinions?
16         MR. HENNESSY:  She can answer.  I'll
17   object to form, but go ahead.
18         THE WITNESS:  People have a lot of
19   opinions.
20   BY MR. DALLER:
21   Q.    Okay.  Would you agree that two physicians,
22   licensed, board-certified, trained, many years of
23   experience, can look at a clinical scenario and have a
24   different opinion as to what they're viewing?
25   A.    They can, but it doesn't always -- I mean, I'd

EXLER REPORTING
412-221-4007

15

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    have to look at the specifics.
2    Q.    Oh, of course.  But you agree that that is
3    certainly possible, correct?
4    A.    It's possible.  It also is possible that they
5    would agree.
6    Q.    That's very true.
7          Now, when you considered the medical aspects
8    of COVID in terms of any religious exemption request,
9    did you consider other experts' opinions, or did you
10   only consider, you know, either one school of thought or
11   your opinions?
12         MR. HENNESSY:  Objection to form.
13         THE WITNESS:  Yeah.  You need to clarify
14   the question, please.
15   BY MR. DALLER:
16   Q.    When you considered religious exemption
17   requests, did you only consider, for example, things
18   that Dr. Fauci may have said?
19   A.    No.
20   Q.    Did you consider things that Rob Redfield
21   might have said?
22   A.    No.
23   Q.    You didn't consider anything he said?
24   A.    I didn't consider only what he said.
25   Q.    Okay.  Did you -- did you consider what

EXLER REPORTING
412-221-4007

16

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    Dr. Birx said?
2    A.    I don't know who that is.
3    Q.    Okay.  Did you consider anything that
4    Dr. Scott Atlas said?
5    A.    I don't specifically know who that person is.
6    Q.    Did you consider anything that Dr. Peter
7    McCullough said?
8    A.    Again, I don't specifically know who that is.
9    Q.    Okay.  If those are all individuals, that I
10   mentioned, that were significant thought leaders in
11   COVID, do you think that that is material that you
12   should have been familiar with if you were going to
13   opine on whether somebody had a sincerely-held religious
14   belief based upon what they said medically?
15         MR. HENNESSY:  Objection.
16         THE WITNESS:  The only name that I
17   recognize was Dr. Fauci because he was the head of the
18   CDC.  I don't remember any specific doctors and what
19   they said.
20   BY MR. DALLER:
21   Q.    Okay.  And you were a member of the committee
22   that reviewed Mrs. Gray's request, correct?
23   A.    I believe that they looked at the transcripts
24   and said I was or looked at the meeting dates and said I
25   was.  I don't remember specifically.

EXLER REPORTING
412-221-4007

17

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    Q.    Okay.  So you have no specific recollection of
2    her application then?
3    A.    I do not.
4    Q.    And I'm assuming you have no specific
5    recollection of anything that was discussed at that
6    meeting then, correct?
7    A.    Nothing specific.
8    Q.    Okay.  And you're -- are you aware if there
9    were any records kept from that meeting?
10   A.    I do not believe there are specific records.
11   Q.    Okay.  And as a physician, you would agree if
12   it's not recorded, it wasn't done, correct?
13   A.    In the medical record, I would completely
14   agree.
15   Q.    Okay.  Other than your personal religious
16   background, you know, you don't have any specific
17   religious training, correct?
18   A.    Correct.
19   Q.    Okay.  You do have religious beliefs, correct?
20   A.    I do.
21   Q.    Okay.  Can you briefly describe those for me?
22   A.    I'm a Lutheran.  I believe in Jesus.  I belive
23   in prayer, and I believe that I am saved.
24   Q.    Okay.  And did your personal religious beliefs
25   influence your decision at all?

EXLER REPORTING
412-221-4007

JENNIFER BURKE, D.O.

18

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1    A.    They did not.
2    Q.    And I think you testified earlier that your
3  medical opinions did not influence your decision,
4  correct?
5    A.    Correct.
6    Q.    So you based your decision on Mrs. Gray's
7  religious exemption request solely based upon your
8  knowledge --
9            MR. HENNESSY:  Object to form.
10           MR. DALLER:  Let me finish and re-ask.
11           MR. HENNESSY:  Go ahead.
12 BY MR. DALLER:
13   Q.    You based your decision on Mrs. Gray's
14 religious exemption request solely upon your knowledge
15 of whether that request demonstrated a sincerely-held
16 religious belief, correct?
17           MR. HENNESSY:  Same objection.
18 BY MR. DALLER:
19   Q.    You can answer.
20   A.    We based it on what she wrote.
21   Q.    Okay.  So if she wrote that she held a
22 sincerely-held religious belief then, then did you
23 accept that she had a sincerely-held religious belief?
24   A.    We accepted that -- we accepted that people
25 had sincerely-held religious beliefs.  We -- we looked

EXLER REPORTING
412-221-4007

20

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1  thought she made a connection, correct?
2            MR. HENNESSY:  Object to form.
3  BY MR. DALLER:
4    Q.    You can answer.
5    A.    We looked at what the religious belief was
6  stated and if it was a truly -- if it was a religious
7  belief.
8    Q.    Okay.  Were there any specific criteria other
9  than -- you know, you mentioned the long-standing, the
10 connection and that it was a sincere belief.
11           Were there any written criteria that the
12 committee utilized in order to determine whether or not
13 to accept or deny a religious exemption request?
14   A.    No.
15   Q.    No.  No document was ever circulated?
16   A.    Correct.
17   Q.    And you had no role in creating any document,
18 correct?
19   A.    Correct.
20   Q.    Did anyone from outside of the committee give
21 you any input into Mrs. Gray's application?
22   A.    No.
23   Q.    Were religious exemption requests granted
24 equitably across the organization?
25   A.    I don't understand the question.

EXLER REPORTING
412-221-4007

19

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1  at what they said and how it related specifically to the
2  vaccine.
3    Q.    Okay.  So you based it upon your knowledge of
4  how her belief would relate to the vaccine, correct?
5    A.    We based it on what she wrote as to what her
6  beliefs were related to the vaccine.
7    Q.    Okay.  And that becomes your opinion then,
8  correct?
9    A.    It became the opinion the committee, yeah.
10   Q.    Okay.  And were there any objective criteria
11 that the committee used to make that determination?
12   A.    Again, it should have been sincerely held, it
13 should have been long-standing, and it should have
14 specifically showed how the belief related to the
15 religious belief or the vaccine -- the vaccine thought
16 related to the religious belief.
17   Q.    Okay.  And that relationship of how it relates
18 is the individual's belief, correct?
19           MR. HENNESSY:  Objection.
20 BY MR. DALLER:
21   Q.    Go ahead.
22   A.    As demonstrated by what they wrote, yes.
23   Q.    Okay.  So you would agree, then, that the
24 assessment of what you wrote was based upon the
25 committee member's beliefs then of whether or not they

EXLER REPORTING
412-221-4007

21

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1    Q.    Well, do you understand the term "equitable"?
2    A.    I do, but what are you saying is equitable?
3    Q.    That's what I'm asking you.
4            Do you say -- do you believe, as a
5  bioethicist, that the application of the criteria,
6  whatever the committees used, was equitable across the
7  organization?
8    A.    Yes.
9    Q.    Okay.  So anybody who submitted a religious
10 exemption request and expressed a sincerely-held
11 religious belief was granted their religious exemption
12 request; is that correct?
13           MR. HENNESSY:  Object to form.
14           Go ahead.
15           THE WITNESS:  If the religious exemption
16 was -- was deeply held, sincerely believed, and it was
17 demonstrated to be a religious exemption, then it was --
18 then it was granted.
19 BY MR. DALLER:
20   Q.    And other than the things that you just
21 stated, do you have any recollection of anything else
22 that you considered when you reviewed Mrs. Gray's
23 exemption request before we go ahead and look at the
24 exemption request?
25   A.    I do not.

EXLER REPORTING
412-221-4007

JENNIFER BURKE, D.O.

22

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    Q.    Okay.  So you don't recall right now if you
2    doubted the sincerity of her belief, correct?
3    A.    I do not.
4    Q.    Okay.  And there's no record of anything that
5    you might have stated during this committee meeting,
6    correct?
7    A.    Correct.
8    Q.    With Main Line Health looking at whether or
9    not a person's sincerely-held religious beliefs stated
10   why they can't take the vaccine, did Main Line Health
11   see themselves as an interpreter of scripture?
12        MR. HENNESSY:  Objection to form.
13        THE WITNESS:  I can't speak for Main Line
14   Health.  I can only speak for myself.
15   BY MR. DALLER:
16   Q.    Okay.  Did you see yourself as a scriptural
17   interpreter?
18   A.    I looked at how the religious belief was
19   related to the exemption.
20   Q.    Did you have any questions about Mrs. Gray's
21   exemption request?
22   A.    I do not recall.
23   Q.    Okay.  All right.  Well, let's take -- first,
24   do you believe that her exemption request exhibited bad
25   science?

EXLER REPORTING
412-221-4007

23

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    A.    I would have to look at it again.
2         MR. DALLER:  Can we just briefly pull up
3    the document Frequently Asked Questions?
4         THE VIDEOGRAPHER:  (Indicating.)
5    BY MR. DALLER:
6    Q.    Would you believe or is it your opinion that
7    documents that Main Line Health puts out should be
8    accurate?
9         MR. HENNESSY:  Objection to form.
10   BY MR. DALLER:
11   Q.    You can answer.
12   A.    Accurate as to what?
13   Q.    I'm sorry?
14   A.    Accurate as to?
15   Q.    Well, I mean, if they make a statement in a
16   document, one should believe that it's accurate,
17   correct?
18   A.    I think that --
19        MR. HENNESSY:  Objection to form.
20        Go ahead.  You can answer.
21        THE WITNESS:  I think that they put out
22   documents they believe to be accurate.  I don't put out
23   their document.
24   BY MR. DALLER:
25   Q.    Okay.  Are you familiar with this document at

EXLER REPORTING
412-221-4007

24

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1    all?
2    A.    I saw it this morning, but, otherwise, no.
3    I've never seen it before.
4    Q.    You've never seen it before, okay.
5         MR. DALLER:  Can we look -- and just for
6    the record, this is a list of Frequently Asked Questions
7    that was updated on August 11, 2021, and it was put out
8    by Main Line Health and sent to employees.  Okay?
9    BY MR. DALLER:
10   Q.    Do you -- you've never seen this document
11   before, correct?
12   A.    I was sent it, and I opened it this morning,
13   but before that I had never seen it.
14   Q.    Okay.
15        MR. DALLER:  Can we look at Number 5,
16   please, on Page 2?
17        THE VIDEOGRAPHER:  I'm sorry, but
18   something is not working here.
19        MR. DALLER:  On the next page, Question 5.
20        THE VIDEOGRAPHER:  I can't get this to
21   work.
22        (Brief pause.)
23        THE VIDEOGRAPHER:  Can we go off the
24   record for a second?
25        MR. DALLER:  Sure.

EXLER REPORTING
412-221-4007

25

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1         THE VIDEOGRAPHER:  All right.  We're going
2    off the record.  The time is 8:59.
3         (Whereupon, a brief recess took place.)
4         THE VIDEOGRAPHER:  All right.  We're back
5    on the record, and the time is approximately 9:03 a.m.
6    BY MR. DALLER:
7    Q.    Okay.  So we're back on the record now.
8         First, Dr. Burke, is there anything from your
9    previous testimony that you'd like to clarify?
10   A.    No.
11        MR. DALLER:  And we went off the record
12   for a brief period of time because we were having
13   technical difficulties in exhibiting a document.
14        Attorney Hennessy has stated that he has a
15   copy, I believe, and Dr. Burke also stated that she has
16   a copy.  So for the sake of time, because we're only
17   going to use one part of this document, we're just going
18   to refer to it and we'll enter as an exhibit that
19   everybody has.
20        Is that okay, Brendan?
21        MR. HENNESSY:  That's okay.
22        (Whereupon, Burke Deposition Exhibit No. 1
23   was identified.)
24   BY MR. DALLER:
25   Q.    So, Dr. Burke, if you look at the second page

EXLER REPORTING
412-221-4007

26

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1   of that Frequently Asked document or Frequently Asked
2   Questions document, specifically Number 5, could you
3   read that, please?
4       **A.   "5:  How do we know it's safe?  MRNA vaccines**
5   **have been around for a very long time.  Side effects are**
6   **minor and will resolve more than 90 percent within the**
7   **first week of vaccine.  We have not seen any long-term**
8   **side effects from vaccine administration."**
9       Q.   Okay.  Thank you.  Do you believe that
10  question and its accompanying answer, that the answer is
11  accurate?
12      **A.   I do.**
13      Q.   How long have messenger RNA vaccines been
14  around?
15      **A.   I don't know exactly how long.**
16      Q.   Okay.  Do you have any idea how long?
17      **A.   Not specifically.  No.**
18      Q.   Do you believe it's more or less than two
19  years?
20      **A.   I do.**
21      Q.   You do what?
22      **A.   I believe it's more.**
23      Q.   You believe it's more than two years.
24      Do you believe it's more than three years?
25      **A.   Yes.**

27

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1       Q.   Okay.  Do you believe it's a more than five
2   years?
3       **A.   Probably.**
4       Q.   Okay.  And what do you base your belief upon?
5       **A.   I know that they have been looking at mRNA**
6   **vaccines for a while, and I do know that they've had**
7   **specific treatment with mRNA, specifically for cancer,**
8   **in the past.**
9       Q.   Okay.  And is there any messenger RNA vaccine
10  that is approved by the Food and Drug Administration,
11  fully approved?
12      **A.   Fully?**
13      Q.   Fully approved, yes.
14      **A.   I do not believe so.**
15      Q.   Okay.  So is it your testimony that an agent
16  that has been around for a long period of time, but is
17  not approved by the Food and Drug Administration for any
18  indication, is safe to be used?
19      **A.   There was an emergency-use authorization.**
20      Q.   Is the -- that's not the question.  The
21  question is if a drug is -- does not hold full FDA
22  approval, do you believe that just because it has been
23  around for a long period of time, it is safe and
24  efficacious to use?
25      MR. HENNESSY:  I'm just going to object to

28

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1   form, and just clarify on the record that Dr. Burke is
2   not being offered as an expert in relation to vaccines
3   or mRNA vaccines.
4       MR. DALLER:  To the extent that her
5   medical knowledge influenced her interpretation of
6   things that were stated in a religious exemption
7   request, if she doesn't have a medical opinion, then
8   she's not qualified to opine to that.
9   BY MR. DALLER:
10      Q.   But you can answer the question if you
11  understood it, Dr. Burke.
12      **A.   I believe there are medications that are used**
13  **for off-label use.  There are medications that have --**
14  **that would not be -- that are used today that would not**
15  **have gotten FDA approval if they came on today, so**
16  **there's a lot of things that have changed and a lot of**
17  **things that have worked.**
18      **So they think that the vaccines that were used**
19  **had emergency-use authorization from the FDA.**
20      Q.   Okay.  But let's go back to Question 5.  When
21  did the emergency-use authorization come about?
22      **A.   Specifically, I don't -- I don't know.**
23      Q.   Just roughly?
24      **A.   2020.**
25      Q.   Okay.  And they were used then in 2021,

29

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1   correct?
2       **A.   Yes.**
3       Q.   And as a physician, you believe that's been
4   being around for a long time, correct?
5       **A.   I believe that there have been mRNA vaccines**
6   **that have been around and have been tested.**
7       Q.   And they were commercially used, correct?
8       **A.   I didn't say that.**
9       MR. HENNESSY:  Objection to form.
10  BY MR. DALLER:
11      Q.   I'm sorry?
12      **A.   I said I didn't say that.  I said they've been**
13  **around and they've been tested.**
14      Q.   Okay.  I'm asking.  They were commercially
15  used?
16      **A.   I do not believe so.**
17      Q.   All right.  Let's go to Ms. Gray's religious
18  exemption request.
19      MR. DALLER:  Are you able to pull that up,
20  Karen?
21      THE VIDEOGRAPHER:  Let's hope so.
22      MR. DALLER:  Yeah, let's hope so.
23      THE VIDEOGRAPHER:  My keyboard is not
24  working.
25      (Brief pause.)

JENNIFER BURKE, D.O.

---

30

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1  THE VIDEOGRAPHER:  (Indicating.)
2  BY MR. DALLER:
3  Q.  So looking at this, do you recognize this
4  document, Dr. Burke?
5  A.  I do.
6  Q.  Okay.  And you agree that this is the first
7  page of Mrs. Gray's religious exemption request?
8  A.  I do.
9  Q.  And you recall that it was handwritten, as you
10  can see?
11  A.  It appears to be, yes.
12  Q.  And then she also provided sort of a typed
13  transcript of the questions that she had.
14  Do you recall that?
15  A.  Not to -- I don't recall if it was -- if the
16  typed transcript was available when we were -- when we were at the
17  meeting.
18  Q.  Well, I mean, this was what was submitted, so
19  are you saying that this was not available to you at the
20  time?
21  A.  I don't recall what specifically -- if
22  specifically the typewritten was available or not.
23  Q.  Okay.
24  MR. HENNESSY:  I want to note for the
25  record that she hasn't seen -- I mean, you just scrolled

---

31

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1  to the first page of the document.  She hasn't seen the
2  full document.
3  MR. DALLER:  We're getting there.  I'm
4  just...
5  THE VIDEOGRAPHER:  (Scrolling.)
6  MR. DALLER:  Okay.  Why don't we stop
7  there for a minute?
8  THE VIDEOGRAPHER:  (Indicating.)
9  BY MR. DALLER:
10  Q.  Do you recall that this was present?
11  A.  I don't recall.
12  Q.  So when you say you don't recall, you don't
13  think it was or --
14  A.  You asked if I recall or not.  I don't recall.
15  If it was, it was.  If it wasn't, it wasn't.  I don't
16  recall.
17  Q.  Okay.
18  MR. DALLER:  Can we stipulate that what's
19  on the typewritten form is verbatim what was on the
20  handwritten form, Brendan?
21  MR. HENNESSY:  You know, John, I don't
22  want to stipulate to anything at this point.  I mean,
23  I'd have to read it and cross-check it, but I -- I mean,
24  I don't think it's really an issue.
25  You can ask the witness based on what's on the

---

32

Jennifer Burke, D.O. - by Mr. Daller

1  typewritten form.  I have no objection to that.
2  MR. DALLER:  Okay.  All right.
3  BY MR. DALLER:
4  Q.  So, Dr. Burke, Attorney Hennessy is
5  stipulating that, you know, A, I can ask you what's on
6  this typewritten form.  Okay?
7  A.  Okay.
8  Q.  I will submit that whatever is on this
9  typewritten form is a verbatim translation of what was
10  on the handwritten form.  Okay?
11  So we can see what your opinions are regarding
12  what Mrs. Gray wrote in the deposition -- in her
13  exemption request.  Okay?
14  A.  Okay.
15  Q.  Do you recall the questions themselves from
16  the form, or do you need to recollect your memory as to
17  that?
18  A.  I mean, we can go through them one by one, so
19  if -- however you're doing it.  I don't recall the
20  specific question to put there.
21  Q.  Okay.  All right.  Let's start with the
22  typewritten form then.  Page 2 is from Question 1, and I
23  will just read question one.
24  Question 1 states, "In the space below, please
25  provide a personal statement detailing the

---

33

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1  sincerely-held beliefs that are religious in nature
2  regarding your COVID-19 vaccination objection explaining
3  why you are requesting this religious exemption, the
4  religious principles that guide your objections to
5  COVID-19 vaccination, and the religious basis that
6  prohibits the COVID-19 vaccination.  Please attach
7  additional documentation if necessary."
8  Okay?  So let's look at her response to
9  Question Number 1.
10  She starts off by saying that even though she
11  could apply for medical exemption, she's chosen to apply
12  for a religious exemption due to the personal
13  convictions of her religious belief.
14  Do you see that?
15  A.  I do.
16  Q.  And is there anything in that statement that
17  caused you to believe that she did not have a
18  sincerely-held religious belief?
19  A.  No.
20  Q.  And she goes on to state that she has a
21  personal explanation and a best example of why, correct?
22  A.  That's what she says, yes.
23  Q.  Okay.  Did you doubt that at all?
24  A.  No.
25  Q.  And she goes on to state that what the example

---

34

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1 is relates to the time when she was trying to conceive
2 children years ago, correct?
3     A.    Yes.
4     Q.    And she stated that after, you know, not being
5 able to conceive, they discussed some other options,
6 correct?
7     A.    Yes.
8     Q.    And they tried some low-tech options to
9 achieve successful pregnancy, but they were
10 unsuccessful.
11          Do you see that?
12    A.    I do.
13    Q.    Okay.  And then at that point, they
14 prayerfully considered the other options -- which would
15 be, I guess, higher tech, right, because she referred to
16 them as low tech -- and concluded that their faith and
17 beliefs did not peacefully allow them to do that,
18 correct?
19    A.    Yes.
20    Q.    And then she goes on to describe hormones,
21 artificial insemination, and in vitro fertilization,
22 correct?
23    A.    Yes.
24    Q.    Okay.  And what's your understanding of those
25 therapies in terms of what they require to be

EXLER REPORTING
412-221-4007

35

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1 implemented or successful?
2     A.    That's not my level of expertise.  I'm sorry.
3     Q.    I'm sorry?
4     A.    That's not my level of expertise.
5     Q.    Okay.  So you have no knowledge of what those
6 are, correct?
7     A.    I have a basic knowledge of what they are, but
8 I can't speak to them.
9     Q.    Okay.  What is your basic knowledge of what
10 they are?
11    A.    You go to the reproductive clinic and they
12 either insert stuff or take stuff out and put it back
13 in.
14    Q.    Okay.  So they are manipulative in nature,
15 correct?
16    A.    I would say that they're medically used.
17    Q.    All right.  Do any of these treatments invade
18 the body?
19    A.    I would say that IVF does, yes.
20    Q.    Okay.  And do hormones manipulate the body?
21    A.    They can.
22    Q.    Okay.  I mean, in fact, a hormone is part of
23 the endocrine system, correct?
24    A.    Yes.
25    Q.    Okay.  And the endocrine system has

EXLER REPORTING
412-221-4007

36

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1 significant impact on physiologic functions, correct?
2     A.    No more than any other systems, but, yes.
3     Q.    I'm not sure I understand your --
4     A.    If your heart doesn't work, it doesn't really
5 matter, right?  So, I mean, it doesn't -- this is not
6 any more physiologic than any other similar systems.
7     Q.    Okay.  Are there hormones that affect the
8 heart?
9     A.    Not too -- not too -- not to any more of a
10 degree than, you know, the stress hormones, sure.
11    Q.    Okay.  And you believe -- you would agree that
12 this is a statement of how Mrs. Gray views certain types
13 of medical treatment, correct?
14    A.    I don't know how she's relating it to the
15 COVID-19 vaccine.
16    Q.    Okay.  So when you read this, would you at
17 this point say this is not a sincerely-held religious
18 belief?
19    A.    I would say that I'm not sure how she relates
20 it to the COVID-19 vaccine.
21    Q.    Okay.  You'd have to read more, correct?
22    A.    I would.
23    Q.    Okay.  So let's read the next thing.  She says
24 that her belief is that if they were to have children,
25 it would be because God allowed it to happen, correct?

EXLER REPORTING
412-221-4007

37

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1     A.    She says that, yes.
2     Q.    Okay.  And that's her belief, correct?
3     A.    I believe so.
4     Q.    Okay.  And she's relating the treatments to
5 the belief that God would allow it to happen naturally,
6 correct?
7     A.    Hormones, yeah.  IVF, yes.
8     Q.    Okay.  And then she goes on to quote
9 scriptures from Psalm 139, Verses 13 through 16.  Okay?
10 And she says, "You created my innermost being.  You knit
11 me together, and all of the days for me were ordained as
12 written in your book before they came to be."
13          Do you see that?
14    A.    Yes.
15    Q.    Okay.  Do you have an issue with that, those
16 beliefs?
17    A.    No.
18    Q.    And then she goes on to say that "Life begins
19 at concept and ends at natural death."
20          Do you see that?
21    A.    I do.
22    Q.    Okay.  Do you believe that?
23    A.    I do.
24    Q.    And she says that, "This is the same belief
25 system that guides my objections to the current -- to

EXLER REPORTING
412-221-4007

JENNIFER BURKE, D.O.

38

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1   the current COVID-19 vaccination," correct?
2       A.   **That's what -- that's what it says.**
3       Q.   Do you not believe that?
4       A.   **I don't know how it relates.**
5       Q.   You don't understand how that relates?
6       A.   **I don't.**
7       Q.   Okay.  All right.  So in the next sentence
8   then she states that she "is not comfortable having
9   genetic components that my body did not create into her
10  -- injected into her body."
11          Do you see that?
12      A.   **I see that, uh-huh.**
13      Q.   And from a standpoint of evaluating her
14  religious exemption request, do you disagree with that
15  or have a problem with that statement?
16      **A.   I don't know how that relates to her religious**
17  **beliefs.**
18      Q.   Okay.  Did you ask her?
19      A.   **I did not.**
20      Q.   Did anybody on the committee ask her?
21      A.   **I do not believe so.**
22      Q.   Are you familiar with the interactive process,
23  that term?
24      A.   **No.**
25      Q.   No, okay.

EXLER REPORTING
412-221-4007

---

40

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1   are?
2       A.   **I do not know what she's saying, what genetic**
3   **components.**
4       Q.   Did you ask her?
5       A.   **Again, no.**
6       Q.   Okay.  Did you interpret that in any way?
7       A.   **It seems more medical than religious.**
8       Q.   Okay.  What -- what is more medical than
9   religious?  I don't understand that.
10      **A.   She's talking about genetics, so it's**
11  **specifically related to medicine.  It doesn't seem**
12  **related to religion at all.  She didn't tie it for me in**
13  **her statement.**
14      Q.   Okay.  Is injection of genetic material
15  invasive at all?
16      A.   **It would depend on the injection.**
17      Q.   You mentioned cancer treatments using
18  messenger RNA, correct?
19      A.   **Yes.**
20      Q.   Is that invasive?
21      **A.   I think it's an injection.  I don't know that**
22  **injections are super invasive.**
23      Q.   Are you familiar with the adenovirus cancer
24  treatments at the University of Pennsylvania for liver
25  cancer?

EXLER REPORTING
412-221-4007

---

39

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1           Are you familiar with the EEOC's sort of
2   guidance on evaluating a religious exemption request?
3       **A.   As much as we talked about it in the**
4   **committee, that's my familiarity.**
5       Q.   Okay.  So other than that, you have no
6   expertise, knowledge of how to evaluate a religious
7   exemption request, is that correct, other than anything
8   you heard in the committee?
9       A.   **Correct.**
10      Q.   Okay.  So you were totally reliant upon things
11  that you were told, correct?
12          MR. HENNESSY:  Objection to form.
13  BY MR. DALLER:
14      Q.   You can answer.
15      **A.   I was reliant on what we discussed in the**
16  **committee and what we looked at as the religious**
17  **beliefs.**
18      Q.   Okay.  So as a physician, do you believe
19  there's an inaccuracy in that last statement of "I am
20  not comfortable having genetic components that my body
21  did not create injected into my body"?
22      **A.   I don't know what genetic components mean --**
23  **mean.**
24      Q.   Okay.  So as a physician, you do not know what
25  a genetic -- what the components of the genetic system

EXLER REPORTING
412-221-4007

---

41

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1       A.   **I'm not.**
2       Q.   You're not, okay.  So you have no knowledge of
3   the deaths that occurred during those early trials,
4   correct?
5       A.   **I do not.**
6       Q.   Let's look at Page 2, Question 3, and you can
7   just look at the typewritten thing, and I will find it
8   and read it.
9           So Question 3 says, "Does the religious belief
10  identified in Question 1 prevent you from receiving
11  other vaccines or just the COVID-19 vaccine?"
12          And on the form she said, "It was some, but
13  not all vaccines."  Okay?
14          Reading her answer to Question 3 on Page 2:  I
15  am not comfortable having genetic components that my
16  body did not create injected into my body.  I am not
17  opposed to vaccines.  If there is a COVID vaccine that
18  comes out that does not use this process, I would
19  investigate and consider accepting it."  And she
20  mentions that at that time she had started to look at
21  the Novavax.
22          Do you see that statement?
23      A.   **I see that statement.**
24      Q.   And any concerns with that statement or
25  anything like that?

EXLER REPORTING
412-221-4007

42

Jennifer Burke, D.O. - by Mr. Daller

- - - - -

1    A.    **I don't know how it relates to her religious**
2  **belief.**
3    Q.    And why is that?
4    A.    **Because it seems medical.**
5    Q.    It seems medical, yeah.
6         And Question 3 states, "Does the religious
7  belief prevent you from receiving other vaccines or just
8  the COVID-19 vaccine"; is that correct?
9    A.    **If you -- if you say so, sure.**
10   Q.    Okay.  Do you need to see that question?
11   A.    **No.  I just am telling you that I don't**
12 **understand how this -- this statement does not appear to**
13 **be religious.  It appears to be medical.**
14   Q.    Okay.  Does the question -- "Does the
15 religious belief identified in Question 1 prevent you
16 from receiving other vaccines or just the COVID-19
17 vaccine?"
18        Is that a medical question?
19   A.    **It's not, but her answer is not religious to**
20 **me.  It's medical.**
21   Q.    But the question itself is not religious,
22 correct?
23   A.    **The question is -- the question said -- asked**
24 **her to state her religious belief.  I do not believe she**
25 **did that.**

EXLER REPORTING
412-221-4007

43

Jennifer Burke, D.O. - by Mr. Daller

- - - - -

1    Q.    That's not what that question states.
2         The question states, and I quote, "Does the
3  religious belief identified in Question 1 prevent you
4  from receiving other vaccines or just the COVID-19
5  vaccine?"
6    A.    **And I said --**
7    Q.    And it requests the individual to choose from
8  all other vaccines, some but not all, or only the COVID
9  vaccine?
10        MR. HENNESSY:  I'm going to object to
11 form, and it sounds argumentative, to me.  I just -- you
12 know, let the witness answer the question.
13 BY MR. DALLER:
14   Q.    Is that question medical or religious?
15   A.    **The question needs a religious answer.**
16   Q.    So it's your testimony that choosing whether
17 you take all vaccines, some but not all, or only the
18 COVID vaccine is a religious answer, correct?
19   A.    **My -- my question -- my answer is her answer**
20 **is not religious to me.**
21   Q.    I'm not asking what her answer is.  I'm asking
22 about the question.
23   A.    **The question is what is -- the question is --**
24 **the question is religious.  The question is religious.**
25   Q.    So choosing what medical intervention you will

EXLER REPORTING
412-221-4007

44

Jennifer Burke, D.O. - by Mr. Daller

- - - - -

1  accept is a religious question?  Is that your testimony?
2    A.    **It's not.**
3    Q.    Okay.  That's --
4         MR. HENNESSY:  Objection.  Again, she
5  answered the question.  This is just argument at this
6  point.
7         MR. DALLER:  All right.  We'll accept that
8  answer.
9  BY MR. DALLER:
10   Q.    Let's -- Page 4, Question 5, "Have you ever
11 been approved for any other type of religious
12 accommodations during your employment with MLH, yes or
13 no?"  She stated, "No."
14        And this is her answer.  Why don't you go
15 ahead and read that and let me know when you're ready?
16   A.    **"Even though" -- it's cut off for me because**
17 **there's pictures on the side, so you have to make it**
18 **smaller.**
19        THE VIDEOGRAPHER:  (Indicating.)
20   A.    **That's fine.  "Even though I have not**
21 **officially requested a religious exemption on the basis**
22 **of my beliefs, I have relied upon the graciousness of**
23 **colleagues to support patient decisions making --**
24 **patient decisionmaking when it conflicts with my**
25 **personal religious belief.  I have, quote, 'switched,'**

EXLER REPORTING
412-221-4007

45

Jennifer Burke, D.O. - by Mr. Daller

- - - - -

1  **unquote, assignments with colleagues to allow for them**
2  **to care for those after an abortion or for those**
3  **patients who are asking for Plan B.**
4         **"I have also switched assignments when I felt**
5  **I would be too emotional to care for those who might be**
6  **experiencing a miscarriage due to my own miscarriages**
7  **when I longed for a baby -- for a child so badly."**
8    Q.    And is your characterization of that answer
9  that it's a religious answer or do you characterize that
10 in some way as medical?
11   A.    **It seems religious to me.**
12   Q.    Okay.  Do you have any objections or concerns
13 with this answer in regards to how you decided to deny
14 Mrs. Gray's religious exemption request?
15        MR. HENNESSY:  Objection to form.
16 BY MR. DALLER:
17   Q.    You can answer.
18   A.    **Again, it didn't relate to what her -- what**
19 **her objection was.**
20   Q.    Okay.  What's Plan B?
21   A.    **It's a medicine that makes you not conceive.**
22   Q.    What type of medicine?
23   A.    **It's a hormone.**
24   Q.    It's a hormone.  And in Question 1 did
25 Mrs. Gray not mention hormones as being unacceptable to

EXLER REPORTING
412-221-4007

46

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1  her?

2      A.    She mentioned that the vaccine has a genetic
3  component that she doesn't want.

4      Q.    Correct.  But did she also not mention
5  hormones?

6      A.    She did.

7      Q.    And do exogenously-administered hormones
8  manipulate the body at all?

9      A.    I'm not sure how this relates to her
10  religious beliefs.

11      Q.    That's not my question.  My question is do
12  exogenously-administered hormones manipulate the human
13  body?

14      A.    They do.

15      Q.    They do, okay.

16      And if genetic material is injected into one's
17  body, does that manipulate the body to do something?

18      A.    It does.

19          MR. HENNESSY:  Object to form, but go
20  ahead.

21  BY MR. DALLER:

22      Q.    I'm sorry?

23      A.    It does.

24      Q.    It does, okay.

25      And what exactly does it cause the body to do?

EXLER REPORTING
412-221-4007

47

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1      A.    Specify the genetic material.

2      Q.    We're talking about a messenger RNA COVID
3  vaccine right now.

4      A.    It causes -- it causes the immune system to
5  recognize the -- recognize the COVID vaccine -- the
6  COVID -- blah.  COVID when it sees it.

7      Q.    How does it do that?

8      A.    By creating a protein spike.

9      Q.    And then what?

10      A.    When the -- when the vac- -- when the virus is
11  seen, the body recognizes it.  The immune system
12  recognizes it.

13      Q.    So it's your testimony that the messenger RNA
14  functions by producing the COVID-spike protein; is that
15  correct?

16      A.    No.  My -- no.  It causes the immune system to
17  recognize it.

18      Q.    Where did the COVID-spike protein come from?

19      A.    The messenger RNA.

20      Q.    So is the COVID-spike protein in the messenger
21  RNA vaccine when it's administered?

22      A.    It is.

23      Q.    So the COVID spike protein coexists with the
24  messenger RNA in the vaccine.  Is that your testimony?

25      A.    I -- I don't -- I'm confused at this point, so

EXLER REPORTING
412-221-4007

48

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1  I'm sorry.  You're going to need to re-ask the question.

2      Q.    Does the COVID-spike protein exist along with
3  the messenger RNA in the syringe when the COVID vaccine
4  is injected into the body?

5      A.    No.

6      Q.    No.  Where does it come from?

7      A.    It comes from the messenger RNA.

8      Q.    So at what point does the messenger RNA create
9  the spike protein?

10      A.    When it -- when it interacts with the immune
11  system.

12      Q.    So the immune system causes the messenger RNA
13  to create the spike protein?

14      A.    Correct.

15      Q.    Okay.  And then once the immune system creates
16  the spike protein, now the person, when they're exposed
17  to COVID, it's recognized and the spike protein takes
18  care of the COVID infection?

19      Is that the correct understanding?

20      A.    The same way -- the same way the influenza,
21  when you get the influenza vaccine, it would do to your
22  immune system.  It recognizes it as a foreign substance
23  and says no.

24      Q.    So --

25      A.    The same way the MR would work.  The same way

EXLER REPORTING
412-221-4007

49

Jennifer Burke, D.O. - by Mr. Daller

– – – – –

1  that -- you know, they work -- they interfere with your
2  immune system, as well.

3      Q.    Okay.  Now, what's the influenza vaccine?

4      A.    Eggs.

5      Q.    I didn't say where it was made.  I asked what
6  is in an influenza vaccine?  What biologic substance is
7  that, if you know?

8      A.    I believe it's inactive- -- inactivated flu.

9      Q.    Inactivated flu, so it's an inactivated
10  biologic agent.

11      What -- does it also contain a messenger RNA?

12      A.    I don't think so.

13      Q.    Does it contain a carbohydrate?

14      A.    I have no idea.

15      Q.    Does it contain a protein?

16      A.    I don't know specifically.  I'd have to look
17  it up.

18      Q.    Okay.  But in your assessment of Mrs. Gray's
19  religious exemption request, you're relying on her
20  statements regarding treatments and how they impact her
21  decision; is that correct?

22          MR. HENNESSY:  Again, objection.

23      Are you basing it on the portions of the
24  exemption request which we reviewed?

25          MR. DALLER:  Yes.  Because that's -- she

EXLER REPORTING
412-221-4007

JENNIFER BURKE, D.O.

---

Jennifer Burke, D.O. - by Mr. Daller

— — — — —

1   has told me she has no recollection of the request or
2   the discussion, so, I mean, I have to assume that
3   anything she's saying is related to what we've reviewed.
4   BY MR. DALLER:
5       Q.   You can answer.
6       A.   **So -- so what I'm saying is that I do not**
7   **understand how -- how she's relating her religious --**
8   **her religious conviction specifically to the COVID**
9   **vaccine.**
10      Q.   And what specifically did you not understand?
11      A.   **Specifically she'll take other vaccines, but**
12  **she will not take this vaccine.  She has not proven to**
13  **me religiously that this is -- that she has an objection**
14  **to the COVID vaccine.**
15      Q.   Okay.  And is there any medical difference
16  between the COVID vaccine and the flu vaccine?
17      A.   **Medically, I do not believe so.**
18      Q.   Okay.  Did the fact that she added the -- that
19  at times if she had to care for a person, you know, who
20  had a miscarriage, that was too emotional for her.
21           Did that impact your decision at all here?
22      A.   **It did not.**
23      Q.   All right.  Well, let's look at the last
24  question here on Page 4, Question 7, and it talks about
25  a --

---

Jennifer Burke, D.O. - by Mr. Daller

— — — — —

1           MR. DALLER:  You can pull it up.
2   BY MR. DALLER:
3       Q.   And you can take a minute to read it,
4   Dr. Burke.
5           THE VIDEOGRAPHER:  (Indicating.)
6           THE WITNESS:  You have to make it smaller.
7           THE VIDEOGRAPHER:  (Indicating.)
8           THE WITNESS:  Thank you.  That's good.
9   "Throughout my life I have held a consistent
10  approach and a genuine conviction about medical invasion
11  that seeks to alter how God created me.  I believe my
12  body is the Temple of the Holy Spirit.  Do you not know
13  your body is your Temple for the Holy Spirit who is in
14  you whom you have received from God?  You are not your
15  own, you were bought at a price.  Therefore, honor God
16  with your bodies," end quote.
17  (First Corinthians 6:19-20).  "And I strive to
18  follow principles that are glorifying to God in
19  acknowledgement of this.  Getting this vaccine would
20  negatively affect my conscious and soul, not allowing me
21  to serve and honor the God I love."
22  BY MR. DALLER:
23      Q.   Okay.  What's your -- and just so we're clear,
24  the prompt for this is, "Please state how receiving the
25  COVID vaccine will negatively affect your purpose in

---

Jennifer Burke, D.O. - by Mr. Daller

— — — — —

1   life or death."
2       Q.   Okay?
3       A.   **Okay.**
4       Q.   All right.  What's your interpretation of her
5   answer here?
6       A.   **I don't know how it's medical invasion that**
7   **she has related to the COVID vaccine.**
8       Q.   So you don't know what she's talking about
9   regarding medical invasion?
10      A.   **I don't know how it relates to the COVID**
11  **vaccine.**
12      Q.   Okay.  Is the COVID vaccine something that's
13  put into her body?
14      A.   **It is.**
15      Q.   Is the COVID vaccine genetic in nature?
16      A.   **It is.**
17      Q.   Is this genetic-in-nature vaccine being placed
18  into the body?
19      A.   **I thought I answered that question.**
20      Q.   Well, answer it again.
21      A.   **Yes.**
22      Q.   And is it not her conviction that this type of
23  medical invasion is something that seeks to alter how
24  God created her?
25      A.   **But, again, how is this different?  She has**

---

Jennifer Burke, D.O. - by Mr. Daller

— — — — —

1   **not said that.**
2       Q.   Okay.  If you do not understand the difference
3   between the vaccines, would that be a problem?
4       A.   **It's not.**
5       Q.   I'm sorry?
6       A.   **No, it's not.**
7       Q.   Okay.  So your belief of what the COVID
8   vaccine is or is not, from a medical perspective, does
9   not influence, then, your decision as to her statements;
10  is that correct?
11          MR. HENNESSY:  Objection to form.
12          THE WITNESS:  The vaccines all create
13  something that the body reacts to.  I don't -- she -- I
14  don't understand how this -- how religiously it's
15  different for her.
16  BY MR. DALLER:
17      Q.   Okay.  Approaching vaccine produces an
18  antibody response, correct?
19      A.   **Yes.**
20      Q.   Okay.  Is the -- does the protein vaccine
21  require interaction between the vaccine and the cellular
22  genetic machinery?
23      A.   **Any more than the mRNA does, no.  It doesn't**
24  **change your genetics.  So, you know, I mean, it just**
25  **uses -- it just uses it.  So, you know, it doesn't**

---

54

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1  change your genetics either way.

2      Q.   Okay.  So your interpretation of all of this

3  relies upon, quote, "changed genetics"; is that correct?

4      A.   **Medical invasion that seeks to alter how God**

5  **created me.  Yeah, I would say that it would change her**

6  **and I can't see how that changes her any more than the**

7  **flu vaccine would change her to be able to rely on the**

8  **fact that she saw it and she's going to fight off the**

9  **flu.**

10     Q.   And these are your beliefs?

11     A.   **This is -- I mean, again, immunology from a**

12  **standpoint of you get -- you know, whether it's alive,**

13  **whether it's, you know, a protein, your body -- your**

14  **body's immune system sees it, and then sees it -- it**

15  **sees it as an invader.**

16          **So how is it different than any other vaccine?**

17  **And how does that it relate to her religious conviction?**

18     Q.   All right.

19          MR. DALLER:  And if we can look at the

20  form, Question 6, please, and it's on Page 4 of the

21  form.

22  BY MR. DALLER:

23     Q.   And while we're going there, I believe you

24  testified that long-standing was important, correct?

25     A.   **Yes.**

55

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1      Q.   Did she have a long-standing belief?

2      A.   **I believe she had a long-standing religion.**

3      Q.   If one practices a religion, do you think

4  that's -- they're practicing their beliefs?

5      A.   **I believe so.**

6      Q.   So when did she start practicing her religion?

7      A.   **1970.**

8      Q.   Is that long enough for you?

9      A.   **It's long.  She's been practicing for a while,**

10  **yes.**

11     Q.   I'm sorry?  I didn't hear you.

12     A.   **Yes.**

13     Q.   Okay.  So now that you've had an opportunity

14  to review the exemption request form, can you tell me

15  the reasons why you decided that, in your opinion,

16  Mrs. Gray's exemption request should not be approved?

17          MR. HENNESSY:  I'm going to object to the

18  form.  You stated that she reviewed the exemption

19  application.  She did not review the whole exemption

20  application, and, particularly, she did not review the

21  pastor's statement, as far as I can recall.

22          MR. DALLER:  Okay.  Thank you for

23  reminding me.

24          Let's pull up the pastor's statement that's on

25  Page 5, and there's a transcribed version of that form,

56

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1  as well.

2          THE VIDEOGRAPHER:  (Indicating.)

3          MR. DALLER:  Okay.

4  BY MR. DALLER:

5      Q.   You recognize this as the pastor's form?

6      A.   **I do.**

7      Q.   Okay.  Do you recall reviewing it?

8      A.   **I don't recall.**

9      Q.   You don't recall, okay.

10          So you don't know if this form influenced your

11  opinion, correct?

12     A.   **I don't know.**

13     Q.   Okay.  Why don't you just take a minute to

14  review what the pastor wrote there in the middle, and

15  let me know when you're done?  You don't have to read it

16  out loud.

17     A.   **(The witness reviews the document on the**

18  **screen.)**

19          **Okay.**

20     Q.   Okay.  What's your opinion after reading this?

21     A.   **That it's medical.  Not sci- -- not religious.**

22     Q.   Okay.  Do you use your religion in everyday

23  life?

24     A.   **I do.**

25     Q.   Do you make decisions in your life regarding

57

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1  or based upon your religion?

2      A.   **In my personal life, yes.**

3      Q.   Yes, okay.

4          And are there any specific types of decisions

5  that you don't rely on your religion for?

6      A.   **When I'm seeing patients, I tend to rely on**

7  **science.**

8      Q.   Okay.  In terms of how you treat that patient,

9  correct?

10     A.   **Correct.**

11     Q.   Because that's what the patient expects you to

12  do because you are a physician, correct?

13     A.   **I don't know what the patient's expectations**

14  **are.**

15     Q.   Okay.  You don't know what your patient's

16  expectations are?

17     A.   **I don't know what their expectations are.**

18     Q.   Okay.  What about in your personal life?  When

19  you consider something that has an impact on you, so

20  it's not you taking care of patients.  Okay?

21          Does religion play a role in all of those

22  decisions?

23     A.   **Not all of them.**

24     Q.   Not all of them, okay.  What type of decision

25  would it not play a role in?

58

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1      A.      Where I go on vacation.  Where -- you know,
2  what I eat for dinner.
3      Q.      Okay.  So where you go on vacation is not
4  influenced by religion at all?
5      A.      No.
6      Q.      Would you go to a satanic cult conference on
7  vacation?
8      A.      Probably not.
9      Q.      Okay.  Why is that?
10     A.      Because I wouldn't go to a conference on
11  vacation.
12     Q.      Okay.  What type of music do you listen to?
13     A.      Pretty much everything.  Well, I don't like
14  country and I don't like heavy metal, but pretty much
15  everything.
16     Q.      You listen to rap?
17     A.      Mainstream occasionally.
18     Q.      All right.  Let's look at the pastor's
19  statement.  So she's not opposed to vaccinations, in
20  general, in her beliefs; is that correct?
21     A.      Yes.
22     Q.      Okay.  But her --
23             THE WITNESS:  Excuse me.  I'm sorry.
24  Could you move this a second so I can read the whole
25  thing, please?

EXLER REPORTING
412-221-4007

59

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1             THE VIDEOGRAPHER:  (Indicating.)
2             THE WITNESS:  Thank you.
3  BY MR. DALLER:
4      Q.      "But her understanding the composition and
5  performance of the, quote, 'vaccines' do not align with
6  her convictions."
7             Do you see that?
8      A.      I see that.
9      Q.      So did the pastor not link her beliefs to why
10  she can't take them, that it's her beliefs that prevent
11  her from taking it?
12     A.      Her understanding of the composition, which is
13  medical.
14     Q.      But it's her belief, correct?
15     A.      But it's still medical.
16     Q.      And he goes on to explain the belief then,
17  right?
18     A.      Correct.
19     Q.      That "God has determined the precise
20  physiological makeup of each person," correct?
21     A.      He says that.
22     Q.      "And, therefore, she believes that the
23  functions of the present COVID-19" -- again in quotes --
24  "would alter" the specific genetic makeup, okay?
25             Is there something concerning in there to you?

EXLER REPORTING
412-221-4007

60

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1      A.      Yeah, because it doesn't change your genetic
2  makeup.
3      Q.      Okay.  Did Ms. Gray state that?
4      A.      But you're bringing this forward as his
5  interpretation of her belief.
6      Q.      Okay.  So the fact that he stated that that's
7  his understanding as a pastor of what genetic makeup
8  would be, that's what you're relying upon your decision
9  about Mrs. Gray's belief, correct?
10     A.      I'm relying on her entire thing.  What he said
11  was she believes that the functions of the present
12  COVID-19 vaccines would alter the specific genetic
13  makeup of her body.
14     Q.      Okay.
15     A.      So he said what her belief is.  I'm going on
16  the entire thing which she -- which is basically
17  medical, not religious.
18     Q.      And vaccines is in quotes, correct?
19     A.      I don't know why it was -- it is in quotes.
20     Q.      Okay.  You're a palliative care physician,
21  correct?
22     A.      I am.
23     Q.      Can you describe what palliative care is?
24     A.      It's for anyone that has serious illness that
25  they will -- that we talk about their goals and we talk

EXLER REPORTING
412-221-4007

61

Jennifer Burke, D.O. - by Mr. Daller

_ _ _ _ _

1  about making them a little more comfortable.
2      Q.      And do you believe in all the tenets of
3  palliative care?
4      A.      You'd have to say each one for me to say yes
5  or no.
6      Q.      Do you believe in comfort measures?
7      A.      In the appropriate patient, yes.
8      Q.      Can comfort measures hasten death?
9      A.      The goal should be comfort, not death.
10     Q.      I understand what the goals are.
11             Do you agree that in providing comfort care,
12  death can be hastened?
13     A.      That's never my goal.
14     Q.      I didn't ask whether it was your goal.
15     A.      But -- but from a -- while standing in front
16  of legal people, that's never my goal.  My goal is
17  always to make comfort.  I would never hasten anybody's
18  death.
19     Q.      What's the term for an unintended consequence
20  of an intended act?
21     A.      You're talking about the double effect?
22     Q.      Correct.
23     A.      Well, I mean, there's -- there's beliefs that
24  that occurs and there's beliefs that it doesn't occur.
25  So, you know, the intention is that you create -- you

EXLER REPORTING
412-221-4007

62

Jennifer Burke, D.O. - by Mr. Daller

- - - - -

1  create a comfortable death, not any hastening of death.
2      Q.    Okay.
3           MR. HENNESSY:  John, I just want to remind
4  you.  We have Barbara coming in at 10:00 and it's 9:54.
5  Do you think we'll be wrapped up by 10:00?
6           MR. DALLER:  Yeah, I think so.  Just give
7  me a minute and then we'll -- we'll go off the record
8  for about two minutes and then we'll be back and finish
9  up.  Okay?
10          MR. HENNESSY:  Okay.
11             (Brief pause.)
12          MR. DALLER:  Okay.  We can go back on,
13  Karen, if Attorney Hennessy and Dr. Burke are ready.
14          THE WITNESS:  Yeah.
15          MR. DALLER:  All right.  We're back on,
16  Karen?
17          THE VIDEOGRAPHER:  Yes, you're back on.
18  Yes.
19          MR. DALLER:  All right.
20  BY MR. DALLER:
21      Q.    So now that we've looked at the narrative
22  portion and the pastor's statement that was provided in
23  Mrs. Gray's exemption request, Dr. Burke, does this give
24  you a recollection of the reasons why her exemption
25  request was denied?

EXLER REPORTING
412-221-4007

63

Jennifer Burke, D.O. - by Mr. Daller

- - - - -

1      A.    I believe it was denied because it was **medical**
2  **and not religious.**
3      Q.    Okay.  So what she explained was medical?
4      A.    **Correct.**
5      Q.    Okay.  And is it your testimony that when an
6  individual makes medical decisions for themselves, that
7  has nothing to do with religion?
8      A.    **My testimony is that her -- that she did not**
9  **link this for me to her religious beliefs.**
10     Q.    If a patient doesn't link their palliative
11  desires or goals to you and they, you know, say that,
12  "Oh, this is my religious belief that this is what I
13  want," what -- how do you respond to that?
14     A.    **They can have --**
15          MR. HENNESSY:  Objection to form.
16          THE WITNESS:  They can have any religion
17  they want.  I'm not -- I'm not here to put my views onto
18  them.
19  BY MR. DALLER:
20     Q.    Okay.  And provide medical care to them,
21  correct?
22     A.    **I'm there to provide medical care.**
23     Q.    I'm sorry?
24     A.    **I'm there to provide medical care.  If they**
25  **don't want it because of their religion, that's their**

EXLER REPORTING
412-221-4007

64

Jennifer Burke, D.O. - by Mr. Daller

- - - - -

1  concern, not -- you know, I don't -- because I don't
2  have to see them.
3      Q.    Okay.  And if Mrs. Gray has a religious belief
4  on the types of medical care that are acceptable to her
5  because of the religion, because of the tenets of the
6  religion, is that okay?
7      A.    **If we are talking about her getting medical**
8  **care, that's fine.  If we're talking about the fact that**
9  **she had -- that what she presented to the Religious**
10 **Exemption Committee, we did not feel related to her**
11 **religious beliefs, then -- then they're two separate**
12 **questions.**
13     Q.    Okay.  And that's your opinion, correct?
14     A.    **That's my opinion, yes.**
15     Q.    Okay.  And everyone has an opinion, correct?
16     A.    **Yes.**
17     Q.    And opinions are subjective, correct?
18     A.    **They're -- they can be -- they can be based on**
19 **fact.**
20     Q.    And what facts did you rely on that she did
21  not have a sincerely-held religious belief?
22     A.    **I said she didn't tie her -- she could not**
23 **give us a reason why the COVID exemption -- the COVID --**
24 **her religion -- she did not tie her belief to her**
25 **religious belief.**

EXLER REPORTING
412-221-4007

65

- - - - -

1      Q.    And that was your opinion, correct?
2      A.    **That was my opinion.**
3          MR. DALLER:  All right.  That's all I
4  have.  Thank you very much, Doctor.  You have a great
5  weekend.
6          THE WITNESS:  Thank you.  You too.
7          THE VIDEOGRAPHER:  All right.  This
8  concludes the videotaped deposition via Zoom of Jennifer
9  Burke, D.O.  Off the record at 9:58 a.m.
10             (Signature not waived.)
11             (Whereupon, the above-entitled matter was
12  concluded at 9:58 a.m.)
13             - - - - -
14
15
16
17
18
19
20
21
22
23
24
25

EXLER REPORTING
412-221-4007

66

```
 1   DAWN GRAY,
             - - - - -
 2   vs.
     MAIN LINE HOSPITALS, INC.

 3           - - - - -

 4   Videotaped Zoom Deposition of:   JENNIFER BURKE, D.O.
                Date:   August 18, 2023

 5

 6

 7            DEPONENT'S CERTIFICATE

 8            I, JENNIFER BURKE, D.O., deponent herein,
     do hereby certify that following my review of the
 9   transcript of my deposition on the above date:

10   _____  There are no changes

11
     _____  Please indicate the within changes totaling _____
12         number of changes.

13
     _____
14   Date                      Jennifer Burke, D.O.

15

16   Subscribed and sworn to before me, a Notary Public, on
17   this _____ day of _____, 2023.

18
     _____
19   Notary Public

20

21   My Commission Expires:

22

23   _____

24

25
```

68

```
 1   COMMONWEALTH OF PENNSYLVANIA   )
     COUNTY OF ALLEGHENY           )
 2

 3            I, Margaret J. Exler, a notary public in
     and for the Commonwealth of Pennsylvania, do hereby
 4   certify that the witness, JENNIFER BURKE, D.O., was by
     me first duly sworn to testify the truth, the whole
 5   truth, and nothing but the truth; that the foregoing
     videotaped Zoom deposition was taken at the time stated
 6   herein; and that the said videotaped Zoom deposition was
     recorded stenographically by me and then reduced to
 7   typewriting under my direction, and constitutes a true
     record of the testimony given by said witness, all to
 8   the best of my skill and ability.

 9            I further certify that the inspection,
     reading and signing of said videotaped Zoom deposition
10   were not waived by counsel for the respective parties
     and by the witness and if after 30 days the transcript
11   has not been signed by said witness that the witness
     received notification and has failed to respond and the
12   videotaped Zoom deposition may then be used as though
     signed.

13            I further certify that I am not a
14   relative, or employee of either counsel, and that I am
     in no way interested, directly or indirectly, in this
15   action.

16            IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office this 19th day of
17   September, 2023.

18

19

20   _____
     Margaret J. Exler, RPR, Notary Public

21
22
23
24
25
```

67

```
 1   VIDEOTAPED ZOOM DEPOSITION OF JENNIFER BURKE, D.O.
            CHANGES AND/OR CORRECTIONS
 2
 3   PAGE____LINE____NOW READS:_____

 4   _____
 5   SHOULD READ:_____

 6   _____
 7   REASON FOR CHANGE:_____

 8   PAGE____LINE____NOW READS:_____

 9   _____
10   SHOULD READ:_____

11   _____
12   REASON FOR CHANGE:_____

13   PAGE____LINE____NOW READS:_____

14   _____
15   SHOULD READ:_____

16   _____
17   REASON FOR CHANGE:_____

18   _____
19
20   PAGE____LINE____NOW READS:_____

21   _____
22   SHOULD READ:_____
23   REASON FOR CHANGE:_____

24   _____
25           Page ___ of _____
     MJE
```

# EXHIBIT H

PAM TEUFEL

1

– – – – –

1              IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                      – – – – –

3
DAWN GRAY,                     )    Civil Action No.
4                              )    2:23-cv-00263-KNS
              Plaintiff,       )
5                              )
          vs.                  )
6                              )
MAIN LINE HOSPITALS,           )
7  INC.,                       )
                               )
8              Defendant.      )

9

10

11

12

13                     – – – – –

14      VIDEOTAPED ZOOM DEPOSITION OF PAM TEUFEL

15           Wednesday, August 9, 2023
                       – – – – –
16

17

18

19

20

21

22

23                     – – – – –

24  *ELECTRONIC DISTRIBUTION, FORWARDING OR REPRODUCTION OF*
      *THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION*
25          *FROM THE CERTIFYING AGENCY*
                       – – – – –

EXLER REPORTING
412-221-4007

VIDEOTAPED ZOOM DEPOSITION OF PAM TEUFEL, a witness herein, called by the Plaintiff for examination, taken pursuant to the Federal Rules of Civil Procedure, by and before Pamela J. Rose, a Registered Professional Reporter and a Notary Public in and for the Commonwealth of Pennsylvania, held remotely with all participants appearing via Zoom, on Wednesday, August 9, 2023, at 2:35 p.m.

_ _ _ _ _

APPEARANCES:

For the Plaintiff:

**JOHN A. DALLER, ESQUIRE**
Daller Law Firm
P.O. Box 162
510 Pittsburgh Street
Mars, PA 16046
724-201-2050
johndaller@daller-law.com

For the Defendant:

**BRENDAN HENNESSY, ESQUIRE**
Hennessy Law
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
484-875-3111
bhennessy@hennessylawfirm.com

Also Present:

**KAREN BEGLEY, VIDEOGRAPHER**
Litigation Advantage
4411 Gibsonia Road, Suite 5
Gibsonia, PA 15044
412-486-3325
kbegley@litadvantage.com

Dawn Gray, Plaintiff

_ _ _ _ _

I N D E X

_ _ _ _ _

WITNESS: PAM TEUFEL

| E X A M I N A T I O N: | PAGE: |
|---|---|
| BY MR. DALLER | 5, 84 |
| BY MR. HENNESSY | 83 |

E X H I B I T S:

(WHEREUPON, NO EXHIBITS WERE MARKED FOR IDENTIFICATION.)

_ _ _ _ _

P R O C E E D I N G S

_ _ _ _ _

THE VIDEOGRAPHER: Good afternoon. My name is Karen Begley, and I'm a legal videographer with Litigation Advantage.

Today's date is August 9, 2023, and the time is approximately 2:35 p.m.

We are taking the videotaped deposition via Zoom of Pam Teufel, Senior Vice-President Human Resources for Main Line Health, in the case of Dawn Gray versus Main Line Hospitals, Inc.

This case is filed in the United States District Court for the Eastern District of Pennsylvania, No. 2:23-cv-00263-KNS.

Our court reporter today is Pamela Rose from Exler Reporting.

Will counsel please identify yourselves, beginning with the noticing attorney, state whom you represent, and our court reporter will then swear in our witness.

MR. DALLER: John Daller representing Dawn Gray, the Plaintiff.

MR. HENNESSY: Brendan Hennessy. I'm representing the Defendants.

_ _ _ _ _

_ _ _ _ _

PAM TEUFEL,

the witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DALLER:

Q. Good afternoon, Ms. Teufel. How are you today?

A. **Good.**

Q. Good. So I know you and I have talked before in a previous deposition. Where things are going to be repetitive, I'm going to try and get through them very quickly, you know, to save us all some time and then, you know, most importantly spend some time on the specifics of this case. Okay?

I know last time I talked about the purpose of the deposition; not talking over each other so the court reporter, Ms. Rose, can get a good, you know, record of what we're talking about; answering verbally because we can't -- she can't transcribe head nods and grunts and groans, and we all know we do that.

So you understand that?

A. **Yes.**

Q. Okay. And you're not using any type of prescription medication or nonprescription medication that would impair your ability to either understand my

Pam Teufel - by Mr. Daller                                    6

_ _ _ _ _

1  questions or to answer them effectively today; correct?
2      A.    No.
3      Q.    Okay.  If you do need to take a break, you
4  know, let me know and we can certainly do that.
5           MR. DALLER:  Brendan, waive all
6  objections, except to form and privilege, until the time
7  of trial?
8           MR. HENNESSY:  Reserve all objections,
9  except for form, until the time of trial.
10          MR. DALLER:  All right.  Sounds good.
11 BY MR. DALLER:
12     Q.    And I know, Ms. Teufel, we talked about if
13 you've ever been deposed before.  I know you said you've
14 been deposed in a couple of these cases, and I deposed
15 you previously.
16          Has anything else changed?
17     A.    No.
18     Q.    Okay.  And you're still working at Main Line;
19 correct?
20     A.    Correct.
21     Q.    Okay.  And still working there as Senior
22 Vice-President for Human Resources?
23     A.    Yes.
24     Q.    Okay.  And you haven't done any specific
25 training on evaluating exemption -- religious exemption

Pam Teufel - by Mr. Daller                                    7

_ _ _ _ _

1  requests, other than what you had previously done in
2  your education; correct?
3      A.    Correct.  I have no formal training.
4      Q.    Okay.  And no specific training in COVID
5  discrimination cases, from what I recall, or in
6  evaluating a COVID discrimination -- a COVID religious
7  exemption request; correct?
8      A.    No formal training in COVID religious
9  exemption requests.
10     Q.    Okay.  All right.  And have you done any
11 specific training in COVID-related medicine issues or
12 medical issues at all?
13     A.    I don't know what that means.  What do you
14 mean?
15     Q.    Yeah.  Have you taken any type of continuing
16 education about the science of COVID?
17     A.    No.
18     Q.    The science of vaccines?
19     A.    No.
20     Q.    Okay.  All right.  And can you refresh my
21 memory in terms what your role was, if any, in
22 formulating the COVID-19 policy at Main Line Health?
23     A.    So like many health systems, we're creating
24 what their policies were going to be around COVID
25 vaccines.

Pam Teufel - by Mr. Daller                                    8

_ _ _ _ _

1      We already had an existing flu policy mandated
2  for staff, and so I spoke with many of my colleagues
3  around the country, as did many peers.
4      They sent drafts to me.  I would forward them
5  to Greg Papa, who is our Vice-President of Human
6  Resources, as well as our employment counsel,
7  Tom Mendicino.
8      We actually have an HR policy committee that
9  already exists, and so I was sending those copies to
10 them to say this is how others are crafting theirs to
11 help in that formation.
12     Q.    Okay.  So in that regard, you were primarily a
13 conduit, if you will, of information from outside your
14 organization coming to the people that worked in your
15 organizational structure?
16     A.    Yes.
17     Q.    Okay.  And if I recall correctly, you said
18 that there was like a local consortium, something like
19 that, of HR or hospitals that sort of would have calls
20 regarding COVID and the COVID-19 policy and how to
21 implement things.
22          Do I recall that correctly?
23          MR. HENNESSY:  Go ahead.
24          THE WITNESS:  Sorry.  Go ahead.
25          MR. HENNESSY:  I just wanted to object to

Pam Teufel - by Mr. Daller                                    9

_ _ _ _ _

1  the form.
2           But go ahead.
3           THE WITNESS:  There was no consortium.
4  It's just finding different HR groups and message the
5  different CHROs, chief HR officers.
6           We would have conversations together about
7  what are you doing versus what we were going to decide
8  to do.
9  BY MR. DALLER:
10     Q.    Okay.  Were any of those groups kind of
11 specific to -- I don't know -- the Philadelphia area/
12 Southeastern Pennsylvania area, or were they all broad
13 in scope?
14     A.    I spoke to health systems across the country.
15     Q.    Mm-hmm, okay.  All right.
16          Now, how would you characterize Mrs. Gray's
17 job performance, in general?
18          MR. HENNESSY:  Objection to form.
19          But go ahead.
20          THE WITNESS:  I have no knowledge of her
21 job performance.
22 BY MR. DALLER:
23     Q.    So as far as you know, there were no
24 issues regarding the performance of her duties as a
25 Clinical 5 Nurse Coordinator in the emergency room?

- - - - -

1    A.    **I have no knowledge of what her performance**
2    **was, whether that was good or bad.**
3    Q.    Okay.  You would agree that if there were
4    performance issues, those would be reflected in her
5    personnel file; correct?
6    A.    **Correct.**
7    Q.    Okay.  All right.  And, to your knowledge, did
8    Mrs. Gray apply for unemployment?
9    A.    **I am not aware if she applied for**
10   **unemployment.**
11   Q.    Okay.  Are you aware of the result of her
12   request for unemployment?
13   A.    **I'm not aware she applied, and I'm not aware**
14   **of what the results were if she did apply.**
15   Q.    Okay.
16          MR. DALLER:  Ms. Begley, if you can pull
17   up the unemployment decision, appeals referee.  That was
18   the shorter one.  I believe it has MLH-Gray 33 to 35.
19          THE VIDEOGRAPHER:  (Indicating).
20   BY MR. DALLER:
21   Q.    I'll give you a minute to take a look at this.
22   It's three pages, Ms. Teufel, and I just kind of want to
23   get on the record what's on the third page.
24          This is the appeals referee's decision.  This
25   was the result of an application that was filed

- - - - -

1    November 7, 2021 and a hearing was held July 1, 2022.
2          Okay?
3    A.    **(The witness reviews the document.)**
4    Q.    Do you have any questions about what the
5    document is?
6    A.    **I'm still looking at it.**
7    Q.    Okay.  All right.  Just let Ms. Begley know
8    when to scroll.
9          THE VIDEOGRAPHER:  If there's anything you
10   need me to enlarge, please just let me know.
11          THE WITNESS:  I'm on the reasoning part.
12   If you can scroll now.
13          THE VIDEOGRAPHER:  (Scrolling.)
14          THE WITNESS:  Okay.  You can keep going.
15          THE VIDEOGRAPHER:  (Scrolling.)
16          THE WITNESS:  Okay.
17          (The witness reviews the document.)
18          Okay.
19   BY MR. DALLER:
20   Q.    All right.  Have you finished reviewing it?
21   A.    **I did.**
22   Q.    Okay.  I just want to focus on the last
23   paragraph there, "There is no dispute," in the first
24   sentence there.  This was their decision of the appeal
25   officer who wrote it.

- - - - -

1          And just as background, if you'll notice, this
2    was appealed by Main Line Health because Ms. Gray's
3    benefits were originally denied.
4          So the first sentence states that, "There is
5    no dispute in the record, clearly as the Claimant has a
6    sincerely-held religious objection to the vaccine."
7          Do you see that?
8          MR. HENNESSY:  Yeah, I'm going to object
9    to the form.  I mean, you misrepresented the history.
10   This was based on -- I mean, I think the appeal was the
11   Claimant's appeal there.
12          But the witness has already stated that she
13   has no knowledge of the unemployment proceeding, so I
14   object to the foundation.  I don't know what you're
15   asking the witness here.
16          MR. DALLER:  Okay.  So, I mean, I just
17   want to establish -- she is the Senior Vice-President of
18   Human Resources.  I just want to make sure that she's
19   aware of this as we go through.
20          MR. HENNESSY:  Well, it sounds like you're
21   just trying to suggest something to her which isn't
22   true.
23   BY MR. DALLER:
24   Q.    I'm asking do you agree this is what the
25   hearing officer at the time stated?

- - - - -

1    A.    **You're showing me the unemployment response.**
2    **I'm reading what they wrote.**
3    Q.    Okay.  And you see that this hearing officer
4    stated that she had a sincerely-held religious belief;
5    correct?
6    A.    **I see it.**
7          MR. HENNESSY:  Objection.
8    BY MR. DALLER:
9    Q.    Okay.  And also you see that there's no
10   dispute in the record which Main Line was represented
11   at.
12          So they did not dispute that fact either at
13   the hearing?
14          MR. HENNESSY:  Objection.  The witness has
15   already testified she doesn't have knowledge of the
16   relationship.
17          MR. DALLER:  I'm just asking her what it
18   says.  Okay?
19          THE WITNESS:  I would like to say that I
20   don't know that we have the right to challenge what the
21   state writes in their opinions.
22          So I don't know that we have an opportunity to
23   object, but I will certainly ask our legal counsel.
24   BY MR. DALLER:
25   Q.    Okay.  All right.

– – – – –

1      So moving off of the unemployment issue, you
2  had no role in her, Mrs. Gray's, initial religious
3  exemption request; correct?
4      A.   **Correct.**
5      Q.   Okay.  So -- and I think we've talked about
6  that you did not sit on the initial exemption committee.
7      Do you have any knowledge of who made the
8  decision in Mrs. Gray's case, what group of
9  representatives on the committee met that day when they
10  denied her request?
11      A.   **Are you referring to the first submission or**
12  **the appeal?**
13      Q.   The first submission.
14      A.   **I am aware of the membership of the committee,**
15  **the first committee.**
16      Q.   Of the committee total or the committee that
17  actually was present when Ms. Gray's particular
18  exemption request was decided?
19      A.   **I don't know who was sitting in the room that**
20  **day.**
21      Q.   Okay.  All right.  So you have no knowledge as
22  to who might have said what that particular day;
23  correct?
24      A.   **Correct.  I was not in the room.**
25      Q.   Okay.  But you were a member of the appeal

– – – – –

1      A.   **Well, we all opined on everything, but if**
2  **somebody had a question about a certain religion, we**
3  **would tend to ask Brian.**
4      Q.   Okay.  Would you ever like say, "Well, we'll
5  table the decision for today and come back to it because
6  we need information from," maybe, one of your chaplains
7  or something like that?
8      A.   **I don't recall that.**
9      Q.   Okay.  And, now, obviously you knew that her
10  question had been denied because it came before your
11  committee; correct?
12      A.   **Correct.**
13      Q.   Okay.  Did you know the reason that it was
14  denied?
15      A.   **We were not given a reason.**
16      Q.   Okay.  And so when you did your review, you
17  basically looked at what?
18      What materials did you look at?
19      A.   **We looked at the appeal and any documentation**
20  **that was submitted with the appeal.**
21      Q.   Mm-hmm.
22      A.   **And then we had the opportunity to review the**
23  **original submission and if there were any materials that**
24  **were submitted with that submission.**
25      Q.   Okay.  Do you recall if Greg Papa was present

– – – – –

1  committee; correct?
2      A.   **Yes.**
3      Q.   Okay.  And all the members of the appeal
4  committee were always present to review each appeal
5  request; correct?
6      A.   **Yes.**
7      Q.   Okay.  And can you first remind me what -- who
8  they were and what their background was, just briefly?
9  Like what was their specialty, if you will?
10      A.   **So Brian Corbett, who is our general counsel;**
11  **Dr. Barbara Wadsworth, who is our chief operating**
12  **officer; and Dr. John Stallkamp, who is the chief**
13  **medical officer; and myself.**
14      Q.   Okay.  And there was no religious expert;
15  correct?
16      A.   **Correct.**
17      Q.   Okay.  If an issue arose regarding the
18  religion part of it, if you will, okay, how would the
19  committee address that?
20      A.   **Typically, a question about religion Brian is**
21  **more expert than others.**
22      Q.   I'm sorry.  Who is?
23      A.   **Brian Corbett.**
24      Q.   Okay.  So he would address the religious part
25  of it; correct?

– – – – –

1  during the consideration of Mrs. Gray's request?
2      A.   **I don't recall Greg Papa being there.**
3      Q.   Okay.  Do you recall anyone from Human
4  Resources being present, other than yourself, obviously?
5      A.   **No.**
6      Q.   Okay.  Do you recall anybody from the original
7  committee being present?
8      A.   **No.**
9      Q.   So during the discussion about her request,
10  can you tell me what you recall from that discussion?
11      A.   **I can't remember our discernment over her**
12  **exemption, in particular.**
13      Q.   Okay.  Are there any records of this
14  discussion?
15      A.   **I don't have any records, no.**
16      Q.   Okay.  But do you know if anybody kept records
17  during the discussion?
18      A.   **I don't believe they did.**
19      Q.   You don't believe they did, okay.
20      So Main Line Health has no documentation about
21  how or why they made a particular decision regarding an
22  employment action then?
23      Is that --
24      A.   **Correct.**
25      Q.   -- a good -- okay.

_ _ _ _ _

1    Is that something that an institution or an
2  organization should have?
3    A.    I don't know.
4    Q.    Okay.  Does Main Line Health have any
5  personnel policies that require documentation of
6  personnel actions and personnel files?
7    A.    **We have a personnel file policy, and we have a**
8  **performance management policy.**
9    Q.    Okay.  So you have a file policy.  What was
10  the second one?
11    A.    **Performance management.**
12    Q.    Performance management policy, okay.
13    Okay.  And, to your knowledge or belief, were
14  the policies followed in Mrs. Gray's case?
15    A.    **Yes.**
16    Q.    Okay.  So since you testified before that you
17  weren't -- that there's no policy in terms of the
18  documentation, then if the -- if it was followed, then
19  Main Line Health did not document anything; correct?
20    A.    **So we have a COVID-19 policy for vaccines that**
21  **stated what employees had to do to comply with the**
22  **policy -- get the vaccine or file a religious or a**
23  **medical exemption -- and we responded, to every employee**
24  **that filed an exemption, with documentation.**
25    Q.    That basically your request was accepted

_ _ _ _ _

1  or denied; correct?
2    A.    **Correct.**
3    Q.    Okay.  But the basis of the denial, if that
4  was the case, there was no documentation to that;
5  correct?
6    A.    **I would have to re-read how we wrote the**
7  **denial letters to say if there was documentation there.**
8    Q.    Okay.  All right.  Now, do you -- you don't
9  recall any discussion regarding Mrs. Gray's exemption
10  request and her appeal, if I understood you correctly.
11    Do you have any recollection of your decision
12  regarding her appeal request?
13    A.    **I do not.**
14    Q.    Okay.  So you don't recall if you said, you
15  know, we should approve it and you got over-voted or
16  overruled or, you know, gave into the consensus then?
17    You don't have any recollection of that;
18  correct?
19    A.    **I do not.**
20    Q.    Okay.  And you have no recollection as to
21  whether or not that day you decided to approve it or
22  not, you, yourself, correct?
23    A.    **Correct.**
24    Q.    Okay.  And do you recall anybody ever using as
25  a reason for turning down an exemption request that

_ _ _ _ _

1  something expressed within it was, quote, "bad science"
2  at all?
3    MR. HENNESSY:  Objection to form.
4    THE WITNESS:  Do I remember if someone
5  said that the reason we were declining it was for bad
6  science?
7    Is that the question?
8  BY MR. DALLER:
9    Q.    Correct.
10    A.    **I do believe we used those words, yes.**
11    Q.    Okay.  And who would be -- was that sort of
12  like everybody said, "Oh, this is bad science," or was
13  it one particular member of the committee that would
14  sort of give guidance to the committee and say, you
15  know, that "this science doesn't make sense"?
16    MR. HENNESSY:  Objection to form.
17    THE WITNESS:  We had a chief medical
18  officer and a doctor of nursing person in the room.  So
19  if there was anything scientific, we would certainly ask
20  for their opinion.
21  BY MR. DALLER:
22    Q.    Okay.  And if, say, the chief medical officer,
23  for example stated, "Oh, this is bad science," that
24  would be sufficient for the group then to make the
25  decision that you would deny an appeal; is that correct?

_ _ _ _ _

1    MR. HENNESSY:  Objection.
2  BY MR. DALLER:
3    Q.    You can answer.
4    A.    **I mean, that's not how we thought about**
5  **things, but we would, again, look at what people wrote,**
6  **and it would be part of our conversation.**
7    Q.    Okay.  Well, I mean, I think you'd agree that
8  if somebody who -- you know, as you said, he's the chief
9  medical officer and I'm sure he has other, you know,
10  qualifications on his CV -- if he said to you, "This
11  appeal request is bad science," are you saying that the
12  committee would say, "No, we disagree with you on that,"
13  if I understood you correctly?
14    MR. HENNESSY:  Objection.
15    THE WITNESS:  What I'm saying is that we
16  would read the appeal in its totality, and so they could
17  have written something about science.  They could have
18  written something about religion.
19    There could have been multiple things written,
20  but on that particular piece, if someone wrote something
21  scientific about what the vaccine would do to them, he
22  would often say, "That's bad science," is my memory.
23  BY MR. DALLER:
24    Q.    Okay.  And if you heard that, okay, that
25  statement, was there ever a time where you still decided

– – – – –
1  that a person had a sincerely-held religious belief?
2      A.   I don't recall.
3      Q.   Okay.  As you sit here today, do you believe
4  that that could be possible; that you would still say
5  that, "Oh, somebody has a sincerely-held religious
6  belief," even though the chief medical officer stated,
7  "This is bad science"?
8          MR. HENNESSY:  Objection.
9          THE WITNESS:  Again, it's hard to
10  hypothesize about it.
11  BY MR. DALLER:
12      Q.   Okay.  Well, unfortunately, since you have
13  little recollection of what happened then, that's kind
14  of the only way I can get to what your opinion might be
15  because I'm sure you would have an opinion, as we sit
16  here today.  Okay?
17          So that's why I'm asking those questions.
18          MR. HENNESSY:  I'm going to clarify that.
19  She's not being offered as an expert witness.  She's
20  being offered as a lay witness but...
21          MR. DALLER:  Correct, but she's also being
22  offered -- she's a fact witness as to what happened
23  during the deliberations, and if a statement was made
24  about science, I need to understand how that influenced
25  her decisionmaking.

– – – – –
1          MR. HENNESSY:  If she has a recollection.
2  If it's just we're asking hypotheticals, you know, you
3  know that those are not admissible or relevant.
4          So I'm giving you some leeway but...
5          MR. DALLER:  And, also, not only does she
6  have no recollection, Main Line has no documentation of
7  what they did.  So, you know, kind of, it's like
8  throwing darts at a board.
9  BY MR. DALLER:
10      Q.   All right.  Did you read Mrs. Gray's religious
11  exemption request?
12      A.   Just now or back then?
13      Q.   Back then, for starters.
14      A.   I mean, my approach, which I said under oath,
15  is I would read the appeal first, and then I would read
16  the original documents that were submitted.
17      Q.   Okay.  So you did consider everything that was
18  in the portal at the time of your review, right, your
19  whatever portal, as you've described previously, where
20  these documents would reside?
21      A.   Yes.
22      Q.   Okay.  All right.
23          MR. DALLER:  Can we pull up the religious
24  exemption request, please?
25          THE VIDEOGRAPHER:  (Indicating).

– – – – –
1  BY MR. DALLER:
2      Q.   I believe there's a total of seven pages
3  that's in there.  For descriptive purposes, Ms. Teufel,
4  I believe that what Ms. Gray did was she handwrote
5  what's on the answers to the questions in the form that
6  Main Line used, and then I believe she also typed up the
7  answers verbatim just to make sure that they were
8  legible.  Okay?  And I think that page has references to
9  Questions 1, 3, 5 and 7 on them.
10          Do you have a preference as to which document
11  we look at, as to whether it's the handwritten one for
12  the specifics of what she wrote, or would you prefer
13  looking at a typed one?
14      A.   If it's just relating to her answer, it's
15  easier to look at the typed one.
16      Q.   Okay.  All right.
17          MR. DALLER:  Ms. Begley, if you could pull
18  up then that page.  At the top of it, it says Page 25 of
19  38.  I believe it was an exhibit that we had filed.  I'm
20  not sure if you included it in the -- there we go.  All
21  right.  Perfect.
22  BY MR. DALLER:
23      Q.   All right.  So we'll start with this one, and
24  then if we need to go back to the other one, you know,
25  we can certainly do that.

– – – – –
1          So Question 1 was about providing a personal
2  statement detailing the sincerely-held religious beliefs
3  that a person has why they can't take the vaccine.
4          Do you agree that that was the question,
5  Ms. Teufel, essentially?
6      A.   Yes.
7      Q.   Okay.  All right.  So if we look at the top,
8  Page 2, Question 1, Ms. Gray says that she's applying
9  for a religious exemption due to the personal conviction
10  of her religious belief.
11          Do you see that?
12      A.   Yes.
13      Q.   And you have no argument with that statement;
14  correct?
15      A.   That's what she wrote.
16      Q.   Okay.  And then she goes on that she's
17  providing a personal explanation; correct?
18      A.   That's what she wrote.
19      Q.   Okay.  And do you have any reason to believe
20  that what she subsequently wrote was not a personal
21  explanation?
22      A.   I believe that is her personal explanation.
23      Q.   Okay.  All right.  So she then went on to
24  provide an example of her belief and explanation;
25  correct?

_ _ _ _ _

1     **A.**    **That's what it looks like.**

2     **Q.**    Okay. And she referenced trying to conceive

3 children; correct?

4     **A.**    **Yes.**

5     **Q.**    Okay. And she talked about the options for

6 that in terms of fertility options; correct?

7     **A.**    **Yes.**

8     **Q.**    Okay. And she described sort of some of the

9 medical issues in terms of the structural hormonal

10 issue; correct?

11     **A.**    **Yes.**

12     **Q.**    And then she did say that they tried some, as

13 she described them, "low-tech options"; correct?

14     **A.**    **Yes.**

15     **Q.**    Okay. And then she went on to talk about how,

16 when the other fertility options were presented, her and

17 her husband prayerfully considered them and concluded

18 that their faith and personal beliefs did not allow them

19 to take further steps.

20     Do you see that?

21     **A.**    **Yes.**

22     **Q.**    Okay. And you would agree that that is a

23 personal statement; correct?

24     **A.**    **That looks like her personal statement.**

25     **Q.**    Okay. And it's based upon her faith; correct?

_ _ _ _ _

1     MR. HENNESSY: Objection.

2     THE WITNESS: She's saying she prayed

3 about it, and because of her faith, they made that

4 decision.

5 BY MR. DALLER:

6     **Q.**    Okay. Do you take this to be, in any way, a

7 scientific argument of her religious exemption request?

8     MR. HENNESSY: Objection to form.

9     THE WITNESS: It's difficult for me to

10 answer because there's mixing of her religion and the

11 fact that she can't put the vaccine in her body because

12 of what it might do to her body, which is scientific.

13 BY MR. DALLER:

14     **Q.**    Okay. So in terms of what it might do to her

15 body, can you be more specific?

16     Well, actually, let me ask you this first:

17 Are you referencing that that interpretation came from

18 any parts that I just read, or are you saying that you

19 recall that from somewhere else in her request?

20     **A.**    **Well, I am reading ahead to the next question**

21 **where she does talk about the genetic component.**

22     **Q.**    Okay. All right. And after she described,

23 you know, what she can't do, right -- that she did not

24 participate or her and her husband said "we cannot do

25 these other therapeutics for fertility," okay? -- she

_ _ _ _ _

1 states that God would allow it to happen through natural

2 means; correct?

3     **A.**    **That's what she wrote.**

4     **Q.**    And then she actually goes and provides a

5 quote from Psalms that kind of formulated the religious

6 belief system, as she stated; is that correct?

7     MR. HENNESSY: Objection to form.

8 BY MR. DALLER:

9     **Q.**    You see the quote from Psalms; correct?

10     **A.**    **I see what she wrote.**

11     **Q.**    Okay. Do you doubt -- do you disagree with

12 the statement as being accurate from the Book of Psalms?

13     **A.**    **I don't know. I'm not a Bible expert.**

14     **Q.**    Okay.

15     **A.**    **I don't have a Bible in front of me.**

16     **Q.**    Okay. And you don't recall whether or not the

17 committee looked at this at all, correct, at the time of

18 the decision?

19     **A.**    **Well, again, as I stated, I read everything**

20 **that was put in front of me.**

21     **Q.**    Okay.

22     **A.**    **Whatever it is.**

23     **Q.**    Okay. You did no independent research

24 yourself to determine any contextual nature of the Book

25 of Psalms 139, Verses 13 to 16; correct?

_ _ _ _ _

1     **A.**    **Correct.**

2     **Q.**    Okay. And then in the next sentence after she

3 just quoted the Book of Psalms, she said, "This is the

4 same belief system that guides my objections to the

5 COVID-19 vaccine."

6     Correct?

7     **A.**    **That's what she wrote.**

8     **Q.**    Okay. Do you disagree with that statement?

9     **A.**    **I mean, this isn't about my personal agree or**

10 **disagree. That's what she wrote.**

11     **Q.**    Okay. Well, I mean, this is about your

12 decision to deny her religious exemption request as part

13 of the appeal, maybe.

14     So whether or not it's your personal decision

15 as to whether or not that is how you would make a

16 decision in your life, you made this decision for

17 Ms. Gray's life; correct?

18     MR. HENNESSY: Objection to form.

19     THE WITNESS: We made a decision on if her

20 religious accomodation would be appealed -- approved or

21 not.

22 BY MR. DALLER:

23     **Q.**    Okay. And then she concluded with, "I'm not

24 comfortable having genetic components, that my body did

25 not create, into my body."

– – – – –

1    Is that correct?

2    **A.    That's what she wrote.**

3    Q.    Okay.  Did anybody say that that statement

4    about genetic components was bad science?

5    **A.    I don't recall.**

6    Q.    You don't recall.  Okay.  All right.

7    And based upon her answer to that question, at

8    that point did you have an opinion as to whether or not

9    she was expressing a sincerely-held religious belief why

10   she could not take the COVID vaccine?

11   MR. HENNESSY:  Objection.

12   THE WITNESS:  I don't recall.

13   BY MR. DALLER:

14   Q.    You don't recall.

15   As you sit here today, can you express your

16   opinion?

17   **A.    I take the whole application as part of how I**

18   **came to my conclusion.  So I just would not have just**

19   **read the first question.  I would have continued**

20   **reading.**

21   Q.    Okay.  Fair enough.

22   Up to this point -- I mean, I think everybody,

23   when they read a document, right, makes a decision?

24   They come to a point, as they're reviewing it, where

25   they say, "Okay, this is what I'm thinking now."  Okay?

– – – – –

1    And that's kind of what I'm asking.

2    What are you thinking now, as you read the

3    answer to Question 1 --

4    MR. HENNESSY:  Objection.

5    BY MR. DALLER:

6    Q.    -- that she has a sincerely-held religious

7    belief, or do you believe that you're leaning towards no

8    because of something you've read within this document?

9    MR. HENNESSY:  Objection.

10   BY MR. DALLER:

11   Q.    You can continue.

12   **A.    So I am thinking she's gotten vaccines her**

13   **whole life and now she doesn't want to get a vaccine.**

14   Q.    Okay.  Do you make any connection between the

15   fertility treatments and the vaccine?

16   **A.    I mean, it's a choice she made.  So certainly**

17   **that is part of the consideration.**

18   Q.    Mm-hmm, okay.  Do you see or believe that

19   there's any religious connection between the two

20   processes?

21   **A.    I mean, she's saying that that's why she did**

22   **not get hormones or IVF, because of her religious**

23   **beliefs, correct.**

24   Q.    Okay.  So other than the fact that she's

25   stating this is a religious belief why she didn't do the

– – – – –

1    IVF treatments and it's her religious belief that she is

2    not going to take the COVID vaccine, other than that, do

3    you see any or do you have any opinion as to their

4    relationship, at all, or do you think they're just

5    totally unrelated?

6    MR. HENNESSY:  Objection.

7    THE WITNESS:  I don't know.

8    BY MR. DALLER:

9    Q.    You don't know.  Okay.

10   Do you think you knew at the time?

11   **A.    I don't know.**

12   Q.    Okay.  If you didn't know at the time, would

13   you believe that you should have asked her?

14   **A.    No.**

15   Q.    Why?

16   **A.    Because we gave every employee the opportunity**

17   **to write as much as they wanted to about why they had a**

18   **sincerely-held religious belief that prohibited them**

19   **from getting the COVID vaccine.**

20   Q.    Okay.  And because she did that and the fact

21   that you and the other members of the committee could

22   not understand that, you decided that she just doesn't

23   have a sincerely-held religious belief; is that correct?

24   MR. HENNESSY:  Objection.

25   THE WITNESS:  You're assuming we didn't

– – – – –

1    understand.

2    BY MR. DALLER:

3    Q.    Well, I mean, do you understand it today?

4    I mean, have you told me everything that you

5    understand about this paragraph?

6    **A.    I think I have told you everything I think I**

7    **understand about that paragraph.**

8    Q.    Okay.  And you don't believe that there's any

9    other possible understanding, other than what you've

10   expressed today; is that correct?

11   **A.    I don't know how to answer that question.**

12   Q.    Well, do you have any other understanding of

13   the meaning of this paragraph?

14   MR. HENNESSY:  Objection.

15   BY MR. DALLER:

16   Q.    You can answer.

17   **A.    I don't know.**

18   Q.    You don't know, okay.

19   And you agree that if someone does not know

20   something, then they don't know it; correct?

21   MR. HENNESSY:  Objection.

22   THE WITNESS:  That might be the strangest

23   question I've ever been asked in my life.

24   BY MR. DALLER:

25   Q.    All right.  Do you have any opinion as to

－ － － － －

1  whether Messenger RNA is part of the genetic system?

2  **A.    What do you mean by a "genetic system"?**

3  Q.    Anything that has to do with inheritance,

4  genes, anything like that.

5  **A.    I don't know.**

6  Q.    Okay.  Looking at the answer to Question

7  No. 4, which was if Ms. Gray had ever applied for a

8  religious exemption, requested anything before, okay,

9  she answered no.

10        And then her answer on the typed page there,

11  if you'd just take a minute to look at that.

12        THE VIDEOGRAPHER:  Did you say Question 4?

13        MR. DALLER:  Correct.  Page 4, Question 5.

14  I apologize.

15        THE VIDEOGRAPHER:  Okay.  No problem.

16        THE WITNESS:  Okay.

17  BY MR. DALLER:

18  Q.    She stated that she did not because of, she

19  said, "the graciousness of her colleagues," but gave

20  examples of how they've switched assignments.

21        Do you see that?

22  **A.    Yes.**

23  Q.    Okay.  And was this explanation something that

24  was acceptable to you in terms of the fact that she had

25  not previously requested a religious exemption?

1  **A.    For me, this was a mix.  Obviously, it had to**

2  **be very emotional to care for someone who may have had a**

3  **miscarriage but it didn't -- I wasn't surprised that she**

4  **didn't officially ask for it, how she stated it that she**

5  **had "gracious colleagues."**

6  Q.    Okay.  So, again, did this statement influence

7  your opinion as to whether or not she had a sincerely-

8  held religious belief?

9  **A.    I think it would have helped if she had**

10  **requested a religious accommodation.  But, again, I**

11  **think it was also emotional and not -- she's saying it's**

12  **religious, but there's obviously high emotion there,**

13  **too, as to why she couldn't care for those patients.**

14  Q.    And do you know what Plan B is?

15  **A.    I do.**

16  Q.    And can you tell me what Plan B is?

17  **A.    It's a drug that would terminate a fetus.**

18  Q.    Commonly known as an induced abortion;

19  correct?

20  **A.    I guess that could be referred to that.**

21  Q.    Do you see a connection between fertility and

22  Plan B?

23  **A.    When you say "connection," what --**

24  Q.    Do you see a spiritual connection between the

25  two?

－ － － － －

1  **A.    I don't know that I thought of it in a**

2  **spiritual way.**

3  Q.    Okay.  So if the individual who wrote this

4  thought of it in a spiritual or religious way, then

5  would that change how you think about what you wrote?

6  **A.    I don't know.**

7        MR. HENNESSY:  Objection.

8  BY MR. DALLER:

9  Q.    You don't know.  Okay.  All right.

10        Question 6 -- and there's no corresponding

11  thing on the typed page.  So before we start moving and

12  losing our place, Question 6 referred to whether or not

13  she belonged to a specific religion, and her response,

14  she's a nondenominational Christian.  Okay?

15        Do you need to see that, or would you agree

16  that that is what -- it looks like we're going to go

17  there anyway.  All right.

18        THE VIDEOGRAPHER:  (Scrolling.)

19        MR. DALLER:  Other direction.

20        THE VIDEOGRAPHER:  (Indicating.)

21        MR. DALLER:  There we go.

22  BY MR. DALLER:

23  Q.    Okay.  Question 6:  Do you have any issue with

24  Question 6 that Ms. Gray stated she was a

25  nondenominational Christian?

－ － － － －

1  **A.    I see that she wrote that, yes.**

2  Q.    Okay.  Do you have any disagreement or reason

3  to the contrary to doubt that?

4  **A.    No.  That's what she wrote.**

5  Q.    Okay.  And when did she first start practicing

6  this religion?

7  **A.    She wrote 1970.**

8  Q.    Okay.  Any reason to disagree with that?

9  **A.    No.**

10  Q.    Okay.  And she applied for an exemption when?

11  In...?

12  **A.    I'd have to look at the date on her**

13  **application.**

14  Q.    Just year.

15  **A.    Oh.  2021.**

16  Q.    Okay.  And then she also indicated when she

17  first started her affiliation, if you will, saying "I'm

18  a nondenominational Christian."

19        What year was that?

20  **A.    What was your question?  I'm sorry.**

21  Q.    What year did she start to become affiliated

22  with the nondenominational Christian movement?

23  **A.    It says her current church is 1998.**

24  Q.    Okay.  That's a period of what?  Twenty-two

25  years or something like that?  Twenty-one years?

– – – – –

1    Is that correct?

2    **A.    Yes.**

3    Q.    Is that a long-standing belief?

4    **A.    It's a long-standing affiliation with the**

5    **church or religion.**

6    Q.    Okay.  And in her answer to Question 1, she

7    said they had been trying for years to get pregnant.

8         So you would agree that she's had these

9    beliefs for at least several years, correct, if not

10   longer?

11   **A.    Her beliefs just about religion or not using**

12   **hormones?**

13   Q.    Well, in Question 1 she was referring to

14   hormones specifically.

15        MR. HENNESSY:  Objection.

16        THE WITNESS:  Yeah.  I mean, I can't say

17   when her beliefs about hormones specifically came to be.

18   BY MR. DALLER:

19   Q.    Mm-hmm, okay.  But in general, her belief

20   system, you would agree, is longstanding; correct?

21        MR. HENNESSY:  Objection.

22        THE WITNESS:  I mean, it's a little vague.

23   Her belief system about injecting things into her body?

24   About hormones?

25   BY MR. DALLER:

– – – – –

1    Q.    Mm-hmm, okay.

2    **A.    Being it's only been around since 2020.**

3    Q.    I'm sorry?

4    **A.    The COVID vaccine was first released at the**

5    **end of 2020, so it has not been around for very long.**

6    Q.    Okay.  So are you saying that the belief not

7    to take -- the belief upon which the reason to not take

8    the COVID vaccine, that belief cannot be present prior

9    to the creation of the COVID-19 vaccine?

10        Is that what you're saying?

11        MR. HENNESSY:  Objection.

12        THE WITNESS:  I was simply stating when

13   the COVID -- your question was vague, and I was trying

14   to understand where you were going.  So...

15        I don't know what I was saying, other than the

16   COVID-19 vaccine has not been around since prior to

17   2020.

18   BY MR. DALLER:

19   Q.    Okay.  Can somebody have a belief prior to

20   2020 that a vaccine, like the COVID vaccine, would not

21   be acceptable to them for their religious belief?

22   **A.    I'm not an expert, but I don't know that there**

23   **are vaccines like COVID-19 vaccine.  So I can't comment**

24   **on that.**

25   Q.    Okay.  And you are correct that until the

– – – – –

1    COVID vaccine, there was no Messenger RNA vaccine that

2    was available on the market.  That is a correct

3    statement.

4         MR. HENNESSY:  Objection.

5    BY MR. DALLER:

6    Q.    Do you believe that someone can have a belief

7    system, however, that would lead to their conclusion not

8    to take the COVID vaccine, 19 vaccine, and that belief

9    system can predate the creation of the COVID-19 vaccine?

10   **A.    It could because there are employees that have**

11   **not gotten any vaccines and have consistently applied**

12   **for a religious exemption for years.**

13   Q.    Okay.  Okay.  And do you know what that belief

14   is based upon?

15   **A.    I don't recall.**

16   Q.    Okay.  If someone's belief is that, as she,

17   you know, explained in Question 1 and some of the other

18   places -- and we'll certainly get to her appeal

19   request -- if their belief is based upon the perfectness

20   of the creation of God and how something about the

21   vaccine can alter that in this particular case, is that

22   necessarily the same argument as those who say "I can't

23   take any vaccine"?

24        MR. HENNESSY:  Objection.

25        THE WITNESS:  Yeah, I don't recall those.

1    BY MR. DALLER:

2    Q.    Mm-hmm, okay.

3         MR. DALLER:  If we can go back to the

4    typed written page, Page 4, Question 7, please.

5         THE VIDEOGRAPHER:  (Indicating).

6    BY MR. DALLER:

7    Q.    And, now, it's important that a religious

8    belief be something that is consistent; correct?

9    **A.    We did look at consistency in the**

10   **applications.**

11   Q.    Okay.  And Question 7, in response to that,

12   she states that she has a consistent approach; correct?

13   **A.    She did write that.**

14   Q.    Uh-huh, okay.  And then she also gave some

15   religious scriptures, as well, correct, to try and

16   explain that?

17        Do you see that?

18   **A.    Yes.**

19   Q.    She believes that "My body is a temple of the

20   Holy Spirit" and to "honor God" and not to do anything

21   that would negatively affect her conscience"; correct?

22   **A.    Correct.  That's what she wrote.**

23   Q.    All right.  And do you have any reason to

24   doubt that, disagree with that, anything like that?

25   **A.    I don't doubt that's what she believes.**

---

- - - - -

1  **Q.** Now, after going through her religious
2  exemption request, can you tell me today, as you sit
3  here, what your opinion is about the sincerity of her
4  religious belief?
5  MR. HENNESSY: Objection.
6  THE WITNESS: I think I've stated before
7  that I didn't put a level of sincerity on people's
8  applications. I read what they wrote. I put that on
9  face value that that is what they believed.
10  BY MR. DALLER:
11  **Q.** Okay. Do you believe she expressed a reason
12  why she could not take the COVID vaccine?
13  MR. HENNESSY: Objection. You're asking
14  her for her opinion, sitting here now, after reviewing
15  these portions of the exemption application?
16  I just want to clarify.
17  MR. DALLER: I'm asking her, as she sits
18  here today, what her opinion is, correct.
19  MR. HENNESSY: All right. I'm going to
20  object to foundation.
21  Again, she's testified she doesn't remember
22  what her decision was, and she's not being offered as an
23  expert but as a fact witness. So this is all irrelevant
24  and inadmissible.
25  MR. DALLER: No, it's actually quite

EXLER REPORTING
412-221-4007

---

- - - - -

1  relevant because I am sure that her opinion, as she sits
2  here today, if she doesn't have one, then I'm not quite
3  sure how she could have had an opinion a year and a half
4  ago when she considered something that she, as we go
5  through this, it's clear --
6  MR. HENNESSY: Again, apples and oranges.
7  Apples and oranges. She met with the committee. She
8  had -- you know, it's a completely different situation.
9  MR. DALLER: All right.
10  BY MR. DALLER:
11  **Q.** So do you have an opinion, as you sit here
12  today, Ms. Teufel, as to the reason why if
13  Ms. Gray expressed a sincerely-held belief that
14  prevented her from getting the COVID vaccine 19?
15  MR. HENNESSY: Objection.
16  BY MR. DALLER:
17  **Q.** You can answer.
18  **A.** **Part of my concerns with her application are**
19  **she believes the vaccine will change her body. So bad**
20  **science.**
21  **And then she says her body is a temple, which**
22  **was not something that, on its face, was an acceptable**
23  **rationale.**
24  **That would be my guess as to why it was**
25  **rejected and the fact that she had never formally filed**

EXLER REPORTING
412-221-4007

---

- - - - -

1  **a religious exemption for any prior vaccine, never asked**
2  **for an exemption to care for patients. All of that**
3  **likely would have been considered.**
4  **Q.** And the fact that it was, quote, "bad
5  science," you're relying on the chief medical officer
6  and the chief nursing officer's opinion as to that;
7  correct?
8  **A.** **Correct. And me.**
9  **Q.** Uh-huh, okay. And you do not have any other
10  understanding of her -- of Ms. Gray's -- exemption
11  request, other than what you have stated today; correct?
12  MR. HENNESSY: Objection. Are you asking
13  her as of now or as of then?
14  BY MR. DALLER:
15  **Q.** Well, let's start with now.
16  **A.** **Yeah. As I'm saying to you, this is what I'm**
17  **thinking we were thinking back then, as I re-read it for**
18  **the first time in almost two years.**
19  **Q.** Okay. So you believe that that was the basis
20  for your decision back then, as well?
21  MR. HENNESSY: Objection.
22  THE WITNESS: Yeah. I'm guessing that
23  that was part of my thought, as I would have considered
24  this request.
25  BY MR. DALLER:

EXLER REPORTING
412-221-4007

---

- - - - -

1  **Q.** Okay. And is it necessary to have a letter
2  from a pastor?
3  **A.** **We gave employees an option to do it. Not**
4  **every employee did.**
5  **Q.** Mm-hmm, okay. Did Ms. Gray? Do you recall?
6  **A.** **She did.**
7  **Q.** I'm sorry. That's --
8  **A.** **She did, yes. I do have it.**
9  **Q.** -- a technological lag, so...
10  Okay. All right.
11  MR. DALLER: If we can bring that up,
12  please. It's on Page 5 of the religious exemption
13  request.
14  THE VIDEOGRAPHER: (Indicating.)
15  MR. DALLER: If we can just look at the
16  typed form, it's probably easier.
17  THE VIDEOGRAPHER: (Indicating.)
18  MR. DALLER: There we go.
19  BY MR. DALLER:
20  **Q.** So this is what her pastor wrote, if you want
21  to take a minute, to, you know, review that.
22  **A.** **(The witness reviews the document.)**
23  **Yep.**
24  **Q.** Okay. And can you tell me what your opinion
25  of the pastor's statement is, please?

EXLER REPORTING
412-221-4007

— — — — —

1     A.     My opinion is that he's restating that she
2   believes the science of the vaccine is going to alter
3   her.
4     Q.     And what does he say in the last paragraph?
5     A.     He wrote that, "Her position on vaccines is
6   consistent with prior decisions she's made."
7     Q.     Now, does fertility have anything to do with
8   vaccines?
9     A.     I don't know.
10     Q.     Okay.  Would that be important for you to
11   understand if there's a relationship between the two, as
12   you evaluate her request?
13     A.     No.
14     Q.     That wouldn't be?
15          Can you explain why, please?
16     A.     I'm not evaluating whether or not she chose to
17   use IVF or not or hormones.
18     Q.     No.  You're evaluating her belief; correct?
19          MR. HENNESSY:  Objection.
20          THE WITNESS:  We're evaluating if she had
21   a longstanding religiously-held belief that would
22   prohibit her from getting the COVID-19 vaccine.
23   BY MR. DALLER:
24     Q.     Okay.  So if her pastor states that her
25   position on the vaccine, which he even put in quotes,

— — — — —

1   "is consistent with previous decisions she has made,"
2   would it not be important to understand what that
3   relationship would be?
4          I'll submit to you vaccines have absolutely
5   nothing to do with fertility.  Okay?  I think that we
6   can agree on that.
7          So at that point then, would that not beg the
8   question that there must be some other relationship
9   there?
10     A.     That's not how I read it.
11     Q.     Okay.  Can you tell me how you read it,
12   please?
13     A.     That she believes that the COVID-19 vaccine
14   would alter her genetic makeup, and that's bad science.
15     Q.     And that is what was told to you by
16   Dr. Stallkamp?
17     A.     Correct.
18     Q.     Okay.  And if Dr. Stallkamp's opinion that it
19   was bad science is incorrect, then would that alter your
20   opinion?
21          MR. HENNESSY:  Objection.
22          THE WITNESS:  He wasn't the only physician
23   that said it, but I guess if the physicians changed and
24   said, "Yes, it absolutely does alter your genetic makeup
25   and cause harm," then I'm sure we would have had a

— — — — —

1   different conversation.
2   BY MR. DALLER:
3     Q.     Okay.
4     A.     And, likely, we would not have mandated a
5   vaccine.  But maybe we would have.  I don't know.
6     Q.     Okay.  If there was evidence that
7   Dr. Stallkamp did not consider in his conclusion, do you
8   believe then that your decision may have been different?
9          MR. HENNESSY:  Objection.
10          THE WITNESS:  Yeah, I'm confused on your
11   first part of the question.  I don't know what you're
12   saying.
13   BY MR. DALLER:
14     Q.     You're saying that you listened to
15   Dr. Stallkamp because he's the expert; correct?
16     A.     Correct.
17     Q.     Okay.  And as the expert, you would expect him
18   to review the available material at the time; correct?
19     A.     Correct.
20     Q.     Okay.  And if he failed to adequately consider
21   the available material, then he would have fell short of
22   his obligation; correct?
23     A.     I don't like to phrase it that way, but that's
24   how you're taking it.
25          I mean, he's a chief medical officer.  He's a

— — — — —

1   physician.  We have infection prevention physicians.  We
2   had a lot of --
3     Q.     Right.  You have a lot of physicians, a lot of
4   opinions, but I mean, ultimately, he's the one who's
5   sitting on this committee --
6     A.     He is.
7     Q.     -- that has told you that this was bad
8   science; correct?
9     A.     Correct.
10     Q.     So again, his opinion about that it was bad
11   science, if that wasn't necessarily accurate, then you
12   would have made your decision on bad information;
13   correct?
14          MR. HENNESSY:  Objection.
15   BY MR. DALLER:
16     Q.     You can answer.
17     A.     It's what he said at the time.
18     Q.     Okay.  All right.  So the committee then made
19   a decision, based upon the statement of a scientist-
20   physician, that determined whether or not someone had a
21   sincerely-held religious belief; correct?
22          MR. HENNESSY:  Objection.
23          THE WITNESS:  That's not what I said.
24   BY MR. DALLER:
25     Q.     But you relied upon Dr. Stallkamp and his

– – – – –

1  opinion; correct?
2  **A.    Whenever an application talks about science,**
3  **we did look to Dr. Stallkamp.**
4  **Q.**    Okay.
5  **A.    We did not look to him to be the expert on**
6  **religion.**
7  **Q.**    Okay.
8          MR. DALLER:  All right.  If we can look at
9  the appeal request -- it kind of follows title -- and
10  then on the top it says Page 30 of 38.
11         THE VIDEOGRAPHER:  (Indicating).
12  BY MR. DALLER:
13  **Q.**    If you can take a minute to review this,
14  please, Ms. Teufel.
15         THE WITNESS:  Can you make it bigger?
16         THE VIDEOGRAPHER:  (Indicating).
17         THE WITNESS:  Thank you.
18         THE VIDEOGRAPHER:  You're welcome.
19         (The witness reviews the document.)
20         THE WITNESS:  Okay.
21  BY MR. DALLER:
22  **Q.**    Okay.  So this is the e-mail that Ms. Gray
23  submitted for her appeal; correct?
24  **A.    Yes.**
25  **Q.**    Okay.  All right.  And in the first paragraph

– – – – –

1  she says that she's submitting this to clarify and more
2  fully explain; correct?
3  **A.    Yes.**
4  **Q.**    Okay.  Do you believe that she accomplished
5  her goal?
6          MR. HENNESSY:  Objection.
7          THE WITNESS:  She added more information
8  than what was in her original submission.
9  BY MR. DALLER:
10  **Q.**    Did she clarify her original submission?
11  **A.    As I said, she added new information about her**
12  **concern over the use of aborted fetal cells in the**
13  **development and generation of the vaccine.**
14  **That was not in her original submission.**
15  **Q.**    It wasn't in her original submission at all?
16  **A.    I don't recall it being in there.**
17  **Q.**    Okay.  Well, let's just take it from the top.
18  So in the second paragraph she says, "I value
19  a perfectly-formed life that God gave me"; correct?
20  **A.    That's what she wrote.**
21  **Q.**    And do you have any reason to doubt that
22  that's her belief?
23  **A.    No.**
24  **Q.**    Okay.  The second paragraph -- or the second
25  sentence talks about that her belief is that "the temple

– – – – –

1  of the Holy Spirit is in the Christian's body"; correct?
2  **A.    That's what she wrote.**
3  **Q.**    Okay.  And she references her previously-
4  submitted exemption request; correct?
5  **A.    Yes.**
6  **Q.**    Okay.  And do you see the connection between
7  the two?
8  **A.    Connection between the two what?**
9  **Q.**    Well, the statement that she made that her
10  "body is a temple of the Holy Spirit that resides" --
11  she's a Christian and the Holy Spirit resides in her
12  body.
13         Do you see that?
14  **A.    I do see that she wrote that.**
15  **Q.**    Okay.  And did she say anything at all like
16  that in her original request?
17  **A.    She did say her body is a temple in the**
18  **original request.**
19  **Q.**    And do you have any reason to doubt her
20  statement or that it's not her belief?
21  **A.    No.**
22  **Q.**    Okay.  And you see that she's "fearfully and
23  wonderfully made by God"; correct?
24  **A.    I read that, yep.**
25  **Q.**    Okay.  And then she says, "I consider that it

– – – – –

1  would have been a violation of my belief to use AI and
2  IVF."
3          Do you see that?
4  **A.    Yes.**
5  **Q.**    Okay.  So she's reiterating that connection
6  between the AI and IVF and her belief; correct?
7  **A.    She's connecting them, yes.**
8  **Q.**    Okay.  And then she gives new information when
9  it talks about gene therapy to enhance knee
10  rehabilitation; correct?
11  **A.    Yes.  That's new information.**
12  **Q.**    Do you doubt that?
13  **A.    I don't.  She wrote it.  I don't doubt that**
14  **that happened.**
15  **Q.**    Is that bad science?
16         MR. HENNESSY:  Objection.
17         THE WITNESS:  I don't know anything about
18  gene therapy to enhance knee rehabilitation.
19  BY MR. DALLER:
20  **Q.**    Do you believe that in vitro fertilization
21  requires the use of anything to alter normal body
22  functions?
23  **A.    I'm not an expert on IVF.**
24  **Q.**    Okay.  Are you aware if Dr. Stallkamp is?
25  **A.    I'm sure he has some knowledge of it as a**

- - - - -
1  physician, but I don't know how much.
2      Q.    Okay.  What type of physician is
3  Dr. Stallkamp?
4            Are you aware?
5      A.    I believe --
6      Q.    I'm sorry?
7      A.    I believe he's a board-certified internal
8  medicine doctor.
9      Q.    Okay.  Then she also says that it would be
10 against her belief to inject any kind of artificially-
11 developed mRNA; correct?
12     A.    She wrote that, correct.
13     Q.    Okay.  Is that bad science?
14     A.    Well, as she wrote prior, that it would alter
15 her genetic makeup.  That's the bad science part.
16     Q.    And you're taking that by the strict
17 interpretation of what "altered genetic makeup" means;
18 correct?
19           MR. HENNESSY:  Objection.
20           THE WITNESS:  I don't know how I'm
21 evaluating it, if it's strict or how I'm looking at
22 that, but...
23 BY MR. DALLER:
24     Q.    Okay.  Well, when she says that her body is
25 "perfectly formed by God," okay, would -- is her body

- - - - -
1  the result of her genetic makeup that God gave her?
2            MR. HENNESSY:  Objection.
3            THE WITNESS:  I don't know.
4  BY MR. DALLER:
5      Q.    You don't know, okay.
6            Do you think that might be an important
7  question when evaluating what she wrote?
8      A.    Well, I know she's gotten other vaccines.  So
9  she didn't -- she's not -- she has put things in her
10 body.
11     Q.    Okay.  But I think you, yourself, testified
12 before that the COVID vaccine was the first Messenger
13 RNA vaccine; correct?
14           MR. HENNESSY:  Objection.
15 BY MR. DALLER:
16     Q.    Correct?
17     A.    I said I wasn't sure if it was the first.  You
18 said it was the first.
19     Q.    I agree with you.
20     A.    Okay.
21     Q.    Okay.  All right.
22           MR. HENNESSY:  I'm going to object.
23           Go ahead.
24 BY MR. DALLER:
25     Q.    The next paragraph she says that she believes

- - - - -
1  life begins at conception and ends at natural death;
2  right?
3      A.    She wrote that.
4      Q.    Okay.  And she wrote that in her original
5  exemption request, too, I believe; correct?
6      A.    I don't remember that part, but we can look
7  back at it.
8      Q.    Okay.  If she did make that statement, then --
9  actually, the next statement she says is that, "I do not
10 believe in abortion"; correct?
11     A.    That's new information in this.
12     Q.    That's new information?
13     A.    Yes.
14     Q.    Okay.  There's nothing about life beginning at
15 conception and ending at natural death that speaks about
16 abortion there?
17     A.    I'm not making that connection, if that's what
18 you're asking.
19     Q.    You're not making that, okay.
20           When does abortion occur?
21     A.    At some point in a person's life?
22     Q.    Uh-huh.  At some point in a person's life.
23     A.    I mean, I don't understand your question.
24     Q.    Okay.
25     A.    When does a woman choose to have an abortion?

- - - - -
1      Q.    If someone performs an abortion, okay, has
2  conception occurred?
3      A.    We're gonna have that religious debate.
4      Q.    We've kind of -- well, we are talking about a
5  religious exemption.
6      A.    Yes, we are.
7      Q.    So I might as well get at it; right?
8      A.    Okay.
9      Q.    So we've got the starting point:  conception;
10 correct?
11           It occurred, because I don't -- I've never
12 heard of an abortion being performed prior to
13 conception.
14     A.    Correct.
15     Q.    Okay.  Therefore, if she made that statement
16 that, "I believe that life begins at conception and ends
17 at natural death," which actually is in her response
18 Page 2, Question 1, she kind of is referencing abortion
19 previously; correct?
20     A.    That would have not occurred to me to pick up
21 on that.
22     Q.    Okay.  Fair enough.  So now with that added,
23 did it ever occur to ask about that?
24     A.    No.
25     Q.    Okay.  And are you aware of Ms. Gray's

- - - - -

1 educational background?

2   A.   **I am not.**

3   Q.   You're not, okay.

4        Are nurses taught to think analytically?

5   A.   **Of course. I think that's a -- they're**

6 **trained to follow protocols, use judgment --**

7   Q.   And that's actually -- I apologize for

8 interrupting you. Were you finished?

9   A.   **-- make decisions, make recommendations to**

10 **physicians and other providers.**

11   Q.   Okay. And that's for a bachelor's-prepared

12 nurse; correct?

13   A.   **We have diploma-prepared nurses that do the**

14 **same job.**

15   Q.   Okay. And if somebody has an advanced degree,

16 would you expect their analytical skills to, perhaps, be

17 even better or more advanced?

18   A.   **I don't know that it has to do with a degree**

19 **more than it has to do with experience.**

20   Q.   Okay. Then you would agree you have a

21 clinical ladder at Main Line; correct?

22   A.   **We do.**

23   Q.   Okay. And are you familiar with where

24 Ms. Gray resided on that ladder?

25   A.   **No, I'm not.**

- - - - -

1   Q.   So if you're not familiar with that today, I'm

2 assuming you were not at the time of her evaluation --

3 of the exemption and appeal request either then;

4 correct?

5   A.   **No, I was not aware then, and I'm not aware**

6 **now.**

7   Q.   Okay. I mean, let's just skip over the fact

8 that she said that it's a direct violation -- that using

9 a vaccine that was created from aborted fetal cells is a

10 direct violation of how precious she considers God's

11 gift of life to be.

12        Do you see that statement, what she wrote?

13   A.   **The Sharing went down, but I can use my own**

14 **copy, I guess.**

15   Q.   You don't have any notes on the copies that

16 you're using; correct?

17   A.   **No.**

18   Q.   So it's in the third paragraph right about the

19 middle: "Receiving."

20        "Receiving a vaccine using this technology

21 would make me feel dirty and contradict my belief that

22 the body is a temple of the Holy Spirit."

23        And right above, "It's in direct violation of

24 how precious I consider God's gift of life to be."

25        Do you see that?

- - - - -

1   A.   **I see that.**

2   Q.   You consider that new information; correct?

3   A.   **The aborted fetal cells is the new**

4 **information.**

5   Q.   Okay.

6   A.   **I mean, she -- I believe she's referenced her**

7 **body as a temple prior.**

8   Q.   Okay. All right. And then a little bit

9 further, actually right beneath it, it says, "I switch

10 assignments with colleagues when patient care involves

11 an abortion or a need to administer Plan B"; correct?

12   A.   **So she wrote it, yeah. I think in a prior**

13 **submission I felt like it was more because she couldn't**

14 **get pregnant and was having a personal disbelief with**

15 **the people who were choosing to abort their fetuses and**

16 **that's why she asked to switch.**

17        **This feels a little different.**

18   Q.   Okay. On Page 4, Question 5 -- and we can

19 pull it up.

20        MR. DALLER: This was from her religious

21 exemption request, Karen. Yeah, Page 4, Question 5.

22        THE VIDEOGRAPHER: (Indicating).

23 BY MR. DALLER:

24   Q.   Can you read the first sentence for me,

25 please?

- - - - -

1   A.   **"Even though I have not officially requested a**

2 **religious exemption on the basis of my beliefs, I've**

3 **relied upon the graciousness of my colleagues' support**

4 **patient decisionmaking when it conflicts with my**

5 **personal religious beliefs."**

6   Q.   Okay. Is the word "emotion" in there

7 anywhere?

8   A.   **No.**

9   Q.   Okay. But you saw the word "emotion" a couple

10 of lines down; correct?

11   A.   **I do see it there, yes.**

12   Q.   Okay. And I believe you testified that that's

13 why you did not value this statement or this answer to

14 this particular question as a religious belief but,

15 rather, as a personal emotional response; correct?

16   A.   **Yes.**

17   Q.   So you made the personal decision then to pick

18 a word and ignore the sentence above; correct?

19        MR. HENNESSY: Objection.

20        THE WITNESS: I didn't ignore what she

21 wrote.

22 BY MR. DALLER:

23   Q.   So that word overpowered the sentence and led

24 you to believe that she was not expressing a sincerely-

25 held religious belief on why she could not take the

- - - - -

1  vaccine but, rather, an emotional response to abortion
2  because she cannot have children; correct?
3              MR. HENNESSY:  Objection to form.
4  BY MR. DALLER:
5      Q.    You can answer.
6      A.    **I just read this as it was not about her**
7  **religion.  It was more about that she could not bear a**
8  **child, and it would be incredibly emotional for her to**
9  **have to care for those patients.  And I believe that's**
10 **true.**
11     Q.    I'm sorry.  You believe that her emotions are
12 more than the belief or...
13     A.    **I believe that that would be an emotional**
14 **thing for her to do and would be very difficult.**
15     Q.    And I think you testified that nobody outside
16 the committee, to your recollection, gave any input into
17 this decision; correct?
18     A.    **That's correct.**
19     Q.    You would agree that these religious
20 statements require some religious interpretation;
21 correct?
22             MR. HENNESSY:  Objection.
23             THE WITNESS:  No.
24 BY MR. DALLER:
25     Q.    They don't?  Okay.

- - - - -

1      A.    **They do not.**
2      Q.    What type of interpretation -- do they require
3  any type of interpretation at all, religious or
4  otherwise?
5      A.    **We were at -- we were evaluating, as I stated**
6  **before, people's ability -- or people's -- do they have**
7  **longstanding religious-held beliefs that connected them**
8  **to why they couldn't get the COVID-19 vaccine.**
9      Q.    Okay.  You're not arguing that Ms. Gray's
10 belief was not longstanding, are you?
11     A.    **I am not arguing that.**
12     Q.    Okay.  So you're basically arguing that she
13 did not make the connection; correct?
14             MR. HENNESSY:  Objection.
15 BY MR. DALLER:
16     Q.    Is that correct?
17             MR. HENNESSY:  Are you asking for argument
18 from her?
19             MR. DALLER:  No.  I'm asking for an
20 answer.  I'm saying that she did not make -- that
21 Ms. Gray, in her application, did not make the
22 connection between her belief and why she can't take the
23 vaccine.
24             That's what I'm asking.  Because we already
25 ascertained it's not because her belief was not

- - - - -

1  longstanding.
2              MR. HENNESSY:  And she testified she
3  doesn't remember what she considered at the time.  I
4  don't know why we've been here for an hour and a half
5  after that but...
6              MR. DALLER:  Oh.  I can tell you we're
7  going to be sitting at trial a whole lot longer when
8  Main Line Health has no documents or any support, other
9  than saying "We didn't think so" and we look at all this
10 but...
11 BY MR. DALLER:
12     Q.    So Main Line Health is not a scriptural
13 interpreter; correct, Ms. Teufel?
14     A.    **Correct.**
15             MR. HENNESSY:  Objection; form.
16 BY MR. DALLER:
17     Q.    Okay.  And the EEOC -- are you familiar with
18 the EEOC?
19     A.    **Yes, I am.**
20     Q.    Uh-huh.  And are you familiar with what the
21 EEOC has said in terms of the evaluation of the
22 sincerity of a sincerely-held religious belief?
23     A.    **Not off the top of my head.**
24     Q.    Okay.  If I were to say that they made the
25 statement that a limited factual inquiry should be made,

- - - - -

1  otherwise pretty much you should accept the sincerity of
2  the belief, would you have any reason to disagree with
3  that?
4              MR. HENNESSY:  I'm just going to object
5  and note that she's not a lawyer.  I don't know where
6  you're going with this.
7              MR. DALLER:  Well, she's a Senior
8  Vice-President of Human Resources and those are the
9  types of people that usually make these types of
10 decisions.  So...
11             MR. HENNESSY:  You're asking a very
12 technical legal question, but the witness can answer if
13 she can.
14             THE WITNESS:  I would rely on my
15 employment attorney for guidance.
16 BY MR. DALLER:
17     Q.    Okay.  All right.  And did you rely on your
18 employment attorney, who was on the committee, for
19 guidance in making this decision?
20     A.    **Brian Corbett was a part of the committee, and**
21 **the four of us discussed every case when we came to our**
22 **conclusions.**
23     Q.    Okay.  Now, Main Line offered accommodations
24 to people; correct?
25     A.    **Accommodations for what?**

1    Q.    For not taking the vaccine; correct?

2    A.    **You mean did we accrue some religious**

3    **accommodation -- religious rationale to not get the**

4    **vaccine?**

5    Q.    No. Let me ask you this: Is the granting of

6    a religious exemption an accommodation?

7    A.    **I don't know that I'd call it accommodation,**

8    **but, yes, I guess it is an accommodation.**

9    Q.    Okay.

10    A.    **You didn't get -- you got the vaccine or you**

11    **got an exemption, whether that was medical or religious.**

12    Q.    Okay. Did employees who got a religious

13    exemption have to do anything different at work, like

14    any other precautions in their job?

15    A.    **We had a testing protocol where they were**

16    **tested for COVID on a weekly basis.**

17    Q.    Okay. Well, was that only on vaccinated

18    people?

19    A.    **It was anyone who had a medical or a religious**

20    **exemption.**

21    Q.    Okay. And was that program successful, do you

22    think?

23    A.    **What do you mean by "successful"?**

24    Q.    Did you have any problems with it?

25    I mean, it worked for you; right? You were

1    able to test people? You got information back?

2    A.    **I believe everyone had to do that. The City**

3    **of Philadelphia tested people twice a week, and we did**

4    **do that for a long time. It's no longer a requirement.**

5    Q.    Okay. Did anybody ever ask Mrs. Gray if she'd

6    be willing to pay for the test?

7    A.    **I don't know that.**

8    Q.    Do people in the emergency room have to wear

9    masks?

10    A.    **So we had a masking protocol for a long time.**

11    **I believe it just ended this year in 2023. It could**

12    **have been 2022. But it's been recent that we dropped**

13    **our masking mandate for all employees.**

14    Q.    Okay. But at the time they did have to wear a

15    mask; correct?

16    A.    **I believe at that time we all had to wear**

17    **masks.**

18    Q.    Okay. And if people were taking care of

19    somebody suspected of COVID, did they have to do any

20    other -- anything else?

21    Like did they wear "PARPs" or anything?

22    A.    **You said "PARPs"?**

23    Q.    Yeah. You know, things that look like

24    spacesuits that you use for infection control in a

25    hospital?

1    A.    **A PAPR.**

2    Q.    PAPR. Pardon me.

3    A.    **No. The only -- well, wait. If a patient**

4    **came in that was suspicious of COVID or had symptoms --**

5    **and even, actually, back then, I think we had certain**

6    **protocols. Every patient that came into the hospital**

7    **was isolated, tested until we got the results, and then**

8    **it was determined where they were placed, on which unit.**

9    **The only employees that wore PAPRs were**

10    **employees that could not properly wear an N95 mask where**

11    **isolation was needed, whether it was for a beard or the**

12    **size of their face, and because there couldn't be a**

13    **seal, they had to wear a PAPR.**

14    Q.    Okay. And that was for, like, any patient who

15    you suspected to have COVID; correct?

16    So it was really patient-driven rather than

17    employer/employee-driven?

18    In other words, if the patient fit the

19    paradigm of possible COVID, this is what everybody did?

20    A.    **So to clarify, there were certain units where**

21    **an N95 -- and again, I'm not an expert on what the**

22    **masking protocols were back then -- but in certain areas**

23    **you had to wear an N95 mask.**

24    **I believe there were other areas that you**

25    **could wear a surgical mask, and it was based on**

1    infection prevention protocols.

2    **The PAPR was strictly if you had to work in an**

3    **area where you needed an N95 and you couldn't get a good**

4    **seal. Then you wore a PAPR. But those were not high**

5    **numbers of people, in my memory.**

6    Q.    All right.

7    MR. DALLER: If we can just finish up with

8    her appeal request again, please, last paragraph there.

9    Ms. Begley?

10    THE VIDEOGRAPHER: Sorry about that.

11    MR. DALLER: That's okay.

12    So the appeal request has the Page 30 of

13    38 up on top. It's the last paragraph of the appeal

14    above the signature line: "If this appeal" --

15    THE VIDEOGRAPHER: Sorry. (Indicating).

16    MR. DALLER: There we go, yeah.

17    BY MR. DALLER:

18    Q.    So I'll give you a minute just to read the

19    paragraph.

20    A.    **(The witness reviews the document.)**

21    **Yep.**

22    Q.    Okay. Do you believe that this information

23    helped clarify her request?

24    A.    **This paragraph in particular?**

25    Q.    Well, no. I mean this document. I mean, she

– – – – –
1  said, "If this appeal has not further clarified my
2  sincerely-held religious belief..."
3       Do you believe that she was successful or met
4  her objective in clarifying the request?
5       A.   I mean, she added new information.  So I don't
6  know what she thought when she submitted it.
7       Q.   So you didn't know what she thought when she
8  submitted it.
9       Do you know what you thought when she
10  submitted it?
11       A.   Well, as I've already stated, there was new
12  information about aborted fetal stem cells, about her
13  knee.
14       I believe that those were the new pieces of
15  information.
16       Q.   Okay.  Did that clarify anything for you?
17       A.   I don't know if it clarified anything for me.
18       Q.   Okay.  What verb would you put in there in
19  terms of what it did?
20       A.   I don't know.
21       Q.   You don't know, okay.
22       And you don't know, as you sit here today;
23  correct?
24       A.   Well, again, part of me wonders why the
25  aborted fetal stem cell wasn't in the first submission.

– – – – –
1       Did someone tell her to add it so it would
2  help her case?  I don't know.
3       Q.   "I believe that life begins at conception and
4  ends at natural death," following a quote from the Book
5  of Psalms.
6       So again going back to the paragraph of "As I
7  stated in my attached religious exemption" where she
8  highlights that and then immediately says, "I do not
9  believe in abortion."  Okay?
10       A.   Okay.
11       Q.   For someone who is analytical and understands
12  that, by definition, an abortion can only happen after
13  conception, rather than clarifying, you're saying that
14  abortion as a topic is a new fact in her appeal; is that
15  correct?
16       A.   So her linking it to the fact that the vaccine
17  was made with fetal stem cells was new information and,
18  yes, her overtly stating that word "abortion."
19       Q.   Mm-hmm.
20       A.   The fact that the vaccine was made with
21  aborted fetal stem cells was not in her original
22  submission.
23       Q.   Do infertility treatments or the process of
24  IVF require the termination of an embryo's existence at
25  all?

– – – – –
1       A.   I have no idea.
2       Q.   Do you think that might be a piece of
3  information that would be helpful to you in analyzing
4  this?
5       A.   I didn't make a -- I don't make a connection
6  between IVF and the COVID-19 vaccine.  I wasn't asked to
7  evaluate that.
8       Q.   So, if anything, that relied upon the science?
9       If it required scientific interpretation, you
10  relied on your expert; correct?
11       A.   That's correct.
12       Q.   That's correct, okay.
13       And if he didn't make that connection, then
14  you would have just said bad science?
15       You'd agree with him it's bad science;
16  correct?
17       A.   Well, again, if someone said they thought the
18  vaccine was going to do something to them, I would look
19  to him to say, "Is that accurate?"
20       Q.   And if he did not understand it and just said,
21  "Yeah, that's accurate," then you would rely on his
22  opinion; correct?
23       A.   Yes.
24       Q.   Okay.  And in the last paragraph of her
25  appeal --

– – – – –
1       MR. DALLER:  If we could go back to that
2  for a minute?
3       THE VIDEOGRAPHER:  (Indicating).
4       MR. DALLER:  The other way.  The other
5  way.  Above the signature line.
6       THE VIDEOGRAPHER:  (Indicating).
7       MR. DALLER:  There we go.
8  BY MR. DALLER:
9       Q.   She says that "If I haven't been successful in
10  clarifying" -- I'm paraphrasing -- "if I have not been
11  successful, please let me know how" -- you know, "what I
12  can do."
13       Is that kind of what she said?
14       A.   That is what she said.
15       Q.   And did anybody reach out to her?
16       A.   I don't believe so, other than to send her the
17  letter that this was denied.
18       Q.   Okay.  Do you know what the term "interactive
19  process" is?
20       A.   I do know that phrase.
21       Q.   Okay.  Can you give me your understanding of
22  the phrase, please?
23       A.   Under the Americans with Disabilities Act
24  process, if somebody has an injury and they cannot
25  perform the essential duties of their function, we have

---

Pam Teufel - by Mr. Daller                                    74

– – – – –

1  a reasonable accommodation meeting or meetings to
2  determine what they can and can't do with those medical
3  restrictions.
4      Q.   Okay.  And does that extend to discussions of
5  religious exemptions?
6              MR. HENNESSY:  Objection.
7  BY MR. DALLER:
8      Q.   You can answer.
9      A.   We did not have an interactive process.  We
10  were very clear in the policy.  If anybody wanted
11  something considered, they had to put it into the
12  application.  A time limit, we were dealing with over
13  200 submissions.
14     Q.   Mm-hmm, okay.  So you're saying that you kind
15  of modified your process because of the time limit;
16  correct?
17     A.   No, we didn't modify it.  We had it clearly
18  stated what it was.
19     Q.   Well, you said that you were under a time
20  limit, I thought, and that you had over 200 submissions.
21          Did you feel that you were under a time
22  crunch?
23     A.   I felt we had to meet for long hours to review
24  a lot of materials in order to get back to employees.
25     Q.   Okay.  Do you recall how long your

EXLER REPORTING
412-221-4007

---

Pam Teufel - by Mr. Daller                                    75

– – – – –

1  conversation about Mrs. Gray's appeal request took?
2      A.   No, I do not.
3      Q.   Do you have a recollection on how long they
4  took, in general?  You know, not just Ms. Gray's?
5      A.   We had multiple meetings for hours to review
6  appeals.  So I don't know, in any one case, how long
7  each one took.
8      Q.   When you say "multiple," can you give me an
9  idea?  I mean, are we talking ten?  Twenty?  Five?
10     A.   I mean, multiple's a broad word.
11     A.   We had at least three to four in-person three-
12  to four-hour meetings, and then some people applied for
13  accommodations later because of pregnancy, and so those
14  were usually one at a time.
15          So we could have had ten meetings in total.  I
16  don't recall the exact number.
17     Q.   All right.  But for most part, you said you
18  had three- or four four-hour meetings, roughly?
19     A.   That's my memory.
20     Q.   Okay.  So that's about... what?  Sixteen
21  hours; correct?
22          And how many people applied for accommodations
23  for submitted appeals?
24     A.   My memory is it was in the 200 range.  I don't
25  know the exact number.

EXLER REPORTING
412-221-4007

---

Pam Teufel - by Mr. Daller                                    76

– – – – –

1      Q.   Okay.  So it was about 16 hours total of
2  meeting time; correct?
3      A.   For the original group, that's my memory.
4      Q.   Okay.  Was Ms. Gray in your original group?
5      A.   I do believe, based on her dates, that she
6  would have been, yes.
7      Q.   Okay.  How many minutes are in 16 hours?  Do
8  you know?
9      A.   No.  I would have to use a calculator.
10     Q.   If I told you it was 960, would you doubt me
11  at all?  And I did use a calculator.
12             MR. HENNESSY:  John, we'll stipulate that
13  it was 960 minutes.  I mean, come on.  You don't ask a
14  witness questions you can get answers to on a
15  calculator.
16             MR. DALLER:  You know, I want to try and
17  avoid as many form and foundation objections as I can.
18  BY MR. DALLER:
19     Q.   So I believe you testified that there were
20  200, roughly, that your group looked at; correct?
21             MR. HENNESSY:  John, and just to clarify
22  the record, I said we reserve all objections except to
23  form, not to foundation.  Foundation --
24             MR. DALLER:  You did make some foundation
25  ones.  So we're really getting off the rails if you --

EXLER REPORTING
412-221-4007

---

Pam Teufel - by Mr. Daller                                    77

– – – – –

1              MR. HENNESSY:  Well... but I still reserve
2  any --
3              MR. DALLER:  I understand.  I understand.
4              MR. HENNESSY:  I just want to put that on
5  the record.
6              MR. DALLER:  I'm not arguing that.
7              MR. HENNESSY:  And, you know, I could have
8  objected to every question for form.
9              MR. DALLER:  I know.
10             MR. HENNESSY:  I'm giving you a little
11  leeway, but go ahead.
12             MR. DALLER:  All right.
13  BY MR. DALLER:
14     Q.   So was it about 200 that you reviewed in that
15  initial group, or was the initial group less?
16          Can you, roughly, give me an idea?
17     A.   I actually don't know.  I mean, the number of
18  200 is in my mind for how many people, too, and I don't
19  know if those were -- how many came later because of
20  pregnancy appeals that wouldn't have come until they had
21  returned from maternity leave.
22     Q.   Okay.  Would you think it would be a good
23  majority of them, though?  Probably about at least
24  three-quarters came during that initial sort of rush of
25  everybody appealing and trying to meet that deadline?

EXLER REPORTING
412-221-4007

---

– – – – –

1    A.    Yes.  Unless you were pregnant.  You had to
2  file your appeal then.
3    Q.    Okay.  All right.  So let's assume 150.  Okay?
4  Seventy-percent.  Do you know how many minutes would
5  have, on average, been spent on each appeal then?
6    A.    I mean, my memory is we spent anywhere from,
7  you know, five to ten minutes on each one.
8    Q.    Okay.  All right.  Nine hundred sixty minutes
9  divided by 150 appeals is 6.4 minutes per appeal.  All
10  right.
11    A.    I should add that the materials were available
12  to us ahead of time, and so typically we would read
13  ahead before we got in the meeting.
14    Q.    All right.  Thank you for adding that.
15          All right.  Why don't we take a ten-minute
16  break, and then hopefully we can wrap this up.
17          Actually, before we do that, was there -- what
18  was the -- you had said there was a time crunch or
19  something, right, to try and get these done.
20          What was the basis of that?
21    A.    The fact that COVID was rampant.  I mean, we
22  wanted to protect our employees and our patients, so we
23  created a policy with dates regarding exemption.
24          Requests had to be in.  When people had to be
25  vaccinated by was upon recommendations of our infection

– – – – –

1  prevention team.
2    Q.    Mm-hmm, okay.  Did it have anything to do with
3  like CMS mandates saying everybody had to be vaccinated?
4    A.    I mean, my memory, yes.  There were CMS
5  regulations.  Again, as I referenced, the City of
6  Philadelphia had even stricter mandates.
7    Q.    Okay.  And were those requirements to be
8  vaccinated?
9          Is that your understanding of what the
10  requirement was by a certain date?
11    A.    We had to report vaccination.  I'm not an
12  expert of how the CMS rights were written.
13    Q.    Mm-hmm, okay.  Was there a financial benefit
14  to having more people vaccinated?
15    A.    For Main Line Health?  No.  It cost us a lot
16  of money.
17    Q.    So there was no financial incentive, if you
18  will, to have people vaccinated?
19    A.    So just like flu where the payers actually
20  ding us if people are not vaccinated, which is why it
21  was mandatory, there was an allusion to it's going to
22  be -- well, there was a tracking by CMS.
23          There was an inference that at some point it
24  was going to count towards something as a quality
25  evaluation would be considered, but I don't know that

– – – – –

1  it's there yet.  But it is the requirement that we track
2  it and report it.
3    Q.    Okay.  And that was true for flu, as well;
4  correct?
5    A.    That is true for flu today.
6    Q.    Okay.  And did that -- those metrics don't
7  take into account whether you had applied for an
8  exemption; is that correct?
9    A.    Correct.
10    Q.    Was Ms. Gray -- where was Ms. Gray on the
11  compensation ladder?  Do you know?
12    A.    I don't know.  I don't know what her pay was.
13    Q.    Okay.  If she was a Clinical Nurse 5, she'd be
14  pretty well paid; correct?
15          MR. HENNESSY:  Objection.
16          THE WITNESS:  Yeah.  Your experience moves
17  you up, and the clinical ladder moves you up from there.
18  So you could be more junior.
19          So I don't know where she would have fallen.
20  BY MR. DALLER:
21    Q.    Say that again.  I don't quite understand.
22    A.    Experience is going to move you up over time.
23  You get increases, and then the clinical ladder puts you
24  up from there.  But you can be on the clinical ladder as
25  more junior nurse.

– – – – –

1    Q.    Okay.  All right.  If Ms. Gray had been at
2  Main Line Health for a couple decades, I believe, she'd
3  be pretty high up if she was also a Clinical 5, correct?
4    A.    She would likely be at least at the midpoint
5  of the range.
6    Q.    Okay.  Were there any merit increases that
7  were given out in the emergency department around the
8  time she was terminated?
9    A.    So we typically do merit increases in the
10  fall.  It used to be November 1st.  Now it's
11  October 1st.
12    Q.    And were there equity increases at the time
13  she was terminated?
14    A.    So I should clarify on the merit.  The year of
15  2020 I don't believe there was a merit increase for
16  anyone because of COVID, and then there was an equity
17  for nurses that was done in, I believe, the summer of
18  2021.  I'm trying to remember.
19    Q.    Okay.  So because of COVID in 2020, there were
20  no merit increases; correct?
21    A.    That's my memory, yes.
22    Q.    Okay.  And finances did not improve in 2021
23  because of COVID; correct?
24    A.    Correct.
25    Q.    I mean, it still was a bad time?

Pam Teufel - by Mr. Daller                 82

- - - - -

1    A.    **Correct.  We are, yes, struggling financially.**

2    Q.    Okay.  But you gave equity increases sometime

3    in 2021; correct?

4    A.    **We did give equity increases to nurses to**

5    **compete with the market.**

6    Q.    Mm-hmm, okay.  All right.  So let's go ahead

7    and take that ten-minute break and then we'll be back.

8          THE VIDEOGRAPHER:  All right.  We're going

9    off the record, and the time is 4:30 p.m.

10         (Whereupon, a short recess was taken.)

11         THE VIDEOGRAPHER:  All right.  We are back

12   on the record, and the time is 4:38 p.m.

13         MR. DALLER:  Okay.

14   BY MR. DALLER:

15   Q.    So, Ms. Teufel, is there anything from our

16   previous discussions that you'd like to clarify before

17   we move forward?

18   A.    **No.**

19   Q.    No?  Okay.

20         And I believe you said that the equity --

21   there was an equity raise sometime in 2021; correct?

22   A.    **Yes.  For nurses.**

23   Q.    Okay.  And is it also true that there was a

24   merit increase sometime in 2021 for nurses or for

25   everybody, for that matter?

EXLER REPORTING
412-221-4007

---

Pam Teufel - by Mr. Hennessy               83

- - - - -

1    A.    **All employees were eligible for a merit**

2    **increase in 2021.**

3    Q.    Okay.  And were there any other raises in 2021

4    that were given?

5    A.    **For nurses?**

6    Q.    Nurses or anybody.  You know, like either

7    nurses in general or everyone in general.  Not like a

8    specific person.  I'm not interested in that.  I'm

9    talking about like across the board.

10   A.    **No, there was no other across the board.**

11   Q.    Okay.  So there was no across-the-board raise

12   given after the termination, say, sometime in November

13   or December of 2021?

14   A.    **No.**

15   Q.    No.  All right.

16         MR. DALLER:  I think that's all I have.

17   Okay?  Thank you very much.

18         MR. HENNESSY:  I have just a couple

19   questions to clarify.

20         MR. DALLER:  Sure.

21         - - - - -

22         EXAMINATION

23   BY MR. HENNESSY:

24   Q.    Did you spend more than 6.5 minutes on each

25   appeal?

EXLER REPORTING
412-221-4007

---

Pam Teufel - by Mr. Daller                 84

- - - - -

1    A.    **We may have.**

2    Q.    Can you tell us exactly how much time, sitting

3    here today, you spent on reviewing each appeal?

4    A.    **No.**

5    Q.    Did it depend on the complexities and nuances

6    of each appeal, each individualized appeal?

7    A.    **Yes.  The length and what people wrote, how**

8    **much conversation we had.**

9    Q.    Okay.

10         MR. HENNESSY:  Thank you.  That's all.

11         MR. DALLER:  Okay.

12         - - - - -

13         EXAMINATION

14   BY MR. DALLER:

15   Q.    And just in followup, would you consider that

16   Mrs. Gray's appeal was complex?

17   A.    **I would agree that there was a lot to read.**

18   **So it likely would have taken longer.**

19   Q.    Okay.  And in your estimate of time that

20   Mr. Hennessy asked about, are you also taking into

21   account the time that people looked at these beforehand,

22   before the actual meeting?

23   A.    **No, I didn't talk about that, but as I stated,**

24   **I would read ahead, because we had access to the portal,**

25   **in preparation for the meeting.  Then it would be**

EXLER REPORTING
412-221-4007

---

Pam Teufel - by Mr. Daller                 85

- - - - -

1    difficult to remember, so you'd always have to refresh.

2    Q.    Okay.  All right.  And you said that you had

3    to refresh.  So, I mean, you had a lot of appeals to

4    review; correct?

5    A.    **As I mentioned, we had about 200.**

6    Q.    And you had no way of -- other than what you

7    read in the portal with the exemption request and the

8    appealed material, there was no other information in

9    that portal, was there?

10   A.    **No.**

11   Q.    Of what was previously discussed?

12   A.    **No.  It was just whatever the employee**

13   **submitted for both the original application and then the**

14   **appeal.**

15   Q.    All right.

16         MR. DALLER:  Okay.  That's all I have.

17   Anything else, Brendan?

18         MR. HENNESSY:  No.  Thank you.

19         MR. DALLER:  Thank you very much.  You

20   have a good day, Ms. Teufel.

21         THE VIDEOGRAPHER:  This concludes the

22   videotaped deposition via Zoom of Pam Teufel.  Off the

23   record at approximately 4:42 p.m.

24         (Signature waived.)

25         (Whereupon, the above-entitled matter was

EXLER REPORTING
412-221-4007

---

86

    _ _ _ _ _
1  concluded at 4:42 p.m.)
2              _ _ _ _ _
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

              EXLER REPORTING

              412-221-4007

87

1  COMMONWEALTH OF PENNSYLVANIA.      )

2  COUNTY OF WESTMORELAND             )

3
4          I, Pamela J. Rose, a notary public in and
   for the Commonwealth of Pennsylvania, do hereby certify
   that the witness, PAM TEUFEL, was by me first duly sworn
5  to testify the truth, the whole truth, and nothing but
   the truth; that the foregoing videotaped Zoom deposition
6  was taken at the time stated herein; and that the said
   videotaped Zoom deposition was recorded stenographically
7  by me and then reduced to typewriting under my
   direction, and constitutes a true record of the
8  testimony given by said witness, all to the best of my
   skill and ability.
9
          I further certify that the inspection,
10 reading and signing of said videotaped Zoom deposition
   were waived by counsel for the respective parties.
11
          I further certify that I am not a
12 relative, or employee of either counsel, and that I am
   in no way interested, directly or indirectly, in this
13 action.
14         IN WITNESS WHEREOF, I have hereunto set
   my hand and affixed my seal of office this 1st day of
15 September, 2023.
16
17  *Pamela J. Rose*
   _____
18     Pamela J. Rose, RPR, Notary Public
19
20      COMMONWEALTH OF PENNSYLVANIA
             NOTARIAL SEAL
        Pamela J. Rose, Notary Public
21         Westmoreland County
   My commission expires September 25, 2024
22      Commission Number 114070
23
24
25
              EXLER REPORTING
              412-221-4007

# EXHIBIT I

1

－ － － － －

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                  － － － － －

3
    DAWN GRAY,                ) Civil Action
4                             ) No.
              Plaintiff,      ) 2:23-cv-00263-KNS
5                             )
        vs.                   )
6                             )
    MAIN LINE HOSPITALS, INC.,)
7                             )
              Defendant.      )
8                             )
                              )
9

10

11                 － － － － －

12  VIDEOTAPED ZOOM DEPOSITION OF BARBARA WADSWORTH, DNP, RN

13             Friday, August 18, 2023
                   － － － － －
14

15

16

17

18

19

20

21

22

23                 － － － － －

24   ELECTRONIC DISTRIBUTION, FORWARDING OR REPRODUCTION OF
    THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION FROM
25             THE CERTIFYING AGENCY
                 － － － － －

               EXLER REPORTING
               412-221-4007

**2**

1          – – – – –
2          VIDEOTAPED ZOOM DEPOSITION OF:
3                BARBARA WADSWORTH, DNP, RN,
4   a witness herein, called by the Plaintiff for
5   examination, taken pursuant to the Federal Rules of
6   Civil Procedure, by and before Margaret J. Exler, a
7   Registered Professional Reporter and Notary Public in
8   and for the Commonwealth of Pennsylvania, held remotely
9   with all participants appearing via Zoom, on Friday,
10  August 18, 2023, at 10:06 a.m.
11          – – – – –
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXLER REPORTING
412-221-4007

**4**

1          – – – – –
2              I N D E X
3          – – – – –
4
5   WITNESS:  BARBARA WADSWORTH, DNP, RN
6
7   E X A M I N A T I O N:              PAGE
8
9     BY MR. DALLER                        6
10
11  E X H I B I T S:              PAGE
12
13    (WHEREUPON, NO EXHIBITS WERE MARKED FOR
14    IDENTIFICATION.)
15
16
17
18
19
20
21
22
23
24
25

EXLER REPORTING
412-221-4007

**3**

1   APPEARANCES:          – – – – –
2   For the Plaintiff:
3       JOHN A. DALLER, ESQUIRE
        Daller Law Firm
4       P.O. Box 162
        510 Pittsburgh Street
5       Mars, PA 16046
        724-201-2050
6       johndaller@daller-law.com
7   For the Defendant:
8       BRENDAN HENNESSY, ESQUIRE
        Hennessy Law Firm
9       101 Lindenwood Drive, Suite 225
        Malvern, PA  19355
10      484-875-3111
        bhennessy@hennessylawfirm.com
11
12  Also Present:
13      KAREN BEGLEY, VIDEOGRAPHER
        Litigation Advantage, LLC
14      4411 Gibsonia Road
        Gibsonia, PA  15044
15      412-486-3325
        kbegley@litadvantage.com
16  Dawn Gray, Plaintiff
17
18
19
20
21
22
23
24
25

EXLER REPORTING
412-221-4007

**5**

1          – – – – –
2          P R O C E E D I N G S
3          – – – – –
4         THE VIDEOGRAPHER:  All right.  Good
5   morning.  My name is Karen Begley, and I am a legal
6   videographer with Litigation Advantage.
7         Today's date is August 18th, 2023, and the
8   time is approximately 10:06 a.m.
9         We are taking the videotaped deposition via
10  Zoom of Barbara Wadsworth, executive vice president and
11  chief nursing officer, in the case of Dawn Gray versus
12  Main Line Hospitals, Inc.
13        This case is filed in the United States
14  District Court for the Eastern District of Pennsylvania,
15  Case Number 2:23-cv-00263-KNS.
16        Our court reporter today is Megan Exler from
17  Exler Reporting.
18        Will counsel please identify yourselves,
19  beginning with the noticing attorney, state whom you
20  represent, and our court reporter will then swear in our
21  witness.
22        MR. DALLER:  John Daller representing Dawn
23  Gray.
24        MR. HENNESSY:  Brendan Hennessy
25  representing Defendant, Main Line Hospital, Inc.
          – – – – –

EXLER REPORTING
412-221-4007

---

6

Dr. Wadsworth - by Mr. Daller

− − − − −

1    BARBARA WADSWORTH, DNP, RN,
2 a witness herein, having been first duly sworn, was
3 examined and testified as follows:
4                      EXAMINATION
5 BY MR. DALLER:
6    Q.    Good morning, Dr. Wadsworth.  How are you
7 today?
8    A.    I'm doing well.  Thank you.
9    Q.    Good.
10          MR. DALLER:  So, Brendan, waive -- reserve
11 all objections to trial except form and privilege?
12          MR. HENNESSY:  Yes.
13          MR. DALLER:  Okay.  And you'll waive any
14 objections as to notice, correct?
15          MR. HENNESSY:  Yes.
16 BY MR. DALLER:
17    Q.    So good morning, again, Dr. Wadsworth.  I know
18 I've spoken to you before.  Just kind of briefly go over
19 the housekeeping issues.
20          I understand that you have a time constraint
21 at 12, and I think we'll be able to get done before
22 that.
23          I'm going to ask you a series of questions
24 today.  It's important that you let me finish the
25 question and that we don't over talk each other.

---

7

Dr. Wadsworth - by Mr. Daller

− − − − −

1          Agree?
2    A.    I agree.
3    Q.    Okay.  And certainly, because of the
4 technology, sometimes that may happen.  I apologize in
5 advance.  If you're not finished with something, please
6 just tell me, "I'm not finished."
7          Okay?
8    A.    Okay.
9    Q.    And if you don't understand a question that
10 I've asked, please ask me to clarify it because I will
11 assume that you're answering it the way I intended it to
12 come out.
13    A.    I understand.
14    Q.    Okay.  And are you taking any prescription or
15 nonprescription medications that could impair your
16 ability to either understand a question or to respond
17 completely and truthfully to any of my questions?
18    A.    No, I am not.
19    Q.    Okay.  And when was the last time you had an
20 alcoholic drink?
21    A.    Last night at dinner.
22    Q.    Okay.  And what time did you get to bed last
23 night?
24    A.    10:15.
25    Q.    Okay.  Now, if you need a break, please let me

---

8

Dr. Wadsworth - by Mr. Daller

− − − − −

1 know.  As I said, you know, we shouldn't be here too
2 long, so hopefully that won't be necessary, but if you
3 do, just I ask that you answer whatever question is
4 pending before we take the break.
5          Okay?
6    A.    Yes.
7    Q.    Now, just refresh my memory.  Did you have any
8 role in the creation of Main Line's COVID-19 vaccine
9 policy?
10    A.    Yes, I had a role.
11    Q.    Okay.  Can you tell me what that role was?
12    A.    So I was in the command center as one of the
13 executive leaders supporting the physician leaders, in
14 the command center that was divided into blue, yellow
15 and green teams.
16          I was on the green team.
17    Q.    Okay.
18    A.    And as part of that, we spent our time daily
19 talking about different policies that needed to be
20 enacted throughout the pandemic, and the COVID policy
21 was one of them where a smaller group of medical staff
22 and other, you know, appropriate experts created some
23 policy draft and then brought it forward to the
24 leadership of our command center teams to review and
25 discuss, and so I was part of it -- part of those

---

9

Dr. Wadsworth - by Mr. Daller

− − − − −

1 discussions, and multiple discussions, including
2 discussions with the CEO and other senior team members.
3    Q.    Okay.  And now you were not on that sort of
4 subgroup that you described in terms of medical and
5 other experts, correct?
6    A.    No, I was not.
7    Q.    Okay.  And do you recall who was on that team?
8    A.    I won't recall everyone, but -- that was on
9 the team, but it included occupational medicine,
10 infectious disease or infectious -- yeah, infectious
11 disease experts, our chair for the system, HR, physician
12 leadership, and there may have been others that were on
13 that subgroup.
14    Q.    Okay.  And then what they did was they kind of
15 brought it to the larger group for kind of signoff any
16 answering of questions and then ultimately
17 implementation; is that correct?
18    A.    The larger group was to ask questions, clarify
19 what other organizations were doing, if that could
20 inform our decisionmaking, also what was being provided
21 by either the local government or the CDC as far as
22 recommendations, CMS recommendations.  Sort of taking in
23 everything that was being shared at that time to see if
24 that influenced what we wanted to do or how it aligned
25 or didn't align and whether or not we were comfortable

---

10

Dr. Wadsworth - by Mr. Daller

— — — — —

1  with that.

2  Q.  Okay.  So the medical group, that subgroup,

3  kind of considered all of the information and then they

4  brought it to your group and your group would ask

5  questions, is that --

6  A.  Correct.

7  Q.  And when your group asked those questions,

8  were the questions based upon or founded in each

9  individual members of that group's, like, understanding

10  of things like that, or did that bigger group bring in

11  other material and say, "Did you consider this?  Did you

12  consider that"?

13  A.  I mean, I don't recall specifically.  I know

14  we were -- we spent a lot of time talking about the

15  policy and the implications of the policy, what other

16  hospitals had experienced because some hospitals across

17  the country were in a different phase than we were, so

18  they had already deployed their policy, and then they

19  even had a few week -- not that much time, but a few

20  weeks or maybe a month ahead of us.

21      I mean, some organizations took no exemptions.

22  Some organizations said yes to one or -- you know,

23  medical exemptions, and then some did medical and

24  religious exemptions, and so to the degree that we could

25  hear others' experiences, we tried bring that in, and

EXLER REPORTING
412-221-4007

11

Dr. Wadsworth - by Mr. Daller

— — — — —

1  sometimes from the chief medical officer or from my

2  perspective as the chief operating officer and the chief

3  nursing officer, we have groups that connect and so you

4  can learn from other groups what they -- what their

5  experience was or how it, you know, supported the

6  organization, the employees, or some of the bumps in the

7  road that they experienced.

8      So we tried to collect that as close to the

9  time that we were developing our policy, so there was a

10  lot of discussion about that.

11  Q.  All right.  Thank you.  Did the phase -- I

12  think you referred to like the phase that a particular

13  hospital was in.  Okay?

14      Did the phase that Main Line was in influence

15  what a religious exemption could be considered for?

16  A.  No.  I don't believe so.

17  Q.  And specifically as it relates to Mrs. Gray,

18  do you recall using any internet sources to review her

19  applications for exemption request?

20  A.  No, I did not.

21  Q.  Okay.  Are you aware of anybody doing that?

22  A.  I'm not aware.

23  Q.  Okay.  And you were not involved in the

24  initial determination of her religious exemption

25  request, correct?

EXLER REPORTING
412-221-4007

12

Dr. Wadsworth - by Mr. Daller

— — — — —

1  A.  No, I was not.

2  Q.  Okay.  And do you have any knowledge of what

3  that discussion entailed?

4  A.  No, I do not.

5  Q.  Okay.  So when your appeal committee -- and

6  we'll go through the specifics later, but when your

7  appeal committee reviewed her exemption, there was --

8  was there anybody there telling you what the denial was

9  based on?

10  A.  I don't recall specifically.  We did have Greg

11  Papa as part of -- he was the connecting person between

12  the exemption -- the Religious Exemption Committee

13  review and the Appeal Committee review.

14      I don't recall specific conversations related

15  to Dawn's exemption, you know, to the denial committee.

16  I don't remember anything particularly specific about

17  that.

18  Q.  Okay.  All right.  But, I mean, in general, if

19  I understood you correctly, Greg Papa would sort of make

20  a connection, "This person was reviewed at the initial

21  Exemption Review Committee.  This was their decision.

22  This is why they decided it, and here's the appeal"?

23      Is that kind of --

24  A.  So we -- not exactly.  So we had -- we had --

25  we knew who was coming forward and we had access to

EXLER REPORTING
412-221-4007

13

Dr. Wadsworth - by Mr. Daller

— — — — —

1  their application, and if we had questions, we would ask

2  Greg.  You know, "Greg, can you help us understand, you

3  know, if you recall, what happened -- what was the

4  discussion around this?"

5      So in this example, "What was the discussion

6  around Dawn's religious exemption and what was the --

7  you know, what was the team talking about that led you

8  to a denial?"

9      So we might ask that.  I don't recall that we

10  did, but that was our process, and so to the degree that

11  he had information and knowledge, he would share that

12  with us at that time.

13  Q.  Okay.  And how would he, you know, have

14  recollection of that knowledge?  Like, did he just, off

15  the top of his head, state it, or did he have any notes

16  or anything like that?

17  A.  Yeah.  I don't --

18      MR. HENNESSY:  I'd object to form.

19      Go ahead.

20  BY MR. DALLER:

21  Q.  You can answer.

22  A.  I don't -- I don't -- I can't answer that.  I

23  just know that when we asked -- I mean, sometimes he

24  would say he didn't recall, but when he did give us

25  information, I don't know where he got that information.

EXLER REPORTING
412-221-4007

14

Dr. Wadsworth - by Mr. Daller

– – – – –

1    Q.    Okay.  Did he bring his laptop with him?
2    A.    We all had our laptops.
3    Q.    Okay.  Was this review virtual, or was it in
4  person?
5    A.    These were in person.
6    Q.    These were in person?
7    A.    Well, I'll say the majority of these were in
8  person with a small group.  I think there were --
9  occasionally, we did them virtually because we were
10  trying to be time sensitive to responding, and so I do
11  think there were a couple that we did virtually, but the
12  initial review of the number of requests we did in
13  person in one of our board rooms.
14    Q.    Okay.  And are there any notes or documents
15  that record the Appeal Committee's deliberations?
16    A.    No notes that were specific.  It was all
17  verbal conversation, and then the final decision was
18  recorded because they would get a letter following up if
19  the religious exemption was approved or if the denial
20  was upheld.
21    Q.    Okay.  So do you have any knowledge of what
22  that document looked like, what it included?  Not the
23  letter that was sent, but sort of the summary of the
24  discussion?
25    A.    So we don't have -- we didn't have -- we

EXLER REPORTING
412-221-4007

15

Dr. Wadsworth - by Mr. Daller

– – – – –

1  didn't keep -- I don't believe we kept notes on the
2  summary of the discussion.  We had the discussion --
3  discussion live with our small group and we answered the
4  questions, and Greg, you know, answered the questions
5  that we had based on what his knowledge was, but we
6  didn't capture any of that on paper.
7        So we didn't take notes of what that
8  discussion was, so, no.
9    Q.    No, okay.  And when -- in general, when you
10  considered an appeal, okay, can you tell me what the
11  factors were that you considered as to whether or not
12  somebody had a sincerely-held religious belief that
13  would warrant them not taking the vaccine in their view?
14    A.    So what we had was -- we had a little bit --
15  we had their original application.  Their exemption
16  request form, we had that, and any documents that came
17  with that.  They were allowed to provide supporting
18  documentation if the application didn't provide them
19  enough space, so we had all of that, and we also had the
20  e-mail that they had -- that they are requesting an
21  appeal because that was the process, for them to send an
22  e-mail that they were requesting an appeal, and so we
23  often -- we had that, as well.
24        So those two documents:  their original
25  application for the exemption and then their e-mail

EXLER REPORTING
412-221-4007

16

Dr. Wadsworth - by Mr. Daller

– – – – –

1  saying that they were appeal- -- that they respectfully
2  were appealing the decision.
3    Q.    And if they submitted additional
4  information with that e-mail saying, you know, "I'd like
5  an appeal," was that information considered?
6    A.    So we had it available.  The appeal process
7  was designed to validate that the exemption committee
8  was fair and consistent and equitable across the board
9  to everyone who applied for a religious exemption.  That
10  was our intent.
11        We did not -- although I will say we did read
12  it.  I read -- well, I'll say I read it, but we did not
13  take additional information into consideration because
14  that was not the intent of the appeal.
15        The appeal wasn't a second chance to make your
16  case.  The appeal was -- was the exemption process
17  applied equitably, fair, consistently by the committee.
18  That was our job.
19    Q.    Okay.  But the material was available --
20    A.    Yes.
21    Q.    -- to look at?
22    A.    Yes.
23    Q.    Okay.  And if somebody did review it, then --
24  I think you testified you were not influenced by it,
25  though, correct?

EXLER REPORTING
412-221-4007

17

Dr. Wadsworth - by Mr. Daller

– – – – –

1    A.    So we did -- we did acknowledge -- because we
2  all -- we all received it, so I know that I read it.  I
3  know other people who were on our team told me that they
4  read it, but we were very conscientious about saying,
5  "However, that does not -- we're not allowing people to
6  give us additional information because we expected
7  people to clearly state their religious -- their
8  strongly-held religious belief in the first
9  application."  It wasn't a second go at it.
10    Q.    Okay.  And, to your knowledge, did anyone
11  speak to any of the applicants at either the initial
12  exemption request -- if there was a question by the
13  committee, did anybody reach out to any of them and say,
14  "Hey.  What did you mean by this?  We don't understand
15  this" or anything like that?
16    A.    So I cannot speak to if there were
17  clarifications in the committee because I wasn't there.
18    Q.    Okay.
19    A.    But I personally have met with other
20  employees.  I did not meet with Dawn, but I met with
21  other employees with some other members of the senior
22  team, typically at their request to discuss their
23  exemption, but we did not -- I did not seek -- I did not
24  seek clarification with anyone individually.
25    Q.    Okay.  And did those discussions influence the

EXLER REPORTING
412-221-4007

18

Dr. Wadsworth - by Mr. Daller
_ _ _ _ _

1  ultimate decision in any way?
2      A.    Are you referring to the employees that I met
3  in person with?
4      Q.    Yes, ma'am.
5              (Telephonic interruption.)
6              THE WITNESS:  Brendan, were you saying
7  something?
8              MR. HENNESSY:  No.  Sorry.  That's the dog
9  in the background.
10             THE WITNESS:  Okay.
11             MR. HENNESSY:  I apologize.
12             THE WITNESS:  Okay.  And I know I'm not
13  supposed to ask questions, but as I -- to the best of my
14  memory, no.  I do not believe that after meeting with
15  the employee that we made any changes.
16             I think that one thing I do recall is we sent
17  -- we went back to the Exemption Committee appeal, the
18  Appeal Committee, which I was on, and we talked about
19  that med- -- that religious exemption another time, but
20  I do not recall that we changed any after we met with an
21  employee face to face.
22  BY MR. DALLER:
23      Q.    Okay.  And were those meetings that, you know,
24  you were involved in, did they only include you and the
25  employee or another member of the Exemption Committee,

EXLER REPORTING
412-221-4007

19

Dr. Wadsworth - by Mr. Daller
_ _ _ _ _

1  or was there anybody outside of the group of Exemption
2  Committee members, the Appeal Committee members that
3  could have been in attendance at those meetings?
4      A.    So, yes.  The other person who would have been
5  in attendance in addition to anybody on the appeals --
6  it wasn't the entire appeal exemption group, so that
7  included myself and others.  It wasn't that entire team,
8  but I was included.
9              So it was with the CEO, and so Jack Lynch
10  would be -- in the one case I'm thinking about, so Jack
11  Lynch was there.  I was there.  Pam Teufel was there.
12  There's two other people there, as I recall.
13      Q.    Okay.  And what was the purpose of that
14  meeting?  You know, not the specific meeting, but, like,
15  those meetings, in general?
16             What was the goal, if you will, of the
17  organization in having that meeting?
18      A.    So Main Line Health is a very transparent
19  organization, and so if an employee wants to talk with
20  us or if we are out and about and people raise a
21  question, a concern, a rumor, I mean, it is not unusual
22  for an employee to send an e-mail to me or to the CEO
23  and for them to get audience with us.  It's not unusual.
24             So during the pandemic that also wasn't
25  unusual, and so the employee that I'm thinking of, she

EXLER REPORTING
412-221-4007

20

Dr. Wadsworth - by Mr. Daller
_ _ _ _ _

1  e-mailed Jack, and Jack said, "I want to meet with her,"
2  and so we did.
3      Q.    Okay.  All right.  And are you familiar with
4  the EEOC rules and guidance in terms of considering a
5  religious exemption request?
6      A.    I am familiar.  I'm not an expert, but I'm
7  familiar.
8      Q.    Okay.  And are you familiar with the fact that
9  the EEOC says that if there's any questions about
10  somebody's request where the sincerity of the belief is
11  questioned, that they should -- that the employer should
12  reach out to the individual?
13             MR. HENNESSY:  I'm going to object to
14  form.  I don't recall seeing that in the EEOC guidance,
15  so I'm just going to object to that.
16             MR. DALLER:  All right.
17  BY MR. DALLER:
18      Q.    Are you familiar with the term "interactive
19  process"?
20      A.    Am I familiar with that?
21      Q.    Yes.
22      A.    I don't know.  I mean, I haven't seen the EEOC
23  form in a while, so I can't speak to it.
24      Q.    Okay.  Do you believe that human resources --
25  human resource workers, individuals, should be familiar

EXLER REPORTING
412-221-4007

21

Dr. Wadsworth - by Mr. Daller
_ _ _ _ _

1  with the requirements of the EEOC?
2      A.    Yes.  I believe that is part of their
3  responsibility.
4      Q.    Would it surprise you that a Main Line Health
5  human resource person believed that Mrs. Gray's
6  exemption should have been granted?
7             MR. HENNESSY:  Objection to form.
8  BY MR. DALLER:
9      Q.    You can answer.
10      A.    I mean, are you asking -- are you asking me to
11  speak about what someone else in HR stated?
12      Q.    No.  I'm asking whether it would surprise you,
13  based upon, you know, your recollection of Mrs. Gray's
14  religious exemption form, that a human resource
15  professional who reviewed her application, that human
16  resource professional works at Main Line Health,
17  believes that her application should have been granted,
18  her request should have been granted?
19             MR. HENNESSY:  I'm going to object to
20  form, and I still don't think there's a foundation for
21  that, and I don't know what you're referring to, but I'm
22  objecting.
23             If she has information she can answer to it,
24  go ahead.
25             THE WITNESS:  I don't have knowledge of

EXLER REPORTING
412-221-4007

22

Dr. Wadsworth - by Mr. Daller

— — — — —

1   that.
2   BY MR. DALLER:
3       Q.   Let me clarify the question. I'm not asking
4   whether you're aware of it. You know, what your opinion
5   of whatever statement was made.
6           It's more would it surprise you, based upon
7   your knowledge of the EEOC's processes and things like
8   that, that a human resource professional would have
9   considered that her exemption request should have been
10  granted?
11          MR. HENNESSY:   Again, same objection.
12  BY MR. DALLER:
13      Q.   You can answer.
14      A.   **I mean, not understanding the context, it's
15  very difficult for me to answer that question.**
16      Q.   So when you considered exemption requests in
17  the appeals, did you have written criteria that you
18  used?
19      A.   **So I believe we did, but I don't recall that I
20  had it out during our meeting.**
21          **It was sort of -- when we did our appeal
22  exemption meeting, our legal counsel was there, and we
23  talked about what were -- what were the accepted
24  exemptions and what would fall outside of that.**
25          **So we would, you know, sort of have a pre**

EXLER REPORTING
412-221-4007

23

Dr. Wadsworth - by Mr. Daller

— — — — —

1   **discussion about, "Okay. So just remind everybody this
2   is what we're looking at. Here's our job, and, you
3   know, here's what we're trying to validate, and, you
4   know, here's the exemption or the exemption guidelines,"
5   you know, just -- but I don't recall them. I didn't
6   have them in the room with me. I don't remember that I
7   had them on my computer either.**
8       Q.   Okay. Was the use of medical information a
9   preclusion to getting a religious exemption request?
10      A.   **I'm not sure I'm clear what you're asking me.**
11      Q.   So if somebody included anything in their
12  religious exemption request that had to do with
13  medicine. Okay?
14          Was that something that would lead to a denial
15  of their request?
16      A.   **Are you asking if they -- if they combined a
17  medical exemption request with a religious exemption
18  request?**
19      Q.   Oh, no. They're not asking for a medical
20  exemption request, but there's medical information in
21  the religious exemption request form.
22          Did that automatically lead to a denial?
23      A.   **I would say that I don't believe there was
24  anything that was an automatic denial.**
25          **There was careful deliberation and discussion**

EXLER REPORTING
412-221-4007

24

Dr. Wadsworth - by Mr. Daller

— — — — —

1   **and review of the exemption requests.**
2       Q.   And, to your recollection, did anyone say that
3   Mrs. Gray's application reflected bad science?
4       A.   **I don't recall that statement.**
5       Q.   Okay. And if anybody -- if there was a
6   science issue, you know, before the committee, did the
7   committee rely on a medical expert who was on that
8   committee to sort of clarify and say, "Yes, this is --
9   this is a medical statement," or -- and -- go ahead.
10          Did anybody -- did the committee rely on a
11  medical expert on the committee regarding "Was this a
12  medical statement"?
13      A.   **As part of our process, if we had a question,
14  then the person with the greatest expertise, so in this
15  case our chief medical officer, Dr. Jon Stallkamp, who
16  would have been in the room or on the call if it was
17  virtual, he would have provided or answered questions
18  that were medically related, yes.**
19      Q.   Okay. And would you have deferred, then, to
20  whatever it was that he said in regards to the medical
21  aspect?
22          In other words, a member of your committee
23  asked him a question and he would make -- give an
24  answer. The committee would say, "Okay. That's what
25  we're going to use as the fact in this particular

EXLER REPORTING
412-221-4007

25

Dr. Wadsworth - by Mr. Daller

— — — — —

1   situation," his statement?
2       A.   **I would say -- again, not recalling the
3   specifics of this conversation related to Dawn, I would
4   say we would, but we could ask another clarifying
5   question, which is completely part of our culture, and
6   Jon would also speak about our medical expert which
7   would have been Dr. Larry Livornese and/or Dr. Brett
8   Gilbert as the system chairs for infectious disease, and
9   we talked to them nearly every day about new things that
10  were coming out, and so, I mean, he might even say, "I'm
11  going to call Brett and ask him."**
12          **Like, it was that fluid. If we had a question
13  and Jon either hadn't spoken to Brett or Larry about
14  that, we would literally call them.**
15      Q.   Okay. So would it be correct to state, then,
16  that specific questions about a specific exemption
17  request could have gone to Dr. Gilbert or Dr. Livornese?
18      A.   **Only the clarifying question.**
19      Q.   Okay. So if there was a question about a
20  statement that somebody made, they could have been asked
21  for their opinion?
22      A.   **Yes. That's accurate.**
23      Q.   Okay. And, to your knowledge, are there any
24  records of these ad hoc discussions?
25      A.   **No. Not that I'm aware of.**

EXLER REPORTING
412-221-4007

26

Dr. Wadsworth - by Mr. Daller

— — — — —

1    Q.    To your recollection, did any of these
2    discussions occur in consideration of Mrs. Gray's
3    exemption request?
4    A.    **No. Not that I'm aware of.**
5    Q.    To your understanding or recollection, did
6    Dr. Stallkamp express an opinion as to the medicine or
7    science of Mrs. Gray's exemption request?
8    A.    **I don't recall that.**
9    Q.    Okay. And are you, yourself, religious?
10   A.    **I am Christian.**
11   Q.    Okay. Does -- do you use your Christian
12   beliefs in making decisions, like, everyday decisions?
13   A.    **I would say mostly, yes.**
14   Q.    Okay. All right.
15              MR. DALLER: Let's pull up Mrs. Gray's
16   exemption request, Ms. Begley.
17              THE VIDEOGRAPHER: (Indicating.)
18   BY MR. DALLER:
19   Q.    And have you reviewed the exemption request,
20   Dr. Wadsworth?
21   A.    **Yes, I have.**
22   Q.    Okay. Recently?
23   A.    **Yesterday.**
24   Q.    Yesterday, okay. All right. You recognize
25   this as her exemption request, correct?

EXLER REPORTING
412-221-4007

27

Dr. Wadsworth - by Mr. Daller

— — — — —

1    A.    **Yes, I do.**
2    Q.    Okay. And when you reviewed it now, did it
3    bring any recollection as to your decisionmaking
4    process, for yourself individually, at the time of the
5    review of her application?
6    A.    **No. No. I don't have any specific memory**
7    **other than I was -- I was surprised because I have -- I**
8    **have, you know, of all of the exemption requests and**
9    **appeals, Dawn is somebody who I feel like I know and**
10   **have seen on multiple occasions in the Paoli ED and**
11   **always had, you know, very good conversations with her,**
12   **so I hadn't realized that -- I just didn't know that**
13   **she, you know, had an exemption request.**
14   **And so, I mean, of all of the exemption**
15   **appeals I looked at, a handful that I know personally,**
16   **Dawn was one of them, and I was like, "Oh."**
17   **I didn't realize that this was -- I didn't**
18   **realize this. I didn't have any previous knowledge of**
19   **her religious beliefs prior to seeing this.**
20   Q.    Okay. Were you aware of the fact that there
21   were certain -- strike that.
22              Did you have a belief as to whether she was
23   religious before you saw this exemption request?
24   A.    **I don't know that I did or didn't. I don't**
25   **remember us ever speaking about religion, but I did have**

EXLER REPORTING
412-221-4007

28

Dr. Wadsworth - by Mr. Daller

— — — — —

1    **multiple conversations over the number of years that**
2    **I've been here.**
3    Q.    Okay. So you said that you didn't know -- you
4    know, that you knew her fairly well and it surprised
5    you.
6              Did that surprise influence your decision in
7    any way?
8    A.    **So I was surprised that Dawn had -- that --**
9    **that -- I was surprised, yes. But what influenced me is**
10   **I always thought very highly of Dawn, and I always**
11   **appreciated her very frank and up-front conversations**
12   **with me, you know, sharing the challenges of working in**
13   **the Paoli emergency department, and, you know, talking**
14   **about her team, and, you know, she loved the people that**
15   **she worked with. And I always found her to be valuable,**
16   **a very valuable person, and so I was -- I -- personally,**
17   **I was sad that the appeal -- you know, I was just sad**
18   **that we weren't going to get to a place.**
19   Q.    Okay. So that sentence came after the fact
20   then and the discussion and the consideration?
21   A.    **Yes, of course.**
22   Q.    Okay. But the fact that -- if I understood
23   your testimony correctly, it doesn't sound like you ever
24   had engaged with Mrs. Gray in a discussion about
25   religion prior to the exemption request, correct?

EXLER REPORTING
412-221-4007

29

Dr. Wadsworth - by Mr. Daller

— — — — —

1    A.    **Correct. I don't believe that we did.**
2    Q.    Okay. And because of your familiarity with
3    her, was that surprise that she had applied, was that
4    something that you viewed negatively because, you know,
5    perhaps you felt she was hiding something from you
6    during those discussions?
7    A.    **Oh, no. Absolutely not. I was just sad**
8    **because I valued -- Dawn was a very valuable member of**
9    **the Paoli team, and I was sad by that.**
10   Q.    Okay. Yeah. There were never any performance
11   issues with her, correct?
12   A.    **I can't speak to exactly that, but I -- I**
13   **mean, she was a clinical coordinator, which is a**
14   **leadership position, and she was a very hard worker and**
15   **my impression was she was a high performer, but I can't**
16   **speak to what was written in her evaluations.**
17   Q.    Okay. But as chief nursing officer, I believe
18   now, or chief operating officer at the time, something
19   like that would have bubbled up to you, had it been
20   true, correct?
21   A.    **No, it would not necessarily get to me at that**
22   **-- unless it was severe, which it was not. I would not**
23   **be aware. I wouldn't be aware.**
24   Q.    Okay. All right. And as you reviewed her
25   application and the appeal, did anyone say that there

EXLER REPORTING
412-221-4007

30

Dr. Wadsworth - by Mr. Daller
_ _ _ _ _

1   was bad science or inaccurate information in it?
2       A.   I don't recall those terms.
3       Q.   Okay.  Any terms like that?
4       A.   I don't recall.
5       Q.   You don't recall, okay.
6            So before we look through this, do you have
7   any recollection as to why you did not believe her
8   exemption should be granted?
9       A.   I mean, I don't have specific recollection of
10  the conversation specifically about her appeal.
11      Q.   Okay.  But you reviewed it yesterday, though,
12  correct?
13      A.   Yes.
14      Q.   Did that review give you any recollection of
15  why you decided that it should not be granted?
16      A.   Yes.
17      Q.   Okay.  Can you tell me those issues, please?
18      A.   So following my review yesterday -- and I
19  might have reviewed it a week ago, but yesterday I did
20  review it again.
21           It was related to what Dawn stated as her
22  sincerely-held religious belief, and that was that the
23  content was not consistent with -- it was focused on
24  genetic components, as I recall, and that -- that was
25  not -- that was not a reason to not take the vaccine.

EXLER REPORTING
412-221-4007

31

Dr. Wadsworth - by Mr. Daller
_ _ _ _ _

1       Q.   Okay.  So when you said that the reason was
2   based upon genetic components, what do you mean by that?
3       A.   Well, I believe -- and if you can pull it
4   up -- I believe that that was the terminology that Dawn
5   used in writing her exemption.
6       Q.   Okay.  So the fact that that term appeared in
7   the request, that was sort of the trigger, then, for the
8   denial?
9       A.   Well, we read the entire application multiple
10  times and reviewed the statement from her pastor, but,
11  yeah.  I mean, the things that were stated, including
12  some of the biblical quotes, did not speak to -- it was
13  -- I mean, it's her religious belief, but it doesn't
14  correlate with why you wouldn't take the COVID-19
15  vaccination.
16      Q.   Okay.  All right.  Let's kind of go through
17  the exemption request.  There's a typewritten version of
18  the written answers, and for the sake of reading, I
19  think we should probably look at those, but I just want
20  to make sure that you, you know, you agree that what you
21  reviewed, though, was typewritten versus handwritten?
22           You don't have -- you know, you agree they're
23  the same?  It's not like one has one set of information
24  and the other says something different, correct?
25      A.   In the initial application, I believe that

EXLER REPORTING
412-221-4007

32

Dr. Wadsworth - by Mr. Daller
_ _ _ _ _

1   they are the same.
2       Q.   Okay.  All right.  And that is what you
3   reviewed, correct?
4       A.   Yes.
5       Q.   All right.
6            MR. DALLER:  So, Ms. Begley, if you can go
7   to the Page 2, Question 1 document?
8            THE VIDEOGRAPHER:  (Indicating.)
9   BY MR. DALLER:
10      Q.   And if you need me to read the question,
11  Dr. Wadsworth, please let me know, you know, in terms of
12  before we read the answer, and I'll certainly kind of
13  help refresh your memory.
14      A.   Could you read Question 1?
15      Q.   Sure.  So, "In the space below, please provide
16  a personal statement detailing the sincerely-held
17  beliefs that are religious in nature regarding your
18  COVID-19 vaccination objection explaining why you are
19  requesting this religious exemption, the religious
20  principles that guide your objections to COVID-19
21  vaccination, and the religious basis that prohibits the
22  COVID-19 vaccination."
23           And then the next sentence basically says,
24  "Use more paper if you need it."
25      A.   Thank you.

EXLER REPORTING
412-221-4007

33

Dr. Wadsworth - by Mr. Daller
_ _ _ _ _

1       Q.   All right.  And do you need a minute to read
2   her answer to Question 1?
3       A.   Yes, I do.
4       Q.   Okay.  Go ahead.  Let me know when you finish.
5       A.   (The witness reviews the document on the
6   screen.)
7            Okay.  I'm ready.
8       Q.   All right.  So after reading that, does that
9   give you any recollection as to why that you believed
10  that her exemption request should be denied?
11      A.   Yes.  Again, it speaks to not having genetic
12  components injected into her body, and, again, that's
13  not -- that's not a rationale for not taking the COVID
14  vaccine.
15      Q.   Okay.  And why is that not a rationale for not
16  taking the COVID-19 vaccine?
17      A.   Because the way that -- I'm not a medical
18  expert, but as I understand it, the way that the vaccine
19  was created, it does not change any of your genetic
20  makeup at all, and so, therefore, it is -- it's to
21  improve your immunity, but it's not going to change any
22  of your genetic makeup.
23      Q.   Okay.  Did Mrs. Gray state that in her
24  paragraph at all?
25      A.   She stated genetic components and that they

EXLER REPORTING
412-221-4007

BARBARA WADSWORTH, DNP, RN

34

Dr. Wadsworth - by Mr. Daller

_ _ _ _ _

1 couldn't be injected into her body.
2    Q.   Okay.  Is that statement inaccurate?
3    A.   Well, in my opinion, as a nonmedical expert,
4 genetic components implies to me that there's something
5 in the vaccine that is going to influence her genetics,
6 and that's not accurate.
7    Q.   Okay.  Did any of the medical people tell you
8 that?
9    A.   It's one of the things that we've discussed.
10 I don't recall specifically related to this application,
11 but it was one of the topics that we've discussed about
12 the vaccination and what -- what can be -- you know,
13 what people can object to as your religious exemption
14 related to how the vaccine is created.
15    Q.   Okay.  So you're aware that Ms. Gray is a
16 master's-prepared nurse, correct?
17    A.   Yes, I am.
18    Q.   And are master's-prepared nurses trained in
19 writing precisely?
20         Is that part of the educational process?
21    A.   I mean, yes.  Master's-prepared nurses are
22 expected to write with a high degree of professionalism
23 and have a, you know, a minimal -- I don't know.
24         I'm not a professor in the school of nursing,
25 but, yes.  Master's-prepared nurses would need to --

EXLER REPORTING
412-221-4007

36

Dr. Wadsworth - by Mr. Daller

_ _ _ _ _

1 "I've chosen to apply for a religious exemption because
2 of personal conviction of my belief."
3         Do you see that?
4    A.   Yes.
5    Q.   Any issue with that statement in terms of how
6 it may have influenced your decision on her exemption
7 request?
8    A.   No.
9    Q.   Okay.  And then she goes on to say that "I
10 have a personal explanation as to why I religiously
11 object," correct?
12    A.   Yes.  That's what that says.
13    Q.   And I think earlier you testified that, you
14 know, you make at least some of your decisions or you
15 may have even said most, I forget, where you have -- you
16 know, you keep in mind your religious beliefs.
17         Is that correct?
18    A.   Yes.
19    Q.   Okay.  So the statement that she made there is
20 kind of consistent with what you said, right?
21         She's using her beliefs to make a decision and
22 she's going to give you an example of how she did it.
23         Is that a fair interpretation of that
24 statement?
25    A.   I think so.

EXLER REPORTING
412-221-4007

35

Dr. Wadsworth - by Mr. Daller

_ _ _ _ _

1 would be expected to write in a certain -- at a certain
2 level.
3    Q.   Okay.  The COVID vaccines that were available
4 at the time, did they contain genetic material?
5    A.   Again, I'm not a medical expert.  I do not
6 believe that they did.
7    Q.   Okay.  If that was -- and you said that you
8 made the conclusion that that's what this statement was
9 talking about, correct?  That genetic material being
10 injected --
11    A.   Yes.
12    Q.   -- is that -- and would you agree that if your
13 understanding of the COVID vaccine was incorrect, that
14 that would have led you to an incorrect interpretation
15 of this statement?
16    A.   I mean, yeah.  Yes.  Yes.
17    Q.   All right.  So if, indeed, the COVID vaccine
18 did contain genetic material that was injected, then her
19 belief system there would be correct; is that not true?
20         MR. HENNESSY:  Objection to form.
21 BY MR. DALLER:
22    Q.   You can answer.
23    A.   I'm not a medical expert.
24    Q.   Okay.  All right.  Now, if we go back to the
25 beginning of the paragraph, you know, she says that,

EXLER REPORTING
412-221-4007

37

Dr. Wadsworth - by Mr. Daller

_ _ _ _ _

1    Q.   So then she goes on to, you know, talk about
2 her attempts at conception, and, you know, determine
3 whether it was a structural issue or a hormonal issue,
4 correct?
5    A.   Yes.  That's what's written.
6    Q.   Okay.  And that they tried several, quote,
7 "low-tech options to achieve a successful pregnancy, but
8 that they did not work."
9         Do you see that?
10    A.   I do.
11    Q.   Did you have an understanding what low-tech
12 options might be?
13    A.   As a nurse, I have some understanding of what
14 they would be.  I'm not sure I could list them all, but,
15 yes, I have some understanding.
16    Q.   Okay.  Can you just give me a couple that you
17 would think of?
18    A.   One I would think of would be trying to
19 identify when ovulation was occurring and using
20 temperatures to help inform the best time to achieve
21 pregnancy.
22    Q.   Okay.  And checking temperature, that's like a
23 measurement, correct?
24    A.   Yes, you're temperature is a measurement.
25    Q.   Okay.  And in taking a measurement, such as

EXLER REPORTING
412-221-4007

38

Dr. Wadsworth - by Mr. Daller

– – – – –

1    temperature, does one change the thing you're taking the
2    temperature of?
3        **A.    Can you restate that?**
4        Q.    Sure.  Let me use a simple example.  If I want
5    to check to see if the steak is cooked, I take a
6    temperature gauge and stick it inside and it tells me
7    how hot the meat is, correct?
8        **A.    Yes.**
9        Q.    Did I change the temperature of that steak by
10   putting in the thermometer at all?
11       **A.    No.**
12       Q.    Okay.  And if I wanted to change it, I needed
13   to do something to it, right?  Like, put it back in the
14   oven, right?
15       **A.    Yes.**
16       Q.    And then the oven, giving off heat, would
17   alter the steak some more, correct?
18       **A.    Yes, provided the oven is on.**
19       Q.    Good point.  Good point.  And that's why I let
20   my wife cook just so I don't do something like that.
21           And then going back to Mrs. Gray's statement,
22   she said that when they next kind of presented the next
23   options, if you will, they "prayerfully considered them
24   and concluded that their faith and personal beliefs did
25   not peacefully allow us to take those further steps,"
                    EXLER REPORTING
                    412-221-4007

39

Dr. Wadsworth - by Mr. Daller

– – – – –

1    correct?
2        **A.    That is what's written.**
3        Q.    Okay.  And then she describes several of those
4    steps:  hormones, artificial insemination, in vitro
5    fertilization, correct?
6        **A.    Yes.**
7        Q.    Okay.  And what would exogenously-administered
8    hormones do to a person's body?  And not, like,
9    specifically, but just in general terms?
10       **A.    So as I understand it as a nurse, it changes
11   the levels of those hormones in your body which can
12   prepare, in this case, the uterus to be more accepting
13   of a fertilized egg and also can lead the ovaries to
14   produce more eggs and bring them to maturity, therefore,
15   increasing the likelihood of a successful pregnancy.**
16       Q.    Okay.  So it kind of manipulates the body into
17   doing something, correct?
18       **A.    Yeah.  It's similar to a medication that you
19   take to control high blood pressure, but it's a hormone
20   and it's going to -- it's going to tell the body, the
21   uterus or the ovaries, it's going to -- it's going to
22   tell the ovaries to do something different or give them
23   more of something that they have that's low.
24           It's going to influence them, in this
25   particular case, potentially in a positive way that**
                    EXLER REPORTING
                    412-221-4007

40

Dr. Wadsworth - by Mr. Daller

– – – – –

1    **would result in a healthy uterus being able to accept a
2    pregnancy.**
3        Q.    Okay.  And what is it that implants into the
4    uterus then?
5        **A.    So the -- again, I'm not a medical expert, but
6    as I understand it, the fertilized egg would implant
7    into the uterus.**
8        Q.    Okay.  And would you agree that a fertilized
9    egg is, broadly speaking, genetic in nature?
10       **A.    Yes.  Yes.  I mean, it's a zygote, so, yes.
11   It's a fertilized egg with DNA, so it's genetic in
12   nature, yes.**
13       Q.    Okay.  And then Ms. Gray states that "Our
14   belief was that if we were to have children, that God
15   would allow it to happen through natural means,"
16   correct?
17       **A.    That's what that says.**
18       Q.    Okay.  And all the things that we were just
19   talking about, in a way, are genetic, correct?  I mean,
20   reproduction is all about genetics, correct?
21       **A.    Correct.**
22       Q.    Okay.  And Mrs. Gray's belief is that anything
23   that happens genetically to her is something that is
24   based upon her religious beliefs, right?
25           MR. HENNESSY:  Objection.  Are you
                    EXLER REPORTING
                    412-221-4007

41

Dr. Wadsworth - by Mr. Daller

– – – – –

1    restating Mrs. Gray's beliefs?
2    BY MR. DALLER:
3        Q.    Would you agree with that statement?  Go
4    ahead.  Let me rephrase it.
5           She used an example of genetics, if you will,
6    and relayed that to how she made medical decisions,
7    correct?
8        **A.    She is using examples that are written here
9    based on her understanding of them.**
10       Q.    Okay.  And based upon your understanding of
11   these techniques and the medicine, do you disagree with
12   Mrs. Gray's presentation of the medicine?
13           MR. HENNESSY:  Objection to form.
14   BY MR. DALLER:
15       Q.    You can answer.
16       **A.    I don't think that I can speak on -- I can
17   respond to what's written.  I don't believe I can speak
18   to what Dawn was thinking about when she wrote this.**
19       Q.    But you would agree that whatever she was
20   thinking about was probably based upon her beliefs,
21   though, correct?
22           I mean, she said that several times in there
23   or do you disagree that this is foundational to her
24   belief?
25       **A.    I mean, this is her --**
                    EXLER REPORTING
                    412-221-4007

---

**42**

Dr. Wadsworth - by Mr. Daller

– – – – –

1      MR. HENNESSEY:  Objection.  Form.
2      You can answer.
3      THE WITNESS:  This is her sincerely-held
4  religious belief.  I would state that horm- -- again,
5  I'm not a medical expert, but hormones -- hormone levels
6  influence how our body works, similar to how vitamins
7  influence how our body works.  Taking more vitamins to
8  be healthier or to improve our issues is a good thing.
9      Q.   Okay.
10      **A.   Similar to people who take hormones to achieve**
11  **a successful pregnancy.  That could be a good thing, but**
12  **I can't -- I can't speak to what Dawn's personal opinion**
13  **is about hormones.**
14          **She lists it here as something, it looks like,**
15  **she's not comfortable with, but I can't speak to that,**
16  **but if I compare hormones to medications, in many cases**
17  **it makes sense to make the hormones to achieve -- to**
18  **help your body be in a better state.**
19      Q.   Okay.  Does more hormone usage always improve
20  body function?
21      **A.   Again, I'm not a medical expert, but, no.**
22  **There can be varied response based on the individual to**
23  **hormones and other treatment that we provide.**
24      Q.   Okay.  Is it okay for athletes to use anabolic
25  steroids?

EXLER REPORTING
412-221-4007

---

**43**

Dr. Wadsworth - by Mr. Daller

– – – – –

1      MR. HENNESSEY:  I'm going to object to
2  form.  I mean, this is -- again, we have a hard stop at
3  12 and I --
4      MR. DALLER:  I understand, Brendan, and I
5  mean, if it's a form objection, you've stated it.  We
6  can move on.
7  BY MR. DALLER:
8      Q.   Is the use of anabolic steroids by an athlete
9  a proper -- is it a use of hormones the way those
10  hormones were intended when God gave you hormones?
11      **A.   So I'm -- again, I'm a mater's-prepared nurse.**
12  **Not a medical expert.  I'm not going to -- I don't have**
13  **an opinion about that.**
14          **I, you know, leave it to the professional**
15  **organizations that say things are permitted or not**
16  **permitted.**
17          **So that's my answer to that.**
18      Q.   Okay.  And what about the use of hormones for
19  gender manipulation?  Is that something -- I mean, it's
20  certainly a medical treatment, correct?
21      **A.   Yes, it is a medical treatment.**
22      Q.   Okay.  And can somebody have a belief that
23  using hormones in that -- for that purpose is against a
24  religious belief?
25      **A.   Yes, they could.**

EXLER REPORTING
412-221-4007

---

**44**

Dr. Wadsworth - by Mr. Daller

– – – – –

1      Q.   Okay.  And is that belief valid for them?
2      MR. HENNESSEY:  I'm going to object to
3  form.
4  BY MR. DALLER:
5      Q.   You can answer.
6      **A.   All individuals have different beliefs based**
7  **on their knowledge, understanding and their religious**
8  **beliefs, and I'm not going to speculate on how people**
9  **believe or feel about hormones in gender-affirming care.**
10      Q.   Okay.  And then Ms. Gray goes on to talk about
11  Psalm 133-13 through 16, and, I mean, she says "God
12  created her innermost being.  Knit her together in her
13  mother's womb.  She's fearfully and wonderfully made,
14  and that God essentially created her and that He knows
15  everything about her or that was ordained for her before
16  it happened."
17          Is that kind of a paraphrase of the Psalm
18  there?
19      **A.   That is what is written.**
20      Q.   Okay.  And, I mean, do you have any objection
21  to her belief or think it's not true or any concern as
22  it applies to her application?
23      **A.   It's a quote she provided.  I don't have an**
24  **opinion about it.**
25      Q.   Okay.  But it's a quote that she provided to

EXLER REPORTING
412-221-4007

---

**45**

Dr. Wadsworth - by Mr. Daller

– – – – –

1  explain her belief, correct?
2      **A.   Yes.**
3      Q.   And in evaluating her belief, you do not have
4  an opinion of this, correct?
5      **A.   In my opinion, this quote does not --**
6          (Zoom interruption.)
7      **A.   Go ahead.**
8      Q.   No.  Go ahead.  I'm listening.
9      MR. HENNESSEY:  You can answer the
10  question.  I'm sorry about the background noise.
11      Go ahead.
12      THE WITNESS:  That's okay.
13      In this quote -- in my opinion, there isn't
14  anything in this quote that supports the earlier
15  sentences.
16  BY MR. DALLER:
17      Q.   Okay.  So the fact that she said that "God
18  created her innermost being," that does not relate at
19  all to what she said before?
20      **A.   Well, in my belief, God created all of us.**
21      Q.   Right.  Okay.  I think anybody who she would
22  present that to -- I mean, I think that would be a fair
23  reading of it, right?
24          It's written in the first person.  So she's
25  speaking about herself.  She's not speaking about

EXLER REPORTING
412-221-4007

---

BARBARA WADSWORTH, DNP, RN

---

46

Dr. Wadsworth - by Mr. Daller

– – – – –

1  anybody else at this point because -- I mean, is God's
2  creation of everybody relevant to her religious
3  exemption request?
4      A.    I -- I can't testify to the quote --
5      Q.    Okay.
6      A.    -- and what Dawn thinks about the quote.
7      Q.    Okay.  And then she says that "it's this
8  belief system that guides my objections," correct, "to
9  getting the vaccine"?
10     A.    Yes, that is what's stated.
11     Q.    Okay.  And you said that you cannot testify as
12 to her belief system, correct?
13     A.    What I stated was I couldn't testify to Dawn's
14 belief about what this quote -- how to interpret this
15 quote.
16     Q.    Okay.  But in that sentence she says then "It
17 is this belief," referring to Psalm 139, "that guides
18 her objections to taking the vaccine," correct?
19     A.    That is what it says.
20     Q.    Okay.  But you don't understand the -- or you
21 cannot interpret the quote, correct?
22     A.    I read the quote and I don't under- -- I --
23 I'm not a religious expert either, and so I had not read
24 this quote ever before, and I don't -- I believe that
25 there's parts of it that talk about that she was created

EXLER REPORTING
412-221-4007

---

47

Dr. Wadsworth - by Mr. Daller

– – – – –

1  by God, and, you know, everything that she was provided
2  by God, but I don't understand the connection to her
3  sincerely-held religious belief related to the vaccine.
4      Q.    So if you don't understand it, you can't
5  really have an opinion on it, correct?
6          MR. HENNESSY:  Objection.
7  BY MR. DALLER:
8      Q.    You can answer.
9      A.    I don't need to be a religious expert to
10 interpret and understand the religious exemption
11 request.
12     Q.    But you need to understand the facts that are
13 there, correct?
14     A.    I need to understand the quote as it's
15 written.
16     Q.    But how do you understand it if you just said
17 you don't understand it?
18          MR. HENNESSY:  I'm going to object to
19 form.  Again, I think we're getting into argument realm
20 here.
21          MR. DALLER:  All right.
22          MR. HENNESSY:  I think she stated her --
23 she responded accurately and the question is now
24 changing her response.
25          MR. DALLER:  All right.

EXLER REPORTING
412-221-4007

---

48

Dr. Wadsworth - by Mr. Daller

– – – – –

1  BY MR. DALLER:
2      Q.    The statement that she "is not comfortable
3  having genetic components that my body did not create
4  injected into my body" -- do you see that statement?
5      A.    Yes.
6      Q.    And what's your disagreement with that
7  statement?
8      A.    My disagreement is that the vaccine does not
9  have genetic components to restrict her from getting it.
10     Q.    Okay.  And in Page 2, Question 3, that
11 question basically said "Does your belief prevent you
12 from taking all vaccines or just some of them or none of
13 them," and then there was a check box, and she chose
14 that "It's some, but not all vaccines."  Okay?
15          And then in the space that was provided, this
16 is what she stated, and go ahead take a minute to review
17 that.
18     A.    (The witness review the document on the
19 screen.)
20          I read it.
21     Q.    Okay.  And based upon what she wrote there,
22 does that influence your decision as to her exemption
23 request in any way?
24     A.    Well, I mean, she's saying that she'll take --
25 she's not opposed to all vaccines, and she took the flu

EXLER REPORTING
412-221-4007

---

49

Dr. Wadsworth - by Mr. Daller

– – – – –

1  vaccine, and so it should not preclude her from taking
2  the COVID-19 vaccine.
3      Q.    Okay.  Are they the same type of vaccine?
4      A.    Again, I'm not a medical expert, but they are
5  similar.
6      Q.    Okay.  So are you basing your decision upon
7  your understanding of their similarity?
8      A.    I'm basing our decision, as I recall, on the
9  lack of a sincerely-held religious belief that actually
10 would be a restriction to the COVID-19 vaccine.  That
11 isn't what I read here.
12     Q.    Okay.  Could somebody get an exemption to the
13 flu vaccine and not the COVID vaccine for religious
14 reasons?
15     A.    I would say it's unlikely, but I don't know --
16 I don't know.
17     Q.    Okay.  Why would Jack Lynch put out an e-mail
18 saying then that "If you had a flu vaccine exemption, it
19 did not automatically give you a COVID vaccine
20 exemption"?
21          What was the rationale for an intelligent
22 individual like Mr. Lynch to make a statement like that?
23     A.    So we have -- we've been giving the flu
24 vaccine for likely 15 years.  Don't hold me to that date
25 exactly, but probably 15 years, and the intent of that

EXLER REPORTING
412-221-4007

---

50

Dr. Wadsworth - by Mr. Daller

_ _ _ _ _

1  communication was if people had an exemption to the flu
2  vaccine, they shouldn't assume that they would have an
3  exemption to the COVID-19 vaccine.
4      Q.    Okay.  Understood.  What -- you know, you said
5  the vaccines are similar, correct?
6      A.    Yes.
7      Q.    So what religious belief then would prevent
8  you from taking the COVID vaccine, but being -- would
9  prevent you from taking the flu vaccine, but be
10  insufficient to allow you to take the flu vaccine?
11             MR. HENNESSY:  Objection to form.
12  BY MR. DALLER:
13      Q.    You can answer.
14             MR. HENNESSY:  I mean, I don't know if she
15  can.  She's not being offered as an expert on vaccines.
16             MR. DALLER:  That's correct.  She's making
17  decisions on religious exemptions.
18  BY MR. DALLER:
19      Q.    So if you can't answer that, that's fine.  You
20  know, we'll just say that and we can move on.
21      A.    Yeah, I don't think I can.
22      Q.    Okay.  All right.
23             MR. DALLER:  If we can look at Page 4,
24  Question 5.
25             THE VIDEOGRAPHER:  (Indicating.)

EXLER REPORTING
412-221-4007

51

Dr. Wadsworth - by Mr. Daller

_ _ _ _ _

1  BY MR. DALLER:
2      Q.    Question 5 says, "Have you ever been approved
3  for any other type of religious accommodation during
4  your employment with MLH?  Yes or no?  And then please
5  explain."
6             Mrs. Gray indicated no and then provided this
7  explanation.  If you would just take a briefer minute,
8  review her response, please.
9      A.    (The witness reviews the document on the
10  screen.)
11             Okay.
12      Q.    Okay.  And any opinion as to this paragraph
13  regarding the sincerity of her belief as she described
14  it in her application.
15      A.    As it relates to this topic of caring for
16  patients, it is completely acceptable to ask for or
17  switch assignments with a colleague when your religious
18  beliefs interfere with what that patient's care might
19  be, and so that's a completely acceptable request that
20  we honor.  That's required by the state board of
21  nursing, as well, so it's completely acceptable, and we
22  do this -- this does happen, as long as there's somebody
23  else to care for the patient.
24             The only time it wouldn't be okay is if there
25  was no one else who could provide immediate care to the

EXLER REPORTING
412-221-4007

52

Dr. Wadsworth - by Mr. Daller

_ _ _ _ _

1  patient, and then Dawn or others would provide care
2  until someone could be reassigned in order to relieve
3  that person with that religious belief.
4      Q.    Okay.  This accommodation does not require an
5  application for it, though, right?  Like, a religious
6  exemption request that goes to a committee?
7      A.    So at Main Line Health it does require
8  acknowledgement that you have this religious belief.
9             For example, in labor and delivery, it may not
10  -- it may not -- Dawn may not have completed an
11  application in the ED because it doesn't happen that
12  often, but in labor and delivery, the nurse does not
13  need to state to the nurse manager that they have a
14  religious belief and that they don't want to take care
15  of patients who are going through a pregnancy
16  termination, that's, I'll say, not medically indicated,
17  and -- or even if it is medically indicated, they can
18  opt out of that as long as there's another nurse to
19  provide care to the patient, but they do that ahead of
20  time.
21             That is not something that happens, you know,
22  during their shift and the first time we're hearing of
23  it, so we actually do know which nurses would prefer to
24  opt out.  And, again, as long as the patient can get
25  high-quality care by someone else, that's okay, but in

EXLER REPORTING
412-221-4007

53

Dr. Wadsworth - by Mr. Daller

_ _ _ _ _

1  the absence of someone else who can take over the care,
2  then that nurse steps up until such a time that they can
3  be switched out.
4      Q.    Okay.  And that's primarily labor and
5  delivery, correct, what you just --
6      A.    Primarily.
7      Q.    Okay.  All right.
8             MR. DALLER:  If we can go to Page 4,
9  Question 7, please.
10             THE VIDEOGRAPHER:  (Indicating.)
11  BY MR. DALLER:
12      Q.    And then the question was, "Please state how
13  receiving the COVID vaccination will negatively affect
14  your purpose in life or death."  Okay?  And if you could
15  just briefly read that paragraph.
16      A.    (The witness reviews the document on the
17  screen.)
18             I read it.
19      Q.    Okay.  Can you just briefly describe to me
20  what your opinion of that paragraph is as it relates to
21  Mrs. Gray's exemption request?
22      A.    In my opinion, in reading this, Dawn is
23  describing her body as a temple, and that it's solely
24  made by God and that she doesn't want to do anything
25  that would, in her relig-- -- in her strongly-held

EXLER REPORTING
412-221-4007

BARBARA WADSWORTH, DNP, RN

54

Dr. Wadsworth - by Mr. Daller

– – – – –

1  religious belief, impact it which would change how God
2  would view her.
3      Q.   Okay.  And do you agree that genetic material
4  is ultimately what physically creates images?
5                MR. HENNESSY:  Objection.  Form.
6  BY MR. DALLER:
7      Q.   Would you --
8      A.   I didn't hear the end of your question.  I'm
9  sorry.
10     Q.   Would you agree that genetic material is
11 responsible, ultimately on earth, how physical
12 appearance occurs, correct?
13               MR. HENNESSY:  Objection.  Form.
14               THE WITNESS:  I mean, I'm not an expert,
15 but I am a nurse, and our DNA, which is our genetic
16 makeup, does contribute to who we are and what we look
17 like and all of those things.
18 BY MR. DALLER:
19     Q.   And, in fact, we all have messenger RNA
20 in us, as well, correct?
21     A.   Again, am I -- am I a medical expert?
22     Q.   I'm just asking.  Do you have an opinion?
23               MR. HENNESSY:  I'm going to state the
24 objection.  Same objection I stated before, but if she
25 can answer the question, that's fine.
                    EXLER REPORTING
                    412-221-4007

55

Dr. Wadsworth - by Mr. Daller

– – – – –

1  BY MR. DALLER:
2      Q.   Okay.  Do human beings have messenger RNA
3  within their body, endogenous messenger RNA?
4      A.   Yes.  I believe they do.
5      Q.   Okay.  And earlier Ms. Gray stated that she's
6  not comfortable having genetic components enter her
7  body, exogenous genetic components, correct?
8                MR. HENNESSY:  Objection to form.
9  BY MR. DALLER:
10     Q.   You can answer.
11     A.   She used genetic components.  I don't believe
12 she used the other terminology.
13     Q.   Okay.  The Page 2, Question 1, "I am not
14 comfortable having genetic components that my body did
15 not create injected into my body."
16          That was her statement.
17     A.   Okay.
18     Q.   I think we've clarified genetic components are
19 DNA and messenger RNA, agree?
20     A.   Yes.
21     Q.   And if her body did not create it, is that not
22 the definition of exogenous?
23     A.   Yes.
24     Q.   Injected into implies it's coming from the
25 outside, correct?
                    EXLER REPORTING
                    412-221-4007

56

Dr. Wadsworth - by Mr. Daller

– – – – –

1      A.   Yes.
2      Q.   "My body."  It's her body, correct?
3      A.   Yes.
4      Q.   And above there, above where the yellow is in
5  the first sentence she says, "I have held a consistent
6  approach and genuine conviction about medical invasion
7  that seeks to alter how God created me," correct?
8      A.   That is what's written.
9      Q.   Okay.  And it is a fact that Mrs. Gray was
10 unable to have children, to your knowledge, correct,
11 according to her statement?
12     A.   According to what is written.
13               MR. HENNESSY:  Objection to form.
14 BY MR. DALLER:
15     Q.   Okay.  And she rejected treatments that would
16 have allowed that, correct?
17     A.   So as I understand what's written in the
18 application, yes.
19     Q.   Okay.  And it's her belief that this invasion
20 would have altered how God created her, correct?
21     A.   That is what she has shared here, yes.
22     Q.   All right.  Let's go to her appeal request and
23 then we'll just take a brief break, and we'll be able to
24 finish up, I believe.
25               THE VIDEOGRAPHER:  (Indicating.)
                    EXLER REPORTING
                    412-221-4007

57

Dr. Wadsworth - by Mr. Daller

– – – – –

1  BY MR. DALLER:
2      Q.   All right.  So do you recognize this document?
3      A.   Could you make it larger, please?
4      Q.   Sure.
5                THE VIDEOGRAPHER:  (Indicating.)
6      A.   Yes, I do.
7      Q.   Okay.  And this was her appeal request,
8  correct, that she submitted?
9      A.   Yes, it was.
10     Q.   Okay.  And other than the fact that it's her
11 appeal request, did you review the content of this
12 document in order to determine whether or not you would
13 grant her appeal?
14     A.   Yes, I read the document.
15     Q.   Okay.  And did you consider it in your
16 deliberation as to the appeal?
17     A.   As I recall, we did not allow additional
18 information, so I read it, but we did not -- it's not
19 additional information or data to support the original
20 religious exemption.
21     Q.   So it's your testimony that the employees were
22 told that "You can request an appeal," correct?
23     A.   Yes, they could request an appeal.
24     Q.   Okay.  And were the employees asked for
25 additional information?
                    EXLER REPORTING
                    412-221-4007

58

Dr. Wadsworth - by Mr. Daller

– – – – –

1    A.    No, they were not.

2    Q.    No, okay.

3          So anything that was on this document, whether

4    it was clarifying or not, was ignored by the members of

5    the Religious Exemption Committee in terms of altering

6    what was decided previously, correct?

7          MR. HENNESSY:  Objection to form.

8          THE WITNESS:  So as I recall -- and as I

9    did with all of the appeal exemptions that I read -- I

10   read all of them.  As I understand, my colleagues did,

11   but I cannot testify to that.

12         I read it and we went -- we discussed the

13   original request for a religious exemption, and our

14   process was to make sure that it was fair, consistent

15   and equitable, and that if something was approved, it

16   was approved consistently and equitably and all of that,

17   and also if it was denied, that those same principles,

18   fair, consistent and equitable, was applied.

19   Q.    Okay.  So do you agree that practice makes

20   perfect?

21   A.    I believe that's a quote.

22   Q.    Okay.  Do you believe in that philosophy?

23         MR. HENNESSY:  I'm going to object to

24   form.

25   BY MR. DALLER:

EXLER REPORTING
412-221-4007

59

Dr. Wadsworth - by Mr. Daller

– – – – –

1    Q.    You can answer.

2    A.    So I believe that practice makes perfect over

3    time and we shouldn't allow perfection to be the enemy

4    of good.

5    Q.    Okay.  Do you play any sports at all?

6    A.    I play golf.

7    Q.    Golf, okay.  And you have a golf swing,

8    correct?

9    A.    Yes, I do.

10   Q.    Okay.  And is that golf swing -- do you

11   practice your golf swing?

12   A.    Not as much as I'd like.

13   Q.    Especially when you're here today with us,

14   right?  So -- but you do practice, correct?

15   A.    Mostly on the course.

16   Q.    Okay.  And do you have a golf pro that works

17   with you?

18   A.    My golf pro is my husband.

19   Q.    Good.  He works with you, correct?

20   A.    Yes.

21   Q.    And he'll provide some guidance, if you will,

22   right?

23   A.    Yes.

24   Q.    Okay.  And, in fact, he'll say, while you're

25   driving off the range, "Well, why you don't shift your

EXLER REPORTING
412-221-4007

60

Dr. Wadsworth - by Mr. Daller

– – – – –

1    hands or your shoulders" or something along those lines,

2    correct?

3    A.    Yes.

4    Q.    Okay.  And he's doing that in order to improve

5    your golf swing, correct?

6    A.    Yes.

7    Q.    Because the golf swing is not perfect,

8    correct?

9    A.    Correct.

10   Q.    And your testimony is that the Appeal

11   Committee was solely to determine whether or not things

12   were done fairly and equitably; is that correct?

13   A.    Yes, and consistently.

14   Q.    Consistently, okay.

15         So if the decisions that the committee made,

16   if -- those decisions were made on their knowledge,

17   correct?

18         MR. HENNESSY:  Objection to form.

19   BY MR. DALLER:

20   Q.    You can answer.

21   A.    The decisions were made in our group with our

22   own expertise, as well as looking at what the exemption

23   committee applied.  Yes.

24   Q.    Okay.  And I'm talking now specifically about

25   the Exemption Committee, not your group.

EXLER REPORTING
412-221-4007

61

Dr. Wadsworth - by Mr. Daller

– – – – –

1          If that Exemption Committee made an error in

2    terms of how they interpreted exemption requests, but

3    they did it consistently, your committee would just say,

4    "Well, it's consistent," correct?

5          MR. HENNESSY:  Objection to form.

6    BY MR. DALLER:

7    Q.    I mean, you testified that your committee only

8    viewed fairness, equitableness and consistency, correct?

9    A.    So our committee validated the process, and if

10   an exemption was overturned by us, we had a specific

11   reason as to why.

12   Q.    And what would those reasons be based upon?

13   A.    So, for example, there was an exemption

14   request that was denied for an employee who was Islamic,

15   and in that religion, they don't accept any vaccination,

16   and he had an exemption request for the flu vaccine and

17   when we reviewed it, we were like, "He's Islamic.  They

18   should have given him this exemption."

19         And just to explain further about equitable,

20   we were very objective about making sure that exemptions

21   were not approved by categories of people.

22         So, for example, physician exemptions were

23   treated the same as nurses, as respiratory therapists,

24   as environmental service workers, and we looked at -- to

25   the degree that we had the information available, we

EXLER REPORTING
412-221-4007

BARBARA WADSWORTH, DNP, RN

62

Dr. Wadsworth - by Mr. Daller

- - - - -

1  looked at the employee, where they worked, what was
2  their role, what was their exemption request, and you
3  could convey your exemption in four sentences or in four
4  pages, and they both may get denied or approved, as long
5  as you made your sincerely-held religious belief clear
6  as to why it should be accepted.
7        So that was part of our process, was to make
8  sure that we were objectively -- that the team -- that
9  the Exemption Committee applied not only the science,
10 guidelines, but also whether someone was a professional
11 writer or a well-prepared, master's-prepared writer or
12 they had no degree at all and had a GED, the writing of
13 their appeal was given the same consideration.
14     Q.   Okay.  And you would agree that that
15 consideration, then, required some interpretation,
16 correct?
17     A.   Well, we had to read it, and we had to assess
18 the religious belief and whether or not it was an
19 acceptable reason to not take the COVID vaccine.
20     Q.   Okay.  And you would agree, if I understood
21 you correctly, that you wanted to be equitable and you
22 wanted to be sure that somebody who could not write as
23 well still had an opportunity to get an exemption
24 request?
25     A.   Yes.

63

Dr. Wadsworth - by Mr. Daller

- - - - -

1      Q.   All right.  And you would agree that the more
2  sophisticated the writing could be, okay, that the more
3  complicated the thoughts could be that they're
4  expressing, correct?
5          MR. HENNESSY:  Objection.  Not for my
6  students, but go ahead.
7          You can answer.
8          THE WITNESS:  So what I would say is that
9  each was read carefully, and we had people who gave us
10 20 pages and people who gave us four sentences, and
11 either one could be approved or denied if they were
12 clear about their religiously-held belief and it was a
13 reason to not accept the vaccine.
14 BY MR. DALLER:
15     Q.   Okay.  And that was based upon the Religious
16 Exemption Committee's interpretation as they reviewed
17 the exemption request; is that correct?
18     A.   It was based on their understanding and also
19 the experts in the room, which included religious
20 experts who were at the table and read all of them.
21     Q.   Okay.  But if it relied upon a medical
22 statement, then they would rely upon the medical
23 individual, correct?
24     A.   Yes, but our -- we were looking at religious
25 exemptions.

64

Dr. Wadsworth - by Mr. Daller

- - - - -

1      Q.   Okay.  What's the Muslim prohibition against
2  vaccination based upon?
3      A.   So I'm not an expert in Muslim religion, but
4  with using our expertise from our chaplains, who are
5  master's prepared in divinity and certified in their
6  practice, Islamic religion does not accept vaccinations
7  and other things, which I'm not going to list, but I
8  don't have a full understanding of the Islamic religion,
9  but I do know that that is a reasonable, and I'll say,
10 expected religious exemption request.
11     Q.   Okay.  So if the Islamic tradition is that
12 they just don't accept vaccines because they don't
13 believe that they're safe, is that an acceptable
14 religious exemption to Main Line Health solely because
15 it's based upon the Islamic religion?
16     A.   So I'm not -- I'm not an expert in Islamic
17 religion.
18     Q.   Okay.
19     A.   And I believe that their objection to vaccines
20 is far deeper than they don't believe that they're safe.
21     Q.   Okay.
22     A.   That's not -- that's not -- I mean, the whole
23 Islamic culture -- again, I'm not a religious expert,
24 but they don't accept vaccinations, and it's a much more
25 substantial religious belief than they're not safe.

65

Dr. Wadsworth - by Mr. Daller

- - - - -

1      Q.   Okay.  And in order for a religious exemption
2  to be granted, does it need to be part of a formal
3  religion that says, "You shall not take a vaccine"?
4      A.   So we didn't -- again, as I understand our
5  purpose and our work, we did not -- a religion is
6  someone's religion, right?  So I'm not going to judge
7  their religion, whatever kind it is, and it doesn't even
8  -- as I understand it, it doesn't have to even be in a
9  formal church.  It can be their religion, but they need
10 to state clearly why the vaccine is unacceptable, but
11 that's how -- that's how we applied the guideline.
12     Q.   Okay.  So if an individual says that
13 "Vaccination is unacceptable to me because it alters me
14 from the image of God in which I was created and that is
15 my belief," that belief, would that be acceptable for
16 not taking the vaccine?
17     A.   No, that would not.
18     Q.   Okay.  What's missing from that belief?
19     A.   There needs to be a -- beyond the fact that
20 your body is a temple, it has to be more specific as to
21 what is in the vaccine that prevents you from taking the
22 vaccine, and that's what's missing.
23     Q.   Okay.  Is genetic component specific, or is
24 that a vague concept?
25     A.   Can you restate the question?

66

Dr. Wadsworth - by Mr. Daller

– – – – –

1    **Q.**   Sure.  Mrs. Gray said that she cannot take the
2  vaccine because a genetic component would be injected
3  into her body, correct?
4          MR. HENNESSY:  I'm going to object to
5  form.
6  BY MR. DALLER:
7    **Q.**   I mean, did she not state that?
8    **A.**   **Her religious belief did talk about genetic**
9  **components, and that's why she didn't want to take the**
10  **vaccine, yes.**
11    **Q.**   Okay.  And that's pretty specific, correct?
12  I mean, she didn't say, "Oh.  There's stuff in
13  the vaccine."
14          She said, "There's genetic components in the
15  vaccine," correct?
16    **A.**   **Yes.**
17          MR. DALLER:  All right.  Why don't we just
18  take a five-minute break and then we can come back and
19  finish up.  Okay?
20          THE WITNESS:  Okay.  Thank you.
21          THE VIDEOGRAPHER:  All right.  We're going
22  off the record.  The time is approximately 11:40.
23          (Whereupon, a brief recess took place.)
24          THE VIDEOGRAPHER:  All right.  We are back
25  on the record, and the time is approximately 11:45 a.m.

EXLER REPORTING
412-221-4007

67

Dr. Wadsworth - by Mr. Daller

– – – – –

1  BY MR. DALLER:
2    **Q.**   Okay.  Dr. Wadsworth, we're back on the
3  record.  Is there anything from your prior testimony
4  that you would like to clarify or change at this point?
5    **A.**   **No.**
6    **Q.**   Okay.  All right.  And you would agree that
7  human resource personnel should be familiar with
8  policies, correct?
9    **A.**   **Yes.**
10    **Q.**   And you agree that operational management
11  should be familiar with policies, correct?
12    **A.**   **Yes.**
13    **Q.**   And you would agree that those individuals or
14  the people fulfilling those roles should communicate
15  accurate information to employees, correct?
16    **A.**   **Yes.**
17    **Q.**   Okay.  And are you aware that operational
18  management instructed individuals to provide additional
19  information with their appeal requests?
20    **A.**   **I am not aware.**
21    **Q.**   Okay.  And are you aware of any policy, if you
22  will, that was dispersed to employees that stated that
23  additional information would not be considered?
24    **A.**   **I am not aware.**
25    **Q.**   Okay.  As a chief operating officer, executive

EXLER REPORTING
412-221-4007

68

Dr. Wadsworth - by Mr. Daller

– – – – –

1  vice president now, I believe, would you agree that
2  something like that should be clear to employees,
3  whether or not additional information is accepted?
4    **A.**   **I don't recall everything that we sent out.**
5          THE WITNESS:  Sorry, Brendan.
6          MR. HENNESSY:  No.  I was just going to
7  object to form, but go ahead.
8          THE WITNESS:  So I don't recall everything
9  exactly that we sent out.  We -- we -- as I described
10  earlier in my testimony, we like to be very transparent
11  and communicative with our employees, and during the
12  pandemic there were a lot of challenges that required
13  decisions to be made quickly, and, you know, also
14  required some maybe changes along the way because
15  it's -- you know, it's not perfect, and, you know, so I
16  can't speak to everything that we put out.
17          I will tell you that we had meetings every
18  single day for weeks where we were talking about
19  everything related to COVID and our patients and our
20  staff wellness, and so I can't recall everything, but I
21  know that we would never intentionally mislead our
22  employees.
23  BY MR. DALLER:
24    **Q.**   Okay.  So if I understood you correctly, then
25  your system was not perfect, correct?

EXLER REPORTING
412-221-4007

69

Dr. Wadsworth - by Mr. Daller

– – – – –

1    **A.**   **There's no system that's perfect.**
2          MR. HENNESSY:  Objection.
3  BY MR. DALLER:
4    **Q.**   Okay.  Fair enough.  And you -- would you
5  agree then that that imperfection could have led to
6  errors?
7    **A.**   **I would agree that we used all of the**
8  **information to the best of our ability to make the best**
9  **decisions.**
10    **Q.**   Okay.  You're familiar with the Swiss cheese
11  model of risk, correct, in the health care business?
12    **A.**   **Yes, I am.**
13    **Q.**   And when there's an alignment of those holes,
14  patients suffer, correct?
15    **A.**   **That is correct.**
16    **Q.**   Okay.  And I believe we've talked before about
17  your role in quality improvement, correct?
18    **A.**   **I don't believe we talked about that today.**
19    **Q.**   Not today.  In the past I believe we've had a
20  conversation about quality improvement.
21          Is quality improvement so that patients aren't
22  harmed in the future?
23    **A.**   **Absolutely.  The goal is to protect patients**
24  **at all costs.**
25    **Q.**   Okay.  And would you agree that religious

EXLER REPORTING
412-221-4007

70

Dr. Wadsworth - by Mr. Daller

− − − − −

1 beliefs are very central to an individual?

2 　　　　MR. HENNESSY:  Object to form.

3 　　　　THE WITNESS:  I mean, I'm not going to

4 comment on individuals' religious beliefs or other

5 beliefs.

6 　　　　Yes, we all have beliefs.  I'm not going to

7 qualify one's more important than the other, but, yes,

8 everybody has beliefs and that is part of who they are

9 when they arrive.

10 BY MR. DALLER:

11 　Q.　Okay.  And if the errors injure those

12 individuals, is that something that needs to be

13 rectified?

14 　**A.　Can you clarify who the individuals are?  Is**

15 **it our staff or our patients?**

16 　Q.　Well, both.  I mean, are one more important

17 than the other?

18 　**A.　No.  The patient and the staff are equally**

19 **important.**

20 　Q.　Okay.  So if the staff is injured in some way,

21 is that not something that the institution should seek

22 to rectify?

23 　**A.　Yes.  If employees are injured or in harm's**

24 **way, yes, we want to make it the safest environment to**

25 **give care.**

EXLER REPORTING
412-221-4007

71

− − − − −

1 　Q.　All right.

2 　　　　MR. DALLER:  That's all I have.  Thank you

3 very much.  I promised to get you out by 12.  I did.

4 　　　　Brendan, enjoy your vacation.  Do you have

5 anything --

6 　　　　MR. HENNESSY:  Thank you.

7 　　　　MR. DALLER:  -- before we finish?

8 　　　　MR. HENNESSY:  No.  No questions.  Thank

9 you.

10 　　　　MR. DALLER:  Thank you.

11 　　　　THE VIDEOGRAPHER:  All right.  This

12 concludes the videotaped deposition via Zoom of Barbara

13 Wadsworth.  Off the record at 11:51 a.m.

14 　　　　− − − − −

15 　　　　(Signature waived.)

16 　　　　(Whereupon, the above-entitled matter was

17 concluded at 11:51 a.m.)

18 　　　　− − − − −

19

20

21

22

23

24

25

EXLER REPORTING
412-221-4007

72

1 COMMONWEALTH OF PENNSYLVANIA　　)

2 COUNTY OF ALLEGHENY　　　　　　)

3

4 　　　　I, Margaret J. Exler, a notary public in

and for the Commonwealth of Pennsylvania, do hereby

5 certify that the witness, BARBARA WADSWORTH, DNP, RN,

was by me first duly sworn to testify the truth, the

6 whole truth, and nothing but the truth; that the

foregoing videotaped Zoom deposition was taken at the

7 time stated herein; and that the said videotaped Zoom

deposition was recorded stenographically by me and then

8 reduced to typewriting under my direction, and

constitutes a true record of the testimony given by said

9 witness, all to the best of my skill and ability.

　　　　I further certify that the reading and

10 signing of said videotaped Zoom deposition were waived

by counsel for the respective parties and by the

11 witness.

12 　　　　I further certify that I am not a

relative, or employee of either counsel, and that I am

13 in no way interested, directly or indirectly, in this

action.

14

　　　　IN WITNESS WHEREOF, I have hereunto set

15 my hand and affixed my seal of office this 19th day of

September, 2023.

16

17

18 _____
Margaret J. Exler, RPR, Notary Public

19

20

21

22 Commonwealth of Pennsylvania - Notary Seal
MARGARET J. EXLER, Notary Public
23 Allegheny County
My Commission Expires February 15, 2025
24 Commission Number 1047211

25

EXLER REPORTING
412-221-4007

# EXHIBIT J

**Boccella, Janine M.**

| | |
|---|---|
| **From:** | Gray, Dawn |
| **Sent:** | Monday, September 27, 2021 8:17 PM |
| **To:** | Covid-19 Religious Exemption |
| **Subject:** | RE: Covid-19 Vaccine Religious Exemption Request |
| **Attachments:** | Final Appeal Exemption Form 1.pdf |

To whom this may concern,

I am respectfully appealing the denial of my religious exemption. I embrace the opportunity to clarify and more fully explain why receiving one of the COVID 19 vaccines deeply contradicts my religious beliefs in a more direct manner.

I value the perfectly formed life God gave me when I was created. My sincerely held religious belief is that the temple of the Holy Spirit is in the Christian's body (see I Corinthians 6:19-20 highlighted in my attached exemption request). Furthermore, I believe I am fearfully and wonderfully made by God (see Psalm 139: 13-16 highlighted in my attached exemption request). I considered it would have been a violation to my sincerely held religious belief to use AI and IVF when my husband and I were trying to conceive. I considered it would have been a violation if, in my twenties, I elected to use gene therapy to enhance knee rehabilitation. I also consider it will be a violation to my sincerely held religious belief if I were to inject artificially developed mRNA into my body that used aborted fetal cells to make it possible.

As I stated in my attached religious exemption, I believe life begins at conception and ends at natural death. I do not believe in abortion as it violates one of God's Ten Commandments "Thou shall not kill". The use of aborted fetal cells in the development and generation of the Covid 19 vaccines is in direct violation of how precious I consider God's gift of life to be. Receiving a vaccine using this technology would make me feel dirty and contradict my belief that my body is a temple of the Holy Spirit (see I Corinthians 6: 18-20 highlighted in my attached exemption request). As my answer on Page 4, Question 5 delineates, I switch assignments with colleagues when patient care involves an abortion or there is a need to administer Plan B so I do not participate in these situations. You can see I am consistent in acting on my sincerely held religious beliefs in many situations as my examples reflect.

If this appeal has not further clarified my sincerely held religious beliefs and why I am opposed to receiving the Covid 19 vaccine, or there is another procedure to submit my application supplementation please communicate that to me in writing. Thank you for your sincere consideration.

Dawn Gray, MSN, RN, CEN, CCRN
Clinical Coordinator
Emergency Department
Paoli Hospital

**From:** Covid-19 Religious Exemption <ReligiousExemption@mlhs.org>
**Sent:** Thursday, September 23, 2021 10:57 PM
**To:** Covid-19 Religious Exemption <ReligiousExemption@mlhs.org>; Gray, Dawn <GrayD@MLHS.ORG>
**Subject:** Covid-19 Vaccine Religious Exemption Request

This email is to acknowledge that your COVID-19 Vaccine Religious Exemption Request Form was reviewed by the MLH COVID-19 Vaccine Religious Exemption Committee and has been denied. After careful consideration, the Committee has

1

determined that your Exemption Request Form does not state a basis why your religious belief requires you to decline the COVID-19 vaccination.

If you would like to appeal this decision, you may appeal to the Religious Exemption Appeal Committee within five (5) days from the receipt of this email.  To request an appeal, please reply directly to this email stating you are appealing the decision.  The Appeal Committee, which consists of the MLH Senior Vice President, Human Resources and the MLH Senior Vice President, Legal Affairs/General Counsel, will review your Religious Exemption Request Form and issue a final decision within two (2) weeks.

Please note employees whose exemptions are denied must initiate the process to fully comply with the MLH COVID-19 Vaccination Policy, Non-patient.

Thank you.

MLH-Gray 00310