# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DAWN GRAY,**        )
)     2:23-cv-00263-KNS
      Plaintiff       )
)
      v.         )
)
**MAIN LINE HOSPITALS, INC**.   )
      Defendant     )
)

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

---

John A. Daller, Esquire
PA Bar No. 329356
PO Box 162
510 Pittsburgh Street
Mars, PA 16046
(724) 201-2050
johndaller@daller-law.com
*Counsel for Plaintiff*

October 30, 2023

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Contents ............................................................i

Table of Authorities ..................................................... iii

  I.   Introduction ......................................................1

  II.  Standard of Review .............................................2

  III. Legal Argument ..................................................3

    A. THE RECORD CONTAINS SUFFICIENT EVIDENCE UPON WHICH A JURY COULD FIND THAT THE DEFENDANT IMPROPERLY REFUSED TO ACCOMMODATE GRAY'S SINCERELY-HELD RELIGIOUS BELIEFS WHEN IT DENIED GRANTING HER AN EXEMPTION FROM THE COVID-19 VACCINATION POLICY…………………………………………………..3

      1. A jury could conclude on this record that Gray's sincerely-held beliefs constitute "religious" beliefs entitled to accommodation under Title VII… . .. ……5
         i. A reasonable jury could conclude on this record that Gray had sincerely held religious beliefs..6

         ii. A reasonable jury could find that Gray's sincerely held religious beliefs are protected under Title VII……………………………………………………….7

      2. The Defendant cannot carry its burden of proof to establish that granting Gray an exemption from the Vaccine Policy would have caused them to suffer an undue hardship……………………………………………………..14

B. THE RECORD CONTAINS SUFFICIENT EVIDENCE UPON WHICH A JURY COULD FIND THAT GRAY HAS ESTABLISHED A DISPARATE DISCRIMINATION CLAIM BASED UPON HER SINCERELY HELD RELIGIOUS BELIEFS..……….…..20

C. THE RECORD CONTAINS SUFFICIENT EVIDENCE UPON WHICH A JURY COULD FIND THAT GRAY HAS ESTABLISHED AN AGE DISCRIMINATION CLAIM UNDER THE PENNSYLVANIA HUMAN RELATIONS ACT…………………………………………………………………..22

IV.   Conclusion  ......................................................25

## TABLE OF CITATIONS

**Cases**                                                          Pages

*Africa v. Pennsylvania,*
      662 F.2d 1025, 1032 (3d Cir. 1981). .................4

*Anderson v. Liberty Lobby, Inc,*
      477 U.S. 242, 251-252 (1986). ..........................3

*Aukamp-Corcoran v. Lancaster Gen. Hosp.,*
      No. 19-5734, 2022 WL 507479 *8 (E.D. Pa. Feb. 18,
      2022). ..................................................19

*Beickert et. al. v. NYC Dept. of Education,*
      No. 22-CV-5265 (DLI)(VMS)2023 WL 6214236, at *3-4
      (E.D.N.Y. Sept. 25, 2023). ........................5

*Burwell v. Hobby Lobby Stores, Inc.,*
      573 U.S. 682 (2014).......................................5

*Cridland v. Kmart Corp,*
      929 F. Supp. 2d 377, 385 (E.D. Pa. 2013). .. 22,24

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
      575 U.S. 768 (2015)...........................3,4,14,20

*EEOC v. Aldi, Inc.,*
      2008 U.S. Dist. LEXIS 25206 at **15-16 (W.D. Pa.
      3/28.2008)...............................................3

*EEOC v. Consol Energy, Inc.,*
      860 F.3d 131 (4th Cir. 2017). ...................... 5,11

*E.E.O.C. v. Geo Group, Inc.,*
      616 F.3d 265, 273 (3d Cir. 2010). ...................17

*EEOC v. Union Independiente De Law Autoridad De Acueductos Y Alcantarillados De P.R.,*
      279 F.3d 49 (1st Cir. 2002) ...............................7

*Fallon v. Mercy Catholic Med. Ctr. Of Southeastern PA,*
    877 F.3d 487 (3d Cir. 2017) ................... 4,6,7,8
*Fasold v. Justice,*
    409 F.3d 178 (3d Cir. 2005). ....................... 22
*Federoff vs. Geisinger Clinic,*
    571 F. Supp 376, (M.D. Pa. 2021). .................. 17
*Groff v. DeJoy,*
    143 S. Ct. 2279, 2295 (2023). ...................... 14
*Hebrew v. Tex. Dep't of Crim. Just.,*
    2023 U.S. App. LEXIS 24672 ......................... 14
*Hernandez v. Commissioner,*
    490 U.S. 680 (1989)................................... 4
*Hugh v. Butler Cty. Family YMCA*,
    418 F.3d 265 (3d Cir. 2005). ........................ 3
*Kiel v. Mayo Clinic Health Sys. Se. Minn,*
    2023 U.S. Dist. LEXIS 135595, *25.. ................. 8
*MacDonald v. Or. Health & Sci. Univ., 2023,*
    2023 U.S. Dist. LEXIS 151070......................... 14
*Makky v. Chertoff,,*
    541 F.3d 205 (3d Cir. 2008). ....................... 20
*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792, 802 (1973). .......................... 22
*N.A.A.C.P. v. North Hudson Reg'l Fire and Rescue,*
    665 F.3d 464, 475 (3d. Cir. 2011). .................. 3
*O'Connor v. Consol. Coin Caterers Corp.,*
    517 U.S. 308, 311(1996) ............................ 22
*Presbyterian Church in United States v. Mary Elizabeth Blue Hull*
*Memorial Presbyterian Church,*
    393 U.S. 440 (1969).................................. 4

*Protos v. Volkswagon of Am., Inc.,*
    797 F.2d 129 (3d Cir. 1986). ..........................17
*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133(2000). ................................. 3,18
*Shelton v. Univ. of Medicine and Dentistry,*
    223 F.3d 220 (3d. Cir. 2000). ..........................4
*Smith v. City of Allentown,*
    589 F.3d 684, 691 (3d Cir. 2009). ................... 24
*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,*
    450 U.S. 707 (1981)................................... 9,11
*Trans World Airlines, Inc. v. Hardison,*
    346 Pa. 271 (1943) .......................................14
*U.S. v. Ballard,*
    322 U.S. 78 (1944). .......................................5
*U.S. v. Seeger,*
    380 U.S. 163 (1965).......................................5
*Valhal Corp. v. Sullivan Assoc.,*
    44 F.3d 95, 200 (3d. Cir. 1995). ......................3
*Weston v. Commonwealth,*
    251 F.3d 420 (3d. Cir.2001).. ..........................3
*Willis v. UPMC Children's Hosp of Pittsburgh*,
    808 F.3d 638 (3d. Cir. 2015). ..........................2

## **Statutes**

29 C.F.R. § 1605.1 .......................................5

Pennsylvania Human Relations Act,
    Act of Oct. 27, 1955, P.L. 744, No. 222........ 22,23
Title VII of the Civil Rights Act of 1964
    *42 U.S.C.* § 2000e-et seq..........................passim

## **Rules**                                    Pages

Rule 56 of the Federal Rules of Civil Procedure  ................2

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

### I.      INTRODUCTION[1]

Simply stated, this case is about a Christian's request for a religious exemption from the Defendant's mandatory Covid-19 vaccination policy based upon her sincerely held religious belief that accepting the vaccine would alter her purpose and image from that which God intended for her.  Gray's belief, deeply rooted and long-standing, was manifested consistently over the years as exemplified, for example by her refusal after prayerful discernment decades ago, to refuse the medically invasive types of artificial manipulations that technology assisted conception required when she and her husband choose to follow God's way and not have children. The spiritual underpinnings of those identical sincerely held beliefs prevented Gray from receiving the Covid-19 vaccine.  Had she succumbed to secular pressure and accepted the vaccine, the essence of her spiritual image - given to her by God through her genetics – would have been defiled by being compelled to effectuate an unnatural process that God did not design.

To be clear, this case is not about the safety and efficacy of the Covid 19 vaccine or the potential sequelae of Covid-19 infection. The case is also not about whether the Centers for Medicare and Medicaid Services mandated the Covid-19 vaccine for healthcare workers, although its linkage of vaccination or the granting of legally sufficient exemption requests to the Defendant's funding may have led the Defendant to subjectively dismiss over one hundred exemption requests to ensure continued funding. This case **is** about the Defendant refusing to grant Gray an exemption from its Covid-19 vaccination policy because of her sincerely held religious

---

[1] Plaintiff's Proposed Statement of Undisputed Material Facts (PSMF), filed contemporaneously with this Memorandum of Law in accordance with Fed.R.Civ.P. 56 and Section E(4) of the Court's Policies and Procedures, is referenced herein as "PSMF" followed by the specific paragraph which contains the full factual statement and record evidence in support of such assertion.

beliefs that it neither understood, nor undertook reasonable efforts to understand, and offer her the same readily available accommodations that it offered younger nurses with whom she worked side by side in the Emergency Department.

This brief is submitted in Opposition to the Defendant's Motion for Summary Judgement. Even if one were to view the evidence in the light most favorable to the *moving* party, contrary to *Fed R.C.P. 56*, there remain sufficient factual disputes in the record that preclude the granting of the Defendant's motion. Gray has established that she had a sincerely held religious belief system that precluded her from taking the Covid-19 vaccine. The record is sufficient that the Defendant denied her exemption request based upon its subjective belief that Gray objected on scientific grounds and envisioned itself as some spiritual interpreter that used a pre-ordained list of criteria upon which it would accept or deny exemption requests. Because there exists in the developed record sufficient factual evidence upon which a jury could reasonably conclude that the Defendant violated both Title VII and the Pennsylvania Human Relation Act by refusing to grant her religious exemption request and failing to offer Gray the same reasonable accommodations that were offered to other individuals, some of which who were younger, the Defendant's Motion for Summary Judgement should be denied n its entirety.

## II.    STANDARD OF REVIEW

Following the close of discovery, the court "shall [only] grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed R. Civ. P. 56(a)*. A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp of Pittsburgh*, 808 F.3d 638, 643 (3d. Cir. 2015). In evaluating a summary judgement motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's

favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The court may not "make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The deciding court must determine whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 251-252 (1986). A court may only declare the absence of a genuine dispute of material fact where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *N.A.A.C.P. v. North Hudson Reg'l Fire and Rescue*, 665 F.3d 464, 475 (3d. Cir. 2011). Therefore, "[t]he non-movant's allegations must be taken as true and, when those assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Valhal Corp. v. Sullivan Assoc.*, 44 F.3d 95, 200 (3d. Cir. 1995).

## III.  LEGAL ARGUMENT

### A. The record contains sufficient evidence upon which a jury could find that the Defendant improperly refused to accommodate Gray's sincerely-held religious beliefs when it denied granting her an exemption from the COVID-19 vaccination policy.

Title VII of the Civil Rights Act of 1964 (Title VII) *42 U.S.C.* § 2000e-2(a)(1) prohibits employers from discriminating against an employee because of the individual's religion.[2] Moreover, "[a]n employer may not make an applicant's religious practice, **confirmed or otherwise** (emphasis added), a factor in employment decisions" with the motivation to avoid an actual, potential, or presumed religious belief or practice. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774-775 (2015). The Court stated that an employee's obligation is to

---

[2] Gray's claims under Title VII and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et. seq. are coextensive and are considered under the same framework by courts in the Third Circuit. *EEOC v. Aldi, Inc.*, 2008 U.S. Dist. LEXIS 25206 at **15-16 (W.D. Pa. 3/28/2008) *citing Weston v. Commonwealth,* 251 F.3d 420, 425 at n.3 (3d. Cir.2001). Gray's discussion and analysis in this response apply equally to her Title VII claims and the PHRA claims raised in her complaint. (ECF 1).

demonstrate that "the employer's desire to avoid the prospective accommodation is a motivating factor in his decision" to terminate employment, *Abercrombie*, 575 U.S. at 773-774.

Regardless of the influence of *Abercrombie* on the Third Circuit's *prima facie* analysis for religious discrimination claims, Gray has made a sufficient showing as to the existence of her sincerely held religious beliefs so to shift the burden of proof onto the Defendant to demonstrate that it either offered a reasonable accommodation or that it could not do so because of a resulting undue hardship. *Shelton v. Univ. of Medicine and Dentistry*, 223 F.3d 220, 224 (3d. Cir. 2000). Under current Circuit interpretation to proceed with a claim of religious discrimination, Gray must establish that 1) she holds a sincerely held religious belief that conflicts with a job requirement; 2) she informed the employer of the conflict; and 3) she was disciplined for failing to comply with the conflicting requirement. *Fallon v. Mercy Catholic Med. Ctr. Of Southeastern PA*, 877 F.3d 487, 490 (3d Cir. 2017). Under either *Abercrombie* or *Fallon*, Gray has satisfied her burden as to her sincerely held religious beliefs. For the reasons discussed below, the Defendant's Motion for Summary Judgement should be denied because the developed record contains disputed facts and as a matter of law.

## 1. A jury could conclude on this record that Gray's sincerely-held beliefs constitute "religious" beliefs entitled to accommodation under Title VII.

Religious beliefs must "address fundamental and ultimate questions having to do with deep and imponderable matters," have a "comprehensive nature,' and be accompanied by "certain formal and external signs." *Fallon* 877 F.3d at 481 *quoting Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981). However, the Supreme Court has "[r]epeatedly and in many different contexts[3], . . . warned that courts must not presume to determine . . . the plausibility of a religious

---

[3] *E.g. Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 450 (1969).

claim." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014). "Religious experiences which are as real as life to some may be incomprehensible to others. . . When the triers of fact undertake that task (referring to the truth or falsity of religious beliefs), they enter a forbidden domain. *U.S. v. Ballard*, 322 U.S. 78, 86-7 (1944). Neither an employer nor a court may determine whether an employee's beliefs are (or are not) "religion" by questioning "the correctness or even the plausibility" of the employee's understandings. *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 142 (4th Cir. 2017). To the extent that a civil court may even legally engage in a determination as to the sincerity or validity of one's religious beliefs, such determination is a question of fact, not readily susceptible to resolution by a court upon summary judgement. *U.S. v. Seeger*, 380 U.S. 163, 185 (1965).

EEOC regulation reflects this governing principle:

"The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee." 29 C.F.R. § 1605.1.[4]

For a belief to be "religious," it is sufficient if the belief "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *Id.* at 166. The employee "must show that her espoused beliefs. . . stem from religious convictions and have not merely been framed in terms of legal belief so as to gain the legal remedy desired." *Beickert et. al. v. NYC Dept. of Education*, No. 22-CV-5265 (DLI)(VMS) 2023 WL 6214236, at *3-4 (E.D.N.Y. Sept. 25, 2023). As discussed infra, Gray's beliefs are "foundational" and do not permit her to "use a means to alter the immune system that God has given [her]." (PSMF ¶¶ 58, 118).

---

[4] See also, EEOC GUIDANCE: "WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS" at § L.2, available at https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeolaws (last accessed 10/6/2023) (noting, as a general rule, that "an employer should proceed on the assumption that a request for religious accommodation is based on sincerely held religious beliefs, practices, or observances.")

       i.  A reasonable jury could conclude on this record that Gray had sincerely held religious beliefs.

Gray had sincerely held long-standing religious beliefs, PSMF ¶¶178-179, that were explicitly stated in her religious exemption request. Gray's narrative draws religious and spiritual equivalence between her declination of unnatural physical manipulation to her body, as would have been required to undergo artificial conception, and the Covid-19 vaccine. Gray builds faith through the intersection of these difficult moments of lfe. (PSMF ¶188). Consistent with *Fallon*, this is Gray's fundamental belief of a deep and imponderable matter – compelling her body to function in a way outside of God's design for her and that would "alter" her from the image that God created for her.

The spiritual nature of Gray's belief is founded upon Psalm 139 that states "I praise you because I am fearfully and wonderfully made." (SMF ¶56, PSMF ¶56). This belief was the foundation for Gray's belief that God would bless them with children through "natural means." (PSMF ¶ 162). Gray testified that her sincerely held religious belief prevented her from altering (interfering, changing, interacting) the perfect body that God made as His Temple. (PSMF ¶ 164). Gray, using this as an example, explained in her religious exemption request that, after prayerful discernment, she and her husband's "faith and personal beliefs did not peacefully allow us to take the further steps (hormones, AI, IVF)" required when the manipulations of fertility treatments were explained to them.  (PSMF ¶ 162).  The "high-tech" fertilization techniques that could have assisted her in conception were unacceptable and violated her sincerely held religious beliefs because they *alter her spiritual image* by compelling her body to conceive in an "artificial," or unnatural way, not the way God designed her reproductive system to work. Bien-Aime understood Gray's belief that to use the external factors required in artificial conception would violate her belief of God's design for her. (PSMF ¶¶ 181-183). Bien-Aime was sure that a spiritual

interpretation of Psalm 139 as an admonition against interfering with God's creation existed. (PSMF ¶ 177). Wadsworth concurred. (PSMF ¶ 178). It is this same belief system that prevented Gray from receiving the Covid-19 vaccines that were available at the time of her exemption request because her world view is a religious world view that she looks at through the lens of God and His word." (PSMF ¶¶ 68, 168).  A reasonable jury could conclude on this record that Gray had sincerely held religious beliefs.

          ii.  A reasonable jury could find that Gray's sincerely held religious beliefs are protected under Title VII.

Title VII affirmatively protects all religious beliefs, even beliefs that are not "acceptable, logical, consistent, or comprehensible to others." *EEOC v. Union Independiente De Law Autoridad De Acueductos Y Alcantarillados De P.R.*, 279 F.3d 49,56 (1st Cir. 2002).  The proper determination is "whether the beliefs professed by the [employee] are sincerely held and whether they are, in [the believer's] scheme of things, religious." *Fallon*, 877 F.3d at 490-491.  Therefore, *Fallon* does not demand dismissal in this case and does not excuse the Defendant's errors in substantively denying Gray's request for an exemption from the Covid-19 vaccination policy. Moreover, the Defendant did not deny the request because it doubted her sincerity, but rather because it erred in determining that it did not understand "the basis for why her religious belief required her to decline the Covid-19 vaccination," (DA264-265), alleging that it "[d]oes not state or articulate a comprehensive, a long-standing, deeply held belief about ultimate ideas about life, purpose or death. Focused on medical information – fertility." (PSMF § 102).Nothing can be further from the truth.

The Defendant erroneously relies upon *Fallon* to claim that Gray's beliefs are not religious, but rather secular, and therefore not worthy of protection under Title VII. In *Fallon*, a health care worker opposed a hospital's flu vaccine requirement, and asserted a medical rationale that "one

should not harm their (sic) body and [that he] strongly believes that the flu vaccine may do more harm than good." *Fallon*, 877 F.3d at 492.  A non-specific statement that vaccines "alter" the body were deemed to be a medical safety judgement, not a religious belief.  *Kiel v. Mayo Clinic Health Sys. Se. Minn*, 2023 U.S. Dist. LEXIS 135595, *25. However, Gray's sincerely held religious belief is easily distinguishable from both of these cases through an understanding of the spiritual interpretation of her beliefs and the analogy she made in her religious exemption request and appeal.  Gray never asserted that the decision to not receive the vaccine was because of a medical impact upon her and, in fact, testified in her deposition that she had received the flu vaccine per further recommendation, despite its questionable medical efficacy.  (PSMF ¶ 189). The fact that Gray did take the flu vaccine in the face of medical uncertainty exemplifies the dichotomy between her decisions regarding the two treatments. Her actions declining the Covid-19 vaccine are consistent with the religious belief upon which it is based, namely that it would alter the design God had for her, just as would artificial means of conception.  With these facts, the record is more than sufficient for a reasonable jury to decide that Gray's sincerely held beliefs are entitled to protection under Title VII.

Furthermore, in evaluating the religious exemption requests, the Defendant had established criteria that it used as "guiding principles" (PSMF ¶ 169).  The "criteria" were actually a pre-ordained list of acceptable and unacceptable reasons to grant an exemption that resulted in such decisions. (PA 110, PSMF ¶ 175).   Burke, in stark contrast,  testified that not only was such a document not utilized, it did not even exist! PSMF ¶ 176).  The exemption committee would ask *each other* clarifying questions and weighed those answers against the guiding principles and what the requestor wrote on the form to make its decision. (PSMF ¶ 170).   Even though Bien-Aime and Wadsworth testified that Gray's statements could be interpreted differently than the other

committee members did, (PSMF ¶¶ 94, 184), at no time did the anyone seek clarification from Gray (PSMF ¶ 81), regarding her religious exemption request resulting in subjective decisions that placed the Committees in the position of "spiritual interpreter.[5] Despite the "decision makers" admitting that Gray's statement could have been interpreted in other ways, the Defendant would have this astute Court believe that they always had unanimity.  (PSMF ¶ 90). To believe that a process that involves the determination of the sincerity of religious beliefs of over two hundred individuals would lead to universal agreement in incredulous at best, and certainly raises questions of credibility not appropriate for a Motion for Summary Judgement.

In addition to the Defendant's dubious decision making process, the factual considerations that the committee members relied upon are equally, if not more so, in dispute and inaccurate. In contrast to the Defendant's medical expert on the Religious Exemption Committee, Gray consistently explained the connection between the religious belief foundational to her refusal of medically invasive manipulative infertility treatments and the refusal of the Covid-19 vaccine, containing genetic components that would have interacted with her body to make a foreign protein, not one that God designed her to naturally make. (PSMF ¶93). When asked whether she understood the science behind the Covid-19 vaccine,   Gray replied "[a]bsolutely" and explained the novel function of the vaccine and their dependence upon genetic components. (PSMF ¶¶ 166-167).

At best the members of the Religious Exemption Committee lacked sufficient sophistication in evaluating her request or, at worst, willfully disregarded her claims to advance its desired agenda.  They each gave testimony that raises concerns regarding their assessment of Gray's request, particularly since they failed to perform a factual limited inquiry into her beliefs to clarify the misunderstandings that obviously existed. Papa, testified that an exemption request

---

[5] Courts are not arbiters of scriptural interpretation; and by inference, neither are employers. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981).

could be denied merely because it mentioned a medical condition, (PSMF ¶93), a fact suggesting they viewed the "criteria," (PA 110), as absolute and essentially ignored whatever Gray wrote. Although religious beliefs impact medical decisions, mentioning a medical condition in an exemption request is an inconsistency. (PSMF ¶¶ 172-173). Unfortunately, this circuitous subjectivity blinded Papa, and the other members of the Committee, in the initial assessment of Gray's religious exemption statements, such that he did not comprehend the belief system that she was expressing. (PSMF ¶174).

Burke testified that in the context of the Covid-19 vaccine, the messenger RNA causes the body's immune system to create the foreign spike protein. (PSMF ¶ 99). In contrast, Dr. McCullough, Gray's expert, opined that this statement is inaccurate and stated that the unique mechanism of "[t]hese vaccines [is] a dangerous mechanism of action" because they *cause the body to make* (emphasis added) an uncontrolled quantity of the foreign, pathogenic wild-type spike protein." (PSMF ¶¶ 98- 99). Burke finally conceded that both exogenously administered hormones and the injection of genetic material would manipulate the body, (PSMF ¶ 165), an unnatural act and the foundation of her spiritual belief. Burke inaccurately testified that the flu vaccine has the same mechanism of action as the Covid-19 vaccine. (SMF ¶ 100 PSMF ¶ 100). This is precisely why Gray could not take the vaccine – it, unlike the flu vaccine, compelled her body to create a foreign protein- an action Gray believed defiled her because it was not as designed for her by her God. Burke's misunderstanding of the science of the Covid-19 vaccine poisoned the views of the committee and exemplifies the biased subjectivity with which Defendant approached the religious exemption requests. Without a doubt, Gray had a sincerely held religious belief that warranted protection under Title VII.

The Committee relied upon the Chaplain to clarify Bible verses and how they relate to the Covid-19 vaccine. (PSMF ¶ 203). Unfortunately, the Chaplain, the individual best equipped to assess the spirituality of Gray's exemption request, acquiesced to the assessment of the physician (who was not a vaccinologist) to determine that Gray's statement was "inaccurate to how the vaccines interact with the body," (PSMF ¶¶ 190-191), despite understanding that to be vaccinated would go against God's design for her Gray. (PSMF ¶ 183). Papa acknowledged that Gray's statement of natural means conception is both religious and scientific and that, for a Chrisitan, God created nature. (PSMF ¶ 185). Papa testified that he is unaware if the Bible speaks to the image of God and does not believe that God has outlined or ordained laws for his followers to abide by. (PSMF ¶ 201-202). Papa agreed that Gray believed that the spiritual and natural way the body responds is the way God designed her and that hormones, artificial insemination, and *in vitro* fertilization unnaturally manipulated the body for those who, like Gray, desired to conceive naturally. (PSMF ¶¶ 186-187, 200). Despite some of the individuals understanding Gray's beliefs, the "collective" denied her request because it fit some pre-ordained criteria for denial.

Papa testified he did not know if the vaccine actually contained a genetic component, (PSMF ¶¶ 198-199), and that the committee believed that the Covid vaccine did not alter genetic makeup. (PSMF § 192). However, when Gray was asked if she was concerned that the genetic components would alter her genes or DNA, she succinctly responded "No." (PSMF § 193). Despite the fact that Gray never averred that her genetic makeup was altered, but rather her spiritual image that God designed for her, the Committee imposed its secular views upon her religious exemption request.

It is not the employer's place to question the correctness or even the plausibility of one's religious understandings because religious beliefs are protected whether or not one's pastor agrees

with them. *Consol Energy, Inc.,* 860 F.3d at 142. cf. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16. The Defendant attempts to use a mere six words in Pastor Fletcher's letter to attribute to Gray a different belief regarding genetic alteration, (PSMF § 194), and ignores the fact that he references "function," in the same sentence, a term Papa did not even understand. (PSMF § 195).  The Pastor actually that Gray's belief  is "completely consistent with decisions she made decades ago regarding her refusal of recommended medical procedures."  (PSMF §§ 196-197). Rather than detracting from Gray's exemption request as Defendant argues, Fletcher's letter supports the spiritual discernment that resulted in Gray refusing the vaccine.  How can the Defendant credibly claim to even understand, let alone interpret, Gray's religious exemption request based upon deep and imponderable matters when it lacks an understanding of the spiritual basis for her request and superimposes its inaccurate secular views. Any determination of credibility or validity to these sincerely held beliefs is not properly raised in a Motion for Summary Judgement because it is a factual inquiry, reserved to the trier of fact.

Even the appeal committee's deliberations exhibit the tunnel vision with which exemption requests were considered.  First, the "appeal" was not actually an appeal but rather a quality assessment to determine whether the initial deliberation was "applied equitably, fair, consistently" and failed to consider any additional information from Gray. (PSMF § 108). This is not an appeal because the exemption request is from Gray, not the Chaplain or any other agent of the Defendant. It is not based upon Gray's spiritual understanding and her sincerely held religious belief, but rather was an affirmation of the flawed beliefs of the committee, based upon scientific misconceptions. These are matters of factual dispute and credibility determinations in support of which Gray has put forth sufficient evidence that must be analyzed by the trier of fact and is not a matter for summary judgement.

First, Teufel did not know whether there could be any other understanding of the meaning of Gray's narrative, PSMF § 204, or whether she even considered its spirituality when she summarily dismissed the statement that Gray considered her body to be a temple as "an unacceptable rationale." (PSMF §§ 205, 208). She did not know if vaccines similar to the Covid vaccine existed before 2020 and could not comment on whether someone could have a religious reason the Covid-19 vaccine would not be acceptable to them. (PSMF § 206). She could offer no example of an exemption ever being granted if it had been termed "bad science." (PSMF § 207). Teufel admitted that her "read" of Gray's request as "bad science" was what Dr. Stallkamp told her, PSMF § 209, and that if the physician said "[y]es it does alter your genetic makeup . . .then I am sure we would have had a different conversation." (PSMF § 207). As a member of the appeal committee charged with ensuring correct decisions were being made, Teufel woefully lacked critical information and analytic skills and merely parroted the party line.

Wadsworth, another appeal committee member, actually understood Gray's religious belief as an alteration of function, not structure. "She's using her beliefs to make a decision and she's going to give you an example of how she did" (PSMF § 211). "[H]ormone[s] . . .tell the body, the uterus, or the ovaries . . . to do something different. . .[i]t's going to influence them." (PSMF § 212). Despite her spiritual understanding of Gray's request, Wadsworth hid behind the secular interpretation of others. She parroted the disputable fact that "the vaccine does not have genetic components." (PSMF § 213). Wadsworth parroted that the flu vaccine and Covid vaccine "are similar." (PSMF §§ 98, 214). Wadsworth testified that it would be "unlikely" to get an exemption from one but not the other, (PSMF § 215), a disputable fact because the Covid vaccine had a unique, and dangerous mechanism of action. (PSMF § 98).

Gray has adduced sufficient facts on this record that a reasonable juror could conclude that she has sincerely held beliefs that are religious in nature and warrant protection under Title VII. Furthermore, the record contains sufficient evidence upon which a jury could find that the Defendant improperly refused to accommodate Gray's sincerely-held religious beliefs when it denied granting her an exemption from the COVID-19 vaccination policy.   Therefore, this Honorable Court should deny Defendant's Motion for Summary Judgement in this matter.

> **2. The Defendant cannot carry its burden of proof to establish that granting Gray an exemption from the Vaccine Policy would have caused them to suffer an undue hardship.**

"An employer may not take an adverse action against an . . . employee because of any aspect of that individual's religious observance or practice unless the employer demonstrates that it is unable to accommodate that observance or practice without undue hardship." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 776–777 (2015).  The United States Supreme Court has recently refined the parameters of "undue hardship," clarifying the *de minimis* standard of Hardison,[6] to mean, rather than bearing a *de minimis* cost in granting an accommodation for a religious exemption request, resulting in substantial increased costs in relation to the conduct of its particular business.  *Groff v. DeJoy*, 143 S. Ct. 2279, 2295 (2023).  In order to avail themselves of an undue burden defense, the Defendant must point to affirmative facts in the record that would allow a jury to find "a burden [that] is substantial in the overall context of [the Defendant's] business." *Groff* 143 S. Ct. at 2294. To date, both the Fifth Circuit, *Hebrew v. Tex. Dep't of Crim. Just.*, 2023 U.S. App. LEXIS 24672, and the Ninth Circuit, *MacDonald v. Or. Health & Sci. Univ.*, 2023 U.S. Dist. LEXIS 151070, have followed the Supreme Court's guidance.   While the Defendant differentiates *Groff* from the case at bar by the fact that *Groff* involved only one

---

[6] *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977). Even if the *de minimis* standard of *Hardison* was still controlling case law, the Defendants have failed to produce evidence sufficient to support that contention.

individual, ECF 21-1 p. 15, the Defendant offered the same accommodations Gray could have been offered to those whom it did grant exemptions.

As a threshold matter, the Defendant did not deny Gray's request for a religious exemption because to grant it would be an undue hardship on the employer. In fact, it denied it because the "request does not state a basis for why your religious belief requires you to decline the Covid-19 vaccination." (PSMF ¶ 107). Additionally, the Defendant disclosed an internal document that indicated her exemption request was denied because it "[d]oes not state or articulate a comprehensive, a long-standing, deeply held belief about ultimate ideas about life, purpose or death. Focused on medical information – fertility." (PSMF § 102). The Defendant only raised an affirmative defense regarding an undue hardship *post hoc* in its Answer to the Complaint, PSMF ¶ 155, to justify its subjective denials of over one hundred religious exemption requests. The burden is on the employer to demonstrate that the denial of Gray's exemption request was based upon an undue hardship, a burden the Defendant never even considered at the time.

The Defendant's Covid-19 policy stated that reasonable accommodations included testing, reassignment, and additional infection prevention and control measures, among other things. (PSMF ¶ 156). Throughout discovery, the Defendant has failed to produce any evidence to suggest how granting Gray the same accommodations, including routine weekly testing, that were offered to other employees who were granted medical or religious exemptions would have created an undue hardship on its business operations of their business.

Furthermore, the policy is discriminatory on its very face, because it states that there may not be a reasonable accommodation that will allow every person with such an exemption to continue to work onsite while unvaccinated. (PSMF ¶ 156). There is no evidence that Main Line Health did not find acceptable accommodations for everyone to whom it granted a religious exemption.

At the very least, the Defendant suggests it would have applied it in a discriminatory fashion as people who were granted exemptions, such as the emergency room nurse colleagues of Gray, were offered an accommodation, while the Defendant argues Gray would have been denied the same accommodation as an undue hardship. (PSMF ¶ 149). Teufel even testified that receiving an exemption was itself an accommodation. (PSMF ¶ 161). Teufel testified that the Defendant had a testing and masking program for all employees that continued until 2023. (PSMF ¶153). Teufel had no knowledge of whether Gray was ever asked whether she would be willing to pay for the test had that cost been a burden to the Defendant. (PSMF ¶154). There is no logical basis that granting Gray an exemption and offering the exact same accommodations would have resulted in a "pandemic surge." (PSMF ¶ 28). These facts, considered in the light most favorable to Gray, raise a sufficient dispute to preclude granting the Defendant's request for summary judgment on the issue of undue hardship.

The reliance on general research treatises, such as offered by Dr. Salmon, is insufficient to satisfy its burden for summary judgement because it fails to address how specifically granting an accommodation to Gray would have increased its burden. Gray provided bedside care to patients in the Emergency Department and used standard universal precautions - including masks, gowns, and gloves - that *all* nurses employed in the emergency room used during the pandemic. (PSMF ¶149). Defendant has not provided any evidence to suggest that requiring Gray to continue using the same Personal Protective Equipment ("PPE") that she—and every other registered nurse at Paoli Hospital—had used since the start of the COVID-19 pandemic would cause an undue hardship on its operations. (PSMF ¶ 38). In fact, if it were indeed such a burden, one would need to question why it granted any accommodations at all if its ability to provide basic safety measures caused such an undue hardship.

In this specific case, Defendant made no factual determination to assess whether granting Gray's request would have imposed upon it an undue hardship. The Defendant has not demonstrated within the record that they would bear any financial burden, *de minimis* or otherwise, had they granted Gray's exemption request. Indeed, the record contains sufficient facts that accommodations would not have imposed such a burden, and therefore the Defendant's Motion for Summary Judgement on this matter should be denied.

The Defendant attempts to justify an 'undue hardship' burden by invoking safety concerns. The Third Circuit has recognized that non-economic costs can impose an undue hardship upon employers and that this can be reached by "genuine safety or security risk." *E.E.O.C. v. Geo Group, Inc.*, 616 F.3d 265, 273 (3d Cir. 2010).  However, even under the *de minimis* standard, the determination of undue hardship remains a factual finding with the conclusion depending heavily on an assessment of the witnesses' credibility.  *Protos v. Volkswagon of Am., Inc.*, 797 F.2d 129, 139 n.3 (3d Cir. 1986).  The case at bar involves the granting of a religious exemption to a specific individual and differs from the facts in *Federoff* in which employees were denied injunctive relief when seeking to prevent a healthcare system from even implementing a Covid-19 vaccination policy.  *Federoff vs. Geisinger Clinic*, 571 F. Supp 376, (M.D. Pa. 2021).  The Defendant's own policy stated that reasonable accommodations included testing, reassignment, and additional infection prevention and control measures, among other things. (PSMF ¶ 156). How the exact same accommodation granted to several employees, but not to another employee, would create an undue hardship, defined by any standard, is a factual matter that cannot be determined on this record in a Motion for Summary Judgement.

Although the expert opinion of Dr. Salmon is a comprehensive treatise providing opinions on the efficacy and utility of the Covid-19 vaccine at the relevant time of the exemption request, it

fails to identify, let alone discuss, what hardship the Defendant would bear by granting additional religious exemptions to less than 1% of its workforce. Given Dr. Salmon's employment history and sources of research funding, PSMF ¶¶ 158-59, a court reviewing summary judgement should not "make credibility determinations or weigh the evidence" regarding his opinion and leave the matter to the trier of fact.  *Reeves* 530 U.S. at 150.

Without belaboring the medical discussion further, since this case is about religion, not a debate on the safety and efficacy of the Covid-19 vaccine, the extensive medical and scientific review of Covid-19 provided by Dr. McCullough's stated that "[t]here simply is no clinical data to support this statement (unvaccinated individuals increased risk of contracting disease and transmitting disease to others who cannot be vaccinated) and Dr. Salmon fails to provide any evidence himself." PSMF ¶¶ 27-28, 34.  He further stated that:

> In contrast to the statements made by Dr. Salmon, evidence exists to the contrary. Mandatory employee Covid vaccination policies have been of questionable value and worthy of debate. In November 2021, a FOIA request led the CDC to admit they had no record of any unvaccinated person spreading the virus after recovering from Covid. Posted on 11/13/2021 (citation removed) he Covid vaccines were not studied to demonstrate that they contained the virus or prevented transmission. The vaccines were tested to determine whether they prevented severe illness. Therefore, there was no data to support the  "public health value" of mass vaccination (especially in people with little to no risk of suffering severe Covid illness) and the subsequent detrimental sequalae. PSMF ¶ 160.

Dr. Salmon states that "[a]llowing all exemption requests to be granted would have likely resulted in a large number of exemptions, and as previously described, a larger number of religious exemptions would result in a greater risk of COVID-19 disease transmission and outbreaks adversely impacting other health care staff, patients, and the capacity of the health care system to operate." SMF ¶ 29.  This generalization is devoid, as is the remainder of Dr. Salmon's report, of anything to do with this case. Dr. McCullough has opined that there are no logical scientific

grounds to argue that providing religious exemptions to less than 1% of the staff would lead to a "pandemic surge." (PSMF ¶ 28). In fact, allowing all 100 religious exemption requests, not just Gray's, would still enable MLH to have almost 100% staff vaccination levels. (PSMF ¶¶ 28-29). Dr. Boutros, another expert and former CEO at MetroHealth, is unaware of any studies that demonstrate any differences in COVID-19 infection rates at healthcare institutions that issued larger numbers of exemptions than those that issued smaller numbers of exemptions. (PSMF ¶ 29). In fact, his facility, while permitting both medical and religious exemptions, achieved similar rates of staff COVID-19 infections compared to hospitals and health systems that permitted very few exemptions. (PSMF ¶ 38). These facts are in contradistinction to the facts upon which Judge Schmehl granted summary judgement stating that "every single additional unvaccinated employee to whom patients are exposed adds to the risk to those patients." *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-5734, 2022 WL 507479 *8 (E.D. Pa. Feb. 18, 2022).

No testimony or documentation exists to show that reassigning Gray to another Main Line Health facility, as stated in its policy, PSMF ¶ 160, would have created an undue hardship on the Defendant's operations. Indeed, logic suggests, and Dr. Boutros agrees, that it would not because reassigning a healthcare worker to another facility amidst a global pandemic while suffering staffing issues and high patient rates, would surely be preferable to losing an experienced nurse such as Gray. (PSMF ¶ 30).  Nothing in the record identifies what might comprise the collection of "other things," referenced in the Covid policy, nor how those unspecified, theoretical accommodations might unduly burden the Defendant's business operations. The Defendant has offered no evidence that granting the exemptions that it did actually resulted in any increase in Covid-19 cases or any other hardship for that matter.

Finally, Dr. Salmon argues that "ensuring that sincerely held religious beliefs that prevent vaccination are granted exemptions but restricting exemptions to those with sincerely held religious beliefs limits the adverse impact of exemptions on outbreaks of disease while preserving this exemption option for those with the sincerely held religious beliefs." (SMF ¶ 37). This circuitous statement actually supports the granting of religious exemptions to those with sincerely held religious beliefs. Indeed, his opinion supports Gray's contention that exempting her from the vaccine requirement because of her sincerely held religious belief would not have created an undue hardship upon the Defendant.

Based upon the record, the Defendant has not met its burden and should be denied summary judgement that granting Gray's religious exemption would have caused it an undue hardship.

**B. The record contains sufficient evidence upon which a jury could find that Gray has established a disparate discrimination claim based upon her sincerely held religious beliefs**

A Plaintiff seeking to establish a *prima facie* case of religious discrimination based upon a disparate treatment theory must demonstrate that 1) she is a member of a protected class, 2) she was qualified for the position that she sought to retain, 3) she suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If avoidance of the accommodation that would be required is the motive for the denial of the religious accommodation request, an employer violates Title VII. *Abercrombie*, 575 U.S at 773.

There is no dispute that Gray satisfies the first three prongs of the *prima facie* elements, because Gray is religious, *supra*, was qualified for her position as a valued member of the Paoli Emergency Department team, SMF ¶142, and was terminated from her position. (SMF ¶ 146). The Covid-19 policy explicitly states that "there may not be a reasonable accommodation that will

allow every person with such an [religious] exemption to continue to work onsite while unvaccinated.  (PSMF ¶ 157). The record establishes that the Defendant granted some religious exemptions from its Covid-19 vaccination policy and provided accommodations for those individuals, (PSMF ¶ 149), which on its face raises a factual concern of disparate treatment.

The Defendant further argues that granting an exemption and offering accommodations to Gray would have been an undue hardship. (ECF 21-1 p. 20).  Gray was disparately treated in comparison to those who provided bedside clinical care, just like Gray, yet were granted accommodations for religious exemptions. (PSMF ¶¶ 149, 153).  Moreover, Teufel testified that as a Clinical Level 5 nurse, Gray would be "pretty well paid" and that her years of experience would also be a determinant of Gray's compensation. (PSMF ¶ 150). Teufel admitted that Main Line Health was struggling financially in 2021, (PSMF ¶ 151), raising a factual dispute regarding motivation for the disparate treatment.

Main Line Health has adduced no evidence to the contrary on this record to refute the above facts that are part of the record.  In fact, Main Line Health has admitted, *supra*, that it may not offer an accommodation to every religious exemption granted. (PSMF ¶ 157).  Instead, Main Line Health ignored sincerely held religious beliefs, using circular arguments that it did not understand why a person's sincerely held religious beliefs precluded them from receiving the vaccine.  Viewed in the light most favorable to the non-moving party, the record is insufficient to establish that avoidance of an accommodation was not a motivating factor for the Defendant's denial of Gray's exemption request.   Therefore, Gray has introduced sufficient evidence to satisfy the fourth prong of the prima facie case and the Defendant is not entitled to summary judgement as a matter of law.

**C. The record contains sufficient evidence upon which a jury could find that Gray has established an age discrimination claim under the Pennsylvania Human Relations Act.**

The Pennsylvania Human Relations Act states that

> [it] shall be an unlawful discriminatory practice unless based upon a bona fide occupational qualification, for any employer because of . . age, . . . to refuse to [] employ or contract with, or to bar or to discharge from employment such individual [] or to otherwise discriminate against such individual [] with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

*Pennsylvania Human Relations Act*, Act of Oct. 27, 1955, P.L. 744, No. 222 as amended.

To establish a *prima facie* case of age discrimination, the Supreme Court has acknowledged that Circuit Courts have applied some variant of the basic evidentiary framework set forth in *McDonnell Douglas*. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311(1996) *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Similarly, Pennsylvania Human Relation Act age discrimination claims are analyzed by applying the *McDonnell Douglas* paradigm. *Fasold v. Justice*, 409 F.3d 178, 183-84. (3d Cir. 2005).

To prevail, the Plaintiff must establish the *prima facie* case by a preponderance of evidence that demonstrates 1) she is forty years of age or older, 2) she suffered an adverse employment action taken by the employer, 3) she was qualified for the position at issue, and 4) she was replaced by a person sufficiently younger to permit an inference of age discrimination.  *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 385 (E.D. Pa. 2013).  However, an age discrimination plaintiff need not establish that she was replaced by an individual outside the protected class, but rather whether the "evidence [is] adequate to create an inference that an employment decision was based on an illegal discriminatory criterion . . . ." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312, (1996).

Gray properly raised a Pennsylvania Human Relations Act claim based upon age discrimination in her complaint.  In this case, the first three prongs of the prima facie case elements for age discrimination are undisputed.  Gray, a woman over the age of forty, requested an accommodation based upon her sincerely held religious beliefs as a non-denominational Christian fundamentalist. (ECF 1 ¶¶ 12, 13, 18).  Defendant denied Gray's request alleging that the request did not "state a basis why your religious belief requires you to decline the COVID-19 vaccination," (PSMF ¶ 107).   Gray suffered an adverse employment action when she was terminated. (ECF 1 ¶ 51).

Gray was treated differently than female colleagues younger than forty years of age, who also worked in immediate contact with other employees, patients, and the general public, but who were granted religious exemptions. Gray testified in her deposition that five people applied for exemptions in the Emergency Department. (PSMF ¶ 149). One of the five, around 30 years of age, had applied for a medical exemption but, when it was ultimately denied on appeal, she applied for a religious exemption that was granted.  *Id.* Gray further testified that at least two of the others were absolutely under 40 and the other two she was not certain. *Id.*  When asked the names of the individuals, Gray provided names for all of them, identifying two by last name. *Id.*

The Defendant misleadingly stated in its brief that the nurses that Gray has mentioned "were not clinical coordinators like Gray," (ECF 21-1 p. 23), implying that is why those nurses could be accommodated. However, they hypocritically allege elsewhere that "[g]ranting an exemption to Dawn Gray, who provided bedside care to Emergency Department patients, would have undermined MLH's efforts to protect its patients and staff. (ECF 21-1 p. 17). By their own admission, Defendant has recognized that Gray, like the nurses who were granted exemptions, provided bedside care. (ECF 21-2 ¶2, PSMF ¶2).   The only difference is that Gray, being older

and holding a more senior position on the nursing clinical ladder, also had supervisory obligations, and, as a result of her overall status, was near the top of the pay scale. (PSMF ¶ 150). Interestingly, Teufel testified that Main Line Health was "struggling financially" at the time, yet nurses who remained employed nevertheless received both equity and potentially merit increases in 2021. (PSMF ¶¶ 150-151). Gray has provided in this record sufficient facts that younger individuals, who were likely paid less, were granted religious exemptions, afforded accommodations and were therefore treated more favorably than Gray. Gray has established a *prima facie* case for age discrimination based upon the Pennsylvania Human Relations Act.

Once Gray has demonstrated a *prima facie* case of age discrimination, the burden shifts to the Defendant to "articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision. *Cridland*, 929 F. Supp. 2d at 691. The Defendant argues that the denial of Gray's religious exemption request was because her request did not "state a basis why your religious belief requires you to decline the COVID-19 vaccination." (PSMF ¶ 107). As discussed above, this determination is devoid of objectivity because the Committee failed to understand the spirituality of Gray's request and refused to request any clarification. Instead, the Defendant subjectively granted some requests while dismissing Gray's request.

Notwithstanding the fact, *arguendo*, that the Defendant has failed to establish that the denial of Gray's religious exemption request was for a "legitimate, nondiscriminatory reason," Gray has adduced sufficient facts on this record that "the employer's proffered justification for the adverse action [was] pretextual." *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). Defendant has adduced insufficient evidence on this record to refute the pretextual nature of Gray's termination. The Defendant has not articulated any reason why significantly younger, lower paid individuals who also performed bedside nursing, were not only granted religious exemptions but

24

received merit and equity raises while the institution was "struggling financially," unless it once again retreats to some medical and scientific explanation of the impact of Covid as it has done throughout this case and has been previously discussed, *supra*.

Indeed, the contradictory positions espoused by the Defendant illuminate the essence of the discriminatory actions in this matter. The Defendant argued that the nurses who remained "were not clinical coordinators like Gray" on one hand, ECF 21-1 p. 23, then argued it could not offer Gray an accommodation because it would have "undermined MLH's efforts to protect its patients and staff in the midst of a deadly pandemic" because Gray provided bedside care to Emergency Department patients. *Id*.  Those who were granted exemptions performed the exact same type of bedside care as Gray provided. For the foregoing reasons, the Defendant is not entitled to summary judgement on Gray's Pennsylvania Human Relation Act age discrimination claim.

## IV.     CONCLUSION

Gray has satisfied her prima facie burdens as to her Title VII and Pennsylvania Human Relation Acts claims.  Furthermore, Gray has established sufficient facts on this record taken as a whole that could lead a rational trier of fact to find in her favor on all claims.  Factual disputes remain as to any defense that the Defendant has against her claims and they are, therefore, not entitled to summary judgement. The Plaintiff respectfully requests that this Honorable Court dismiss the Defendant's Motion for Summary Judgement in its entirety.

Dated: October 30, 2023                                    Respectfully submitted,

                                                                         /s/John A. Daller, Esquire
                                                                         PA Bar No. 329356
                                                                         PO Box 162
                                                                         510 Pittsburgh Street
                                                                         Mars, PA 16046
                                                                         (724) 201-2050
                                                                         johndaller@daller-law.com