## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAWN GRAY,** | ) | |
| | ) | 2:23-cv-00263-KNS |
| Plaintiff | ) | |
| | ) | **PLAINTIFF'S RESPONSE** |
| v. | ) | **TO DEFENDANT'S** |
| | ) | **STATEMENT OF FACTS** |
| **MAIN LINE HOSPITALS, INC**. | ) | **AND PLAINTIFF'S PROPOSED** |
| Defendant | ) | **STATEMENT OF UNDISPUTED** |
| | | **ADDITIONAL FACTS IN** |
| | ) | **OPPOSITION TO** |
| | ) | **SUMMARY JUDGEMENT** |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND PLAINTIFF'S PROPOSED STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN OPPOSITION TO DEFENDANT'S REQUEST FOR SUMMARY JUDGEMENT

AND NOW comes Plaintiff, Dawn Gray, by and through her attorney, John A. Daller, and Pursuant to Fed.R.Civ.P. 56 and Section E (4) of the Honorable Kai N. Scott's Policies and Procedures, respectfully submits the following Plaintiff's Response to Defendant's Statement of Undisputed Facts and Plaintiff's Proposed Statement of Additional Undisputed Facts in Opposition to Defendant's Request For Summary Judgement and states as follows:

### PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

**A. Plaintiff's Employment as a Nurse in Paoli's Emergency Department**

1. The fact is admitted as stated.

2. The fact is admitted as stated. Furthermore, Plaintiff stated that, referring to the emergency department nurses "we all wore the same PPR. We all followed the same procedures. People that received exemptions, whether it was medical or religious, followed the same

protocols with the exception of weekly testing." (Ex. A Boutros Expert Rebuttal Report, Gray Tr. 67:19-23, DA22).

**B. Impact of Covid-19 on Health Care Institutions**

3. The fact is admitted as stated. Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

4. The fact is admitted as stated. Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff's Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

5.   The fact is admitted as stated. Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff's Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra.*

6.   The fact is admitted as stated. Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra.*

7.  The fact is admitted as stated. Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra.*

8.  The fact is admitted as stated. Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra.*

9. The Plaintiff disputes the statement as stated. Gray testified that the Emergency Department "had our busy days [but] was it always due to Covid? No." Even pre-Covid there was the need to "use hallways and cubbies . . .and [at times patients] would have their whole emergency room visit in the waiting room and never get back to a room." (Ex. A, Gray Tr. 78:2-79:2, DA25).

10. The Plaintiff disputes this statement. Dr. Boutros has stated that "[w]hile there were fears . . . there were no scientific or CDC recommendation to reject medical and religious exemptions, or that such exemptions would pose a higher risk of transmission to the patient or staff in healthcare settings. (Ex. B, Boutros Rebuttal p.5 PA80 ) Dr. Boutros has also stated that there are no studies on the impact of non-medical exemptions on COVID-19 transmission and that a reliance on the study of the transmission of measles is "pure conjecture," as the mode of transmission of the measles virus is different. (*Id* at p. 7). Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*.

Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

11. The Plaintiff does not dispute the statement as published in September 2020. However, Dr. Boutros has stated that  "[w]hile there were fears . . . there were no scientific or CDC recommendation to reject medical and religious exemptions, or that such exemptions would pose a higher risk of transmission to the patient or staff in healthcare settings. (Ex. B Boutros Report p.5 PA 80) Dr. Boutros has also stated that there are no studies on the impact of non-medical exemptions on COVID-19 transmission and that a reliance on the study of the transmission of measles is "pure conjecture," as the mode of transmission of the measles virus is different. (*Id* at p. 7). Dr. McCullough stated that other clinical data showed that: "We found that the fatality rate in the US general population (2.48%) was more than 7-fold higher than that among HCWs (0.33%)." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9328912/. (Ex. A, McCullough Report p. 30 PA 32). Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

12. The Plaintiff does not dispute the statement as published in September 2020. However, Dr. Boutros has stated that "[w]hile there were fears . . . there were no scientific or CDC recommendation to reject medical and religious exemptions, or that such exemptions would pose a higher risk of transmission to the patient or staff in healthcare settings. (Ex. B Boutros Report p.5 PA 80) Dr. Boutros has also stated that there are no studies on the impact of non-medical exemptions on COVID-19 transmission and that a reliance on the study of the transmission of measles is "pure conjecture," as the mode of transmission of the measles virus is different. (*Id* at p. 7). Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed

Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

13. The Plaintiff does not dispute the statement as published in April 2021. However, Dr. Boutros has stated that "[w]hile there were fears . . . there were no scientific or CDC recommendation to reject medical and religious exemptions, or that such exemptions would pose a higher risk of transmission to the patient or staff in healthcare settings. (Ex. B Boutros Report p.5 PA 80) In the SARS-CoV-2 variants of concern and variants under investigation in England Technical briefing 17 25 June 2021, 92,056 cases had the Delta variant and 50/7235 fully vaccinated and 44/53,822 of the unvaccinated died. This indicates that the fully vaccinated who contract the Delta variant have an 8.6-fold increased risk for death, (95% CI 5.73-12.91), p < 0.0001, as compared to those who chose to remain unvaccinated,https://assets.publishing.service.gov.uk/government/uploads/system/upload s/attachment_data/file /1001354/Variants_of_Concern_VOC_Technical_Briefing_17.pdf. Ex. B McCullough Report PA 18) Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed

Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

14. The Plaintiff disputes this statement as stated. A series of published reports confirmed the trivial and inconsequential nature of asymptomatic spread. McCullough Report Ex. B PA 28). For example, "There was no evidence of transmission from asymptomatic positive persons to traced close contacts." https://www.nature.com/articles/s41467-020-19802-w, and an article in April 2021 from the CDC Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020 failed to demonstrate evidence of asymptomatic spread. https://wwwnc.cdc.gov/eid/article/27/4/20-4576_article. Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

15. The Plaintiff disputes this statement as stated. Dr. Boutros has stated that "In September 2021, alternative infection control strategies such as masking, testing and social distancing were recommended for both patients and staff who could not or would not be vaccinated

against COVID-19. With over 80% of staff being vaccinated, the small number of exemptions that healthcare institutions allowed, did not pose additional risk to patients, staff of the healthcare institutions, nor the community." (Ex. B, Boutros Report p. 8 PA 83).

## C.  Availability and Efficacy Of Vaccines

16. The Plaintiff admits that the statement was published as stated in the Journal of the American Medical Association in 2020. Dr. Boutros has stated that in September 2021, alternative infection control strategies such as masking, testing and social distancing were recommended for both patients and staff who could not or would not be vaccinated against COVID-19. With over 80% of staff being vaccinated, the small number of exemptions that healthcare institutions allowed, did not pose additional risk to patients, staff of the healthcare institutions, nor the community. (Ex. B, Boutros Report p. 8 PA 83). Furthermore, [b]ecause COVID-19 is primarily spread through droplet inhalation, mask wearing in health care settings was universally recommended to control the spread of COVID-19. Healthcare institutions, such as The MetroHealth System, which issued both medical and religious exemption did not experience higher rates of staff infections. [He is] also unaware of any studies that demonstrated any differences in COVID-19 infection rates at healthcare institutions that issued larger numbers of exemptions than those issued smaller numbers of exemptions. *Id.* In some cases, vaccinated staff were less compliant with masking, handwashing, and social distancing because they falsely believed they were 100% immune. *Id.* Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a  "tendency to make the existence of any

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

17. The Plaintiff disputes the statement as stated. Gray testified that it was the "intent" to vaccinate medical personnel first. Gray also testified that frontline medical personnel all were wearing personal protective equipment and that exemptions were given. (Ex. A, Gray Tr. 123:24-124:9 DA 36). Dr. Boutros stated that "[h]ospitals throughout the country took significant precautionary measures to reduce the risk of transmission in health care settings, and these measures were applied equally to vaccinated and unvaccinated patients and staff. (Ex. B, Boutros Report p. 8 PA 80).

18. The Plaintiff admits the fact as stated.

19. The Plaintiff admits that the stated statement was published as referenced. However, Dr. Boutros has stated that "[i]n September 2021, alternative infection control strategies such as masking, testing and social distancing were recommended for both patients and staff who could not or would not be vaccinated against COVID-19. With over 80% of staff being vaccinated, the small number of exemptions that healthcare institutions allowed, did not pose additional risk to patients, staff of the healthcare institutions, nor the community." (Ex. B, Boutros Report p. 8 PA 80). Dr. McCullough has stated that [t]he CDC itself

published a report titled: "Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021" demonstrating complete failure of the COVID-19 in controlled spread of SARS-CoV-2 in congregate settings. [His] interpretation of this report is that the vaccines are not sufficiently effective to make the elective, investigation vaccine recommended for use beyond individual preference. https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7031e2-H.pdf (Ex. A McCullough Report PA 18).

20. The Plaintiff disputes the facts stated herein as the publication dates all proceeded the relevant time in question and therefore are not applicable to determining what, if any, increased risk unvaccinated individuals presented. In fact, Dr. McCullough referenced a report in June 2021, more than four months after the most recent reference Dr. Salmon provided, that in the SARS-CoV-2 variants of concern and variants under investigation in England Technical briefing 17 25 June 2021, 92,056 cases had the Delta variant and 50/7235 fully vaccinated and 44/53,822 of the unvaccinated died. This indicates that the fully vaccinated who contract the Delta variant have an 8.6-fold increased risk for death, (95% CI 5.73-12.91), $p < 0.0001$, as compared to those who chose to remain unvaccinated,https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1001354/Variants_of_Concern_VOC_Technical_Briefing_17.pdf . The CDC itself published a July 2021report, more than five months after the most recent reference Dr. Salmon provided, titled: "Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021" demonstrating complete failure of the

COVID-19 in controlled spread of SARS-CoV-2 in congregate settings. (Ex. A McCullough Report PA 18).

21. The Plaintiff disputes the statement as stated because it mischaracterizes her testimony. Gray stated that the recommendation was based upon a *belief* (emphasis added) because "many of the testings, things like that, were not known and were not done. (Ex. A, Gray Tr. 73:4-74:6, DA24). Furthermore, Dr. McCullough stated that in the SARS-CoV-2 variants of concern and variants under investigation in England Technical briefing 17 25 June 2021, 92,056 cases had the Delta variant and 50/7235 fully vaccinated and 44/53,822 of the unvaccinated died. This indicates that the fully vaccinated who contract the Delta variant have an 8.6-fold increased risk for death, (95% CI 5.73-12.91), $p < 0.0001$, as compared to those who chose to remain unvaccinated, https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_ data/file/1001354/Variants_of_Concern_VOC_Technical_Briefing_17.pdf . The CDC itself published a July 2021report, more than five months after the most recent reference Dr. Salmon provided, titled: "Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021" demonstrating complete failure of the COVID-19 in controlled spread of SARS-CoV-2 in congregate settings. (Ex. B McCullough Report p. 16 PA 18).

22. The Plaintiff disputes this statement as it mischaracterizes her testimony. Gray stated that "I can say that I believe that that was their intention, yes," not that the recommendation to obtain a vaccination was to ensure that healthcare facilities could continue to provide care for patients. (Ex. A, Gray Tr. 124:11-19 DA36). Dr. Boutros stated that "[healthcare CEOs

were concerned that health care workers may choose to leave their job rather than get vaccinated at a time when patients were overwhelming hospital capacity. . . and [t]his would pose a health care crisis of great proportion. The inability to provide adequate care to patients in an appropriate acute care setting has catastrophic effect on individual care and the care of the entire community. (Ex. B Boutros Report p. 6 PA 81). He further stated that "[w]ith over 80% of staff being vaccinated, the small number of exemptions that healthcare institutions allowed, did not pose additional risk to patients, staff of the healthcare institutions, nor the community. (Ex. B Boutros Report p. 8 PA 83).

**D.  Mandatory Vaccine Policies**

23.  The Plaintiff disputes the statement as stated. Dr. Boutros stated that [w]ith over 80% of staff being vaccinated, the small number of exemptions that healthcare institutions allowed, did not pose additional risk to patients, staff of the healthcare institutions, nor the community. (Ex. B Boutros Report p. 8 PA 83). Furthermore, he indicated that "[e]xemptions from mandatory vaccination policy have not been found to undermine healthcare institutions' ability to inhibit the spread of a serious communication disease. The use of both medical and religious exemptions for Influenza vaccination is widespread throughout the healthcare industry." *Id.*

24.  The Plaintiff admits that mandatory vaccine policies likely had a mixed impact on vaccine hesitancy. Dr. McCullough as stated that "[r]eligious beliefs may mandate this discernment [of taking a vaccine] through the lens of religion. Regardless of one's beliefs, however, it is mandatory from the medical perspective that patients receive informed consent to determine if medical therapy is appropriate for them." (Ex. A McCullough Report PA 18). Dr. Boutros has stated that t "[e]xemptions from mandatory vaccination policy have not

been found to undermine healthcare institutions' ability to inhibit the spread of a serious communication disease. The use of both medical and religious exemptions for Influenza vaccination is widespread throughout the healthcare industry." (Ex. B Boutros Report p. 8 PA 83).

25. The Plaintiff does not dispute this fact.

**E. Impact of Exemptions on Vaccination Rates.**

26. The Plaintiff disputes this statement. Pertussis and measles are different viruses, with different epidemiological characteristics. The argument that these studies are consequential to the issue of granting COVID-19 vaccination exemptions is pure conjecture. The Measles virus is one of the most contagious viruses studied. If one person is infected with Measles, up to 90% of the people close to that person who are not immune will also become infected. That is not the case for COVID-19 transmission (Ex. B Boutros Report p. 7 PA 82). Universal vaccination was never warranted nor supported by scientific data. Conventional wisdom at the time suggested that 70 to 90% of people would need to have immunity (via vaccine or via prior infection). Therefore, it would be unnecessary to vaccinate EVERY employee and exemptions could be granted. (Ex. A McCullough Report PA 49).

27. The Plaintiff disputes this statement. There is simply no clinical data to support this statement and Dr. Salmon himself does not offer any. (Ex. A McCullough Report PA 52). The Measles virus is one of the most contagious viruses studied. If one person is infected with Measles, up to 90% of the people close to that person who are not immune will also become infected. That is not the case for COVID-19 transmission.

28. The Plaintiff disputes this statement. There is simply no clinical data to support this statement and Dr. Salmon himself does not offer any. (Ex. A McCullough Report PA 52).

The Measles virus is one of the most contagious viruses studied. If one person is infected with Measles, up to 90% of the people close to that person who are not immune will also become infected. That is not the case for COVID-19 transmission (Ex. B Boutros Report p. 7 PA 82). Had MLH granted religious exemptions to those whose requests were denied, that would constitute only an incremental 0.8% of all MLH staff. There are no logical scientific grounds to argue that providing religious exemptions to less than 1% of the staff would lead to a "pandemic surge". In fact, allowing all 100 religious exemption requests would still enable MLH to have almost 100% staff vaccination levels. (Ex. A McCullough Report PA 53).

29. The Plaintiff disputes this fact. To the contrary, had MLH granted religious exemptions to those whose requests were denied, that would constitute only an incremental 0.8% of all MLH staff. There are no logical scientific grounds to argue that providing religious exemptions to less than 1% of the staff would lead to a "pandemic surge". In fact, allowing all 100 religious exemption requests would still enable MLH to have almost 100% staff vaccination levels. (Ex. A McCullough Report PA 53). In addition, healthcare institutions, such as The MetroHealth System, which issued both medical and religious exemption did not experience higher rates of staff infections. Dr. Boutros is also unaware of any studies that demonstrated any differences in COVID-19 infection rates at healthcare institutions that issued larger numbers of exemptions than those issued smaller numbers of exemptions. (Ex. B Boutros Report p. 8 PA 83).

30. The plaintiff does not dispute this statement. However, the issues in this case regards the denial of a religious exemption, not a medical exemption, and Plaintiff believes that this fact is not relevant because it does not have a "tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

31. The Plaintiff disputes this statement to the extent that Dr. Salmon has offered no data to support it. Dr. Boutros, one of Plaintiff's expert, has stated that healthcare CEOs were concerned that health care workers may choose to leave their job rather than get vaccinated at a time when patients were overwhelming hospital capacity. This would pose a health care crisis of great proportion. The inability to provide adequate care to patients in an appropriate acute care setting has catastrophic effect on individual care and the care of the entire community. (Ex. B Boutros Report p. 6 PA 81).

32. The Plaintiff disputes this statement. Numerous published reports from the summer and fall of 2021 showed that fully vaccinated individuals have equal viral loads in the nasopharynx as determined by PCR testing as those who are unvaccinated. Further, it was already evident that universal vaccination – even at 100% vaccinated levels – would not eliminate or possibly not even reduce the transmission of the virus. (Ex. A McCullough Report PA 34).

33. The Plaintiff disputes this statement. Numerous published reports from the summer and fall of 2021 showed that fully vaccinated individuals have equal viral loads in the

nasopharynx as determined by PCR testing as those who are unvaccinated. Further, it was already evident that universal vaccination – even at 100% vaccinated levels – would not eliminate or possibly not even reduce the transmission of the virus. Moreover, it was evident that the COVID-19 vaccines were progressively losing efficacy over the prevention of COVID-19 and, in widely vaccinated countries, up to 80% of COVID-19 cases were in the previously vaccinated, implying the vaccines were becoming obsolete with antigenic escape or resistance to variants (e.g. Delta) that have evolved to infect persons who were vaccinated against the now extinct wild-type SARS-CoV-2 strain. Thus, as shown in numerous articles, COVID-19 vaccination does not make a person less infectious, nor does it "protect" others. (Ex. A McCullough Report PA 34-36).

34. The Plaintiff disputes this statement. There simply is no clinical data to support this statement and Dr. Salmon fails to provide any evidence himself. Conventional wisdom at the time suggested that 70 to 90% of people would need to have immunity (via vaccine or via prior infection). Therefore, it would be unnecessary to vaccinate EVERY employee. Instead, MLH could target 70 to 90% immunity. Indeed, the Centers for Disease Control's own data suggested that the incidence of disease was not further decreased in a high-risk population who exhibited greater than 75% vaccination rates. Mandatory employee Covid vaccination policies have been of questionable value and worthy of debate (Ex. A McCullough Report PA 49-52).

35. The Plaintiff disputes this statement. The Covid vaccines were not studied to demonstrate that they contained the virus or prevented transmission. The vaccines were tested to determine whether they prevented severe illness. Therefore, there was no data to support the "public health value" of mass vaccination. MLH has disclosed they received denied

approximately 100 requests for religious exemption. According to their website data, MLH has over 10,000 employees and 2,000 physicians. Therefore, had MLH granted religious exemptions to these additional 100 applicants, which would constitute only an incremental 0.8% of all MLH staff. There are no logical scientific grounds to argue that providing religious exemptions to less than 1% of the staff would lead to a "pandemic surge". (Ex. A McCullough Report PA 52-53).

36. The Plaintiff does not dispute that religious exemptions represent an effort to accommodate the religious views of those impacted by mandatory policies. The Plaintiff disputes the remainder of the statement. Therefore, there was no data to support the "public health value" of mass vaccination. MLH has disclosed they received denied approximately 100 requests for religious exemption. According to their website data, MLH has over 10,000 employees and 2,000 physicians. Therefore, had MLH granted religious exemptions to these additional 100 applicants, which would constitute only an incremental 0.8% of all MLH staff. There are no logical scientific grounds to argue that providing religious exemptions to less than 1% of the staff would lead to a "pandemic surge." (Ex. A McCullough Report PA 52-53).

37. The Plaintiff does not dispute this statement.

38. The Plaintiff disputes this statement as written. In September 2021, alternative infection control strategies such as masking, testing and social distancing were recommended for both patients and staff who could not or would not be vaccinated against COVID-19. Because COVID-19 is primarily spread through droplet inhalation, mask wearing in health care settings was universally recommended to control the spread of COVID-19. Healthcare institutions, such as The MetroHealth System, which issued both medical and religious

exemption did not experience higher rates of staff infections. Dr. Boutros was also unaware of any studies that demonstrated any differences in COVID-19 infection rates at healthcare institutions that issued larger numbers of exemptions than those issued smaller numbers of exemptions. (Ex. B Boutros Report p. 8 PA 83).

39. The Plaintiff disputes this statement as stated. Masking, social distancing, and testing are indeed all imperfect methods to attempt to contain SARS-CoV-2. These methods are imperfect related to all people, whether vaccinated or not. (Ex. A McCullough Report PA 53).

40. The Plaintiff disputes this statement as stated. While the vaccines temporarily protected high-risk groups like the elderly and/or those who had significant health comorbidities, these effects were waning as well. The vaccines did not stop the spread of SARS-CoV-2. In fact, vaccinated people were walking around unwittingly spreading the virus. As discussed previously, in the summer and fall of 2021, it was well documented that asymptomatic Covid patients were spreading SARS-CoV-2. The goal of mass vaccination campaigns was to get to herd immunity as discussed above. In the summer and fall of 2021, health "experts" were arguing that Covid "herd immunity" would occur once 70 to 90% of people in a setting had immunity (either from natural infection and/or vaccination). https://www.webmd.com/covid/what-is-herdimmunity#:~: text=There%20was%20a%20big%20push,immunity%20has%20not%20been%20 achieved. (Ex. A McCullough Report PA 53).

**F. MLH COVID-19 Vaccination Policy.**

41. The Plaintiff does not dispute the fact that Main Line Health issued a COVID-19 Vaccination Policy as described.

42. The Plaintiff disputes the statement as stated to the extent that it mischaracterizes Mr. Papa's testimony. Mr. Papa also stated that he did not know if Brian Corbett was involved or whether Mr. Mendicino "brought in corporate." He also testified that infection control nurses and other clinical individuals were involved as well. (Ex. D, Papa Tr. 11:7-12:13 DA 136, Ex. D, Papa Tr. 15:9-25 DA136).

43. The Plaintiff disputes the statement to the extent it mischaracterizes Mr. Papa's testimony. Furthermore, Mr. Papa testified that there were other sources such as literature searches but could not describe what the Defendant considered or not. (Ex. D, Papa Tr. 16:8-17:3 DA137).

44. The Plaintiff does not dispute the fact as stated.

45. The Plaintiff does not dispute the fact as stated.

46. The Plaintiff does not dispute the fact as stated.

47. The Plaintiff does not dispute the fact as stated.

48. The Plaintiff does not dispute the fact as stated.

49. The Plaintiff does not dispute the fact as stated.

**G. Gray's Request for a Religious Exemption**

50. The Plaintiff does not dispute the fact as stated.

51. The Plaintiff does not dispute the fact as stated.

52. The Plaintiff does not dispute the fact as stated.

53. The Plaintiff does not dispute the fact as stated.

54. The Plaintiff does not dispute the fact as stated.

55. The Plaintiff does not dispute the fact as stated.

56. The Plaintiff does not dispute the fact as stated.

57. The Plaintiff does not dispute the fact as stated.

58. The Plaintiff disputes the statement as it mischaracterizes Gray's complete testimony. Gray further described the relationship between infertility treatments and the Covid-19 vaccine: "When it came to infertility, it was a clear answer. We were not going to take those steps that did not let -- and I say that in here. I believe I say -- I'm looking for it. That it would happen naturally if it was going to happen. The same thing applies to my immune system. I am not going to use a means to alter the immune system that God has given me. And to me and my walk with my Lord, taking this vaccine did that. (Ex. A, Gray Tr. 137:20-138:4 DA40).

59. The Plaintiff does not dispute the fact as stated.

60. The Plaintiff does not dispute the fact as stated.

61. The Plaintiff disputes the statement as stated as it mischaracterizes Gray's testimony because counsel asked "Do you know what the context was for your statement" yet then went on to ask about the context of the writer of scripture. Once clarified that counsel was asking about homosexuality, Gray testified "that I believe that God created us male and female." (Ex. A, Gray Tr. 146:14-147:2 DA42). Gray testified that what she wrote is her interpretation of the scripture and how she applies those beliefs to her life. (Ex. A, Gray Tr. 149:1-20 DA43).

62. The Plaintiff does not dispute the fact as stated.

63. The Plaintiff does not dispute the fact as stated.

64. The Plaintiff disputes the statement as it mischaracterizes the context of Gray's testimony. Gray testified that "I'm not administering a medication that is going to change how their body is *working* (emphasis added). We hope when we prescribe an antibiotic that their

body responds to it. . . But it is their body responding to the treatment we're giving. (Ex. A, Gray Tr. 86:2-7 DA27).

65. The Plaintiff does not dispute the fact as stated.

66. The Plaintiff does not dispute the fact as stated.

67. The Plaintiff does not dispute the fact that mRNA and DNA are genetic components.

68.  The Plaintiff disputes the statement as it mischaracterizes the context of Gray's testimony. Gray testified that Because my body did not create those genetic components. I am -- to quote Psalms 139, "I am created in Him. My frame was hidden. I was woven together." To me, that speaks -- for me, that is genetics. To me, that is my interpretation in what God has revealed to me in my walk with Him. That is what that means. (Ex. A, Gray Tr. 142:14-20 DA41).

69. The Plaintiff does not dispute the fact as stated.

70. The Plaintiff does not dispute the fact as stated.

71. The statement provided is immaterial to whether or not Gray had a sincerely held religious belief that prevented her from receiving the Covid-19 vaccine at the time she was terminated because the Novavax vaccine was not available at the tie according to Defendant's expert. Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

72. The Plaintiff does not dispute the fact as stated.

73. The Plaintiff does not dispute the fact as stated.

74. The Plaintiff does not dispute the fact as stated.

75. The Plaintiff does not dispute that the Cavalry (*sic*) Church did not require her to get a vaccination. The Plaintiff does not dispute the fact that several members of the Church have gotten the Covid-19 vaccine.

76. The Plaintiff does not dispute that she submitted a statement that was authored by Pastor Reverend Harry Fletcher from Cavalry (*sic*) Church.

**H. Religious Exemption Committee**

77. The Plaintiff does not dispute the fact as stated.

78. The Plaintiff does not dispute the fact that the Religious Exemption Committee included members of a multi-disciplinary background. However, the actual members who considered any particular request was not the entire team. See for example Ex. F, Bien-Aime Tr 21:3-7 DA182, Ex. D, Papa Tr. 21: 14-17, DA138.

79. The Plaintiff disputes the statement as stated to the extent that it mischaracterizes Mr. Papa's testimony. Mr. Papa also stated that he did not know if Brian Corbett was involved or whether Mr. Mendicino "brought in corporate." He also testified that infection control nurses and other clinical individuals were involved as well. (Ex. D, Papa Tr. 11:7-12:13 DA 136, Ex. D, Papa Tr. 15:9-25 DA136).

80. The Plaintiff does not dispute the statement provided. The EEOC document that the Defendant references also states that, in further relevant part, that:

> Because the definition of religion is broad and protects beliefs, observances, and practices with which the employer may be unfamiliar, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief. If, however, an employee requests religious accommodation, and an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief, observance, or practice, the employer would be justified in seeking additional supporting information. . . Where the accommodation request itself does not provide enough information to enable the employer to make a determination, and the employer has a bona fide doubt as to the basis for the accommodation request, it is entitled to make a limited inquiry into the facts and circumstances of the employee's claim that the belief or practice at issue is religious and sincerely held, and that the belief or practice gives rise to the need for the accommodation.

81. The Plaintiff disputes this fact. Papa testified that "he did not know" what the EEOC said should happen if the nature or sincerity of the religious belief was questioned. (Ex. D Papa Tr. 119:4-7 DA163). Burke testified that her familiarity with the EEOC guidelines was limited to and reliant upon "as much as we talked about it in the hearing" and that she has no further expertise or knowledge of how to evaluate a religious exemption request. (Ex. G, Burke Tr. 39:1-17 DA211). Bien-Aime testified that no one requested any clarification regarding Gray's exemption request. (Ex. F, Bien-Aime Tr. 82:6-24 DA198).

82. The Plaintiff does not dispute this fact as stated.

83. The Plaintiff disputes this statement as it mischaracterizes the testimony. Bien-Aime did not recall if she specifically reviewed Gray's request for exemption and, if she did, may have read it once or twice. (Ex. F, Bien-Aime Tr. 19:6-13 DA182).

84. The Plaintiff does not dispute the fact as stated. Teufel testified that the time spent on reviewing each was appeal was about five to ten minutes. (Ex. H, Teufel Tr. 78:6-7 DA239).

85. The Plaintiff disputes this statement to the extent it miscategorizes the testimony. Papa testified that takin the flu vaccine and not taking the Covid vaccine are not mutually exclusive, taking into account the differences in the vaccines. (Ex. D, Papa Tr. 30:19-31:4 DA141).

86. The Plaintiff does not dispute this statement as stated.

87. The Plaintiff disputes this statement. Papa testified that the Chaplain interpreted the meaning of Bible verses to provide the committee with her clarification of the Bible, not what Gray articulated. (Ex. D, Papa Tr. 53:18-23 DA146).

88. The Plaintiff does not dispute this fact.

89. The Plaintiff does not dispute that the "collective" made the decisions on exemption requests. However, the actual members who considered any particular request was not the entire team. See for example Ex. F, Bien-Aime Tr 21:3-7 DA182, Ex. D, Papa Tr. 21: 14-17, DA138.

90. The Plaintiff disputes this statement to the extent it miscategorizes the testimony. Papa testified that "we never had a situation in which we had to take a consensus. . . . we did not move on until [] we were all in favor of the acceptance or denial. "Ex. D Papa Tr, 18:17-20:8 DA138-139).

**I.** Religious Exemption Committee's Denial of Gray's Exemption Request.

91. The Plaintiff does not dispute this statement.

92. The Plaintiff does not dispute that the citations provided state the deposition testimony. Gray's response to her religious exemption request clearly articulates her belief. (Ex. E, Gray RE Request p.2-3, typed form included, DA169-170, 172).

93. The Plaintiff disputes this statement. Gray testified that:

> When it came to infertility, it was a clear answer. We were not going to take those steps that did not let -- and I say that in here. I believe I say -- I'm looking for it. That it would happen naturally if it was going to happen. The same thing applies to my immune system. I am not going to use a means to alter the immune system that God has given me. And to me and my walk with my Lord, taking this vaccine did that. (Ex. A, Gray Tr. 137:20-138:4 DA40).

94. The Plaintiff disputes this statement as it miscategorizes Gray's exemption request. It is the Defendant's agents' interpretation of her request. For example, Bien-Aime testified that Gray's statements could be interpreted differently. Ex. F, Bien-Aime Tr. 62:4-10 DA193). Wadsworth testified that "I don't believe I can speak to what Dawn was thinking about when she wr[o]te this. . .This is her sincerely held religious belief." (Ex. I Wadsworth Tr. 41:16-42:4 DA254-255).

95. The Plaintiff does not dispute that this statement reflects Bien-Aime's testimony. Gray's response to her religious exemption request articulates her sincerely held belief. (Ex. E, Gray RE Request DA168). Wadsworth testified that "I don't believe I can speak to what Dawn was thinking about when she wr[o]te this. . .This is her sincerely held religious belief." Ex. I Wadsworth Tr. 41:16-42:4 DA254-255).

96. The Plaintiff does not dispute that the Chaplain made this medical statement.

97. The Plaintiff does not dispute that this subjective statement was made by Bien-Aime.

98. The Plaintiff does not dispute this statement. However, Defendant agents inaccurately testified to how the vaccine worked. For example, Burke, the "medical" person on the

committee testified that the mRNA of the immune system interacts with the immune system, the same way the influenza vaccine works. Ex. G Burke Tr. 48:8-23. DA213). Gray's expert, Dr. McCullough, has stated that "[t]hese vaccines have a dangerous mechanism of action, in that they all cause the body to make an uncontrolled quantity of the foreign, pathogenic wild-type spike protein from the SARS-CoV-2 virus for at least two weeks, probably for a longer period based on the late emergence of vaccine injury reports. This is unlike all other vaccines." (Ex. A McCullough Report PA 14).

99. The Plaintiff does not dispute that the statement reflects Burke's testimony but disputes its technical accuracy. "[t]hese vaccines have a dangerous mechanism of action, in that they all cause the body to make an uncontrolled quantity of the foreign, pathogenic wild-type spike protein from the SARS-CoV-2 virus for at least two weeks, probably for a longer period based on the late emergence of vaccine injury reports. This is unlike all other vaccines." (Ex. A McCullough Report PA 14).

100.    The Plaintiff disputes this statement as technically inaccurate. McCullough has stated that "[t]hese vaccines have a dangerous mechanism of action . . .**b** This is unlike all other vaccines." (Ex. A McCullough Report PA 14).

101.    The Plaintiff disputes this statement. Gray's answers to question one, three, and seven of her religious exemption request stated the basis of her objection. Ex. E Gray's RE Request, typed responses DA172). Furthermore, when asked during her deposition testimony, Gray testified that:

> When it came to infertility, it was a clear answer. We were not going to take those steps that did not let -- and I say that in here. I believe I say -- I'm looking for it. That it would happen naturally if it was going to happen. The same thing applies to my immune system. I am not going to use a means to alter the immune

system that God has given me. And to me and my walk with my Lord, taking this vaccine did that. (Ex. A, Gray Tr. 137:20-138:4 DA40).

102.    The Plaintiff does not dispute the fact that the Committee interpreted Pastor Fletcher's statement as stated. However, Bien-Aime testified that Gray's statements could be interpreted differently. Ex. F, Bien-Aime Tr. 62:4-10 DA193). Moreover, Wadsworth, from the appeal committee testified that "I don't believe I can speak to what Dawn was thinking about when she wr[o]te this. . .This is her sincerely held religious belief." Ex. I Wadsworth Tr. 41:16-42:4 DA254-255).

103.    The Plaintiff does not dispute that the Committee had the subjective belief stated.

104.    The Plaintiff disputes the statement as stated. Defendant's agents repeatedly testified that they did not understand what "genetic" referenced. For example, Bien-Aime testified that she did not know if the receiving the vaccine injected a genetic component and that she "would have to have an understand how somebody is deciding genetic component. (Ex. F,  Bien-Aime Tr. 53:16-23, DA190 Ex. F,  Bien-Aime Tr. 54:1-5,  DA190). Burke testified that, as a physician, she did not know what genetic components mean. (Ex. G, Burke Tr. 39:18-23 DA211).

105.    The Plaintiff disputes this fact. Repeatedly Defendant witnesses stated that they had some objection to the "science" that was in Gray's request while not understanding the science of the vaccine in order to be able to understand her religious belief. For example, Papa himself immediately thereafter testified that a religious belief impacts how one views the world but then says it is "false science" and therefore not religious. )Ex. D, Papa Tr. 97:13:8-25 DA157). Bien-Aime testified that she did not know if the

receiving the vaccine injected a genetic component and that she "would have to have an understand how somebody is deciding genetic component. (Ex. F, Bien-Aime Tr. 53:16-23, DA190). Burke testified that, as a physician, she did not know what genetic components mean. (Ex. G, Burke Tr. 39:18-23 DA211).

106.       The Plaintiff disputes this statement as stated. For example, Bien-Aime testified that the Committee only looked at the application and did not seek any clarifications of what Gray articulated although interpretations can be subjective "depending on the lens in which you're looking at them. Ex. F, Bien-Aime Tr. 82:15-83:23, DA198). The decision was subjectively made "as a team" based on its opinion. (Ex. F, Bien-Aime Tr. 80:23-81:13), DA190).

107.       The Plaintiff does not dispute this statement as stated. To be clear, the reason for denial was stated as the "request does not state a basis for why your religious belief requires you to decline the Covid-19 vaccination." (Ex. J Denial email DA264-265).

108.       The Plaintiff disputes this statement. The Defendant did not offer an "appeal" to determine whether a decision was correct but rather a review of the initial decision to determine that the "exemption process was applied equitably, fair, consistently" and considered no additional available information. Ex. I Wadsworth Tr. 16:3-18 DA248).

**J. Appeals Committee**

109.       The Plaintiff does not dispute this statement.

110.       The Plaintiff disputes this statement as written because Wadsworth failed to indicate that she provided medical input but rather that the questions were directed to Dr. Stallkamp and, if necessary, to non-committee members, Dr. Brett Gilbert or Dr.

Larry Livornese. (Ex. I Wadsworth Tr. 24:10-25:14. DA250). Wadsworth stated she is not a medical expert. (Ex. I Wadsworth Tr. 33:17-18. DA252).

111.     The Plaintiff disputes the statement as stated. Wadsworth testified that the Appeal Committee "validated the process" and made sure that appeals were "not approved by categories of people" and "looked at the employee, where they worked, what was their role, what was their exemption request." (Ex. I Wadsworth Tr. 61:7-62:2. DA259-260).

112.     The Plaintiff disputes this statement because the Appeal Committee "looked at the employee, where they worked, what was their role, what was their exemption request," (Ex. I Wadsworth Tr. 61:7-62:2. DA259-260), rather than redacting the requests in the first place.

113.     The Plaintiff does not dispute that the statement was made as stated,

114.     The Plaintiff does not dispute the statement as stated.

115.     The Plaintiff does not dispute that the Appeal Committee members did not consider additional information as testified to by Wadsworth. The remainder of the statement is disputed as there is no evidence in the record that the policy (Ex. C DA129) or the Religious Exemption form provided this information. (Ex. E DA168).

116.     The Plaintiff does not dispute that the statement reflected Defendant's process.

**K.  Plaintiff's Appeal**

117.     The Plaintiff does not dispute this fact.

118.     The Plaintiff does not dispute that her email contained the information so quoted from her appeal request. Gray specifically disputes that she did not implicitly reference abortion when she stated: "I believe life begins at conception at ends at

natural death" in the context of fertility treatment, Ex. E Gray RE Request (DA172). Gray testified that "the ovum and sperm dying is, to me, an abortion. . . it was foundational." Ex. A, Gray Tr. 167:2-12 DA47). Teufel herself testified that abortion occurs "at some point in a person's life."  (Ex. H, Teufel Tr. 56:20-21 DA234).

119.    The Plaintiff does not dispute that she did not specifically reference "fetal cell lines." However, she discussed the destruction of embryos in the context of fertility. (Ex. E Gray RE Request DA172). Gray testified that "the ovum and sperm dying is, to me, an abortion. . . it was foundational." Ex. A, Gray Tr. 167:2-12 DA47).Teufel's testified that that abortion occurs "at some point in a person's life."  (Ex. H, Teufel Tr. 56:20-21 DA234).

120.    The Plaintiff does not dispute this statement to the extent that she did not administer Plan B. Plaintiff disputes the remainder of the statement as stated as it miscategorizes her testimony. Gray testified that "the ovum and sperm dying is, to me, an abortion. . . it was foundational." (Ex. A, Gray Tr. 167:2-12 DA47).

121.    The Plaintiff disputes this statement as it miscategorizes her testimony about why she requested an exemption. Ex. E Gray RE Request (DA172). When asked why she objected to the vaccine with genetic components, Gray testified that "my body did not create those genetic components." (Ex. A, Gray Tr. 167:2-12 DA41).

122.    The Plaintiff disputes this fact as Wadsworth testified that "it does require acknowledgment that you have this religious belief." ( Ex I, Wadsworth Tr. 52:7-8 DA257). Plaintiff also disputes this statement as it is irrelevant to her request for an exemption from the Covid-19 vaccine.

123.     The Plaintiff disputes this statement to the extent that she stated in her exemption request as the basis of her objection that "I believe life begins at conception at ends at natural death" in the context of fertility treatment, Ex. E Gray RE Request (DA172). Gray testified that "the ovum and sperm dying is, to me, an abortion. . . it was foundational." Ex. A, Gray Tr. 167:2-12 DA47).

124.     The Plaintiff disputes this statement as it miscategorizes her testimony as the basis for her exemption request. Gray testified that "it's all about human life, and the sanctity of human life." (Ex. A, Gray Tr. 170:25-171:1 DA48). Furthermore, the issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

125.     The issues in this case regards the denial of a religious exemption, not a scientific analysis of the Covid-19 pandemic, and Plaintiff believes that this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*.

Evidence is to be excluded "if its probative value is substantially outweighed by the danger

of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E.*

*403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional

facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's

Motion for Summary Judgement, *infra.*

126.     The Plaintiff disputes the statement to the extent that it incompletely represents

her testimony. Gray also correctly stated "I believe that there was an adenovector." (Ex.

A, Gray Tr. 157:10 <span style="color:red">DA 45</span>).

127.     The Plaintiff does not dispute the facts stated.

128.     The Plaintiff disputes the statements to the extent that they are irrelevant to her

basis for her religious exemption request because this fact is not relevant because it does

not have a  "tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the

evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be

excluded "if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To

the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in

her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion

for Summary Judgement, *infra*.

129.     The Plaintiff disputes the statements to the extent that they are irrelevant to her basis for her religious exemption request because this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

130.     The Plaintiff disputes the statements to the extent that they are irrelevant to her basis for her religious exemption request because this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

131.     The Plaintiff disputes the statements to the extent that they are irrelevant to her basis for her religious exemption request because this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

132.     The Plaintiff disputes the statements to the extent that they are irrelevant to her basis for her religious exemption request because this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

133.     The Plaintiff does not dispute the facts stated.

134.     The Plaintiff does not dispute the fact as so stated. However, the Plaintiff disputes the statements to the extent that they are irrelevant to her basis for her religious exemption request because this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

135.     The Plaintiff does not dispute the fact as so stated. However, the Plaintiff disputes the statements to the extent that they are irrelevant to her basis for her religious exemption request because this fact is not relevant because it does not have a  "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed

Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary Judgement, *infra*.

**L. Denial of Plaintiff's Appeal**

136.     The Plaintiff disputes this statement because Wadsworth testified that the material in the appeal request was not considered. Ex. I, Wadsworth Tr. 57:17-20 DA258).

137.     The Plaintiff disputes the statement as it miscategorizes the testimony. Teufel testified that Gray made a choice not to get fertility treatments, did not how it related to the Covid-19 vaccine, and did not believe she should have asked. (Ex. H, Teufel Tr. 31:3-32:14 DA228).

138.     The Plaintiff disputes the statement made as stated. Gray's religious exemption request stated that she was using the fertility treatments as a personal example of her religious objection. Ex. E, RE Request DA172).

139.     The Plaintiff disputes the statement as stated. The Plaintiff's appeal was denied according to a disclosed internal document because her exemption request "[d]oes not state or articulate a comprehensive, a long-standing, deeply held belief about ultimate ideas about life, purpose or death. Focused on medical information – fertility." (PA 102).

140.     The Plaintiff does not dispute that she objects to having genetic components injected into her body. The plaintiff disputes remainder of the statement because it miscategorizes the content of her religious exemption request in which she states that the objection was based upon the fact that her body did not create the genetic components. (Ex. E, RE Request DA172).

141.     The Plaintiff does not dispute that the Appeal Committee upheld the Religious

Exemption Committee's decision.

**M. November 1, 2021 Termination**

142.     The Plaintiff does not dispute this statement.

143.     The Plaintiff does not dispute this statement.

144.     The Plaintiff does not dispute this statement.

145.     The Plaintiff does not dispute this statement.

146.     The Plaintiff does not dispute this statement.

**N.  Plaintiff's age discrimination claim.**

147.     The Plaintiff does not dispute this statement.

148.     The Plaintiff disputes this statement to the extent that it is irrelevant to her basis for

her age discrimination claim because it does not have a  "tendency to make the existence

of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence," *Fed. R.E. 401*, and is therefore

inadmissible. *Fed R.E. 402*. Evidence is to be excluded "if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." *Fed. R. E. 403*. To the extent that the evidence is

deemed admissible, Plaintiff has provided additional facts in her Plaintiff Proposed

Statement of Undisputed Facts in Opposition to Defendant's Motion for Summary

Judgement, *infra*.

149.     Plaintiff disputes this statement as stated. Gray testified to the names of the

nurses, their relative ages, and the fact that they were staff nurses just like Gray, who

were granted exemptions and continued to work. (Ex. A, Gray Tr. 217:14-219:24 DA60).

**PLAINTIFF'S PROPOSED STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN OPPOSITION TO DEFENDANT'S REQUEST FOR SUMMARY JUDGEMENT**

150.    Gray would be at least at the mid-range of the compensation range for a clinical ladder five nurse coordinator given her decades at Main Line Health. (Ex. H, Teufel Tr. 81:1-5 DA240).

151.    Teufel testified that Main Line Health was struggling financially in 2021. (Ex. H, Teufel Tr. 81:22-82:1 DA240-241).

152.    Defendants gave nurses who remained employed in 2021 equity and merit increases. (Ex. H, Teufel Tr. 82:2-83:2 DA241).

153.    Teufel testified that the Defendant had a testing program and a masking program for all employees that continued until 2023. (Ex. H Teufel Tr. 66:15-67:4 DA237)

154.    Teufel had no knowledge of whether Gray was even asked whether she would be willing to pay for the test had that cost been a concern. (Ex. H Teufel Tr. 67:5-7 DA237).

155.    The Defendant only raised an affirmative defense regarding an undue hardship *post hoc* in its Answer to the Complaint (ECF 9 p. 21).

156.    The Defendant's Covid-19 policy stated that reasonable accommodations include testing, reassignment and additional infection prevention and control measures, among other things. (Ex. C Policy cDA130-131).

157.    The Covid-19 vaccination policy states that there may not be a reasonable accommodation that will allow every person with such an exemption to continue to work onsite while unvaccinated. (Ex. C Policy DA130-131).

158.    Defendant's expert, Dr. Daniel Salmon, has worked for the Centers for Disease Control and Prevention and Department of Health and Human Services as both a contractor and employee, having several roles including Policy Analyst and Director of Vaccine Safety. (Ex. B, Salmon Report p. 1 DA79).

159.    Dr. Salmon has received research funding from pharmaceutical companies and vaccine advocacy groups. (Ex. B, Salmon Report p. 1 DA79).

160.    Dr. McCullough has stated that:

> In contrast to the statements made by Dr. Salmon, evidence exists to the contrary. Mandatory employee Covid vaccination policies have been of questionable value and worthy of debate. In November 2021, a FOIA request led the CDC to admit they had no record of any unvaccinated person spreading the virus after recovering from Covid. Posted on 11/13/2021 (citation removed) he Covid vaccines were not studied to demonstrate that they contained the virus or prevented transmission. The vaccines were tested to determine whether they prevented severe illness. Therefore, there was no data to support the "public health value" of mass vaccination (especially in people with little to no risk of suffering severe Covid illness) and the subsequent detrimental sequalae. (Ex. A McCullough Report PA 52-53).

161.    Teufel testified that receiving an exemption was an accommodation. (Ex. H, Teufel Tr. 66:5-8 DA237).

162.    Gray explained in her religious exemption request that, after prayerful consideration, her and her husband's "faith and personal beliefs did not peacefully allow us to take further steps (hormones, AI, IVF). (Ex. E RE Request, DA172).

163.    Gray state that "Our belief was if we were to have children that God would allow it to happen through natural means." (Ex. E RE Request, DA172).

164.     Gray's "sincerely religious-held belief is that I am not going to alter - - not alter. But I am not going to interfere, change, interact, do anything that would put the perfect body, even though it isn't perfect, that God made because I am a temple for Him. And He speaks through me. And He formed me." (Ex. A, Gray Tr. 83:4-11 DA26).

165.     Burke agreed that both exogenously administered hormones and the injection of genetic material would manipulate the body. Ex. G, Burke Tr. 46:11-15 DA213).

166.     Defendant asked gray whether she understood the science behind the Covid-19 vaccine. Gray replied "Absolutely. I knew that it was a new technology, a new approach to a vaccine. I was well aware of , you know, the discussions and concerns for those of faith with the aborted fetal cells." (Ex. A, Gray Tr. 80:25-81:4 DA25-26).

167.      When asked about the meaning of approach and whether she was referring to the then available RNA vaccine and Adeno-vector vaccines, Gray testified "Well, both of those use genetic components in their vaccines. . . The method of delivery, so obviously I know enough about it." (Ex. A, Gray Tr. 81:10-13  DA26).

168.     Gray testified "My world view is a religious world view. And I take the situations and life's events and things that are happening and I look at them through the lens of God and His word."   (Ex. A, Gray Tr. 81:23 -82:1 DA26).

169.     The Defendant had established criteria that it used as "guiding principles" (Ex. D, Papa Tr. 24:8 DA139).

170.     The exemption committee would ask each other clarifying questions and "If they gave the answer, we weighed it against these guiding principles, against what the individual wrote on the form to make our decision." (Ex. D, Papa Tr. 25:15-18 DA139).

171.     Papa, the Vice President of Human Resources, testified that an exemption request that mentioned a medical condition "could definitely [have] caused us to deny a religious exemption request."  (Ex. D, Papa Tr. 27:13-15 DA140).

172.     Mentioning a medical condition could be an inconsistency because it was not "religious" in nature. (Ex. D, Papa Tr. 27:17-19 DA140).

173.     Papa testified that "religious beliefs can impact medical decisions." (Ex. D, Papa Tr. 27:20-23 DA140).

174.     Papa "don't (sic) see the connection in this statement: 'The best example to explain my objection is when my husband and I tried to conceive children.'  I don't see the connection to the Covid vaccine." (Ex. D, Papa Tr. 67:6-10 DA150).

175.     The "criteria "were the accepted exemptions and what would fall outside of that." (Ex. I, Wadsworth Tr. 22:21-24 DA250).

176.     Burke denied the existence of any document or written criteria that the committee utilized to determine whether or not to accept or deny a religious exemption request. (Ex. G, Burke Tr. 20:11-16 DA206).

177.     When asked about whether Psalm 139 could be interpreted as an admonition against interfering with what God has created, Bien Aime testified "I'm sure there could be an interpretation like that." (Ex. F, Bien-Aime Tr. 40:7-11 DA187).

178.     Wadsworth testified that Gray's understanding of her fertility choices "is her sincerely held religious belief." (Ex. I, Wadsworth Tr. 42:3-4 DA255).

179.     Bien-Aime acknowledged that Gray followed a religion. (Ex. F, Bien-Aime Tr. 26:20-21 DA184).

180.     Bien Aime agreed that Gray's "practice of Christianity does appear to be long standing." (Ex. F, Bien-Aime Tr. 29:23-24 DA184).

181.     Bien Aime p. 29 line 23-24. Bien Aime testified "yes" when asked whether she accepts that Gray's statement that she has a personal explanation as to why she religiously objects to the vaccine is a statement of how religion has impacted her life. (Ex. F, Bien-Aime Tr. 28:23-29:6 DA184).

182.     Bien Aime understood Gray's statement about artificial means to conception and testified "that through their belief in God, that they identify that natural means [to] be without using external factors to support conception or carrying a pregnancy to term. (Ex. F, Bien-Aime Tr. 33:16-19 DA185).

183.     Bien Aime agreed that if God created Gray not to have children *in vitro* fertilization, hormones, and artificial insemination would go against God's design for her. (Ex. F, Bien-Aime Tr. 62:4-10 DA185).

184.     Bien-Aime recognized that people reading the same document could have different interpretations of those documents. (Ex. F, Bien-Aime Tr. 83:10-13 DA198).

185.     Papa acknowledged that Gray's statement of conception by natural means is both religious and scientific and that, for a Chrisitan, God created nature. (Ex. D, Papa Tr. 69:6-10 DA150).

186.     Papa agreed that Mrs. Gray believed that "the natural way of the body responding

is the way God made her." (Ex. D, Papa Tr. 110:19-21 DA161).

187.     Papa testified that hormones, artificial insemination, and *in vitro* fertilization

"require[d] things to be done to the body" for those who, like Gray, could not get

pregnant naturally. (Ex. D, Papa Tr. 72:20-73:5 DA151).

188.     Gray stated "I feel that God still has a plan for my life. He is in charge. . . because

you build faith when you intersect life's difficult moments. (Ex. A, Gray Tr. 29:5-6; 29:-

9-10 DA12).

189.     Gray testified that she "had received the flu vaccine per further recommendation.

Even though, as we all know, and it is well published, that the efficacy of that is sometimes

very low."  (Ex. A, Gray Tr. 69:21-24; DA23).

190.     Chaplain Bien Aime, "turned to Dr. Jen Burke as our representative from

more of the medical side." (Ex. F, Bien-Aime Tr. 10:25-11-2 DA180).

191.     Based on Burke, Bien-Aime determined that Gray's exemption was "inaccurate to

how the vaccines interact with the body." (Ex. F, Bien-Aime Tr. 11:18-19 DA180).

192.     Papa testified that "We believed, as a committee, . . .[t]hat the Covid vaccine

does not alter genetic makeup. (Ex. D, Papa Tr. 91:11-13 DA156).

193.     When Attorney Hennessey specifically asked, "Were you concerned that the

genetic components would alter your genes or DNA," Gray succinctly responded "No."

(Ex. A, Gray Tr. 82:7-9; DA26).

194.     Papa uses Pastor Harry Fletcher's letter to state that Gray believed "[her]

genetic makeup would be altered (Ex. D, Papa Tr. 105:12-15 DA155).

195.     Papa testified that "the anatomy and physiology of your body is the makeup of
your body. (Ex. D, Papa Tr. 104:9-10 DA159).

196.     Pastor Fletcher stated that Gray believed that she was "[c]onfident that God has
determined the precise physiological makeup of each individual person," and believed
that "the functions of the present Covid-19 'vaccines' would alter the specific genetic
makeup of her body."  (ECF 1-3 p. 27).

197.     Pastor Fletcher stated that Gray's position on the Covid-19 vaccines is
"completely consistent with decisions she made decades ago regarding her refusal of
recommended medical procedures. (ECF 1-3 p. 27).

198.     Papa testified "I believe they do" when asked if the Covid-19 vaccines
contained genetic components (Ex. D, Papa Tr. 75:4-6 DA152).

199.     Papa did not know whether the vaccine as taken from the shelf contained any
genetic components from Gray. (Ex. D, Papa Tr. 75:10-12 DA152).

200.     Papa testified "I do think Mrs. Gray has a spiritual connection between the two."
(referencing the connection between injecting genetic components and artificial means
of conception.) (Ex. D, Papa Tr. 76:3-4 DA152).

201.     Papa testified that he does not even know if the Bible speaks to the image of
God. (Ex. D, Papa Tr. 70:21 DA151).

202.     Papa that he does "not believe that God has outlined or ordained laws for his
followers to abide by." (Ex. D, Papa Tr. 59:20-22 DA148).

203.     The committee relied upon the Chaplain present to clarify a Bible verse and
how it relates to the Covid-19 vaccine, and not - - or either requesting on the exemption
or getting the vaccine." (Ex. D, Papa Tr. 52:8-11 DA146).

46

204.     Teufel stated that she did not know whether there could be any other understanding of the meaning of Gray's narrative response to question. (Ex. H, Teufel Tr. 33:8-17 DA228).

205.     Teufel did not know that she thought of the narrative in a spiritual way." (Ex. H, Teufel Tr. 35:24-36:2 DA229).

206.     Teufel did not know if  similar vaccines to the Covid vaccine existed before 2020 and could not comment on whether someone could have a religious reason the Covid-19 vaccine would not be acceptable to them. (Ex. H, Teufel Tr. 39:9-24 DA230).

207.     Teufel recalls that Gray's exemption request being declined for "bad science" and could offer no example of an exemption ever being granted in the circumstance. (Ex. H, Teufel Tr. 21:15-22:2 DA225-226).

208.     The fact that Gray's body is a temple is not an acceptable rationale. (Ex. H, Teufel Tr. 43:18-23 DA231).

209.     Teufel admitted that her "read" of Gray's request is thar the vaccine would alter her genetic makeup because that is what Dr. Stallkamp told her. (Ex. H, Teufel Tr. 47:13-17 DA232).

210.     Had the physician said "[y]es it does alter your genetic makeup  . . .then I am sure we would have had a different conversation." (Ex. H, Teufel Tr. 47:24-48:1 DA232).

211.     Wadsworth testified that "she's using her beliefs to make a decision and she's going to give you an example of how she did" it is a fair interpretation of Gray's use of conception as an example of following her religious beliefs. (Ex. I Wadsworth Tr. 36:21-25 DA253).

212.     "[H]ormone[s] . . .tell the body, the uterus, or the ovaries . . . to do something

different. . .[i]t's going to influence them. (Ex. I Wadsworth Tr. 39:19-24 DA254).

213.     Wadsworth testified that "the vaccine does not have genetic components to

restrict her form getting it." (Ex. I Wadsworth Tr. 48:8-9 DA256).

214.     Wadsworth testified that the flu vaccine and Covid vaccine "are similar." (Ex. I

Wadsworth Tr. 49:3-5 DA256).

215.     Wadsworth testified that it would be "unlikely"  to get an exemption from one but

not the other. (Ex. I Wadsworth Tr. 49:12-15 DA256).



Dated: October 30, 2023                            Respectfully submitted,

                                                   /s/ John A. Daller, Esquire
                                                   PA Box 329356
                                                   Daller Law Firm
                                                   PO Box 162
                                                   510 Pittsburgh Street
                                                   Mars, PA 16046
                                                   (724) 201-2050
                                                   johndaller@daller-law.com