# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAWN GRAY,** | ) | |
| | ) | 2:23-cv-00263-KNS |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **MAIN LINE HOSPITALS, INC**. | ) | |
| Defendant | ) | |
| | ) | |

---

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO  EXCLUDE PLAINTIFF'S EXPERT OPINIONS

---

John A. Daller, Esquire
PA Bar No. 329356
PO Box 162
510 Pittsburgh Street
Mars, PA 16046
(724) 201-2050
johndaller@daller-law.com
*Counsel for Plaintiff*

February 13, 2024

## <u>TABLE OF CONTENTS</u>

Page

Table of Contents .................................................................................................. i

Table of Authorities .............................................................................................. ii

A.   INTRODUCTION .......................................................................................1

B.   LEGAL ARGUMENT...................................................................................3

1.   THE *DAUBERT* STANDARD...…………………………………………3

2.   Dr. Boutros's Report and Testimony that Arise from it are Admissible Under Both Daubert and Relevance Standards.................................................5

    a.   Dr. Dr. Boutros' opinions in support of Gray's affirmative claims are both reliable and a "fit" for the potential issues before the trier of fact.......6

    b.   Dr. Boutros's rebuttal opinions in response to Dr. Salmon's report are qualified, reliable, and a fit for the issues anticipated to come before the trier of fact. ................................................................................................8

3.   Dr. Peter McCullough's Report and Testimony is Admissible Under Daubert and Relevance Standards. ....................................................................9

    a.   Dr. McCullough's background renders him qualified as an expert under Daubert.....................................................................................................10

    b.   Overview of Dr. McCullough's September 2023 report...........................13

    c.   Dr. McCullough's opinions in his September 2023 are likewise "reliable" and a "fit" in this case if the Defendant introduces evidence regarding the "science" of Covid and/or the undue hardships it would incur by granting exemptions. ................................................................13

    d.   Dr. McCullough's other opinions in his September 2023 are likewise "reliable" and a "fit" in this case if the Defendant introduces evidence regarding the "science" of Covid and/or the undue hardships it would incur by granting exemptions. ................................................................14

    e.   Dr. McCullough's rebuttal opinions are reliable and helpful for the issues which may come before the trier of fact and are admissible under Daubert.....................................................................................................16

    f.   Dr. McCullough's opinions regarding gene therapy are "qualified, reliable, and fit" under  Daubert as to the reasonableness of Gray's sincerely held religious beliefs................................................................19

C.   CONCLUSION .........................................................................................23

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                        <u>Pages</u>

*Agudath Isr. v. Cuomo,* ...................................................................................14
      983 F.3d 620, (2d Cir. 2020)

*Daubert v Merrell Dow Pharmaceuticals, Inc,* ........................................ passim
      509 US 579 (1993)

*Dzielak v. Whirlpool Corp.,*...............................................................5,7,11,17
      2017 U.S. Dist. LEXIS 39232, at *15 (D.N.J. Mar. 17, 2017).

*Gen. Elec. v. Joiner,*..........................................................................................19
      522 U.S. 136, (1997)

*Giorgini v. Ford Motor Co.,*...........................................................................6,7,20
      2008 U.S. Dist. LEXIS 25344, *34 (E.D. Pa. Mar. 28, 2008).

*Jacobson v. Massachusetts,* ..........................................................................15,16
      197 U.S. 11, (1905).

*Kumho Tire Co. v. Carmichael,* .........................................................................4
      526 U.S. 137 (1999).

*Navy Seal 1 v. Austin,* ...................................................................................10,11
      600 F.Supp.3d  1 (D.D.C. 2022)

*Navy Seal 1 v. Austin,* .......................................................................................11
      Nos. 22-5114, 22-5135, 2023 U.S. App. LEXIS 5843
      (D.C. Cir. Mar. 10, 2023)

*Phillips v. City of New York,*..............................................................................16
      775 F.3d 538 (2d Cir. 2015).

*Scalia v. E. Penn Mfg. Co.,*,...............................................................................4
      2020 U.S. Dist. LEXIS 164234, at *16 (E.D. Pa. Sep. 9, 2020)

*Schneider v. Fried,*.............................................................................................4
      320 F.3d 396 (3d Cir. 2003)

*Smolow v. Hafer,*..............................................................................................5,6
      513 F. Supp. 2d 418 (E.D. Pa. 2007).

*Terry v. McNeil-PPC, Inc.* (In re Tylenol (Acetaminophen) Mktg.,
Sales Practices, & Prods. Liab. Litig.),............................................................15,16
      198 F. Supp. 3d 446 (E.D. Pa. 2016).

*United States v. Downing*, ........................................................................ passim
    753 F.2d 1224 (3d Cir. 1985)

*United States v. Mitchell,* ...................................................................20
    365 F.3d 215 (3d Cir. 2004).

*United States v. Munsingwear, Inc.*, .............................................11
    340 U.S. 36 (1950).

*United States v. Schiff,* ...............................................................4,15
    602 F.3d 152 (3d Cir. 2010).

*United States v. Van Wyk,* .............................................................14
    83 F.Supp. 2d 515 (D.N.J. 2000).

*Waldorf v. Shuta,* ...........................................................................9
    142 F.3d 601 (3d Cir. 1998).

**Statutes**

Pennsylvania Human Relations Act,
    Act of Oct. 27, 1955, P.L. 744, No. 222 ...............................................2

Title VII of the Civil Rights Act of 1964
    42 U.S.C. § 2000e-et seq .....................................................................2

**Rules**                                    <u>Pages</u>

Rule 104(e) of the Federal Rules of Evidence ................................................19

Rule 702 of the Federal Rules of Evidence ...............................................3,4,7

Rule 703 of the Federal Rules of Evidence ....................................................4

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT OPINIONS**

### A.  INTRODUCTION

Plaintiff, Dawn Gray, filed a complaint on January 23, 2023, against Main Line Hospitals, Inc. that included claims for religious discrimination and age discrimination arising from the Defendant's denial of her religious exemption request to not be compelled to accept the Covid-19 vaccination. Prior to her termination, Gray was employed in the Emergency Hospital at Paoli Hospital, a subsidiary of the Main Line Health System. In response to the Defendant implementing Main Line Health's Covid-19 Vaccination Policy that required either compliance or obtaining a medical or religious exemption, Gray complied with the policy and submitted a religious exemption request to the Religious Exemption Committee based upon her sincerely held religious beliefs.

Gray's exemption request was based on the fact that her sincerely held religious beliefs precluded her from receiving a therapy that would alter her from the spiritual image of God in which she was created by causing her body to create something that God did not intend for her to create. In explaining her religious beliefs, Gray analogized her rejection of the Covid-19 vaccine to her and her husband's rejection of *in vitro* fertilization techniques two decades ago that would have manipulated her body to function in a way contradictory to the natural image of God in which she was created. Curiously, the Defendant still does not understand Gray's exemption request as it states she claimed it would "alter the genetic makeup of her body."  (ECF 26-1 at 6). Gray's exemption request was denied by the Committee, which focused only on a scientific secular interpretation of Gray's request and alleged that Gray's exemption request did not state a basis for which her religious beliefs prevented her from taking the vaccine and simply ignored the spiritual nature of her request.

Although Main Line Health purportedly had an "appeal" process, this was merely an affirmation of the first committee's decision, did not consider any other information provided by an applicant, and Gray's "appeal" request was likewise denied. The Defendant then terminated her for allegedly violating the Main Line Health Vaccination Policy. After exhausting administrative remedies, Gray filed the instant Complaint for religious and age discrimination including claims under Title VII of the Civil Rights Act and Pennsylvania Human Relations Act.

As a threshold matter, Gray's claims are for religious discrimination. Plaintiff has always asserted that this case is about religious practice and therefore litigation of the "science" of Covid-19 is not proper to its resolution. It is the Defendant who has raised scientific arguments about Gray's sincerely held religious beliefs during deposition testimony and in asserting an affirmative defense of undue hardship were it to provide Gray an accommodation that they acknowledge was provided to numerous other workers. In fact, her religious exemption request was denied since it did not "state a basis why your religious belief requires you to decline the COVID-19 vaccination."

In support of her claims and to rebut the scientific expert report of Dr. Daniel Salmon, a vaccinologist from Johns Hopkins University who advocates against vaccine hesitancy and has received significant funding from pharmaceutical companies, including Pfizer, the manufacturer of one of the Covid-19 vaccines in question, ECF 26-3, Gray submitted two rebuttal reports, one from Dr. Peter McCullough and the other from Dr. Akram Boutros. (ECF 26-4 and ECF 26-2, respectively). Defendants then submitted a rebuttal report from Dr. Eric Feigl-Ding, ECF 26-6, that is based upon his opinions and presentations on main stream media platforms.

It is believed that the Defendant will offer its experts' testimony regarding the "science" of Covid-19. Plaintiff anticipates objecting to the relevance of science in a religious exemption discrimination case. If such evidence is nevertheless deemed admissible, then rebuttal would be

proper. However, any determination of whether Plaintiff's expert opinions are relevant can only be made once such defense evidence is introduced at trial. If deemed admissible, the credibility and weight to be accorded to the testimony is a matter for the trier of fact to adjudicate.

To the extent that the Defendant attempts to discredit her sincerely held religious beliefs because of their "scientific" misunderstanding of the religious exemption request, or to argue an affirmative defense that to grant an accommodation to her, but not to others, would pose "substantial increased costs" to its business operations, Gray would offer the testimony of Dr. McCullough and Dr Boutros in rebuttal. The Defendant cannot then seek refuge behind a claim that science has nothing to do with this case and argues to exclude Gray's expert opinions. At this time, Gray has responded to the Defendant's Motion for Summary Judgement (ECF 22) and respectfully submits this response to Defendant's Motion to Exclude Plaintiff's Expert Opinions.

## B.  LEGAL ARGUMENT

### 1.  The Daubert Standard

Federal Rule of Evidence 702 permits a witness who is

> qualified as an expert by knowledge, skill, experience, training, or education" to offer expert opinion if the proponent of such testimony demonstrates to the court by a preponderance of the evidence, or more likely than not, that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise. . . .

*F. R. E. 702*. The Supreme Court has further defined the boundaries of *Rule 702*, specifying that it is the Rule's word 'knowledge,' not the words (like scientific) that modify that word, that 'establishes a standard of evidentiary reliability.'"  *Daubert v Merrell Dow Pharmaceuticals, Inc*. 509 US 579, 589-590. (1993). The term knowledge "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds. *Id*. at 481. The

evidentiary rationale that underlies the basic *Daubert* "gatekeeping" determination is not limited to "scientific" knowledge as *F.R.E. Rule 70*2 and *F.R.E. Rule 703* grant all expert witnesses testimonial latitude unavailable to other witnesses, including those that are not based on firsthand knowledge or observation on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. "In assessing whether an expert's proposed testimony "fits," we are asking "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."' *Daubert*, 509 U.S. at 591 *quoting United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985). "The Court did not abuse its discretion when it allowed the possibility of introducing evidence at trial if the proponent provided a sufficient factual foundation that would remedy a "fit" gap in the expert's testimony." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010). In fact, a trial court

> may consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Defendant wants to hide behind the claim that it was doing the best they could during the Covid-19 pandemic. While that may be an argument for Summary Judgement, it has no place in the application of the three prongs of the *Daubert* standards, namely an expert's "qualification, reliability, and fit." Particularly in the situation of the novel coronavirus pandemic "[w]here there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point." *Scalia v. E. Penn Mfg. Co.*, 2020 U.S. Dist. LEXIS 164234, at *16 (E.D. Pa. Sep. 9, 2020) quoting *Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003). "Publication (which is but one element of peer review) is not a *sine qua*

4

*non* of admissibility; it does not necessarily correlate with reliability, and in some instances well-grounded but innovative theories will not have been published." *Dzielak v. Whirlpool Corp*., 2017 U.S. Dist. LEXIS 39232, at *15 (D.N.J. Mar. 17, 2017). "The *Daubert* factors, especially the peer review and known rate of error factors, are not always entirely applicable to non-scientific expert testimony, particularly when the expert did not arbitrarily or subjectively alter information." *Smolow v. Hafer*, 513 F. Supp. 2d 418, 428 (E.D. Pa. 2007). "A court assessing reliability may consider the novelty of the new technique, that is, its relationship to more established modes of scientific analysis. This consideration may be especially significant in connection with an assessment of techniques that are new to the litigation setting." *Downing*, 753 F.2d at 1238.

## 2. Dr. Boutros's Report and Testimony that Arise from it are Admissible Under Both *Daubert* and Relevance Standards.

As an initial matter, Dr. Boutros is "qualified" as an expert under the *Daubert* standards by virtue of his education, training, and experience. Dr Boutros, a medical graduate of the State University of New York Downstate Medical School is a board-certified physician in Internal Medicine and is currently a Professor of Clinical Medicine at Case Western Reserve School of Medicine. He is a Fellow of the American College of Healthcare Executives and has served on and been the chairperson of numerous committees focusing on quality of care and risk management. Most recently, he was the President and Chief Executive Officer of the MetroHealth System in Cleveland, Ohio for nearly a decade.

In these roles, Dr Boutros has over 30 years' experience in medical staff affairs, quality improvement, patient safety, and healthcare management. (*See* ECF 26-2 at 13-22, generally). Specifically, Dr. Boutros led the effort at MetroHealth in defining and implementing that institution's Covid-19 vaccination policy. "[W[e instituted mandatory COVID-19 vaccine policies at The MetroHealth System, and we permitted both medical and religious exemptions, and

achieved similar [] lower rates of staff COVID-19 infections to hospitals and health systems that permitted very few exemptions." *Id*. at 6. Not only is Dr. Boutros qualified by the positions that he has held, but he also has specific experience in instituting a Covid-19 vaccination policy in a major Cleveland health care system responsible for serving the vulnerable population of Cuyahoga County's 1.25 million individuals. Dr. Boutros satisfies the qualification prong of *Daubert*.

"The *Daubert* factors, especially the peer review and known rate of error factors, are not always entirely applicable to non-scientific expert testimony, particularly when the expert reviews the available information and does not arbitrarily or subjectively alter" the fact pattern. *Smolow* 513 F. Supp. 2d at 428. Once again, an expert "may rely upon evidence of another expert's study, literature in that expert's field that supports the expert's conclusion, or evidence that a theory has been generally accepted and adopted by his particular investigative community." *Giorgini v. Ford Motor Co.,* 2008 U.S. Dist. LEXIS 25344, at *34 (E.D. Pa. Mar. 28, 2008). In such cases, the trier of fact determines what opinions of the expert may be admissible at trial. *Id*. at *, 36. Dr. Boutros is qualified to evaluate a Covid-19 religious exemption request and opine on the decisions that the Religious exemption and appeal committees rendered based upon his experience as a healthcare executive with an extensive clinical background.

  a. **Dr. Boutros' opinions in support of Gray's affirmative claims are both reliable and a "fit" for the potential issues before the trier of fact.**

Dr. Boutros was engaged to opine upon Gray's Religious Exemption Request and Dr. Daniel Salmon's expert report and produced a report summarizing his opinions. (ECF 26-2). The Defendant alleges that Dr. Boutros is not qualified to render opinions on religious exemptions. If that is the case, Defendant is tacitly admitting that its Religious Exemption Committee is equally unqualified as it contained numerous individuals without religious training and did not give deference to the Chaplain who was on the committee. Instead, as stated by the Defendant's agents

in their depositions, the members of the committee who were present "reached consensus" and curiously never had anything but a unanimous decision in considering over two hundred exemption requests. Furthermore, the Appeal Committee did not even include a person with religious training.

As noted above, Dr. Boutros instituted mandatory COVID-19 vaccine policies at the MetroHealth System and permitted both medical and religious exemptions, achieving infection rates as low as other systems that were more stringent in granting exemptions. The fact that he did not publish his results does not detract from his testimony because "[p]ublication is not a sine qua non of admissibility and well-grounded innovative theories may not have been published." *Dzielak*, 2017 U.S. Dist. LEXIS 39232, at *15.

Dr. Boutros had reviewed Gray's Exemption Request and Dr. Salmon's report at the time of authoring his report and he is entitled to rely upon those documents, *Giorgini supra*, in rendering an opinion using his over thirty-years' experience as a healthcare executive. Dr. Boutros is qualified by background and experience to speak on the assessment of a religious exemption request, the impact of the Covid-19 pandemic on a health care system in general, and any impact granting a religious exemption request has upon an institution. The Defendant merely dismisses Dr. Boutros' opinions as not fitting the requirements of *F.R.E. Rule 702* or the *Daubert* prongs and says "[h]e has none." (ECF 26-1 at 10). Dr. Boutros has the data of his own institution. Only if and until the Defendant presents its "science experts" in this case, which is really about sincerely held religious beliefs, can the Plaintiff know what evidence actually requires rebuttal as that testimony itself will be likewise subject to a relevance objection. Dr. Boutros' opinions are both reliable and a "fit" for the affirmative claims asserted by Gray.

**b. Dr. Boutros's rebuttal opinions in response to Dr. Salmon's report are qualified, reliable, and a fit for the issues anticipated to come before the trier of fact.**

Dr. Boutros' report addresses the report of Dr. Salmon. (ECF 26-2 at 2, 4-9). The Defendant "cherry-picks" portions of the two reports to create a false equivalency argument since the Defendant's stated goal of vaccination was not what was being discussed. Dr. Salmon did infer that mandatory vaccination was necessary "since natural immunity was insufficient and was needed to reduce their likelihood for future infection, [and] all eligible persons **should be offered** (emphasis added, not forced to take) the COVID-19 vaccine, even those with previous SARS-CoV-2 infection. (ECF 26-3 at 36, *citing* Centers for Disease Control and Prevention. Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination — Kentucky, May–June 2021. MMWR. August 13, 2021, 70(32);1081-1083.

In referencing MetroHealth's Covid-19 infection rates, Dr. Boutros clearly references his institution's experience. Unlike the data in *Ervin* where the expert was opining on data that was not his own, Dr. Boutros is referring to his own data. *Ervin v. Johnson & Johnson, Inc*. 492 F.3d 901, 904 (7th Cir. 2007). The Defendant criticizes Dr. Boutros for stating that he is unaware of studies that compared infection rates stratified for vaccination status at healthcare institutions, yet then admits in a footnote that no such studies existed at the time but was merely a "logical corollary." ECF 26-1 at 12-13, f.n.4. The Defendant alleges that its Covid-19 vaccine policy was designed to "protect patients, employees, students, volunteers, and members of the Medical Staff," ECF 26-1 at 11, yet ignores data from the Centers for Disease Control and Prevention upon which it claimed to rely upon for significant guidance. That data specifically demonstrated that in a high-risk vulnerable population, the incidence of Covid-19 infection did not decrease further once the vaccination rate rose above 75%, a level well below the Defendant's vaccination rate at the time

of Gray's termination. [Vaccination to Prevent COVID-19 Outbreaks with Current and Emergent Variants — United States, 2021 (cdc.gov)](#).

The assertions about Dr. Boutros' qualifications, the reliability of his opinions, and the "fit" for the issues before the Court are simply inaccurate given his extensive healthcare executive experience. The mere fact that he is not an epidemiologist is irrelevant. He is a healthcare executive with over thirty-years ' clinical experience. Furthermore, Dr. Boutros' report and testimony are a precise fit for whether a necessary accommodation would cause a "substantial increase cost" to the business, which is one of the Defendant's affirmative defenses.

Dr. Boutros' rebuttal opinions regarding Dr. Salmons's report and the hybrid disclosures are "qualified, reliable, and fit" under  *Daubert*. Whether they are relevant and admissible will be a question for the Court to determine if the Defendant attempts to discredit Gray's religious beliefs as not sincere or protected under the law.

**3.  Dr. Peter McCullough's Report and Testimony is Admissible Under *Daubert* and Relevance Standards.**

Dr. McCullough was asked to provide expert rebuttal to the opinions of Drs. Daniel Salmon, Brett Gilbert, and Jonathan Stallkamp. At the time of his report, he also had reviewed Gray's religious exemption request, Gray's deposition transcript, and Main Line Health's criteria for considering an exemption request. He then authored a two-part report, providing first, general comments about Covid-19 based upon his experience treating Covid and his review of the available literature, and second, a rebuttal to Dr. Salmon's report and anticipated rebuttal to the hybrid witnesses, Drs. Stallkamp and Gilbert. For the reasons set forth below, Dr. McCullough is a qualified expert under *Daubert* and his testimony satisfies the reliability and fit prongs of the *Daubert* criteria.

a.  **Dr. McCullough's background renders him qualified as an expert under *Daubert*.**

Dr. McCullough received his medical degree from the University of Texas Southwestern Medical School, was a member of the Alpha Omega Alpha Honor Society, and was ranked number one out of 199 students in the clinical years and twelve out of 199 overall in his graduation class. He received a Master's Degree in Public Health with a specialty in Epidemiology from the University of Michigan. Dr. McCullough is board certified by the American Board of Internal Medicine as an Internist and Cardiovascular Diseases Subspecialist, a Diplomate of the American Board of Forensic Examiners, and a Diplomate of the American Board of Clinical Lipidology. He has testified about various aspects of Covid-19 before numerous governmental bodies including the United States Senate Homeland Security and Governmental Affairs Committees and co-moderated a United States Senate panel entitled "COVID-19 Vaccines: What they Are, How They Work, and Possible Causes of Injuries." (ECF 26-4, at 4-5). In addition, he has testified before numerous state legislative bodies, including in Pennsylvania, Texas, Colorado, New Hampshire, and South Carolina. *Id*. at 5. He is a prolific funded investigator in numerous areas and has received academic institutional grant money to study aspects of Covid-19. He has published, dating back to Match 2020, at least 65 peer reviewed articles on various aspects of Covid-19 infection and vaccination, and given numerous lectures and abstract presentations. (ECF 26-4 at 74-250, generally).

The Defendants argue that Dr. McCullough's opinions were challenged in *Navy Seal 1 v. Austin* and *Roth v. Austin*. (ECF 26-1 at 9). First, the Defendants assertion that one cannot be qualified to opine on a novel matter because " his practice. . . . was almost entirely internal medicine and clinical cardiology until he began publishing on Covid-19 in the early days of the pandemic," *Id*. at 4 *citing Navy SEAL 1 v. Austin* 600 F.Supp.3d  1, 16 (D.D.C. 2022), would lead

to the absurd conclusion that no one could be qualified to opine on a new issue, contrary to *Dzielak, supra*. Furthermore, the Defendant fails to provide the context that this case concerned granting a preliminary injunction and "the Court [wa]s not inclined to conclude at this early stage of the case that the military's scientific and medical conclusions, [ ] should be rejected" in favor of Dr. McCullough's opinion and grant an injunction. *Navy SEAL 1* 600 F. Supp. 3d at 17-18. By the time the appeal became before the court, the Secretary of Defense had actually rescinded the military's COVID-19 vaccination mandate and the subsequent directives, rendering the matter moot. *Navy Seal 1 v. Austin*, Nos. 22-5114, 22-5135, 2023 U.S. App. LEXIS 5843 (D.C. Cir. Mar. 10, 2023). In so doing, the Court stated that the "established practice in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." *Id. See  United States v. Munsingwear, Inc.,* 340 U.S. 36, 39 (1950). Dr. McCullough's testimony was not excluded but rather would have been heard by the trier of fact to make credibility and weight of the testimony determinations in comparison to the government experts.

Finally, the Defendant attempts to discredit Dr. McCullough because he is "very active in voicing public opinions against the Covid-19 vaccines online and in social media." (ECF 26-1 at 15). Curiously, they reference numerous "scientific" websites that attempt to discredit him, yet name only one, *Health Feedback* which is itself a biased site in favor of global vaccination against disease. The *Health Feedback* website indicates that it is a French organization sponsored by multiple groups and individuals including Meta/Facebook, TikTok and Google and a member of the WHO-led project Vaccine Safety Net (VSN). https://www.who.int/teams/regulation-prequalification/regulation-and-safety/pharmacovigilance/networks/vaccine-safety-net/vsn-members/health-feedback. *Health Feedback* is a "fact checking service under the auspices of

Science Feedback, which operates multiple left-leaning science-related fact-check services." www.Influencewatch.org. As reviewed by *Influence Watch*, *Health Feedback* uses crowd sourced reviews which are typically anonymous. https://www.influencewatch.org/non-profit/health-feedback/. Rather than attacking Dr. McCullough's science, the Defendant seeks to discredit him with biased internet or ChatGPT information. The Defendant further cites a 2022 law review article as "proof" that Dr. McCullough is part of the "common anti-vaccine" movement. (ECF 26-1 at 15).

Curiously, the Defendant submitted Dr. Feigl-Ding's report, ECF 26-6, only after the Plaintiff submitted the rebuttal report of Dr. McCullough presumably because Dr. Salmon's report was somehow deficient. Feigl-Ding holds doctorates in both epidemiology and nutrition, with his professional experience being in nutritional epidemiology and epidemiology of chronic disease. His graduate work was supported by the Paul and Daisy Soros Fellowship for New Americans, hardly an unbiased sponsor having a globalist agenda.[1] Prior to the COVID-19 pandemic, he was an unpaid research scientist at Harvard with his research work and expertise primarily focused on the health effects of diet and exercise. He lacked any publication in infectious disease epidemiology or any aspect of "infection" in general. In fact, prior to the pandemic, he was actually an aspiring politician as a candidate in the 2018 Democratic primary for Pennsylvania's 10th congressional district.[2] Despite these facts, the Defendants seem to ask this Honorable Court to *ipse dixit* accept his opinions and disregard those of much senior and experienced clinician scientists such as Dr. McCullough and Dr. Boutros.  The Defendant is merely engaged in a smear

---

[1] PD Soros Fellowships for New Americans - Eric Feigl-Ding
[2] https://ballotpedia.org/Eric_Ding;
https://www.pennlive.com/opinion/2018/05/im_running_for_congress_becaus.html; Public health scientist hopes to take his activism to Congress | Science | AAAS

campaign because it cannot discredit his work. Based upon his background, Dr. McCullough satisfies the qualification prong of *Daubert*.

    **b.  Overview of Dr. McCullough's September 2023 report**.

Dr. McCullough's rebuttal report from September 2023, was requested following depositions that revealed that Gray's exemption request was not denied for the stated reason that she did not "state a basis why your religious belief requires you to decline the COVID-19 vaccination" but rather because she included "bad science" and receipt of Dr. Salmon's undated report on August 23, 2023. Dr. McCullough was specifically asked to provide expert rebuttal of the opinions of Dr. Salmon and the Defendant's hybrid witnesses, Dr. Jonathan Stallkamp and Dr. Brett Gilbert. He did that. (ECF 26-4). For the reasons discussed below, Dr. McCullough's report and any testimony that he would provide is relevant to refute any Defendant defense that alleges that Gray's sincerely held religious beliefs were somehow based upon "bad science."   His opinions are qualified, reliable, and "fit" under *Daubert* and *F.R.E. 702* for the issues that may arise in this case.

    **c.  Dr. McCullough's opinions in his September 2023 are likewise "reliable" and a "fit" in this case if the Defendant introduces evidence regarding the "science" of Covid and/or the undue hardships it would incur by granting exemptions.**

The Defendant continues its attempt to discredit Dr. McCullough because of his social media activity and its unsubstantiated claim that his opinions do not withstand "scientific scrutiny" under *Daubert*. (ECF 26-1 at 16). Other than sweeping generalized statements, the Defendant makes no specific assertions. The Defendant attempts to distract this astute Court from the real issue before it, namely the denial of Gray's religious exemption request, by claiming that Dr. McCullough's opinions are irrelevant since *Biden* upheld the constitutionality of the vaccine mandate. *Biden v. Missouri*, 595 U.S. 87, 142 (2022). That is not the issue before this Court. Gray requested an exemption; she did not challenge the constitutionality of the mandate or the Defendant's policy.

In fact, the *Biden* Court even noted that "the rule requires providers to offer medical and religious exemptions and does not cover staff who telework full-time." *86 Fed. Reg*. 61561, 61571-61572. The Defendant wants to exclude Plaintiff's experts because it wants no opposition to its narrative of discrediting Gray's religious exemption request. Dr. McCullough's informed opinions are reliable and a fit under *Daubert* for issues anticipated to come before the trier of fact if the Defendant attempts to discredit Gray's sincerely held religious beliefs with a science argument because it failed to understand her narrative or if it asserts an undue hardship defense.

> **d. Dr. McCullough's other opinions in his September 2023 are likewise "reliable" and a "fit" in this case if the Defendant introduces evidence regarding the "science" of Covid and/or the undue hardships it would incur by granting exemptions.**

Once again, the Defendant attempts to discredit Dr. McCullough because of social media activity and its unsubstantiated claim that his opinions are based upon "Yahoo News." (ECF-26-1 at 16.) The Defendant offers no explanation of how Dr. McCullough could have at least 65 publications on Covid-19 and yet not be qualified to speak about Covid-19. He has more publications than Dr. Salmon on Covid-19 and *Dr. Feigl-Ding does not appear to have any* publications according to the *curriculum vitae* produced during discovery and curiously none was included with the instant motion. "Publication in a peer-review journal is relevant in assessing the scientific validity of a methodology upon which an opinion is based." *United States v. Van Wyk*, 83 F.Supp. 2d 515, 520 (D.N.J. 2000). The Defendant did not take Dr. McCullough's deposition and therefore has no evidence of what he relied upon in rendering his qualified expert opinions. Furthermore, since his testimony is offered in rebuttal, his testimony will be dependent upon what "science" the defense intends to introduce to discredit Gray's sincerely held religious beliefs or to assert an undue hardship claim.

Moreover, "[r]eliability does not require that a technique or methodology be generally accepted by a scientific community. *Terry v. McNeil-PPC, Inc.* (In re Tylenol (Acetaminophen) Mktg., Sales Practices, & Prods. Liab. Litig.), 198 F. Supp. 3d 446, 452 (E.D. Pa. 2016). "A court assessing reliability may consider the novelty of the new technique, a consideration especially significant in connection with an assessment of techniques that are new to the litigation setting." *Downing*, 753 F.2d at 1238. The third factor "is typically understood in terms of whether there is a sufficient 'fit' between the expert's testimony and the facts that the jury is being asked to consider." *Schiff*, 602 F.3d at 172-73 (*citing Daubert*, 509 U.S. at 591 "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Here, however, if the Defendant is permitted to introduce "science" evidence into a religious discrimination case, Dr. McCullough's report and testimony will not only be relevant but also a reliable "fit" to address evidence that the Defendant propounds.

The Defendant's Brief identifies herd immunity as an area that they do not deem a "reliable measure" or fit for the jury. (ECF 26-1 at 17). Yet the Defendants themselves asked Dr. Salmon to opine on asymptomatic spread, ECF 26-3 at 32, herd/natural immunity, *Id.* at 36, and "anti-vaccination movement *Id.* at 45-47. Again, Dr. McCullough's general comments to the various aspects of Covid infection, treatment, and vaccination are "reliable" and a "fit" under *Daubert* to address evidence that the Defendant may propound to discredit Gray's sincerely held religious beliefs as "bad science" or to assert that to grant an accommodation to her would have been an undue hardship despite the fact that they granted those same accommodations to other workers who received religious exemptions.

The Defendant references *Jacobson* as upholding the constitutionality of vaccine mandates and that Courts regularly defer to public health agencies. (ECF 26-1 at 17, *citing Jacobson v.*

*Massachusetts* 197 U.S. 11, 25 (1905)). Notwithstanding the fact that this case is not about the constitutionality of the mandate or the Defendant's policy but rather the granting of an exemption, "[] *Jacobson* predated the modern constitutional jurisprudence of tiers of scrutiny, was decided before the First Amendment was incorporated against the states," and "did not address the free exercise of religion." *Agudath Isr. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) *see Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015). "*Jacobson* hardly supports cutting the Constitution loose during a pandemic. That decision involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction." *Agudath* 983 F.3d at 635. The *Jacobson* Court itself pointed out that "even if based on the acknowledged police powers of a state," a public-health measure "must always yield in case of conflict with . . . any right which [the Constitution] gives or secures." *Id. citing Jacobson* 197 U.S. at 25.

Dr. McCullough's opinions are reliable and a fit if the opinions of Dr. Salmon and Dr. Feigl-Ding are deemed admissible. The Plaintiff has no intention of turning this case into a case about science unless the Defendant uses these experts to discredit the credibility of Gray's sincerely held religious beliefs.

**e. Dr. McCullough's rebuttal opinions are reliable and helpful for the issues which may come before the trier of fact and are admissible under *Daubert*.**

Dr. McCullough submitted a rebuttal report in response to Dr. Salmon's report and the hybrid disclosures of Dr. Jonathan Stallkamp and Dr. Brett Gilbert that have been previously referenced. "Reliability does not require that a technique or methodology be generally accepted by a scientific community." *Terry* 198 F. Supp. 3d at 452. "This is especially true and may be especially significant in connection with an assessment of techniques that are new to the litigation setting." *Downing*, 753 F.2d at 1238. Dr. McCullough is more widely published than either of the Defendant's experts, particularly Dr. Feigl-Ding who does not appear to have any publications in

16

the Covid-19 area. Although "[p]ublication is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, particularly in instances where well-grounded but innovative theories will not yet have been fully explored and published,." *Dzielak*, 2017 U.S. Dist. LEXIS 39232, at *15, the Defendant cannot have its cake and eat it too.

In his report, Dr. McCullough meticulously provided counterpoints with reference sources to Dr. Salmon's report, which it should be noted is identical to one he produced for another case, is in no way is specific to Gray nor even includes her name, and does not even mention "undue hardship" which is an affirmative defense of the Defendant (ECF 9 at 21). Once again, the Defendant requests this astute Court to exclude Dr. McCullough's opinions merely because they differ from their experts' opinions.

The Defendant identifies the precise reason Dr. McCullough's opinions and testimony would be a "fit" for the trier of fact: "[he]contends that there was no objective way to limit exceptions to the Covid-19 [vaccine] mandate to individuals with sincerely held religious beliefs because he believes MLH based decisions on indefensible science positions." (ECF 26-1 at 29). First, the Defendant uses the imprimatur of the CDC mandate for the MLH vaccination policy to imply that the governmental mandate did not provide for exemptions based upon medical or religious reasons. This is simply false. *86 Fed. Reg* at 61571-61572, *supra*. Furthermore, Main Line Health *post hoc* itself stated in depositions that Gray's exemption request was based upon "bad science" rather than not stating a religious belief that prevented her from taking the Covid-19 vaccine. The Defendant merely offers Dr. Salmon's assertion that every unvaccinated healthcare worker presented additional risk. (ECF 26-1 at 29). Again, the Defendant attempts to discredit Dr. McCullough's opinion as being based upon "news articles" and fails to cite Dr. McCullough's references, for example, to the Centers for Disease Control and Preventions' Morbidity and Mortality Weekly

report describing the well-publicized Provincetown, Massachusetts viral spread event in July 2021 in which at least 74% of Covid cases occurred in fully vaccinated persons, resulting from transmission from vaccinated individuals,[3] or a series of published reports, in journals such as the *Journal of the American Medical Association* and *Nature* that confirmed the trivial and inconsequential nature of asymptomatic spread.[4] (ECF 26-4 at 26-27).  Therefore, any evidence that the Defendant introduces as a defense is fair game for rebuttal testimony in order to demonstrate that Gray's sincerely held religious belief was not predicated upon "bad science" and therefore was worthy of protection.

Indeed, if Dr. McCullough's report regarding Dr. Salmon was so unqualified, unreliable, and misfit as the Defendant claims, why rebut it with another expert's report? The Defendant submitted Dr. Feigl-Ding's report, ECF 26-6, only after the Plaintiff submitted the rebuttal reports of Drs. McCullough and Boutros, presumably because Dr. Salmon's report was somehow deficient. As discussed *supra*, prior to the COVID-19 pandemic, Dr. Feigl-Ding was an unpaid research scientist at Harvard and his research work and expertise primarily focused on the health effects of diet and exercise. He lacked any publication in infectious disease epidemiology or any aspect of "infection" in general. He does not appear to have any publications regarding Covid-19. *Id.* (*see* generally as well as embedded hyperlink to Google Scholar). In fact, prior to the pandemic, he was actually an aspiring politician as a candidate in the 2018 Democratic primary for Pennsylvania's 10th congressional district.[5]  Despite these facts, the Defendant seems to ask this Honorable Court to

---

[3] https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w.
[4] For example, *Madewell et al. Household Transmission of SARS-CoV-2: A Systematic Review and Metaanalysis*.
Dec 2020, was a meta-analysis of contact tracing studies that showed asymptomatic COVID-19 spread, published in JAMA, was negligible at 0.7%.
https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774102.
[5] https://ballotpedia.org/Eric_Ding;
https://www.pennlive.com/opinion/2018/05/im_running_for_congress_becaus.html; Public health scientist hopes to take his activism to Congress | Science | AAAS

*ipse dixit* accept his opinions and disregard those of much senior and experienced clinician scientists such as Dr. McCullough and Dr. Boutros.

Plaintiff agrees with the Defendant that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" in such circumstances. *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). However, *F.R.E. 104(e)* states that while the court determines whether a witness is qualified or evidence is otherwise admissible, it does not limit a party's right to introduce before the jury evidence that is relevant to the weight or credibility of other evidence. This means that the Defendant cannot *ipse dixit* disagree with Plaintiff's expert opinions, offer their own arguably biased opinions, and seek to exclude Plaintiff's experts preventing the trier of fact from making its own determination, essentially allowing the Defendant to present whatever unopposed evidence they desire to explain why they violated Plaintiff's religious beliefs.

> **f. Dr. McCullough's opinions regarding gene therapy are "qualified, reliable, and fit" under *Daubert* as to the reasonableness of Gray's sincerely held religious beliefs.**

Dr. McCullough is board certified by the American Board of Medical Specialties in Internal Medicine and Cardiovascular Medicine and is a Diplomate of the American Board of Lipidology and Forensic Examiners. As reviewed above and as demonstrated by his *curriculum vitae*, Dr. McCullough is a prolific author and funded investigator, having published at least 65 articles relating to a myriad of aspects of Covid-19 and complications arising from both the disease itself and vaccination. (*see* ECF 26-4 at 2-5 and 74-250 generally). "We have recognized that evidence of the non-judicial uses of the technique in question is relevant to the *Daubert* reliability inquiry. This is because non-judicial use of a technique can imply that third parties—i.e., persons other

than the proponent of the expert testimony, for whom the testimony is typically self-serving—would vouch for the reliability of the expert's methods." *United States v. Mitchell*, 365 F.3d 215, 242–43 (3d Cir. 2004). Dr. McCullough has testified in both judicial and non-judicial settings, including before the United States Senate and European Parliament. (ECF 26-4 at 4-5). Dr. McCullough is qualified to render opinions and testify in this case based upon his background and first-hand experience with Covid-19.

"A court assessing reliability may consider the novelty of the new technique, that is, its relationship to more established modes of scientific analysis. This consideration may be especially significant in connection with an assessment of techniques that are new to the litigation setting." *Downing*, 753 F.2d at 1238. Covid-19 was declared a pandemic in March 2020. Dr. McCullough had already published a Lancet journal article in March 2020 on Covid-19, during its nascent period. His opinions are reliable because he has first-hand investigative experience in the field of Covid-19.

"Failure on the part of an expert to test a theory might be remedied under *Daubert* by submitting evidence of another expert's study [or] literature in that expert's field that supports the expert's conclusion. *Giorgini*, 2008 U.S. Dist. LEXIS 25344, at *34. In such an event, it is a matter for the trier of fact to determine what opinions of the expert may be admissible at trial. *Id*. at *, 36. The Defendant attempts to discredit Dr. McCullough's opinions merely by the imprimatur of their experts disagreeing with him and that he does not have some specific qualification. For the reasons set forth below. Dr. McCullough's qualified opinions regarding gene therapy are reliable and fit for the issues before the trier of fact in this case.

First, the Defendant's specific claim that the SEC filing is irrelevant is simply not true. Moderna is the creator of the vaccine it manufactured, is certainly an expert in the field, and fully

aware of the nature of the technology it was using.[6] As Dr. McCullough notes in his report "Gene therapy products are **all** products that mediate their effects by **transcription** and/or **translation** of **transferred** genetic material and/or by integrating into the host genome and that are **administered as nucleic acids**, viruses, or genetically engineered microorganisms." (emphasis added) (ECF 26-4 at 63. In the case of the Covid vaccines, mRNA, a foreign **nucleic acid** genetic sequence is **administered** and then subsequently undergoes **translation** to the foreign spike protein. (emphasis added) *Id*. at 70 citing Fatima from https://the-dna-universe.com/2021/02/18/what-why-and-how-of-mrna-vaccines. Dr. McCullough has "submitt[ed] evidence of another expert's study, [and] literature in that expert's field that supports [his] expert[] conclusion." He directly links the FDA's definition of gene therapy as one that alters the biologic properties of living cells for therapeutic use to Gray's religious objection and that her refusal to use such products is consistent with her refusal of manipulative therapy for conception purposes. (ECF 26-4 at 64).

The Defendant alleges that Gray's religious exemption request was denied because it did not state a reason why she could not receive the Covid-19 vaccine. The issue before the Court is whether Gray had a sincerely held religious belief. The Defendant now claims it was denied because the request included "bad science" and therefore was somehow not worthy. Dr. McCullough's opinion satisfies the *Daubert* "reliability" and "fit" criteria because the Defendant has placed that issue into controversy. Finally, there is a distinction of gene therapy as a "dangerous mechanism of action,"  ECF 26-4 at 13-14, and the regulatory pathway for a vaccine. The

---

[6] Moderna itself recognized the "novel and unprecedented nature of this new category of medicines" and that [at the time], mRNA [wa]s considered a gene therapy product by the FDA. Unlike certain gene therapies that irreversibly alter cell DNA and could act as a source of side effects, mRNA based medicines are designed to not irreversibly change cell DNA. Moderna SEC Filing November 9, 2018 at 18-19 https://d18rn0p25nwr6d.cloudfront.net/CIK-0001682852/df2042b3-1071-4a4a-af1d-f6b0e9f9cbd3.pdf

Defendant compares apples to oranges when it does not distinguish mechanism of action from regulatory guidance and self-servingly ignores the difference in their brief.(ECF 26-1 at 27).

With respect to "cherry-picking" information, Dr. McCullough referenced the Food and Drug Administration Official Governmental Website. *Should governmental publications not be considered trusted information*? The website itself stated that human gene therapy seeks to modify or **manipulate** (emphasis added) the expression of a gene. That is precisely what the Covid-19 vaccine did functionally – it resulted in the translation of a foreign nucleic acid genetic sequence into a foreign protein. (ECF 26-4 at 57). It is this precise fact that was anathema to Gray's sincerely held religious belief that *functionally* she would be changed in the image that God created for her if she were to accept this vaccine - she never said she would look different to the world. Rather, she succinctly tied this to why she refused *in vitro* fertilization and how she could not accept the Covid-19 vaccine. The Defendant's claim that the term "gene therapy products" is oxymoronic, ECF 26-1 at 26) is itself oxymoronic as footnote 11 provides the exact same definition of gene therapy that the Defendant derided when Dr. McCullough referenced it. Again, the Defendant expects this Court *ipse dixit* accept its position and exclude Plaintiff's expert.

Finally, the Defendant objects to Dr. McCullough's characterization of "gene therapy" for Covid-vaccines by referencing "pandemic deniers" as the reason the Centers for Disease Control and Prevention altered its definition of vaccine. In fact, Dr. McCullough's report has a reproduction of the email that was produced in response to a Freedom of Information Act request that documents the CDC's rationale for the change that informed the basis of Dr. McCullough's opinion. (ECF 26-4 at 65).

Dr. McCullough's opinions regarding gene therapy are "qualified, reliable, and fit" under *Daubert* as to the reasonableness of Gray's sincerely held religious beliefs. Whether they are

relevant and admissible will be a question for the Court to determine if the Defendant attempts to undermine Gray's sincerely held religious beliefs as not credible based upon "bad science" being the basis for those beliefs.

### C. CONCLUSION

The Plaintiff submitted a religious exemption request based upon her sincerely held religious belief that prevented her from accepting the Covid-19 vaccine because it would functionally alter her from the image in which God created her. Plaintiff's experts are qualified under *Daubert* by their background and experience to render rebuttal opinions in this case. Should the Defendant allege that her request was based upon "bad science" or raise an affirmative defense of "undue hardship" because of the nature of the pandemic, their opinions likewise are both "reliable" and a "fit" under Daubert. Therefore, Plaintiff respectfully requests this Honorable Court to deny Defendant's Motion to Exclude Plaintiff's Expert Opinions.

Respectfully Submitted,

/s/ John A. Daller

Date:   February 13, 2024

John A. Daller, Esquire
PA No. 329356

John A. Daller, Esquire
Daller Law Firm
PO Box 162
510 Pittsburgh Street
Mars, Pennsylvania 16046