# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAWN GRAY,** | ) | |
| | ) | 2:23-cv-00263-KNS |
| Plaintiff | ) | |
| | ) | **FINAL PRETRIAL** |
| v. | ) | **MEMORANDUM** |
| | ) | |
| **MAIN LINE HOSPITALS, INC**. | ) | |
| Defendant | ) | |
| | ) | |

### FINAL PRETIRAL MEMORANDUM

AND NOW comes Dawn Gray, Plaintiff, by and through her attorney, John A. Daller, and submits this Final Pretrial Memorandum, pursuant to this Honorable Court's Jury Trial Notice of February 22, 2024, and Chamber rules.

**I.     FACTUAL SUMMARY**

Simply stated, this case is about a Christian's request for a religious exemption from the Defendant's mandatory Covid-19 vaccination policy based upon her sincerely held religious belief that accepting the vaccine would alter her purpose and image from that which God intended for her. Gray's belief, deeply rooted and long-standing, was manifested consistently over the years as exemplified, for example by her refusal after prayerful discernment decades ago, to refuse the medically invasive types of artificial manipulations that technology assisted conception required when she and her husband choose to follow God's way and not have children. The spiritual underpinnings of those identical sincerely held beliefs prevented Gray from receiving the Covid-19 vaccine. Had she succumbed to secular pressure and accepted the vaccine, the essence of her spiritual image - given to her by God through her genetics – would have been defiled by being compelled to effectuate an unnatural process that God did not design.

Defendant failed to conduct an interactive process meeting with Mrs. Gray to clarify its naïve understanding of her sincerely held fundamental religious beliefs or to address possible accommodations. Mrs. Gray performed her job duties in an exemplary fashion throughout the pandemic with the very safety precautions that she proposed to continue. Driven by the hubris of its senior leadership, Defendant subsequently terminated Mrs. Gray and ignored the Biblical foundation of her sincerely held religious beliefs formed years ago and manifested through her life experiences.

**A. Gray Has Sincerely Held Religious Beliefs that Guide Her Life Choices**

Mrs. Gray was employed in a Clinical Ladder V nurse position at Paoli Hospital's emergency room by the Defendant since August 7, 2000, and complied with all of the Defendant's safety rules during the pandemic, including the wearing of personal protective equipment. After Defendant announced its mandatory Covid-19 vaccination policy, Mrs. Gray complied with the policy by submitting a religious exemption request stating that she could not accept the vaccine because of her sincerely held religious beliefs.

Gray had sincerely held long-standing religious beliefs that were explicitly stated in her religious exemption request. Gray has stated that she builds faith through the intersection of life's difficult moments. Her narrative drew religious and spiritual equivalence between her declination of unnatural physical manipulations to her body, such as those that would have been required had she received fertility treatments such as artificial insemination and *in vitro* fertilization and the Covid-19 vaccine.

The spiritual nature of Gray's belief is founded upon Psalm 139 that states "I praise you because I am fearfully and wonderfully made." This belief was based upon the foundational belief that God would bless them with children through "natural means." Gray testified that her sincerely

held religious belief prevented her from altering (interfering, changing, interacting) the perfect body that God made as His Temple. As an example, she explained in her religious exemption request that, after prayerful consideration, her and her husband's "faith and personal beliefs did not peacefully allow us to take further steps, such as hormones, artificial insemination, and *in vitro* fertilization," that would have been needed when the manipulations of fertility treatments were explained to them. The "high-tech" fertilization techniques that could have assisted her in conception were unacceptable and violated her sincerely held religious beliefs because they would alter her spiritual image by compelling her body to conceive in an "artificial," or unnatural way, not the way God intended her reproductive system to work. In fact, the Chaplain member of the exemption request committee, Bien-Aime, was sure that such an interpretation of Psalm 139 as an admonition against interfering with God's creation existed and Wadsworth, a member of the appeal committee concurred.

It is this same belief system that prevented Gray from receiving the Covid-19 vaccines that were available at the time of her exemption request because her world view is a religious world view that she looks at through the lens of God and His word. Bien-Aime understood Gray's belief that to use external factors required in artificial conception and accepted that it would violate her belief of God's design for her.

**B**. **Gray Requested a Religious Exemption from Defendant's Covid-19 Vaccination Policy**

Mrs. Gray requested a religious exemption from Defendant's mandatory Covid-19 vaccination policy when she submitted a detailed response to the Defendant's questionnaire. The Defendant ignored the response and instead misapplied a previously created list of criteria to deny her request. In evaluating the religious exemption requests, the Defendant had established criteria that it used as "guiding principles." The "criteria" were actually nothing more than a list of unacceptable

reasons to grant an exemption and whatever fell inside of that list would simply be denied, regardless of what the applicant wrote. Curiously, Burke, a member of the decision-making committee, in stark contrast to others, incredulously testified that not only was such a document not utilized, it did not even exist! Defendant subsequently summarily denied Gray's request, stating it "does not state a basis for why your religious belief requires you to decline the Covid-19 vaccination" without conducting an interactive process meeting.

Deposition testimony has revealed that the exemption committee would ask each other "clarifying questions" and weighed those answers against the guiding principles and what the requestor submitted to make its decision. This process would continue until the committee reached supposed unanimity that effectively excluded any belief that did not conform to the Defendant's criteria or beliefs. Even Bien-Aime and Wadsworth testified that Gray's statements could be interpreted differently than the interpretation reached by both the exemption request and appeal committees, but at no time did anyone from committee seek clarification from Gray about *her* beliefs that were clearly expressed in her religious exemption request. As a result, the committees reached subjective decisions and placed themselves in the role of "spiritual interpreter."[1]

The factual considerations that the committee members relied upon in determining whether a religious belief was sincere are equally, if not more so, inaccurate. In contrast to the opinion of the Defendant's medical expert on the Religious Exemption Committee, Gray consistently explained the connection between her refusal of medically invasive manipulative infertility treatments and the Covid-19 vaccines that contained genetic components that would have interacted with her body to make a foreign protein, not one that God created her to naturally make. When asked whether she understood the science behind the Covid-19 vaccine, Gray replied

---

[1] Courts are not arbiters of scriptural interpretation; and by inference, neither are employers. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981).

"[a]bsolutely" and explained the novel function of the vaccine and their dependence upon genetic components. Burke, in her role as a "medical expert" on the Religious Exemption Committee, parroted that the vaccine did change the physical genetic makeup of an individual as the reason why Gray's request was not valid. *Gray never made that claim!*

At best, the members of the Religious Exemption Committee lacked sufficient sophistication in evaluating Gray's request or, at worst, recklessly disregarded her claims to advance its desired agenda, because they each gave testimony that raised concerns regarding their assessments of Gray's request. These concerns are magnified because the committee failed to perform a factual limited inquiry into Gray's beliefs to clarify the misunderstandings that obviously existed. Papa, Vice President of Human Resources, testified that an exemption request could be denied merely because it mentioned a medical condition, supporting the fact that the committees viewed the "criteria," as absolute and essentially would ignore whatever else an applicant wrote. Although religious beliefs impact medical decisions, the committee considered the mention of a medical condition in an exemption request as inconsistent with a religious belief. Unfortunately, this circuitous subjectivity blinded Papa, and the other members of the Committee in the initial assessment of Gray's religious exemption statements, such that they did not comprehend the belief system that she was expressing.

Burke testified, partially correctly, that in the context of the Covid-19 vaccine, the messenger RNA causes the body to create the foreign spike protein. As clarified by Dr. McCullough, Plaintiff's expert, the unique mechanism of "[t]hese vaccines [is] a dangerous mechanism of action" because they *cause the body to make* (emphasis added) an uncontrolled quantity of the foreign, pathogenic wild-type spike protein." It is this exact fact – the body as made in the image of God making a foreign protein - that is reprehensible to Gray's sincerely held

religious beliefs. Burke finally agreed that both exogenously administered hormones and the injection of genetic material would manipulate the body in a similar way. Burke inaccurately testified that the flu vaccine has the same mechanism of action as the Covid-19 vaccine, further evidencing the naivete of the exemption request committees or their reckless disregard for the religious beliefs of the applicants. This is precisely why Gray could not take the vaccine – it caused her body to create a foreign protein, clearly distinct form the action of the flu vaccine - an action Gray believed  never intended for her by God. Burke's lack of understanding of the science of the Covid-19 vaccine poisoned the views of the committee and exemplifies the biased subjectivity with which Defendant approached the religious exemption requests. Without a doubt, Gray had a sincerely held religious belief.

      The Committee relied upon the Chaplain present to clarify Gray's use of a Bible verse and how it related to her refusing to receive the Covid-19 vaccine. Unfortunately, the Chaplain, the committee member best equipped to assess the spirituality of Gray's exemption request, simply relied upon the assessment of the physician (who was not a vaccinologist) to determine that Gray's exemption was "inaccurate to how the vaccines interact with the body," even though she understood that to do so would go against God's design for Gray.  Even Papa acknowledged that Gray's statement of natural means conception is both religious and scientific and that, for a Chrisitan, God created nature. Papa testified that he does not know if the Bible speaks to the image of God and does not even believe that God has outlined or ordained laws for his followers to abide by. Papa agreed that Gray believed that the spiritual and natural way the body responds is the way God intended for her to live and function and that hormones, artificial insemination, and *in vitro* fertilization  manipulated the body for those who were to be naturally impregnated. Despite some

of the committee members individually understanding Gray's beliefs, the "collective" denied her request because it fit some pre-ordained criteria for denial.

Although Papa testified he did not know if the vaccine actually contained a genetic component, the committee believed that the Covid vaccine did not alter genetic makeup and would therefore lead to a denial of the exemption request. However, when Gray was asked if she was concerned that the genetic components would alter your genes or DNA, she succinctly responded "No." Despite the fact that Gray never averred that her physical genetic makeup was altered, but rather that her spiritual image that God created for her, the Committee imposed its secular views upon her religious exemption request.

Even the actions of the appeal committee exhibited the tunnel vision with which exemption requests were considered. First, the "appeal" was not actually an appeal but rather a "quality assessment" to determine whether the initial deliberation was "applied equitably, fair, consistently" and did not consider any additional information from Gray. This is not an appeal because the exemption request is Gray's and is based upon Gray's spiritual understanding and her sincerely held religious belief. Instead, the "appeal" became an affirmation of the flawed beliefs, based upon scientific misconceptions, of the committee.

First, Teufel, a member of the appeal committee, did not know whether there could be any other understanding of the meaning of Gray's narrative and did not know whether she even considered its spirituality when she summarily dismissed the statement that Gray considered her body to be a temple while nonetheless accepting it as "an acceptable rationale."  She did not know if  vaccines similar to the Covid vaccine existed before 2020 and Teufel could not comment on whether someone could have a religious reason the Covid-19 vaccine would not be acceptable to them. She could offer no example of an exemption ever being granted if it had been termed "bad

science." Teufel admitted that her "read" of Gray's request as "bad science" was what Dr. Stallkamp told her and that if the physician said "[y]es it does alter your genetic makeup . . .then I am sure we would have had a different conversation." As a member of the appeal committee charged with ensuring correct decisions were being made, Teufel woefully lacked critical information and analytic skills and merely parroted the party line.

Wadsworth, another member of the appeals committee, actually understood Gray's religious belief as an alteration of function, not structure. "She's using her beliefs to make a decision and she's going to give you an example of how she did". . . "[H]ormone[s] . . .tell the body, the uterus, or the ovaries . . . to do something different. . .[i]t's going to influence them." Despite her spiritual understanding of Gray's request, Wadsworth hid behind the secular interpretation of others and parroted the disputable fact that "the vaccine does not have genetic components." Wadsworth further parroted that the flu vaccine and Covid vaccine "are similar" and that it would be "unlikely" to get an exemption from one but not the other.

C.  **Granting Gray's Religious Exemption Request Would Not Create an Undue Hardship for the Defendant**

As a threshold matter, the Defendant did not deny Gray's request for a religious exemption because to grant it would be an undue hardship on the employer. It denied it because the "request does not state a basis for why your religious belief requires you to decline the Covid-19 vaccination." In fact, the Defendant disclosed an internal document that indicated her exemption request was denied because it "[d]oes not state or articulate a comprehensive, a long-standing, deeply held belief about ultimate ideas about life, purpose or death. Focused on medical information – fertility." The Defendant only raised an affirmative defense regarding an undue hardship *post hoc* in its Answer to the Complaint to justify its subjective denials of over one hundred religious exemption requests and never considered any possible accommodation for Gray.

The burden is on the employer to demonstrate that the denial of Gray's exemption request was based upon an undue hardship, a burden the Defendant never even considered at the time.

The Defendant's own Covid-19 policy stated that reasonable accommodations included testing, reassignment and additional infection prevention and control measures, among other things. Throughout discovery, the Defendant has failed to produce any evidence to suggest how granting Gray the same accommodations, including routine weekly testing, which were offered to other employees who were granted medical or religious exemptions, would have created an undue hardship on its business operations of their business.

Furthermore, on its very face, the policy appears discriminatory as it states that there may not be a reasonable accommodation that will allow every person with a religious exemption to continue to work onsite while unvaccinated. There is no evidence that Main Line Health did not find acceptable accommodations for everyone to whom it granted a religious exemption. At the very least the Defendant applied it in a discriminatory fashion as people who were granted exemptions, such as the emergency room nurse colleagues of Gray, were offered an accommodation, while the Defendants now incredulously argue Gray would have been denied an accommodation because of an undue hardship because she provided bedside care, just as did those who were granted accommodations.

In fact, Teufel testified that receiving an exemption from the administration of the vaccine was itself an accommodation, as if nothing else was necessary. Teufel testified that the Defendant had a testing program and a masking program for all employees that continued until 2023. Teufel had no knowledge of whether Gray was even asked whether she would be willing to pay for the test had that cost been a concern to the Defendant. There is no logical basis that granting Gray an exemption and using the exact same accommodations would have resulted in a "pandemic surge."

D.   PLAINTIFF'S CLAIMS

A. The Defendant Failed to Accept Gray's Sincerely Held Religious Beliefs

Title VII affirmatively protects all religious beliefs, even beliefs that are not "acceptable, logical, consistent, or comprehensible to others." *EEOC v. Union Independiente De Law Autoridad De Acueductos Y Alcantarillados De P.R.*, 279 F.3d 49,56 (1st Cir. 2002). The proper determination is "whether the beliefs professed by the [employee] are sincerely held and whether they are, in [the believer's] scheme of things, religious." *Fallon*, 877 F.3d at 490-491. Religious beliefs must "address fundamental and ultimate questions having to do with deep and imponderable matters," have a "comprehensive nature,' and be accompanied by "certain formal and external signs." *Fallon* 877 F.3d at 481 *quoting Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981).

However, the Supreme Court has "[r]epeatedly and in many different contexts[2], . . . warned that courts must not presume to determine . . . the plausibility of a religious claim." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014). "Religious experiences which are as real as life to some may be incomprehensible to others. . . When the triers of fact undertake that task (referring to the truth or falsity of religious beliefs), they enter a forbidden domain. *U.S. v. Ballard*, 322 U.S. 78, 86-7 (1944). Neither an employer nor a court may determine whether an employee's beliefs are (or are not) "religion" by questioning "the correctness or even the plausibility" of the employee's understandings. *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 142 (4th Cir. 2017).

EEOC regulation reflects this governing principle:

> "The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee." 29 C.F.R. § 1605.1.[3]

---

[2] *E.g. Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 450 (1969).
[3] See also, EEOC GUIDANCE: "WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS" at § L.2, available at

For a belief to be "religious," it is sufficient if the belief "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *Id*. at 166. The employee "must show that her espoused beliefs. . . stem from religious convictions and have not merely been framed in terms of legal belief so as to gain the legal remedy desired." *Beickert et. al. v. NYC Dept. of Education*, No. 22-CV-5265 (DLI)(VMS) 2023 WL 6214236, at *3-4 (E.D.N.Y. Sept. 25, 2023). As discussed infra, Gray's beliefs are "foundational" and do not permit her to "use a means to alter the immune system that God has given [her]."

### B. The Defendant Failed to Accommodate Gray's Sincerely Held Religious Beliefs

"An employer may not take an adverse action against an . . . employee because of any aspect of that individual's religious observance or practice unless the employer demonstrates that it is unable to accommodate that observance or practice without undue hardship." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 776–777 (2015). The United States Supreme Court has recently refined the parameters of "undue hardship," clarifying the *de minimi*s standard of Hardison,[4] to mean, rather than bearing a *de minimis* cost in granting an accommodation for a religious exemption request, substantial increased costs in relation to the conduct of its particular business. *Groff v. DeJoy*, 143 S. Ct. 2279, 2295 (2023). In order to avail themselves of an undue burden defense, the Defendant must point to affirmative facts in the record that would allow a jury to find "a burden [that] is substantial in the overall context of [the Defendant's] business." *Groff* 143 S. Ct. at 2294. The correct standard is whether granting an accommodation would result in "substantial increased costs for the employer in relation to the conduct of its particular business,"

---

https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeolaws (last accessed 10/6/2023) (noting, as a general rule, that "an employer should proceed on the assumption that a request for religious accommodation is based on sincerely held religious beliefs, practices, or observances.")
[4] *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977). Even if the *de minimis* standard of *Hardison* was still controlling case law, the Defendants have failed to produce evidence sufficient to support that contention.

while "tak[ing] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id*. at 2295. Hardship "attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Id*. at. 2296. To date, both the Fifth Circuit, *Hebrew v. Tex. Dep't of Crim. Just*., 2023 U.S. App. LEXIS 24672, and the Ninth Circuit, *MacDonald v. Or. Health & Sci. Univ*., 2023 U.S. Dist. LEXIS 151070, have followed the Supreme Court's guidance.

If avoidance of the accommodation that would be required is the motive for the denial of the religious accommodation request, an employer violates Title VII. *Abercrombie*, 575 U.S at 773. Even if the defendant proves a business necessity defense, "the plaintiff can overcome it by showing that an alternative policy exist[ed] that would serve the employer's legitimate goals as well as the challenged policy with less of a discriminatory effect." *El v. SEPTA*, 479 F.3d 232, 239 n.9 (3d Cir. 2007)

**II.      RELIEF SOUGHT**

Mrs. Gray respectfully requests relief in excess of $900,000.00 determined as follows:

1. Back pay at the rate of compensation (annualized estimate $ 125,864.34 for 2021) earned while employed by the Defendant minus any earnings subsequently earned. This amount equals $123,222.68 as of April 30, 2024, and does not account for any bonuses, value of benefits, and raises to which she would have been entitled to since her termination.

2. Plaintiff requests future pay at the difference of her rate of compensation while employed by the Defendant and any bonuses, value of benefits, and raises to which she would have become entitled from verdict to full retirement age of 67. This amount is approximately $365,000.

3. Loss of increased pension benefits of approximately $108,000.00.

4. Loss of incremental employer 403(b) contributions of approximately $12,698.00.

5. In lieu of forward pay, Plaintiff requests immediate reinstatement to her previous, or similarly situated, position at terms at least as favorable to those under her previous employment.

6. Punitive damages to be awarded by the Court based upon Defendant's malice and reckless indifference to the federally protected rights of Plaintiff. Defendant has more than 500 employees and is therefore subject to a punitive damage cap of $300,000.00.

7. Interest on the above backpay award and applicable attorney fees and costs.

### III.   EXPERT WITNESS REPORTS AND CURRICULUM VITAE

The expert reports and curriculum vitae of Dr. Peter McCullough and Dr. Akram Boutros have previously been filed .

### IV.   MOTIONS IN LIMINE

There is currently a Daubert motion filed by the Defendant and Plaintiff's response that are before the Court for consideration.

### V.   DEPOSITIONS TO BE USED AT TRIAL

Plaintiff will use deposition testimony in their case in chief, including that of Dawn Gray, Casey Bien-Aime, Dr. Jennifer Burke, Gregory Papa, Pamela Teufel, and Barbara Wadsworth. In addition, Plaintiff will use the video deposition testimony of Dr. Peter McCullough for rebuttal purposes. Plaintiff further reserves the right to use deposition testimony for impeachment purposes and to refresh recollection, in accordance with the Federal Rules of Evidence.

## VI. UNRESOLVED OBJECTIONS TO WITNESSES OR EXHIBITS

Pursuant to the Court's order of February 22, 2024, the parties are to exchange exhibits by 5:00 PM on April 11, 2024.

## VII. PLANNED JOINT STIPULATIONS

At this time, the parties do not have joint stipulations.

## VIII. PROPOSED QUESTIONS FOR VOIR DIRE

The parties are collaborating on proposed *void dire* instructions and shall submit to the Court their respective proposed *voir dire* questions by 5:00 PM April 15, 2024, pursuant to the Court's order dated February 22, 2024.

## IX. PROPOSED JURY INSTRUCTION

The parties have jointly submitted Proposed Request for Charge on April 5, 2024, pursuant to the Court's direction given at the Initial Pre-Trial Conference on February 6, 2024.

## X. PROPOSED VERDICT FORM

Following the Court's ruling on Defendant's Motion *in Limine*, the Plaintiff has revised the previously submitted proposed jury verdict form reflecting those decisions and it is heretofore attached as **Exhibit A.**

Respectfully Submitted,

/s John A. Daller, Esquire
PA No. 329356

Date: April 9, 2024

John A. Daller, Esquire
Daller Law Firm
PO Box 162
510 Pittsburgh Street
Mars, Pennsylvania 16046

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Final Pretrial Memorandum has been filed electronically and thereby making the memorandum available for viewing and download to all counsel of record listed below via the Court's Case Management/Electronic Case Filing system this 9th day of April 2024.

<u>Via electronic case filing system</u>

| | |
|---|---|
| Caren Litvin, Esquire | Brendan Hennessy, Esquire |
| Litvin Law Firm | *Of Counsel* |
| 150 N. Radnor Chester Road | 150 N. Radnor Chester Road |
| Suite F-200 | Suite F-200 |
| Radnor, PA 19087 | Radnor, PA 19087 |
| *counsel for Defendant* | *counsel for Defendant* |
| cl@litvinlawoffice.com | bhennessy@hennessylawfirm.com |

Respectfully Submitted,

Date:   April 9, 2024

John A. Daller, Esquire
PA No. 329356

John A. Daller, Esquire
Daller Law Firm
PO Box 162
510 Pittsburgh Street
Mars, Pennsylvania 16046